**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Joint Administration Requested) |

**DECLARATION OF MOHSIN Y. MEGHJI, CHIEF**
**RESTRUCTURING OFFICER OF WHITTAKER, CLARK & DANIELS, INC.,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mohsin Meghji, hereby declare under penalty of perjury:

**Introduction**

1.      Before 2004, Whittaker, Clark & Daniels, Inc. ("WCD"), Brilliant National

Services, Inc. ("Brilliant"), L. A. Terminals, Inc. ("LAT"), and Soco West, Inc. ("Soco")

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760), Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

(collectively, the "Debtors") or their predecessors in interest operated as processors, manufacturers, and distributors of industrial chemicals. The Debtors ceased all operations in 2004, but continued their corporate existence to manage alleged asbestos and environmental liabilities related to the historical processing and distribution of cosmetic and industrial compounds.

2.      At its zenith in the 1970s and 1980s, WCD operated one of the largest talc and industrial compound supply and distribution businesses in the United States. Substantially all of the Debtors' operational assets were sold to various entities under the umbrella of Brenntag North America ("Brenntag N.A.") in 2004, and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets. The consideration the Debtors received in exchange for these transfers remained on the Debtors' books for purposes of administering and satisfying any outstanding alleged asbestos or environmental liabilities (the "Liabilities").

3.      In December 2007, National Indemnity Company ("NICO") agreed to purchase—and assigned to an affiliated entity, Ringwalt & Liesche Co. ("Ringwalt")—the equity in the Debtors.[2] Since 2007, the Debtors' Liabilities have increased materially as a result of the evolution of the tort litigation landscape. Indeed, since the 2007 acquisition, the talc-asbestos theory of liability has risen to prominence and major talc suppliers have availed themselves of chapter 11 protection, leaving the Debtors as a main litigation target.

4.      Each Debtor has been in existence for at least 40 years and incurred the alleged Liabilities at issue in these cases through their operations before the sale of substantially all of their

---

[2]    NICO and Ringwalt are affiliates of Berkshire Hathaway, Inc. ("BHI"). None of Ringwalt, the Debtors' other indirect parent entities, NICO, or any other BHI affiliate were involved with the Debtors at the time the Debtors were conducting any of the historical business operations that gave rise to the Tort Claims (as defined herein). As a result, there are no allegations that any of these non-Debtor entities ever manufactured, distributed, or possessed any of the products that are the basis of the Asbestos Lawsuits.

operating assets in 2004.  The Debtors are not the result of divisive merger nor any recent strategic corporate reorganization.  Instead, they are the same corporate entities whose historical operations precipitated these chapter 11 cases.  The Debtors have commenced these chapter 11 cases to address and fairly resolve their Liabilities in an effective, efficient, and centralized forum under title 11 of the United States Code (the "Bankruptcy Code").

5.      More specifically, the Debtors commence these chapter 11 cases to address:

- existing and future tort claims alleging various injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest (the "Asbestos Claims," and such claimants, the "Asbestos Claimants"); and

- certain environmental remediation costs and obligations of the Debtors or their predecessors in interest relating to production or handling of hazardous materials which subsequently contaminated certain properties (the "Environmental Claims," and such claimants, the "Environmental Claimants," and together with the Asbestos Claims and Asbestos Claimants, the "Tort Claims" and "Tort Claimants," respectively) in an equitable and efficient manner.

6.      Beginning in the late-2000s, the Debtors have been litigated claims stemming from talc-, asbestos-, and other chemical compound-related liabilities.  In recent years, such claims have engulfed the Debtors in litigation.  There are over 1,000 pending cases naming the Debtors as defendants or co-defendants that allege exposure to asbestos or talc (collectively, the "Asbestos Lawsuits").  The Asbestos Lawsuits are in addition to potentially tens of millions in costs related to Environmental Claims.  The Debtors have been managing an active docket of cases across the United States for close to 40 years—a task that has recently become increasingly cumbersome to manage absent a centralized forum to achieve global resolution for the benefit of all Tort Claimants.

