| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>          rswitkes@shermansilverstein.com<br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* | **COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email: cspeckhart@cooley.com<br>          mklein@cooley.com<br>          elazerowitz@cooley.com<br>          jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005<br>Tel: (202) 862-5000<br>Email: kmaclay@capdale.com<br>          tphillips@capdale.com<br>          sconcannon@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>          Debtors. | Case No. 23-13575 (MBK)<br><br>Chapter 11<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

### THE OFFICIAL COMMITTEE OF TALC CLAIMANTS' OBJECTION TO THE AD HOC COMMITTEE'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN <u>OFFICIAL COMMITTEE OF UNSECURED COMMERCIAL CREDITORS</u>

The Official Committee of Talc Claimants (the "**TCC**") of Whittaker, Clark & Daniels,

Inc. and its affiliated debtors and debtors-in-possession in the above-captioned case (collectively,

the "**Debtors**"), hereby submits this objection (the "**Objection**") to the *Ad Hoc Committee's*

*Motion for an Order Directing the Appointment of an Official Committee of Unsecured*

*Commercial Creditors* [Docket No. 854] (the "**Motion**").[1]   In support of this Objection, the

Committee respectfully represents as follows:

<div align="center">

**PRELIMINARY STATEMENT**

</div>

1.      Nearly ten months after the UST initially declined to form a GUC Committee, the

Ad Hoc Committee seeks the court-ordered appointment of an additional estate fiduciary to

represent the interests of a small cohort of non-tort unsecured claimants consisting almost

exclusively of professional firms that represent the Debtors in talc litigation pending in the state

court system.  The relief requested is not necessary to ensure adequate representation of this small

special interest group in these chapter 11 cases.  And given the Ad Hoc Committee member's

ethical obligations and duties of loyalty and confidentiality to the Debtors who remain their clients,

the Ad Hoc Committee's members are exceedingly poor candidates to serve as estate fiduciaries.

As such, and for the reasons more fully discussed below, the Ad Hoc Committee has failed to meet

its extraordinary burden under section 1102(a)(2) and the Motion should be denied.

2.      The relief requested in the Motion is predicated on the Ad Hoc Committee's

misguided belief that Professional Services Creditors (as defined below) are entitled to their own

statutory committee merely because non-tort unsecured creditors exist in these cases.  As the plain

language of section 1102(a)(2) and the cases cited herein make clear, the appointment of an

additional official committee by court order (and the implicit overriding of the UST's decision-

---

[1]      Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

<div align="center">1</div>

making) is appropriate *only* when the unique and specific nature of a bankruptcy case mandates the formation of an additional committee to ensure the adequate representation of an otherwise disenfranchised interest group.  The Ad Hoc Committee fails to present *any* evidence in support of its generalized allegations that the interests of the Ad Hoc Committee—whose claims represent a tiny fraction of the overall creditor body—are not being accounted for as the Debtors and the TCC administer these chapter 11 cases.  The absence of any such evidence alone warrants denial of the Motion.

3.      Nonetheless, the Court can take judicial notice of the substantial record before it of the zealous efforts of the TCC and the FCR to maximize value of the estates for the benefit of all stakeholders.  While those efforts have taken various forms, there can be no doubt that no creditor group has been left on the sideline.  In particular, the tireless efforts of the TCC to investigate the convoluted web of prepetition transactions that led to the indirect ownership of the Debtors' shell companies by Berkshire Hathaway, the complex multi-party indemnification claims owed to and by the Debtors' current and previous owners, and the myriad of potentially applicable insurance policies that could be available to satisfy creditor claims, confer material benefits on all of the estates' creditors and increase the likelihood that these cases will conclude with the largest pool of funds possibly available to satisfy the claims of all unsecured creditors.  The inclusion of a statutory committee to represent Professional Services Creditors will not enhance that effort in any way.

4.      Moreover, the unfortunate timing of the Motion also supports its denial.  If the Ad Hoc Committee possessed a legitimate interest in the cases that needed special representation, then it should have filed its motion in May 2023 (when the UST first declined to form a GUC Committee) or in October 2023 (when the UST rejected its second request for committee

formation).  Appointing a GUC Committee now would only impose additional cost, delay, and disruption at a crucial moment in these cases, as the parties stand poised to make significant progress in a mediation overseen by former Judge Gerber that includes the Debtors, the TCC, the FCR, Brenntag, Deutsche Bahn, and the Berkshire Hathaway entities.  Adding an additional committee into that mix on behalf of a constituency that constitutes less than 1% of the Debtors' estimated claims pool is unwarranted absent compelling evidence that doing so would provide cognizable benefit to the Debtors' estates.  Because the Ad Hoc Committee cannot make such a showing, the Motion should be denied.

