**ROBERT E. GERBER**
800 Third Avenue, 30th Floor
New York, New York 10022
Telephone: (917) 747-0280
rgerber@jhany.com

*Mediator*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors. | (Jointly Administered) |
| WHITTAKER, CLARK & DANIELS, INC., BRILLIANT NATIONAL SERVICES, INC., L.A. TERMINALS, INC., and SOCO WEST, INC., | |
| Plantiffs, | |
| v. | Adv. Proc. No. 23-01245 (MBK) |
| BRENNTAG AG, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES, LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC., THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT, and JOHN AND JANE DOES 1–1,000, | |
| Defendants. | |

## INTERIM REPORT OF MEDIATOR (#2)

1. As the Court is aware, pursuant to its order dated November 15, 2023 (the "**Initial Mediation Order**"), subsequently amended on December 29, 2023 (the "**Mediation Order**"),[1]

---

[1] See Case Docket Nos. 654, 762.

I was appointed as a Mediator to attempt, by mediation (the "**Mediation**"), to achieve a resolution of Mediation Matters (as defined in the Mediation Order) in this case.  On February 2 of this year, I submitted a report (Case Doc. No. 814) ("**Initial Report**") advising the Court of the status of the mediation at that time.  This report ("**Second Report**") updates my Initial Report.

*Background*

2. Under the Mediation Agreement in this case (as in each of the 50 or so mediations that I've managed in the eight years since I left the bench), I was authorized to act in a dual capacity—first, of course, in a facilitative way, to elicit the offers and counteroffers that are the norm in negotiations (and then to try to bridge differences), and second, in an evaluative way, to share views I could form as to potential outcome and risk if the Mediation Parties could not reach a settlement.  Early on, as described in my Initial Report, after review of background documents (and, especially, briefs submitted to this Court and the district court on an appeal of the dismissal motion determination made by this Court), I briefed the Mediation Parties on my views as to likely outcomes in this Court and on appeal.[2]  And early in the mediation, as also discussed in my Initial Report, we then discussed methodology to facilitate agreement—once again employing methodology I had successfully employed in other mediations in the past.

3. This methodology included, by way of example, informal exchanges of information (so any proposals, in either direction, would be fact-based—and, particularly, as a function of the

---

[2] Under familiar principles, the views I then expressed were, and must remain, confidential, and are not appropriately addressed here.  Likewise, under the Court's Mediation Order, I was authorized to brief the Court on the status of the Mediation (*see* Mediation Order ¶ 7(a) ("the Mediator is authorized to submit general statements to this Court as to the status of the Mediation"), but not, of course, to divulge confidential communications with the Mediation Parties.  Throughout this report, I've limited my discussion to status and events that were "in the clear," and I've leaned over backwards to avoid discussion of confidential communications or matter learned in them.

number and amount of victim claims to be satisfied); preservation of the status quo while the mediation was ongoing and would still have hopes of success; and eliciting offers and counteroffers, in each direction (and then dealing with them) to reach a consensual resolution.

4. Preservation of the status quo, as I then envisioned it, would be of two types. First, the parties would ask the Court, if it was agreeable to doing so, to defer ruling on the summary judgment motion ("**Summary Judgment Motion**"), which had been previously fully briefed, argued, and taken under submission, addressing the ownership of successor liability, alter ego, and other claims that might be determined to belong to the Debtors' estates, on the one hand, or individual victim plaintiffs, on the other. The second was a stay of actions by individual victims pending determination of the first issue.

5. The methodology, and certain requests to the Court to facilitate it, were embodied in a stipulation in February (the "**February Stipulation**"), originally drafted by me and thereafter refined pursuant to Mediation Parties' comments, to be submitted to the Court for its approval. The February Stipulation was subsequently "so ordered" by the Court.[3] My hope was that a successful end to the Mediation would obviate the need for the Court to decide the Summary Judgment Motion.

6. Under the February Stipulation (and its successors), Mediation Parties could, however, thereafter request that the deferral come to an end, and that the Court decide the Summary Judgment Motion.[4] Even assuming a dedication to the mediation process by all Mediation

---

[3] See Case Docket No. 813, Adv. Pro. Docket No. 137.

[4] The Court was requested to "defer issuance of a decision through Monday March 11, 2024 …, without prejudice to the right of any Mediation Party to ask the Court to defer issuance of a decision on the Summary Judgment Motion for a longer period of time, on the one hand, or to ask the Court to decide the Summary Judgment Motion as soon as practical, on the other…." (Case Docket No. 813, ¶ 1(i)). The March 11 date was thereafter extended, first to May 10, and then to June 10, on the same terms. (See Case Docket No. 1057 ¶ 1).

