**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email:  cspeckhart@cooley.com<br>         mklein@cooley.com<br>         elazerowitz@cooley.com<br>         jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* | **WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi<br>Justin Garbacz (admitted *pro hac vice*)<br>Christine Thain (admitted *pro hac vice*)<br>Amanda M. Payne (admitted *pro hac vice*)<br>787 Seventh Avenue<br>New York, NY 10019<br>Tel: (212) 728-8000<br>Email:  slombardi@willkie.com<br>         jgarbacz@willkie.com<br>         cthain@willkie.com<br>         apayne@willkie.com<br><br>*Co-Counsel to Future Claimants' Representative* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005<br>Tel: (202) 862-5000<br>Email:  kmaclay@capdale.com<br>         tphillips@capdale.com<br>         kdavis@capdale.com<br>         sconcannon@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | **RABINOWITZ LUBETKIN & TULLY, LLC**<br>Jonathan I. Rabinowitz<br>Barry J. Roy<br>293 Eisenhower Parkway, Suite 100<br>Livingston, NJ 07039<br>Tel: (973) 597-9100<br>Email:  jrabinowitz@rltlawfirm.com<br>         broy@rltlawfirm.com<br><br>*Co-Counsel to Future Claimants' Representative* |
| **SHERMAN, SILVERSTEIN,**<br>**KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email:  aabramowitz@shermansilverstein.com<br>         rswitkes@shermansilverstein.com<br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>         Debtors. | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered)<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

**NOTICE OF JOINT MOTION OF THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS AND THE FUTURE CLAIMANTS' REPRESENTATIVE FOR ENTRY
OF AN ORDER GRANTING STANDING AND AUTHORIZING THE COMMITTEE
AND THE FCR TO COMMENCE, PROSECUTE, AND SETTLE CERTAIN CAUSES
OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**

**PLEASE TAKE NOTICE** that the Official Committee of Talc Claimants
(the "**Committee**") of Whittaker, Clark & Daniels, Inc., Brilliant National Services, Inc, L. A.
Terminals, Inc., and Soco West, Inc. (collectively, the "**Debtors** and the Honorable Shelley C.
Chapman (Ret.), as the court-appointed legal representative (the "**FCR**," together with the
Committee, the "**Movants**") for the purpose of representing and protecting the rights of future
claimants, by and through their undersigned counsel, shall move before the Honorable Michael B.
Kaplan, U.S.B.J., Chief, on **October 15, 2024 at 11:00 a.m.** or as soon thereafter as counsel may
be heard, at the U.S. Bankruptcy Court, District of New Jersey, 402 East State Street, Trenton,
New Jersey 08608, seeking the entry of an order granting the Movants leave, standing, and
authority to commence, prosecute and settle the claims and causes of action (the "**Motion**") against
Brenntag SE, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc.,
Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag
Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC,
Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc (collectively, "**Brenntag**"),
National Indemnity Company ("**NICO**"), and DB US Holding Corporation (f/k/a Stinnes Corp.)
("**DBUS**").

**PLEASE TAKE FURTHER NOTICE** that the Movants shall rely upon the Motion
which sets forth the legal basis for the relief requested and the declaration submitted herewith in
support of the relief sought in the Motion.

**PLEASE TAKE FURTHER NOTICE** that in accordance with D.N.J. LBR 9013-2(a), opposition to the relief requested, and, or cross-motions, if any, shall be filed with the Clerk of the Bankruptcy Court and served upon all parties in interest at least seven (7) days before the hearing date of the Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to D.N.J. LBR 9013-3(a), in the event the Motion is contested, there is a duty to confer to determine whether a consent order may be entered disposing of the Motion or to stipulate to the resolution of as many issues as possible.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed, the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that in accordance with D.N.J. LBR 9013-3(e), unless the Court authorizes otherwise prior to the hearing date hereof, no testimony shall be taken at the hearing except by certification or affidavit.

Dated: August 30, 2024

*/s/ Arthur J. Abramowitz*
**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
        rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards

New York, NY 10001
Tel: (212) 479-6000
Email: cspeckhart@cooley.com
mklein@cooley.com
elazerowitz@cooley.com
jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email: kmaclay@capdale.com
tphillips@capdale.com
sconcannon@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

*/s/ Stuart R. Lombardi*
**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi
Justin Garbacz (admitted *pro hac vice*)
Christine Thain (admitted *pro hac vice*)
Amanda M. Payne (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Email:  slombardi@willkie.com
jgarbacz@willkie.com
cthain@willkie.com
apayne@willkie.com

**RABINOWITZ LUBETKIN & TULLY, LLC**
Jonathan I. Rabinowitz
Barry J. Roy
293 Eisenhower Parkway, Suite 100
Livingston, NJ 07039
Tel: (973) 597-9100
Email:  jrabinowitz@rltlawfirm.com
broy@rltlawfirm.com

*Co-Counsel for Future Claimants' Representative*

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email:  cspeckhart@cooley.com<br>  mklein@cooley.com<br>  elazerowitz@cooley.com<br>  jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* | **WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi<br>Justin Garbacz (admitted *pro hac vice*)<br>Christine Thain (admitted *pro hac vice*)<br>Amanda M. Payne (admitted *pro hac vice*)<br>787 Seventh Avenue<br>New York, NY 10019<br>Tel: (212) 728-8000<br>Email:  slombardi@willkie.com<br>  jgarbacz@willkie.com<br>  cthain@willkie.com<br>  apayne@willkie.com<br><br>*Co-Counsel to Future Claimants' Representative* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005<br>Tel: (202) 862-5000<br>Email:  kmaclay@capdale.com<br>  tphillips@capdale.com<br>  kdavis@capdale.com<br>  sconcannon@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | **RABINOWITZ LUBETKIN & TULLY, LLC**<br>Jonathan I. Rabinowitz<br>Barry J. Roy<br>293 Eisenhower Parkway, Suite 100<br>Livingston, NJ 07039<br>Tel: (973) 597-9100<br>Email:  jrabinowitz@rltlawfirm.com<br>  broy@rltlawfirm.com<br><br>*Co-Counsel to Future Claimants' Representative* |
| **SHERMAN, SILVERSTEIN,**<br>**KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email:  aabramowitz@shermansilverstein.com<br>  rswitkes@shermansilverstein.com<br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered)<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

**JOINT MOTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS
AND THE FUTURE CLAIMANTS' REPRESENTATIVE FOR ENTRY OF AN
ORDER GRANTING STANDING AND AUTHORIZING THE COMMITTEE AND
THE FCR TO COMMENCE, PROSECUTE, AND SETTLE CERTAIN CAUSES OF
<u>ACTION ON BEHALF OF THE DEBTORS' ESTATES</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 2

JURISDICTION ................................................................................................. 6

BACKGROUND ................................................................................................ 6

    I.    Solvent Non-Debtor Proposed Defendants are Liable for the Successor
        Liability Claims ........................................................................................ 7

        A.    The 2004 and 2007 Transactions Shift Responsibility for the
               Debtors' Talc Liabilities to Their Affiliate NICO .................................. 7

        B.    NICO Has Controlled the Debtors Since 2007 ......................................... 9

        C.    NICO Is Seeking to Evade Its Indemnity Obligations ............................. 14

        D.    The Debtors Initiated an Adversary Proceeding to Take Control of
               the Claims NICO Indemnifies ............................................................... 15

    II.    The Debtors Failed to Conduct a Reasonable Investigation and Took No
        Steps To Advance Claims That Would Benefit Creditors ................................. 17

    III.    The Movants Doggedly Investigated Potential Successor Liability Claims
        and Are Prepared to Prosecute Those Claims ...................................................... 19

    IV.    The Movants' Investigation Uncovered Valuable Claims Against the
        Proposed Defendants .......................................................................................... 22

        A.    Successor Liability Claims Against Brenntag ......................................... 23

        B.    Declaratory Judgment for Indemnification Obligations under the
               2004 and 2007 Agreements ..................................................................... 24

        C.    Preliminary Injunction Pursuant to Section 105(a) of the
               Bankruptcy Code ................................................................................... 25

RELIEF REQUESTED ........................................................................................ 25

ARGUMENT ................................................................................................... 29

    I.    The Proposed Claims Are Colorable ................................................................. 29

        A.    The Successor Liability Claims Are Colorable (Count I) ........................ 29

               i.    Product Line Claims Are Colorable ............................................ 30

               ii.    The Traditional Successor Liability Claims Are Colorable ......... 33

        B.    The Indemnification Obligation Claims Are Colorable (Counts II
               and III) .................................................................................................. 34

        C.    The Preliminary Injunction Claim Is Colorable (Count IV) ................... 35

    II.    Prosecution of the Causes of Action Will Benefit the Estate .............................. 37

    III.    Because of Their Inherent and Inescapable Conflicts of Interest, The
        Debtors Cannot Assert the Proposed Claims for Their Full Value ..................... 39

IV.     The Court Should Grant the Movants Sole Authority to Settle the
        Proposed Claims ................................................................................................ 52

CONCLUSION ............................................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.),*
    330 B.R. 364 (Bankr. S.D.N.Y. 2005)...................................................................28

*In re Aldrich Pump LLC,*
    No. 20-3060 (JCW) (Bankr. W.D.N.C. Apr. 14, 2022) (Docket No. 1121)...........27

*In re Bestwall LLC,*
    606 B.R. 243 (Bankr. W.D.N.C. 2019)................................................................36

*Blasband v. Rales,*
    971 F.2d 1034 (3d Cir. 1992)..............................................................................48

*Bussell v. DeWalt Products Corp.,*
    259 N.J. Super. 499 (1992) ................................................................................31

*Cambridge Realty West, LLC v. NOP, LLC,*
    No. 10-2791, 2010 WL 4668436 (E.D. La. 2010)...............................................50

*Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.),*
    66 F.3d 1436 (6th Cir. 1995) ..............................................................................26

*In re Cendant Corp. Derivative Litig.,*
    189 F.R.D. 117 (D.N.J. 1999)............................................................................48

*Commodore Int'l v. Gould (In re Commodore Int'l, Ltd.),*
    262 F.3d 96 (2d Cir. 2001).................................................................................26

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,*
    330 F.3d 548 (3d Cir. 2003)........................................................................ *passim*

*In re DBMP LLC,*
    No. 20-30080 (JCW) (Bankr. W.D.N.C. Nov. 3, 2021) (Docket No. 1197) ..........27

*In re Dewey & LeBoeuf LLP,*
    No. 12-12321 (MG), 2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012)..........54

*In re Diocese of Camden, New Jersey,*
    No. 20-21257 (JNP), 2022 WL 884242 (Bankr. D.N.J. Mar. 24, 2022) ..........28, 50

*Enodis Corp. v. Emplrs. Ins. (In re Consol. Indus. Corp.),*
    360 F.3d 712 (7th Cir. 2004) ..............................................................................26

*In re Evergreen Solar, Inc.*,
   Case No. 11-12590-MFW (Bankr. D. Del. Oct. 28, 2011)......................................52

*In re First Capital Holdings Corp.*,
   146 B.R. 7 (Bankr. C.D. Cal. 1992).....................................................................51

*Fogel v. Zell*,
   221 F.3d 955 (7th Cir. 2000) .............................................................................26

*G-I Holdings, Inc.v. Bennet (In re G-I Holdings, Inc.)*,
   328 B.R. 691 (D.N.J. 2005) ...............................................................................38

*In re G-I Holdings, Inc.*
   313 B.R. 612 (Bankr. D.N.J. 2004) ............................................................. *passim*
   420 B.R. 216 (D.N.J. 2009) ...............................................................................36

*In re Hydrogen L.L.C.*,
   No. 18-014139 (AJG), 2009 WL 2913448 (Bankr. S.D.N.Y. May 7, 2009) ..................39, 50

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*,
   555 F.3d 231 (6th Cir. 2009) .............................................................................26

*In Re Johns-Manville Corp.*,
   41 B.R. 926 (S.D.N.Y. 1984).............................................................................35

*In re Johns-Manville Corp.*,
   26 B.R. 420 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984) ...........................35

*Jones v. Schlosberg (In re Jones)*,
   178 Fed. App'x 662 (9th Cir. 2006) .....................................................................26

*Jordan v. N.J. Dep't of Corr.*,
   881 F. Supp. 947 (D.N.J. 1995)...........................................................................28

*In re Joyanna Holitogs, Inc.*,
   21 B.R. 323 (Bankr. S.D.N.Y. 1982).....................................................................26

*Koch Materials Co. v. Shore Slurry Seal, Inc.*,
   205 F. Supp. 2d 324 (D.N.J. 2002) ......................................................................33

*In re La. World Exposition, Inc.*,
   832 F.2d 1391 (5th Cir. 1987) ...........................................................................51

*La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*,
   858 F.2d 233 (5th Cir. 1988) .....................................................................26, 49, 51

*Lefever v. K.P. Hovnanian Enters.*,
  160 N.J. 307, 310, 734 A.2d 290, 292 (1999) ......................................................33

*In re Majestic Capital, Ltd.*,
  Case No. 11-36225-CGM (Bankr. S.D.N.Y. Dec. 12, 2011) (Docket No. 211) ...................52

*In re Marin Motor Oil, Inc.*,
  689 F.2d 445 (3d Cir. 1982) ......................................................................26

*Mettinger v. Globe Slicing Mach. Co.*,
  153 N.J. 371 (1998) ..............................................................................30

*Munenzon v. Peters Advisors, LLC*,
  No. 20-14644 (KM)(JBC), 2022 U.S. Dist. LEXIS 85440 (D.N.J. May 10,
  2022) ............................................................................................33

*Off. Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*,
  2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006) ..............................................27

*Off. Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley
  Media, Inc.)*,
  No. 01-11353 (PJW), ADV. 02-04553, 2003 WL 21956410 (Bankr. D. Del.
  Aug. 14, 2003) ..................................................................................52

*Off. Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
  326 B.R. 532 (W.D. Pa. 2005) ...............................................................50, 51

*In re Old Carco LLC*,
  Case No. 09-50002-AG (Bankr. S.D.N.Y. Aug. 13, 2009) (Docket No. 5151) .......................52

*Pacius v. Thermtroll Corp.*,
  259 N.J. Super. 51 (Law Div. 1992) ..............................................................32

*In re Pack Liquidating, LLC*,
  658 B.R. 305 (Bankr. D. Del. 2024) .............................................................37

*Papera v. Pennsylvania Quarried Bluestone Co.*,
  948 F.3d 607 (3d Cir. 2020) .....................................................................45

*Peterson Mfg. Co. v. Titan Int'l, Inc.*,
  Nos. B176630, B177816, 2005 Cal. App. Unpub. LEXIS 7413 (2d. Dist.
  Aug. 17, 2005) .................................................................................30

*Philadelphia Newspapers*,
  407 B.R. 606 (E.D. Pa. 2009) ...................................................................36

*PHL Variable Ins. Co. v. ESF QIF Tr. by & through Deutsche Bank Tr. Co.*,
  No. CV 12-319-LPS, 2013 WL 6869803 (D. Del. Dec. 30, 2013) ...................................35

*PW Enters. v. N.D. Racing Comm'n (In re Racing Servs.)*,
   540 F.3d 892 (8th Cir. 2008) ................................................26

*Ramirez v. Amsted Indus., Inc.*,
   86 N.J. 332 (1981) ........................................30, 31, 32, 34

*Ray v. Alad Corp.*,
   19 Cal. 3d 22 (1977) ........................................30, 31, 32

*Reed v. Cooper (In re Cooper)*,
   405 B.R. 801 (Bankr. N.D. Tex. 2009) ................................39

*In re Roman Catholic Church of Archdiocese of Santa Fe*,
   621 B.R. 502 (Bankr. D.N.M. 2020) ................................26, 27

*In re Roman Catholic Diocese of Harrisburg*,
   640 B.R. 59 (M.D. Pa. 2022) ................................27, 28

*In re SGK Ventures, LLC*,
   521 B.R. 842 (N.D. Ill. 2014) ................................49

*In re Specialty Prods. Holding Corp.*,
   No. 10-11780 (PJW) (Bankr. D. Del. Nov. 19, 2013) (Docket No. 4318) ................................27

*Stewart v. Telex Commc'ns, Inc.*,
   1 Cal. App. 4th 190 (1991) ................................32

*In re STN Enters.*,
   779 F.2d 901 (2d Cir. 1985) ................................26, 29

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
   309 F.3d 144 (3d Cir. 2002) ................................36

*In re Thomas*,
   No. 16-27850-K, 2018 WL 10323389 (Bankr. W.D. Tenn. Aug. 24, 2018) ................................50

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*,
   714 F.3d 860 (5th Cir. 2013) ................................26

**Statutes**

11 U.S.C. §
   101 ................................1

   105(a) ................................*passim*

   323 ................................26

   362(a) ................................15

524(g) ..................................................................................................................4, 7, 38

544 ..........................................................................................................................26

1103 ...............................................................................................................1, 6, 25

1107 ....................................................................................................................6, 26

1108 ..........................................................................................................................6

1109(b) ...........................................................................................................1, 6, 25

28 U.S.C. §

157 ............................................................................................................................6

1334 ..........................................................................................................................6

1409 ..........................................................................................................................7

**Other Authorities**

2 COLLIER ON BANKRUPTCY § 362.05 (15th Ed.) ................................................35

Bankruptcy Rule 7065 ..............................................................................................35

Bankruptcy Rule 9019 ..............................................................................52, 53, 54

Fed. R. Civ. Proc. 12(b)(6) ...........................................................................................4

Fed. R. Civ. Proc. Rule 30(b)(6) ................................................................................20

The Official Committee of Talc Claimants (the "**Committee**") of Whittaker, Clark & Daniels, Inc. ("**WCD**"), Brilliant National Services, Inc. ("**Brilliant**"), Soco West, Inc. ("**Soco**"), and L. A. Terminals, Inc. (collectively, the "**Debtors**") and the Honorable Shelley C. Chapman (Ret.), as the court-appointed legal representative (the "**FCR**," together with the Committee, the "**Movants**") for the purpose of representing and protecting the rights of future claimants, by and through their undersigned counsel, hereby move (the "**Motion**") for entry of an order substantially in the form attached hereto as <u>**Exhibit A**</u> (the "**Proposed Order**") pursuant to sections 105, 1103, and 1109 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), granting the Movants leave, standing, and authority to commence, prosecute and settle the claims and causes of action against Brenntag,[1] NICO,[2] and DBUS[3] (collectively, the "**Proposed Defendants**") as set forth in the draft complaint attached hereto as <u>**Exhibit B**</u> (the "**Proposed Complaint**") on behalf of and for the benefit of the Debtors' estates.  In support of the Motion, the Movants submit the *Declaration of Michael Berkovits in Support of the Joint Motion of The Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* (the "**Berkovits Decl.**") filed contemporaneously herewith and respectfully represent as follows:

---

[1]    Brenntag SE, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc., Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc (collectively, "**Brenntag**").

[2]    National Indemnity Company ("**NICO**").

[3]    DB US Holding Corporation (f/k/a Stinnes Corp.) ("**DBUS**").

## PRELIMINARY STATEMENT

1.      After this Court's ruling that the Successor Liability Claims against Brenntag are

property of the Debtors' estates,[4] the critical issue to be determined is whether the Debtors are the

appropriate estate fiduciaries to control these valuable estate assets.  The answer to that question

is a resounding no.  As explained herein, the Debtors suffer from disabling conflicts of interest that

will undoubtedly motivate them to settle the Successor Liability Claims with Brenntag, DBUS,

and their controlling affiliate NICO for a fraction of their value in a conflicted transaction.  The

Debtors' main goal is to minimize the backstop indemnity obligations of NICO (the affiliate) for

the Successor Liability Claims, rather than maximize value for creditors.  Such an outcome,

however, is prohibited under applicable law, is an affront to the integrity of the bankruptcy system,

and must be avoided.

