**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) APPROVING THE SETTLEMENT AGREEMENT BETWEEN THE DEBTORS AND THE CONTRIBUTING PARTIES, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  Whittaker, Clark & Daniels, Inc. ("WCD") (4760); Brilliant National Services, Inc. ("Brilliant") (2113); L. A. Terminals, Inc. ("LAT") (6800); and Soco West, Inc. ("Soco West") (3400).  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion"):[2]

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit B** (the "Order"), (a) authorizing (i) entry into that certain settlement agreement attached

as Exhibit 1 to the Order (the "Settlement Agreement")[3] between and among the Debtors,

Brenntag,[4] NICO,[5] and DB US[6] (Brenntag, NICO, and DB US, collectively, the "Contributing

Parties"), and (ii) the Debtors (together with the Contributing Parties, the "Parties") to perform all

of their obligations thereunder; and (b) granting related relief.

---

[2]     The Debtors have filed or soon will file (a) the *Declaration of Tim Pohl in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Pohl Declaration"); (b) the *Declaration of David L. McKnight in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "McKnight Declaration"); and (c) the *Declaration of Brian J. Griffith in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Griffith Declaration").  A detailed description of the facts and circumstances supporting the Settlement Agreement is set forth in greater detail in the Pohl Declaration, McKnight Declaration, and the Griffith Declaration, which are also incorporated by reference herein.  The Debtors have also filed or will soon file the *Declaration of Gavin C.P. Campbell in Support of Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Campbell Declaration"), which attaches a number of exhibits concerning the historical facts described in this Motion.  All references to "Ex." refer to exhibits to the Campbell Declaration.

[3]     A summary of the terms contained in the Settlement Agreement is attached to this Motion as **Exhibit A**.

[4]     "Brenntag" means, collectively, Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc. ("MPSI")) ("Brenntag Specialties"), and Coastal Chemical Co., LLC.

[5]     "NICO" means, collectively, Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company ("National Indemnity"), Resolute Management, Inc., Ringwalt & Liesche Co. ("Ringwalt"), and National Liability & Fire Insurance Company.

[6]     "DB US" means DB US Holding Corporation.

## **Preliminary Statement**

2.      For more than a year, the Debtors have worked hard to reach a consensual, efficient, and value-maximizing outcome in these cases.  The Debtors have now successfully negotiated a $535 million contribution to their estates to resolve their estate causes of action against Brenntag, DB US, and NICO.  While the Debtors remain hopeful that they can achieve a fully consensual resolution to these cases, the Settlement Agreement will benefit all of the Debtors' stakeholders regardless of whether a global deal is ultimately reached.  The Settlement Agreement is a significant achievement, provides a material recovery that exceeds what tort claimants could have recovered against Brenntag, DB US, and NICO even if these bankruptcy proceedings had never been filed, and easily satisfies the factors courts consider in deciding whether to approve a settlement of estate claims.  It is not a close call.

3.      The challenges in these cases are well known.  The Debtors have finite assets—and limited cash flows from interest on such assets—that are rapidly depleting as these chapter 11 cases proceed without a resolution.  Indeed, besides cash and insurance assets, the Debtors' only material assets are the potential estate causes of action they hold.  Accordingly, the Debtors have sought to maximize the value of their assets by investigating and assessing these causes of action and engaging in extensive arm's-length negotiations with the Contributing Parties to achieve the value-maximizing outcome reflected in the Settlement Agreement.  This is similar to what other debtors have done with similar claims in other cases.[7]

---

[7]   *See, e.g.*, *In re Emoral, Inc.*, 740 F.3d 875, 882 (3d Cir. 2014) (affirming bankruptcy court's approval of settlement agreement of successor liability and other related claims); *see also In re Wilton Armetale, Inc.*, 968 F.3d 273, 283–84 (3d Cir. 2020) ("[T]he Bankruptcy Code makes a creditor's derivative causes of action property of the estate.  From there, the trustee decides how best to manage them for the benefit of all creditors. One option is to prosecute those claims to judgment.  Another is to settle and extinguish them.") (internal citations omitted).

4.      As the Court has ruled, any causes of action for alter ego and successor liability against the Contributing Parties are property of the estate.[8]  The Debtors view the settlement of these and any other potential estate causes of action as the most equitable, efficient, and value-maximizing means of resolving them, and one that avoids "an effective race to the courthouse."[9]  Indeed, the Settlement Agreement ensures that *all* of the Debtors' stakeholders benefit from resolution of the Debtors' estate causes of action.  Importantly, the Settlement Agreement <u>does not</u> prohibit claimants from pursuing any *direct* claims they may have against the Contributing Parties, including any claims against Brenntag for liabilities arising from Brenntag's own post-February 2004 operations.

5.      The $535 million contribution that the Debtors were able to negotiate is sufficient to cover all or nearly all of the Debtors' total tort liabilities.  As the Court has observed, all estate causes of action asserting successor liability or alter ego theories attempt to hold non-Debtors liable for the Debtors' tort liabilities.[10]  As a result, the value of such causes of action can never exceed the amount of the Debtors' own liabilities.  The claims then must be discounted for the likelihood of success on the merits.  The Debtors' claims valuation expert estimates that the Debtors' asbestos and asbestos-related talc liabilities in the tort system but for these bankruptcies would be between $474 million and $571 million (in present value terms).  Thus, the settlement amount either exceeds or covers the vast majority of the Debtors' tort liabilities *before* necessary adjustments for litigation risks and uncertainties.  This remarkable outcome was only possible

---

[8]  *See* [Adv. Proc. Docket No. 268] (the "<u>MSJ Opinion</u>") at 36–37, 45; *see also* [Adv. Proc. Docket No. 292].

[9]  MSJ Opinion at 40.

[10]  *E.g.*, *id.* at 30 ("Here, the Successor Liability Claims seek to establish a non-debtor's liability bottomed on Debtors' liability, through allegations of successor liability, alter ego, or some similar theory."); *id.* at 36 ("In sum, all Successor Liability Claims seek—in some fashion—to impute Debtors' liability to a non-debtor entity.").

because the Debtors were able to negotiate for millions of dollars in additional consideration based

on what the Contributing Parties otherwise would spend to litigate absent a resolution here—value

that, absent settlement, would go to *defense* lawyers and experts, and *not* to tort claimants.  Of

course, the Debtors are not required to obtain such a significant recovery for the Court to approve

the Settlement Agreement.  Once litigation risks and uncertainties are considered, the "lowest

point" in the range of reasonable settlements is well below $300 million.  But the fact that the

Debtors were able to achieve a settlement that either exceeds or covers nearly all of their tort

liabilities demonstrates the inherent reasonableness of the compromise—and that "pursuit of

Successor Liability Claims in good faith by the Debtors" has in fact "result[ed] in more efficient

and equitable resolutions, thus, maximizing value to creditors."[11]

      6.     Not surprisingly, the settlement easily satisfies the four factors courts in the Third

Circuit consider in approving settlements of estate claims.  *See Myers v. Martin (In re Martin)*,

91 F.3d 389, 393 (3d Cir. 1996).  ***First***, the probability of successfully litigating the claims resolved

under the Settlement Agreement is inherently uncertain.  With respect to the Debtors' strongest

claims, the Debtors believe they have no more than a 50%—and potentially materially lower—

likelihood of success on their successor liability claims against Brenntag.  Even making the

plaintiff-friendly assumption of continuity of operations and personnel between the relevant

Debtors and the Brenntag entities that purchased their assets, the law of two of the three states

most likely to apply also requires a continuity of ownership for successor liability claims to

succeed, which indisputably does not exist here.  As to estate causes of action against DB US and

NICO:  (a) claims against DB US based on historical dividends before it sold the Debtors in 2007

are likely either time-barred or otherwise lack merit, (b) NICO did not take dividends or otherwise

---

[11]  *Id.* at 27.

extract value from the Debtors during its ownership of the Debtors, (c) any alter ego claims against either DB US or NICO are likely curtailed because the Debtors' liabilities did not arise when they were owned by DB US or NICO, and (d) any alter ego claims against DB US and NICO would face substantial hurdles on the merits, including because the Debtors continued to generally pay their liabilities in the ordinary course until these bankruptcy proceedings.

7.      **Second**, there would also be challenges to collecting any judgment on any estate causes of action against Brenntag, DB US, or NICO.  Absent settlement, Brenntag likely would assert recoupment defenses against the Debtors that could materially diminish any recovery. Additionally, to obtain a significant recovery through litigation, the Debtors would need to obtain judgments against specific entities with sufficient assets to satisfy them or for which solvent entities remain part of an indemnification chain.

8.      **Third**, any litigation over the Debtors' estate causes of action outside of a settlement would be complex, expensive, and time-consuming, requiring litigation over complicated factual and legal issues, often concerning events that took place over twenty years ago and for which memories have dramatically faded or for which witnesses may be unavailable.

9.      **Fourth**, the paramount interest of all the Debtors' stakeholders is served by entering into the Settlement Agreement because it maximizes recoverable value for all of the Debtors' stakeholders, creates value for the Debtors' estates that would not be available in tort litigation outside of a settlement, does not release creditors' direct claims against non-Debtor parties (including based on Brenntag's post-2004 conduct), avoids any potential dilution of tort claimant recoveries by releasing any claims assertable against the estates by the Contributing Parties, and is the product of hard-fought, good-faith, arm's-length negotiations conducted and overseen by the Debtors' disinterested directors.

10.     For more than six months, the Debtors participated in the Court-ordered mediation process with the Contributing Parties, the Official Committee of Talc Claimants (the "Committee"), and the future claimants' representative (the "FCR") in good faith to try to reach a consensual, global, and workable resolution for the benefit of all the Debtors' stakeholders. That did not happen.  Nevertheless, if these cases are to have a value-maximizing, efficient, and equitable outcome for the benefit of *all* of the Debtors' stakeholders, the Settlement Agreement paves the best path forward and provides a source of substantial funding for a confirmable chapter 11 plan.  To be clear, the Debtors remain open to discussions with the Committee and the FCR and are still hopeful that a fully consensual deal can be reached.  But the Debtors must move these chapter 11 cases forward for the benefit of all their stakeholders.

