**Exhibit B**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) APPROVING THE SETTLEMENT**
**AGREEMENT BETWEEN THE DEBTORS AND THE**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  Whittaker, Clark & Daniels, Inc. (4760); Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

Page | 2)

| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

**CONTRIBUTING PARTIES, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through eight (8),

is **ORDERED**

Page | 3)

| | |
|---|---|
| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"): (a) authorizing (i) entry into that certain settlement agreement attached as **Exhibit 1** to this Order (the "Settlement Agreement") between and among the Debtors, Brenntag,[1] NICO,[2] and DB US[3] (Brenntag, NICO, and DB US, collectively, the "Contributing Parties") and the Debtors (together with the Contributing Parties, the "Parties") and (ii) the Debtors to perform all of their obligations thereunder; and (b) granting related relief, all as more fully set forth in the Motion; and upon the Pohl Declaration, the McKnight Declaration, the Griffith Declaration, and the Campbell Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Settlement Agreement.

[1]    "Brenntag" means, collectively, Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.), and Coastal Chemical Co., LLC.

[2]    "NICO" means, collectively, Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc., Ringwalt & Liesche Co. ("Ringwalt"), and National Liability & Fire Insurance Company.

[3]    "DB US" means DB US Holding Corporation (f/k/a Stinnes Corporation).

Page | 4)

| | |
|---|---|
| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Settlement is fair and equitable and that the probability of success in litigation, the likely difficulties in collection, the complexity of the litigation involved and the attendant expense, inconvenience, and delay, and the paramount interest of the creditors all weigh in favor of approving the Settlement; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice of the Motion need be provided; and this Court having reviewed the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY FOUND, DETERMINED AND ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      Any objections to the Motion and to the relief requested therein and/or granted in this Order that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled on the merits.

3.      The Parties are authorized to enter into the Settlement Agreement, substantially in the form attached hereto as **<u>Exhibit 1</u>** and the terms contemplated therein are hereby approved in all respects.

Page | 5)

| | |
|---|---|
| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

4.      The claims to be released by the Debtors in the Settlement Agreement, defined as the Estate Causes of Action in the Settlement Agreement, are property of the Debtors' estates.

5.      The Settlement Agreement, including the releases contained therein, is fair and equitable and in the best interests of the Debtors and their estates, based upon the evidence and arguments made at the hearing on the Motion as to the probability of success in litigation; the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and the paramount interest of creditors.

6.      The probability of success on the claims the Debtors are releasing under the Settlement Agreement, and the value of any recovery in the event the Debtors were to prevail, are both uncertain.

7.      In the absence of a settlement, the resolution of the Debtors' claims against the Contributing Parties would require lengthy and costly litigation.  There is no assurance that such litigation would result in higher recoveries for the Debtors' creditors.  By entering into the Settlement Agreement, the Debtors avoid this delay, uncertainty, and risk.

8.      When considering the challenges the Debtors face on the merits of the Estate Causes of Action, the Settlement Payment is reasonable and exceeds the lowest point in the range of reasonableness.

9.      The Settlement Agreement was the product of good faith negotiations conducted at arm's-length between the Debtors and the Contributing Parties, each of which was separately represented by counsel.

| | |
|---|---|
| Page \| 6) | |
| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

10.     The terms and conditions of the Settlement Agreement, including the rationale underlying the agreement, have been adequately disclosed to the Court.

11.     In accordance with the terms of the Settlement Agreement, the Debtor Releasing Parties and creditors of the Debtors' estates, as applicable, are enjoined from commencing, prosecuting, accepting payment on account of, or otherwise pursuing Debtor Released Estate Causes of Action against the Non-Debtor Released Parties, and the Court will retain exclusive jurisdiction to enforce this Order and to determine, without limitation, whether any claim brought against any Non-Debtor Released Party constitutes a Debtor Estate Cause of Action and is thus subject to the prohibition against prosecution of such claims.

12.     The Non-Debtor Released Parties are forever barred from asserting the Brenntag Released Claims, the NICO Released Claims, and the DB US Released Claims, as applicable, against the Debtor Releasees, and the Court will retain exclusive jurisdiction to enforce this Order and to determine, without limitation, whether any claim brought against any of the Debtor Releasees constitutes a Brenntag Released Claim, NICO Released Claim, and/or DB US Released Claim and is thus subject to the prohibition against prosecution of such claims.

13.     Notwithstanding anything to the contrary contained herein (including, but not limited to, this paragraph 13) or in the Settlement Agreement, each Contributing Party reserves all, and does not release any, rights, claims, and defenses (whether contractual or otherwise) against each other Contributing Party, including but not limited to all rights, claims, and defenses under the 2003 MSPA and 2007 SPA (including in the arbitration proceeding pending under the 2021 Arbitration Rules of the International Chamber of Commerce, Case Ref. 27945/PDP), defined in

| Page | 7) | |
|---|---|
| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

the Settlement Agreement as Preserved Rights.  For the avoidance of doubt, the Contributing

Parties agree that the releases of the Brenntag Released Claims, the DB US Released Claims, and

the NICO Released Claims by the respective Contributing Parties shall not be raised as a defense

and shall not constitute a defense to the assertion of Preserved Rights.

14.    For the avoidance of doubt, the effectiveness of the terms of the Settlement

Agreement are not contingent upon the confirmation of a chapter 11 plan, and this Order shall be

binding on all the Debtors, all holders of claims against the Debtors, the respective successors and

assigns referenced in this paragraph, and any chapter 11 trustee, liquidating or other trustee, or

other trust or other form of distribution vehicle established under a chapter 11 plan of the Debtors,

and on any chapter 7 trustee if any of the Debtors' cases is converted to a chapter 7 proceeding.

15.    Nothing in the Settlement Agreement or this Settlement Order bars any person from

asserting a Cause of Action against a Non-Debtor Released Party that is not an Estate Cause of

Action.

16.    The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

17.    Notwithstanding Bankruptcy Rule 6004(h), 7062, 9014, or otherwise, this Order

shall be effective and enforceable immediately upon entry hereof.

18.    Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied

by such notice.

| | |
|---|---|
| Page | 8) | |
| Debtors: | WHITTAKER, CLARK & DANIELS, INC., *et al*. |
| Case No. | 23-13575 (MBK) |
| Caption of Order: | Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief |

19.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

20.     As set forth in the Settlement Agreement, any damages payable by the Debtors under the Settlement Agreement for breach of the Settlement Agreement shall be entitled to administrative expense priority under 11 U.S.C. § 503(b)(1) against each of the Debtors' estates.

21.     No party shall be required to seek relief from the automatic stay to enforce the Settlement Agreement or to exercise any rights thereunder, including to exercise rights of termination in accordance with the terms of the Settlement Agreement.

22.     This Court shall retain exclusive jurisdiction to interpret provisions of the Settlement Agreement and this Order in all respects and further to hear and determine any and all disputes relating to the Settlement Agreement; in the event the Debtors' cases are closed, there shall be cause to reopen the Debtors' cases upon motion or application for such purposes, absent which the parties may seek enforcement or interpretation of the Settlement Agreement or this Order in the District Court for this District.

## Exhibit 1

**Settlement Agreement**

**[EXECUTED VERSION]**

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Settlement Agreement") is made and executed as of the third day of September, 2024 by and between:  (a) BRENNTAG CANADA, INC.; BRENNTAG GREAT LAKES, LLC; BRENNTAG MID-SOUTH, INC.; BRENNTAG NORTH AMERICA, INC.; BRENNTAG NORTHEAST, LLC; BRENNTAG PACIFIC, INC.; BRENNTAG SOUTHWEST, INC.; BRENNTAG SPECIALTIES, LLC (F/K/A BRENNTAG SPECIALTIES, INC.; AND AS MINERAL AND PIGMENT SOLUTIONS, INC. ("MPSI")) ("Brenntag Specialties"), AND COASTAL CHEMICAL CO., LLC (collectively, "Brenntag"), a group of affiliated entities; (b) BERKSHIRE HATHAWAY INC.; BH COLUMBIA INC.; COLUMBIA INSURANCE COMPANY; NATIONAL INDEMNITY COMPANY; RESOLUTE MANAGEMENT, INC.; RINGWALT & LIESCHE CO.; and NATIONAL LIABILITY & FIRE INSURANCE COMPANY (collectively, "NICO"), a group of affiliated entities; (c) DB US HOLDING CORPORATION (f/k/a Stinnes Corporation) ("DB US," and together with Brenntag and NICO, collectively, the "Contributing Parties," and each individually, a "Contributing Party"), a corporation; and (d) WHITTAKER, CLARK & DANIELS, INC. ("WCD"); BRILLIANT NATIONAL SERVICES, INC. ("Brilliant"); L. A. TERMINALS, INC. ("LAT"); and SOCO WEST, INC. ("Soco," and together with WCD, Brilliant, and LAT, collectively, the "Debtors," together with Brenntag, NICO, and DB US, the "Parties," and each of the foregoing individually, a "Party").

