NOT FOR PUBLICATION

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

</td><td></td></tr>
</table>

| | |
|---|---|
| Whittaker, Clark & Daniels, Inc. *et al.*,<br><center>Debtors.</center> | Case No. 23-13575 (MBK) |
| Whittaker, Clark & Daniels, Inc., *et al.*,<br><br><center>Plaintiffs,</center><br><br><center>v.</center><br><br>Brenntag, AG, *et al.*,<br><br><center>Defendants.</center> | Adv. Pro. No. 23-01245 (MBK)<br><br>Chapter 11<br><br>Hearing Date: October 15, 2024 |

*All Counsel of Record*

## MEMORANDUM OPINION

        This matter comes before the Court by way Debtor's bankruptcy case (Case No. 23-13575)

and subsequent motion ("Motion", ECF No. 299) filed by Whittaker, Clark & Daniels, Inc.,

("WCD") and its affiliates (collectively, "Debtors") in adversary proceeding Adv. Pro. No. 23-

01245[1] seeking a preliminary injunction.  The Court has fully considered the submissions of the

parties and the arguments set forth on the record at a hearing held on October 15, 2024.  The Court

---

[1] Unless otherwise specified, all ECF Nos. will refer to docket entries in the instant adversary proceeding (the "Second Talc Adversary Proceeding"), Adv. Pro. No. 23-01092.

also takes judicial notice of prior rulings and documents filed in this adversary proceeding, in the underlying bankruptcy case (23-13575) and in the related state court tort actions.[2]  For the reasons set forth below, the Court grants Debtor's Motion, in part, and enters a limited preliminary injunction (the "Preliminary Injunction"), and denies the Motion, in part, for the specific purpose of granting limited stay relief.[3]  As explained further, the limited Preliminary Injunction will prohibit the continuation of the actions identified in the attached Schedule, subject to the limitations described herein, until final resolution of the pending Settlement Motion (discussed *infra*) or further of this Court.  The Court issues the following findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.[4]

## I.      Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court.  As explained in detail below, this matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (G).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] *See In re Davis*, 597 B.R. 770, 773 (Bankr. M.D. Pa. 2019) ("Federal Rule of Evidence 201 allows a federal court to take judicial notice of facts that are not subject to reasonable dispute. A bankruptcy court may take judicial notice of the docket entries in a case and the contents of the bankruptcy schedules to determine the timing and status of case events, as well as facts not reasonably in dispute."); *see also In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n.1 (3d Cir. 2018) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) and taking judicial notice of documents, "including matters of public record and judicial opinions").

[3] For the reasons set forth on the record during the October 15, 2024 hearing, the Court grants stay relief to plaintiff Sneider and directs Debtors to remove the Sneider action from the Schedule of restricted actions.

[4] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## II.    Background

The background and procedural history of this case is well known to the parties and will not be repeated in detail at this time.  For purposes this Opinion, it is enough to report that Debtors filed for chapter 11 bankruptcy to address and resolve existing and future claims alleging injuries from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest.

The claims against the Debtors fall into two general categories: (1) Asbestos Claims, which are claims alleging injuries resulting from exposure to products containing talc, asbestos, or chemical compounds processed or distributed by the Debtors or their predecessors in interest; and (2) Environmental Claims, which are environmental litigation claims against the Debtors relating to the production or handling of hazardous materials which allegedly contaminated certain properties. *See Complaint* ¶ 1, ECF No. 1.   As a result of this litigation, Debtors are currently defendants in lawsuits across more than 30 different jurisdictions.  Much of the litigation also includes claims against Brenntag North America and its related entities ("Brenntag") which, in 2004, purchased substantially all the Debtors' operating assets, including indemnification rights against certain Debtors. *See First Day Decl. of Moshin Y. Meghji* ¶ 21, ECF No. 5 in Case No. 23-13575.[5]

---

[5] The parties have stipulated into evidence the Master Sale and Purchase Agreement ("MSPA", ECF Nos. 4-6 and 4-7), which include the following indemnification provisions:

> WCD shall indemnify and hold harmless [Brenntag] . . . and each of their respective successors, assigns, officers, directors, managers, employees and agents . . . from and against any Indemnified Losses incurred in connection with any present or future Retained Subsidiary Asbestos Claims relating to WCD or any alleged corporate predecessor-in-interest thereof.