7.      Dispositions of historical Asbestos Claims have varied significantly, from outright dismissal to judgments in excess of $76 million.[3]  Continued prosecution of the Asbestos Lawsuits will burden the Debtors with substantial defense and litigation costs, depleting resources and delaying or limiting recoveries to any legitimate claimants for years to come.  The Debtors are currently incurring up to $1,000,000 in defense costs monthly in connection with the Asbestos Lawsuits.  The Debtors anticipate that litigation of Asbestos Claims could consume an enormous amount of the Debtors' remaining resources with unpredictable and potentially unfairly preferential outcomes for the Asbestos Claimants.  The commencement of these chapter 11 cases is necessary and appropriate for these reasons.

8.      On March 10, 2023, following a recent jury verdict returned against WCD in excess of $29 million, a state court in South Carolina appointed a receiver over WCD.  But WCD possesses no assets in South Carolina.[4]  On April 18, 2023, in a bench ruling the state court denied WCD's motion to reconsider.  And on April 19—despite the absence of any written order—the receiver demanded privileged documents from attorneys representing WCD and filed a complaint in the South Carolina state court.  WCD disputes the validity and enforceability of the receivership order.

9.      In light of these recent developments, and the fact that the Debtors are currently defendants in lawsuits across more than 30 different jurisdictions, the benefits of chapter 11 and the Court as a centralized federal forum cannot be overstated.  In fact, counsel to the plaintiff in

---

[3]    *See, e.g.*, *Calif. Jury Awards Talc Plaintiff $76 Million; Case Settles Before Punitives Phase*, HarrisMartin (Dec. 16, 2021), https://www.harrismartin.com/publications/1/asbestos/articles/28555/calif-jury-awards-talc-plaintiff-76-million-case-settles-before-punitives-phase/#:~:text=OAKLAND%2C%20Calif.,plaintiff's%20risk%20of%20developing%20cancer.

[4]    *See* Order on Plaintiffs' Motion to Appoint a Receiver, *Plant v. Avon Prods., Inc.*, No. 2022-CP-40-01265 (S.C. March 10, 2023).

the South Carolina action gave a statement to Reuters after the verdict: "I just hope we can figure out a better way than having juries resolve (cases) every time."[5] The Debtors agree. The Debtors will seek to work with claimants' counsel by and through any tort claimants committee and future claims representative appointed in these chapter 11 cases and engage in rapid good faith negotiations. The Debtors' assets are truly a melting ice cube from which all claimants—both current and future—must recover fairly and equitably. There is simply no other Court that would have the jurisdictional power to administer the assets of the Debtors' estates and provide a global, equitable, and efficient resolution for all Tort Claimants.

10.      The Debtors intend to use the breathing spell and other tools afforded by chapter 11 of the Bankruptcy Code to establish a claims trust or trusts, as applicable, consistent with the requirements of sections 524(g) and 105(a) of the Bankruptcy Code, and ultimately seek approval of a settlement as part of a chapter 11 plan. The Debtors seek to most efficiently administer their remaining assets to maximize recoveries for claimants. Resolving the Debtors' Liabilities in a comprehensive manner through a claims trust or trusts will be the most efficient and equitable use of resources, expenses, and time and will inure to the benefit of all stakeholders—including both present and future Tort Claimants.

### Background

11.      I am the Chief Restructuring Officer of the Debtors and a Managing Partner of M3 Partners, LP ("M3 Partners"), the Debtors' proposed restructuring advisor.

12.      I submit this declaration to assist the Court and parties in interest in understanding the circumstances that resulted in the commencement of these chapter 11 cases, and in support of

---

[5]      Brendan Pierson, *Talc Supplier Hit With $29 mln Verdict in South Carolina Trial*, Reuters (Mar. 6, 2023), https://www.reuters.com/legal/talc-supplier-hit-with-29-mln-verdict-south-carolina-trial-2023-03-06.

the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code filed on the date hereof (the "Petition Date") and related motions and pleadings seeking "first day" relief (collectively, the "First Day Motions").

13.    As Chief Restructuring Officer, I am generally familiar with the Debtors' historical businesses, financial condition, policies and procedures, claims management operations, and books and records.  The statements in this declaration are based upon my personal knowledge, information obtained from my colleagues at M3 Partners under my ultimate supervision or from the Debtors' other advisors, or my review of relevant documents and information concerning the Debtors' financial affairs.  The Debtors have authorized me to submit this declaration (this "Declaration") on their behalf.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

14.    Contemporaneously herewith, the Debtors are filing the First Day Motions to ensure a smooth transition into chapter 11.  I am familiar with the contents of each First Day Motion and believe that the relief sought therein (a) is necessary to enable the Debtors to manage the Tort Claims fairly and efficiently in these chapter 11 cases, (b) constitutes a critical element in achieving successful confirmation of a chapter 11 plan, and (c) best serves the Debtors' estates and the interests of the Debtors' stakeholders.  The facts set forth in each First Day Motion are incorporated herein by reference.  I submit this Declaration to assist the Court and parties in interest in understanding the background for these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and First Day Motions.