## **RELEVANT BACKGROUND**

5.      For nearly 20 years, the Debtors have been shell entities with no operations, no employees, and no funded third-party debt.  *See* Docket No. 5 (the "**Meghji Decl.**") ¶ 28.  Since 2004, the Debtors' only function has been defending against lawsuits arising from the devastating health and environmental impacts of their historic operations processing and distributing cosmetic and industrial compounds.  *Id.* ¶ 2.

6.      On April 26, 2023 (the "**Petition Date**"), the Debtors commenced these chapter 11 cases with the stated goal of confirming a plan that would "establish and fund claims trusts to resolve current and future [asbestos and environmental liabilities] pursuant to sections 524(g) and 105(a) of the Bankruptcy Code."  *Id.* ¶ 43.

7.      On April 27, 2023, the Debtors filed a motion seeking entry of an order authorizing the Debtors to, among other things, and in lieu of Bankruptcy Rule 1007(d)'s requirement to file a list of the Debtors' twenty largest unsecured creditors, file a consolidated list of the top fifteen law firms representing the largest numbers of claimants asserting talc, asbestos, and other tort claims against the Debtors.  *See* Docket No. 8 ¶ 1 (the "**Rule 1007(d) Motion**").  In support, the

3

Debtors cited "the nature of the Debtors' restructuring," including (a) that the "overwhelming majority of claims against the Debtors in these chapter 11 cases originate from over one thousand lawsuits alleging exposure to asbestos-containing products manufactured by the Debtors (the 'Asbestos Lawsuits')"; (b) that the "majority of the Debtors' known contingent creditors are Tort Claimants in the Asbestos Lawsuits, and the other known unsecured claims against the Debtors consist primarily of potential environmental claims"; (c) the "**relatively limited number of non-tort-related unsecured claims in these chapter 11 cases**"; and (d) the Debtors' belief "that it is in the best interests of their estates and their creditors . . . to produce a Top Counsel List instead of a Top Twenty List [of unsecured creditors]." *Id.* ¶¶ 6–7, 9 (emphasis added).

8.      On May 8, 2023, the Court entered an interim order that, in addition to granting the Rule 1007(d) Motion, and at the request of the UST, required the Debtors to file a consolidated list "of the twenty creditors, excluding insiders, with the largest unsecured claims against the Debtors other than asserted Tort Claims." *See* Docket No. 69 ¶ 5.  On May 10, 2023, the Debtors filed a consolidated list of their twenty largest unsecured non-tort claimants, comprised solely of professional services firms that helped the Debtors defend against talc claims filed against the Debtors before the Petition Date.  *See* Docket No. 81; *see also* Motion, Ex. A at 1.

9.      On May 24, 2023, the UST appointed the Official Committee of Talc Claimants. *See* Docket No. 121.  The TCC includes the following members: Kathy Ripley Didawick (on behalf of Ann Ripley), Blue Cross Blue Shield Association, Katia Figueroa, Virginia Harrington, Juliet Gray, Sandra Jankowski (individually and on behalf of Leo Jankowski), Sarah Plant, Tara Valentine (on behalf of Patricia Krempecki), and Shelly Yerkes.

10.      According to the Motion, the UST also solicited interest in forming an official committee of non-talc general unsecured creditors.  *See* Motion ¶ 18.  Certain non-talc creditors

4

298726762

indicated their willingness to serve on an official committee, but the UST ultimately decided not to appoint a committee of non-talc creditors.  *Id.* ¶ 19.

11.     On October 20, 2023, the Ad Hoc Committee sent a letter to the UST requesting appointment of a GUC Committee.  *See* Motion, Ex. A.  Several days later, the UST informed the Ad Hoc Committee that its request was declined.  *See id.*, Ex. B.

12.     On February 16, 2024—nearly 10 months after these cases were commenced—the Ad Hoc Committee filed the Motion, seeking entry of an order directing the UST to appoint an additional committee comprised of "non-tort/non-environmental unsecured commercial creditors" ("**Professional Services Creditors**").  *See* Motion ¶ 2 n.4.  The nine-member Ad Hoc Committee includes eight law firms and one consultant "that were retained prior to the Debtors' chapter 11 bankruptcy filing to defend the Debtors in connection with talc claims filed against the Debtors." *Id.* at 1 n.2.  According to the Ad Hoc Committee, Professional Services Creditors are "owed over $14 million." *Id.* ¶ 20.