3

Parties, a future inability to reach agreement was then foreseeable. And it was foreseeable that if negotiations broke down to the point where a Mediation Party might make such a request, rulings by the Court on the Summary Judgment Motion, however they might come out, might give the Mediation Parties a better understanding of the terrain on which they should thereafter be should be working to achieve victim recoveries.

*Events Since Initial Report Filing*

7. In the time after the filing of my Initial Report, my mediation efforts continued. The information exchange (which was more elaborate and characterized by a level of formality that I, for one, had not contemplated), took longer than envisioned (at least by me), and, as noted, it became necessary to extend the dates provided under the February Stipulation first through May 10, and then through June 10. In one sense, the mediation was ongoing throughout that period; in another, it lacked the traditional back-and-forth that the Court might understandably desire.

8. But during the extended period (and even before the information exchange was completed), I sought to advance the mediation as much as I could, based on the considerable body of information that was already known. I conducted an "all-hands" mediation session with the participation of all of the Mediation Parties on May 8, and a like session with all of the Mediation Parties' claims experts on May 24. The Mediation Parties were invited to, and most did, submit, supplemental mediation submissions—though principally not to rehash arguments previously made to the Court and the district court, which I had already reviewed, and that were the subject of my earlier briefing to the Mediation Parties. I reviewed these supplemental submissions with the mindset of what I saw as the next, and most critical, stage in my efforts—to reach a consensual deal. And I additionally had Zoom sessions, telephonic conversations (individually and by conference call), and exchanges of emails (in each case far too numerous to

4

describe with greater particularity) with counsel for the parties before each of those sessions and thereafter.

9. In this period, I sought to, and eventually did, get Mediation Parties to issue the offers and counteroffers I had desired. But although confidentiality obligations prohibit me from discussing the specifics, the process (of soliciting proposals and in getting the factual bases for them) was a challenging one.

*Present Status of the Mediation*

10. Incident to my desire that proposals in each direction be fact-based, I wanted experts for the various constituencies to caucus with each other, sharing with their counterparts their conclusions as to the actual number and amount of victim claims to be satisfied, along with their methodology and the data upon which they reached their views. A caucus session to that end was scheduled for, and took place, on May 24. But though I cannot, consistent with my confidentiality obligations, provide more detail (and, in particular, say how and why), that session did not achieve my desired ends. The present status of that effort is that the experts have only partially interfaced with each other to compare their conclusions and methodology, and to debate the strengths and weaknesses of their respective views.

11. Largely as the consequence of events that transpired during the last week in May (though confidentiality obligations once again prohibit me from discussing them in greater detail), I came to the view that there is no reasonable likelihood of a deal between the Claimants Side (the Talc Creditors Committee and FCR), and the other Mediation Parities in the near term. Whether that is characterized as an "impasse" (which to me connotes an inability to agree after meaningful negotiations, and, also, with no hope in the future), or by another noun, I recognize that my efforts so far have been unsuccessful; I see no reasonable basis for a view that a deal between the Claimants and the other Mediation Parties will be forthcoming any time soon.

12. By letter dated June 2, counsel for the Debtors wrote the Court invoking the process laid out in the February Stipulation and its successors, and requesting that the Court issue its decision on the Summary Judgment Motion on the June 10 date previously mentioned, or as soon as practicable thereafter. By letters dated June 9 and 10, counsel for the FCR and the Talc Creditors Committee wrote the Court generally urging that the Court not decide the Summary Judgment Motion, and, in addition, saying that the parties are at an impasse and that the mediation should be terminated.[5]

13. It would be inappropriate for me to comment on what the Court should do after the submission of these letters. And I express no views on that, other than as the history and status of the mediation, described above, might be relevant to that issue.

*Continuing Willingness to Serve*

14. Notwithstanding the foregoing, it would be my preference that the Mediation remain open. I remain willing and able to remain involved and assist the Mediation Parties in any and all respects in which they believe I could be useful, subject, of course, to the wishes of the Court.[6]

Dated: June **11**, 2024

/s/ Robert E. Gerber

---

[5] This, of course, is a characterization of their views, and less than the entirety of what they said; their respective letters are the best evidence of their content.

[6] To my mind, whether I continue or not is a decision solely for the Court.