2.      The Successor Liability Claims, which arise out of Brenntag's 2004 acquisition of

the Debtors' operating assets, have the potential to provide full recoveries for Talc Claimants from

highly solvent non-debtor corporate enterprises.[5]  These claims against Brenntag are meritorious

and valuable, as evidenced by the fact that both Brenntag and the Debtors settled such claims with

plaintiffs for value prepetition.  The Movants' investigation in these cases has confirmed this.  The

---

[4]    *See* Adv. No. 268 (the "**SJ Decision**").  Unless otherwise specified, references to "Docket No." are to docket
entries in Case No. 23-13575, and references to "Adv. No." are to docket entries in Adv. Proc. No. 23-01245
(MBK).  The Committee respectfully disagrees with the Court's determination in the SJ Decision that the
Successor Liability Claims (as defined in the Debtor AP Complaint) are derivative and intends to pursue all
appropriate action to obtain review of the SJ Decision, including through an appeal.  Accordingly, the Movant's
description of Successor Liability Claims herein, in the Proposed Complaint, or otherwise as derivative claims is
subject to those reservations of rights in all respects and should not be deemed an admission that the Movants
agree that any Successor Liability Claims are derivative rather than direct claims.

[5]    This Court has recognized the value of these claims when it noted that whether "these claims can or should be
pursued on behalf of the bankruptcy estate is significant for creditors as a whole."  Oct. 6, 2023 Hr'g Tr. at 3:15-
17.

Debtors nonetheless have never advanced Successor Liability Claims against Brenntag in any meaningful way, either before or after the Petition Date.

3.      The Debtors are hopelessly conflicted because their highly solvent parent, NICO, ultimately backstops Brenntag's successor liability.  As such, it is inconceivable that these Debtors will ever resolve the Successor Liability Claims against Brenntag for fair value, let alone maximum value, because doing so would lead to their affiliate NICO being obligated to pay billions of dollars.  Recognizing their inherent conflicts of interest, the Debtors appointed two "disinterested" directors prepetition, but that does not cleanse or absolve them of this conflict, particularly since those directors have likewise failed to advance the Successor Liability Claims and have financial and professional ties with Debtors' counsel that precludes them from acting with true independence to advance the interests of creditors.

4.      Accordingly, and pursuant to this Court's determination that the Successor Liability Claims are property of the Debtors' estates, the Movants bring this Motion for exclusive derivative standing and authority to prosecute and, if appropriate, resolve the Successor Liability Claims against Brenntag in a manner that maximizes their value to the estates—a pursuit that the Debtors are wholly conflicted from undertaking zealously.  It is imperative that estate fiduciaries not controlled by NICO, nor subject to undue influence or coercion by NICO, exercise control over the Proposed Claims (defined below) for the benefit of creditors and not NICO or the other Berkshire Entities (defined below).

5.      The Movants easily satisfy all three elements that courts consider when assessing a standing motion.[6]  **First**, the Proposed Complaint asserts colorable claims for declaratory,

---

[6]    To be granted derivative standing, the Movants must establish that (i) the claim is "colorable;" (ii) the debtor-in-possession has unjustifiably failed to bring the claim; and (iii) prosecution of the claim would be beneficial to the estate.  *In re G-I Holdings, Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004).

monetary, and injunctive relief that will maximize the value of the Successor Liability Claims against Brenntag for the benefit of the estates by: (a) determining the merit and value of the Successor Liability Claims against Brenntag under both the strict liability product line theory and traditional principles of successor liability law (Count I); (b) resolving whether the Debtors' prior owner, DBUS, is contractually obligated to indemnify Brenntag for any of the Successor Liability Claims (Count II); (c) resolving whether NICO is contractually obligated to satisfy indemnification claims asserted by DBUS with respect to the Successor Liability Claims (Count III); and (d) preliminarily enjoining NICO and DBUS from continuing their efforts ███████████ to modify or adjudicate their contractual obligations to indemnify Brenntag while these Chapter 11 Cases are pending (Count IV) (collectively, the "**Proposed Claims**"). As demonstrated herein, the Proposed Claims easily satisfy the applicable Rule 12(b)(6) standard.

6. **Second**, the Debtors' conflicts of interest and divided loyalties preclude them from prosecuting or settling the Proposed Claims. From the outset, the Debtors' strategy in this case has been clear: to control valuable estate claims and settle them for a fraction of their value for the benefit of their controlling affiliates (including NICO), instead of tort creditors, pursuant to a plan that provides non-consensual releases to the Berkshire Entities and other non-debtor parties. The Supreme Court's recent decision in *Purdue*, however, has made that outcome impossible. The only avenue for obtaining non-consensual releases for non-debtors in these cases is confirmation of a plan under section 524(g) of the Bankruptcy Code. However, the Debtors have refused to negotiate any kind of consensual plan under section 524(g), and it is unlikely that any plan granting releases to non-debtors would achieve the requisite creditor support unless supported by the Movants. The Debtors' actions and inaction in these cases thus belies any contention that they

4

could serve as neutral stewards of valuable causes of action that would benefit Talc Claimants at the expense of the Debtors' parent companies.

7.     **Third**, the Movants are clearly the only appropriate parties—rather than the conflicted Debtors—to prosecute, and if appropriate, negotiate a settlement of the valuable Successor Liability Claims.   The Movants have collaboratively undertaken a thorough investigation of the subject claims and are poised to pursue them for maximum value.   More importantly, the Movants have no conflicts of interest that would compromise their ability to maximize the value of the Successor Liability Claims.   To the contrary, the Movants' interests are fully aligned with the creditor constituency that would be the main beneficiaries of any recovery from the Successor Liability Claims (i.e., Talc Claimants), which recovery could potentially add billions of dollars from solvent non-debtors to the estates.   The monetary benefits arising from the Proposed Claims are significant and dwarf any associated costs.   Allowing the Movants to prosecute the Proposed Claims will also result in non-monetary benefits that will move these cases to a global resolution.   Moreover, only the Committee and the FCR, as fiduciaries for current and future Talc Claimants, can build the necessary creditor support for a consensual plan predicated upon recoveries from the Proposed Claims.

8.     At bottom, this case serves as the paradigmatic fact pattern for granting derivative standing.   The only way to ensure the value of the Successor Liability Claims is maximized and that these cases proceed for the benefit of the Debtors' estates and their creditors—as opposed to the benefit of NICO and other non-debtors—is for this Court to grant the Movants exclusive standing and authority to commence, prosecute, and, if appropriate, settle the Proposed Claims on behalf of the Debtors' estates.

## JURISDICTION

9.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these

proceedings and the Motion is proper under 28 U.S.C. § 1409.  The statutory bases for the relief

requested herein are sections 105, 1103, and 1109 of the Bankruptcy Code.

## BACKGROUND

10.      On April 26, 2023 (the "**Petition Date**"), the Debtors commenced these chapter 11

cases (the "**Chapter 11 Cases**"), purportedly to resolve claims including: (a) "existing and future

tort claims against the Debtors alleging injuries resulting from exposure to products containing

talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors

in interest" (the "**Talc Claims**," and such current and future claimants, the "**Talc Claimants**");

(b) "claims against certain non-Debtor entities seeking to establish such entities' liability for [Talc]

Claims on any grounds, including, without limitation, that such entities are successors to, or alter

egos of, the Debtors" (the "**Successor Liability Claims**");  and (c) "indemnification or

contribution claims against the Debtors with respect to any Successor Liability Claim" (the

"**Indemnification Claims**").  *See* Adv. No. 1 ¶ 1.

11.      Pursuant to 11 U.S.C. §§ 1107(a) and 1108, the Debtors have continued to operate

their businesses and manage their property as debtors-in-possession.

12.      On May 24, 2023, the United States Trustee appointed the Committee, which

comprises the following members: Kathy Ripley Didawick (on behalf of Ann Ripley), Blue Cross

Blue Shield Association, Katia Figueroa, Virginia Harrington, Juliet Gray, Sandra Jankowski

(individually and on behalf of Leo Jankowski), Sarah Plant, Tara Valentine (on behalf of Patricia

Krempecki), and Shelly Yerkes.  *See* Docket No. 121.

13.      On May 3, 2023, the Debtors moved to appoint the Honorable Shelley C. Chapman

6

(Ret.) as the FCR in these Chapter 11 Cases, in order "to ensure that the rights of Future Claimants are adequately represented by a disinterested and qualified representative[,]" citing to section 524(g)(4)(B)(i) of the Bankruptcy Code.  Docket No. 54 ¶¶ 11–12.

14.    On June 26, 2023, the Court approved the appointment of Ret. Judge Chapman as the FCR, effective as of the Petition Date.  Docket No. 231 ¶ 1.

## I.    SOLVENT NON-DEBTOR PROPOSED DEFENDANTS ARE LIABLE FOR THE SUCCESSOR LIABILITY CLAIMS

15.    Each of the "Proposed Defendants"—Brenntag, NICO, and DBUS—is a corporation with independent legal or contractual liability under the 2004 and 2007 Agreements (described below) for injuries caused by asbestos in the Debtors' talc products.

### A.    *The 2004 and 2007 Transactions Shift Responsibility for the Debtors' Talc Liabilities to Their Affiliate NICO*

16.    In late 2003 and early 2004, DBUS sold the Debtors' operating assets (the "**2004 Transaction**") pursuant to a Master Sale and Purchase Agreement and related Asset Purchase Agreements (collectively, the "**2004 Agreements**") to a newly formed Brenntag entity that Bain Capital ("**Bain**") owned.[7]  At the time the 2004 Transaction was negotiated, the Debtors already faced significant exposure to asbestos-related tort lawsuits.  The 2004 Transaction was designed to attempt to cleanse the Debtors' operating assets of those liabilities by leaving all of the Debtors' historical tort liabilities with non-operating shell corporations that DBUS would continue to own, while simultaneously providing for substantially all of the Debtors' operating assets to be transferred to Brenntag.

---

[7]    The 2004 Agreements, including the Master Sale and Purchase Agreement (the "**2004 MSPA**"), the Brilliant Asset Purchase Agreement, the Soco Asset Purchase Agreement, and the WCD Asset Purchase Agreement are attached to the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of the Debtors' Summary Judgment and Preliminary Injunction Motions* (the "**Meghji Decl.**") as Exhibits F, G, H, and I, respectively at Adv. No. 4.

17.     As part of the 2004 Transaction, the Debtors agreed to indemnify Brenntag and Bain for environmental and asbestos claims, with DBUS agreeing to backstop those indemnity obligations if the Debtors became "unable to financially satisfy them." *See* 2004 MSPA § 12. DBUS and Bain also entered into a ███████████████████████████████████ ████████████████████████ (which, as discussed below, is relevant to the merits of the Proposed Claims). *See* Berkovits Decl., Ex. A.

18.     After the 2004 Transaction was consummated, ██████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████. Proposed Complaint ¶¶ 50–56 (setting forth evidence with respect to Brenntag's go-forward operation of the Debtors' operating assets). Specifically, Brenntag ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████. *Id.*

19.     In November 2007, DBUS sold the Debtors (i.e., the shell companies) to NICO (the "**2007 Transaction**") pursuant to a Stock Purchase Agreement (the "**2007 Agreement**").[8] For the nominal price of one dollar, NICO acquired the Debtors' assets, which included approximately $129 million in "Dedicated Funds" that were supposedly earmarked for payment of asbestos claims against the Debtors. *See* 2007 Agreement §§ 2.02, 3.09. NICO also received two sweeteners: (i) a policy from XL Insurance covering asbestos claims in amounts of up to $88 million ("**XL Policy**") (*see id.* § 3.18), and (ii) a post-closing purchase price adjustment under which DBUS would pay $30 million to NICO should lifetime asbestos liabilities exceed $135 million and another $15 million should lifetime environmental liabilities exceed $65 million (*see*

---

[8]     *See* Meghji Decl., Ex. J.

*id.* § 2.06). The XL Policy could also be commuted—i.e., the coverage could be discharged—for $44 million in cash, and it came with a cash option of $5.6 million. *See id.* § 3.18.

20.       As part of this transaction, NICO also guaranteed DBUS's indemnity obligations to Brenntag under the 2004 Agreements, and it also indemnified DBUS for any claims or losses related to asbestos liabilities of the Debtors. *See id.* § 8.03. Collectively, the chain of indemnification obligations pursuant to the 2004 Agreements and the 2007 Agreement backstop the Debtors' primary indemnification of Brenntag and shifts the ultimate responsibility for Brenntag's successor liability to the Debtors' solvent affiliate NICO.

**B.       *NICO Has Controlled the Debtors Since 2007***

21.       NICO's purchase of the Debtors added the Debtors' $129 million in "Dedicated Funds" to Berkshire Hathaway's[9] war chest of investable cash.[10] The 2007 Transaction was ███

████████████████████████████████████████████████████████

████████████████████████████████████ [11] and part of ████████████

████████████████████████████████████████████████████████

---

[9]     Berkshire Hathaway, Inc. ("**Berkshire Hathaway**" or "**Berkshire**"), NICO, National Liability & Fire Insurance Company ("**NLF**"), Resolute Management, Inc. ("**Resolute**"), Ringwalt & Liesche Co., BH Columbia Inc., and Columbia Insurance Company ("**Columbia**") (collectively, the "**Berkshire Entities**").

[10]    *See* Berkovits Decl., Ex. B, transcript of June 13, 2024 deposition of John Arendt ("**Arendt Tr.**") at 203:7-10, 205-207 (



[11]    Arendt Tr. at 49:9-24.

[12]

22.     Since their purchase in 2007, the Debtors have had no real separate existence from NICO and the other Berkshire Entities.  Immediately after closing the 2007 Transaction, NICO took control of the Debtors by installing its own directors and officers as directors of each Debtor: Raj Mehta █████████████████, John Arendt █████████████, and Forrest Krutter ██████████████, and, in place of Mr. Krutter after 2012, Carmel O'Sullivan ███████████.[13]  The Debtors have no employees and have relied on ██████ ███████████████████████████[14] for their sole "operation" of managing legacy tort liabilities; they have long relied, and continue to "rely on Berkshire Hathaway in order to conduct their business."[15]  The only action the Debtors' directors ever took was to ██████ ████████████████████████ where NICO and Berkshire are based.[16]  Those ████████████████████████████████████████.[17]  And the only thing those ████████████████████████████

---

[12]   Arendt Tr. at 242:20-23, 244:11-13.

[13]   *See* Berkovits Decl., Ex. C (████████████████████████████ ██████); Berkovits Decl., Ex. D (██████ ██████); Berkovits Decl., Ex. E (████████████████████).

[14]   *See, e.g.*, Berkovits Decl., Ex. F, Transcript of June 27, 2024 deposition of Raj Mehta ("**Mehta Tr.**")  Mehta Tr. at 50-65.

[15]   *See* Berkovits Decl., Ex. G, Transcript of November 2, 2023 Meghji Deposition (the "**Meghji Tr.**") at 49:2-9.

[16]   *See* Berkovits Decl., Ex. H, Transcript of February 7, 2024 Deposition of Carmel O'Sullivan ("**O'Sullivan Tr.**") at  66:13-68:3;  70:2-14 (██████████████████████████████ ████████████████████████████████ ████).

[17]   O'Sullivan Tr. at 49:12-49:14; 50:18-50:20; 50:23-51:4; Arendt Tr. at 232:24-233:18 ████████████████████████████████ ████████████████████).

██████.[18] Across some 15 years, the Debtors did not ████████████████████████.[19]

23.     The testimony of the Debtors' former directors and officers also makes clear the Debtors have always been beholden to the interests of NICO and the other Berkshire Entities.  In her deposition, Ms. O'Sullivan ███████████████████████████████████████████ ████████████████████████████████.[20] As Ms. O'Sullivan testified, ██████████ ████████████████████████████████████[21]  And with respect to the Debtors, Ms. O'Sullivan explained that ███████████████████████████████████[22] Similarly, Mr. Mehta testified that ████████████████████████████████████████ ██████████████████[23]  And Mr. Arendt testified that ███████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████[24]  Mr. Arendt further testified that ████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████.[25]

24.     Moreover, since 2007, the Debtors' officers and directors have been reluctant to take actions that conflict with the interests of other Berkshire affiliates even where such failure to

---

[18]   *See, e.g.*, Berkovits Decl., Ex. I (███████████████████████████████████████ ████████████████████████); Berkovits Decl., Ex. J (████████████████████████████████).

[19]   O'Sullivan Tr. at 49:12-14; Arendt Tr. at 209:6-9; Mehta Tr. at 33:9-11 (████████████████ ████████████████████████████).

[20]   O'Sullivan Tr. at 37:15-20 ████████████████████████████████████████████████████ ████████████████████████████████████████████).

[21]   *Id.* at 31:3-32:4.

[22]   *Id.* at 52:13-19.

[23]   Mehta Tr. at 26:6-8.

[24]   Arendt Tr. at 259-262.

[25]   *See* Arendt Tr. at 45:17-46:2 (██████████████████████████████████████████████████ ████████████████████████████████████████████████); *see also* Berkovits Decl., Ex. E.

act went against the Debtors' own interests.  On multiple occasions since the 2007 Transaction,

the Debtors ███████████████████████████████████████████████████████████

███████████████████████.  For example, in November 2016, Mr. Mehta ███████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████.[26]  The clear implication is that the

Debtors—which are Berkshire subsidiaries—██████████████████████████████

██████████████████████, because that would not have been in the overall interest of

Berkshire.  Mr. Mehta admitted that ██████████████████████████████████.[27]

        25.     Similarly, in 2020, the Debtors ████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.[28]  And in

connection with policies issued to WCD █████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████.[30]

        26.     Likewise, in connection with excess insurance policies issued to various Soco

predecessors ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

---

[26]  *See* Berkovits Decl., Ex. K.

[27]  Mehta Tr. at 308:13-310:20.

[28]  *See* Berkovits Decl., Ex. L; Mehta Tr. at 322:2, 323:13-18, 324:12.

[29]  *See* Mehta Tr. at 24:23-25:4.

[30]  *See* Berkovits Decl., Ex. M.



[REDACTED].[31] [REDACTED]

[REDACTED].[32]

27.  Leading up to 2023, the Debtors' talc liability [REDACTED], and in March

2023, a South Carolina court entered a $29 million judgment against WCD that resulted in the

appointment of a receiver.[33]  At that time, it was all but certain that the Debtors would soon become

"unable to financially satisfy" Brenntag's indemnity claims, thus creating an imminent financial

risk for NICO given its agreement to backstop the Debtors' obligations to Brenntag.

Consequently, and on account of NICO's and the other Berkshire Entities' control over the

Debtors, the Debtors worked hand in glove with Berkshire to orchestrate next steps that would

protect NICO from liability.

28.  Specifically, Mr. Mehta met with [REDACTED]

[REDACTED],[34] to discuss [REDACTED]

[REDACTED][35]  After that meeting, the Debtors engaged Kirkland & Ellis LLP ("**Kirkland**") to

---

[31]  *See* Berkovits Decl., Ex. N; *see also* Mehta Tr. at 278-81 [REDACTED]

[REDACTED].

[32]  *See* Berkovits Decl., Ex. O.

[33]  *See, e.g.*, Docket No. 157 ¶¶ 7–9; *see also* Mehta Tr. at 257:12-258:16 [REDACTED]

[REDACTED].

[34]  *See* Berkovits Decl., Ex. E ([REDACTED]).

[35]  Mehta Tr. at 255:19-24.

[REDACTED] *See* Mehta Tr. at 256:5-14 [REDACTED]

provide restructuring advice to them.[36]  Kirkland also represents Berkshire Hathaway, certain non-Debtor Berkshire Hathaway affiliates, and Brenntag, outside of these Chapter 11 Cases.

29.    After Kirkland was retained on March 20, 2023, the Debtors appointed officers from M3 Advisory Partners, LP ("**M3**"), a restructuring advisory firm, and for the replacement of two Berkshire directors from the Debtors' three-director board with two purportedly disinterested directors.[37]  These individuals, Paul Aronzon and Tim Pohl, are regularly appointed to sit on the boards of companies that Kirkland represents on the eve of a chapter 11 filing.  *See* Docket No. 223 ¶ 6.  Thus, each of the Debtors' "disinterested" directors and officers has a long-standing, lucrative association with counsel for multiple Proposed Defendants.  Critically, high-level NICO employee Mr. Mehta remained on the Board.