11.     The Debtors require liquidity to facilitate and administer the Settlement Agreement and bring these chapter 11 cases to a conclusion in the near term.  Accordingly, the Debtors have negotiated for a portion of the settlement amount to be paid promptly to fund these chapter 11 cases in the form of a $50 million first priority secured debtor-in-possession delayed draw term loan facility (the "DIP Facility," and loans thereunder, the "DIP Loans"), as more fully explained in the motion to approve the DIP Facility filed substantially contemporaneously with this Motion (the "DIP Motion").

12.     For these and other reasons set forth in this Motion and the Pohl, McKnight, and Griffith Declarations, the Settlement Agreement falls within the range of reasonableness and should be approved as fair and equitable under the standard set forth by the Third Circuit in *Martin*.[12]

---

[12]   On August 30, 2024, the Committee and the FCR filed the *Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1293] (the "Standing Motion") seeking relief with respect to certain estate causes

### Jurisdiction and Venue

13.     The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*

*Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a

final order in connection with this Motion to the extent it is later determined that the Court, absent

consent of the parties, cannot enter final orders or judgments in connection herewith consistent

with Article III of the United States Constitution.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are sections 105(a) and 363(b) of title 11

of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local

Bankruptcy Rules for the District of New Jersey (the "Local Rules").

### Background

16.     The Debtors highlight below some of their operational and corporate history

leading up to the Petition Date, as well as the indemnification relationships among the Debtors and

the Contributing Parties, to provide additional context for the claims resolved under the Settlement

Agreement and additional support for the reasonableness and fairness of the settlement.

### I.    The Debtors' Corporate History

17.     The Debtors' corporate history collectively goes back more than 100 years.  Until

November 1998, however, the entities that now constitute the Debtors were part of two separate

---

of action that are property of the Debtors' estates.  Approval of the relief requested in this Motion would moot the relief sought in the Standing Motion.  The Debtors reserve all rights to object to and all defenses regarding the arguments raised in the Standing Motion, with which the Debtors strongly disagree.

revenue generating businesses that were *not* under the same corporate ownership:  (a) the "SOCO Chemical" group and (b) WCD.

18.     Debtor Brilliant, the parent entity in these proceedings, has historically been a holding company, and was known for the majority of its pre-2004 history as first "Stinnes Oil & Chemical Company" (hence the abbreviation "SOCO") and then as SOCO Chemical.[13]  During that time, Brilliant (f/k/a SOCO Chemical) served as a North American parent entity for chemical operations within the German industrial conglomerate Stinnes AG.[14]  Brilliant was a direct, wholly owned subsidiary of Stinnes Corp., a US holding company.[15]

19.     Between Brilliant's founding in 1977 and 2004, Brilliant formed or acquired other operating companies.   By 2004, Brilliant owned the equity of multiple separate chemical distribution businesses largely organized by region, which in turn were often the result of combining multiple different corporate entities.[16]  For example, what is now Soco West was built by combining—over more than twenty years—multiple distributors with connections to California (Western Chemical & Manufacturing, A.J. Lynch, and Crown Chemical) with two entities (Dyce Chemical and Holchem) acquired from the Holland Chemical group (which was brought into the Stinnes corporate family around 2000).[17]

---

[13]  *See* Ex. 1 (original Dec. 1977 certificate of incorporation as Stinnes Oil & Chemical Company, Inc.); Ex. 2 at BNS-TCC-0978235 (1986 name change to SOCO Chemical, Inc.); *id.* at BNS-TCC-0978238 (1998 name change to Brenntag, Inc.); *id.* at BNS-TCC-0978240 (2004 name change to Brilliant National Services, Inc.).

[14]  *See* Ex. 7 at DBUS0036544 (Stinnes Corp.'s year-end financial statements for 2003 and 2002 describing Brilliant as Stinnes Corp.'s "chemical distribution subsidiary" in the United States and describing corporate chain from Stinnes Corp. to Stinnes AG).

[15]  *See id.*

[16]  *See* Ex. 29 (Dec. 2002 printout of various pages from Brilliant's website describing six "full-line distribution companies in the U.S." including Soco West, and three "specialty chemical distributors" including WCD, as well as listing various corporate acquisitions).

[17]  *See* Ex. 3 at BNS-TCC-0007542–43 (noting merger of Western Chemical); *id.* at BNS-TCC-0007556 (same for A.J. Lynch); at BNS-TCC-0007557 (same for Crown Chemical); *id.* at BNS-TCC-0007564–65 (same for

20.     During the multi-decade build-up of various chemical distribution businesses owned by Brilliant, Brilliant did *not* own WCD.  Instead, WCD was privately held for over 100 years after it first began business (and over twenty-five years after it was reorganized from a New York corporation to a New Jersey corporation),[18] operating as a distributor of minerals and pigments, including talc.  It was only in November 1998 that Brilliant acquired WCD from its then-individual stockholders and WCD became, indirectly, part of the Stinnes corporate family.[19]

**Figure 1:  Simplified 1998 Transaction Diagram**



21.     In 2002, Deutsche Bahn AG became the ultimate parent of the Stinnes group but it did not want to retain Stinnes' chemical businesses, including the U.S. operations conducted by Brilliant's subsidiaries.[20]  In a series of transactions between 2003 and 2004, Deutsche Bahn

---

Holchem); *id.* at BNS-TCC-0007567–68 (same for Dyce Chemical); *see also* Ex. 31 (letter and attachment describing ownership of various Holland Chemical entities eventually acquired by Stinnes Corp. or Brilliant, noting Holchem and Dyce Chemical were owned by HCI USA Distribution); Ex. 2 at BNS-TCC-0978242 (May 2001 certificate of merger between HCI USA Distribution and Brilliant).

18    *See* Ex. 5 (materials concerning 1972–73 reorganization of WCD from a New York corporation to a New Jersey corporation).

19    *See* Ex. 6 (Nov. 1998 share purchase agreement between Brenntag, Inc. and WCD's individual shareholders).

20    *See* Ex. 7 (Stinnes Corp. financial report noting that "On October 7, 2002, Deutsche Bahn AG ('DB') acquired 99.7% of the outstanding shares of Stinnes AG. . . . In 2003, DB acquired the remaining .3% of the outstanding shares of Stinnes AG."); Ex. 8 at 12 (Deutsche Bahn AG 2002 financial statements noting that "the [Stinnes] Chemicals division (Brenntag group) is an international leader in chemicals logistics . . . . Despite [its] high profitability and development potential, we plan to divest the Chemicals . . . division[] in the medium term, as [its] activities do not fit in with our core business.").

divested itself of these businesses by selling them to affiliates of Bain Capital.  These transactions were effectuated with respect to Brilliant and its subsidiaries by two sets of agreements (collectively, the "2004 Transaction"):  (a) a December 2003 master sale and purchase agreement (the "2003 MSPA") to which both Brilliant and its immediate parent Stinnes Corp. were parties, and (b) a series of February 2004 agreements between Brilliant or its subsidiaries on the one hand, and newly created Bain-affiliated "Brenntag" entities on the other.[21]  The result of these agreements was that Brilliant sold most of its operating subsidiaries to Brenntag North America, and Brilliant's remaining subsidiaries, including WCD and Soco West, sold their operating assets to other subsidiaries of Brenntag North America.[22]  In particular, WCD sold its assets to MPSI (n/k/a Brenntag Specialties), and Soco West sold its assets to Brenntag Pacific.[23]

22.    As a result of the February 2004 sales, Brilliant received approximately $140 million of cash from selling the equity in its other subsidiaries, WCD received approximately $16 million of cash from selling its operating assets, and Soco West received approximately $44 million of cash from selling its operating assets.[24]

---

[21]  *See* Ex. 9 (2003 MSPA); Exs. 10–12 (2004 asset purchase agreements for Brilliant, WCD, and Soco West). A further description of the 2004 Transaction is contained in the Debtors' filings in the adversary proceeding. *See, e.g.*, [Adv. Proc. Docket Nos. 1, 4].

[22]  *See* Ex. 7 at DBUS0036544 (Stinnes Corp. financial report noting that "[a]s part of the Sale, in the United States, five companies' shares were committed for sale and four companies committed to sell certain operating assets less certain assumed liabilities").

[23]  *See* Exs. 11–12 (Soco West and WCD asset purchase agreements).  Brilliant changed its name from SOCO Chemical to Brenntag, Inc. in July 1998. Ex. 2 at BNS-TCC-0978238.  By 2004, the majority of Brilliant's subsidiaries also had "Brenntag"-prefix names (for example, Soco West was named "Brenntag West"). Ex. 3 at BNS-TCC-0007563 (Mar. 2001 name change to "Brenntag West").  WCD, however, never had a "Brenntag"-prefix name.

[24]  *See* Ex. 30 (cash flow statement showing "Funds Collected on Sale" for Brilliant, Soco West, and WCD).  WCD received an additional approximately $2.3 million because one of its subsidiaries (Crozier-Nelson Sales, Inc.) also sold its operating assets to a Brenntag entity in the 2004 Transaction, and Crozier-Nelson Sales then merged into WCD shortly after the 2004 Transaction, which is why just over $18 million is listed for WCD's sale proceeds.  *See* Ex. 13 (Crozier-Nelson Sales asset purchase agreement); Ex. 4 at BNS-TCC-0975135–38 (May 2004 certificate of merger and agreement of merger).

**Figure 2:  Simplified 2004 Transaction Diagram**



23.    Between February 2004 and December 2007, Brilliant, WCD, and Soco West

managed their liabilities under the direct ownership of Stinnes Corp. and the indirect ownership of

Deutsche Bahn.