WITNESSETH:

WHEREAS, Stinnes Corp. (n/k/a DB US), Stinnes AG, Stinnes UK Limited, Schenker-BTL, S.A., and Deutsche Bahn Aktiengesellschaft (collectively, the "DB Parties") and certain of its affiliates entered into a master sale and purchase agreement with certain affiliates of Bain Capital L.P.  (the  "2003 MSPA"), which contemplated, in part, sales of certain of the Debtors' assets to Brenntag North America, Inc., a then-affiliate of Bain Capital L.P., and certain of its affiliates in exchange for cash and the assumption of certain non-asbestos and non-environmental liabilities, while certain defined asbestos and environmental liabilities remained with the Debtors;

WHEREAS, the 2003 MSPA provided that WCD and Soco would indemnify Brenntag North America, Inc. and certain of its affiliates for certain defined asbestos-related liabilities, which indemnification obligations were guaranteed by Brilliant, which in turn were guaranteed by DB US if WCD, Soco, and Brilliant were unable to satisfy such claims, as applicable;

WHEREAS, Soco entered into that certain asset purchase agreement whereby Soco divested substantially all of its assets in exchange for, among other things, cash and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc. (the "2004 Soco APA");

WHEREAS, WCD entered into an agreement divesting substantially all of its assets in exchange for, among other things, cash and the assumption of certain ongoing liabilities by the purchaser, MPSI (the "2004 WCD APA");

WHEREAS, Brilliant engaged in an asset sale transaction with Brenntag North America divesting its intellectual property assets, resigning from certain LLC agreements, and terminating certain management fee agreements in exchange for Brenntag North America assuming certain

non-asbestos-related and non-environmental related ongoing liabilities, in addition to the consideration paid under the Soco APA and WCD APA (the "2004 Brilliant APA," and together with the 2003 MSPA, the 2004 Soco APA, and the 2004 WCD APA, the "2004 Transaction Documents");

WHEREAS, Brenntag acquired substantially all of WCD's, Soco's, and Brilliant's operating assets pursuant to the 2004 Transaction Documents (collectively, the "2004 Transaction");

WHEREAS, pursuant to the 2004 Transaction Documents, the Debtors retained liabilities as to certain tort claims and retained certain assets, including certain asbestos- and environmental-related insurance receivables and certain real property;

WHEREAS, pursuant to the 2004 Transaction Documents, Brenntag asserts claims against the Debtors for indemnification of certain claims arising from the Debtors' historical business practices prior to the 2004 Transaction;

WHEREAS, in December 2007, National Indemnity Company purchased the equity in Brilliant (which owned all of the equity of WCD and Soco) and LAT from DB US (the "2007 Acquisition"), pursuant to a stock purchase agreement (the "2007 SPA");

WHEREAS, in the 2007 Acquisition, National Indemnity Company agreed to indemnify DB US for, among other things, certain indemnification obligations arising under the 2003 MSPA in connection with certain asbestos-related and environmental liabilities;

WHEREAS, after the consummation of the 2007 Acquisition, National Indemnity Company assigned the equity interests in Brilliant and LAT to its affiliate Ringwalt & Liesche Co.;

WHEREAS, on April 26, 2023, WCD, Soco, Brilliant, and LAT filed for chapter 11 bankruptcy relief under title 11 of the United States Code (the "Bankruptcy Code") and such bankruptcy cases are being jointly administered under the case captioned *Whittaker, Clark & Daniels, Inc. et al*, Case No. 23-13575 (MBK) in the United States Bankruptcy Court for the District of New Jersey (the "Court," and such cases, the "Chapter 11 Cases");

WHEREAS, on September 7, 2023, the Debtors initiated an adversary proceeding against Brenntag AG and other defendants under the caption *Whittaker, Clark & Daniels, Inc. v. Brenntag AG*, Adv. Proc. No. 23-01245 (MBK) (the "Adversary Proceeding");

WHEREAS, on September 8, 2023, the Debtors filed a motion for summary judgment in the Adversary Proceeding [Adv. Proc. Docket No. 3] (the "Summary Judgment Motion") seeking a declaration that Successor Liability Claims, as defined in the Summary Judgment Motion (the "Successor Liability Claims"), are property of the Debtors' Estates;

WHEREAS, on August 13, 2024, the Court issued a Memorandum Decision granting the Summary Judgment Motion [Adv. Proc. Docket No. 268] and entered an order to such effect on August 28, 2024 [Adv. Proc. Docket No. 292] (the "Summary Judgment Order");

WHEREAS, the Debtors own certain Estate Causes of Action (as defined below), including the Successor Liability Claims;

WHEREAS, the Contributing Parties deny liability on any potential Estate Causes of Action the Debtors may or could assert against the Contributing Parties and their Related Parties;

WHEREAS, the Debtors, Brenntag, NICO, and DB US wish to fully and finally resolve the disputes described in the above recitals;

WHEREAS, the Debtors believe that this Settlement Agreement is in the best interests of the Debtors' Estates and claimants;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Brenntag, NICO, DB US, and the Debtors agree as follows:

1.      Additional Defined Terms.  The following additional definitions apply to this Agreement.  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Bankruptcy Code.  The singular form of a word includes the plural and *vice versa*; the disjunctive "or" is not exclusive and thus includes the conjunctive "and"; all pronouns apply to the male, female, and neutral genders; the word "any" includes the word "all" and *vice versa*; the words "includes" and "including" are without limitation; and the past tense of a word includes the present tense and *vice versa*.

A.   "Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other Claims and Causes of Action, actions, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, actions, or remedies arising under sections 502, 510, 541, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

B.   "Brenntag Releasees" means Brenntag and Brenntag's Related Parties.

C.   "Causes of Action" means, collectively, any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, obligations, third-party claims, indemnity claims, damages (including claims for or award of costs and/or expenses, court costs and attorneys' fees), losses, remedies, causes of action, demands, rights, lawsuits, suits, litigation, arbitration, legal proceeding, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, franchises, guaranties, Avoidance Actions, agreements, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown or hereafter discovered, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, Law, equity, or otherwise pursuant to any theory of civil Law (whether local, state, or federal U.S. Law or non-U.S. Law).  Causes of Action

3

also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim (whether under local, state, federal U.S. Law or non-U.S. civil Law) based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction Law, violation of local, state, or federal non-U.S. Law or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

D.  "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code.

E.  "DB US Releasees" means DB US and DB US's Related Parties, including the DB Parties.

F.  "Debtor Releasees" means the Debtors, the Estates, and their predecessors, and their past, present, and future officers, directors, employees, agents, servants, and representatives.

G.  "Debtor Releasing Parties" means the Debtors and the Estates, on behalf of themselves and (a) their respective predecessors and representatives, (b) any (i) trust, plan administrator, or trustee established under a chapter 11 plan, (ii) chapter 7 trustee, or (iii) chapter 11 trustee, and (c) any other persons claiming under or through each of the foregoing, including the Debtors and the Estates.

H.  "Effective Date" shall mean the first date by which both the following have occurred: (i) the Settlement Order has become a Final Order and (ii) the Summary Judgment Order has become a Final Order.

I.  "Estate" means as to each Debtor, the estate created in its Chapter 11 Case under section 541 of the Bankruptcy Code.

J.  "Estate Causes of Action" means any and all actions, Claims, rights, remedies, defenses, counterclaims, suits, and Causes of Action (a) owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the Tort Claimants' Committee or FCR, or by any other creditors, on behalf of any Debtor or its Estate), (b) that constitute property of the Estates under section 541 of the Bankruptcy Code, (c) that are or may be commenced or pursued by a representative of the Debtors or the Estates, including pursuant to sections 323 or 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (d) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under chapter 5 of the Bankruptcy Code or other applicable law, (e) that constitute Successor Liability Claims, or (f) otherwise assertable by any Debtor or its Estate under any federal, state, or other applicable law seeking to establish a non-Debtor's liability for existing or future Tort Claims, Environmental Claims, Indirect Environmental Claims, or other Claims against the Debtors; in all cases, however denominated and whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction.

4

K. "<u>Environmental Claims</u>" means any Claim or Cause of Action against a Debtor asserted by any Government Environmental Unit, and other civil responsibilities, obligations or liabilities with respect to sites relating to or arising under the Comprehensive Environmental Response, Compensation, and Liability Act, Resource Conservation and Recovery Act, or any other environmental Laws, including Claims for restoration, corrective action, or remediation of environmental or natural resource conditions.

L. "<u>Final Order</u>" means, as applicable, an order or judgment of the Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken or any petition for certiorari that has been filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

M. "<u>Governmental Environmental Unit</u>" means federal, state, local, or tribal Governmental Units asserting claims or having regulatory authority or responsibilities with respect to environmental Laws.

N. "<u>Governmental Unit</u>" means governmental unit as defined in section 101(27) of the Bankruptcy Code.

O. "<u>Indirect Environmental Claims</u>" means a Claim held by a private party for breach of contract, indemnification, contribution, reimbursement, or cost recovery related to environmental monitoring or remediation, including Claims for contribution, personal injury, property damage, or direct costs under any environmental Law.

P. "<u>Law</u>" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Court).

Q. "<u>NICO Releasees</u>" means NICO and NICO's Related Parties.

R. "<u>Non-Debtor Intercompany Agreements</u>" means any agreement between a Debtor and NICO, including any delegation of authority by a Debtor to NICO or a Related Party of NICO.

S. "<u>Non-Debtor Released Parties</u>" means the Brenntag Releasees, the NICO Releasees, and the DB US Releasees.

T. "<u>Petition Date</u>" means April 26, 2023.

U. "<u>Related Party</u>" means, with respect to an entity, (a) such entity's current and former

affiliates and (b) such entity's and such entity's current and former affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

V.    "Settlement Order" means an order approving this Settlement Agreement containing terms and provisions acceptable to the Debtors and each of the Contributing Parties.