After filing their chapter 11 petition, Debtors commenced the instant adversary proceeding to address the Environmental and Asbestos Claims (collectively, the "Tort Claims"). Debtors then filed a Summary Judgment motion as to Counts I and IV. After oral argument and many months of stalled mediation efforts among the parties, this Court issued a decision and held that any Tort Claim that seeks to establish non-debtor entities' liability on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors—such as Brenntag— is property of the bankruptcy estate. Such claims are referred to by the parties and the Court as "Successor Liability Claims." The Court memorialized its ruling in a written Opinion dated August 13, 2024 (ECF No. 268) and directed the parties to meet and confer on a proposed form of order. This task proved to be easier said than done, and gave rise to further disputes regarding the scope of the existing Temporary Restraining Order ("TRO"). The Court continued the TRO on a limited basis and advised the Debtors that—in order to continue the TRO—Debtors must present to the Court a proposed end game, which would fully and finally address these claims. Ultimately, an Order granting summary judgment was entered on August 28, 2024.

Heeding the Court's instruction, the Debtors then filed the "Settlement Motion", seeking approval of an agreement between and among the Debtors, Brenntag, NICO, and DB US Holding

---

MSPA § 12.1.2.

Section 12.2 of the MSPA defines "Retained Subsidiary Asbestos Claims" as:

> any claim, action, lawsuit, litigation, arbitration or legal proceeding in a court or tribunal of any kind, regardless of the legal or equitable theory alleged . . . seeking to recover damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary [i.e., WCD] or by any alleged predecessor entity of any Retained Subsidiary . . . .

Corp. ("DBUS") that purports to resolve all Estate Causes of Action against the Contributing
Parties and their Related Parties (including Successor Liability Claims) as of the Effective Date of
the Settlement Agreement, in exchange for $535 million and mutual releases.  Debtors then filed
a Motion to Amend the Complaint—which the Court granted—and a Motion to Extend the
Automatic Stay and/or Preliminarily Enjoin Certain Actions against Non-Debtors pending a final
decision of the Debtors' Settlement Motion.  The Court also granted the latter motion and entered
an Order Enforcing the Automatic Stay and Temporarily Restraining Certain Actions Against
Non-Debtors ("October TRO" ECF No. 344), which included Exhibits 1 & 2 (collectively, the
"Schedule", ECF No. 344-2), identifying restrained actions.  A final hearing on the October TRO
was conducted on October 15, 2024, and this decision follows.

The parties debate appropriate treatment of claims and litigation involving a nondebtor,
Brenntag.  The Talc Claimants Committee ("TCC") concedes that Successor Liability Claims
cannot proceed in light of this Court's Summary Judgment ruling, but asserts that direct claims
against Brenntag should be allowed to continue.  The Debtors assert that certain plaintiffs are
attempting to circumvent the Summary Judgment Order and the October TRO by strategically
dismissing the successor liability components of their claims against Brenntag.  Notwithstanding
these efforts, Debtors contend that the remaining direct claims against Brenntag continue to be
premised on allegations of pre-2004 talc/asbestos exposure and, thus, implicate Debtors' conduct,
operations, and potential indemnification obligations owing Brenntag.  The record includes a
detailed Schedule, listing such claims which Debtors seek to stay and/or enjoin, pending resolution
of their Settlement Motion.

Debtors maintain that all of the six hundred eighty-three (683) lawsuits identified in the Schedule are either subject to the automatic stay or should be enjoined for one of three reasons: (1) because they include *express* Successor Liability Claims; (2) because they contain a bifurcation stipulation in which the plaintiff acknowledges Brenntag as successor to WCD; or (3) because the claims allege pre-2004 exposure, rendering them *effective* Successor Liability Claims and/or necessarily impacting Debtors' rights and defenses and creating the potential for litigation prejudice (by way of possible application of res judicata and collateral estoppel, as well as record taint).

The Court read an oral ruling into the record on October 21, 2024. This written Opinion is intended to clarify and supplement the oral opinion, the transcript of which is available on the docket at ECF No. 359 and is hereby incorporated by reference.