15.    To familiarize the Court with the Debtors and the circumstances leading to these chapter 11 cases, I organized this Declaration as follows:

- **Part I** provides an overview of the Debtors' corporate history and structure;

- **Part II** describes the circumstances leading to the commencement of these chapter 11 cases and the Debtors' objectives for these chapter 11 cases; and

- **Part III** summarizes the relief requested in and the evidentiary support for the First Day Motions.

I.    **Overview of the Debtors' History and Governance.**

16.    The Debtors and their predecessors in interest were formed as early as 1918 and continued their operations through the mid-2000s.  Debtors WCD, Soco, and LAT are direct or indirect subsidiaries of Brilliant.[6]  From the time of their formation until substantially all of the Debtors' operational assets were sold, the Debtors' businesses consisted of storage, and distribution of minerals and pigments, including talc, industrial chemicals, and solvents, as applicable.

17.    WCD was formed and began its operations as a supplier and distributor of minerals and pigments in New York in 1918.  In 1972, WCD reincorporated in New Jersey.  Brilliant (then named Brenntag Inc.), purchased the stock of WCD in 1988.  The operational assets of WCD were divested in 2004, as discussed further below, and the Debtors' current business activities largely relate to the management of alleged Tort Claims asserted against WCD.

18.    Soco's pre-2004 operations began as early as 1933, with the formation and incorporation of A.J. Lynch Co. ("A.J. Lynch"), which sold and distributed chemicals and raw materials to the paint industry.  Over multiple decades and through a series of strategic mergers and acquisitions and corporate name changes, Soco's historical operations expanded to include those of:

- Western Chemical & Manufacturing Co. ("Western Chemical"), which manufactured and distributed industrial chemicals and was incorporated in California in 1944;

---

[6]    An illustrative organizational chart is attached hereto as **Exhibit B**.

- Dyce Chemical Inc. ("Dyce Chemical"), which repackaged and distributed industrial chemicals and was incorporated as Dyce Sales & Engineering Service Co. in Montana in 1957;

- Crown Chemical Corp. ("Crown Chemical"), which sold and distributed industrial chemicals and was incorporated as Petrosolve Corp. Ltd. in California in 1969; and

- Holchem Inc. ("Holchem"), which distributed chemicals and handled and recycled solvents and was incorporated in California in 1981.

By 2001, after the culmination of various mergers, acquisitions, and name changes, A.J. Lynch, Western Chemical, Dyce Chemical, Crown Chemical, and Holchem became Brenntag West, Inc. ("Brenntag West"), an indirect subsidiary of Stinnes Corporation ("Stinnes").

19.    LAT was formed and began its operations importing and storing industrial chemicals in 1981.  Specifically, LAT operated a chemical storage and distribution terminal and bulk plant located within the Los Angeles Harbor.  LAT ceased its storage and distribution operations in 1994 and has largely resolved its Liabilities through ordinary course claims management.  By 2001, through a series of stock purchases, LAT became a direct subsidiary of Stinnes.

20.    Brilliant was formed and began its operations in 1977 as Stinnes Oil & Chemical Company, Inc. ("Stinnes Oil & Chemical").  Stinnes Oil & Chemical was a subsidiary of Stinnes, and by 1982, Stinnes Oil & Chemical withdrew from the oil business and concentrated its business on the marketing, distributing, and trading of chemicals.  Stinnes Oil & Chemical changed its name twice:  first to Soco Chemical Inc. in 1986, and then to Brenntag Inc., a direct subsidiary of Stinnes, in 1998.[7]

---

[7]    In 1995, Brenntag Inc. purchased the stock of Eastech Chemical Inc. ("Eastech"), which sold and distributed specialty chemicals.  Eastech was dissolved in 2008, the last lawsuit associated with Eastech was dismissed in 2012, and there are currently no known liabilities associated with Eastech.