13.     The Debtors' schedules identify that many members of the Ad Hoc Committee are parties to executory contracts with the Debtors, including engagement letters and consulting services agreements.  *See* Docket No. 134, Schedule G.  Certain of these and other Ad Hoc Committee members also received payment from the Debtors totaling more than $3 million in the 90-day period prior to the Petition Date.  *See id.*, at 357.

14.     Members of the Ad Hoc Committee played a major role in representing the Debtors in talc litigation prior to the Petition Date:

- Fox Rothschild, LLP represented the Debtors in the action captioned *Sarah J. Plant and Parker Plant v. Avon Products, Inc., et al.*, C/A No. 2022-CP-40-1265 (S.C. C.P.) (the "**Plant Action**") and litigated the Debtors' motion to reconsider and vacate the receivership order that immediately preceded the Debtors' bankruptcy filing.  *See, e.g.*, Docket No. 157, Ex. 5 at 15.

5

- Lathrop GPM LLP was involved in correspondence with the court-appointed receiver (the "**Receiver**") in the Plant Action. *See id.*, Ex. 14.

- McGivney, Kluger, Clark & Intoccia, P.C. is national coordinating counsel for the Debtors and also corresponded with the Receiver prior to the Petition Date. *See, e.g., id.*, Ex. 4.

## **ARGUMENT**

**I.    Appointment of a Second Statutory Committee Is Only Appropriate Under Exceptional Circumstances and Only Upon a Showing of Rare Necessity**

15.     Section 1102(a)(1) of the Bankruptcy Code requires the UST, "as soon as practicable after the order for relief under chapter 11," to appoint a committee of creditors holding unsecured claims and permits the UST to appoint additional committees of creditors as the UST deems appropriate.  11 U.S.C. § 1102(a)(1).  Here, the UST fulfilled its obligation under section 1102(a)(1) when it formed the TCC.  *See* Docket No. 121 at 1.

16.     Once the UST appoints an official committee (or committees) pursuant to section 1102(a)(1), an additional committee can only be appointed "[o]n request of a party in interest" and upon a showing that such an additional committee is "necessary to assure adequate representation of creditors or of equity security holders."  11 U.S.C. § 1102(a)(2).  The party seeking appointment of an additional committee bears a heavy burden of establishing its necessity.  *In re Budd Co.*, 512 B.R. 910, 912 (Bankr. N.D. Ill. 2014) (citing *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002)).  The standard is high given that the Bankruptcy Code requires that an additional committee be "**necessary**" and the burden "is far more onerous than if the statute merely provided that a committee be useful or appropriate."  *In re SunEdison Inc.*, 556 B.R. 94, 103–05 (Bankr. S.D.N.Y. 2016) (internal quotation marks and citation omitted) (emphasis added) (denying appointment of additional equity committee upon finding that "equity's interests will be adequately represented without an Equity Committee" and the "Creditors' Committee shares equity's interest in maximizing value and keeping management honest").

17.     Although courts apply varying definitions of "necessary," they uniformly agree that the appointment of additional committees of creditors or equity holders "is considered 'extraordinary relief' and should be 'the rare exception'" to the general rule that such committees are usually unnecessary and superfluous. *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (quoting *Exide Tech. v. State of Wisconsin Inv. Bd.*, No. 02-11125-KJC, 2002 WL 32332000, at *1 (D. Del. Dec. 23, 2002)) (denying appointment of additional committee of equity holders); *see also In re New Century TRS Holdings, Inc.*, No. 07-10416-KJC, 2013 WL 5377962, at *3 (Bankr. D. Del. Sept. 26, 2013) (denying motion to appoint official committee of borrowers and noting that "[a]ppointment of an additional Committee is an extraordinary remedy that courts are reluctant to grant") (internal citation and quotation marks omitted).

18.     "Bankruptcy Courts have discretion to examine the circumstances on a case-by-case basis to determine if additional committees are warranted." *In re New Century TRS Holdings, Inc.*, 2013 WL 5377962, at *3 (citation omitted).  Courts considering whether to appoint a second committee generally apply a two-part test: "first, whether the appointment of an additional committee is necessary to assure that the movants are adequately represented; and second, whether the court should exercise its discretion and order the appointment." *Id.* (citing *In re Enron Corp.*, 279 B.R. at 685).

19.     Some courts consider the following factors to determine initially whether an additional committee is necessary to assure adequate representation:[2] (1) the ability of the committee to function; (2) the nature of the case; and (3) the standing and desires of the various constituencies. *See In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996).