### C.    *NICO Is Seeking to Evade Its Indemnity Obligations*

30.    On July 24, 2023, following the commencement of these bankruptcy proceedings, NICO ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████.[38]

31.    The Movants were not informed ██████████████████ until November 29, 2023—over seven months into these Chapter 11 Cases.  To date, upon information and belief, the ████

---

████████████████████████████████████████████████████████████).  Movants reserve
their rights in connection with this invocation of purported privilege.

[36]  *See* Mehta Tr. at 255:7-257:6.

[37]  Mehta Tr. at 33:5-8.

[38]  *See* Berkovits Decl., Ex. Q.

████████████████████████████████████████████████████████

████████████████████████████████████████.  An adverse ruling ████████████████████

could be devastating to Talc Claimant recoveries in these cases.

**D.**      ***The Debtors Initiated an Adversary Proceeding to Take Control of the Claims NICO Indemnifies***

32.      On September 7, 2023, more than four months after the Petition Date but only a

month-and-a-half after NICO ████████████████████████████████████████████████

██████████, the Debtors commenced an adversary proceeding (the "**Debtor AP**") seeking

declaratory and injunctive relief with respect to the Successor Liability Claims.  *Whittaker, Clark*

*& Daniels, Inc. v. Brenntag AG*, Adv. Proc. No. 23-01245 (MBK).  In their complaint (the "**Debtor**

**AP Complaint**"),[39] the Debtors sought a declaration that section 362(a) of the Bankruptcy Code

prohibits the commencement, continuation, or settlement of any action by a Talc Claimant seeking

to hold a defendant liable for Successor Liability Claims either because the automatic stay

allegedly applies to such claims by its express terms or because "unusual circumstances" warrant

an extension of the automatic stay to such claims.  Adv. No. 1 ¶¶ 60–75.  The Debtor AP Complaint

also requested an injunction under section 105(a) of the Bankruptcy Code staying any Successor

Liability Claims while the Chapter 11 Cases are pending, as well as a declaration that Successor

Liability Claims are property of the Debtors' estates that the Debtors have sole standing to pursue

and compromise.  *Id.* ¶¶ 76–91.  The Debtor AP Complaint does not seek adjudication of the merits

of the Successor Liability Claims or Indemnification Claims.[40]

---

[39]    Adv. No. 1.

[40]    *See* Oct. 6, 2023 Hr'g Tr. at 28:8-14 (Debtors' counsel stating that "[t]his adversary proceeding does not concern the merits of any successor liability claims against the protected parties.  It does not seek to adjudicate any of the debtors' potential indemnification obligations."  And adding that "[t]he debtors have not sought to preclude the TCC from seeking standing to prosecute and compromise these claims.").

33.    One day after filing the Debtor AP Complaint, the Debtors filed a motion to preliminarily enjoin the prosecution of Successor Liability Claims against certain "Protected Parties," including NICO and Berkshire Hathaway (Adv. No. 1 ¶ 17), and a motion for summary judgment with respect to certain counts of the Debtor AP Complaint (the "**MSJ**").  Adv. No. 3. The Court entered a case management order pursuant to which two of the Debtors' claims—those seeking a declaration that (1) the Successor Liability Claims are estate property the Debtors have sole authority to pursue or settle, and (2) the continued prosecution of the Successor Liability Claims violates the automatic stay—were permitted to go forward on summary judgment.  Adv. No. 52.

34.    On November 2, 2023, the Committee deposed the Debtors' Chief Restructuring Officer, Mohsin Meghji, with respect to the evidentiary basis for the Debtors' MSJ, including regarding statements that Mr. Meghji made in the declaration the Debtors submitted in support of their MSJ.  *See* Adv. No. 4.  Among other things, Mr. Meghji testified that he had not undertaken any investigation of the Indemnification Claims or any other sources of non-debtor recovery potentially available to satisfy the Debtors' liabilities.[41]

35.    On November 22, 2023, the Committee filed its opposition to the MSJ.  *See* Adv. No. 90 ("**MSJ Opposition**").  The MSJ Opposition put the Debtors on notice that the Committee was investigating, among other things, whether the Debtors can serve as neutral, disinterested

---

[41]  Meghji Tr. at 62:14-24 ("Q.  Do you know whether the board or the company have conducted an investigation into the indemnity provisions that we just reviewed in the 2004 and 2007 APAs?  A.  I don't.  Q.  Do you know whether the company or the board have investigated whether Deutsche Bahn on NICO may be obligated to satisfy liabilities of the debtors?  A.  I don't know."); *id*. at 47:25-48:6 (Q.  You haven't independently investigated whether NICO has provided indemnity that could backstop the asbestos claims; is that what you're saying?  MR. DEAN: Objection to form.  THE WITNESS: No, I have not.); *id*. at 64:16-65:2 (Q.  Have the debtors in possession of the company investigated whether nondebtors have to satisfy the debtors' liabilities?  MR. DEAN: Objection.  Asked and answered.  THE WITNESS: I don't have anything to add to my previous answer.  Q.  So no?  MR. DEAN: Objection.  THE WITNESS: Yeah.).

stewards of valuable estate claims (*id.* ¶ 95), the web of indemnifications among the Debtors, their

affiliates, and other non-debtors (*id.* ¶ 107), and the conflicting interests between the Debtors and

NICO with respect to the potential settlement of Successor Liability Claims (*id.* ¶ 94). The

Committee argued that granting the Debtors' request for sole authority to settle Successor Liability

Claims would inappropriately pre-judge the Committee's ability to obtain derivative standing (*id.*

¶ 93), and to the extent that the Court later determines that any of the claims listed on Appendix A

to the Debtor AP Complaint are estate property, it reserved the right to file a derivative standing

motion (*id.* ¶ 95).

36.     On August 13, 2024, the Court issued a *Memorandum Decision* finding that the

Successor Liability Claims are property of the Debtors' estates. *See* SJ Decision. On August 28,

2024, the Court entered an order with respect to the SJ Decision. Adv. No. 292.

## II.    THE DEBTORS FAILED TO CONDUCT A REASONABLE INVESTIGATION AND TOOK NO STEPS TO ADVANCE CLAIMS THAT WOULD BENEFIT CREDITORS

37.     Although the Debtors spent months attempting to wrest control of the Successor

Liability Claims from the Talc Claimants, they never initiated a reasonable investigation into the

merits of such claims.

38.     For example, the Debtors served no Rule 2004 requests for documents or

depositions.[42]

39.     To be sure, the Debtors have access to their own documents. But the merits of the

Successor Liability Claims relate to the relationship between the Debtors' pre-2004 legacy talc

operations and the successor operations after the 2004 Transaction. Tellingly, the Debtors possess

only limited records of their own operations prior to 2004, because those operational records were

---

[42]   *See* Berkovits Decl. ¶ 28.

retained by Brenntag in the 2004 transaction.[43]  Records of post-2004 operations are naturally also in the possession of Brenntag.  Yet, the Debtors served no discovery requests on Brenntag for such documents and did not otherwise seek or procure such documents.

40.    The Debtors produced minutes of the meetings of the Debtors' boards of directors. Those minutes are heavily redacted ████████████████████████████████████ ████████████████████████████.[44]  If the Debtors had investigated the Successor Liability Claims designed to maximize the value of such claims, the Debtors would have a common interest with the Committee and the FCR with respect to that investigation and could share such information without endangering the privilege.  The Debtors have not offered to share such information with the Committee and the FCR on a common-interest basis.[45]

41.    Indeed, apart from the Debtors' declaration in their Chapter 11 petitions that Talc Claims against the Debtors total up to $10 billion, the Movants are aware of no evidence that the Debtors have taken any steps at all to establish the merits and value of the Successor Liability Claims that the Debtor AP Complaint sought to have declared property of the estates.[46]

42.    The Debtors have repeatedly claimed that once the Court declared the Successor Liability Claims to be property of the estates, they could be resolved globally.[47]  The Debtors have not explained in these proceedings how it would be possible to achieve a global resolution of the

---

[43]    *See* Berkovits Decl. ¶ 30.

[44]    *See* Berkovits Decl., Ex. R.

[45]    *See* Berkovits Decl. ¶ 34.

[46]    *See* Berkovits Decl. ¶¶ 28–34.

[47]    *See, e.g.*, Adv. No. 99 ¶ 54 (stating in reply to the Committee's MSJ Opposition that the "Debtors cannot prosecute or compromise Successor Liability Claims unless the threshold and contested issue of ownership is resolved – that is the purpose of this Adversary Proceeding and a critical first step towards a comprehensive resolution of all Tort Claims, Successor Liability Claims, and Indemnification Claims that will maximize value for all creditors and provide a more efficient and streamlined process to distribute such value as compared with the tort system.").

18

Successor Liability Claims at the maximum value for creditors without a robust investigation of the merits of such claims.

**III.    THE MOVANTS DOGGEDLY INVESTIGATED POTENTIAL SUCCESSOR LIABILITY CLAIMS AND ARE PREPARED TO PROSECUTE THOSE CLAIMS**

43.    In contrast to the Debtors, the Committee, in close collaboration with the FCR, undertook (and continue to undertake) a serious investigation commensurate with the billions of dollars in potential value that a successful prosecution of the Successor Liability Claims against Brenntag can achieve for the Debtors' estates.  To investigate whether and to what extent the Successor Liability Claims against Brenntag are actionable and meritorious—and to prepare to prosecute such claims—the Committee served discovery requests on the Debtors, Berkshire, Brenntag, DBUS, and Bain.[48]  Given the relevance of the Debtors' operating assets pre- and post-2004, and the motivations underlying the 2004 Transaction (as described in further detail below), the Committee's requests sought documents relevant to the historical talc operations of the Debtors, the nature of the 2004 Transaction, Brenntag's talc operations after the 2004 Transaction, and the continuity of operations at the Debtors before and after the 2004 Transaction.[49]  The Committee has also sought similar information through depositions.  The Committee and the FCR also exchanged written communications and met and conferred extensively—on dozens of occasions—with various parties, including the Debtors and Brenntag.[50]

44.    Specifically as to Brenntag, the Movants have, among other relevant requests, sought documents from both *before* and *after* the 2004 Transaction sufficient to show a continuity

---

[48]    *See* Berkovits Decl. ¶ 35.

[49]    Such requests were included in the 38 requests served on the Debtors on August 14, 2023; in the 47 requests served on the Berkshire on September 14, 2023; in the 45 requests served on Brenntag on November 16, 2023; and in the 11 targeted requests served on Brenntag on May 24, 2024.  *See* Berkovits Decl. ¶ 36.

[50]    *See, e.g.*, Berkovits Decl. ¶ 37, Ex. S.

of operations, including documents sufficient to show continuity of (1) facilities; (2) directors, officers, and employees; (3) assets used to process and distribute talc; (4) customers; (5) products; and (6) suppliers.[51] The Committee also noticed a Rule 30(b)(6) deposition of Brenntag on topics relevant to the merits and value of the Successor Liability Claims and related subject matter.[52] Most recently, following extensive negotiations and persistence by the Committee, Brenntag agreed to produce documents on numerous topics relevant to successor liability.[53]

45.     As noted, the Debtors did not serve any of their own discovery requests. Although the Committee provided the Debtors with notice of all of its discovery requests, the Debtors did not join in any of the Committee's efforts. As recently as July 17, 2024, the Debtors declined the Committee's express invitation to join a scheduled meet-and-confer with Brenntag concerning the Committee's recent document requests to Brenntag targeted at successor liability.[54]

46.     Alongside their investigation into Brenntag's successor liability, and consistent with their fiduciary obligations, the Movants have undertaken a careful investigation into the Debtors' relationship with NICO, the other Berkshire Entities, and the Debtors' talc liabilities. In connection therewith, the Movants deposed two of the Debtors' former directors (Carmel O'Sullivan on February 7, 2024 and John Arendt on June 13, 2024) and the Debtors' current director and former president (Raj Mehta on June 27, 2024). Testimony from these witnesses

██████████████████████████████████████████

---

[51]  *See* Berkovits Decl., Ex. T (May 24, 2024 Subpoena to Brenntag, Schedule B, Requests 2–8). At a meet-and-confer conference on July 25, 2024, Brenntag agreed to produce relevant documents from the first 12 months after the 2004 Transaction. *See* Berkovits Decl. ¶ 37.

[52]  *See* Berkovits Decl., Ex. T at Schedule A.

[53]  *See* Berkovits Decl. ¶ 37. Brenntag's production efforts continue and nothing in this memorandum should be interpreted as a concession that Brenntag's, or any other party's, production is adequate. The Committee reserves all rights with respect to applicable motion practice, including motions to compel further discovery.

[54]  *See, e.g.*, Berkovits Decl., Ex. S.

████████████████████████████████████████████████████████████████

████████████████████████████████████. The Debtors' and Berkshire's email

productions ███████████████████████████████████████████████████████

████████████████████████████████████.

47.     Indeed, the Debtors' officers and directors ██████████████████████

████████████████████████████████████████████████.[55] The

Debtors produced hundreds of emails sent by the former directors Ms. O'Sullivan and Mr. Arendt

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████[56]   Similarly, the Debtors produced more than ████████████████

████████████████████████████████████████████████████████████████

███████████████████████████.[57]

48.     The Berkshire Entities' control of the Debtors extends to this very case.   Counsel

to the Debtors and counsel to Berkshire ██████████████████████████████████████

████████████.[58] There is also ████████████████████████████████████████████

████████████████████████████████████████. While the Debtors and Berkshire

are represented by separate counsel in these proceedings, ██████████████████████████

████████.[59]

49.     Indeed, Debtors' counsel has explained ██████████████████████████████

_____

[55]   *See* Berkovits Decl. ¶ 40.

[56]   *Id.* ¶ 41.

[57]   *Id.* ¶ 42.

[58]   *See, e.g.*, O'Sullivan Tr. 9:11-10:25; Arendt Tr. 11:8-11; Mehta Tr. 10:14-11:10.

[59]   *See* Berkovits Decl. ¶ 39.

██████████████████████████████████████████████████████████

███████████.[60]  Berkshire's counsel ████████████████████████████

████████████████████████████████.[61]

50.    Debtors' and Berkshire's counsel explained ███████████████████

██████████████████████████████████████████████████████████

████████████████████████████████.  Instead, counsel for the Debtors and

Berkshire ████████████████████████████████████████████████████

████████████████████████████████████████████.[62]  Debtors'

counsel ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████.[63]

## IV.    THE MOVANTS' INVESTIGATION UNCOVERED VALUABLE CLAIMS AGAINST THE PROPOSED DEFENDANTS

51.    The Movants' thorough investigation into claims that the Debtors have not

adequately investigated has uncovered the Proposed Claims.  The Proposed Claims include the

Successor Liability Claims against Brenntag, declaratory relief with respect to DBUS's and

NICO's indemnification obligations owed to Brenntag for those Successor Liability Claims, and a

preliminary injunction pursuant to section 105(a) of the Bankruptcy Code to enjoin ████████

████████  whereby NICO is seeking to disclaim its indemnity obligations for the Successor

Liability Claims.

---

[60]    *Id.*

[61]    *Id.*

[62]    *Id.*

[63]    *Id.*

### A.     Successor Liability Claims Against Brenntag

52.     The 2004 Transaction was a sophisticated scheme designed to graft new entities onto the Debtors' entire income-generating business—with the same directors, officers, employees, facilities, products, and customers—while attempting to leave a finite pool of assets to pay the costs imposed by decades of selling asbestos-contaminated talc.   While DBUS and Brenntag benefitted from the transaction, it was designed to have deleterious effects on the ability of asbestos claimants to recover on their claims.   Worse still, the Debtors also incurred contractual obligations to indemnify Brenntag for successor liability resulting from its continuation of the Debtors' businesses.   From the outset, those indemnities were an extraordinary burden that far outweighed the meager assets the Debtors retained following the sale.   The 2004 Transaction was engineered to have precisely the kind of inequitable consequence for innocent injured individuals that led courts to create successor liability doctrines in the first place.

53.     The Movants have identified claims under applicable law to hold Brenntag liable as a successor-in-interest to the Debtors.   Those claims arise under two separate state law doctrines. First, the product line doctrine recognized by several states imposes strict tort liability as a matter of public policy against an asset purchaser for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired.   Courts have not hesitated to impose successor liability where new entities assume existing operations.   As set forth in the Proposed Complaint, that is exactly what Brenntag did and exactly why Brenntag is required to assume the legal obligations of the Debtors, which are now unable to fully compensate those they injured.

54.     Second, the Movants have identified claims predicated on traditional theories of successor liability.   Here, all of the factors that courts consider when determining the successor status of a purchaser weigh heavily in favor of a successor liability finding.   Among other things,

Brenntag acquired substantially all of the Debtors' operating assets and liabilities, maintained the same business operations, management, and personnel, and held itself out as carrying out the uninterrupted operations of the Debtors.

      **B.**      ***Declaratory Judgment for Indemnification Obligations under the 2004 and 2007 Agreements***

55.      Contractual obligations associated with the 2004 and 2007 Transaction give rise to viable indemnification claims against DBUS and NICO.

56.      In addition to the discovery described above, the Movants also undertook extensive discovery, including deposition testimony, concerning indemnification obligations relating to the Successor Liability Claims. This discovery confirmed the following facts.

57.      As part of the 2004 Transaction, the Debtors were required to indemnify Brenntag for any claims involving asbestos exposure from the Debtors' pre-2004 Transaction operations. But DBUS agreed to guarantee the Debtors' indemnification obligations in the event the Debtors became "unable to financially satisfy" them. At the latest, since their bankruptcy filing, the Debtors have been "unable to financially satisfy" any indemnity claims made by Brenntag, thereby triggering DBUS's responsibility for such obligations.

58.      Moreover, as part of the 2007 Transaction, NICO guaranteed DBUS's indemnity obligations to Brenntag under the 2004 Agreements and also agreed to indemnify DBUS directly for any claims or losses related to the asbestos liabilities of the Debtors. NICO is thus contractually obligated to satisfy indemnification claims asserted by DBUS with respect to the Successor Liability Claims and any claims to enforce DBUS's guarantee of indemnification claims in connection with the 2004 Transaction.

### C.      *Preliminary Injunction Pursuant to Section 105(a) of the Bankruptcy Code*

59.      Pursuant to section 105(a) of the Bankruptcy Code, this Court may enjoin creditor actions against third parties to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of these Chapter 11 Cases, including by fully effectuating the protections of the automatic stay.  Based on the facts above, and the need to ensure the orderly administration of these cases, the Proposed Claims include a request for an injunction staying ███████████ ██████ to prohibit NICO and DBUS from obtaining an order modifying or adjudicating their contractual obligations related to Successor Liability Claims while the Chapter 11 Cases are pending.

### RELIEF REQUESTED

60.      By this Motion, the Movants seek an order pursuant to sections 105, 1103, and 1109 of the Bankruptcy Code granting the Movants exclusive standing and authority to commence, prosecute and, if appropriate, settle the Proposed Claims on behalf of the Debtors' estates as set forth in the Proposed Complaint.

### LEGAL STANDARD

61.      Congress specifically authorized official committees to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."  11 U.S.C. § 1103(c)(2).  Indeed, section 1103(c)(5) provides that a committee may perform such other services as are in the interest of those represented, and section 1109(b) provides that an official committee of creditors "may raise and

may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).[64]  The

right to be heard "includes the right to sue when a trustee or debtor in possession will not."  *In re*

*Marin Motor Oil, Inc.*, 689 F.2d 445, 456 n.11 (3d Cir. 1982) (quoting *In re Joyanna Holitogs,*

*Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982)).