24.    In December 2007, National Indemnity paid $1.00 to acquire the Debtors, with the

possibility of an up to $45 million purchase price adjustment payable by Stinnes Corp. (and

guaranteed by Deutsche Bahn) to National Indemnity if the Debtors actually paid (or incurred

before paying) more than specified thresholds for asbestos and environmental claims.[25]  At closing

in December 2007, National Indemnity assigned the right to acquire the Debtors' stock to

Ringwalt—a NICO affiliate under a different corporate chain—such that Ringwalt is Brilliant's

sole direct equityholder (together with National Indemnity's 2007 acquisition of the Debtors,

the "2007 Transaction").[26]

---

[25]    Ex. 14 (2007 share purchase agreement between National Indemnity and Stinnes Corp. (the "2007 SPA")).

[26]    Ex. 15 (2007 assignment agreement between National Indemnity and Ringwalt).

**Figure 3:  Simplified 2007 Transaction Diagram**



25.    From 2007 through the Petition Date, Brilliant, WCD, and Soco West invested their assets and managed their liabilities under the direct ownership of Ringwalt, and the indirect ownership of NICO.[27]  In connection with their claims management and investment activities, the Debtors also entered into intercompany services and tax sharing agreements with various non-Debtor NICO affiliates.[28]

26.    The third Debtor that is a subsidiary of Brilliant is LAT.  LAT stands apart from both WCD and Soco West because LAT (a former chemical business located at the Los Angeles harbor) was *never* a revenue-generating entity while it was a subsidiary of Brilliant.  LAT had already ceased operations by the mid-1990s before it was brought into the Stinnes corporate family as part of the Holland Chemical transactions around 2000.[29]  As a result, LAT was not involved in

---

[27]    In 2008, WCD was moved underneath Soco West.  *See* Ex. 24 (Apr. 2008 reorganization agreement transferring WCD from Brilliant to Soco West).

[28]    *See, e.g.*, Exs. 16–23 (intercompany services agreements and tax sharing agreements between NICO entities and the Debtors).

[29]    *See* Ex. 31 (letter and attachment describing ownership of various Holland Chemical entities eventually acquired by Stinnes Corp. or Brilliant, noting LAT was owned by HCI Americas, Inc.); Ex. 32 (Apr. 2001 certificate of merger between Stinnes Corp. and HCI Americas, Inc.).

the 2004 Transaction.  LAT was sold to Ringwalt as part of the 2007 Transaction between Stinnes

Corp. and National Indemnity and was moved underneath debtor Brilliant in 2008.[30]

**Figure 4:  Simplified 2008 to Present Structure Diagram**



## II.    Indemnification Relationships Among the Debtors, Brenntag, DB US, and NICO[31]

27.    Under the 2003 MSPA, WCD and Soco West were responsible for indemnifying

the entities that purchased their assets and specified Brenntag-related entities and individuals from

claims seeking damages "allegedly caused by asbestos, asbestiform minerals and/or asbestos-

---

[30]    *See* Ex. 14 at BNS-TCC-0979379 (2007 SPA recitals noting LAT shares exclusively owned by Stinnes Corp. and included in "Shares" conveyed to National Indemnity); Ex. 15 (Ringwalt assignment of all "Shares" transferred under 2007 SPA); Ex. 25 (Apr. 2008 reorganization agreement transferring LAT from Ringwalt to Brilliant).

[31]    The summary descriptions of certain indemnification provisions in the 2003 MSPA and 2007 SPA are qualified in their entirety by reference to their terms, which contain additional provisions and specificity with respect to the scope of the relevant indemnification obligations and conditions and/or exclusions to such obligations. *See generally* Ex. 9 (2003 MSPA) § 10 ("Environmental Indemnity"); *id.* § 12 ("Asbestos Indemnity"); Ex. 14 (2007 SPA) art. VIII ("Indemnification").

containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by" WCD, Soco West, or their predecessors prior to the 2004 Transaction.[32]

28.    If WCD or Soco West could not fulfill their asbestos-related indemnification obligations to their Brenntag-related indemnitees, Brilliant guaranteed those obligations; if Brilliant could not fulfill its indemnification obligations, Stinnes Corp. (now DB US) guaranteed those indemnification obligations.[33]

29.    Additionally, although Brilliant itself was a holding company and had no legacy asbestos or environmental operations giving rise to liability, Brilliant and Stinnes Corp. agreed to indemnify the asset purchasers and other Brenntag-related entities and individuals from asbestos-related claims arising from the pre-transaction operations of the business entities that were sold outright to Brenntag (*i.e.*, even when unrelated to WCD or Soco West) as well as certain liabilities arising from existing environmental conditions at those sold businesses (in addition to any equivalent conditions at Soco West and WCD).[34]

30.    In connection with the 2007 Transaction, when National Indemnity and Ringwalt acquired the Debtors from Stinnes Corp., National Indemnity agreed to indemnify Stinnes Corp. and specified Stinnes-related entities and individuals for (a) asbestos-related claims seeking to hold Stinnes-related entities and individuals liable "under any theory that such party is liable for the acts or financial obligations of" WCD or Soco West and (b) any obligations owed by such

---

[32]   *See* Ex. 9 (2003 MSPA) § 12.1.1–12.1.2, 12.2.

[33]   *See id.*

[34]   *See* Ex. 9 (2003 MSPA) §§ 12.1.5, 12.3 (relating to "Non-Retained Subsidiary Asbestos Claims"); *id.* § 10 ("Environmental Indemnity").

Stinnes-related entities and individuals under the asbestos-related (and certain environmental-related) indemnification provisions of the 2003 MSPA.[35]

## III.    The Appointment of the Disinterested Directors, Their Investigation of Estate Causes of Action, and the Negotiation of the Settlement Agreement.

31.    Tim Pohl and Paul Aronzon were appointed as disinterested directors of the Debtors effective as of March 30, 2023.[36]  Other than their directorships, neither Mr. Pohl nor Mr. Aronzon have any relationships with the Debtors or any of their respective major debtholders or equityholders that would cause them to be unable to exercise independent judgment based on the best interests of the Debtors.

32.    The Debtors' disinterested directors have authority to both investigate and approve any transaction, settlement, or other action with respect to any "Conflict Matter," which is defined to include any matter pertaining to a strategic transaction or any chapter 11 proceeding in which a conflict of interest exists or is reasonably likely to exist between the Debtors, on the one hand, and any of the Debtors' equityholders, affiliates, subsidiaries, directors, managers, and officers, or other stakeholders (collectively, the "Related Parties"), on the other hand.[37]  Specifically, in connection with their appointment, the Debtors' disinterested directors were given the authority to (a) investigate and determine, in their business judgment, whether any matter constitutes a Conflict Matter, and (b) take any action with respect to the Conflict Matters, as determined in their sole judgment, including but not limited to:  (i) any release or settlement of potential claims or causes of action of the Debtors against Related Parties; (ii) any decision regarding all or part of a strategic

---

[35]    *See* Ex. 14 (2007 SPA) § 8.03.

[36]    *See* Ex. 28 (April 8, 2023 unanimous consent appointing Mr. Pohl and Mr. Aronzon as disinterested directors of the Debtors effective as of March 30, 2023).

[37]    *Id.*

transaction to the extent it constitutes a Conflict Matter; and (iii) any other transaction implicating the Debtors in which a Related Party has an interest.[38]

33.    At the direction of their disinterested directors, the Debtors investigated their potential causes of action against third parties.  The Debtors focused on potential successor liability theories against Brenntag entities, as well as any estate causes of action against DB US or NICO based on transactions and governance during their respective periods of ownership of the Debtors.

34.    During these cases, the Debtors have provided extensive discovery to all parties in interest, including the Committee, FCR, Brenntag, DB US, and NICO, and participated in good faith in a mediation with retired Judge Gerber.  This included producing more than 240,000 documents regarding the Debtors' corporate history, the litigation claims asserted against the Debtors, and other documents responsive to more than 100 formal document requests served by the Committee and FCR.  Following the breakdown in that mediation (as described by Judge Gerber in his report to the Court [Docket No. 1121]), the Debtors' disinterested directors and their advisors commenced discussions with the Contributing Parties and their advisors about the possibility of settling some or all of the estate causes of action held by the Debtors against those parties.

35.    Because NICO entities are affiliated with the Debtors, the process for negotiating and approving the Settlement Agreement on the Debtors' behalf was conducted entirely by and at the direction of the Debtors' disinterested directors and the Debtors' external advisors, without the participation of the Debtors' remaining NICO-affiliated director.  *See* Pohl Decl. ¶ 12.  As part of considering potential offers and the ultimate terms of the Settlement Agreement, the disinterested directors requested and received advice from their advisors, including from the Debtors' counsel

---

[38]    *Id.*

and claims estimation advisor, The Brattle Group Inc. ("Brattle").[39]  *See* Pohl Decl. ¶ 10.  The disinterested directors have participated in multiple negotiation sessions, sometimes with advisors and sometimes on a principals-only basis.  *Id.* ¶ 11.  The Debtors and the Contributing Parties have exchanged multiple settlement offers and drafts of settlement documentation in the nearly two months since they began negotiations.  *Id.* ¶ 11.

36.    The hard-fought, good faith, arm's-length negotiations between the Debtors and the Contributing Parties have resulted in the Settlement Agreement.  The Settlement Agreement provides for, among other things, a mutual release of claims and the Contributing Parties' agreement to make an aggregate payment to the Debtors in the amount of $535 million.  The terms of the Settlement Agreement were reviewed and approved by the Debtors' disinterested directors.  *See id.* ¶¶ 11–13.

## Basis for Relief

**I.    The Settlement Agreement Should be Approved Pursuant to Sections 105(a), 363(b), and Bankruptcy Rule 9019(a).**

37.    Bankruptcy Rule 9019(a) provides, in relevant part:

On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.