W.    "Tort Claims" means any Claim or Cause of Action against a Debtor whether known or unknown, manifested or unmanifested, for costs or damages, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or other personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to asbestos, talc, asbestiform minerals or any other chemical compound, or asbestos-, talc-, asbestiform- or any other chemical compound containing products caused or allegedly caused by, based on or allegedly based on, arising or allegedly arising from, attributable or allegedly attributable to, or in connection with, directly or indirectly, in whole or in part, the alleged acts, omissions, or conduct of the Debtors or any of the Debtors' predecessors-in-interest, including any such claims directly or indirectly, in whole or in part, arising out of or in any way relating to:  (a) any products previously mined, manufactured, engineered, assembled, distributed, sold, used, consumed, installed, maintained, owned, occupied, stored, possessed, processed, designed, marketed, fabricated, constructed, supplied, produced, serviced, specified, selected, repaired, removed, replaced, released, and/or in any other way made available by the Debtors or any of the Debtors' predecessors-in-interest; (b) any materials present at any premises owned, leased, occupied, or operated by the Debtors or the Debtors' predecessors-in-interest; or (c) any talc in any way connected to the Debtors alleged to contain asbestos, asbestiform minerals, asbestos-containing products, or other constituent.

2.    Subject to the terms and conditions of the debtor-in-possession financing order (such order, the "DIP Order") and the debtor-in-possession credit agreement approved by the DIP Order and that is consistent in all respects with the terms in the DIP Term Sheet attached as **Exhibit A** (the "DIP Credit Agreement"), and the entry of the DIP Order by the Court, NICO or its designee shall provide to the Debtors a first priority secured debtor-in-possession delayed draw term loan facility of up to $50 million (the "DIP Term Loan Facility," and loans thereunder, the "DIP Loans").  The aggregate principal amount of DIP Loans funded in Cash by NICO or its designee shall be deemed the "Initial Settlement Contribution."

3.      Within five business days of the Debtors giving NICO notice of the occurrence of the Effective Date, and provided that the Effective Date has occurred, (a) NICO or its designee shall pay the Debtors an amount equal to $535 million *less* the aggregate principal amount of DIP Loans funded in Cash by NICO or its designee (the "Settlement Contribution" and, together with the Initial Settlement Contribution, the "Settlement Payment") and (b) the DIP Loans and other obligations under the DIP Credit Agreement shall be deemed satisfied in full.  The Settlement Payment shall be made in full and final settlement and satisfaction of the Estate Causes of Action released in this Settlement Agreement against Brenntag, NICO, DB US, and their Related Parties. The Settlement Contribution shall be paid to the Debtors via wire transfer in lawful currency of the United States of America ("Cash").

4.      NICO     may     terminate     this     Settlement     Agreement,     effective     upon five business-days' notice to the Debtors, if any of the following occur:  (1) entry of an order by any court denying the Settlement Motion; (2) entry of an order by any court reversing or vacating an order approving the Settlement Motion; (3) entry of an order by any court reversing, modifying, or vacating the Summary Judgment Order; (4) entry of an order by any court appointing a chapter 11 trustee in the Chapter 11 Cases; (5) entry of an order by any court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to chapter 7; (6) entry of an order by any court granting any person other than the Debtors standing to assert the Estate Causes of Action; or (7) an uncured default or Event of Default under the DIP Order and DIP Term Loan Facility pursuant to the terms of the DIP Order and the DIP Credit Agreement.  NICO shall not be required to seek relief from the automatic stay in order to serve notice of termination, and to terminate, the Settlement Agreement pursuant to this paragraph.

5.      Upon NICO's payment of the Settlement Payment, and without the need for the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtor Releasing Parties, waive, release, acquit, and forever discharge the Brenntag Releasees of and from the Estate Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "Debtor Released Brenntag Estate Causes of Action"). The Brenntag Releasees other than Brenntag (which is a Party) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party.  The Debtor Releasing Parties agree not to file, commence, or assert any of the Estate Causes of Action against the Brenntag Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date).

6.      Upon NICO's payment of the Settlement Payment, and without the need for execution or delivery of any further documents or the taking of any other action by Brenntag, on behalf of itself and its respective successors and assigns, Brenntag waives, releases, acquits, and forever discharges the Debtor Releasees of and from any and all Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "Brenntag Released Claims").  The Debtor Releasees other than the Debtors (which are Parties) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party. Brenntag agrees not to file, commence, or assert any of the Brenntag Released Claims against the Debtor Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the

Effective Date), including, for the avoidance of doubt, by filing a proof of claim in the Chapter 11 Cases.

7.     Upon NICO's payment of the Settlement Payment, and without the need for the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtor Releasing Parties waive, release, acquit, and forever discharge the NICO Releasees of and from the Estate Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date, including the Non-Debtor Intercompany Agreements (the "Debtor Released NICO Estate Causes of Action").  The NICO Releasees other than NICO (which is a Party) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party.  The Debtor Releasing Parties agree not to file, commence, or assert any of the Estate Causes of Action against the NICO Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date).

8.     Upon NICO's payment of the Settlement Payment, and without the need for execution or delivery of any further documents or the taking of any other action by NICO, on behalf of itself and its respective successors and assigns, NICO waives, releases, acquits, and forever discharges the Debtor Releasees of and from any and all Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date, including the Non-Debtor Intercompany Agreements (the "NICO Released Claims").  The Debtor Releasees other than the Debtors (which are Parties) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party.  NICO agrees not to file, commence, or assert any of the NICO Released Claims against the Debtor Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date), including, for the avoidance of doubt, by filing a proof of claim in the Chapter 11 Cases.

9.     Upon NICO's payment of the Settlement Payment, and without the need for the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtor Releasing Parties waive, release, acquit, and forever discharge the DB US Releasees of and from the Estate Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "Debtor Released DB US Estate Causes of Action," and together with the Debtor Released Brenntag Estate Causes of Action and the Debtor Released NICO Causes of Action, the "Debtor Released Estate Causes of Action").  The DB US Releasees other than DB US (which is a Party) are intended third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party.  The Debtor Releasing Parties agree not to file, commence, or assert any of the Estate Causes of Action against the DB US Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date).

10.     Upon NICO's payment of the Settlement Payment, and without the need for execution or delivery of any further documents or the taking of any other action by DB US, on behalf of itself and its respective successors and assigns, DB US waives, releases, acquits, and forever discharges the Debtor Releasees of and from any and all Causes of Action arising out of, in connection with, or relating to any matters occurring before the Effective Date (the "DB US Released Claims").  The Debtor Releasees other than the Debtors (which are Parties) are intended

third-party beneficiaries of this Settlement Agreement and may independently enforce all or any portion of the rights created hereunder without in any way diminishing the rights of any Party.  DB US agrees not to file, commence, or assert any of the DB US Released Claims against the Debtor Releasees after the effectiveness of the releases granted herein (*i.e.*, the occurrence of the Effective Date), including, for the avoidance of doubt, by filing a proof of claim in the Chapter 11 Cases.

11.     Notwithstanding anything to the contrary contained herein (including, but not limited to, paragraph 16 herein) or in the Settlement Order, each Contributing Party reserves all, and does not release any, rights, claims, and defenses (whether contractual or otherwise) against each other Contributing Party, including but not limited to all rights, claims, and defenses under the 2003 MSPA and 2007 SPA (including in the arbitration proceeding pending under the 2021 Arbitration Rules of the International Chamber of Commerce, Case Ref. 27945/PDP) ("Preserved Rights").  For the avoidance of doubt, the Contributing Parties agree that the releases of the Brenntag Released Claims, the DB US Released Claims, and the NICO Released Claims by the respective Contributing Parties shall not be raised as a defense and shall not constitute a defense to the assertion of Preserved Rights.

12.     The Parties expressly acknowledge that there may be changes in the law or the Parties may hereafter discover facts different from, or in addition to, those that they now believe to be true with respect to any and all of the claims released in this Settlement Agreement. Nevertheless, the Parties hereby agree that the foregoing releases shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.  In addition, the Parties acknowledge that they have been advised by their respective legal counsel and are familiar with the provisions of Section 1542 of the California Civil Code, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

13.     As a material condition to the Effective Date of this Settlement Agreement, the Settlement Order must provide that holders of Claims against, and interest holders in, the Debtors, as applicable, are barred from asserting or recovering upon, directly or indirectly, the Estate Causes of Action against any Non-Debtor Released Party.  The Court shall have exclusive jurisdiction to enforce the Settlement Order and to determine, without limitation, whether any such claims brought against any of the Non-Debtor Released Parties constitute Estate Causes of Action and are subject to the prohibition against prosecution of such claims.

14.     As a material condition to the Effective Date of this Settlement Agreement, the Settlement Order must provide that the Non-Debtor Released Parties are forever barred from asserting the Brenntag Released Claims, the NICO Released Claims, and the DB US Released Claims, respectively, against the Debtor Releasees, and the Court shall have exclusive jurisdiction to enforce the Settlement Order and to determine, without limitation, whether any such claims brought against any of the Debtor Releasees constitute Brenntag Released Claims, NICO Released

Claims, and/or DB US Released Claims, as applicable, and are subject to the prohibition against prosecution of such claims.

15.     As a material condition to the Effective Date of this Settlement Agreement, subject to the Debtors' compliance with the requirements of the Bankruptcy Code with respect to a plan and disclosure statement, each Contributing Party agrees they shall support confirmation of a chapter 11 plan, including all exhibits, supplements, and amendments thereto (collectively, as may be amended from time to time, the "<u>Plan</u>") that is consistent in all respects with the terms in the Plan Term Sheet attached as **<u>Exhibit B</u>** to this Settlement Agreement and is otherwise consistent with this Settlement Agreement and reasonably acceptable to NICO.  For the avoidance of doubt, confirmation of a Plan is not a condition precedent to the effectiveness of this Settlement Agreement.