## III. Discussion

### A. Authority and Standard for Extension of Stay to Nondebtors

Prior to addressing the merits of Debtors' Motion, the Court first assures itself of its authority and jurisdiction to grant the requested relief. In doing so, the Court looks to its own well-documented jurisprudence on this issue; noting its view that § 362(a), §105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties. *See In re LTL Mgmt., LLC*, 645 B.R. 59 (Bankr. D.N.J. 2022); *In Re LTL Mgmt., LLC*, 640 B.R. 322 (Bankr. D.N.J. 2022); *In re LTL Management, LLC*, 638 B.R. 291 (Bankr. D.N.J. 2022). The Court will not repeat the lengthy discussions therein and, instead, incorporates them by reference.

In sum, this Court relies on the Third Circuit's decision in *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997) which, in turn, cites with approval the Fourth Circuit in *In re A.H. Robins Co*, 788 F.2d 994, 1001-1003 (4th Cir. 1986).  Notably, the *McCartney* court determined that the automatic stay—and not a stay extension or an injunction under § 105—precluded a litigant from pursuing a state court action against a nondebtor.  Thus, *McCartney* appears to be an endorsement of § 362 as an independent basis for applying the stay to nondebtor actions.

Nevertheless, this Court is mindful that other courts still view the question as unsettled. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 423 B.R. 98, 103 n.8 (E.D. Pa. 2010).  While the practical effect of an extension of the stay under § 362 or an injunction under § 105 is the same, the distinction is significant because it impacts subject matter jurisdiction.  Therefore, this Court will utilize the same three-step inquiry outlined in its *LTL Management* opinions to address the instant Motion. Namely, in determining whether to extend the automatic stay to nondebtor third parties, the Court considers: (1) whether it has jurisdiction to issue the injunction; (2) whether extension of the automatic stay under § 362(a) to the nondebtors is appropriate; and (3) whether the Court should, in its discretion, issue the injunction. *In re LTL Mgmt., LLC*, 638 B.R. at 301 (citing *In re Philadelphia Newspapers, LLC*, 423 B.R. at 102 (other citations omitted).

### 1.  Subject Matter Jurisdiction

As the TCC points out, § 105 cannot serve as an independent source of federal subject matter jurisdiction.  Thus, the TCC posits that this Court lacks subject matter jurisdiction to enjoin the direct claims against Brenntag.  The Court disagrees.

"Bankruptcy jurisdiction extends to four types of title 11 matters: (1) cases 'under' title 11; (2) proceedings 'arising under' title 11; (3) proceedings 'arising in' a case under title 11; and (4) proceedings 'related to' a case under title 11." *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006), as amended (Mar. 17, 2006) (citing 28 U.S.C. § 1334(b) and *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004), as amended (Feb. 23, 2005) (citations omitted)). "The first three categories are considered 'core' proceedings, whereas the fourth category, 'related to' proceedings, are considered 'non-core' proceedings." *In re E. Orange Gen. Hosp., Inc.*, 587 B.R. 53, 71 (D.N.J. 2018) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004)). A bankruptcy court has the power to hear, decide and enter final orders and judgments in the first three categories of proceedings. 28 U.S.C. § 157(b)(1); *In re Roggio*, 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020).

A proceeding "arise[s] under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d at 217. A proceeding "arise[s] in" a case when it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. *Id.* at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999) and explaining that a proceeding arises in a bankruptcy case if it has "no existence outside of the bankruptcy"). Finally, "a claim falls within the bankruptcy court's 'related to' jurisdiction if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009) (internal quotations and citations omitted); *see also In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009). "What will or will not be sufficiently related to a

bankruptcy to warrant the exercise of subject matter jurisdiction is a matter that must be developed on a fact-specific, case-by-case basis." *In re W.R. Grace & Co.*, 591 F.3d at 174 n.9.