21.     As of 2004, the Debtors were owned by Stinnes, an affiliate of Deutsche Bahn AG. In 2004, substantially all of WCD, Soco, and Brilliant's operating assets were sold to entities under the umbrella of Brenntag N.A., and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "2004 Transactions").  LAT was not involved in the 2004 Transactions, as it had previously ceased all operations.

22.     More specifically, in 2004, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 Soco APA"), Soco (then named Brenntag West, Inc.) divested substantially all of its assets in exchange for approximately $44 million and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc.  Pursuant to the 2004 Soco APA, Soco retained all liability for the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real estate.  Following these transactions, on March 8, 2005, Soco changed its name from Brenntag West, Inc. to Soco West, Inc.

23.     Simultaneously, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 WCD APA"), WCD divested substantially all of its assets in exchange for approximately $15.9 million and the assumption of certain ongoing liabilities by the purchaser, Mineral & Pigment Solutions Inc.  Pursuant to the 2004 WCD APA, WCD retained all liabilities as to the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real property.

24.     Together with the execution of the 2004 Soco APA and the 2004 WCD APA, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "Brilliant APA," and together with the 2004 WCD APA and the 2004 Soco APA, the "2004 Transaction Documents"), Brilliant (then named Brenntag Inc.) engaged in an asset sale transaction with

Brenntag N.A.  In connection and concurrently with this transaction, Brilliant terminated certain management fee agreements, resigned from certain LLC agreements, and divested its intellectual property assets in exchange for assumption of certain non-asbestos-related and non-environmental ongoing liabilities by Brenntag N.A., in addition to certain other consideration and that consideration provided under the 2004 WCD APA and 2004 Soco APA.  Contemporaneously with the execution of the 2004 Brilliant APA, Brilliant changed its name from Brenntag Inc. to Brilliant National Services, Inc.

25.    The consideration the Debtors received under the 2004 Transaction Documents remained on the Debtors' books to satisfy the anticipated Liabilities.

26.    In 2007, NICO entered into an agreement to purchase the Debtors from Stinnes pursuant to that certain stock purchase agreement dated November 7, 2007 (the "2007 SPA"). Pursuant to the 2007 SPA, Stinnes agreed to certain post-closing purchase price adjustments payable to NICO up to $45 million, based on the amounts (a) paid and (b) "incurred but not reported" with respect to the asbestos and environmental liabilities retained by the Debtors (such provisions, the "Purchase Price Adjustment Provisions").[8]  Pursuant to an assignment agreement dated December 12, 2007, NICO assigned its right to receive the Debtors' equity interests to Ringwalt, which remains the direct parent of Brilliant (and the indirect parent of the other Debtors) today.

27.    Since 2008, certain administrative and shared services have been performed by NICO and National Liability & Fire Insurance Company ("NLF"), pursuant to those certain intercompany service agreements dated July 21, 2008, and May 9, 2008, respectively (collectively,

---

[8]    On March 1, 2023, pursuant to and in compliance with the Purchase Price Adjustment Provisions, NICO submitted a reimbursement request to Stinnes in the amount of $45 million.

the "Shared Services Agreements"). Pursuant to the Shared Services Agreements, NICO and NLF make available or otherwise provide, among other facilities and services reasonably necessary to the conduct of the Debtors' claims management operations, certain data processing equipment, business property, and claims services to the Debtors. The Debtors retain independent control and management of their businesses, and there is no commingling of funds among NICO, NLF, on one hand, and the Debtors on the other hand, under the Shared Services Agreements or otherwise.

28.    For nearly 20 years, the Debtors have had no chemical processing or distribution operations (outside of business operations related to management of the Liabilities), no employees, no funded third-party debt, and minimal assets aside from cash and certain insurance receivables. Since the 2007 SPA, the Debtors have not issued dividends or distributions to Ringwalt or any of its other indirect parent entities. The Debtors have carefully managed and invested their assets and have achieved significant realized and unrealized investment gains on their asset portfolio since 2007. These gains have allowed the Debtors to pay out significantly more in settlements and judgments on the Liabilities than the assets on their balance sheets at the time of the 2007 SPA.