---

[2]     *See, e.g.*, *In re Roman Cath. Church of Archdiocese of New Orleans*, No. 20-10846, 2021 WL 454220, at *10 (Bankr. E.D. La. Feb. 8, 2021) (citing *Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, No. 02-6274, 2003 WL 22327118, at *4 (S.D.N.Y. Oct. 10, 2003)).

Depending on the outcome of that analysis, courts then evaluate four additional factors to determine whether the court should proceed and exercise its discretion to act: (4) the ability for creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to section 503; (5) the delay and additional cost that would result if the court grants the motion; (6) the tasks that a committee or separate committee is to perform; and (7) other factors relevant to the adequate representation issue. *Id.* No one factor is dispositive, and the amount of due consideration given to each factor depends on the circumstances of the particular chapter 11 case. A court need only focus on those factors it deems essential to a particular case. *See In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 WL 523129, at *2 (Bankr. D. Del. Mar. 2, 2005).

20.     The Ad Hoc Committee, which bears the burden of proving that the appointment of a GUC Committee is necessary to ensure "adequate representation" of Professional Services Creditors, offers ***no*** evidence in support of the Motion and it should be denied for that reason alone. Regardless, and as further set forth below, there is no necessity to establish a GUC Committee at this later stage of the proceedings, and the Ad Hoc Committee will never be able to make the requisite showing to support its request for relief even if it is given the chance to build a record.

## II.     Appointment of a GUC Committee is Not Necessary to Assure Adequate Representation for Professional Services Creditors

### A.     The TCC is a Well-Functioning Committee

21.     The TCC is charged with representing the interests of Talc Claimants and has been a zealous advocate for maximizing the pool of assets available to satisfy the claims of ***all*** unsecured creditors, including Professional Services Creditors. Notably, the Ad Hoc Committee fails to cite a single instance where the ability of the TCC to function has been impaired; indeed, no such complaints have been made by any party in interest. To the contrary, the Ad Hoc Committee

8

concedes that the TCC has demonstrated "strong advocacy on behalf of talc creditors."  Motion ¶ 41.  Accordingly, this factor supports denial of the Motion.

### B.      The Nature of the Case Does Not Support Appointment of a GUC Committee

22.      The nature of these cases flows entirely from the thousands of lawsuits the Debtors face arising out of exposure to their talc and asbestos and the Debtors' efforts to summarily resolve them through the bankruptcy process.  Rule 1007(d) Motion ¶ 6–7.  For nearly 20 years, the Debtors have been shell companies with no operations, employees, or funded debt.  Meghji Decl. ¶ 28.  As the Debtors acknowledge, "[t]his is not a case with a billion dollars in funded debt.  This is not a case with operation restructuring [rejected] leases.  This is a case with litigation, pre-petition, general unsecured litigation."  Aug. 24, 2023 Hr'g Tr. at 18:12-15.  This is a case where the "overwhelming majority of claims against the Debtors . . . originate from over one thousand lawsuits alleging exposure to asbestos-containing products manufactured by the Debtors" and, comparatively, the Debtors have a "relatively limited number of non-tort-related unsecured claims in these chapter 11 cases."  Rule 1007(d) Motion ¶ 6–7.

23.      The Ad Hoc Committee asserts that the claims of Professional Services Creditors are "significant" and "material."  This is not true.  It concedes that such claims total no more than $14 million, *see, e.g.*, Motion ¶ 46, an amount that represents the proverbial "drop in the bucket" in comparison to the talc- and asbestos-related claims that the Debtors estimate could exceed $1 billion.[3]  *See, e.g.*, *In re Dana Corp.*, 344 B.R. 35, 39 (Bankr. S.D.N.Y. 2006) (denying appointment of an additional official committee to represent asbestos creditors where asbestos

---

[3]      *See Whittaker, Clark & Daniels, Inc. Voluntary Petition for Non-Individuals Filing for Bankruptcy*, Docket No. 1 at 4 (estimating the Debtors' liabilities, on a consolidated basis, to be in the range of $1 billion – $10 billion).

298726762

claims made "up only approximately three percent of the unsecured claims against the Debtors"
and "the Debtors' economic plight [was] not asbestos driven.").