62.     Although a debtor has standing to prosecute claims on behalf of its estate (*see* 11

U.S.C. §§ 323, 1107, 544), the concept of conferring derivative standing on a creditors' committee

comes into play when the Bankruptcy Code's "envisioned scheme breaks down" and a bankruptcy

court must use its equitable power "to craft a remedy."  *Off. Comm. of Unsecured Creditors of*

*Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery* ("*Cybergenics*"), 330 F.3d 548, 553 (3d

Cir. 2003).  The Third Circuit has recognized that "Congress approved of creditors' committees

suing derivatively to recover property for the benefit of the estate" and that the concept of

derivative standing is necessary because debtors-in-possession "often act[] under the influence of

conflicts of interest" that may impair their willingness, or ability, to pursue estate claims for the

benefit of the estate and creditors.[65]  *Id.* at 567, 573; *see also In re G-I Holdings, Inc.*, 313 B.R. at

---

[64]   The FCR has equivalent rights as the Committee in these cases.  *See Order (I) Appointing Honorable Shelley C. Chapman (Ret.) as Future Claimants' Representative, Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 231] (providing that "Ret. Judge Chapman shall have standing under section 1109(b) of the Bankruptcy Code to be heard as a party-in-interest in all matters relating to the Chapter 11 Cases on any issue on which she has standing under applicable standing principles and shall have such powers and duties of a committee, as set forth in section 1103 of the Bankruptcy Code, as are appropriate for an FCR.").

[65]   Indeed, numerous federal courts, including the Third Circuit, have approved of derivative standing for creditor committees and other parties where, as here, the debtor is conflicted, or unable or unwilling to pursue estate causes of action.  *See, e.g.*, **Second Circuit:** *Commodore Int'l v. Gould* (*In re Commodore Int'l, Ltd.*), 262 F.3d 96, 100 (2d Cir. 2001); *In re STN Enters.*, 779 F.2d 901 (2d Cir. 1985).  **Third Circuit:** *Cybergenics*, 330 F.3d 548.  **Fifth Circuit**: *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 863 (5th Cir. 2013); *La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 858 F.2d 233, 247–48 (5th Cir. 1988).  **Sixth Circuit**: *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)*, 66 F.3d 1436, 1440–41 (6th Cir. 1995); *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 240 (6th Cir. 2009).  **Seventh Circuit**: *Enodis Corp. v. Emplrs. Ins. (In re Consol. Indus. Corp.)*, 360 F.3d 712, 716-17 (7th Cir. 2004); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000).  **Eighth Circuit**: *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs.)*, 540 F.3d 892, 898–900 (8th Cir. 2008).  **Ninth Circuit**: *Jones v. Schlosberg (In re Jones)*, 178 Fed. App'x 662, 664 (9th Cir. 2006).  **Tenth Circuit**: *In re Roman Catholic Church of Archdiocese of Santa Fe*, 621 B.R. 502, 508 (Bankr. D.N.M. 2020).

628 ("'[N]early all courts considering the issue [of appointing a creditor's committee to act on behalf of the debtor] have permitted creditor's committees to bring actions in the name of the debtor-in-possession if the committee is able to establish' that a debtor is neglecting its fiduciary duty.") (quoting *Cybergenics*, 330 F.3d at 553), *aff'd in part, vacated in part on other grounds by* No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510 (D.N.J. June 21, 2006).

63.    Significantly, bankruptcy courts in this and other circuits routinely grant official committees and future claimants' representatives standing to assert estate claims under circumstances like those here (i.e., where debtors are conflicted and thus unable to serve as neutral, disinterested stewards of valuable estate claims).  *See, e.g.*, *In re Specialty Prods. Holding Corp.*, No. 10-11780 (PJW) (Bankr. D. Del. Nov. 19, 2013) (Docket No. 4318) (granting derivative standing to asbestos creditors' committee and future claimants' representative to prosecute claims arising from prepetition corporate restructuring); *In re DBMP LLC*, No. 20-30080 (JCW) (Bankr. W.D.N.C. Nov. 3, 2021) (Docket No. 1197) (granting derivative standing to asbestos creditors' committee and future claimants' representative to investigate, prosecute and settle claims arising out of the prepetition divisional merger); *see also In re G-I Holdings, Inc.*, 313 B.R. 612 (granting derivative standing to asbestos claimants' committee to prosecute fraudulent transfer claims where the debtor was conflicted with respect to the subject transaction); *In re Roman Catholic Church of Archdiocese of Santa Fe*, 621 B.R. 502, 508 (Bankr. D.N.M. 2020) (granting unsecured creditors' committee representing tort claimants derivative standing to prosecute fraudulent transfer and turnover claims against certain trusts and parishes); *In re Aldrich Pump LLC*, No. 20-3060 (JCW) (Bankr. W.D.N.C. Apr. 14, 2022) (Docket No. 1121) (granting derivative standing to asbestos creditors' committee to investigate, prosecute, and settle claims arising out of the prepetition divisional merger); *In re Roman Catholic Diocese of Harrisburg*, 640 B.R. 59 (M.D. Pa. 2022)

(granting tort claimants' committee derivative standing to prosecute preferential and fraudulent transfer claims against two separate trusts created by debtor).

64.    To be granted derivative standing, the Movants must establish that (i) the claim is "colorable"; (ii) prosecution of the claim would be beneficial to the estate; and (iii) the debtor-in-possession has unjustifiably failed to bring the claim. *In re G-I Holdings, Inc.*, 313 B.R. at 628 ("A committee may have derivative standing to initiate an avoidance action on behalf of the debtor where . . . a colorable claim that would benefit the estate if successful exists[.]") (citing cases).

65.    Colorability only requires a showing that the claim meets the applicable pleading standards. *Id.* at 631 ("[T]he first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.") (citations omitted).  In finding a claim colorable, the Court must accept as true all factual allegations in the complaint. *Id.* at 630–31. "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim," the "colorability" prong of derivative standing is met. *Id.* (quoting *Jordan v. N.J. Dep't of Corr.*, 881 F. Supp. 947, 950 (D.N.J. 1995) (emphasis added)).  Thus, if the Proposed Claims "set out sufficient factual matter to show that [they are] facially plausible," they are colorable. *In re Roman Cath. Diocese of Harrisburg*, 640 B.R. 59, 68 (Bankr. M.D. Pa. 2022).

66.    The Court should grant the Movants standing if the asserted claims are likely to benefit the estate—in other words, if "the proposed litigation will not be a hopeless fling." *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005) (acknowledging that the burden of showing a colorable claim is a "relatively easy one"); *see also In re Diocese of Camden, New Jersey*, No. 20-21257 (JNP), 2022 WL 884242, at *4 (Bankr. D.N.J. Mar. 24, 2022) ("This inquiry is like that of a motion to dismiss for failure to state a claim, where a court must accept as true the allegations and facts pleaded in

the complaint."). In determining if a colorable claim exists, a court need not undertake a mini-trial. *Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters., Inc.)*, 779 F.2d 901, 905–06 (2d Cir. 1985).

## ARGUMENT

67.     Cause exists for the Court to grant the Movants authority to commence, prosecute, and, if appropriate, settle the Proposed Claims. The Proposed Complaint alleges colorable claims that are well grounded in law and fact and would add substantial value to the Debtors' estates. Due to the Debtors' irreconcilable conflicts, it is inconceivable that they would ever prosecute the Successor Liability Claims since doing so would lead to their controlling affiliate, NICO, being obligated to pay billions of dollars. Indeed, the Debtors' failure to adequately investigate potential estate claims against the Proposed Defendants or advance the Successor Liability Claims in any meaningful way is proof enough that they will not go further to zealously prosecute any such claims. Therefore, the only path forward is for this Court to authorize the Movants to commence with prosecuting and, if appropriate, resolving, the Proposed Claims.

## I.      THE PROPOSED CLAIMS ARE COLORABLE

68.     The Proposed Complaint demonstrates that colorable claims exist against the Proposed Defendants. Based on an intensive investigation by the Movants, the Proposed Complaint alleges sufficient facts to make a *prima facie* case of the Proposed Claims.

### A.      *The Successor Liability Claims Are Colorable (Count I)*

69.     Count I of the Proposed Complaint seeks a declaration that Brenntag is a successor-in-interest to the Debtors and seeks an award of damages arising therefrom. The Debtors have strong claims for successor liability against Brenntag, the purchaser of substantially all of the

Debtors' operating assets in 2004, under both the strict liability product line doctrine[66] and

traditional principles of successor liability law.   These claims are both colorable and valuable

because if successfully prosecuted, all or a substantial portion of the Debtors' liabilities would be

imputed onto Brenntag, a solvent non-debtor with billions of dollars in assets and annual profits,

and other solvent non-debtors.

### i.      Product Line Claims Are Colorable

70.      Several states recognize a product line theory of successor liability that focuses on

whether an acquiring entity continued the seller's product line.   *See, e.g.*, *Ray v. Alad Corp.*, 19

Cal. 3d 22 (1977).   Successor liability can be imposed under the product line exception where the

following factors are met: (1) the successor's acquisition of the manufacturer's business virtually

destroyed plaintiff's remedies against the manufacturer; (2) the successor has the ability to assume

the manufacturer's role of spreading the risk of injury as a cost of doing business; and (3) the

successor's assumption of the responsibility for defective products is a fair result when considering

whether the successor enjoys the manufacturer's goodwill in continuing the business.   *Peterson*

*Mfg. Co. v. Titan Int'l, Inc.*, Nos. B176630, B177816, 2005 Cal. App. Unpub. LEXIS 7413, at *12

(2d. Dist. Aug. 17, 2005) (citing *Ray*); *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 358 (1981)

(same).

71.      Here, the Proposed Complaint alleges colorable product line claims that satisfy all

of the factors that courts consider when analyzing the product line doctrine.   There can be no

reasonable dispute that Brenntag acquired substantially all of the manufacturing assets of the

Debtors and continued essentially the same manufacturing operation as the Debtors, ███████

---

[66]   The doctrine is so claimant-friendly that the New Jersey Supreme Court, in re-affirming the doctrine as striking
a "sound accommodation of the competing interests" noted that "[c]ritics of the exception believe that it is unfair."
*Mettinger v. Globe Slicing Mach. Co.*, 153 N.J. 371, 381 (1998).

███████████████████████████████████████████████████████. *See* Proposed

Complaint ¶¶ 50–56 (████████████████████████████████████████████████

████████████████). That allegation satisfies the primary inquiry under the product line

doctrine for imposition of strict liability on a purchaser. *See Ramirez*, 86 N.J. at 350; *Ray*, 19 Cal.

3d at 34.

72.    In addition, the Proposed Complaint alleges colorable facts in support of the three

*Ray* factors that courts consider when determining whether to apply the product line doctrine.

**First**, Brenntag's acquisition of the Debtors in 2004 attempted to impair Talc Claimants' remedies

against the manufacturer by, among other things, transferring valuable assets from the Debtors to

Brenntag and saddling the Debtors with indemnification obligations that, together with their

retained tort and environmental liabilities, far exceeded the value of the assets that were left with

the Debtors upon closing of the sale—as the present circumstances amply demonstrate. Proposed

Complaint ¶¶ 38–49. The Proposed Complaint also alleges that ██████████████████████

█████████████████████ was an attempt to conceal Brenntag's status as the Debtors'

successor from Talc Claimants. *Id.* ¶¶ 42–43. These allegations are more than sufficient to state

colorable allegations in support of the first *Ray* factor. *Ramirez v. Amsted Indus.*, Inc., 86 N.J. at

350, (finding that "plaintiff's potential remedy against Johnson, the original manufacturer of the

allegedly defective press, was destroyed by the purchase of the Johnson assets, trade name and

good will,  . . . , [which] directly brought about the ultimate dissolution of [the predecessor's]

corporate existence); *Bussell v. DeWalt Products Corp.*, 259 N.J. Super. 499 (1992) (rejecting

arguments that "total destruction" of plaintiff's remedies is a strict requirement for imposing

product line successor liability under New Jersey law, and explaining that under principles of

"fundamental fairness," the plaintiff must show only that the predecessor company is nonviable,

not that the successor company caused that nonviability) (citing *Pacius v. Thermtroll Corp*., 259

N.J. Super. 51, 56 (Law Div. 1992); *Stewart v. Telex Commc'ns, Inc.*, 1 Cal. App. 4th 190, 199

(1991).

73.    **Second**, Brenntag, as the Debtors' successor, has the ability to assume the

manufacturer's role of spreading the risk of injury as a cost of doing business given that it had

more than €10 billion in assets as of December 31, 2023, and annual sales of over €16 billion.[67]

Brenntag also has active business operations, maintains product liability coverage for products that

it manufactures and distributes, and holds contractual indemnification and contribution rights

against non-debtor parties with respect to products that it manufactures and distributes.  Proposed

Complaint ¶ 84; *Ramirez*, 86 N.J. at 352 (citing *Ray*, 19 Cal.3d at 33).  Brenntag, like the successor

in *Ramirez*, acquired the Debtors' "trade name[s], physical plant[s], manufacturing equipment,

inventory, records of manufacturing designs, patents and customer lists," and "sought the

continued employment of the factory personnel that had manufactured the [Debtors' products],"

placing it in a superior position to estimate, bear, and spread the costs of the operations it

purchased.  *Id*.

74.    **Third**, it is fair to impose strict liability on Brenntag given that it enjoyed the

Debtors' goodwill, trademarks, product names, product lines, domain names, and trade names.

Proposed Complaint ¶ 83; *Ramirez*, 86 N.J. at 352–53 ("Public policy requires that having received

the substantial benefits of the continuing manufacturing enterprise, the successor corporation

should also be made to bear the burden of the operating costs that other established business

operations must ordinarily bear.").

---

[67]    https://brenntagprod-media.e-spirit.cloud/06432017-be1f-41ce-8d1d-
564e2a66d213/documents/corporate/investor-relations/2023/annual-report-2023/brenntag_annualreport-
2023_en.pdf.

ii.    **The Traditional Successor Liability Claims Are Colorable**

75.    Count I of the Proposed Complaint also asserts claims for successor liability pursuant to traditional theories of successor liability, including mere continuation and de facto merger theories.  These colorable claims would establish that Brenntag is a successor for all purposes and thereby shift the estates' talc liabilities onto Brenntag in their entirety.

76.    For example, under New Jersey law,[68] a buyer will be liable as the mere continuation of a seller when the following four factors are met: "(1) continuity of management, personnel, physical location, assets and general business operations; (2) cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) continuity of ownership/shareholders." *Munenzon v. Peters Advisors, LLC*, No. 20-14644 (KM)(JBC), 2022 U.S. Dist. LEXIS 85440, at *13 (D.N.J. May 10, 2022) (quoting *Lefever v. K.P. Hovnanian Enters.*, 160 N.J. 307, 310, 734 A.2d 290, 292 (1999)).[69]  A court will find that the buyer is a mere continuation where circumstances suggest that the sale sought to unfairly limit potential claimants.  *See, e.g.*, *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 337 (D.N.J. 2002).

77.    The Proposed Complaint alleges that Brenntag acquired substantially all of the Debtors' operating assets and liabilities, maintained the same business operations, management, and personnel, and held itself out as carrying out the uninterrupted operations of the Debtors.  Proposed Complaint ¶¶ 50–56.  Upon closing of the 2004 Transaction, the Debtors did not have

---

[68]    The Motion cites New Jersey law illustratively because that is the forum state for the Chapter 11 Cases.  The Movants reserve all of its rights to engage in a choice of law analysis and address all potentially applicable theories of successor liability.

[69]    New Jersey courts consider the same four factors for the mere continuation theory as they do for the de facto merger theory.  *See Munenzon*, 2022 U.S. Dist. LEXIS 85440, at *13.

the ability to engage in active business operations and were required to indemnify Brenntag for the Successor Liability Claims. Those indemnification obligations, plus the value of the asbestos liabilities, far exceeded the value of assets that were retained by the Debtors following the 2004 Transaction. "[I]n light of the social policy underlying the law of products liability, the true worth of a predecessor corporation must reflect the potential liability that the shareholders have escaped through the sale of their corporation. Thus, a reduction of the sale price by an amount calculated to compensate the successor corporation for the potential liability it has assumed is a more, not less, accurate measure of the true worth of the business." *Ramirez*, 86 N.J. at 353–54. Under those circumstances, the Proposed Complaint contains colorable allegations that Brenntag should be determined to be a successor to the Debtors.

### B.    The Indemnification Obligation Claims Are Colorable (Counts II and III)

78.    Counts II and III of the Proposed Complaint assert claims for declaratory relief holding that DBUS and NICO are contractually obligated to satisfy Indemnification Claims that Brenntag holds pursuant to the 2004 and 2007 Agreements, respectively. DBUS (the Debtors' former owner) in 2004, and NICO (the Debtors' current owner) in 2007, both contractually indemnified Brenntag's successor liabilities and guaranteed the Debtors' indemnification obligations to Brenntag, and the Movants have identified additional estate claims designed to force DBUS and NICO to honor their agreed-to obligations and enjoin NICO's attempts to evade its responsibilities through a foreign arbitration.

79.    The Proposed Complaint plausibly alleges that the condition precedent for the triggering of these indemnification obligations, i.e., the Debtors' financial inability to pay, has been met and thus the responsibility for satisfying the Debtors' indemnification obligations to Brenntag under the 2004 Agreements has shifted to solvent non-debtors. *See, e.g.*, *PHL Variable Ins. Co. v. ESF QIF Tr. by & through Deutsche Bank Tr. Co.*, No. CV 12-319-LPS, 2013 WL

6869803, at *3 (D. Del. Dec. 30, 2013) ("Pursuant to 28 U.S.C. § 2201, '[i]n a case of actual

controversy within its jurisdiction ... any court of the United States ... may declare the rights and

other legal relations of any interested party seeking such declaration, whether or not further relief

is or could be sought.'").

80.     These claims—which the Debtors clearly lack inventive to pursue—provide yet

another avenue of recovery by increasing the funds available to satisfy the estates' liabilities to

include additional solvent non-debtors.  *See supra* n.6.  If successfully prosecuted, these claims

could create significant value for the Debtors' estates by shifting liabilities from the insolvent

Debtors to the solvent non-Debtors who contractually agreed to bear the risk of loss decades ago.

### C.     The Preliminary Injunction Claim Is Colorable (Count IV)

81.     Count IV of the Proposed Complaint asserts a claim for entry of a preliminary

injunction enjoining ████████████████████████ while the claims in the Proposed

Complaint are adjudicated.   Such an injunction is critical to the successful outcome of these

Chapter 11 Cases and good cause exists for the entry of injunctive relief pursuant to section 105(a)

of the Bankruptcy Code and Bankruptcy Rule 7065.

82.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]."  11 U.S.C. § 105(a).  This includes "ample power to enjoin actions excepted

from the automatic stay which might interfere in the rehabilitative process" of a bankruptcy case.

*In re Johns-Manville Corp.*, 26 B.R. 420, 425 (Bankr. S.D.N.Y. 1983), *aff'd*, 40 B.R. 219

(S.D.N.Y. 1984), and appeal allowed, decision vacated in part on other grounds, 41 B.R. 926

(S.D.N.Y. 1984) (citing 2 COLLIER ON BANKRUPTCY § 362.05 (15th Ed.))

83.     Courts considering the propriety of an injunction under section 105(a) typically

apply the traditional four-pronged test for injunctions, as modified for the bankruptcy context.  *See*

*In re G-I Holdings, Inc.*, 420 B.R. 216, 281 (D.N.J. 2009); *Philadelphia Newspapers*, 407 B.R.

606, 616–17 (E.D. Pa. 2009) (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144,

157 (3d Cir. 2002)).   The four elements, as tailored to a bankruptcy case, are: (i) the debtor's

reasonable likelihood of a successful reorganization; (ii) the imminent risk of irreparable harm to

the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor

and its creditors; and (iv) whether the public interest weighs in favor of an injunction.  *In re G-I*

*Holdings Inc.*, 420 B.R. at 281; *see also In re Bestwall LLC*, 606 B.R. 243, 253 (Bankr. W.D.N.C.

2019).