Fed. R. Bankr. Proc. 9019(a).  In addition, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

38.    If a settlement is outside of a debtor's ordinary course of business, it requires approval under section 363(b) of the Bankruptcy Code.  *Myers v. Martin (In re Martin)*, 91 F.3d

---

[39] Brattle is an experienced economic consulting group that has over four decades of combined experience and has represented a variety of parties as a claims estimation expert in other mass tort chapter 11 cases.  *See* McKnight Decl. ¶¶ 4–5.

389, 394 n.2 (3d Cir. 1996) ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy."). Courts normally defer to a debtor's business judgment if there is a legitimate business justification for the use of estate property. *See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (holding that only a "sound business purpose" is needed to justify use of estate property pursuant to section 363(b)).

39.    "The federal courts have a well-established policy of encouraging settlement to promote judicial economy and limit the waste of judicial resources." *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 384 (S.D.N.Y. 2007). The force of this established federal policy is particularly acute in the bankruptcy context, where compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Indeed, to "minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Martin*, 91 F.3d at 393 (cleaned up).

40.    Whether to approve a proposed settlement is committed to the discretion of the bankruptcy court, which must determine whether a proposed compromise is fair and equitable. *TMT Trailer*, 390 U.S at 424; *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644–45 (3d Cir. 2006). In making this determination, the Third Circuit has stated that courts should consider: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393; *In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020).

19

41.     In determining whether to approve a proposed settlement, "[t]he Bankruptcy Court need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement; rather, avoiding litigating the issues is one of the main advantages of settlement." *NovaPro Holdings*, 815 F. App'x at 658; *In re ID Liquidation One, LLC*, 555 F. App'x 202, 207 (3d Cir. 2014) (similar). "Instead, the court need only canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *In re Immune Pharms. Inc.*, 635 B.R. 118, 122 (Bankr. D.N.J. 2021) (cleaned up); *see also In re Annunziata*, 2018 WL 1091291, at *5 (D.N.J. Feb. 28, 2018) ("A settlement does not need to be the best possible compromise available, it only needs to be above the lowest point in the range of reasonableness.") (cleaned up).

42.     Here, the Settlement Agreement should be approved because it easily meets the *Martin* standard and is a reasonable exercise of the Debtors' business judgment.

## A.     Probability of Success in Litigation

43.     Success on the merits of the Debtors' estate causes of action is inherently uncertain and there are significant hurdles to asserting colorable claims. Given the significant risks in litigating the Debtors' estate causes of action to judgment, the recovery provided by the Settlement Agreement provides material benefits for the Debtors, their estates, and creditors and easily exceeds the lowest point in the range of reasonableness. *See Immune Pharms.*, 635 B.R. at 122; *Annunziata*, 2018 WL 1091291, at *5.

### 1.     Claims Against DB US and NICO

44.     The Debtors have evaluated—and the Settlement Agreement would resolve—estate causes of action against NICO and DB US (the Debtors' existing and prior equityholders, respectively). In evaluating those causes of action, the Debtors have focused on any (a) potential claims based on transfers of value from the Debtors to NICO or DB US during their respective

ownership of the Debtors (*e.g.*, fraudulent transfer, unlawful dividend, and breach of fiduciary duty claims); and (b) potential alter ego or corporate veil-piercing claims. Because these face significant factual and legal hurdles, settling them is in the best interests of the Debtors' estates.

(a)    **Claims Based on Transfers of Value From the Debtors**

45.    With respect to transfers of value to DB US, the Debtors historically paid dividends to DB US during its ownership of the Debtors, with the last dividend of $25 million paid in December 2004, after the sale of the Debtors' operating assets.[40] Any potential fraudulent transfer claims based on financial distress (*i.e.*, "constructive" fraudulent transfer claims), however, are likely completely time-barred for transactions during DB US's ownership of the Debtors (even assuming the applicability of a ten-year statute of limitations based on a potential governmental "golden creditor").[41] Other potential claims based on historical dividends or any other intercompany transactions during DB US's pre-December 2007 ownership of the Debtors, such as unlawful dividend, would likely also be entirely time-barred.[42] The most notable claims the Debtors could potentially assert without a time limitation against DB US are fraudulent transfer claims based on an "actual intent" to hinder, delay, or defraud creditors, based on the existence of any "golden creditor" tort claimant whose disease only manifested in the year leading up to the Petition Date.[43] Even assuming that theory could be used to extend the statute of limitations for

---

[40]    *See* Ex. 33 at BNS-TCC-0978255 (unanimous consent of the Brilliant board of directors approving $25 million dividend to Stinnes Corp. (n/k/a DB US) payable on December 31, 2004); *see also, e.g., id.* at BNS-TCC-0978297, 310, 337 (unanimous board consents approving $10.34 million, $10.41 million, and $8.34 million dividends to Stinnes Corp. payable on January 1, 2000, January 1, 1999, and January 1, 1998, respectively).

[41]    *See In re Gilbert*, 642 B.R. 687, 704–05 & n.75 (Bankr. D.N.J. 2022) (discussing availability of and limitations on invoking IRS as a golden creditor triggering a 10-year lookback period under section 544(b)).

[42]    *See, e.g.*, 8 Del. C. § 174 (six-year limitations period for unlawful dividend claims for Delaware corporations).

[43]    *See, e.g., Lippe v. Bairnco Corp.*, 225 B.R. 846, 855 (S.D.N.Y. 1998); *In re G-I Holdings, Inc.*, 313 B.R. 612, 639–40 (Bankr. D.N.J. 2004), *aff'd in relevant part*, 2006 WL 1751793, at *15–16 (D.N.J. June 21, 2006).

such claims, however, there is no indication that DB US's historical dividends were intended to hinder, delay, or defraud creditors. As a result, there are significant hurdles to any estate causes of action based on historical transfers of value to DB US. Accordingly, the Debtors believe that settling any such causes of action is a reasonable exercise of their business judgment and in the best interests of their estates.

46.    With respect to transfers of value to NICO, the Debtors did not make any regular or extraordinary dividend payments to NICO during its ownership of the Debtors.[44] The only recurring transfers of value from the Debtors to NICO over the course of NICO's ownership of the Debtors were (a) payments for intercompany services provided by NICO to the Debtors and (b) payments under tax sharing agreements between Brilliant and NICO.[45] The payments for intercompany services totaled approximately $5.2 million paid to NICO entities over the more than 15 years of NICO's ownership—less than $350,000 a year.[46] In exchange for these payments, NICO provided the Debtors with the services of its officers and directors, and those of other NICO employees, who, together, provided the Debtors with their claims handling, finance, accounting, tax, and other functions.[47] With respect to tax sharing payments, while the Debtors did make certain payments to NICO entities, the Debtors also *received* substantial payments *from* NICO entities pursuant to their tax sharing agreements, resulting in net tax sharing payments *to* the Debtors of approximately $51 million over the course of NICO's prepetition ownership of the

---

[44]    *See* Griffith Decl. ¶ 8.

[45]    *See id.* ¶ 9.

[46]    *See id.*

[47]    In negotiating the Settlement, the Debtors also considered the outstanding net intercompany and tax sharing balances NICO entities owe to the Debtors of approximately $4.4 million as of July 31, 2024, and are otherwise resolving any claims under (and terminating) the intercompany agreements between the Debtors and NICO. *See id.* ¶ 10.

Debtors.[48]   As a result, there are significant hurdles to any estate causes of action based on the

intercompany payments and tax sharing payments to NICO, and the Debtors believe settling any

such causes of action is a reasonable exercise of their business judgment and in the best interests

of their estates.[49]

### (b)    Alter Ego and Veil-Piercing Claims

47.    With respect to alter ego or veil-piercing claims against both DB US and NICO, a

threshold defense that significantly reduces the likelihood of success on the merits is the timing of

when those entities owned the Debtors as compared to when the Debtors were engaged in the

underlying operations giving rise to potential liabilities.   Alter ego and veil-piercing claims

generally seek to impose the liabilities incurred by a debtor on another entity that is controlling the

debtor as an alter ego or sham front.[50]  Such theories are premised on the concept that a controlling

entity is using a debtor as an alter ego or sham front *at the time* it is transacting business and

creating the liabilities to be imposed on the controlling entity.   *See, e.g.*, *Fluorine On Call, Ltd. v.*

*Fluorogas Ltd.*, 380 F.3d 849, 861–62 (5th Cir. 2004) ("[Alter ego] theories, therefore, presume

that the corporations are unified *at the time of the wrongful act*.") (emphasis added).   As a result,

"[i]t is illogical, for example, to hold a parent liable for controlling another corporation's debts

when it had no control at the time the debts were incurred."   *Id.*   Here, there is a significant

---

[48]  *See id.* ¶ 9.

[49]  In negotiating the Settlement, the Debtors also considered, among other transactions, any potential estate causes
of action that might have been associated with (a) the 2008 commutation of an XL insurance policy assigned by
Deutsche Bahn to National Indemnity as part of the 2007 Transaction and the contribution of the commutation
proceeds plus interest to the Debtors in 2017, (b) the purchase price adjustment owed to National Indemnity under
the 2007 SPA, and (c) the intercompany sales of Apple stock from the Debtors to other NICO affiliates at market
prices prior to the Petition Date.

[50]  *See, e.g.*, *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 498 (N.J. App. Div. 2006) ("Veil piercing
is an equitable remedy whereby . . . the parent corporation may be found liable for the actions of the subsidiary.").

disconnect between the time at which the Debtors' operations gave rise to liabilities and the timing

of their ownership by DB US and NICO.