16.     Nothing in this Settlement Agreement or Settlement Order bars any person from asserting a Cause of Action against a Non-Debtor Released Party that is not an Estate Cause of Action.

17.     Each Party shall use its reasonable efforts and take all such steps and execute all such documents as are reasonably necessary and proper to secure the purpose and intent of this Settlement Agreement, including entry of the Settlement Order.  In the event that any objection, action, proceeding, or appeal is commenced by any person to invalidate, hinder, or prevent approval, validation, enforcement, or carrying out of any provisions of this Settlement Agreement or entry of the Settlement Order, the Parties agree to cooperate in good faith and undertake reasonable efforts in opposing any such objection, action, proceeding, or appeal.  The Parties acknowledge that they share a common interest in effecting this Settlement Agreement, including that the Settlement Order becomes a Final Order.

18.     NICO shall be entitled to treat the Settlement Payment (and any portion thereof) in a manner that yields the most advantageous tax consequences to NICO; *provided* that, for the avoidance of doubt, NICO shall make each Settlement Payment within the time frame indicated in paragraph 3 of this Settlement Agreement.

19.     The Debtors' obligations under this Settlement Agreement shall be binding on their Estates and any representatives thereof, including any reorganized or wind-down Debtors, and any trust, plan administrator or trustee established under a chapter 11 plan, chapter 7 trustee, or chapter 11 trustee.  Following the Effective Date, the Debtors, and any successor or assignee of the Debtors, including any plan administrator or trustee appointed under a chapter 11 plan, shall indemnify and defend, and seek, at its sole cost and expense, the dismissal of any litigation asserting a Debtor Released Estate Cause of Action against Non-Debtor Released Parties in violation of this Settlement Agreement or the Settlement Order.

20.     The effectiveness of this Settlement Agreement is subject to entry of the Settlement Order.  Within five business days of execution of this Settlement Agreement, counsel for the Debtors shall file with the Court a motion to approve this Settlement Agreement acceptable in form and substance to the Parties (the "<u>Settlement Motion</u>").  Should any creditor or party in interest object to this Settlement Agreement, the Debtors shall oppose any such objection and each Contributing Party agrees to file a pleading opposing any such objection.

21.     Counsel for the Debtors shall seek relief from the Court establishing procedures and deadlines for filing proofs of claim for all claims arising before commencement of the Debtors' Chapter 11 Cases acceptable in form and substance to the Parties in conjunction with or prior to entry of an order confirming the Plan.

22.     The Parties agree that this Settlement Agreement constitutes settlement of disputed claims and that nothing stated herein shall constitute an admission of liability on the part of any Party, such liability being expressly denied by the same.

23.     Nothing contained in this Settlement Agreement, or in any negotiations, discussions, correspondence, other materials of any kind relating to this agreement or relating to the negotiation of this agreement waives or shall be deemed to waive any Party's work product protection or right to claim the protections of any privilege, including attorney-client privilege, common-interest privilege, or mediation privilege.

24.     This Settlement Agreement constitutes the entire agreement between and among the Parties hereto with respect to the matters contained herein and shall inure to the benefit of the predecessors, successors, and assigns of each.  The Parties hereto further state that they have carefully read the foregoing, understand the contents thereof, and each have been independently represented by counsel in entering this Settlement Agreement.

25.     The Parties warrant and represent that they each have the power and authority to sign, execute, and deliver this Settlement Agreement and to consummate the terms contemplated hereby.  The Parties further warrant and represent that they have not assigned to any person or entity any Claims or Causes of Action that are subject to this Settlement.

26.     In the event of a breach of this Agreement, the Parties shall have all remedies available in law and equity.  The Debtors acknowledge that the assertion of any claim or demand against any Non-Debtor Released Party in breach of this Settlement Agreement shall cause irreparable injury to the Non-Debtor Released Party for which there is no adequate remedy at law. Accordingly, the Debtors agree that a Non-Debtor Released Party shall have the right, in addition to any other remedies it may have under this Settlement Agreement or at law, to specific performance to enforce, or injunctive or other equitable relief to prevent a threatened breach of, this agreement.  No party shall assert that the automatic stay in the Debtors' bankruptcy case precludes an action for breach or enforcement of this agreement.  The Parties agree and the Settlement Order shall provide that damages, if any, payable by the Debtors hereunder for breach of this agreement shall be entitled to administrative expense priority under Section 503(b)(1) of the Bankruptcy Code against each of the Debtors' estates, and assertable against any reorganized or wind-down Debtors, and any trust established under a chapter 11 plan.

27.     This Settlement Agreement is entered into, and is to be construed in accordance with, and enforceable pursuant to, the laws of the State of New York without regard to the principles of conflicts of laws.  Any applications by any Party regarding the enforcement or non-enforcement of this Settlement will be limited to the exclusive jurisdiction of the United States Bankruptcy Court for the District of New Jersey or, if the Chapter 11 Cases have been closed and cannot be reopened, to the United States District Court for the District of New Jersey, to which jurisdiction the Parties consent.

28.     No persons or entities shall be considered third-party beneficiaries of this Settlement Agreement except the Debtor Releasees and Non-Debtor Released Parties (other than the Debtors, Brenntag, DB US, and NICO), each of which are not signatories hereto, but who shall be third-party beneficiaries under this Settlement Agreement and entitled to enforce it in accordance with its terms; *provided*, *however*, the consent of the Debtor Releasees and the Non-Debtor Released Parties (other than the Debtors, Brenntag, DB US, and NICO) shall not be required to amend, modify, or terminate this Settlement Agreement, or waive any of its provisions.

29.     This Settlement Agreement and the Plan Term Sheet attached hereto may be amended or modified only by a writing signed by or on behalf of each Party.

30.     This Settlement Agreement may be executed in one or more counterparts and by facsimile, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.

[*Rest of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**WHITTAKER, CLARK & DANIELS, INC.**
**BRILLIANT NATIONAL SERVICES, INC.**
**SOCO WEST, INC.**
**L. A. TERMINALS, INC.**


By: _____
Name:  Tim Pohl
Title:   Disinterested Director



By: _____
Name:  Paul Aronzon
Title:   Disinterested Director

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**WHITTAKER, CLARK & DANIELS, INC.**
**BRILLIANT NATIONAL SERVICES, INC.**
**SOCO WEST, INC.**
**L. A. TERMINALS, INC.**


By: _____
Name:  Tim Pohl
Title:   Disinterested Director



By: _____
Name:  Paul Aronzon
Title:   Disinterested Director

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**BRENNTAG CANADA, INC.**
**BRENNTAG GREAT LAKES, LLC**
**BRENNTAG MID-SOUTH, INC.**
**BRENNTAG NORTH AMERICA, INC.**
**BRENNTAG NORTHEAST, LLC**
**BRENNTAG PACIFIC, INC.**
**BRENNTAG SOUTHWEST, INC.**
**BRENNTAG SPECIALTIES, LLC (F/K/A BRENNTAG SPECIALTIES, INC., AND AS MINERAL AND PIGMENT SOLUTIONS, INC.)**
**COASTAL CHEMICAL CO., LLC**

By: _Jaime Skinner_____
Name:  Jaime Skinner
Title:   General Counsel, Brenntag North America, Inc.

*[Brenntag's Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**BERKSHIRE HATHAWAY INC.**

By: _____
Name: Marc Hamburg
Title:   Authorized Signatory


**BH COLUMBIA INC.**
**COLUMBIA INSURANCE COMPANY**
**NATIONAL INDEMNITY COMPANY**
**RESOLUTE MANAGEMENT, INC.**
**RINGWALT & LIESCHE CO.**
**NATIONAL LIABILITY & FIRE INSURANCE COMPANY**

By: _____
Name: Brian Snover
Title:   Authorized Signatory

*[NICO's Signature Page to Settlement Agreement]*

IN WITNESS WHEREOF, the Debtors and the Contributing Parties have executed this Settlement Agreement as of the date and year first written above.

**DB US HOLDING CORPORATION**

By: _____

Name:  Richard Kaluzinski

Title:   Vice President & Head of Legal

*[DB US's Signature Page to Settlement Agreement]*

## EXHIBIT A

**DIP Term Sheet**

**THIS TERM SHEET IS AN INDICATIVE SUMMARY OF SELECTED TERMS AND IS NOT COMPLETE OR A COMMITMENT, OFFER, OR AGREEMENT IN PRINCIPLE TO PROVIDE FINANCING.  THIS TERM SHEET IS NOT BINDING ON ANY PARTY AND THE PARTIES DO NOT INTEND TO BE BOUND UNLESS AND UNTIL THEY ENTER INTO DEFINITIVE DOCUMENTATION REGARDING THE SUBJECT MATTER OF THIS TERM SHEET.  NOTHING CONTAINED IN THIS TERM SHEET IS OR SHALL BE CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO, BE ADMISSIBLE IN ANY ACTION RELATED TO THE MATTERS ADDRESSED HEREIN, OR CONSTITUTE A WAIVER OF ANY RIGHTS OF THE PARTIES HERETO, WITH RESPECT TO THE PLAN OR ANY OTHER DOCUMENTS CONTEMPLATED BY THE FOREGOING.**

**THIS TERM SHEET DOES NOT CREATE A DUTY TO NEGOTIATE IN GOOD FAITH TOWARD DEFINITIVE DOCUMENTATION AND SHALL NOT BE RELIED UPON BY ANY PERSON AS THE BASIS FOR ANY LIABILITY OR THE BASIS FOR A CONTRACT BY ESTOPPEL OR OTHERWISE.**