Here, Debtors' Motion unquestionably implicates § 362(a), which is a substantive right under the Code.  This Court certainly has jurisdiction to determine § 362(a)'s applicability and scope in this bankruptcy case, and—more specifically—whether it is appropriate to apply or extend the substantive rights afforded under § 362(a) to nondebtors. *See, e.g.*, *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1100 (9th Cir. 2005) (holding that lower court had jurisdiction to determine whether the automatic stay of the Texas bankruptcy court applied to the Attorney General's suit). Therefore, the instant matter is decidedly a proceeding over which this Court has "core" jurisdiction. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, 2022 WL 190673, at *4 (D.N.J. Jan. 21, 2022) (collecting cases).

Having found "core" jurisdiction over the instant Adversary Proceeding, there is no need for a secondary source of jurisdiction. *See In re Essar Steel Minnesota, LLC*, 47 F.4th 193 (3d Cir. 2022) (discussing *In re Shenango Group, Inc.*, 501 F.3d 338, 342–44 (3d Cir. 2007), and holding that where a court finds one type of jurisdiction, it need not go further in its jurisdictional inquiry). Nevertheless, given the lack of clarity regarding the appropriate authority to enjoin third-party actions, the Court offers the following analysis and determines that, at a minimum, it has "related to" jurisdiction.  As discussed in prior opinions, continued litigation of the actions identified in the Schedule—especially to the point of liquidation of a claim through trial—will have a "conceivable effect" on the bankruptcy estate. *In re Winstar Commc'ns, Inc.*, 554 F.3d at 405.  Notably, the Third Circuit has also ruled that contractual indemnity claims can have an effect on a bankruptcy

estate and thus provide a basis for the exercise of "related to" jurisdiction. *See Belcufine v. Aloe*, 112 F.3d 633, 636 (3d Cir. 1997).   As will be discussed, the Direct Claims against Brenntag necessarily implicate WCD's liability, which impacts Debtors' rights, results in liquidation of claims against the Debtors, and exposes Debtors to substantial indemnification obligations.

Having satisfied this Court's jurisdiction and the authority under which it makes the within ruling, the Court addresses the merits of the Motion and the second two factors: whether extension of the automatic stay under § 362(a) to the nondebtors is appropriate; and whether the Court should, in its discretion, issue the preliminary injunction.

### 2. The Automatic Stay Under § 362(a)—by Application or Extension—Precludes All Scheduled Actions

The Debtors seek a determination that all 683 of the lawsuits listed in the Schedule are subject to the stay because they each fall into one (or more) of three categories: (1) they include *express* Successor Liability Claims; (2) they contain a bifurcation stipulation in which the plaintiff acknowledges Brenntag as successor to WCD; or (3) they allege pre-2004 exposure, rendering them *effective* Successor Liability Claims and/or necessarily impacting Debtors' rights and defenses and creating the potential for application of res judicata and collateral estoppel, as well as record taint.  The Court will address each category in turn.

### a. Express Successor Liability Claims

As for the six hundred fifty-five (655) scheduled actions that include express Successor Liability Claims, there is no question that the automatic stay applies.  For the reasons expressed in this Court's Summary Judgment Opinion (ECF No. 268), Successor Liability Claims are property

of the bankruptcy estate and, thus, subject to the automatic stay.  No additional injunctive relief is necessary.

### b.  Actions Including Bifurcation Stipulations

Debtors contend that seven (7) of the remaining actions involve an executed stipulation— referred to as a "Bifurcation Stipulation"—in which the plaintiff concedes that his or her claims against Brenntag constitute Successor Liability Claims.  This admission renders those claims *effective* Successor Liability Claims and, for the same reasons discussed in this Court's Summary Judgment Opinion, such claims are property of the estate and subject to the automatic stay.

### c.  Actions Involving Pre-2004 Exposure

The balance of the twenty-one (21) scheduled actions are among the five hundred seventy (570) actions which expressly allege pre-2004 talc and asbestos exposure or lack sufficient detail to discern the date of exposure.  The Court and the parties have employed the term "straddle claims" to identify these Direct Claims against Brenntag, but which also reference pre-2004 exposure. The TCC contends that these claims are not subject to the stay because they do not seek any damages for exposure to WCD's talc products or for any conduct attributable to WCD.  Rather, the TCC asserts that plaintiffs in these actions place the focus on their injuries stemming from Brenntag's own talc products and conduct.