29.    The only changes to the Debtors' corporate structure since the 2007 SPA occurred in 2008, when: (a) LAT, which was originally a direct subsidiary of Ringwalt and a corporate sibling to Brilliant, became a direct subsidiary of Brilliant; and (b) WCD, which was originally a direct subsidiary of Brilliant and a corporate sibling to Soco, became a direct subsidiary of Soco. In short, these chapter 11 cases, and the Debtors' Liabilities are not the result of a "two-step." The Debtors' status as entities with finite assets and no operations beyond those associated with the management of the Liabilities is the result of natural corporate evolution and a series of arm's-length transactions over the past 20 years.

11

## II.    Circumstances Leading to These Chapter 11 Cases and the Debtors' Objectives.

### A.    Historical Asbestos Litigation Arising from the Debtors' Talc and Chemical Compound Businesses.

30.    Plaintiffs first began alleging in 1979 that the Debtors' chemical processing and distribution operations were causally related to their asbestos-related injuries.  The Debtors have been sued by approximately 2,700 individual Asbestos Claimants, under numerous theories of tort liability, generally alleging exposure to asbestos- and talc- containing compounds and products arising from the Debtors' historical processing and distribution of cosmetic and industrial talc.  The Debtors have been subject to a deluge of cases and have seen increasingly large verdicts in the last 24 months.

31.    Each of these lawsuits have presented unique facts, circumstances, and allegations.  While these lawsuits have contained common allegations of asbestos or talc exposure and related injuries, they have involved plaintiffs who assert claims in different venues across the United States based on exposure to different products, sold by different companies, at different times.  Because of these litigation burdens, hurdles, and expenses, the Debtors have historically sought alternative ways to resolve asbestos and other litigation related to their historic chemical processing and distribution operations short of taking cases to trial, irrespective of the underlying merits of the claims.  As of the Petition Date, the Debtors have managed to settle approximately 1,696 Asbestos Claims.  During the five-year period ending December 31, 2022, approximately 1,700 asbestos- or talc- related lawsuits were asserted against the Debtors.  Since 2008, the Debtors have remitted approximately $213 million in payments related to Asbestos Claims.

32.    For the Debtors to defend against each of these cases, it must assess hundreds of different health profiles and medical situations.  Each case requires fact and expert analysis and discovery regarding events that occurred decades ago.  Moreover, approximately 100–200 new

Asbestos Claims are filed against the Debtors each year.  Litigating each case is extremely costly and time-consuming.  Moreover, the value of the Debtors' assets, including their applicable insurance policies, is expected to be dwarfed by the Debtors' outstanding Liabilities.

> **B.**  **Historical Environmental Litigation Arising from the Debtors' Talc and Chemical Compound Businesses.**

33.    Federal and state governmental entities and plaintiffs have pursued actions or brought claims against the Debtors alleging that the Debtors produced and handled hazardous materials that subsequently contaminated approximately 32 properties across at least 14 states. These properties historically housed the Debtors' or their predecessors' historical chemical processing and distribution operations, including legacy solvent recovery, reclamation, and recycling; chemical storage, treatment, and distribution; and waste transfer activities.

34.    The Debtors have actively engaged with both federal and state governmental entities with respect to responding to, investigating, monitoring, and remediating the alleged contamination on these properties.  Of the approximately 32 properties, ten are in the remediation process, three are undergoing ongoing investigation, six are subject to continued monitoring, maintenance, or other operations, seven have been resolved, and six are engaged in other processes, including continued correspondence with U.S. Environmental Protection Agency.  Two properties—one located in Longview, Texas, and another in Pacoima, California—previously operated by the Debtors' predecessors, are in the process of preparing for closure with expected site closures in 2023 and early 2024, respectively.  As of December 31, 2022, the Debtors' accounting records reflect approximately $54.5 million of remediation, monitoring, investigation, and other environmental liabilities, on a GAAP basis, brought by federal and state government entities related to these properties.  Since 2008, in the aggregate, the Debtors have remitted approximately $123 million in payments related to Environmental Claims.

C.      **Decision to Commence These Chapter 11 Cases.**

35.      The Debtors' decision to commence these chapter 11 cases is a result of a lack of any alternative mechanism to efficiently and equitably address their alleged Liabilities.   The continuing influx of Asbestos Claims and recent judgments have made clear that it is nearly impossible for the Debtors to obtain finality with respect to the Asbestos Claims and Environmental Claims, absent these chapter 11 cases.