24.     The Ad Hoc Committee's argument primarily relies upon the generalized assertion
that a GUC Committee should be appointed because non-tort unsecured claims exist, and
Professional Services Creditors are willing to serve on that committee.  Motion ¶¶ 46–47.  But the
nature of these cases does not support appointment of a GUC Committee.  Notwithstanding the
Ad Hoc Committee's mischaracterizations to the contrary, Professional Services Creditors are not
a key constituency that is necessary for the potential resolution of these cases, and there is no
reason that this small and discrete creditor group requires official committee status to participate
in these cases.

25.     Further, the Ad Hoc Committee does not identify any key or unique case issues that
require an additional estate fiduciary to resolve.  Instead, it makes conclusory and inaccurate
statements about the purported divergent interests of Talc Claimants and Professional Services
Creditors.  *See, e.g.*, Motion ¶¶ 37, 45 49, 51, 56.  Since its appointment, the TCC has expended
significant time and effort to expand the amount of assets available to pay claimants in these cases,
including through the TCC's investigation of the events leading to these cases, the availability of
insurance to cover claims against the estates, the Debtors' relationship with their non-debtor
affiliates, and the possibility that indemnities owed by non-debtors could satisfy claims against the
estates.  *See, e.g.*, Adv. Proc. Docket No. 90 ¶ 4.

26.     The Professional Services Creditors stand to benefit from the TCC's efforts, much
like equity holders can indirectly benefit from the work of a creditors' committee.[4]  While the Ad

---

[4]     *See, e.g.*, *Eastman Kodak*, No. 12-10202 ALG, 2012 WL 2501071, at *2–3 (Bankr. S.D.N.Y. June 28, 2012)
(denying the appointment of an official committee of equity security holders where shareholders' interests were
adequately represented by other constituencies, including an equity owning board of directors, a "well-organized"
ad hoc committee, and an unsecured creditors committee).

Hoc Committee claims that it may have the ability to access insurance proceeds, it offers no support for that proposition other than expressing that its members, like all creditors, desire to be paid. *See, e.g.*, Motion ¶ 56. The TCC has retained special insurance counsel and undertaken significant efforts to explore the availability of insurance coverage for payment of claims. As such, the Ad Hoc Committee has failed to identify any issues that necessitate investigation and resolution by a separate committee.

### III.    Other Factors Weigh Against Appointment of a GUC Committee

27.    Even if the Court finds that Professional Services Creditors are not adequately represented (which they are), it should not exercise discretion to appoint a GUC Committee, as it should also consider: (4) the ability for Professional Service Creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to section 503; (5) the delay and additional cost that would result if the court grants the Motion; (6) the tasks that a separate GUC Committee is to perform; and (7) other factors relevant to the adequate representation issue. *See In re Kalvar Microfilm, Inc.*, 195 B.R. at 601. All of these factors also weigh against appointing a GUC Committee.

#### *(4) Professional Services Creditors Can Participate in the Case Without a Committee*

28.    The Ad Hoc Committee's adequate representation analysis ignores the fact that Professional Services Creditors—the vast majority of whom are law firms that represent the Debtors—already have the capability to individually participate in these bankruptcy cases and to protect their perceived interests. In addition, the Ad Hoc Committee, whose membership includes eight law firms, has been organized since October 2023 and is fully capable of participating in these bankruptcy cases and protecting the perceived interests of its members and constituents regardless of whether its members sit on an official committee. For example, Ad Hoc Committee

11

member McGivney, Kluger, Clark & Intoccia, P.C. is national coordinating counsel for the Debtors (Docket No. 157, Ex. 4) and has had discussions with the Debtors about these cases after the Petition Date (*see* Docket No. 759 at 81–82).  The Ad Hoc Committee therefore does not need to be an official committee to protect the rights of its members, and Professional Services Creditors are also uniquely qualified to represent themselves in these cases.

29.    As demonstrated by its letter correspondence with the UST and its filing of the Motion, the Ad Hoc Committee is well organized, represented by counsel,[5] and capable of representing its constituents' interests without official status.  These cases already have an active TCC—and FCR—and it would be wasteful for the estates to expend additional resources for a second committee "whose efforts would be duplicative and whose interests are already protected by a variety of estate fiduciaries and sophisticated parties with aligned interests."  *Spansion*, 421 B.R. at 163 (finding that, "[e]ven if [the Court] were to conclude on this record that neither the Debtors, its management, nor the Creditors' Committee [were] adequately representing the interest of the equity security holders," appointment of an official equity committee in place of such a "well organized ad hoc group" would be unwarranted).