84.     The Proposed Complaint plausibly alleges that all of the above factors weigh in

favor of entering a preliminary injunction to enjoin ███████████ .  First, if the Movants are

granted standing, the prospects for a successful outcome in these Chapter 11 Cases are reasonably

strong given that the claims in this Proposed Complaint will ensure non-debtor sources of funding

are preserved and available to satisfy or eliminate claims against the estates.  Second, the failure

to grant the requested injunction would irreparably harm the Debtors' estates and defeat the

purpose of these Chapter 11 Cases by ███████████████

██████ , thereby negatively impacting the value of the Successor Liability Claims against

Brenntag.  Third, the balance of the harms weighs heavily in favor of the requested injunction

because ██████████████████ would cause irreparable harm to

the Debtors and their estates by eliminating alternative sources of recovery potentially available to

satisfy the Talc Claims and the Successor Liability Claims.  In contrast, the harm that an injunction

might cause NICO and DBUS is non-existent (or minimal at best).  The issuance of a preliminary

injunction will neither permanently deprive NICO and DBUS ██████████████

██████████████████████

36

███████████.  Instead, it will merely preserve the current status quo, giving the relevant stakeholders time to reach a resolution regarding the treatment of the Successor Liability Claims, which are stayed during the pendency of these Chapter 11 Cases.  Fourth, the public interest weighs in favor of an injunction because there is a strong public interest in resolving the Talc Claims and protecting Talc Claimants rather than solvent non-debtors.  Proposed Complaint ¶¶ 109–121.

## II.  PROSECUTION OF THE CAUSES OF ACTION WILL BENEFIT THE ESTATE

85.  In determining if an action would be beneficial to an estate, many courts engage in a limited cost-benefit analysis.  *In re Pack Liquidating, LLC*, 658 B.R. 305, 336 (Bankr. D. Del. 2024) ("While not an explicit requirement under *Cybergenics* for obtaining derivative standing, many other courts consider whether the committee's claim would benefit the bankruptcy estate based on a cost-benefit analysis.") (citing cases).  Courts conduct this analysis by "consider[ing] the probability of success and the potential costs of litigation[.]"  *Id.*

86.  Here, to the extent any cost-benefit analysis is required, the benefits to be gained from pursuing the Proposed Claims are substantial and significantly outweigh any concerns about delay or expense.  The Proposed Claims are compelling as detailed *supra*.  Those claims are the key to unlocking potentially *billions* of dollars in value from solvent non-debtors and have the potential to expand the outer limits of recoveries in these cases from an otherwise finite pool of available cash.  Obtaining fair value for the Successor Liability Claims against Brenntag and ensuring that NICO and DBUS do not escape their indemnity obligations is also the only way to build creditor consensus for a plan, which would provide a far less costly and litigious outcome to these cases.  Talc Claimants would not support the Debtors' preferred approach—settling the claims for a fraction of their actual value in a manner designed to artificially cap NICO's liabilities to the detriment of innocent asbestos victims—and thus, no progress would be made towards confirmation of a plan in these cases.  Accordingly, the monetary and non-monetary benefits of

granting the Movants standing far outweighs the costs associated with prosecuting the Proposed
Claims.

87.    Additionally, granting the Movants standing to prosecute the Proposed Claims will
benefit the estates by ensuring that responsibility for the pursuit of those claims is in the hands of
the only estate fiduciaries that have both the incentive and the ability to maximize the value of the
claims.  The Movants are fiduciaries to current and future talc victims (the fulcrum creditors who
pursued the Proposed Claims in the tort system and will be the primary beneficiary of any
settlement), they have no conflicts of interest, and they undertook and are continuing to undertake
an extensive investigation into all aspects of the Successor Liability Claims (and related indemnity
obligations).

88.    Not only are the Movants the parties best incentivized to maximize value, but they
are the only parties capable of doing so.  As the FCR has made clear, future claimants cannot be
bound by a settlement of the Proposed Claims other than through a 524(g) Plan supported by the
FCR and 75% of voting claimants. *See* Docket No. 675 (citing *G-I Holdings, Inc. v. Bennet (In re
G-I Holdings, Inc.)*, 328 B.R.691, 697 (D.N.J. 2005) (future claimants' representative is not a
guardian ad litem with the power to bind future claimants in an adversary proceeding)).
Accordingly, the Debtors alone cannot offer the Proposed Defendants a settlement that will bind
future claimants.  The Debtors may argue otherwise, and have suggested as much, but the Proposed
Defendants know well that claimants will vigorously dispute the Debtors' position and spend years
litigating the issue, and so the Proposed Defendants will discount their settlement offers
accordingly.  The Movants, in contrast, can offer the Proposed Defendants much greater
protection—a 524(g)-compliant plan that is supported by and binds current and future claimants—
and accordingly secure a much greater settlement.

89.     Moreover, the Movants are prepared to prosecute the Proposed Claims on an expedited timeframe.  Many of the claims are suitable for early summary judgment adjudication either based on the evidence that the Movants have already developed through their investigation, or after the Movants conduct limited additional discovery.  In particular, the Movants are prepared to expeditiously seek a partial summary judgment ruling that Brenntag is a successor under (at least) the product line theory of liability and that DBUS and NICO are responsible for satisfying those liabilities.  That ruling will clarify the non-debtor Proposed Defendants' obligations to satisfy a substantial amount of the estates' tort liabilities and serve as a pathway to move these Chapter 11 Cases forward to final resolution.

## III.   BECAUSE OF THEIR INHERENT AND INESCAPABLE CONFLICTS OF INTEREST, THE DEBTORS CANNOT ASSERT THE PROPOSED CLAIMS FOR THEIR FULL VALUE

90.     Courts in this and other circuits recognize that granting derivative standing to a non-conflicted estate fiduciary to prosecute or settle estate claims is particularly warranted where the debtor suffers from a conflict preventing it from pursuing estate claims for the benefit of the estate.  *Cybergenics*, 330 F.3d at 573 (noting that granting derivative standing to a creditors' committee is especially warranted where the debtor-in-possession's management not only controls the estate but such control has led to divided loyalties and conflicts); *see also Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009) (observing that the rationale underlying a committee's standing to bring estate causes of action "comes into play when a debtor-in-possession has a conflict of interest in pursuing an action."); *In re Hydrogen L.L.C.*, No. 18-014139 (AJG), 2009 WL 2913448, at *2 (Bankr. S.D.N.Y. May 7, 2009) ("The suit by the Committee is necessary because Debtor is conflicted from bringing the suit itself . . . and is beneficial because if the Committee did not have standing to sue, potentially valuable estate causes of action would be wasted.") (citation omitted).

91.      Here, the Debtors are inherently incapable of resolving the Proposed Claims in a manner that maximizes their value for the estates, as established by the fact that they are undoubtedly conflicted from doing so.  The Debtors are intertwined with NICO—the Proposed Defendant that is ultimately responsible for the Debtors' talc liability under the backstop indemnities.  As such, the Debtors' conflict prevents them from maximizing the value of the Successor Liability Claims for the benefit of asbestos victims, as doing so would substantially increase the liability of their controlling affiliate, i.e., NICO, potentially by billions of dollars.  The presence of "disinterested" directors appointed by Debtors' counsel (ostensibly for purposes of providing a mirage of neutrality in this bankruptcy) does not cleanse these conflicts of interest, especially given Mr. Mehta's continued presence on the board, and the absence of any meaningful investigation into matters relating to the Proposed Claims even after the Debtors appointed the two "disinterested" directors.

92.      *The Debtors are beholden to NICO and the other Berkshire Entities*.  As discussed in detail herein, an overwhelming amount of evidence shows that NICO has controlled the Debtors since acquiring them in 2007, and that the Debtors are beholden to the interests of NICO and the other Berkshire entities.  *See supra* § I(B).  In addition, for over 15 years, the Debtors have relied completely on the Berkshire Entities for all of their operational needs and have no real separate existence or independence from their affiliates:  the Debtors have no employees of their own, and their key officers and directors have been unable to describe any respect in which the Debtors had a separate existence in deposition testimony.

93.      Mr. Mehta served as the Debtors' president from 2007 until right before the Petition Date.  Following the Debtors' bankruptcy filing, Mr. Mehta has remained as one of the Debtors' three directors.  Mr. Mehta, however, has irreconcilable conflicts of interest given that ████████

40

███████████████████████████[70]—both of which are indirect parents of the Debtors.  *See*

Docket No. 5 at Ex. B.[71]

94.    Historically, Mr. Mehta has not acted independently from NICO or the other

Berkshire Entities while purportedly acting on behalf of the Debtors.  For example, ██████

████████████████████████████████████████████████████████████████████

██████████████████████████.  As detailed above, on several occasions, ██████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.  *See, e.g.,*

*supra* ¶¶ 24–26.

95.    At a deposition in this bankruptcy case, Mr. Mehta testified that, prior to the

Debtors' retention of Kirkland in 2023, ████████████████████████████████████

███████████████████[72]—even though the Debtors' **sole** "business" involves managing

legacy talc and environmental liabilities that NICO ultimately backstops.  That failure ██████

█████████████████████████████████.

96.    Mr. Mehta also ████████████████████████████████████████

---

[70]    *See* Berkovits Decl., <u>Ex. U</u>.

[71]    As recently as March 1, 2023, Mr. Mehta ████████████████████████████████

████████████████████████████████████.  *See* Berkovits Decl.,

<u>Ex. V</u>.

[72]    *See* Mehta Tr. at 210:4-18 (████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████.

Tellingly, prior to the Petition Date, ████████████████████████████████████████

███████████████████████.  *See* Mehta Tr. at 209:5-13 (████████████████████

██████████████████████████████████████████████████████████████████).

███████████████████████████████████████████████████████.  In
March 2023, Mr. Mehta and the Debtors—despite having retained Kirkland and M3—████████
███████████████████████████████████████████████████████
████████████████████████.[73]

97.    ***The Debtors' engagement of "disinterested" directors does not cleanse their
conflicts of interest***.  In connection with the Debtors' pursuit of a bankruptcy filing, the Debtors
appointed Timothy Pohl and Paul Aronzon as purportedly "disinterested" directors.  But this has
not resolved the issues posed by Mr. Mehta's continued involvement with the Debtors.

98.    Even after appointment of the "disinterested" directors, Mr. Mehta ████████
███████████████████████████████████████████████████████
████████████████████████████████████.[74]    The Debtors'
"disinterested" directors do not play a similar role.

99.    Mr. Mehta also ████████████████████████████████████
██████████████████████████.  According to the Debtors' privilege log, ████████████
████████████████████████████████████████████████.  *See*
Berkovits Decl. ¶ 42.  In contrast, ████████████████████████████████

---

[73]    *Compare* Berkovits Decl., Ex. P, *with id.*, Ex. E; *see also* Mehta Tr. at 260:3-9 (████████████████████
████████████████████████████████).

[74]    *See, e.g.*, Berkovits Decl., Ex. R (████████████████████████████████

████████████████████████.

███████████████████████████████████████████████████████████████████.

*See* Berkovits Decl., <u>Ex. W</u>.  Mr. Aronzon ███████████████████████████████

███████████████████████████████████████████████████████.  *See* Berkovits

Decl., <u>Ex. X</u>.

      100.    Furthermore, Mr. Mehta has testified ████████████████████

███████████████████████████.  *See* Mehta Tr. at 266:14-267:11 (███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████; Mehta Tr. at 263:11-25 (███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████).

      101.    The Debtors' pervasive conflicts with NICO and the other Berkshire Entities

remain unaffected by the appointments of Timothy Pohl and Paul Aronzon as purportedly

"disinterested directors" on the Debtors' boards because their decision-making is not—and cannot

be—truly independent of Mr. Mehta.  As the only individual left on the Debtors' board with any

working knowledge of their corporate structure, relationships, operations, assets, and liabilities, all

information that the disinterested directors receive regarding the Debtors necessarily flows through

Mr. Mehta.  And without any independent sources of information, the disinterested directors have

no ability to challenge Mr. Mehta's views of important facts and are not independent in any real

sense.

      102.    ***The fact that the Debtors do not possess "disinterested" directors in any real sense***

***is evidenced by the Debtors' actions to date***.  As discussed in detail above, while the Movants

have been laser-focused on maximizing the largest potential source of recovery to creditors, i.e.,

the Successor Liability Claims, the Debtors have done nothing to prosecute these claims, increase

litigation pressure on the Proposed Defendants, or otherwise act in the best interests of creditors.

To the contrary, the Debtors have actively blocked the Committee and FCR from obtaining

discovery relevant to these claims.

103.    As explained herein, the Debtors have not pursued discovery relevant to

establishing the merits and value of the Successor Liability Claims, while the Movants—

unconflicted parties-in-interest with an interest in maximizing the assets of the estate—have done

so.[75]  *See, e.g.*, *supra* ¶ 43–44.  For example, the Debtors apparently ███████████████

████████████████████████████████████████████████████████████████████████

███████████████████████.[76]  Indeed, in seeking to conceal NICO's true interest in

this bankruptcy, when the Debtors initiated an adversary proceeding and moved for injunctive

relief to protect certain "Protected Parties" including NICO and the other Berkshire Entities, they

failed to advise the Court that the reason NICO, a Berkshire subsidiary, needed "protection" is

because it had agreed to indemnify all of the Debtors' talc liabilities (by way of its agreement to

indemnify DBUS for its guarantee of the Successor Liability Claims).

---

[75]  To be sure, the Debtors possess certain internal documents concerning the 2004 Transaction, the 2007
Transaction, and Brenntag's tender to the Debtors of successor liability claims against Brenntag from 2004
through the bankruptcy filing, for indemnification by the Debtors.  But the Debtors do not possess, and have taken
no steps to acquire and review, other information relevant to maximizing the value of Successor Liability Claims,
including the extensive discovery zealously pursued by the Movants, as described above.

[76]  *See* Mehta Tr. at 146:17-148:11 ██████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████).

104.     Nothing the Debtors have filed with the Court even takes a position about the merits of the Successor Liability Claims or even acknowledges the existence of the backstop indemnities. Instead, the Debtors have obtained an injunction against the pursuit of the Successor Liability Claims against Brenntag that would trigger those indemnities and have done nothing whatsoever to enforce the indemnification obligations of DBUS and NICO or to prevent DBUS and NICO from attempting to escape such obligations ████████████ .

105.     Furthermore, the Debtors' actions with respect to the enjoined Successor Liability Claims have effectively resulted in the destruction of valuable estate claims.  Following the May 15, 2024 hearing at which the Court denied Brenntag's request to expand the scope of the TRO,[77] the Debtors took a hardline position that they will only exempt actions from the TRO if the claimant, among other things, elects to dismiss all Successor Liability Claims against Brenntag *with* prejudice.  The Debtors took this position notwithstanding that the Court stated that an agreement to allow claimants to be exempt from the TRO upon dismissal of Successor Liability Claims *without* prejudice would be acceptable.[78]   Accordingly, the Debtors unnecessarily demanded that claimants permanently forfeit valuable estate claims[79] even though dismissal of such claims without prejudice would have sufficed to address the underlying purposes of the TRO (i.e., preventing harm to the estates and preserving the status quo).[80]  Such demands benefit no one

---

[77]   The "TRO" refers to the *Temporary Restraining Order* (Adv. No. 89), as extended on a 28-day basis and most recently pursuant to the *Eighth Order Extending Temporary Restraining Order* (Adv. No. 250) (together with all prior extensions granted by this Court, "**TRO**").

[78]   *See* May 15, 2024 Hr'g Tr. at 47:14-18 (Judge Kaplan: The parties are "always free to come up with their own mechanism that has been discussed as far as dismissals without prejudice.").

[79]   *See Papera v. Pennsylvania Quarried Bluestone Co.*, 948 F.3d 607, 611 (3d Cir. 2020) ("A dismissal with prejudice 'operates as an adjudication on the merits,' so it ordinarily precludes future claims.") (internal citation and quotations omitted).

[80]   *See* Adv. No. 88 at 4.

other than NICO, which is ultimately on the hook for the Successor Liability Claims. This further underscores the Debtors' poor stewardship over estate assets stemming from their core desire to reduce or eliminate the liabilities of their controlling affiliates.

106.     Regardless of whether the Court would ultimately hold that the Successor Liability Claims are property of the estates, the Debtors and the Movants were in agreement that the Successor Liability Claims are a potential source of recovery to the largest body of creditors—i.e., the Talc Claimants.    Thus, the Debtors—if they were acting as legitimate fiduciaries for creditors—should have advanced the Successor Liability Claims and other claims on the merits, so as to extract as much value for those claims as possible from solvent non-debtors such as Brenntag, DBUS, and NICO.    The Debtors could have formulated theories of recovery and cooperated with the Committee and FCR to ensure that in the event the Court found that the Successor Liability Claims were property of the estates, such claims would be ready to be robustly litigated. Barring that, the Debtors could have at least conducted an investigation of the Successor Liability Claims so as to give the Court an accurate picture of recoveries available to the largest class of creditors, the Talc Claimants, as is necessary for achieving finality in these cases. None of that has happened.

107.     Indeed, notwithstanding the substantial value of the Successor Liability Claims and the indemnification obligations of two highly solvent non-debtors backstopping those claims, the Debtors' directors have completely failed to conduct any meaningful investigation into those claims during the 15 months in which these cases have been pending.

108.     Mr. Meghji, the Debtors' Chief Restructuring Officer, also seems to have studiously avoided engaging in any analysis of those obligations. At eight months into these cases

46

Case 23-13575-MBK    Doc 1293    Filed 08/30/24    Entered 08/30/24 20:28:16    Desc Main
Document    Page 60 of 107

he testified that he had never even read the documents that gave rise to any of those obligations,[81] professing to have very little understanding of their terms and admitting he had not seen or performed any analysis regarding their value or enforceability.[82]    Based on discovery the Committee and FCR have received to date, there exists no evidence indicating that anything has changed since Mr. Meghji's testimony.

109.    ***The "disinterested directors" are repeat partners with Debtors' counsel***.  Messrs. Pohl and Aronzon routinely serve as "disinterested" or "independent" directors on the boards of companies represented by Debtors' counsel Kirkland.[83]    For example, Mr. Pohl has been an independent director on the following companies represented by Kirkland as part of both in-court and out-of-court restructuring transactions: Voyager Digital Holdings, Inc. et al., Dunn Paper Holdings, LLC, and Genesis Specialist Care Pty. Ltd.  *See* Docket No. 223 ¶ 6.  Mr. Aronzon has served as an independent director for JUUL Labs, Inc., EXCO Services, Inc., Noble Corp., and Cirque de Soleil Entertainment Group, all of which retained Kirkland as counsel.  *See id.*

---

[81]  Meghji Tr. at 22:2-8 ("Q. And have you reviewed the 2004 transaction documents? A. No. Q. Have you reviewed any other documents related to the 2004 transaction? A. I have not reviewed the APAs or anything like that. I know they exist."); *id.* at 26:17-24 ("Q. I'm going to direct you to 18 section twelve [of the 2004 Transaction Documents] which is labeled as asbestos indemnity. Do you see that? A. Yes. Q. Have you seen this provision before? A. I have not read this."); *id.* at 40:6-13 ("Q. This is a stock purchase agreement between Stinnes Corporation and National Indemnity Company or NICO dated November 7, 2007. Have you seen this document before? A. No, I have not read this document before."); *id.* at 45:6-11 ("Q. I'm going to direct you to section 8.03 [of the 2007 Transaction Documents] . . . .  Have you seen this provision before? A. I have not read this before.").

[82]  Meghji Tr. at 62:10-24; 100:10-14 ("Q. I'll make this easier. Have you seen any analysis of the value of successor liability claims in any form? A. No."); Meghji Tr. at 62:10-24 ("Q. Do you know if anyone else besides counsel and the directors are involved in the investigation? A. No. Q. Do you know whether the board or the company have conducted an investigation into the indemnity provisions that we just reviewed in the 2004 and 2007 APAs? A. I don't. Q. Do you know whether the company or the board have investigated whether Deutsche Bahn on NICO may be obligated to satisfy liabilities of the debtors? A. I don't know."); Meghji Tr. at 136:22-137:11 ("Q. Have you discussed potential claims against Berkshire Hathaway with anyone besides counsel? A. No. Q. How about the claims against Brenntag, are you aware of any claims against Brenntag? A. Again, all of my discussions have been with counsel, with my counsel, not their counsel. Q. All right. And the same question, how about Bain Capital? A. The same answer.").