48.      Specifically, the only time at which WCD—the primary source of the talc liabilities

that constitute the overwhelming majority of the Debtors' liabilities—was operating as a

distributor of talc under the indirect ownership of either DB US or NICO was between November

1998 and February 2004, when WCD was indirectly owned by DB US (then known as Stinnes

Corp.).  WCD never operated as a talc distributor under NICO's ownership of the Debtors.  Prior

to November 1998, WCD was owned by individual shareholders, not by DB US.  And after

February 2004, WCD's operating assets, including any related to talc distribution, were sold to

Brenntag.  As a result, this timing mismatch is a potentially claim-dispositive hurdle to using any

alter ego or veil-piercing theory to impose *any* WCD liabilities on NICO, or any WCD liabilities

on DB US other than those incurred between November 1998 and February 2004.

49.      Similarly, any distribution of raw asbestos or asbestos-containing products by

WCD that would result in "traditional" asbestos claims occurred far before either NICO's indirect

ownership of WCD (beginning December 2007) or DB US's indirect ownership of WCD

(beginning November 1998).  The only source of traditional asbestos liabilities based on *any* of

the Debtors' operations during DB US's indirect ownership (and thus the only source of potential

alter ego claims against DB US for such liabilities) would be if Western Chemical—which was

acquired by and merged into Soco West in 1980—had distributed asbestos or asbestos-containing

products after 1980, and even then, only for the portion of products (if any) sold after the

acquisition.

50.      Even if any alter ego claims against NICO are not barred as a matter of law by the

mismatch between its ownership of the Debtors and when they conducted operations giving rise

to alleged liabilities, such claims would still have to meet the two-pronged showing for any alter ego or veil-piercing theory: (a) that there is significant interconnectedness, control, and a disregard of corporate formalities between a debtor with liabilities and a specific non-debtor entity; and (b) respecting corporate formalities would somehow effectuate a fraud or injustice (*e.g.*, where entities are "shams" or created solely as vehicles for fraud).[51]  Additionally, any alter ego or veil-piercing claim here would have to go up (and across) multiple steps in corporate chains—first within the Debtors (from either Soco West to Brilliant or from WCD to Soco West to Brilliant), and then outside the Debtors.  This gives rise to potential defenses based on whether each layer in a corporate chain requires a separate veil-piercing analysis.[52]  Brilliant's direct parent is solely the NICO entity Ringwalt, and National Indemnity (the original NICO signatory on the 2007 SPA and a provider of intercompany services to the Debtors) is in a different corporate chain from—and is not an indirect parent entity of—the Debtors.

51.    On the merits of the two-prong test for imposing the Debtors' liabilities on NICO under an alter ego theory, the factors that would most support alter ego or veil-piercing claims against NICO would be: (a) the Debtors' officers and directors between December 2007 and April 2023 were all employees of NICO; (b) NICO shared services employees provided back-office, administrative, and investment services on behalf of the Debtors; and (c) NICO shared services employees were involved in the litigation and settlement of tort and environmental claims against the Debtors.  Such relationships, however, are typically held to be insufficient on their own

---

[51] *See, e.g., Verdantus Advisors, LLC v. Parker Infrastructure Partners*, LLC, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022); *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 500 (N.J. App. Div. 2006).

[52] *Compare, e.g.*, *In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018) ("[W]hen dealing with multiple layers of parents and subsidiaries, the corporate veil likely must be pierced at each level."), *with In re Moll Indus., Inc.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011) ("The Court concludes that it is not necessary for the Committee to make allegations sufficient to pierce every layer of the corporate structure . . . .").

to establish alter ego liability.[53]    Moreover, against these factors showing interconnectedness,

NICO could likely raise factors including that:  (a) the Debtors and NICO existed separately long

before the 2007 Transaction, and the Debtors' post-2007 operations and assets were and are

distinct from those of NICO; (b) the Debtors maintained separate and distinct boards of directors

from NICO entities (despite some overlap) and enacted separate corporate resolutions;[54] (c) the

Debtors did not intermingle funds with NICO or use bank accounts shared with NICO;[55] (d) the

Debtors did not transfer funds to NICO without explanation, and only ever transferred limited

amounts for intercompany services and tax sharing payments;[56] and (e) the Debtors have paid

millions to tort claimants and other third parties in connection with defending and resolving claims

since the 2007 Transaction.[57]    These factors likely go to both the interconnectedness and fraud or

injustice prongs of the alter ego test.  In particular, NICO may argue that the intercompany services

it provided to the Debtors led to the payment of far more tort and environmental claims against

WCD and Soco West in the fifteen years leading up to the Petition Date than could have been

accomplished using the less than $30 million in cash on their balance sheets at the time of the

---

[53]  *See, e.g.*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459–60 (2d Cir. 1995) (concluding that "[c]ourts have generally declined to find alter ego liability based on a parent corporation's use of a cash management system," that domination could not be found based on evidence that a parent's "approval was required for [the subsidiary's] real estate leases" and "major capital expenditures" and was instead "conduct [that] is typical of a majority shareholder or parent corporation," and that "[p]arents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations"); *cf. In re Teleservs. Grp., Inc.*, 2009 WL 838157, at *14 (Bankr. D.N.J. Jan. 15, 2009) (citing *Fletcher* in analyzing breach of fiduciary duty claims under New Jersey law).

[54]  *Compare, e.g.*, Exs. 26–27 (Dec. 2007 consent appointing Raj Mehta, John Arendt, and Forrest Krutter as directors of Brilliant, May 2012 consent appointing Carmel O'Sullivan in place of Forrest Krutter on Brilliant board); *and* Ex. 28 (Apr. 8, 2023 consent replacing Carmel O'Sullivan and John Arendt with Paul Aronzon and Tim Pohl as directors of Brilliant), *with, e.g.*, Exs. 34–35 (lists of historical National Indemnity and Ringwalt directors and officers).

[55]  *See* Griffith Decl. ¶ 14.

[56]  *See supra* ¶ 47.

[57]  *See* Griffith Decl. ¶ 15.

2007 Transaction.  As a result, there are significant hurdles to any estate causes of action seeking to impose the Debtors' liabilities on NICO under an alter ego or veil-piercing theory, and the Debtors believe settling any such causes of action is a reasonable exercise of their business judgment and in the best interests of their estates.

52.    On the merits of the two-prong test for imposing the Debtors' liabilities on DB US under an alter ego theory (again putting aside the potentially dispositive timing mismatch described above), the Debtors have more limited records in their possession, custody, and control for the pre-2007 period under DB US's ownership.  However, both WCD and Soco West had many different directors and officers from both their immediate parent Brilliant and indirect parent DB US.[58]  Moreover, board materials make clear that WCD and Soco West had operations distinct from each other, their sibling corporations (other chemical distribution businesses), and from Brilliant and DB US (holding companies).[59]  Indeed, WCD had decades of separate operations and existence prior to being acquired by DB US.  And because DB US was the sole former direct parent of Brilliant, any attempt to impose liability on different or deeper-pocketed DB US-affiliated entities would require additional levels of veil-piercing.  As a result, there appear to be significant hurdles to any estate causes of action seeking to impose the Debtors' liabilities on DB US under an alter ego or veil-piercing theory, and the Debtors believe settling any such causes of action is in the best interests of their estates.

---

[58]    *Compare, e.g.*, Exs. 36–37 (historical Stinnes Corp. director and officer lists) *with* Exs. 38–39 (historical Brilliant director and officer lists), Exs. 40–41 (historical Soco West director and officer lists), Exs. 42–43 (1998–2002 WCD director and officer lists).

[59]    *See, e.g.*, Ex. 44 (April 2000 Brilliant board minutes describing review of separate performance of different subsidiaries with and discussion with president of Brilliant); Ex. 45 (December 1999 WCD board minutes describing review of WCD's performance alone and discussion with WCD management); Ex. 46 (November 1999 Soco West board minutes describing review of Soco West's performance alone and discussion with Soco West management).

## 2.    Claims Against Brenntag

53.    Because Brenntag never owned the Debtors, the key estate cause of action against Brenntag entities are any claims for successor liability.   Theories of successor liability are generally consistent across state lines (with the exception of the handful of states that have adopted a "product-line" theory of successor liability); however, application of these theories can vary significantly from state to state.[60]   As the Debtors have previously explained in the Adversary Proceeding, they believe the most likely potential choice of law for successor liability claims against Brenntag would be Delaware, New Jersey, or New York.[61]

54.    "The general rule of corporate-successor liability is that when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller."[62] The four traditional exceptions to this rule are:  "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability."[63]   In addition to these traditional exceptions, a minority of states (including New Jersey) have adopted a fifth "product-line" exception.[64]

---

[60]   *See generally United States v. Gen. Battery Corp.*, 423 F.3d 294, 301 (3d Cir. 2005) ("Beneath a veneer of uniformity, the 'entire issue of successor liability . . . is dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake.'").

[61]   Choice of law issues were briefed extensively in the Debtors' motion for summary judgment and reply in support thereof.  *See, e.g.*, [Adv. Proc. Docket Nos. 3, 99].

[62]   *Lefever v. K.P. Hovnanian Enterprises, Inc.*, 160 N.J. 307, 310 (1999).

[63]   *Id.*

[64]   *See id.*

55.    The Debtors' strongest claims for successor liability against Brenntag entities would be grounded in a mere continuation or *de facto* merger theory.  An express or implied assumption theory would be unlikely to succeed on the merits because none of the Brenntag asset purchasers assumed WCD or Soco West's asbestos-related liabilities, and instead any such liabilities were expressly identified as "Excluded Liabilities."[65]  A fraud-based theory of successor liability would be unlikely to succeed on the merits because the 2004 Transaction where the Debtors sold their assets was between unrelated parties—a German industrial conglomerate and a sophisticated private equity firm—and occurred years before the present wave of talc litigation had appeared.  A product-line theory also would be unlikely to succeed.  Neither New York nor Delaware has recognized the product-line theory.[66]  New Jersey has recognized the exception.[67]  But courts applying New Jersey law have been reluctant to apply the "product-line" theory of successor liability to distributors like the Debtors and Brenntag.[68]

56.    With respect to the mere continuation or *de facto* merger theories, most courts consider four factors in determining whether a particular transaction amounts to a de facto consolidation or mere continuation:  "(i) continuity of management, personnel, physical location,

---

[65]  *See* Exs. 10–12 (2004 asset purchase agreements for Brilliant, WCD, and Soco West) at Schedule 1.2 ("Excluded Liabilities") ¶ 2 ("Any and all Liabilities relating to or arising from any Retained Subsidiary Asbestos Claims and Non-Retained Subsidiary Asbestos Claims (as defined in [the 2003 MSPA]).").