**THIS TERM SHEET IS SUBJECT TO MATERIAL CHANGES AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.**

### INTRODUCTION

This Term Sheet describes potential structural terms for a financing transaction.  This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in any definitive documents (the "DIP Financing Documents"), which remain subject to negotiation and completion, and none will become effective until agreed-to by the relevant parties.

| **TERMS** | |
|---|---|
| **Parties to the Proposed DIP Facility:** | Borrower: Brilliant National Services, Inc., a Delaware corporation. <br><br> Guarantors:  Guaranteed, on a joint and several basis, by (a) Whittaker, Clark & Daniels, Inc., a New Jersey corporation; (b) L. A. Terminals, Inc., a California corporation; and (c) Soco West, Inc., a Delaware corporation (together with the Borrower, the "Debtors"). <br><br> DIP Lenders: National Indemnity Company and/or certain of its affiliates or designees. |
| **DIP Facility:** | The DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of new money delayed-draw term loans (the "DIP Loans") to be made from time to time pursuant to a term loan facility (the "DIP Facility") during the Availability Period (as defined below) in an aggregate principal amount (exclusive of interest) not to exceed at any time outstanding aggregate principal commitments of $50,000,000 (the "DIP Commitment"), which shall be made available to the Borrower subject to the terms of the DIP Credit Agreement. <br><br> The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Lenders, which shall be perfected pursuant to the DIP Financing Order (as defined below) and shall be subject to an account control agreement reasonably satisfactory to the DIP Lenders and the Debtors. <br><br> "Availability Period" means the period from the Closing Date to the Maturity Date (each as defined below). |

1

| | |
|---|---|
| **Interest Rate:** | 5.35% per annum, payable in kind in arrears, on the last business day of the month.  Interest shall be computed on the basis of a 365/366-day year for the actual number of days elapsed.<br><br>At all times following the earlier of (a) December 31, 2024 and (b) upon the written election of the DIP Lenders following the occurrence and during the continuance of an Event of Default (as defined below), the principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 4.00% per annum in excess of the interest rate set forth above. |
| **Security and Priority:** | The DIP Lenders shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code (as defined below), continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens to secure the DIP Facility (the "<u>DIP Liens</u>") on all tangible and intangible real and personal property of the Debtors, and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition, and the proceeds of each of the foregoing (the "<u>DIP Collateral</u>").  Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, (w) Avoidance Actions (as defined in the DIP Order), (x) Successor Liability Claims (as defined in the DIP Order), (y) other estate causes of action and estate claims, if any, against the DIP Lenders and their Affiliates (as defined in the DIP Financing Documents) (together with subclauses (w) and (x), the "<u>Specified Estate Claims</u>") and (z) Excluded Assets (as defined in the DIP Order); *provided*, that DIP Collateral shall include the proceeds of Specified Estate Claims and Excluded Assets; *provided, however*, that DIP Collateral shall not include the proceeds of the EPA Trust Account (as defined in the DIP Order).  For the avoidance of doubt, all estate causes of actions and estate claims other than the Specified Estate Claims shall be DIP Collateral.<br><br>The DIP Facility shall constitute allowed superpriority administrative expense claims (the "<u>DIP Claims</u>") in the Chapter 11 Cases (as defined below) and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>The DIP Liens and the DIP Claims shall be subject to the Carve Out (as defined below).<br><br>All of the liens described herein with respect to the assets of the Debtors shall be effective and perfected by the DIP Financing Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the DIP Liens, or to enable the DIP Lenders to protect, exercise or enforce its rights under the DIP Financing Order and the DIP Documents. |
| **Carve Out:** | The DIP Financing Order shall include the professional fee carve out as set forth in **<u>Annex A</u>** attached hereto (the "<u>Carve Out</u>"). |
| **Fees and Expenses:** | None. |
| **Closing Date:** | Closing to occur upon satisfaction (or waiver by the DIP Lenders in their sole discretion) of the "Closing Conditions" (the date on which such conditions have been satisfied or waived, the "<u>Closing Date</u>"). |
| **Closing Conditions; Conditions Precedent to** | The DIP Facility and the making of each DIP Loan shall be conditioned upon the satisfaction of conditions precedent usual for facilities and transactions of this type and appropriate in these circumstances as set forth in the DIP Financing Documents, including, (a) no continuing default or Event of Default; (b) in the case of the initial DIP Loan, entry of an Approved Order |

| | |
|---|---|
| **Extensions of Credit:** | (as defined below) by the Bankruptcy Court approving the DIP Financing and DIP Financing Documents, on a final basis, which order shall not have been reversed, modified, amended, supplemented, stayed, vacated or subject to stay (the "<u>DIP Financing Order</u>") and delivery of the Initial Approved Budget; and (c) in the case of subsequent DIP Loans, delivery of (i) a Notice of Borrowing and (ii) a Subsequent Approved Budget. |
| **Budget:** | The Debtors shall prepare and deliver to the DIP Lenders a budget beginning with the week which includes the Closing Date of the DIP Facility through January 31, 2025 (the "<u>Budget Period</u>"), showing anticipated cash receipts and cash disbursements in form and substance satisfactory to the DIP Lenders in their sole discretion (the "<u>Initial Approved Budget</u>").<br><br>The Debtors shall prepare and deliver with a Notice of Borrowing an updated budget for the remainder of the Budget Period in form and substance reasonably satisfactory to the DIP Lenders and the Debtors (a "<u>Subsequent Approved Budget</u>"); *provided*, that any Subsequent Approved Budget that shows "Net Available Unrestricted Cash" of the Debtors at the end of the Budget Period of less than $5 million must be satisfactory to the DIP Lenders in their sole discretion |
| **Milestones:** | The Debtors shall comply with the following milestones (the "<u>Milestones</u>"), and the failure to timely comply shall constitute an immediate Event of Default:<br><br>(a)  The hearing to approve the Proposed Settlement (which hearing may be the hearing to approve the Approved Plan) shall be scheduled to begin on or before December 1, 2024;<br><br>(b)  Entry by the Bankruptcy Court of an Approved Order approving the Proposed Settlement (a "<u>Settlement Order</u>") on or before December 31, 2024;<br><br>(c)  Filing an Approved Plan and Approved Disclosure Statement with the Bankruptcy Court on or before October 28, 2024; and<br><br>(d)  Commencement of solicitation of acceptances of an Approved Plan on or before December 26, 2024. |
| **Draw of Initial DIP Loan:** | Subject to the satisfaction of certain conditions precedent, the Borrower may borrow DIP Loans in the amount of $20 million upon the Closing Date. |
| **Subsequent Draws of DIP Loans:** | At any time on or after October 12, 2024, subject to the satisfaction of certain conditions precedent, including the Borrower providing the DIP Lenders with (a) a Notice of Borrowing and (b) a Subsequent Approved Budget, the Borrower may borrow DIP Loans in amounts requested by the Borrower and the DIP Lenders shall promptly make available funds equal to the amount of the requested DIP Loan to the Borrower by wire transfer to the account specified in the Notice of Borrowing; *provided* that, notwithstanding anything to the contrary in this Term Sheet or Annex A, the DIP Lenders shall have no obligation to make DIP Loans to the extent that such DIP Loans would cause the aggregate amount of outstanding DIP Loans to exceed the DIP Commitment. |
| **Maturity Date:** | All obligations in respect of the DIP Facility and DIP Loans shall be due and payable in full and in cash, and the DIP Commitments (if any) shall terminate, on the earliest to occur (the "<u>Maturity Date</u>") of (i) the date the Debtors' receive the Settlement Contribution (as defined in the Proposed Settlement) (the "<u>Settlement Contribution Date</u>"), (ii) the date the DIP Loans are accelerated in accordance with the DIP Financing Documents and the DIP Financing Order, and (iii) the date of the dismissal of any of the chapter 11 cases or conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. |

| | |
|---|---|
| | No order confirming a plan of reorganization entered in the Chapter 11 Cases shall discharge or otherwise affect in any way the joint and several obligations of the Debtors to the DIP Lenders under the DIP Facility.<br><br>Notwithstanding the foregoing, upon the occurrence of the Settlement Contribution Date, the DIP Lenders hereby irrevocably agree that:  (a) the Debtors' obligations under the DIP Financing Documents to repay the principal of the DIP Loans and any interest thereon shall be automatically forgiven, released, and terminated, and (b) any DIP Liens or securities interests granted to the DIP Lenders by the Debtors on any DIP Collateral shall be automatically released and terminated. |
| **Use of Proceeds and Cash Collateral:** | Proceeds of the DIP Facility and other cash collateral will be used (i) for general corporate purposes of the Debtors, including to fund the costs of the administration of the Chapter 11 Cases and to pay such prepetition expenses, in each case in a manner consistent with the Approved Budget; (ii) to pay professional fees and expenses; (iii) to pay premiums, fees, expenses, penalties, and other amounts owed under the DIP Financing Documents, to the extent applicable; (iv) to fund a wind-down budget in form and substance acceptable to the DIP Lender; and (v) to fund the Carve Out; *provided*, that in no event shall any such proceeds be used to assert, support or prosecute (or to seek standing to assert, support or prosecute) any claims or causes of action against, or which are indemnified by, the DIP Lenders or any of their Affiliates; *provided*, however, that such proceeds may be used to seek approval of (or object to or otherwise respond to) the Proposed Settlement. |
| **Representations and Warranties:** | The DIP Facility (and the making of any DIP Loan) shall include representations and warranties of the Debtors usual for facilities and transactions of this type and appropriate in these circumstances. |
| **Covenants:** | The DIP Facility shall include covenants usual for facilities and transactions of this type and appropriate in these circumstances, including as set forth above. |
| **Events of Default:** | Each of following shall constitute an "Event of Default":<br><br>(i)    failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made and, to the extent capable of being cured, such representation or warranty is not corrected or clarified (in each case, in a manner which causes such representation or warranty to no longer be incorrect or misleading) within 5 days after it was initially made;<br><br>(ii)   failure by any Debtor to be in compliance in all respects with the Milestones and any other provisions of the DIP Facility and/or the DIP Financing Order, unless, in the case of certain affirmative covenants, such failure is cured within 15 days after written notice thereof;<br><br>(iii)  entry of an order of the Bankruptcy Court with respect to any Debtor, dismissal of its Chapter 11 Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), or, in each case, any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing;<br><br>(iv)   the Bankruptcy Court declines to approve the Settlement Order or the Confirmation Order;<br><br>(v)    entry of an order of the Bankruptcy Court or other court of competent jurisdiction reversing, amending, supplementing, staying, vacating or otherwise modifying the Estate |