As indicated during the oral ruling on this issue, the Court had hoped that a resolution could be reached that would insulate Debtors, while permitting Direct Claims against Brenntag to proceed.  Upon further reflection, however, the Court concludes such a situation is unworkable. In cases with factual allegations alleging pre-2004 exposure, Brenntag and WCD are in the same

11

boat.  To the extent these Direct Claims against Brenntag make waves for Brenntag, Debtors inevitably will also feel the movement.  In defending the direct claims that plaintiffs bring, Brenntag can—and has indicated to this Court that it will—highlight the evidence of pre-2004 exposure in an effort to defend against and reduce its own liability.  This will necessarily implicate WCD's liability and/or give rise to a Successor Liability Claim.  Additionally, Brenntag has stated expressly that it will seek indemnification from Debtors bottomed on the parties' MSPA.  While the TCC maintains that Brenntag cannot seek indemnification for any Direct Claims, this position again ignores that these cases may well involve evidence of pre-2004 exposure—meaning there exists a direct link to WCD and its products and conduct.  Pursuant to the terms of the MSPA, Brenntag is entitled to indemnity from WCD as to any "damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by any Retained Subsidiary" such as WCD.

        In short, once pre-2004 exposure is established, WCD's liability is on the table and at issue. To the extent Brenntag is held liable in such a case, said liability may very well be tied to WCD's conduct.  There is simply no way to discern with certainty the source of a party's injuries in a case involving pre-2004 exposure allegations.  This Court comprehends the TCC's explanation that juries regularly do make such determinations and allocate damages caused by separate entities, and notes that Ms. Kagan provided a demonstrative illustration with a sample jury sheet.  However, even if such determinations are made and a jury distinguishes between Brenntag's and WCD's liability, these determinations effectively liquidate claims against Debtors.

As a result, the Direct Claims against Brenntag involving pre-2004 exposure amount to either effective Successor Liability Claims—that is, derivative claims against Brenntag based on WCD's conduct—or serve to liquidate claims against WCD.  In either instance, continuation of these claims is expressly prohibited by § 362 of the Code

In the alternative—and assuming, without finding, that the Direct Claims are not already subject to the automatic stay under § 362—this Court finds cause to extend the stay to preclude these actions.  As the parties recognize, Third Circuit jurisprudence permits extension of the automatic stay to nonbankrupt codefendants where "unusual circumstances" exist. *McCartney*, 106 F.3d at 510 (citing *A.H. Robins*, 788 F.2d at 999; *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 104.  The *McCartney* court explained that such unusual circumstances may be found "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id.*  Unusual circumstances have also been found where a third-party action will have an adverse impact on the debtor's ability to reorganize effectively, or where a debtor faces potential indemnification obligations. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009).

Here, the pre-2004 exposure allegations trigger WCD's potential liability.  Evidence of Debtors' conduct and culpability will be introduced, and findings will be rendered that may have future implications for Debtors—either through findings of liability or through indemnification obligations.  Thus, Debtors will be faced with the Hobson's choice of either standing idly by while their rights and defenses are not protected, or—alternatively—expending what little estate

resources remain to prevent findings and/or judgments that may be employed against them in the future. These distractions will impede reorganizational efforts.

Moreover, Debtors' indemnification obligations owing to Brenntag are not in dispute. Although the TCC frames Debtors' indemnification obligations as speculative and conclusory, the MSPA clearly establishes that Debtors must indemnify Brenntag for any "damages . . . allegedly caused by asbestos, asbestiform minerals and/or asbestos-containing products allegedly mined, manufactured, distributed, sold, used, installed, maintained, or possessed by [WCD]." While the extent and scope of Debtors' indemnification obligation remain unknown at this juncture (judgments have not been rendered), it is conceivable that any action in which a finding of liability could be bottomed on pre-2004 exposure may trigger the referenced indemnification clause. This Court will not require the bankruptcy estate to bear such risks.