36.      Further, certain recent developments arising from the growing number of claimants pursuing talc manufacturers in the United States, including the significant increase in settlement demands with respect to cosmetic talc claims in the wake of recent verdicts such as those rendered against Johnson & Johnson, have threatened to swiftly exhaust the Debtors' remaining assets, leaving the universe of potential future claimants without any remaining assets from which to collect.[9]  The Debtors have become a main target for claimants asserting asbestos- and talc- based claims

37.      For example, a jury in South Carolina recently returned a verdict against WCD exceeding $29 million (the "Plant Verdict," and such action, the "Plant Action").[10]  Following the Plant Verdict, the plaintiffs filed a motion to appoint a receiver with the Richland County Court of Common Pleas on March 6, 2023 (such court, the "South Carolina State Court," and such motion, the "Plaintiffs' Receiver Motion").  The same day WCD received notice of the Plaintiffs' Receiver Motion, WCD informed the South Carolina State Court that it intended to file an opposition and

---

[9]      *See, e.g.*, Tim Povtak, *U.S. Supreme Court Rejects J&J Appeal of $2 Billion Talc Verdict*, Asbestos.com (June 2, 2021), https://www.asbestos.com/news/2021/06/02/johnson-johnson-supreme-court-talc/.

[10]     *See* Order on Plaintiffs' Motion to Appoint a Receiver, *Plant v. Avon Prods., Inc.*, No. 2022-CP-40-01265 (S.C. March 10, 2023) (the "Receivership Order").

requested a hearing.  Before WCD had an opportunity to respond and without holding a hearing, the South Carolina State Court entered the Receivership Order on March 10, 2023.

38.     The South Carolina State Court ordered the appointment of a receiver over WCD (the "Receiver"), notwithstanding that WCD has no assets in South Carolina.  In so doing, the South Carolina Court stated that the assets available to WCD have been precipitously reduced, WCD is currently set for numerous trials, and WCD is, "at bare minimum, in imminent danger of insolvency."[11]

39.     The Receivership Order provided that WCD could file a motion to reconsider, which WCD filed on March 16, 2023 (the "Reconsideration Motion").  A hearing for WCD's motion was set for April 18, 2023.  In its Reconsideration Motion, WCD disputes many of the assertions made by the plaintiff in the Plant Action and adopted by the South Carolina State Court in its Receivership Order, as well as the authority of the South Carolina State Court to appoint a South Carolina state receiver over a corporation that is incorporated in New Jersey and has no assets located in South Carolina.  In addition to the $29 million verdict, the litigation and defense costs associated with the Plant Action are significant.  This is just one action of the hundreds currently pending against the Debtors.

40.     Litigation costs continue to drain the Debtors of resources that could be more efficiently allocated to a trust designed to process claims in a single forum and get money into the hands of legitimate claimants on a far more expedited basis than can be accomplished through sequential, expensive trials.  All without the attendant risk of disparate judgments among Asbestos Claimants across the country.  Indeed, section 524(g) of the Bankruptcy Code provides such an

---

[11] *See* Receivership Order, at 2.

effective, efficient, and equitable mechanism for the Debtors to address their Liabilities in a single forum.

### D.    Corporate Governance Changes.

41.    In connection with evaluating potential strategic alternatives to address the Liabilities, the Debtors appointed Paul Aronzon and Tim Pohl (together, the "Disinterested Directors") to their boards of directors (the "Boards"). Messrs. Aronzon and Pohl are experienced independent board members with no prior affiliations with the Debtors or their non-Debtor affiliates. The Disinterested Directors have been delegated broad decision-making authority with respect to matters that may constitute a conflict between the Debtors and their non-Debtor affiliates. The Debtors also engaged advisors—including Kirkland & Ellis LLP and Cole Schotz P.C. as legal counsel, M3 Partners as restructuring advisor, and appointed me as Chief Restructuring Officer—to advise the Boards with respect to the Tort Claims, including through a potential chapter 11 process.

### E.    Objectives of the Debtors' Chapter 11 Cases.

42.    The evolving litigation landscape (informed by the recent blockbuster verdicts), the defense and administrative costs associated with nationwide simultaneous litigation, and the South Carolina State Court's Receivership Order has placed the Debtors' assets at immediate risk of full and final depletion. This risk unfairly favors some plaintiffs at the expense of others—by either luck of the draw or their presence in a specific venue. There is no funding agreement nor any debtor-in-possession financing in these chapter 11 cases. The Debtors have limited cash-flow stemming from insurance proceeds in connection with its liability management operations, and the Debtors' resources are finite.