### (5) Appointment of a GUC Committee Would Lead to Additional Cost and Delay; and (6) The GUC Committee Would Not Perform any Unique Tasks

30.    The costs to the estates associated with appointing a GUC Committee far outweigh any potential benefit to Professional Services Creditors.  The estates are already funding the costs of the TCC which, as stated above, is investigating the availability of insurance coverage for payment of claims and legal theories to expand the pool of assets available to pay claimants in these cases—the same issues that the Ad Hoc Committee deems necessary for the appointment of

---

[5]    *But see* footnote 6 *infra* (noting that the Ad Hoc Committee's counsel suffers from certain conflicts of interest).

a GUC Committee.  The Court also appointed the FCR to undertake similar tasks on behalf of future claimants.  The estates should not, and are not required to, fund duplicative efforts that a GUC Committee would undertake.  The estates will not benefit from a relatively insignificant constituency being given official committee status and the "additional cost to be incurred by the Debtors' estates cannot be justified."  *In re Dana Corp.*, 344 B.R. at 40 (concluding that an additional official committee was not appropriate because of the high cost of legal and professional fees in a large chapter 11 case and the possibility of duplicative efforts).  At bottom, appointment of the GUC Committee to perform essentially duplicative tasks would only serve to diminish the recoveries for unsecured creditors without providing any tangible corresponding benefits to such creditors.

31.      Further, the Ad Hoc Committee fails to identify any tasks either (i) that the TCC has not performed in these bankruptcy cases or (ii) that a GUC Committee would perform that the TCC cannot—both critical considerations when deciding whether Professional Services Creditors are adequately represented.  *See, e.g.*, *Budd Co.*, 512 B.R. at 912–13.  Nor would appointment of a GUC Committee be conducive to the ongoing mediation taking place among the Mediation Parties before Judge Gerber.  *See* Motion ¶ 6 (arguing that the mediation is not focused on addressing the claims of Professional Services Creditors).  The mediation has been underway for approximately three months, and is predicated on the TCC's pre-mediation investigation and the continuing exchange of information and discovery.  Adding a GUC Committee who has not participated in the cases, and who holds a small amount of unsecured claims, will undeniably delay the mediation process without providing any clear benefit to the potential resolution of significant case issues.

13

32.     In addition, the TCC is concerned about the possibility of an official committee composed entirely of professional firms who were involved in representing the Debtors in the talc litigation that led to the filing of these cases.  As set forth *infra*, the professional firms may also face disabling conflicts of interests if they attempt to serve on a committee while continuing to owe ethical and contractual duties to the Debtors.

### *(7) The Motion is Untimely*

33.     Parties moving for the appointment of an additional committee under section 1102(a)(2) must do so promptly.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 118 B.R. 209, 211 (Bankr. S.D.N.Y. 1990) (denying request for appointment to unsecured creditors' committee where motion was filed nearly two months after UST denied initial request); *In re Pub. Serv. Co. of N.H.*, 89 B.R. 1014, 1020 (Bankr. D.N.H. 1988) (denying appointment of separate committee to represent debenture holders where motion was filed approximately five months after petition date); *see also Ad Hoc Bondholders Grp. v. Interco Inc. (In re Interco Inc.)*, 141 B.R. 422, 424–25 (Bankr. E.D. Mo. 1992); *In re Hills Stores Co.*, 137 B.R. 4, 7–8 (Bankr. S.D.N.Y. 1992) (denying appointment of a separate committee to represent bondholders where the motion was brought almost a year after the UST appointed a single committee and plan negotiations were about to commence).

34.     At the outset of these cases—nearly 10 months before the Motion was filed—the UST sent questionnaires to non-talc creditors to solicit interest for the formation of an official committee of unsecured creditors.  *See* Motion ¶ 18.  Ultimately, the UST declined to form such an official committee.  On October 20, 2023, counsel to the Ad Hoc Committee sent a letter to the UST requesting appointment of a GUC Committee.  *See* Motion, Ex. A.  Days later, the UST informed the Ad Hoc Committee that its request was declined.  *See id.*, Ex. B.  Almost four months

passed, and a mediation commenced, before the Ad Hoc Committee filed the Motion. The Ad Hoc

Committee provides no reason for its delay in bringing the Motion or why it did not request to

participate in the mediation before it commenced.  Here, the Ad Hoc Committee's unexplained

delay in seeking the appointment of a GUC Committee constitutes an additional ground to deny

the Motion.  *See, e.g.*, *Matter of Kalvar Microfilm, Inc.*, 195 B.R. at 601 (denying motion to appoint

an official committee due to, among other things, the "late timing of the motion").