[83]  As detailed in its retention application, Kirkland also represents Berkshire and certain of its affiliates, as well Brenntag and its affiliates.  *See* Docket No. 160, Ex. B ¶¶ 35, 39.  Kirkland also represented Bain in connection with the negotiation and execution of the 2004 Agreements.

110.    Here, both of the "disinterested" directors have a demonstrated relationship with Debtors' counsel and a readily apparent commercial interest in future nominations to the boards of companies represented by Debtors' counsel, a preeminent law firm that routinely represents restructuring companies in need of independent directors.  *See Blasband v. Rales*, 971 F.2d 1034, 1048 (3d Cir. 1992) ("Directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders.").  "[D]irectorial independence requires a director's decision to be 'based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'"  *In re Cendant Corp. Derivative Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999).  But Messrs. Pohl and Aronzon each have divided loyalties and are subject to extraneous influences in their decision-making based on their demonstrated relationships with Debtors' counsel, which are pecuniary in nature and on which future board appointments depend.  Tellingly, they are not even represented by their own separate legal counsel.

111.    Messrs. Pohl and Aronzon's relationship with Kirkland, in conjunction with their failure to take a more active role in these cases, including, significantly, conducting their own investigation of the Successor Liability Claims, as well as the continued dominant presence of Mr. Mehta of the Debtors' board, demonstrate that the Debtors' conflict of interest is simply inescapable.

112.    In short, the Debtors are plagued by disabling conflicts and divided loyalties with respect to the Proposed Claims.  As such, the Debtors are incentivized to settle the Successor Liability Claims for as little as possible for the benefit of their controlling affiliates and shareholders, rather than maximize value for creditors.  Under analogous circumstances, courts in this and other circuits routinely deputize a creditors' committee with standing to prosecute and/or

settle the estate claims at issue.  For example, in *In re G-I Holdings*, the court granted derivative

standing to the asbestos claimants' committee to challenge the "Pushdown Transaction" as a

fraudulent transfer.  313 B.R. at 643.  The transfers sought to be avoided "were implemented by

executives who still remain[ed] in charge of both [the debtor] and [its primary operating

subsidiary] BMCA" and the "individual that principally drafted the reorganization agreement for

the . . . transaction . . . is not only the President of [the debtor], but also serves as Executive Vice

President and General Counsel for BMCA."  *Id.* at 630.  In granting derivative standing, the court

reasoned that the debtor was "operating under at least the influence of conflicts of interest, and

[that] it is perfectly reasonable to assume that this dynamic is, to some degree, influencing its

decision-making process as a debtor-in-possession."  *Id.*

113.    Similarly, in *Louisiana World Exposition*, the Fifth Circuit held that a creditors'

committee had derivative standing to assert gross negligence, mismanagement, and breach of

fiduciary duty claims against the debtor's officers and directors.  858 F.2d at 234.  In so holding,

the court articulated its reasoning as follows:

> [W]e note that where a debtor-in-possession possesses a cause of action—and, because the estate will benefit as a result, must assert that cause of action—yet is unable, because of a conflict of interest, to bring that action, allowing a creditors' committee to pursue the suit on the debtor-in-possession's behalf will often prove beneficial to the estate. Inherent conflicts in the debtor-in-possession's relationship with its management and creditors may constitute a basis for the appointment of a trustee.  It takes but little imagination to discern the benefits of permitting a creditors' committee to proceed in lieu of appointing a trustee for that purpose[.]

*Id.* at 251; *see also In re SGK Ventures, LLC*, 521 B.R. 842 (N.D. Ill. 2014) (granting derivative

standing to unsecured creditor's committee to prosecute fraudulent conveyance claims where one

of the defendants is an insider of the debtor and part of the debtor's management); *In re Thomas*,

No. 16-27850-K, 2018 WL 10323389 (Bankr. W.D. Tenn. Aug. 24, 2018) (granting derivative

standing to creditors to assert claims seeking to avoid certain transfers that the debtor made to his wife because the "Debtor-In-Possession has an obvious conflict of interest"); *In re Hydrogen L.L.C.*, 2009 WL 2913448, at *2 (holding that granting derivative standing to the Committee "is necessary because Debtor is conflicted from bringing the suit itself . . . and is beneficial because if the Committee did not have standing to sue, potentially valuable estate causes of action would be wasted.") (citation omitted); *Cambridge Realty West, LLC v. NOP, LLC*, No. 10-2791, 2010 WL 4668436 (E.D. La. 2010) (granting derivative standing to creditor to avoid a lease that the debtor entered into with an insider of the debtor because the debtor was conflicted).

114.     At bottom, the Debtors' conflicts of interest with respect to the Successor Liability Claims disqualifies them from prosecuting and/or settling those claims.

115.     ***The Court Should Excuse the Formal Demand Requirement Under the Present Circumstances***.  The second element of the derivative standing test requires that either: (a) the Movants make a demand on the Debtors to assert the Proposed Claims, and the Debtors unjustifiably refuse the Movants' demand; or (b) that such a demand be excused as futile.  *See In re G-I Holdings*, 313 B.R. at 630 ("[I]n appropriate circumstances form should not override substance.  That is, a debtor's refusal . . . can be implied even where no formal demand has been made by a creditors committee"); *In re Diocese of Camden, New Jersey*, 2022 WL 884242, at *4 (same).

116.     Importantly, a committee is not required to formally demand a debtor act where, as here, it is "plain from the record that no action on the part of the debtor would have been forthcoming." *Off. Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 544 (W.D. Pa. 2005) (finding formal request of debtor to bring action would have been futile as debtor could not have "seriously entertained the idea"); *La. World Exposition, Inc.*, 832 F.2d at

1397–98 (court would not remand so that committee could make formal demand upon debtor where conflicts would likely prevent the debtor from pursuing litigation adverse to itself and its officers).

117.    Indeed, courts routinely excuse a movant seeking derivative standing from making a formal demand where, as here, the debtor suffers from a disabling conflict with respect to the claims at issue and/or the debtor's refusal to pursue the subject claims can be implied.  For example, in *G-I Holdings*, the Bankruptcy Court granted derivative standing to the asbestos claimants' committee to commence an avoidance action even though the committee did not make a formal demand on the debtor to prosecute such an action.  *In re G-I Holdings, Inc.*, 313 B.R. at 629.  Taking into account the debtor's conflict of interest and its prior positions in opposition to proposed challenges to the subject transaction, the court determined that "ample evidence suggests that any formal demand made by the Committee upon G–I Holdings to investigate and prosecute the proposed avoidance action would have been refused."  *Id.* at 630; *see also In re Nat'l Forge Co.* at 544–45 (affirming bankruptcy court's holding that the committee's failure to make a formal demand on the debtor should be excused where the debtor "would have been operating under a patent conflict of interest if faced with a demand to file suit."); *In re La. World Exposition, Inc.*, 832 F.2d 1391, 1397–98 (5th Cir. 1987) (court would not remand so that committee could make formal demand upon debtor where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (creditors' committee would be excused from making a demand on a debtor to pursue action against its officers, directors and controlling shareholders where such a demand would be futile); *Off. Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 01-11353 (PJW), ADV. 02-04553, 2003 WL 21956410, at *3 (Bankr. D. Del.

51

Aug. 14, 2003) (demand would be futile where debtor's counsel has conflict of interest sufficient to effectively disqualify counsel from pursuing the otherwise colorable action).

118.    As demonstrated herein, given the Debtors' irreconcilable conflicts, divided loyalties, and actions to date, any demand on the Debtors to assert the Proposed Claims would have been futile.  Accordingly, the Court should hold that the Movants were not required to make a formal demand on the Debtors.

## IV.    THE COURT SHOULD GRANT THE MOVANTS SOLE AUTHORITY TO SETTLE THE PROPOSED CLAIMS

119.    As a corollary to the relief discussed above, the Movants request the grant of exclusive authority to negotiate and enter into settlements regarding the Proposed Claims, subject to Court approval pursuant to Bankruptcy Rule 9019.  Such relief is frequently part and parcel of orders conferring derivative standing upon a creditors' committee.[84]  Indeed this Court has noted that compromising claims is part and parcel of prosecuting them.[85]  This case presents the "proverbial problem of the fox guarding the henhouse" that motivated the Third Circuit's decision

---

[84]    *See In re Evergreen Solar, Inc.*, Order Granting Leave, Standing and Authority to the Official Committee of Unsecured Creditors of Evergreen Solar, Inc. to Commence, Prosecute, and Settle Claims on Behalf of the Debtor's Estate and Related Relief, Case No. 11-12590-MFW (Bankr. D. Del. Oct. 28, 2011) [Docket No. 382] (granting derivative standing to unsecured creditors' committee and providing that the committee "shall have the exclusive right and authority to negotiate and enter into settlements on behalf of the Debtor's estate" with respect to certain causes of action); *In re Majestic Capital, Ltd.*, Order (I) Authorizing the Official Committee of Unsecured Creditors to (A) Assert and Prosecute Certain Claims and Causes of Action in the Name of and on Behalf of the Debtors' Estates, and (B) Move for Authority to Compromise Any Such Claims and Causes of Action, and (II) Granting Related Relief, Case No. 11-36225-CGM (Bankr. S.D.N.Y. Dec. 12, 2011) [Docket No. 211] (granting derivative standing to unsecured creditors' committee and providing that it "shall have the exclusive right, without further order of the Court, to move for authority, pursuant to Bankruptcy Rule 9019, to compromise any of the Estate Claims"); *In re Old Carco LLC*, Order Authorizing the Official Committee of Unsecured Creditors to Pursue Certain Claims on Behalf of the Estate of Debtor Old Carco LLC, Case No. 09-50002-AG (Bankr. S.D.N.Y. Aug. 13, 2009) [Docket No. 5151] (granting creditors' committee derivative standing, including "exclusive right to prosecute and settle these claims on behalf of CarCo estate").

[85]    Aug. 15, 2024 Hr'g Tr. at 87:3-6 (Judge Kaplan discussing the Debtors' proposed order with respect to the SJ Decision and stating that "I don't have an issue with the language that provides for exclusive right to prosecute and, by the way, also to compromise, however -- you know, I assumed that that's part and parcel of prosecuting a claim is compromising a claim.").

in *Cybergenics*, 330 F.3d at 573.

120.    The Movants' ability to litigate the Proposed Claims will be hindered if the Debtors retain the rights to propose settlements because, among other things, it will reduce incentives for the Proposed Defendants to enter into settlement negotiations with the Movants.  Further, it creates an improper settlement dynamic that the Proposed Defendants may exploit to the detriment of all Talc Claimants and these estates.  This is particularly problematic under the facts of these cases given the grave conflicts of interest that the Debtors have with respect to the Berkshire Entities, which render them ill-suited to serve as responsible stewards of the Proposed Claims.  Granting the Movants the sole right to compromise those claims eliminates these concerns and makes clear to all potential defendants that the party in control of the litigation controls any potential settlements thereof as well.  Moreover, it is indisputable that any settlement of the Proposed Claims will have a disproportionate economic impact on the current and future Talc Claimants whose interests the Committee and the FCR, respectively, represent in these cases.

121.    At bottom, the Debtors' conduct in these cases and divided loyalties makes clear that they cannot zealously advance meritorious claims against Brenntag, DBUS, or the Berkshire Entities.  Allowing the Debtors to settle the Proposed Claims would violate Bankruptcy Rule 9019 given the strength of the Proposed Claims, and is incompatible with the Court's SJ Decision finding that the Successor Liability Claims exist for the benefit of all of the estates' creditors.[86]

122.    Accordingly, the Movants request that the Court grant this Motion, the Court also grant the Movants the exclusive right, without further order of the Court, to move for authority, pursuant to Bankruptcy Rule 9019, to compromise any Proposed Claim, and that the Court

---

[86]  *See, e.g.*, SJ Decision at 27 (finding that the "pursuit of Successor Liability Claims in good faith" will "maximize value to creditors.").

expressly prohibit the Debtors from undertaking to compromise any Proposed Claim under Bankruptcy Rule 9019 or otherwise. *See, e.g.*, *In re Dewey & LeBeouf LLP*, No. 12-12321 (MG), 2012 WL 5985445, at *7 (Bankr. S.D.N.Y. Nov. 29, 2012).

## **CONCLUSION**

123.     For the foregoing reasons, the Movants respectfully request that the Court enter the Proposed Order annexed hereto as **Exhibit A**: (i) granting the Movants derivative standing to commence and prosecute the Proposed Claims on behalf of the Debtors' estates; and (ii) granting the Movants exclusive authority to settle such claims on behalf of the Debtors' estates.

124.     The Movants reserve all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend the Proposed Complaint in accordance with applicable law, including after the completion of discovery, to add additional defendants or remove defendants as it determines is necessary or appropriate, and to raise further and other claims and causes of action in connection with the prosecution of the Proposed Complaint.

125.     The Movants reserve the right to appeal the Court's SJ Decision notwithstanding this Motion.

Dated:   August 30, 2024

*/s/ Arthur J. Abramowitz*

**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
        rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz

Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Email: cspeckhart@cooley.com
      mklein@cooley.com
      elazerowitz@cooley.com
      jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email: kmaclay@capdale.com
      tphillips@capdale.com
      sconcannon@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

/s/ Stuart R. Lombardi
**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi
Justin Garbacz (admitted *pro hac vice*)
Christine Thain (admitted *pro hac vice*)
Amanda M. Payne (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Email:  slombardi@willkie.com
      jgarbacz@willkie.com
      cthain@willkie.com
      apayne@willkie.com

**RABINOWITZ LUBETKIN & TULLY, LLC**
Jonathan I. Rabinowitz
Barry J. Roy
293 Eisenhower Parkway, Suite 100
Livingston, NJ 07039
Tel: (973) 597-9100
Email:  jrabinowitz@rltlawfirm.com
         broy@rltlawfirm.com

*Co-Counsel for Future Claimants' Representative*

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** **COOLEY LLP** Cullen D. Speckhart (admitted *pro hac vice*) Michael Klein (admitted *pro hac vice*) Evan M. Lazerowitz Jeremiah P. Ledwidge (admitted *pro hac vice*) 55 Hudson Yards New York, NY 10001 Tel: (212) 479-6000 Email:   cspeckhart@cooley.com       mklein@cooley.com       elazerowitz@cooley.com       jledwidge@cooley.com <br><br> *Lead Counsel to the* *Official Committee of Talc Claimants* | **WILLKIE FARR & GALLAGHER LLP** Stuart R. Lombardi Justin Garbacz (admitted *pro hac vice*) Christine Thain (admitted *pro hac vice*) Amanda M. Payne (admitted *pro hac vice*) 787 Seventh Avenue New York, NY 10019 Tel: (212) 728-8000 Email: slombardi@willkie.com       jgarbacz@willkie.com       cthain@willkie.com       apayne@willkie.com <br><br> *Co-Counsel to Future Claimants' Representative* |
| **CAPLIN & DRYSDALE, CHARTERED** Kevin C. Maclay (admitted *pro hac vice*) Todd E. Phillips (admitted *pro hac vice*) Kevin M. Davis (admitted *pro hac vice*) Serafina A. Concannon (admitted *pro hac vice*) One Thomas Circle, NW, Suite 1100 Washington, DC 20005 Tel: (202) 862-5000 Email:   kmaclay@capdale.com       tphillips@capdale.com       kdavis@capdale.com       sconcannon@capdale.com <br><br> *Special Asbestos Counsel to the* *Official Committee of Talc Claimants* | **RABINOWITZ LUBETKIN & TULLY, LLC** Jonathan I. Rabinowitz Barry J. Roy 293 Eisenhower Parkway, Suite 100 Livingston, NJ 07039 Tel: (973) 597-9100 Email:   jrabinowitz@rltlawfirm.com       broy@rltlawfirm.com <br><br> *Co-Counsel to Future Claimants' Representative* |
| **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.** Arthur J. Abramowitz Ross J. Switkes 308 Harper Drive, Suite 200 Moorestown, NJ 08057 Tel: (856) 662-0700 Email:   aabramowitz@shermansilverstein.com       rswitkes@shermansilverstein.com <br><br> *Local Counsel to the* *Official Committee of Talc Claimants* | |
| In re: <br><br> WHITTAKER, CLARK & DANIELS, INC., *et al.*, <br><br>       Debtors. | Chapter 11 <br><br> Case No. 23-13575 (MBK) <br><br> (Jointly Administered) <br><br> Honorable Michael B. Kaplan, U.S.B.J., Chief |

(Page 2)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-13575 (MBK)
Caption of Order: Order Granting Standing and Authorizing the Committee and FCR to Pursue
Claims on Behalf of the Debtors' Estates

---

**ORDER GRANTING MOTION OF THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS AND THE FUTURE CLAIMANTS' REPRESENTATIVE FOR ENTRY
OF AN ORDER GRANTING STANDING AND AUTHORIZING THE COMMITTEE
AND FCR TO COMMENCE, PROSECUTE, AND SETTLE CERTAIN ESTATE
<u>CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES</u>**

The relief set forth on the following pages, numbered three (3) through five (5), is

**ORDERED**.

(Page 3)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-13575 (MBK)
Caption of Order: Order Granting Standing and Authorizing the Committee and FCR to Pursue
Claims on Behalf of the Debtors' Estates

---

Upon consideration of the motion [Docket No. ____] (the "**Motion**"),[1] of the Official Committee of Talc Claimants (the "**Committee**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**") and the Honorable Shelley C. Chapman (Ret.), as the court-appointed legal representative (the "**FCR**," together with the Committee, the "**Movants**") for the purpose of representing and protecting the rights of Future Claimants, for entry of an order (the "**Order**"), pursuant to 11 U.S.C. §§ 105(a), 1103(c) and 1109(b), granting the Movants (i) derivative standing to commence and prosecute certain causes of action on behalf of the Debtors' estates, and (ii) exclusive leave, standing, authority to commence, prosecute, and settle such causes of action claims on behalf of the Debtors' estates; and of any objections thereto and the record of these chapter 11 cases; and it appearing that (i) this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, dated September 18, 2012; (ii) venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this matter is a core proceeding under 28 U.S.C. § 157(b); (iv) proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and (v) the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor;

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

(Page 4)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-13575 (MBK)
Caption of Order: Order Granting Standing and Authorizing the Committee and FCR to Pursue
Claims on Behalf of the Debtors' Estates

---

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections, if any, to the Motion or the relief requested therein, that have not

been withdrawn, waived, or settled, are overruled.

3.      The Movants are granted, on behalf of the Debtors' estates, exclusive leave,

standing, and authority to commence and prosecute the Proposed Claims set forth in the Motion

and the Proposed Complaint, with the full rights and privileges of, and in the stead of, the Debtors.

4.      The Movants are authorized, and shall have the exclusive right and authority, to

negotiate and settle the Proposed Claims on behalf of the Debtors' estates, subject to further order

of this Court approving such settlements.

5.      The Movants may amend or modify the Proposed Complaint attached to the Motion

prior to its filing.

6.      The Movants are authorized and empowered to take all actions necessary to

implement the relief granted in this Order.

7.      Nothing in this Order shall affect in any way the Movants' rights to seek standing

to bring additional causes of action against the Proposed Defendants or any other party.

8.      Nothing in this Order shall impair the Movants' ability to seek appellate review of

the SJ Decision or be deemed an admission that the Movants agree that any Successor Liability

Claims are derivative rather than direct claims.

9.      The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

(Page 5)
Debtors: Whittaker, Clark & Daniels, Inc., *et al.*
Case No. 23-13575 (MBK)
Caption of Order: Order Granting Standing and Authorizing the Committee and FCR to Pursue
Claims on Behalf of the Debtors' Estates

---

10.     The Court shall retain jurisdiction to hear and determine all matters arising from or

related to the implementation of this Order.