[66]  *See Semenetz v. Sherling & Walden, Inc.*, 7 N.Y.3d 194, 201 (2006) ("We [] join the majority of courts declining to adopt the 'product line' exception[.]"); *The O'Brien Corp. v. Hunt-Wesson, Inc.*, 1999 WL 126996, at *7 n.3 (Del. Ch. Feb. 25, 1999) (suggesting that product line theory is "not particularly well-thought out"); *see also Dickens v. A-1 Auto Parts & Repair Inc.*, 2020 WL 6265078, at *3 (S.D. Miss. Oct. 23, 2020) ("There is no indication that Delaware has adopted the product line exception to the general rule against successor liability.").

[67]  *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 358 (1981).

[68]  *See Falor v. G&S Billboard*, 2008 WL 539225, at *6 (D.N.J. Feb. 27, 2008) ("This Court has not located, and the parties have not identified, any case applying the product-line exception announced in *Ramirez* to a situation such as this where a third party plaintiff (or any plaintiff) argued, much less won the argument, that a defendant *distributor* was liable as a successor-in-interest to a predecessor *distributor* for strict products liability where the *manufacturer* is a viable defendant in the case at bar.").

assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders."[69]  There is a significant likelihood that a court applying any relevant state law would deem the first and third factors satisfied based on the evidence supporting (a) the continuity of assets, physical locations, management, and business operations following the 2004 Transaction between WCD and Soco West on the one hand, and Brenntag entities on the other, and (b) the Brenntag entities' assumption of the vast majority of the Debtors' operational liabilities in connection with the 2004 Transaction. The second and fourth factors, however, are far less certain.

57.    With respect to the second factor—the cessation of ordinary business and dissolution of the predecessor—there is no dispute that the Debtors ceased all ordinary business operations following the closing of the 2004 Transaction.  But it is equally undisputed that the Debtors were not formally dissolved in connection with the 2004 Transaction and instead continued their corporate existence for the purpose of administering their assets and managing their liabilities for decades thereafter.[70]  Consequently, a court could well conclude that the Debtors were not left a "barren continuation" or "corporate shell" given their decades-long existence in this capacity following the 2004 Transaction.[71]

---

[69]  *Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, 678 F. Supp. 3d 611, 622 (D.N.J. 2023).

[70]  *See* Griffith Decl. ¶¶ 9–15.

[71]  *See In re New York City Asbestos Litig.*, 15 A.D.3d 254, 257 (N.Y. App. Div. 2005) (corporation was not a mere "shell" following sale of most of its operating assets because corporation retained significant assets, including cash, receivables, and causes of action, and retained obligations, including indemnification, insurance, and environmental remediation obligations).

58.     The fourth factor—continuity of ownership—is likely the most critical factor for two reasons.  First, it has not been consistently applied by courts across the relevant states. And second, it weighs heavily against a finding that the 2004 Transaction amount to a *de facto* consolidation or mere continuation.   Indeed, the Debtors have not identified any evidence supporting continuity of ownership between the Debtors and Brenntag, as the 2004 Transaction constituted a cash purchase of assets by unrelated corporate entities.   New York and Delaware courts emphasize continuity of ownership in adjudicating the *de facto* merger/mere continuation theory and would likely dismiss any such claims that cannot satisfy this factor.[72]   On the other hand, a court applying New Jersey law is likely to omit the fourth factor from its analysis entirely.[73] Accordingly, whether the 2004 Transaction constitutes a *de facto* merger is highly dependent upon which state's law is applied such that the successor liability claims are subject to significant litigation risk.

59.     Based on the foregoing, the Debtors believe that the likelihood of success on the merits on their successor liability claims against Brenntag are no greater than 50%, and possibly materially lower.

## B.     Valuation of Claims

60.     In valuing any claim that seeks to hold another entity liable for the Debtors' liabilities—such as alter ego and successor liability claims—the Debtors have considered the likelihood of success on those claims as applied to the value attributable to the Debtors' liabilities.

---

[72]   *Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 401 (S.D.N.Y. 2012) ("The Second Circuit has explained that continuity of ownership is the essence of a merger, and therefore the [mere continuation/*de facto* merger] exception[s] cannot apply in its absence." (citations and internal quotations omitted)); *see also Simple Glob., Inc. v. Brathwait Watches, Inc.*, 2022 WL 100363, at *2 (Del. Super. Ct. Jan. 10, 2022).

[73]   *Pub. Serv. Elec. & Gas Co.*, 678 F. Supp. 3d at 622 ("[T]he more modern view of New Jersey law . . . no longer require[s] continuity of shareholder interest." (quoting *Woodrick v. Jack J. Burke Real Est., Inc.*, 306 N.J. Super. 61, 75, 703 A.2d 306, 313 (App. Div. 1997))).

61.     To assist the Debtors and the disinterested directors' assessment of the value of the

Debtors' estate causes of action, the Debtors retained estimation experts at Brattle, who reviewed

documents from the Debtors' productions (as well as documents produced by the Contributing

Parties)—in particular, the Debtors' historical claims and sales data (where available)—and

calculated reasonable estimates of what the Debtors' liabilities in the tort system would be but for

the Debtors' bankruptcy.  *Cf. In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 42 (Bankr. E.D.N.Y.

2014) (where trustee "retained a reputable valuation expert and utilized that valuation as a baseline

in negotiating the Settlement," it was "neither necessary nor appropriate to engage in [valuation]

litigation in the context of a Rule 9019 motion").

62.     With respect to successor liability theories against Brenntag, the Debtors have

considered the value of (a) WCD cosmetic talc asbestos-related liabilities, (b) WCD industrial talc

asbestos-related liabilities, (c) WCD and Soco West traditional asbestos-related liabilities, and

(d) Soco West environmental liabilities.  With respect to alter ego claims against DB US and

NICO, the same liabilities were considered, as well as environmental liabilities at Brilliant and

LAT, which would not be subject to a potential successor liability theory against Brenntag.[74]

Brattle's estimates of these liabilities in present value terms are as follows:[75]

| | |
|---|---|
| WCD cosmetic talc liabilities | $428–$516 million |
| WCD industrial talc liabilities | $32–$41 million |
| WCD and Soco West traditional asbestos liabilities | $14 million |
| Soco West environmental liabilities | $24 million |
| **Total liabilities subject to potential successor liability theories** | **$498–$595 million** |

---

[74]  Successor liability is not even theoretically available to impose such liabilities on Brenntag because as noted above, Brilliant and LAT had no legacy operations or assets giving rise to environmental liabilities that were sold to Brenntag in the 2004 Transaction.

[75]  *See* McKnight Decl. ¶ 7.

| Brilliant and LAT environmental liabilities | $13 million |
|---|---|
| **Total liabilities subject to potential successor liability and alter ego theories** | **$511–$608 million** |

63.     Notably, with respect to claims that alleged the presence of asbestos in cosmetic and industrial talc distributed by WCD, the Debtors recognize there can be a wide range of disputes over the merits of such claims.  The Debtors vigorously disputed the tort claims prior to these chapter 11 proceedings and firmly believe in their defenses to the underlying liabilities on their merits.  However, for purposes of negotiating the Settlement Agreement, the Debtors took the approach that the value of estate causes of action that attempt to impose WCD and Soco West's liabilities on non-Debtors should be calculated off of a reasonable estimate of what WCD and Soco West would face in the tort system but for the Debtors' bankruptcy—not what the Debtors actually "should" be liable for under a legal liability approach.[76]  Brenntag, DB US, and NICO have emphasized to the Debtors what they believe to be fundamental weaknesses and flaws in many or most underlying talc-related claims against the Debtors, which would counsel in favor of basing a settlement off a much lower number than that calculated by Brattle, but the Debtors have diligently sought to maximize recoveries for their estates and all stakeholders by using the numbers calculated by their own advisors as a basis for negotiations.

64.     The estimated liability numbers calculated by Brattle must be discounted, as noted above, by a reasonable estimate of likelihood of success on the merits of any successor liability or alter ego claims.  For the reasons set forth above, the Debtors believe the likelihood of success on the merits of successor liability claims is much greater than the likelihood of success on alter ego

---

[76]  If actual legal liability were at issue (as would be the case in claims estimation under 11 U.S.C. § 502(c)), that figure should take into account not just causation evidence, but evidence of inefficiencies, settlement dynamics, and other confounding factors that can render figures derived from the tort system unreliable and overstated indicators of true liability.  *See In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 94–97 (Bankr. W.D.N.C. 2014).

claims.  The Debtors do not assess the likelihood of success on the merits on those claims cumulatively above 50% (and indeed believe the likelihood of success on the merits could be materially lower).  This places a reasonable potential settlement of estate causes of action—and at a minimum, the "the lowest point of reasonableness"—at a number below $300 million.

65.    The Debtors, however, negotiated for a far higher recovery in the Settlement Agreement.  In negotiating with NICO, DB US, and Brenntag, the Debtors advocated and obtained consideration that, in the Debtors' view, reflects two additional key factors.