|  | Claims Decision, DIP Financing Order, the Settlement Order or the Confirmation Order or any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing, in each case; |
|---|---|
|  | (vi)  entry of an order in the Chapter 11 Cases confirming a plan that is not an Approved Plan or any Debtor shall seek approval therefor or support or fail to object to any motion seeking the foregoing; |
|  | (vii)  entry of an order of the Bankruptcy Court for any financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Financing), or any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing; |
|  | (viii)  entry of an order of the Bankruptcy Court granting (x) any Liens in any of the Chapter 11 Cases that (i) are senior to or pari passu with the DIP Liens or (ii) encumber any Specified Estate Claims, or (y) any claims that are senior to or pari passu with the DIP Claims or, in each case, any Debtor shall seek approval therefor or support or fail to object to and motion seeking the foregoing; |
|  | (ix)  any Debtor shall seek to, or shall support any motion to disallow in whole or in part the DIP Claims; |
|  | (x)  based on (a) the most recent Subsequent Approved Budget, (b) actual cash disbursements made by the Debtors as of such date and (c) fees incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, as reflected on any fee statement or fee application filed with the Court as of such date, cash of the Debtors at the end of the Budget Period will be less than $5 million; and |
|  | (xi)  the DIP Financing Order or any DIP Financing Document shall cease, for any reason, to be in full force and effect or the Debtors shall so assert in writing. |
| **Remedies Upon Event of Default:** | Subject to the terms of the DIP Financing Order, the Carve Out, and the DIP Financing Documents, upon the occurrence and during the continuance of any Event of Default, subject to notice to the Debtors required under the DIP Financing Order, the DIP Lenders may take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay: |
|  | (a)  declare the DIP Loans (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable; and/or |
|  | (b)  exercise rights and remedies pursuant to the terms of the DIP Financing Order, the DIP Financing Documents or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the DIP Financing Documents, and (ii) to sell or otherwise dispose of or otherwise monetize any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code; *provided* that, subject to the DIP Financing Order, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lenders' exercise of their rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Lenders. |

| **CERTAIN DEFINITIONS** | |
|---|---|
| **Approved Disclosure Statement** | A disclosure statement in form and substance mutually agreeable to the DIP Lenders and the Debtors. |
| **Approved Order** | An order of the Bankruptcy Court in form mutually agreeable to the DIP Lenders and the Debtors. |
| **Approved Plan** | A plan of reorganization in form and substance mutually agreeable to the DIP Lenders and the Debtors. |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532. |
| **Bankruptcy Court** | The United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases. |
| **Chapter 11 Cases** | When used with reference (a) to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, and (b) to all Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 23-13575 (MBK) pursuant to the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 72]. |
| **Estate Claims Decision** | The order of the Bankruptcy Court entered on August 28, 2024 in Case No. 23-01245 (MBK) at Adv. Proc. Docket No. 292. |
| **Proposed Settlement** | That certain Settlement Agreement between the Debtors and various other parties settling estate claims and causes of action. |
| **Notice of Borrowing** | An irrevocable notice (which notice must be received by the Lender no later than 10:00 a.m., New York time, five (5) Business Days prior to the requested borrowing date). <br><br> Such notice shall be signed by an authorized officer of the Borrower and state that, to the best of their knowledge, (a) the proceeds of the DIP Loans to be made in connection with such Notice of Borrowing shall be used in accordance with the terms of the DIP Credit Agreement, (b) no default or Event of Default has occurred and is continuing, and (c) the representations and warranties contained in the DIP Credit Agreement are true and correct in all material respects as at the applicable borrowing date. |

**<u>Annex A</u>**

**Carve Out**

1.      *Carve Out.*

(a)      <u>Carve Out</u>.  As used in this Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), the FCR pursuant to section 105(a) or 1103 (the "<u>FCR Professionals</u>"), and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals and FCR Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the FCR, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Lenders to the Debtors with a copy to counsel to the FCR and counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Commitments (each, as defined in the DIP Credit Agreement), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for DIP Loans under the DIP Commitments, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  On the first business day after the DIP Lenders give such notice, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), the DIP Lenders shall make available to the Debtors such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Debtors.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "<u>Post-Carve Out Amounts</u>"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments

have been terminated, in which case any such excess shall be paid to the Debtors.  Notwithstanding anything to the contrary in the DIP Facility Documents or this Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 7, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 7, prior to making any payments to the DIP Lenders.  Notwithstanding anything to the contrary in the DIP Facility Documents or this Order, following delivery of a Carve Out Trigger Notice, the DIP Lenders shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Lenders for application in accordance with the DIP Facility Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order or the DIP Facility, the Carve Out shall be senior to all liens and claims securing the DIP Facility and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

(c)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)      No Direct Obligation To Pay Allowed Professional Fees.  The DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Order or otherwise shall be construed to obligate the DIP Lenders in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)      Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Order, the DIP Facility Documents, the Bankruptcy Code, and applicable law.

**<u>EXHIBIT B</u>**

**Plan Term Sheet**

**THIS IS AN ILLUSTRATIVE TERM SHEET AND IS NOT AND SHALL NOT BE CONSTRUED AS AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS ILLUSTRATIVE TERM SHEET IS OR SHALL BE CONSTRUED AS AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO, BE ADMISSIBLE IN ANY ACTION RELATED TO THE MATTERS ADDRESSED HEREIN, OR CONSTITUTE A WAIVER OF ANY RIGHTS OF THE PARTIES HERETO, WITH RESPECT TO THE PLAN OR ANY OTHER DOCUMENTS CONTEMPLATED BY THE FOREGOING.**

**THIS ILLUSTRATIVE TERM SHEET DOES NOT CREATE A DUTY TO NEGOTIATE IN GOOD FAITH TOWARD DEFINITIVE DOCUMENTATION AND SHALL NOT BE RELIED UPON BY ANY PERSON AS THE BASIS FOR ANY LIABILITY OR THE BASIS FOR A CONTRACT BY ESTOPPEL OR OTHERWISE.**

**THIS ILLUSTRATIVE TERM SHEET IS SUBJECT TO MATERIAL CHANGES AND IS BEING DISTRIBUTED FOR DISCUSSION AND ILLUSTRATIVE PURPOSES ONLY.**

*ILLUSTRATIVE TERM SHEET*[1]

## INTRODUCTION

This Illustrative Term Sheet describes potential structural terms of a chapter 11 plan, incorporating the implementation of a consensual resolution regarding estate causes of action against NICO, Brenntag, and DB US and related parties.  This Illustrative Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in any definitive documents, which remain subject to negotiation and completion, and none will become effective until agreed-to by the relevant parties.  This Illustrative Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

| CLAIMS TREATMENT | |
| --- | --- |
| **Treatment of Environmental Claims and Indirect Environmental Claims** | (i)  Treatment:  On the Plan Effective Date, each Holder of an Allowed Environmental Claim and each Holder of an Allowed Indirect Environmental Claim shall receive, in full and final satisfaction of such Environmental Claim its Pro Rata share of the Environmental Remediation Trust Assets in accordance with the Environmental Remediation Trust Agreement after all DIP Claims, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Claims have been paid in full.<br><br>(ii)  Impairment and Voting:    Environmental Claims and Indirect Environmental Claims are impaired.  Holders of Environmental Claims and Holders of Indirect Environmental Claims are entitled to vote to accept or |

---

[1]    This Illustrative Term Sheet is presented for discussion purposes only and is subject in its entirety to (a) approval of the Debtors' boards of directors, and with respect to conflicts matters, the Disinterested Directors, and (b) confirmatory tax diligence.  Capitalized Terms not otherwise defined herein have the meaning ascribed to them in the Settlement Agreement.