It is likely that Debtors will dispute indemnification to reduce their exposure. The TCC seizes on the fact that indemnity will be debated and offers it as further evidence that Debtors' indemnification obligations are not "absolute," as required under Third Circuit precedent. As an initial matter, this Court is not convinced that indemnity must be "absolute" in the sense that it is "automatic" or "an inevitable certainty" to warrant extension of the automatic stay. The Court's rationale can be found in its *LTL* opinion and the Court will not repeat the analysis here. *See In re LTL MANAGEMENT, LLC*, 638 B.R. at 312. As an illustration, however, the Court highlights the fact that in *McCartney*, the Third Circuit cites a Delaware bankruptcy case for the proposition that extension of a stay is appropriate where indemnification obligations exist. The case cited favorably by the Third Circuit is *In re Am. Film Techs., Inc.*, 175 B.R. 847 (Bankr. D. Del. 1994) and, in that

case, the bankruptcy court extended the stay where the obligation to indemnify was far from established.  The complaint at issue in *AFT* pleaded certain facts that—if proven—would "presumably" entitle third party nondebtors to indemnification from the debtor. *Id.* at 854. However, if other facts were accepted as true (for instance, establishing fraud), indemnification obligations would not be triggered.  Thus, this Court does not share the TCC's view that the indemnifications obligations here are too tenuous to warrant extension of the stay.  The indemnification clause in the MSPA exists and, in that sense, Debtors' indemnification obligation is "absolute."  The complaints alleging pre-2004 exposure contain facts that—if proven—could trigger those indemnification obligations; therefore, extension of the stay is warranted, consistent with Third Circuit precedent.

Additionally, still other courts have found unusual circumstances where a debtor is an indispensable party to litigation between a creditor and a third party, as determined under either Federal Rule of Civil Procedure 19 or comparable state rules of procedure and substantive law. *See*, *e.g.*, *In re Lennington*, 286 B.R. 672, 674–75 (Bankr. C.D. Ill. 2001) (collecting cases); *555 M Mfg., Inc. v. Calvin Klein, Inc.*, 13 F. Supp. 2d 719, 723 (N.D. Ill. 1998).  In point of fact, in *McCartney*—the seminal case in this circuit regarding application of the automatic stay to nondebtor actions—the Third Circuit affirmed the lower court's decision staying an action involving nondebtors under § 362 because the debtor was a necessary party to that litigation. *See In re McCartney*, 165 B.R. 18, 20 (Bankr. W.D. Pa. 1994), subsequently aff'd sub nom. *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997).

To determine whether a party is an "indispensable" party as defined by Federal Rule of Civil Procedure 19, the court must make a two-part inquiry. *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312–13 (3d Cir. 2007).

> A court must first determine whether a party should be joined if "feasible" under Rule 19(a).  If the party should be joined but joinder is not feasible . . . the court must then determine whether the absent party is "indispensable" under Rule 19(b).  If the party is indispensable, the action therefore cannot go forward.

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993)

Determining whether a party is indispensable requires a fact-specific, flexible analysis.  In assessing whether WCD is a "necessary" party, the Court must inquire whether—in WCD's absence—the disposition of the action would as a practical matter prejudice WCD's ability to protect its own interest. *See, e.g.*, Fed. R. Civ. P. 19(a)(1)(B)(i).  For reasons previously discussed, continuation of the actions in which pre-2004 allegations are raised would impede WCD's ability to protect its own interests.  Thus, it is a necessary party.  However, due to its involvement in bankruptcy, joinder is not feasible.  Ordinarily, the court considering the issue would then determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.  To be clear, this Court does not have the authority to dismiss the actions in question and is not suggesting dismissal is appropriate.  This Court engages in the indispensable party analysis for the sole purpose of considering whether extraordinary circumstances exist so as to warrant extension of the stay.[6]

---

[6] Additionally, the Court believes extension of the stay is appropriate to avoid the risk of dismissal in the event courts overseeing the litigations in question likewise find Debtors to be an indispensable party.