43.     The Debtors' goal in these chapter 11 cases is to negotiate and ultimately confirm a plan that would, among other things, establish and fund claims trusts to resolve current and future Liabilities pursuant to sections 524(g) and 105(a) of the Bankruptcy Code.  The Debtors believe they have sufficient assets (a) to fund claims trusts that will be governed by procedures that efficiently and fairly review claims and compensate current and future claimants, and (b) to otherwise satisfy the requirements necessary to qualify for section 524(g) and section 105(a) relief.

44.     The Debtors hope to reach a consensual resolution of these chapter 11 cases with representatives for current and future claimants as soon as their representatives are in position and willing to begin discussions.  The Debtors are prepared to promptly engage in good-faith negotiations with any tort claimants committee and future claimants' representative appointed in these cases.  The Debtors also plan to file a motion in the near term to schedule an estimation trial to determine the Debtors' Liabilities, utilizing key tools of the Bankruptcy Code in the event the parties are unable to reach a settlement.

## III.     Evidentiary Support for the First Day Motions.

45.     Contemporaneously with the filing of this Declaration, the Debtors have filed the First Day Motions, seeking relief intended to facilitate to minimize the adverse effects of the commencement and ensure the efficient administration of these chapter 11 cases.

46.     Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to preserve value for the Debtors' estates and their stakeholders.  I have reviewed each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and ultimately consummate a chapter 11 plan.  A list of the First Day Motions is set forth on **Exhibit A** attached hereto and is incorporated herein by reference.

## IV.    Conclusion.

47.    I am cautiously optimistic about the Debtors' ability to achieve a consensual resolution to address the Debtors' outstanding and future Liabilities efficiently and equitably.

48.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated:  April 27, 2023                    */s/ Mohsin Meghji*
                                          Mohsin Meghji
                                          Chief Restructuring Officer
                                          Brilliant National Services, Inc.


*[Remainder of page intentionally left blank.]*

## Exhibit A

**First Day Motion Support**

## Evidentiary Support for First Day Motions

1.      Contemporaneously with the filing of this Declaration, the Debtors have filed the

First Day Motions, seeking orders granting various forms of relief intended to facilitate to

minimize the adverse effects of the commencement of these chapter 11 cases and ensure the

efficient administration of these chapter 11 cases.  The First Day Motions include the following:

- **Joint Administration Motion.**  *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;*

- **Notice and Claims Agent Motion.**  *Debtors' Application for Appointment of Stretto as Claims and Noticing Agent;*

- **Schedules/SOFAs Extension Motion.**  *Debtors' Motion for Entry of an Order (I) Extending Time to File Certain Schedules and Statements of Financial Affairs, and (II) Granting Related Relief;*

- **Case Management Motion.**  *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief;*

- **Creditor Matrix Motion.**  *Debtors' Motion For Entry of an Order (A) Authorizing the Debtors to (I) File a List of the Top Law Firms and Use the Addresses of Counsel in Lieu of Claimants' Addresses and (II) Redact Personally Identifiable Information, (B) Approving Certain Notice Procedures, and (C) Granting Related Relief; and*

- **Cash Management Motion.**  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Operate Their Cash Management System, (B) Use Their Bank Accounts, and (C) Perform Intercompany Transactions; (II) Authorizing the Debtors' Bank to Charge Certain Fees; and (III) Granting Related Relief.*

2.      These First Day Motions seek authority to, among other things, ensure the

continuation of the Debtors' cash management system, which I believe is essential to fund the

Debtors' expenses in these chapter 11 cases.  I believe that the relief requested in the First Day

Motions is also necessary to allow the Debtors to achieve an immediate and orderly transition into

chapter 11, successfully and efficiently negotiate a consensual plan, and successfully complete

these chapter 11 cases.

3.      I am familiar with the content and substance contained in each First Day Motion. The factual statements contained in each First Day Motion are true and correct to the best of my knowledge, information, and belief, and each such factual statement is incorporated herein by reference.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to efficiently navigate these chapter 11 cases, constitutes a critical element in successfully resolving the Debtors' Liabilities, and best serves the Debtors' estates.

## Exhibit B

**Organizational Chart**