## IV.    Professional Services Creditors Could be Conflicted If They Serve on a Committee

35.     In addition to failing to meet the standards of section 1102(a)(2) of the Bankruptcy

Code, the Motion should also be denied because Professional Services Creditors are primarily law

firms or professionals with conflicts arising out of their engagements by, and representations of,

the Debtors.[6]  Those conflicts arise out of the incompatible nature of the fiduciary duties to all

unsecured creditors that each member of the creditors' committee must fulfill, with the specific

duties of confidentiality, loyalty, and other ethical obligations that Professional Services Creditors

continue to owe to the Debtors.  Given those conflicts, as shown below, it would be futile to grant

the Motion because Professional Services Creditors will be unable to carry out their fiduciary

duties to unsecured creditors and be subject to removal by the Court and/or UST.

36.     Members of an official committee of unsecured creditors owe fiduciary duties to

all creditors represented by that committee.  *See Westmoreland Hum. Opportunities, Inc. v. Walsh*,

246 F.3d 233, 256 (3d Cir. 2001) ("We have construed § 1103(c) as implying a fiduciary duty on

the part of members of a creditor's committee . . . toward their constituent members"); *see also In*

---

[6]    Indeed, the Ad Hoc Committee's counsel, Lowenstein Sandler LLP, may also have conflicts arising out of its
representation of the Debtors in talc litigation before the Petition Date.  *See* Docket No. 160, Schedule 1(c) (listing
Lowenstein Sandler as one of the Debtors' defense counsel); *see also In re Quality Beverage Co., Inc.*, 216 B.R.
592 (Bankr. S.D. Tex. 1995) (holding that trustee would be precluded from employing accounting firm because
accounting firm had an actual conflict of interest stemming from its previous representation of the unsecured
creditors' committee; committee members' alleged waiver of any conflict of interest did not change the outcome).

15

*re Johns–Manville Corp.*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) ("the individuals constituting

a committee should be honest, loyal, trustworthy and without conflicting interests, and with

undivided loyalty and allegiance to their constituents . . . Conflicts of interest on the part of the

representative persons or committees are . . . not to be tolerated."). While the Bankruptcy Code

does not impose a disinterestedness requirement on committee members, a conflict of interest that

amounts to a breach of the member's fiduciary duty to creditors "would mandate removal of the

creditor from the committee." *In re Venturelink Holdings, Inc.*, 299 B.R. 420, 424 (Bankr. N.D.

Tex. 2003); *In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 432 (Bankr. E.D. Va. 2001)

("If a trustee appoints a party with such serious conflicts to the committee and fails to remove the

party when the situation comes to light, the trustee's decision constitutes an abuse of discretion.");

*In re First RepublicBank Corp.*, 95 B.R. 58, 61 (Bankr. N.D. Tex. 1988) (citing *In re Johns–*

*Manville Corporation*, 26 B.R. 919 (Bankr. S.D.N.Y. 1983)) ("A committee member holding a

conflict of interest cannot continue to serve.").

     37.    Courts have removed or affirmed the UST's removal of committee members where,

among other things, the member was a former chairman of the debtor's board of directors,

*Venturelink Holdings, Inc.*, 299 B.R. at 424, its chief operating officer was father of the chairman

of the debtor, *In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981), and its wife was the

bookkeeper and office manager of the debtor, *In re Swolsky*, 55 B.R. 144, 13 C.B.C.2d 985 (Bankr.

N.D. Ohio 1985), or an insider of the debtor, *In re Glendale Woods Apartments Ltd.*, 25 B.R. 414

(Bankr. D. Md. 1982); *In re Penn-Dixie Indus., Inc.*, 9 B.R. 941, 945 (Bankr. S.D.N.Y. 1981)

(removing member of committee who was controlled by a director of the debtor and noting that

allowing it to remain on the committee "would be as risky as leaving a fox to guard the chicken

coop").