## **Exhibit B**

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email:   cspeckhart@cooley.com<br>           mklein@cooley.com<br>           elazerowitz@cooley.com<br>           jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* | **WILLKIE FARR & GALLAGHER LLP**<br>Stuart R. Lombardi<br>Justin Garbacz (admitted *pro hac vice*)<br>Christine Thain (admitted *pro hac vice*)<br>Amanda M. Payne (admitted *pro hac vice*)<br>787 Seventh Avenue<br>New York, NY 10019<br>Tel: (212) 728-8000<br>Email:   slombardi@willkie.com<br>           jgarbacz@willkie.com<br>           cthain@willkie.com<br>           apayne@willkie.com<br><br>*Co-Counsel to Future Claimants' Representative* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005<br>Tel: (202) 862-5000<br>Email:   kmaclay@capdale.com<br>           tphillips@capdale.com<br>           kdavis@capdale.com<br>           sconcannon@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | **RABINOWITZ LUBETKIN & TULLY, LLC**<br>Jonathan I. Rabinowitz<br>Barry J. Roy<br>293 Eisenhower Parkway, Suite 100<br>Livingston, NJ 07039<br>Tel: (973) 597-9100<br>Email:   jrabinowitz@rltlawfirm.com<br>           broy@rltlawfirm.com<br><br>*Co-Counsel to Future Claimants' Representative* |
| **SHERMAN, SILVERSTEIN,**<br>**KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email:   aabramowitz@shermansilverstein.com<br>           rswitkes@shermansilverstein.com<br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>              Debtors. | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered)<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF TALC CLAIMANTS, and the Honorable Shelley C. Chapman (Ret.), in her capacity as the court-appointed legal representative for Future Claimants, on behalf of the estates of the Debtors,<br><br>Plaintiffs,<br><br>v.<br><br>BRENNTAG SE, BRENNTAG CANADA INC., BRENNTAG GREAT LAKES, LLC, BRENNTAG MID-SOUTH, INC., BRENNTAG NORTH AMERICA, INC., BRENNTAG NORTHEAST, INC., BRENNTAG PACIFIC, INC., BRENNTAG SOUTHEAST, INC., BRENNTAG SOUTHWEST, INC., BRENNTAG SPECIALTIES, INC., BRENNTAG SPECIALTIES LLC, COASTAL CHEMICAL CO., LLC, MINERAL AND PIGMENT SOLUTIONS, INC; DB US HOLDING CORP., and NATIONAL INDEMNITY CO.,<br><br>Defendants. | Adv. Proc. No. 24-_____ (MBK) |

## **[PROPOSED] COMPLAINT**

The Official Committee of Talc Claimants (the "**Committee**") of Whittaker, Clark &

Daniels, Inc. ("**WCD**"), Brilliant National Services, Inc. ("**Brilliant**"), L. A. Terminals, Inc.

("**LAT**"), and Soco West, Inc. ("**Soco**" and together with WCD, Brilliant, and LAT, the

"**Debtors**"), in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and the Honorable

Shelley C. Chapman (Ret.), as the court-appointed legal representative (the "**FCR**," together with

the Committee, the "**Plaintiffs**") for the purpose of representing and protecting the rights of future

claimants, by and through their undersigned counsel, having been vested with standing to sue on

behalf of each of the Debtors' estates, files this Complaint for relief against the following

defendants: (a) Brenntag SE, Brenntag Canada Inc., Brenntag Great Lakes, LLC, Brenntag Mid-

South, Inc., Brenntag North America, Inc., Brenntag Northeast, Inc., Brenntag Pacific, Inc.,

Brenntag Southeast, Inc., Brenntag Southwest, Inc., Brenntag Specialties, Inc., Brenntag

Specialties LLC, Coastal Chemical Co., LLC, and Mineral and Pigment Solutions, Inc

(collectively, "**Brenntag**"); (b) DB US Holding Corporation ("**DBUS**"); and (c) National

Indemnity Co. ("**NICO**" and, collectively with Brenntag and DBUS, the "**Defendants**") and

alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      The Debtors historically mined, processed, manufactured, and distributed talc and

talc products containing asbestos until their operating assets were sold to Brenntag in 2004.  The

asbestos in the Debtors' talc products has caused, and continues to cause, mesothelioma and other

diseases in thousands of victims, who hold personal injury and/or wrongful death claims against

the Debtors (the "**Talc Claimants**," whom the Committee represents).

1

2.     Brenntag acquired the Debtors' entire businesses from DBUS in 2004 and continued to operate those businesses after the acquisition in an identical manner.  Indeed, Brenntag continued to sell the same talc products that Debtors sold following the acquisition. Meanwhile, at the time of the 2004 Transaction (defined below), the Debtors ceased all operations with the exception of paying out on legacy claims with the (inadequate) cash retained after the sale to Brenntag.  Accordingly, Brenntag is the Debtors' successor for injuries arising in connection with the products sold by those businesses prior to the acquisition by Brenntag.

3.     Asbestos-related diseases have a notoriously long latency period which can be decades.  The Brenntag sale occurred roughly 10 to 15 years before the volume of new talc claims against the Debtors began to significantly increase.  Although concerns regarding the potential magnitude of those future liabilities were material enough to provide an impetus for the sale, DBUS and Brenntag knew those liabilities would not become acute for many more years.

4.     In this context, and despite the fact that Brenntag was a direct and uninterrupted successor to the Debtors' operations, DBUS and Brenntag agreed that the Debtors would indemnify Brenntag for all pre-transaction asbestos-related liabilities.

5.     DBUS and Brenntag further agreed that the Debtors and DBUS would conceal from the Talc Claimants that Brenntag might have tort liability as a successor to the Debtors.  To further shield Brenntag, DBUS agreed to guarantee the Debtors' contractual obligation to indemnify Brenntag.

6.     Three years later, in 2007, DBUS sold the Debtors—which were now shell corporations—to a large insurance company, NICO.  As part of that transaction, NICO agreed to guarantee, in turn, DBUS's guarantee of the Debtors' indemnification obligation to Brenntag. However, neither DBUS nor NICO has yet to cover the Debtors' obligations to Brenntag for the

successor liability claims. Indeed, NICO is attempting to renege on its obligations to DBUS in an arbitration proceeding.

7.      Accordingly, through this Complaint, the Plaintiffs seek (a) a declaration that Brenntag is liable as the Debtors' successor for injuries caused by the Debtors' pre-2004 Transaction operations, as well as damages to be established with precision at trial (or in an appropriate claims reconciliation process), (b) declarations that the Debtors are not obligated to indemnify Brenntag for this successor liability because, pursuant to contractual arrangements, DBUS and NICO are instead responsible for any such indemnification, and (c) a preliminary injunction staying ██████████████████████████████████ to avoid interference with this ruling. In the alternative, the Plaintiffs seek entry of an order lifting the automatic stay with respect to claims against DBUS and the Berkshire Entities (as defined below).

8.      A ruling by the Court on these key issues is essential to an efficient, fair, and successful outcome for these Chapter 11 Cases.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      This is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2). Alternatively, to the extent that any part of this proceeding is "non-core," it is "related to" these Chapter 11 Cases as used in 28 U.S.C. § 157(b)(2).

11.      This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and section 105(a) of chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**"), 11 U.S.C. § 105(a). Declaratory relief is appropriate pursuant to Bankruptcy Rule 7001(2) and (9) and the Declaratory Judgment Act, 28

U.S.C. § 2201.  Injunctive relief is appropriate pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7001(7).  The Plaintiffs have made no prior request for the relief requested herein to this or any other court.

12.      Pursuant to Local Rule 9013-1(f), the Plaintiffs do not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

13.      The Plaintiffs demand a trial by jury of all issues so triable pursuant to Bankruptcy Rule 9015 and Rule 38 of the Federal Rules of Civil Procedure.

## PARTIES

14.      Plaintiff Official Committee of Talc Claimants was appointed by the U.S. Trustee on May 24, 2023.  Plaintiff Future Claimants Representative was appointed by order of this Court on June 26, 2023.  The Court vested the Plaintiffs with the right to bring these claims on [●].  *See* Docket No. [●].

15.      Debtor Brilliant is a Delaware corporation.  Brilliant is a direct subsidiary of Ringwalt & Liesche Co., which is an indirect is a subsidiary of Berkshire Hathaway, Inc. ("**Berkshire**") and an affiliate of NICO.[1]

16.      Debtor Soco is a Delaware corporation.  Soco is a direct subsidiary of Brilliant.

17.      Debtor LAT is a California corporation.  LAT is a direct subsidiary of Brilliant.

18.      Debtor WCD is a New Jersey corporation.  WCD is a direct subsidiary of Soco.

19.      Defendant Brenntag SE, formerly known as Brenntag AG, is a German corporation, and is the parent corporation for the other Brenntag defendants, which collectively acquired

---

[1]      Berkshire and its subsidiaries NICO, National Liability & Fire Insurance Company, Resolute Management, Inc., Ringwalt & Liesche Co., BH Columbia Inc., and Columbia Insurance Company are referred to herein as the "**Berkshire Entities**."

substantially all of the operating assets of WCD, Soco, and Brilliant in connection with the 2004 Transaction.

20.     Defendant DBUS, formerly known as Stinnes Corp., is a New York corporation. DBUS is a subsidiary of Deutsche Bahn AG, and was the owner of WCD, Soco, and Brilliant prior to the 2004 Transaction.

21.     Defendant NICO is a Nebraska corporation, and is a direct subsidiary of Berkshire. NICO acquired the Debtors pursuant to the 2007 Transaction.

## PROCEDURAL BACKGROUND

### I.    THE CHAPTER 11 CASES

22.     On April 26, 2023 (the "**Petition Date**"), the Debtors commenced these Chapter 11 Cases, purportedly to resolve claims including: (a) existing and future tort claims against the Debtors alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds mined, processed or distributed by the Debtors or their predecessors in interest (the "**Talc Claims**"); (b) existing and potential claims against various non-debtor parties, including the Defendants, seeking to establish such entities' liability for Talc Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors (the "**Successor Liability Claims**"); and (c) claims for indemnification or contribution from the Debtors by various non-debtor parties, including the Defendants, with respect to any Successor Liability Claim (the "**Indemnification Claims**" and, collectively with the Talc Claims and Successor Liability Claims, the "**Talc Liabilities**").  Debtor AP Docket No. 90 ¶ 1.

23.     On May 24, 2023, the United States Trustee appointed the Committee, which comprises the following members: Kathy Ripley Didawick (on behalf of Ann Ripley), Blue Cross Blue Shield Association, Katia Figueroa, Virginia Harrington, Juliet Gray, Sandra Jankowski

(individually and on behalf of Leo Jankowski), Sarah Plant, Tara Valentine (on behalf of Patricia

Krempecki), and Shelly Yerkes. *See* Docket No. 121.

24.    On June 26, 2023, the Court approved the appointment of Ret. Judge Chapman as

the FCR, effective as of the Petition Date. *See* Docket No. 231.

## II.    THE DEBTOR AP

25.    On September 7, 2023, more than four months after the Petition Date, the Debtors

commenced an adversary proceeding (the "**Debtor AP**") seeking declaratory and injunctive relief

with respect to the Successor Liability Claims. *Whittaker, Clark & Daniels, Inc. v. Brenntag AG*,

Adv. Proc. No. 23-01245 (MBK). In that complaint (the "**Debtor AP Complaint**"), the Debtors

sought a declaration that section 362(a) of the Bankruptcy Code prohibits the commencement,

continuation, or settlement of any action by a Talc Claimant seeking to hold Brenntag and the

Berkshire Entities liable for Successor Liability Claims either because the automatic stay allegedly

applies to such claims by its express terms or because "unusual circumstances" warrant an

extension of the automatic stay to such claims. The Debtor AP Complaint also requested an

injunction under section 105(a) of the Bankruptcy Code staying any Successor Liability Claims

while the Chapter 11 Cases are pending, as well as a declaration that Successor Liability Claims

are property of the Debtors' estates that the Debtors have sole standing to pursue and compromise.

26.    One day after filing the Debtor AP Complaint, the Debtors filed a motion to

preliminarily enjoin the prosecution of Successor Liability Claims against Brenntag and the

Berkshire Entities and a motion for summary judgment with respect to certain counts of the Debtor

AP Complaint (the "**MSJ**"). Debtor AP Docket Nos. 2 and 3. The Court entered a case

management order pursuant to which two of the Debtors' claims—those seeking a declaration that

(1) the Successor Liability Claims are estate property that the Debtors have sole authority to pursue

6

or settle, and (2) the continued prosecution of the Successor Liability Claims violates the automatic stay—were permitted to go forward on summary judgment. Debtor AP Docket No. 52. The Committee opposed the MSJ. Debtor AP Docket No. 90.

27.     On August 13, 2024, the Court issued a *Memorandum Decision* finding that the Successor Liability Claims are property of the Debtors' estates. Debtor AP Docket No. 268 (the "**SJ Decision**"). On August 28, 2024, the Court entered an order with respect to the SJ Decision. Debtor AP Docket No. 292.

28.     The claims set forth in this Complaint are based on, and informed by, discovery that the Plaintiffs obtained.[2]

## V.     THIS ADVERSARY PROCEEDING

29.     On August 30, 2024, the Plaintiffs filed a motion seeking standing to pursue the claims set forth in this Complaint on behalf of the Debtors' estates (the "**Standing Motion**") [Docket No. ●].

30.     On September [●], 2024, the Court issued an order granting the Standing Motion.

## FACTUAL ALLEGATIONS

## I.     DEBTORS' CORPORATE HISTORY PRE-2004

31.     The Debtors, under various trade names, have produced talc-containing products for decades.

32.     In 1998, Brenntag ("**Old Brenntag**"), a German chemical conglomerate and a subsidiary of Stinnes Oil & Chemical Company ("**Stinnes**"), acquired WCD, Soco, and Brilliant. It named the entities now known as Brilliant and Soco "Brenntag, Inc." and "Brenntag West, Inc.,"

---

[2]     The Plaintiffs reserve the right to supplement or amend this Complaint based on additional information learned through discovery, which remains ongoing.

respectively, while maintaining the WCD brand with an added tagline—"A Brenntag Company."

33.     These companies distributed thousands of chemical products under the trade name "Brenntag."  WCD supplied most of the talc giving rise to Talc Claims against the Debtors, while Brenntag West and Brenntag Inc. supplied the rest.

34.     In 2003, DBUS—an arm of the German state railroad—purchased Old Brenntag, including the Debtors.

## II.     THE TALC CLAIMANTS' INJURIES FROM THE DEBTORS' PRE-2004 OPERATIONS

35.     The Talc Claims are personal injury claims brought by or on behalf of individuals who were exposed to asbestos contained in talc and/or talc products mined, processed, manufactured, or distributed by the Debtors until the 2004 Transaction.  As of the Petition Date, approximately 882 Talc Claims were pending against the Debtors.  Many Talc Claimants were exposed to asbestos through use of cosmetic or industrial products containing the Debtors' talc powder, which generated dust containing respirable asbestos fibers.

36.     As set out in the underlying complaints of Talc Claimants, in light of the known risks of asbestos, the Debtors' continued mining, processing, and distribution of talc and talc products—without appropriate testing, appropriate warnings, and otherwise without appropriate care—was unreasonable and negligent.

37.     The Talc Claimants suffer from, or have died from, illnesses caused by asbestos in talc or talc products mined, processed, manufactured, or distributed by the Debtors, the most common and serious of which are mesothelioma and lung cancer.  Mesothelioma is a rare, aggressive, and fatal cancer that develops in the mesothelium, the thin tissue that lines many internal organs.  Many of the Talc Claimants that suffer from mesothelioma will not be alive by the time their claims are resolved.

III.    2004 TRANSACTION

38.    The 2004 Transaction resulted in the sale of the Debtors' business operations.

39.    On December 9, 2003, DBUS entered into a Master Purchase and Sale Agreement

(the "**2004 MSPA**," a copy of which is attached hereto as Exhibit [●]) with Bain Capital ("**Bain**"),

pursuant to which DBUS sold the entirety of Old Brenntag, including the operating assets of WCD,

Brilliant, and Soco, to Bain in a series of transactions ("**2004 Transaction**") with a sale value of

approximately €1.4 billion.  The details of the 2004 Transaction were set forth in additional asset

purchase agreements specific to each of WCD, Brilliant, and Soco (together with the 2004 MSPA,

the "**2004 Agreements**").

40.    At the time the 2004 Transaction was negotiated, the Debtors already faced

significant exposure to asbestos-related tort lawsuits, ████████████████████████

████████████████████████████████████████.

41.    In an attempt to cleanse the Debtors' assets of these liabilities, DBUS and Bain

structured the transaction to transfer substantially all of the Debtors' operating assets,

management, personnel, facilities, customers, goodwill, and intellectual property to a series of

brand "new" Brenntag entities (collectively, "**New Brenntag**"), leaving the historical tort

liabilities with the Debtor entities, which would survive as non-operating shell corporations still

owned by DBUS following the transaction.

| Old Brenntag<br>(Former Holder of Operational Assets) | New Brenntag<br>(New Holder of Operational Assets) |
|---|---|
| Whittaker, Clark & Daniels, Inc. | Mineral and Pigment Solutions,<br>Inc. ("**MPSI**")[3] |
| Brenntag West, Inc.<br>(n/k/a Soco) | Brenntag Pacific, Inc. |

---

[3]    MPSI subsequently merged into Brenntag Specialties, Inc., which then became Brenntag Specialties,
LLC.

| Old Brenntag<br>(Former Holder of Operational Assets) | New Brenntag<br>(New Holder of Operational Assets) |
|---|---|
| Brenntag Inc.<br>(n/k/a Brilliant) | Brenntag North America Inc. |

42.    In  connection  with  the  2004  Transaction, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

43.    DBUS also agreed to ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.

44.    In connection with the 2004 Transaction, Brenntag, the Debtors, and DBUS entered

into contractual indemnities that are relevant to Brenntag's successor liability.

45.    Under the 2004 Agreements, the Debtors were required to indemnify Bain and the

New Brenntag entities for any claims involving asbestos exposure from the Debtors' pre-2004

Transaction operations, as well as for various environmental liabilities.  For example, § 12.1.2 of

the 2004 MSPA provides:

> Seller 4 [Brenntag Inc. n/k/a Brilliant] shall see to it that WCD shall
> indemnify  and  hold  harmless  the  US  Asset  Purchasers,  the
> Companies, Purchasers, Purchasers' Affiliates and each of their
> respective  successors,  assigns,  officers,  directors,  managers,
> employees  and  agents  (herein  collectively  "WCD  Indemnitees")
> from  and  against  any  Indemnified  Losses  incurred  in  connection

with any present or future Retained Subsidiary Asbestos Claims relating to WCD or any alleged corporate predecessor-in-interest thereof. This provision is expressly limited to any such indemnified Retained Subsidiary Asbestos Claims and does not in any way relate to other products or other hazardous substances that may have been manufactured, distributed, sold or used by WCD or any of the Sellers, or any of the Companies, or any alleged predecessors of any of these aforementioned entities in the conduct of any business prior to the Effective Date. Seller 4 [Brilliant] shall be the guarantor of the indemnification provided by WCD described in the preceding sentences to the WCD Indemnitees.

Section 12.1.1 of the 2004 MSPA replaces references to WCD with Soco, but is otherwise identical.

46.     Moreover, DBUS agreed to guarantee the Debtors' indemnification obligations in the event the Debtors became "unable to financially satisfy" them:

In the event that Seller 4 [Brilliant] is unable to financially satisfy any claims made by any WCD Indemnitee pursuant to the guarantee provided in the preceding sentence, then Seller 3 [Stinnes Corp. n/k/a DBUS] shall be the guarantor with respect to any such claims made by any WCD Indemnitee under the indemnification provided by WCD described in this Section 12.1.2.

*See, e.g.*, 2004 MSPA §§ 12.1.2, 12.1.1.

47.     In November 2007, DBUS sold the Debtors' shell companies to NICO (the "**2007 Transaction**") pursuant to a stock purchase agreement (the "**2007 Agreement**," a copy of which is attached hereto as <u>Exhibit [●]</u>). NICO specializes in managing asbestos liability to turn a profit.