66.    *First*, the Debtors negotiated with Brenntag, DB US, and NICO over the inclusion of tort system defense costs.  Brattle estimated that absent a bankruptcy, tort system defense costs associated with estimated claims alleging solely pre-2004 exposure would be approximately $158–$185 million in present value terms (using a percentage of indemnity methodology).  *See* McKnight Decl. ¶¶ 7, 22–24.[77]  Notably, the inclusion of *any* amount of defense costs during negotiations, and ultimately in the amount reflected in the Settlement Agreement, are a significant benefit to the Debtors' stakeholders.  But for the settlement, tort system defense costs would never be paid to claimants—they would be paid to Brenntag's defense lawyers and experts.  The inclusion of these costs—and the fact that the settlement amount is far greater than the value of the estate causes of action standing on their own—demonstrates not only the reasonableness of the settlement, but its superiority for the Debtors' stakeholders over the prepetition *status quo*.

67.    *Second*, the Debtors negotiated with Brenntag, DB US, and NICO over an amount (or "premium") to reflect (a) the avoidance of uncertainty in the tort system provided by the settlement and the benefits to those entities from finally resolving all estate claims arising out of

---

[77]    The Debtors focused on calculating tort system defense costs for claims alleging only pre-2004 exposures because Brenntag will not have to incur such costs if the successor liability claims are settled, whereas it will continue to have to defend claims asserting post-2004 exposures even if successor liability claims are settled.

the Debtors' operations, (b) any residual value of other estate causes of action, (c) the costs of administering the chapter 11 cases, and (d) the costs of administering any future trust or trusts as part of an eventual resolution of these proceedings.

68.     In sum, after considering all these component parts of value, the Debtors negotiated a $535 million resolution of estate causes of action that provides for far more than the "the lowest point of reasonableness" for settling those causes of action.

### C.     Difficulties in Collection

69.     As explained above, any estate causes of action face significant hurdles to succeeding on their merits, regardless of any difficulties in collection.  The Settlement Agreement further benefits the Debtors and their creditors by locking in payment from NICO and thus eliminating any potential difficulties in collection.

70.     Absent settlement, Brenntag likely would raise equitable recoupment defenses against any successor liability claims asserted by WCD or Soco West against Brenntag Specialties and Brenntag Pacific, respectively.  *See, e.g.*, *In re Revel AC Inc.*, 909 F.3d 597, 603 (3d Cir. 2018) ("When a claim against a debtor qualifies for equitable recoupment, the claim avoids the usual bankruptcy channels, in that it receives full value in the netting of obligations between a creditor and the debtor without regard to the bankruptcy priority of the claim—thus, in essence, the claim is given priority over other creditors' claims.") (cleaned up).  Following the 2004 Transaction, WCD and Soco West owe indemnification obligations to Brenntag entities for asbestos and environmental claims relating to the Debtors' pre-2004 operations, but the 2004 Transaction is also what gives rise to the Debtors' potential successor liability claims against Brenntag entities. As a result, Brenntag could argue that the transactional overlap and factual nexus between the Debtors' successor liability claims and the Debtors' potential indemnification obligations meets

the standard for equitable recoupment. *See Revel AC*, 909 F.3d at 603 (explaining equitable recoupment requirements). While the Debtors could assert that any such indemnification claims do not meet the standard for equitable recoupment and should be disallowed as contingent indemnification claims under section 502(e)(1)(B), that issue would be disputed and at a minimum reduces the potential collectability of any successor liability claims asserted against Brenntag.

71.     If any recoupment defenses are overcome, any successor liability claims that seek to impose the tort liabilities of WCD and Soco West onto Brenntag would likely be limited to the specific entities that purchased WCD and Soco West's assets:  Brenntag Specialties and Brenntag Pacific, respectively. In particular, successor liability for WCD's asbestos-related talc liabilities— which constitute the overwhelming majority of the Debtors' total liabilities—would most likely be assertable only against Brenntag Specialties, which in turn would likely seek indemnification from DB US.  Whatever the financial condition or strength of the overall Brenntag or Deutsche Bahn groups, it is the financial condition of these specific entities that would normally be directly relevant to assessing potential collectability challenges.

72.     In *this* case, however, collectability on successor liability claims against Brenntag Specialties ultimately rests on a chain of indemnity relationships that relies on payment not from Brenntag Specialties or DB US, but from National Indemnity.  Specifically, successor liability claims against a Brenntag entity will likely be tendered to DB US under the 2003 MSPA, and DB US will likely tender such claims to National Indemnity under the 2007 SPA.  Any pressure on either of the steps on this indemnification chain further reduces the potential collectability of any successor liability claims.  Since the Debtors' bankruptcy, DB US, Brenntag, and National Indemnity have exchanged correspondence contesting their respective obligations in this indemnification chain.  Most notably, National Indemnity commenced an international arbitration

36

proceeding against DB US seeking, among other relief, to declare its indemnification obligations to DB US null and void. If the outcome of that pending proceeding is that National Indemnity is not obligated to indemnify DB US for claims relating to the Debtors' liabilities, the likelihood of collectability on any successor liability claim is undoubtedly less than if National Indemnity remains in the indemnification chain.

73.     As to any potential estate causes of action directly against NICO and DB US, while there is no doubt that various NICO entities (including National Indemnity) have significant assets, any estate causes of action against NICO would have to succeed on a claim against a specific NICO entity with such assets—the assets of the entire NICO group are not available to satisfy any claim that the Debtors might have against any specific NICO entity. Similarly, while DB US may be part of a larger Deutsche Bahn group, the assets of that group are not readily available to satisfy any claim that the Debtors might have against DB US alone.

74.     The Settlement Agreement avoids all of the uncertainties of collectability identified above by preserving National Indemnity's involvement and securing its backing of the payment obligations under the Settlement Agreement, and resolving any potential recoupment defenses that Brenntag might have been able to assert. As a result, the $535 million provided by the Settlement Agreement can be locked in now for the benefit of the Debtors' estates and all their stakeholders immediately, without the risks and costs associated with an uncertain litigation.

**D.     Complexity of the Litigation Involved and the Attendant Expense, Inconvenience, and Delay**

75.     "The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." *Nutraquest*, 434 F.3d at 646. And it is "axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation." *Id.* (citing *TMT Trailer*, 390 U.S. at 434 ("Litigation and delay are always the

37

alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.")).  Where probability of success is low, a bankruptcy court is well within its discretion to find that escaping complex defenses via settlement is in the best interests of the debtor's estate.  *See id.*

76.    As noted above, the Debtors believe even the strongest of their estate causes of action have no greater than a 50% likelihood of success on the merits, and many of the claims released have a materially lower likelihood of success.  Absent settlement, all of the considerations that the Debtors set forth above would have to be litigated, requiring complex and expensive litigation over both factual and legal issues, likely concerning events that took place over twenty years ago and for which memories have dramatically faded or for which witnesses may be unavailable.  Among other issues, it is likely that absent the Settlement Agreement:  (a) Brenntag would aggressively litigate the merits of the successor liability claims, including the Debtors' working assumption (as discussed above) of a high degree of operational and personnel continuity between pre-2004 WCD and Soco West and post-2004 Brenntag Specialties and Brenntag Pacific, as well as the choice of law for successor liability, and the applicability of the equitable recoupment doctrine; (b) DB US and NICO would aggressively litigate the merits of any alter ego or other non-successor liability estate causes of action; and (c) each of Brenntag, DB US, and NICO would dispute the value of the Debtors' liabilities that the Debtors have used during negotiations.

77.    All of these disputes would be complex, time-consuming, and expensive, without any guarantee that the outcomes would be more favorable than those achieved through the Settlement Agreement.  The complexities, uncertainties, and risks surrounding these disputes are obviated by approval of the Settlement Agreement.  The Court should find that the complexity of

the litigation involved and the attendant expense, inconvenience, and delay weighs in favor of granting the Motion and approving the Settlement Agreement.

### E.   Paramount Interest of the Creditors

78.   In considering whether a settlement is in the paramount interest of the creditors, courts will conduct an independent review of the fairness of the proposed settlement agreement. *See In re Scripsamerica, Inc.*, 634 B.R. 863, 874 (Bankr. D. Del. 2021). Courts have recognized that not all constituencies affected by a proposed settlement agreement may be involved in the negotiations, and the views of potential objectors "are not dispositive and cannot be permitted to predominate over the best interests of the estate as a whole." *Id.* (internal citations omitted).[78]

79.   In this case, the Debtors' potential estate causes of action against Brenntag, DB US, and NICO are their most valuable asset for monetization and distribution under the Bankruptcy Code. Because this is a fixed asset case, monetizing and maximizing the value of those estate causes of action is in the best interests of all of the Debtors' creditors.[79] For the reasons discussed above, the Debtors *have* maximized the value of the estate causes of action released under the Settlement Agreement and achieved a settlement far exceeding the lowest point of reasonableness. As explained above, the Debtors negotiated for the inclusion of value reflecting tort defense system costs (and an additional premium) in the Settlement Agreement—value that would not be available

---

[78]   *See also In re NovaPro Holdings, LLC*, 2018 WL 2102323, at *9 (Bankr. D. Del. May 4, 2018) ("[Objecting creditor] argues that the paramount interest of creditors does not favor settlement approval because 99% of the creditors object to the settlement. Indeed, if the decision was up to [two of the debtors' largest creditors], they may prefer to take a gamble by taking this case to trial. Even so, I am persuaded that the settlement serves the paramount interest of creditors."), *aff'd*, 2019 WL 1324950 (D. Del. Mar. 25, 2019), *aff'd*, 815 F. App'x 655 (3d Cir. 2020); *In re Summit Metals, Inc.*, 477 F. App'x 18, 22 (3d Cir. 2012) (affirming approval of settlement where "[c]oncerning . . . the paramount interest of the creditors, the Bankruptcy Court concluded that despite some creditors' objections to the settlement, and an indication some were willing to wait longer for the slightest chance of a more substantial recovery, 'the exercise is all about maximizing value for creditors'").