| | reject the Plan. |
|---|---|
| **Treatment of Tort Claims** | (i)  Treatment:  On the Plan Effective Date, each Holder of an Allowed Tort Claim shall receive, in full and final satisfaction of such Tort Claim, its Pro Rata share of the Tort Claims Trust Assets in accordance with the Plan, Tort Claims Trust Agreement, and Tort Claims Trust Distribution Procedures after all Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Claims have been paid in full. |
| | (ii)  Impairment and Voting:   Tort Claims are impaired.  Holders of Tort Claims are entitled to vote to accept or reject the Plan. |
| **Treatment of General Unsecured Claims** | On the Plan Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, its Pro Rata share of the GUC Trust Assets in accordance with the Plan and GUC Claims Trust Agreement, after all Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Claims have been paid in full. |
| **Treatment of Administrative, Priority and Priority Tax Claims** | On or as soon as practicable after the later to occur of (i) the Plan Effective Date and (ii) the date such claim becomes allowed (or as otherwise set forth in the Plan), each holder of an administrative, priority, or priority tax claim will either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Treatment of DIP Claims** | On or as soon as practicable after the Plan Effective Date, each Holder of a DIP Claim shall receive, in full and final satisfaction of such DIP Claim, upon the earlier of: (i) the occurrence of the Settlement Effective Date, pursuant to the Estate Claims Settlement, a dollar-for-dollar reduction on account of the principal amount of the DIP Loans funded in cash otherwise required to be paid by such holder (or its designated affiliate); or (ii) the occurrence of a termination event pursuant to paragraph 4 of the Settlement Agreement, payment in full in cash of such DIP Claims. |
| **Treatment of Non-Debtor Intercompany Claims** | On the Plan Effective Date, each Holder of a Non-Debtor Intercompany Claim shall waive such Non-Debtor Intercompany Claim pursuant to the Estate Claims Settlement. |
| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
| **Wind-Down Transactions** | On the Plan Effective Date, or as soon as reasonably practicable thereafter, the Wind-Down Debtors shall take all actions as may be necessary or appropriate to effectuate the Wind-Down Transactions, which shall be reasonably acceptable to NICO, including, without limitation:   (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, |

| | |
|---|---|
| | or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) such other transactions that are required to effectuate the Wind-Down Transactions; (5) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (6) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. |
| **Distributable Proceeds and Waterfall Recovery** | On or after the Plan Effective Date, the Disbursing Agent shall make Distributions on account of Allowed Claims in accordance with the Plan, the Environmental Remediation Trust Agreement, Tort Claims Trust (and Tort Claims Trust Distribution Procedures), and GUC Trust Agreement, as applicable, using the Distributable Proceeds. |
| | In accordance with this Plan, Distributable Proceeds shall be paid to Holders of Allowed Claims until satisfied in full from time to time in the following priority: (1) *first*, on account of DIP Claims (if any remain outstanding after giving effect to the Estate Claims Settlement), (2) *second*, on account of Allowed Administrative Claims and Priority Tax Claims; (3) *third*, on account of Allowed Priority Claims; and (4) *fourth*, (A) Distributable Proceeds that constitute the Tort Claims Trust Assets shall be paid to Holders of Allowed Tort Claims in accordance with the Tort Claims Trust Distribution Procedures, (B) Distributable Proceeds that constitute the Environmental Remediation Trust Assets shall be paid to Holders of Allowed Environmental Claims and Holders of Allowed Indirect Environmental Claims, and (C) Distributable Proceeds that constitute the GUC Trust Assets shall be paid to Holders of Allowed General Unsecured Claims (collectively, the "**Waterfall Recovery**"); *provided*, for the avoidance of doubt, that the foregoing shall be subject in all respects to the funding of the Professional Fee Escrow Account prior to or on the Plan Effective Date. |
| **Environmental Remediation Trust**[2] | The trust to be established by the Debtors on the Plan Effective Date, to which the Debtors will contribute the Environmental Remediation Trust Assets and which will be governed by the Environmental Remediation Trust Agreement to be filed with the Plan Supplement. |
| **Environmental Remediation Trust Assets** | (a) the Cash proceeds obtained through the pursuit of Assigned Insurance Rights on account of Environmental Claims and Indirect Environmental Claims (the "Environmental Claim Insurance Proceeds" and (b) [●]% of the Settlement Proceeds. |

---

[2]    For the avoidance of doubt, trust structure is subject in all respects to confirmatory tax diligence.

| GUC Claims Trust[3] | The trust to be established by the Debtors on the Plan Effective Date, to which the Debtors will contribute the GUC Trust Assets and which will be governed by the GUC Trust Agreement to be filed with the Plan Supplement, which shall be reasonably acceptable to NICO. |
|---|---|
| **GUC Claims Trust Assets** | (a) the Cash proceeds obtained through the pursuit of Assigned Insurance Rights on account of General Unsecured Claims (the "General Unsecured Claim Insurance Proceeds") and (b) [●]% of the Settlement Proceeds. |
| **Tort Claims Trust[4]** | The trust to be established by the Debtors on the Plan Effective Date, to which the Debtors will contribute the Tort Claims Trust Assets and which will be governed by the Tort Claims Trust Agreement to be filed with the Plan Supplement. |
| **Tort Claims Trust Assets** | (a) the Cash proceeds obtained through the pursuit of Assigned Insurance Rights on account of Tort Claims (the "Tort Claim Insurance Proceeds") and (b) [●]% of the Settlement Proceeds. |
| **Tort Claims Trust Distribution Procedures** | The document to be included in the Plan Supplement governing the procedures for submission, resolution, and distribution in respect of all Tort Claims, which shall be reasonably satisfactory to NICO. |
| **Plan Administrator** | The Debtors, in consultation with NICO, shall appoint a Plan Administrator, who shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a president and chief executive officer (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order. |
| | The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distributable Proceeds to the Environmental Remediation Trust, Tort Claims Trust, and GUC Trust, as applicable, in accordance with the Plan, the Environmental Remediation Trust Agreement, Tort Claims Trust, and GUC Trust Agreement, and the Waterfall Recovery and wind down the affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court):  (1) receiving, holding, investing, liquidating, supervising, and protecting the assets of the Wind-Down Debtors (2) taking all steps to execute all instruments and documents necessary to effectuate the Distributions to be made under the Plan; (3) making Distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all |

---

[3]    For the avoidance of doubt, trust structure is subject in all respects to confirmatory tax diligence.

[4]    For the avoidance of doubt, trust structure is subject in all respects to confirmatory tax diligence.

| | |
|---|---|
| | reasonable and documented fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) investigating commencing, prosecuting, or settling the Retained Causes of Action; (10) pursuing Claims related to the Insurance Contracts subject to the terms and conditions of the Plan and applicable terms, conditions, and other provisions of the applicable Insurance Contracts and applicable Law; (11) taking all steps to enforce the Settlement Order and the Confirmation Order, including by acting for the Wind-Down Debtors with respect to actions to enforce the Settlement Order and the Confirmation Order and/or defend appeals of the Settlement Order and/or the Confirmation Order, and (12) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan. |
| **Estate Claims Settlement** | A settlement of all claims or causes of actions that are property of the Debtors' estates or that Debtors otherwise have standing to assert under the Bankruptcy Code,  by and among the Debtors and the Contributing Parties, the proceeds of which (the "Settlement Proceeds") shall be used to fund the Professional Fee Amount and Distributions pursuant to the Waterfall Recovery, pursuant to terms agreeable to the parties and contingent upon Bankruptcy Court approval.<br><br>Following the Effective Date of the Settlement Agreement, the Debtors, and any successor or assignee of the Debtors, including any plan administrator or trustee appointed under a chapter 11 plan, shall indemnify and defend, and seek, at its sole cost and expense, the dismissal of any litigation asserting a Debtor Released Estate Cause of Action against the NICO Releasees, the DB US Releasees, or the Brenntag Releasees (each as defined in the Settlement Agreement) in violation of this Settlement Agreement or the Settlement Order. |
| **Gatekeeping Provisions** | The Settlement Order and the Confirmation Order shall, among other provisions, enjoin prosecution of any claims released pursuant to the Estate Claims Settlement and provide that the Bankruptcy Court shall retain jurisdiction to enforce the Settlement Order (as defined in the Settlement Agreement) and Confirmation Order, including to determine, without limitation, whether (a) any claim brought against any NICO Releasees, Brenntag Releasees, or DB US Releasees (each as defined in the Settlement Agreement) constitutes an Estate Cause of Action and is subject to the prohibition against prosecution of such claim and (b) any claims brought against any of the Non-Debtor Released Parties constitutes a Brenntag Released Claim, NICO Released Claim, and/or DB US Released Claim (each as defined in the Settlement Agreement) and are subject to the prohibition against prosecution of such claims. |
| **Releases** | In addition to the releases granted pursuant to the Estate Claims Settlement, which are subject to terms agreeable to the parties, the Plan shall provide for customary releases of Debtor Claims and Causes of Action. |

| | |
|---|---|
| **Bar Date** | A Bar Date for all claims arising before commencement of the Debtors' Chapter 11 Cases shall be established in accordance with the Estate Claims Settlement in advance of or pursuant to the Confirmation Order. |
| **Related Parties** | Collectively, with respect to an Entity, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity Holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other Representatives, and other Professionals, Representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing. |
| **Non-Debtor Released Parties** | The parties benefitting from the releases of Debtor Released Estate Causes of Action granted pursuant to the Estate Claims Settlement. |
| **Exculpation** | The Plan shall provide for customary exculpation. |
| **Procedures for Payment of Administrative Claims** | The Debtors will be responsible for payment of all allowed administrative claims through the Plan Confirmation Date.  The TCC shall be dissolved on the Confirmation Date and the FCR shall be discharged from her duties on the Confirmation Date.  There shall be no further obligation of the Debtors to pay any of the FCR's or TCC's fees and expenses after the Confirmation Date; *provided*, *however*, that notwithstanding the foregoing, the TCC may, at its option and without taking any action or seeking or receiving any approval, continue to serve and function after the Confirmation Date for the purposes of participating in any hearing on a Committee Professional Fee Claim.  To the extent that the Committee determines to continue to serve and function after the Confirmation Date pursuant to the preceding sentence, the Committee shall dissolve upon entry of a final order approving such Committee Professional Fee Claim. |
| **Conditions Precedent to the Plan Effective Date** | The Plan shall provide for customary conditions precedent to the Effective Date, including funding of the remaining contribution of the Estate Claims Settlement, pursuant to terms agreeable to the Parties. |
| **DEFINITIONS** | |
| **Debtors** | Whittaker, Clark & Daniels, Inc., a New Jersey corporation, Brilliant National Services, Inc., a Delaware corporation; L. A. Terminals, Inc., a California corporation; and Soco West, Inc., a Delaware corporation. |
| **NICO** | Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, National Indemnity Company, Resolute Management, Inc., Ringwalt & Liesche Co., and National Liability & Fire Insurance Company. |