Engaging in this analysis, the Court carefully considers the Third Circuit's ruling in *Janney Montgomery Scott, Inc* and balances the interests of the plaintiffs, defendants, absent parties, and the public.  As explained, adjudication of the claims involving pre-2004 exposure will implicate WCD's conduct and/or expose it to indemnification risks.  The Court clarifies that this is not merely a situation where the litigation will result in a "persuasive precedent" against an absent party, an argument that the Third Circuit has rejected as a basis to deem a party indispensable. *See, e.g.*, *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 317 (3d Cir. 2007).  Rather, continuation of these actions, without Debtors' participation, will have very real consequences for Debtors and certainly will impair or prejudice Debtors' interests.  Unlike the circumstances in *Janney*, a judgment that Brenntag is liable where evidence supports a finding of pre-2004 exposure suggests that WCD may also have liability.  Further, the *Janney* court observed that if it is shown that preclusion or collateral estoppel could be invoked against an absent party in other litigation, then continuation of the federal action could "as a practical matter impair or impede" the absent parties' interests. *Janney Montgomery Scott, Inc.*, 11 F.3d at 409 (quoting Rule 19(a)(2)(i)).

For all of these reasons, the Court finds that—because the actions involving pre-2004 exposure implicate conduct, operations, and potential indemnification obligations owing to Brenntag—they present the type of unusual circumstances that warrant extension of the automatic stay.  As in *McCartney*, continued litigation of actions listed in the Schedule would defeat the purpose of § 362.

### 3.  § 105(a) Injunction

The Court next addresses the parties' competing positions as to whether an injunction

17

under § 105(a) is appropriate.  Pursuant to § 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  "The issuance of an injunction under section 105(a) is governed by the standards generally applicable to the issuance of injunctive relief in non-bankruptcy contexts." *In re Philadelphia Newspapers, LLC*, 423 B.R. at 105.  In determining whether a preliminary injunction is appropriate, the Court considers the following factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*McTernan v. City of York, Pa.,* 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell*, 414 F.3d 474, 478 n.4 (3d Cir. 2005)); *see also ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *1 (3d Cir. Apr. 21, 2022) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), as amended (June 26, 2017)).  "A preliminary injunction is an 'extraordinary remedy, which should be granted only in limited circumstances.' " *Kos Pharmaceuticals Inc. v. Andrex Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)).  The burden rests on the party seeking the injunction to establish the appropriateness of the injunction. *See In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011) (citations omitted).

### a. Success on the Merits

"In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. at 660 (quoting

*In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986) (explaining reasonable likelihood of success in terms of a successful reorganization)).  To demonstrate a reasonable likelihood of success, a movant need only show the prospect or possibility that he or she will succeed, and need not prove same with certainty. *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 397 (3d Cir. 2013) (Jordan, J., dissenting) (reversed and remand on other grounds) (collecting cases).

The TCC contends that this factor is not met where the request for a preliminary injunction is unrelated to the ultimate relief the movant seeks.  Here, however, the temporary relief sought is consistent with Debtors' ultimate goal of reorganization, which includes its desire to maximize its estate, avoid defense costs, minimize its exposure to findings of liability, and preserve its assets. And although the Debtors face challenges still—namely a successful Settlement—Debtors have taken steps in the right direction, thus, satisfying their burden of demonstrating the possibility that it will succeed.  Accordingly, this first factor is weighs in favor of an injunction.

### b. Irreparable Injury

The Court next assesses whether Debtors are likely to suffer irreparable injury without the requested relief.  As it has done in prior cases, this Court "recognizes that the alleged irreparable harm cannot be too remote—in terms of time—or too speculative—in terms of likeliness to occur." *In Re LTL Mgmt., LLC*, 640 B.R. at 341.  Nevertheless, it remains this Court's view "that the test for whether irreparable harm has been demonstrated in the context of a bankruptcy case should encompass a broader view of the impact on the debtor and can take into account risks of negative consequences." *Id.*

As explained, here, continuation of the Direct Claims presents the potential consequences of adverse judgments and litigation prejudice in the form of res judicata, collateral estoppel, and record taint.  Moreover, continued litigation of actions involving pre-2004 exposure poses the very real possibility of laying a foundation for indemnification obligations and for liquidating Successor Liability Claims belonging to the estate.