298726762

38.     Here, Professional Services Creditors cannot serve on a creditors' committee because they continue to owe the Debtors ethical, contractual, and/or confidentiality obligations that would conflict with their fiduciary duties to all creditors.  For example, during the course of their representation of the Debtors in pending talc litigation, Professional Services Creditors presumably obtained privileged and/or confidential information directly relevant to material issues in these cases, including with respect to talc and litigation strategy.  If appointed to an official committee, Professional Services Creditors would face the obligation of carrying out their fiduciary duties to creditors with undivided loyalty, while at the same time owing ethical duties as current or former counsel to the Debtors.  *See, e.g.*, Model Rules of Prof. Conduct, Rule 1.7 (current clients) and Rule 1.9 (former clients); *see also id.*, Comment 9 to Rule 1.7 ("In addition to conflicts with other current clients, a lawyer's duties of loyalty and independence may be materially limited by . . . the lawyer's responsibilities to other persons, such as fiduciary duties arising from a lawyer's service as a trustee, executor or corporate director.")[7]; *Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 454 (D. Utah 1998) ("Counsel's duty of loyalty [under the Model Rules] to the debtor-in-possession includes the duty to maintain client confidentiality and prevent any conflict of interest."); *Bagdan v. Beck*, 140 F.R.D. 650, 653 (D.N.J. 1991) (noting that "[l]oyalty is an essential element in the lawyer's relationship to a client."); *Arifi v. de Transport du Cocher, Inc.*, 290 F.Supp.2d 344, 348 (E.D.N.Y. 2003) ("The duty of loyalty that runs from

---

[7]     *See also* Model Rules of Prof. Conduct, 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b)."), 1.8(b) ("A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.").  Similar standards apply even to former clients.  *See id.*, Rule 1.9(c) ("A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter: (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.").

298726762

an attorney to a client does not necessarily end when the formal attorney-client relationship ends because the attorney owes a 'duty of continuing loyalty' to his former client." (internal citations omitted)).

39.     The putative members of the GUC Committee make no mention of their ethical duties.  They also do not address whether they have undertaken to disqualify themselves from serving as an ordinary course professional of the Debtors or whether they have even obtained waivers from the Debtors.

40.     Professional Services Creditors would face constraints stemming from their ethical and contractual obligations to the Debtors, the confidential and privileged information they acquired while representing the Debtors, and the possibility of attracting future business opportunities from the Debtors and their non-debtor affiliates.  Those constraints would directly conflict with their fiduciary duties to unsecured creditors which duties require them to be free from the Debtors' influence so that they can properly monitor, investigate, and negotiate with the Debtors.  This would create an unequivocal conflict of interest.  *See, e.g.*, *In re Charter Co.*, 44 B.R. 256, 258–59 (Bankr. M.D. Fla. 1984) (removing committee member due to high likelihood of conflict of interest); *cf. In re Penn-Dixie Indus., Inc.*, 9 B.R. at 944–45 (removing shareholder from committee of equity holders due to "[i]ts abyssal entanglement with the Debtor [which] render[ed] it unfit to monitor, scrutinize, investigate, and negotiate with the Debtor" and noting that "[n]ot even a myriad of protective orders . . .  could effectively shield Committee members from [the shareholder's] influence, which may be subliminal and unwittingly passing on the Debtor's views, or could guarantee confidentiality of Committee proceedings vis a vis the Debtor").[8]

---

[8]     While the requirements of section 327 are not directly applicable to committee members, they are instructive and stand for the proposition that a law firm cannot simultaneously represent a debtor and a creditor.  *See, e.g.*, *In re*

41.    In short, Professional Services Creditors are unfit to serve on a creditors'
committee. *Cf. Venturelink Holdings, Inc.*, 299 B.R. at 424 ("The inherent conflicts of this
situation cannot be avoided by the officer or director abstaining from committee participation when
issues pertaining to his performance or transfers to him emerge.  Rather, the conflict, stemming
from the officer and director's position as a fiduciary, implicate the fiduciary nature of the
committee position. As a matter of public policy, the officer or director should not be a member
of the committee.").

## CONCLUSION

For the foregoing reasons, the TCC respectfully requests that the Court deny the Motion
and grant such other relief as may be just and proper.

Dated:  March 26, 2024

<div style="margin-left: 40%">

*/s/ Arthur J. Abramowitz*

**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
        rswitkes@shermansilverstein.com

*Local counsel to the*
*Official Committee of Talc Claimants*

-and-

</div>

---

*JMK Constr. Grp., Ltd.*, 441 B.R. 222, 234 (Bankr. S.D.N.Y. 2010) ("The representation of both debtors and creditors may create an irremediable conflict of interest. Other courts have likewise concluded that representation of both a debtor and a creditor may present a disabling conflict of interest in violation of section 327(a) of the Bankruptcy Code.").

298726762

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Email: cspeckhart@cooley.com
      mklein@cooley.com
      elazerowitz@cooley.com
      jledwidge@cooley.com

*Lead Counsel to the*
*Official Committee of Talc Claimants*

-and-

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email: kmaclay@capdale.com
      tphillips@capdale.com
      sconcannon@capdale.com

*Special Asbestos Counsel to the*
*Official Committee of Talc Claimants*

298726762