48.     NICO "purchased" the Debtors for the nominal price of one dollar, and thereby acquired the Debtors' assets and entitlements to insurance and other receivables. In exchange for these assets, NICO guaranteed DBUS's indemnity obligations to New Brenntag under the 2004 Agreements, and also indemnified DBUS directly for any claims or losses related to the Debtors' asbestos liabilities. Section 8.02 of the 2007 Agreement provides in relevant part:

The Purchaser [NICO] and its Affiliates, including the Companies and the Retained Subsidiaries, and their respective officers,

11

directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") shall be indemnified and held harmless by the Seller [DBUS] for and against any and all Liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including attorneys' and consultants' fees and expenses) actually suffered or incurred by them (including any Action brought or otherwise initiated by any of them) (hereinafter a "Loss") arising out of or resulting from: . . .

(c) all Liabilities of the Companies and the Retained Subsidiaries, whether arising before or after the Closing, which arise from or relate to the ownership or actions or inactions of the Seller or any of its Affiliates, any Company or any Retained Subsidiary or the conduct of their respective businesses prior to the Closing, except . . . (iii) Liabilities for which Purchaser has agreed to indemnify Seller Indemnified Parties pursuant to Section 8.03(c), (d), (e) and (f).

Additionally, § 8.03 of the 2007 Agreement provides:

The Seller [DBUS] and its Affiliates, and their respective officers, directors, employees, agents, successors and assigns (each a "Seller Indemnified Party") shall be indemnified and held harmless by the Purchaser [NICO] for and against any and all Losses arising out of or resulting from: ·. . .

(c) the Seller's or Seller's Affiliates' indemnification obligations for Retained Subsidiary Asbestos Claims as defined in, and pursuant to, Section 12 of the Master Sale and Purchase Agreement whether arising before or after the date hereof;

(d) Claims against the Seller or its Affiliates seeking to recover, under any theory that such party is liable for the acts or financial obligations of any Company or Retained Subsidiary, Losses allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any of the Companies or Retained Subsidiaries or by any alleged predecessor entity of any Company or Retained Subsidiary or by any other entity ( other than a Seller Indemnified Party) to whose Liabilities any Company has become subject either contractually or by operation of Law;

49.     The chain of indemnification obligations between these two non-Debtor

Defendants backstops the Debtors' primary indemnification of Brenntag and shifts the ultimate

responsibility for Brenntag's successor liability to the Debtors' solvent affiliate NICO.  The backstop indemnities became operative at the latest upon the commencement of these Chapter 11 Cases, when they were triggered by the Debtors' inability to "financially satisfy" their indemnity obligations to Brenntag.

**IV.    BRENNTAG CONTINUES THE DEBTORS' TALC OPERATIONS**

50.    Leading up to the 2004 Transaction, Bain was focused on ensuring that it could continue operating the Debtors' businesses post-acquisition without disruption and virtually unchanged.  For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

51.    WCD   likewise ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

52.    Following the 2004 Transaction, New Brenntag proceeded to operate the Debtors' businesses with the same assets, facilities, product lines, intellectual property, management, employees, and customer bases as the old entities. For example, ███████████████

████████████████████████████████████████████████████

████ :

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

53.    From the perspective of Old Brenntag's employees, nothing changed. Former WCD President Ted Hubbard testified that "in 2004 the company became MPSI" but he remained "President" with the "same responsibilities" as at WCD. Similarly, WCD's former Vice President of Marketing, Thomas Grunstra, testified that in March 2004 he "went to work one day" and "the next day . . . we were under a different name"—and he was "now VP of marketing for MPSI." Former WCD Treasurer and Controller Bradley Owens testified that he started working for MPSI without an interview or benefits change, that every employee of MPSI was employed by WCD immediately before joining MPSI, and that MPSI started identical operations the day after WCD ceased operations.

54.    Consistent with this testimony, New Brenntag continued operating the exact same facilities that Old Brenntag had.  And, as reflected on MPSI's website in March 2004, it sold the same core talc products as WCD and Soco, and from the same suppliers:



55.    On information and belief, Brenntag continued to sell the same talc products following the acquisition through at least 2013.

56.    In sum, *nothing* about the Debtors' underlying business operations changed after the 2004 Transaction.  Their personnel worked at the same facilities to sell the same talc from the same suppliers to the same customers.  The Debtors even ██████████████████████ ██████████████████████████████████████████████ ████████████████████████████:



## V.  THE 2004 TRANSACTION WAS A SHAM DESIGNED TO BLOCK TORT CLAIMANTS FROM APPROPRIATE RECOVERIES

57.    The 2004 Transaction was a sophisticated scheme to segregate the Debtors' operating assets from asbestos liabilities that were beginning to manifest in accelerated numbers. It allowed DBUS to obtain top dollar for profitable businesses the parties believed had been effectively cleansed of their associated litigation risk.  The transaction structure also materially benefitted Brenntag, which operated the assets it acquired as a seamless continuation of the Debtors' businesses, thereby capturing the full value of the Debtors' accumulated goodwill without the successor liability exposure that a going concern acquisition typically entails.

58.    At the same time, the Debtors transformed from revenue-generating businesses into

shell corporations and, for the next approximately twenty years, remained in existence for the sole purpose of administering their retained tort liabilities.

59.    As such, the benefits recognized by DBUS and Brenntag from the 2004 Transaction came at the expense of the Debtors themselves and, in turn, their tort creditors.  Following the 2004 Transaction, the Debtors retained liability for Talc Claims that had arisen from their past operations, but lost the ability to generate recoveries going forward to satisfy those liabilities as they continued to manifest.  Worse still, the Debtors also incurred contractual obligations to indemnify Brenntag for successor liability resulting from its continuation of the Debtors' businesses.  From the outset, those indemnities were an extraordinary burden that far outweighed the meager assets the Debtors retained following the sale.

60.    The structure of the acquisition was intended to, and did in fact, confer the benefits of a true merger on Brenntag without the associated burdens, which were left behind at shell companies.  The 2004 Transaction was engineered to create inequitable consequences for innocent asbestos victims.

61.    Under the 2004 Transaction, the assets that were set aside for the Debtors' asbestos liabilities represented a tiny fraction of the total value generated by the same business operations that gave rise to the Talc Claims.  The assets that the Debtors retained post-2004 have proven to be woefully insufficient as these Chapter 11 Cases demonstrate.  Anticipating this very outcome, Brenntag required DBUS to guarantee the Debtors' indemnification obligations to Brenntag in the event the Debtors become "financially unable" to satisfy those obligations.  At the same time, Brenntag and DBUS █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████.

62.     Upon information and belief, NICO and the Debtors are not party to any contract that provides NICO with rights to seek indemnification or contribution from the Debtors with respect to NICO's indemnity obligations to Brenntag under the 2007 Agreement.

**VI.   THE** 

63.     On July 24, 2023, NICO ███████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████.

64.     The Committee was not informed █████████████ until November 29, 2023.

65.     ████████████████████████████████████████.

66.     ████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████.

67.     ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████.

## COUNT I

### SUCCESSOR LIABILITY
(against Brenntag)

68.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

69.     The Debtors mined, processed, manufactured and/or distributed talc and talc products which exposed many individuals, including the Talc Claimants, to asbestos.

70.     The Debtors did not conduct appropriate testing on these products and did not

provide appropriate warnings, and in all respects did not act with due care.

71.     The Talc Claimants were injured by these products.

72.     The Debtors accordingly are liable in tort for the Talc Claimants' injuries, as set out in the Talc Claimants' claims, including as a matter of strict product liability, negligence (including failure to warn, failure to test, failure to use reasonable care, and negligent misrepresentations), negligence per se, breached express and implied warranties including warranties for fitness of purpose and merchantability, and fraud.

73.     When the Debtors' operations were transferred from legal ownership of the Debtors to Brenntag, they underwent a mere change in corporate form without any significant change in substance.

74.     The Debtors and Brenntag intended that the successor, Brenntag, would assume all of the benefits and burdens of the Debtors' pre-existing operations.

75.     Brenntag acquired all of the talc-related assets of the Debtors.

76.     Brenntag continued the same talc-related operation as the Debtors.

77.     Following the 2004 Transaction, there was a continuity of management, personnel, physical location, assets and general business operations as the Debtors' talc operations transitioned from the Debtors to Brenntag.

78.     Brenntag assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor.

79.     The Debtors immediately ceased their ordinary business operations.  To the extent the Debtors continued to exist following the 2004 Transaction, they did so as mere shell entities.

80.     Brenntag's acquisition of the Debtors' talc operations pursuant to the 2004 Transaction destroyed the Talc Claimants' remedies against the Debtors.

81.     Moreover, the Debtors and the Defendants intended to steer Talc Claimants away from successor liability claims for sole recovery against the Debtors, ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████.

82.     When Brenntag acquired the Debtors' operations and continued to manufacture the same products, it reasonably expected to, and did, assume the manufacturer's role of spreading the risk of injury as a cost of doing business.

83.     Brenntag benefitted from selling its talc products under the "Brenntag" brand and took advantage of the brand's accumulated good will, business reputation and established customers.  For this reason, and because Brenntag otherwise enjoyed the Debtors' goodwill in continuing its business, it is equitable to impose liability on Brenntag.

84.     Brenntag has active business operations, maintains product liability coverage for products that it manufactures and distributes, and holds contractual indemnification and contribution rights against non-Debtor parties with respect to products that it manufactures and distributes.

85.     Accordingly, Brenntag is liable as a successor to the Debtors' talc operations and/or with respect to all of the Debtors' talc liabilities, including under the doctrines of de facto merger, mere continuation, product line, and continuity of enterprise.

86.     **WHEREFORE**, Plaintiffs are entitled to a declaration that Brenntag is liable for the Debtors' pre-2004 Transaction talc liability.

87.     **WHEREFORE**, Plaintiffs are further entitled to damages, including compensatory damages, punitive damages, costs, and attorney's fees, in an amount to be determined at trial.

## COUNT II

**DECLARATORY JUDGMENT—DBUS IS CONTRACTUALLY
OBLIGATED TO INDEMNIFY BRENNTAG FOR SUCCESSOR LIABILITY
CLAIMS UNDER THE 2004 MSPA**
(against DBUS and Brenntag)

88.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

89.    An actual legal and substantial controversy exists regarding whether DBUS is contractually obligated to satisfy Indemnification Claims asserted by Brenntag with respect to the Successor Liability Claims.

90.    The 2004 MSPA states that WCD "shall indemnify and hold harmless" Brenntag from certain asbestos claims, and that Brilliant shall guarantee such indemnification provided by WCD.

91.    Brenntag has contended, and is likely to continue to contend, that the Debtors are responsible for any payments to be made by Brenntag to the estate under principles of successor liability, based on these provisions in the 2004 MSPA.

92.    Brilliant is "unable to financially satisfy" any claims made by Brenntag to enforce its indemnification of Brenntag or guarantee of WCD and Soco's indemnities pursuant to the 2004 MSPA.

93.    Accordingly, the conditions precedent to DBUS's guarantee of Indemnification Claims against the Debtors under § 12 of the 2004 MSPA have been satisfied.

94.    There is a high likelihood that the requested declaration will definitively resolve the uncertainty that gave rise to the controversy—i.e., whether non-Debtor DBUS is contractually obligated, rather than Brilliant or WCD, to indemnify Brenntag for any Successor Liability Claims as the guarantor of the Debtors' Indemnification Claims.

95.     This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.  Indeed, the Debtors asserted that uncertainty regarding Brenntag's ability to assert Indemnification Claims against the Debtors' estates contributed to the filing of these Chapter 11 Cases.

96.     No other remedy will be as convenient or as readily available as a declaratory judgment from this Court.

97.     **WHEREFORE**, the Plaintiffs are entitled to a declaratory judgment that DBUS is liable for Indemnification Claims asserted by Brenntag.

## COUNT III

**DECLARATORY JUDGMENT—NICO IS CONTRACTUALLY
OBLIGATED TO INDEMNIFY DBUS FOR SUCCESSOR LIABILITY
CLAIMS AND INDEMNIFICATION CLAIMS UNDER THE 2007 AGREEMENT**
(against NICO and DBUS)

98.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

99.     An actual legal and substantial controversy exists regarding whether NICO is contractually obligated to satisfy indemnification claims asserted by DBUS with respect to the Successor Liability Claims.

100.     Brenntag is likely to contend that the Debtors are responsible for any payments to be made by Brenntag to the estate under principles of successor liability, based on these provisions in the 2004 MSPA.

101.     Brilliant is "unable to financially satisfy" any claims made by Brenntag to enforce its indemnification of Brenntag or guarantee of WCD and Soco's indemnities pursuant to the 2004 MSPA.

102.     Accordingly, the conditions precedent to DBUS's guarantee of Indemnification

Claims against the Debtors under § 12 of the 2004 MSPA have been satisfied.

103.     The 2007 Agreement states that DBUS shall be indemnified by NICO for, in relevant part, Talc Claims.

104.     Given their own indemnification and guarantee obligations, respectively, Brilliant and WCD are third-party beneficiaries of this provision of the 2007 Agreement.

105.     NICO has claimed that it is excused from performance of its indemnification obligations to DBUS under the 2007 Agreement.

106.     There is a high likelihood that a declaration concerning NICO's obligation to meet its indemnification responsibilities to DBUS under the 2007 Agreement will definitively resolve the uncertainty that gave rise to the controversy.  Such a declaration would protect the estate's third-party interest in NICO's indemnification of DBUS, and would clarify the source of funds available to satisfy Brenntag's indemnification claims that otherwise may be tendered against the estate.

107.     This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

108.     **WHEREFORE**, the Plaintiffs are entitled to a declaratory judgment that NICO is liable for Indemnification Claims and Successor Liability Claims asserted by DBUS, with no right of recourse (through indemnification, subrogation, or otherwise) against the Debtors.

<u>**COUNT IV**</u>

**PRELIMINARY INJUNCTION**
(against NICO and DBUS)

109.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

110.     Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue

any order that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Cases, aid in the preservation of the assets of the Debtors' estates, and aid in the formulation and confirmation of a chapter 11 plan that maximizes recovery to all of the Debtors' creditors.

111.    Pursuant to section 105(a) of the Bankruptcy Code, this Court may enjoin creditor actions against third parties to prevent an adverse impact on the Debtors' estates or to assure the orderly administration of these Chapter 11 Cases, including by fully effectuating the protections of the automatic stay.   An injunction is appropriate in this case to prohibit DBUS and NICO ████████████████████████████████████████████████████████████████ ███████████████ while the Chapter 11 Cases are pending.   Such an injunction is critical to the successful outcome of these Chapter 11 Cases.

112.    The Plaintiffs are likely to prevail on the merits of its request for an injunction under applicable Third Circuit law.   First, the Debtors' prospects for a successful outcome in the Chapter 11 Cases would be reasonably strong given that the claims in this Complaint will ensure that a non-Debtor source of funding is preserved and available to satisfy or eliminate Talc Claims and Indemnification Claims against the estates.

113.    Second, the failure to grant the requested injunction would irreparably harm the Debtors and their estates, and defeat the purpose of these Chapter 11 Cases.   Absent the requested injunction, ████████████████████████████████████████████████████████████ ██████████████████████████████████████.   Such a decision would significantly impact the value of the Successor Liability Claims belonging to the Debtors' estates by potentially depriving the Debtors' estates of an additional non-debtor source of recovery that should be preserved for the benefit of all of the Debtors' creditors.

114.    Moreover ███████████████████████████████████████ may give rise to Indemnification Claims against the Debtors.  Permitting NICO ██████████████████ ████████████████████████████████████████████████████ would undermine the stated purpose of these Chapter 11 Cases—to consolidate and collectively resolve all current and future Talc Claims against the Debtors, as well as the Successor Liability Claims and Indemnification Claims, through the bankruptcy process.  This ████████████████, if not stayed, would undermine (or eliminate) the parties' and the Court's ability to treat all creditors (including current and future Talc Claimants and Indemnified Parties) fairly and equitably.

115.    Third, the balance of the harms weighs heavily in favor of the requested injunction because █████████████████████████████████ would cause irreparable harm to the Debtors and their estates by eliminating a potential alternative source of recovery available to satisfy Talc Claims and Successor Liability Claims.  It would also compromise the protections of the automatic stay and the integrity of these Chapter 11 Cases.

116.    On the other hand, the harm, if any, that an injunction might cause NICO and DBUS is minimal, to the extent it would exist at all.  The issuance of an injunction will not permanently deprive NICO and DBUS ████████████████████████████████████████ ████████████████████████████████████████.  Instead, it will merely preserve the current status quo, giving the relevant stakeholders time to reach a resolution regarding the treatment of the Successor Liability Claims.

117.    Fourth, the public interest weighs in favor of an injunction.  Injunctive relief is critical to protect and preserve property of the estates.  It also is in the public interest to ensure that the bankruptcy process is used to protect and serve the interests of insolvent debtors and their creditors, not solvent non-debtor affiliates.  This result is not possible if the non-debtor Defendants

are permitted to attempt to "globally resolve" the Successor Liability Claims and Indemnification Claims through these Chapter 11 Cases (and benefit from associated relief, including a stay of claims against them), while simultaneously ███████████████████████████████ ███████████████████████████████████████████.

118.    Accordingly, an injunction enjoining the ███████████████████ while the Chapter 11 Cases are pending is appropriate and essential to the orderly and effective administration of the Debtors' estates.  Good cause exists for the entry of injunctive relief pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

119.    **WHEREFORE**, Plaintiffs respectfully request that this Court: (a) after notice and a hearing, issue a preliminary injunction pursuant to section 105(a) of the Bankruptcy Code prohibiting the continuation ███████████████ while the Chapter 11 Cases are pending; and (b) grant such other and further relief as the Court may deem proper.

## RESERVATION OF RIGHTS

120.    The Plaintiffs reserve the right to bring additional claims, including, without limitation, additional claims that the Plaintiffs discern from its ongoing investigation of Defendants' and other parties' related conduct.

121.    The Plaintiffs reserve the right to bring the claims asserted herein, and any additional claims in any appropriate forum, including, without limitation, any state or U.S. District Court, notwithstanding the caption for this Complaint.

## PRAYER FOR RELIEF

122.    **WHEREFORE**, by reason of the foregoing, the Plaintiffs request that the Court enter judgment in its favor as follows:

123.    On Count I, declaring that Brenntag is the legal successor to the Debtors and the

Debtors' business under applicable law and declaring that Brenntag is liable as the Debtors' successor with respect to the Talc Claims under applicable law.

124.    On Count II, declaring that DBUS is contractually obligated to indemnify Brenntag for Successor Liability Claims under the 2004 MSPA.

125.    On Count III, declaring that NICO is contractually obligated to indemnify DBUS for Successor Liability Claims and Indemnification Claims pursuant to the 2007 Agreement, with no recourse against the Debtors.

126.    On Counts I, II, and III, entering judgment against the Defendants for damages on the Successor Liability Claims in an amount to be determined at trial.

127.    On Count IV, enjoining the continuation of ███████████ during the pendency of these Chapter 11 Cases.

Dated:    [_____], 2024

*/s/ DRAFT* _____

**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
        rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Email: cspeckhart@cooley.com
        mklein@cooley.com
        elazerowitz@cooley.com
        jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email: kmaclay@capdale.com
        tphillips@capdale.com
        sconcannon@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*

*/s/ DRAFT* _____
**WILLKIE FARR & GALLAGHER LLP**
Stuart R. Lombardi
Justin Garbacz (admitted *pro hac vice*)

Christine Thain (admitted *pro hac vice*)
Amanda M. Payne (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Email:  slombardi@willkie.com
          jgarbacz@willkie.com
          cthain@willkie.com
          apayne@willkie.com

**RABINOWITZ LUBETKIN & TULLY, LLC**
Jonathan I. Rabinowitz
Barry J. Roy
293 Eisenhower Parkway, Suite 100
Livingston, NJ 07039
Tel: (973) 597-9100
Email:  jrabinowitz@rltlawfirm.com
          broy@rltlawfirm.com

*Co-Counsel for Future Claimants' Representative*