[79]   *See Summit Metals*, 477 F. App'x at 22 (affirming approval of settlement where bankruptcy court, in discussing the paramount interest of creditors, emphasized "the exercise is all about maximizing value for creditors").

to the Debtors' creditors absent the Settlement Agreement.  This allowed the Debtors to obtain a settlement of more than half a billion dollars for the estates.  Moreover, the avoidance of collection risk, and the uncertainty, costs, and delay associated with otherwise litigating these causes of action also directly benefit all creditors.

80.      Another specific benefit that will improve the distributions to *all* creditors in these cases is that the Settlement Agreement avoids any dilution of distributable value due to potential allowance of, or the expense of litigating disputes regarding, potential unsecured indemnification claims that might be asserted by Brenntag against the Debtors in the absence of any settlement.[80]

81.      The limited scope of the releases in the Settlement Agreement also confirm that it is in the best interests of creditors.  The only claims released by the Debtors are estate causes of action and any other claims assertable by the Debtors—not direct claims of individual tort creditors against non-Debtors.  And notably, nothing in the Settlement Agreement releases Brenntag from independent, direct liability for its own conduct after the sale of the Debtors' assets to Brenntag in February 2004.  The principled and limited scope of the Settlement Agreement thus ensures that Debtors' estates are maximized, while independent, direct claims for post-February 2004 non-Debtor conduct are not released.

82.      The Debtors' hard-fought, arm's-length, and good faith negotiations also support the conclusion that the Settlement Agreement is in the best interests of all stakeholders.  *See ID Liquidation One*, 555 F. App'x at 206 (affirming approval of settlement where the bankruptcy court had "found that the Settlement was fair and equitable, given that the negotiations were

---

[80]    *See, e.g.*, *NovaPro Holdings*, 2018 WL 2102323, at *9 & n.59 (noting benefits of a release "eliminat[ing] the need to litigate over the validity of [a] claim, and remov[ing] a sizable claim from the claims distribution pool" as supporting the paramount interest of creditors); *Immune Pharms.*, 635 B.R. at 126 (identifying a creditor's agreement to reduce the amount of its claim as favoring the paramount interest of creditors).

conducted in good faith and a special committee of the Debtors' board had approved and

authorized the Settlement"). The Debtors' disinterested directors, unaffiliated with any of the other

settling parties, were personally involved in negotiating the Settlement Agreement and received

advice from their advisors and valuation experts, while Brenntag, DB US, and NICO were

represented by separate principals and advisors. The nature of these negotiations therefore also

supports approval of the Settlement Agreement.

83.     For the reasons described in this Motion, the Debtors respectfully submit that the

Settlement Agreement satisfies the standards for approval under applicable law and that the Court

should therefore approve the Settlement Agreement pursuant to Bankruptcy Rule 9019.

## II.    The Settlement Agreement Should Be Approved Under a Business Judgment Standard, and Regardless, Meets the Entire Fairness Standard.

84.     The Debtors submit that the Settlement Agreement should be approved under the

business judgment rule. *See Montgomery Ward*, 242 B.R. at 153 (explaining that the "sound

business purpose" required to justify use of estate property pursuant to section 363(b) "essentially

represent[s] a 'business judgment test'"). Such business judgments can only be set aside upon a

showing that directors did not actually make a decision or were uninformed, grossly negligent, or

lacking independence.[81] "A plaintiff faces 'an uphill battle' to carry this burden of proof."[82] Here,

the Settlement Agreement is plainly a reasonable exercise of the Debtors' business judgment,

---

[81] *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[T]he business judgment rule governs unless the opposing party can show one of four elements: (1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent."); *Immune Pharms.*, 635 B.R. at 123 ("Although the 'business judgment rule,' ordinarily would protect fully informed corporate decisions made in good faith, it does not apply to grossly negligent acts; acts tainted with fraud, self-dealing, or unconscionable conduct; or decisions which lack a business purpose or result from an obvious and prolonged failure to exercise oversight or supervision.").

[82] *HH Liquidation, LLC*, 590 B.R. at 272; *see also id.* ("The burden is on the plaintiff to show that the Business Judgment Rule is not applicable.").

because as described above, the Settlement Agreement was entered into for the valid purpose of monetizing and maximizing the value of the Debtors' estate causes of action and falls well within the range of reasonableness. It should therefore be approved.

85.    The business judgment standard should apply to approval of the Settlement Agreement even though it settles causes of action against the Debtors' current direct and indirect equityholders (NICO) and related parties. The Settlement Agreement was negotiated and approved on behalf of the Debtors exclusively by their disinterested directors (with the assistance of the Debtors' advisors), and without interference from NICO. Bankruptcy courts have approved transactions with insiders without applying an "entire fairness" analysis akin to that applied in derivative suits for breach of fiduciary duty when, as here, the transaction is negotiated by a debtor without interference by any allegedly controlling insider. *E.g.*, *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (where settlement was "reviewed and approved by independent directors" who were "highly qualified individuals who had a regular practice during board meetings of convening separately from [an insider] and his designated directors to consider what was in [the debtor's] best interest," the court concluded that "[g]iven the role played by the independent directors and the evidence indicating that [the insider] did not exert any undue influence over [the debtor] in negotiating the CII Settlement, the CII Settlement should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders"), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012) (finding that settlements with insiders that were negotiated on the debtor's behalf "without interference from" those insiders

were "not related party transactions that, in other contexts, make application of the entire fairness

doctrine appropriate").

86.     For the same reasons, an entire fairness analysis should not apply to the approval

of the Settlement Agreement.  Consistent with the delegation of authority to exclusively determine

and handle any Conflict Matters, the disinterested directors led the settlement negotiations on

behalf of the Debtors—and did not discuss these negotiations with the only NICO-affiliated

director, who did not have input on the Debtors' positions on those negotiations.  Given the

disinterested directors' independence from the other parties to the Settlement Agreement, and their

extensive role (to the exclusion of any NICO-affiliated individuals) in negotiating, reviewing, and

approving the Settlement Agreement on behalf of the Debtors, the "entire fairness" standard should

not apply and the Settlement Agreement should be approved as a valid exercise of the Debtors'

business judgment.  *See* Pohl Decl. ¶¶ 5, 11–13.

87.     Even if the Court determined that an "entire fairness" standard applies to approval

of the Settlement Agreement, the approval of the Settlement Agreement by the Debtors'

disinterested directors shifts the burden of proving unfairness to any objecting party—it is not the

Debtors' burden to prove fairness.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117

(Del. 1994) ("[A]n approval of the transaction by an independent committee of directors . . . *shifts

the burden of proof on the issue of fairness* from the controlling or dominating shareholder *to the

challenging shareholder-plaintiff*.") (emphasis added); *In re Match Grp., Inc. Deriv. Litig.*, 315

A.3d 446, 462 (Del. 2024) ("*Lynch* . . . clarified that if the defendants demonstrated that the

transaction was . . . negotiated by a well-functioning special committee of independent directors .

. . then the burden shifted to the plaintiffs to prove that the transaction was not entirely fair."); *see

also Teleservs. Grp., Inc.*, 2009 WL 838157, at * 9 ("New Jersey courts have previously sought

guidance and instruction from Delaware case law when deciding matters involving corporate directors' decision-making. . . . In the absence of binding doctrinal authority from New Jersey, the Court here too reviews Delaware case law for guidance.").

88.    For the same reasons the Settlement Agreement should be approved, no potential objecting party could sustain its affirmative burden of proving that the terms of the Settlement Agreement are unfair—and the Debtors could readily demonstrate that the Settlement Agreement is entirely fair as a matter of both fair price and fair dealing.  *See Match Grp.*, 315 A.3d at 459 ("The concept of fairness has two basic aspects:  fair dealing and fair price . . . entire fairness is a unitary test, under which a reviewing court will scrutinize both the price and the process elements of the transaction as a whole.").

89.    The Settlement Agreement is entirely fair as a matter of fair price because it resolves the settled causes of action well above the range of reasonableness, avoids collection risks, avoids the complexities and costs of litigating the issues resolved, and benefits all creditors by monetizing and maximizing estate assets.

90.    As described more fully above and in the Pohl Declaration, the Settlement Agreement was negotiated and approved on behalf of the Debtors by experienced and well-informed independent and disinterested directors.  *See Match Grp.*, 315 A.3d at 461–62 ("[F]airness in this context can be equated to conduct by a theoretical, wholly independent, board of directors acting upon the matter before them . . . .  Particularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.").

91.     The Settlement Agreement is therefore entirely fair both as a matter of price and process and should be approved under any standard.

### Request of Waiver of Stay

92.     To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to prosecute their chapter 11 cases and preserve the value of their estates.

### Waiver of Memorandum of Law

93.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

### Reservation of Rights

94.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds (other than as expressly provided for in the Settlement Agreement), (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all

such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## No Prior Request

95.    No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

96.    The Debtors have provided notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the District of New Jersey; (b) the Committee; (c) the Top Counsel List;[83] (d) NICO and counsel thereto; (e) the Office of the United States Attorney for the District of New Jersey;  (f) the Internal Revenue Service;  (g) the Securities Exchange Commission; (h) the Environmental Protection Agency; (i) the offices of the attorneys general in states where the Debtors conduct their business operations; (j) Brenntag and counsel thereto; (k) DB US and counsel thereto; (l) the FCR and counsel thereto; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is required.

*[Remainder of page intentionally left blank.]*

---

[83]    As defined in the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a List of the Top Law Firms and Use the Addresses of Counsel in Lieu of Claimants' Addresses and (II) Redact Personally Identifiable Information, (B) Approving Certain Notice Procedures, and (C) Granting Related Relief* [Docket No. 8].

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in

substantially the form submitted herewith, granting the relief requested herein and such other relief

as is just and proper under the circumstances.

Dated:  September 3, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*