| | |
|---|---|
| **Brenntag** | Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.), and Coastal Chemical Co., LLC. |
| **DB US** | DB US Holding Corporation (f/k/a Stinnes Corporation). |
| **Bankruptcy Code** | Title 11 of the United States Code, 11 U.S.C. §§ 101–1532. |
| **Bankruptcy Court** | The United States Bankruptcy Court for the District of New Jersey or such other court having jurisdiction over the Chapter 11 Cases. |
| **Chapter 11 Cases** | When used with reference (a) to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, and (b) to all Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 23-13575 (MBK) pursuant to the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 72]. |
| **Plan** | A plan under chapter 11 of the Bankruptcy Code in the Debtors' bankruptcy proceedings, proposed by the Debtors in form and substance consistent with this Term Sheet and in all respects otherwise reasonably acceptable to the Debtors and NICO, confirmed by the Confirmation Order of the Bankruptcy Court and, to the extent required, affirmed by order of the District Court. |
| **Plan Effective Date** | The date that is the first business day after all conditions precedent to the effectiveness of the Plan, including that the Plan has become final and non-appealable, have been satisfied or waived by the Parties. |
| **Petition Date** | April 26, 2023. |
| **Avoidance Actions** | Any and all actual or potential avoidance, recovery, subordination, or other Claims and Causes of Action, actions, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, actions, or remedies arising under sections 502, 510, 541, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws. |
| **Causes of Action** | Collectively, any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, obligations, third-party claims, indemnity claims, damages (including claims for or award of costs and/or expenses, court costs and attorneys' fees), losses, remedies, causes of action, demands, rights, lawsuits, suits, litigation, arbitration, legal proceeding, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, franchises, guaranties, Avoidance Actions, agreements, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown or hereafter discovered, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly |

7

|  | or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, Law, equity, or otherwise pursuant to any theory of civil Law (whether local, state, or federal U.S. Law or non-U.S. Law).  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim (whether under local, state, federal U.S. Law or non-U.S. civil Law) based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction Law, violation of local, state, or federal non-U.S. Law or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code. |
|---|---|
| **Law** | Any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Court). |
| **Claim** | Any claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor. |
| **Confirmation Order** | The order of the Bankruptcy Court approving the Plan under Section 1129 of the Bankruptcy Code, which order shall be reasonably acceptable to NICO. |
| **Debt** | Any "debt," as defined in section 101(12) of the Bankruptcy Code. |
| **Distributable Proceeds** | All (a) Cash, (b) Cash proceeds generated from the use, sale, lease, liquidation, or other disposition of Estate property, including, for the avoidance of doubt, proceeds generated from the Insurance Contracts, and (c) Cash proceeds generated by the use, sale, lease, liquidation, or other disposition of any property belonging to the Wind-Down Debtors, *less* (x) the Professional Fee Amount required to be funded into the Professional Fee Escrow Account on or prior to the Effective Date and (y) the Reserve Funds. |
| **Reserve Funds** | On the Effective Date, the Wind-Down Debtors shall (a) with respect to each unpaid Administrative Claim, Priority Tax Claim, and Priority Claim, either pay the Allowed amount of such Claim in full in Cash (collectively, the "**Effective Date Payment**") or reserve Cash sufficient for payment of the Allowed amount of such Claim in full and (b) reserve Cash sufficient for payment of all legal fees and expenses reasonably likely to be incurred by the Wind-Down Debtors through the closing of the Chapter 11 Cases, including all legal fees and expenses necessary to defend to final resolution any appeal of the Confirmation Order, the Motion to Dismiss Denial Order, or any other matter arising in or related to these Chapter 11 Cases, hearing on a Professional Fee Claim, and any adversary proceeding pending as of the Effective Date (the aggregate amount of such reserved Cash pursuant to clauses (a) and (b), the "**Reserve Funds**").  The Wind-Down Debtors will transfer, or cause to be transferred, to the to the Environmental Remediation |

| | |
|---|---|
| | Trust, Tort Claims Trust, and GUC Trust, on a *pro rata* basis, any Reserve Funds remaining following the Wind-Down Debtors' payment in full of all DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims as well as all other post-Effective Date legal fees and expenses. |
| **DIP Order** | The order approving the first priority secured debtor-in-possession delayed draw term loan facility, entry into related documentation, including the debtor-in-possession credit agreement, and related relief. |
| **DIP Claim** | All Claims against any Debtor with respect to any DIP Obligations, as defined in the DIP Order, which shall be superpriority administrative expense claims against each of the Debtors' estate with priority over all other Administrative Claims, secured by perfected first priority liens on all assets of the Debtors. |
| **Environmental Claim** | Any Claim or Cause of Action against a Debtor asserted by any Government Environmental Unit, and other civil responsibilities, obligations or liabilities with respect to sites relating to or arising under the Comprehensive Environmental Response, Compensation, and Liability Act, Resource Conservation and Recovery Act, or any other environmental Laws, including Claims for restoration, corrective action, or remediation of environmental or natural resource conditions. |
| **Indirect Environmental Claim** | A Claim held by a private party for breach of contract, indemnification, contribution, reimbursement, or cost recovery related to environmental monitoring or remediation, including Claims for contribution, personal injury, property damage, or direct costs under any environmental Law. |
| **Tort Claims** | Any Claim or Cause of Action against a Debtor whether known or unknown, manifested or unmanifested, for costs or damages, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or other personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to asbestos, talc, asbestiform minerals or any other chemical compound, or asbestos-, talc-, asbestiform- or any other chemical compound containing products caused or allegedly caused by, based on or allegedly based on, arising or allegedly arising from, attributable or allegedly attributable to, or in connection with, directly or indirectly, in whole or in part, the alleged acts, omissions, or conduct of the Debtors or any of the Debtors' predecessors-in-interest, including any such claims directly or indirectly, in whole or in part, arising out of or in any way relating to: (a) any products previously mined, manufactured, engineered, assembled, distributed, sold, used, consumed, installed, maintained, owned, occupied, stored, possessed, processed, designed, marketed, fabricated, constructed, supplied, produced, serviced, specified, selected, repaired, removed, replaced, released, and/or in any other way made available by the Debtors or any of the Debtors' predecessors-in-interest; (b) any materials present at any premises owned, leased, occupied, or operated by the Debtors or the Debtors' predecessors-in-interest; or (c) any talc in any way connected to the Debtors alleged to contain asbestos, asbestiform minerals, asbestos-containing products, or other constituent. |

| | |
|---|---|
| **Estate Causes of Action** | Any and all actions, Claims, rights, remedies, defenses, counterclaims, suits, and Causes of Action (a) owned or held, or assertable by or on behalf of any Debtor or its Estate (including, without limitation, claims assertable by the TCC or FCR, or by any other creditors, on behalf of any Debtor or its Estate), (b) that constitute property of the Estates under section 541 of the Bankruptcy Code, (c) that are or may be commenced or pursued by a representative of the Debtors or the Estates, including pursuant to sections 323 or 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (d) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under chapter 5 of the Bankruptcy Code or other applicable law, (e) that constitute Successor Liability Claims, or (f) otherwise assertable by any Debtor or its Estate under any federal, state, or other applicable law seeking to establish a non-Debtor's liability for existing or future Tort Claims, Environmental Claims, Indirect Environmental Claims, or other Claims against the Debtors; in all cases, however denominated and whether or not asserted, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction. |
| **General Unsecured Claims** | Any unsecured Claim against any of the Debtors that is not:  (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) a DIP Claim; (c) an Administrative Claim; (d) a Tort Claim; (e) an Environmental Claim; or (f) an Indirect Environmental Claim. |
| **Non-Debtor Intercompany Claims** | Any Claim (including Claims related to setoff rights) held against a Debtor by NICO or NICO's Related Parties. |
| **TCC** | The Official Committee of Talc Claimants appointed in the Chapter 11 Cases [Docket No. 121]. |
| **FCR** | Honorable Shelley C. Chapman, retired Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York, in the capacity as legal representative for future tort claimants in the Chapter 11 Cases [Docket No. 231]. |
| **Other Sites** | The sites not owned by any Debtor as of the Petition Date and to be identified in the Other Sites exhibit attached, as applicable, to any settlement agreement entered into with respect to Environmental Claims and Indirect Environmental Claims. |
| **Owned Site** | 1353 Taylor Place, Billings, MT 59101. |
| **Governmental Unit** | A governmental unit as defined in section 101(27) of the Bankruptcy Code. |
| **Government Environmental Unit** | Federal, state, local, or tribal Governmental Units asserting claims or having regulatory authority or responsibilities with respect to environmental Laws. |
| **Settlement Agreement** | The *Settlement Agreement* by and between the Debtors, Brenntag, NICO, and DB US. |
| **Settlement Effective Date** | "Settlement Effective Date" shall have the meaning ascribed to "Effective Date" in the Settlement Agreement. |