The Court agrees with the TCC that the mere existence of an indemnification agreement does not *per se* translate to irreparable harm.  Rather, this Court looks to the specific claims at issue and the terms of the agreement and concludes that irreparable harm is likely in these circumstances.  Notably, the case cited by the TCC in support of its position is materially distinguishable from the situation the Court now faces. In *In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007), the bankruptcy court had not made any findings that an indemnity agreement existed or that said agreement even covered the liabilities in question.  In contrast, here, the contractual indemnification obligations unquestionably exist.  And to the extent Brenntag is deemed liable for pre-2004 exposure, Debtors' indemnification responsibilities are triggered. Further, the Court reiterates that even if Brenntag is found liable on account of post-2004 closing conduct, indemnification rights may be triggered if the evidence establishes the existence of pre-2004 exposure.

The Court is unpersuaded by the TCC's argument that any indemnification obligation would not cause irreparable harm because it would result in a contingent prepetition claim disallowable under 11 U.S.C. § 502(e)(1)(B).  This contention effectively concedes that continued litigation of the Direct Claims could result in liquidation of a claim against Debtors—which is a

20

violation of the automatic stay and certainly harmful to the Debtors' reorganizational efforts. Additionally, this Court will not speculate as to the ultimate treatment of such a claim and whether it could be allowed or subordinated.

Finally, the Court further rejects the TCC's reference to Debtors' "backstop"; namely, that NICO and DBUS will pay in the event Debtors are financially unable to satisfy their own obligations. That the Debtors have a backstop ignores the fact that Debtors first will be required to deplete their own assets. In making determinations, this Court must keep the larger picture in focus. As this Court previously noted, the plaintiffs in these actions are not Debtors' only creditors—Debtors have significant creditors with Environmental Claims. Compelling the Debtor to expend its limited resources and deplete it assets with the aim of reaching the "backstop" resources (which serve to benefit only a portion of the creditor body) is unjust and inequitable.

### c. Public Interest

The court next jumps to the fourth factor for issuing a preliminary injunction: whether granting the preliminary relief will be in the public interest. In weighing all competing factors, the Court concludes that granting the injunction would be in the public interest. Again, this Court mindful of the interests of future claimants, and Environmental Claimants, and considers the inequities that could result if certain litigation proceeded outside the present bankruptcy. An injunction balances all interests involved. With these considerations in mind, the Court now returns to the third factor.

#### d.  Harm to Nonmoving Party

The Court struggles the most—as it repeatedly has in the past—with this third factor.  The Court has tried to express through its prior rulings and on-record discussions that it does not enter this relief lightly.  This Court wants to give plaintiffs—who are suffering and dying—their day in Court, and takes no pleasure in standing in the way.  Nevertheless, this Court must be mindful of its role in overseeing this bankruptcy case.  The Court must balance all stakeholder interests involved.  If there were a way to permit these plaintiffs to proceed, without negatively impacting the bankruptcy estate, the cases could go to trial tomorrow.  However, careful analysis reveals the inevitable fact that the actions involving pre-2004 exposure are inextricably tied to Debtors' interests.  They cannot be unwound.

The Court considers the public policy concerns that underlie all mass tort cases and balances the equities on all sides.  To the extent it is successful, the Debtors' Settlement Motion will resolve issues with Brenntag and eliminate the need for future litigation and conserve estate resources—a result that benefits *all* of Debtors' creditors: the TCC, future claimants, and Environmental Claimants.

### IV.   Conclusion

For the reasons set forth above, the Court concludes that the actions identified in the Schedule are subject to the automatic stay under § 362 or, in the alternative, that "unusual circumstances" exist warranting an extension of the automatic stay to Brenntag under § 362(a). To the extent § 362(a) does not serve as an independent basis for extension of the stay to nondebtor parties, the Court determines that a preliminary injunction under § 105(a) extending the stay is

appropriate.   In reaching today's ruling, this Court believes it has appropriately balanced the competing interests at stake.  Significantly, these actions are not stayed indefinitely.  Debtors have filed a Settlement Motion that will be considered in the near term and, if approved, would resolve their obligations to Brenntag.  Debtors acknowledge that injunctive relief would extend only through the Court's issuance of a ruling on the Settlement Motion.

For the foregoing reasons, the actions in the Schedule are hereby stayed pending resolution of the Settlement Motion or further Order of this Court.  Counsel for Debtors are directed to settle a proposed form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: October 24, 2024