**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## DISCLOSURE STATEMENT RELATING TO THE CHAPTER 11 PLAN OF
## OF WHITTAKER, CLARK & DANIELS, INC. AND ITS DEBTOR AFFILIATES

> THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' federal tax identification number, are Whittaker, Clark & Daniels, Inc. (4760); Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400). The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases are 100 First Stamford Place, Stamford, Connecticut 06902.

**Important Information About This Disclosure Statement**

The Debtors are providing the information in this disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, this "<u>Disclosure Statement</u>") to Holders of Claims entitled to vote for purposes of soliciting votes to accept or reject the chapter 11 plan of Whittaker, Clark & Daniels, Inc. and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>").[2] Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in the Plan and this Disclosure Statement, including the risk factors described in <u>Article IX</u> herein.

<u>The Plan is supported by the Debtors.  The Debtors urge Holders of Tort Claims, Environmental Claims, Indirect Environmental Claims, General Unsecured Claims, and Convenience Claims whose votes are being solicited to vote to accept the Plan.</u>

The Debtors urge each Holder of a Claim entitled to vote to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, the Environmental Remediation Trust, the GUC Trust, and the Tort Claims Trust, as applicable, contemplated thereby.  Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain events and anticipated events in these Chapter 11 Cases.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  A copy of the Plan to which this Disclosure Statement relates is attached hereto as <u>Exhibit A</u>.  The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' historical business operations.  While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' historical business.  The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Debtors or any other authorized party may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted.  Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise.  Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed.  Information contained herein is subject to completion, modification, or

---

[2]     Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement).  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

amendment.  The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims (including those Holders of Claims who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article X of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read the Plan and this Disclosure Statement in their entirety, including Article IX herein entitled "Risk Factors," which begins on page 39, before submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and rule 3016-1 of the Local Bankruptcy Rules for the District of New Jersey (the "Local Rules") and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.  This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.  Any representation to the contrary is a criminal offense.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by independent auditors unless explicitly provided otherwise.

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................1

II.    INTRODUCTION .................................................................................................2

     A.    Overview..................................................................................................2

     B.    Mediation Efforts ....................................................................................3

     C.    Continued Settlement Efforts ..................................................................4

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN ................................................................................................................4

     A.    What is chapter 11?.................................................................................4

     B.    Why are the Debtors sending me this Disclosure Statement? .........................5

     C.    Am I entitled to vote on the Plan?..........................................................5

     D.    What is the Wind-Down under the Plan?................................................6

     E.    What will I receive from the Debtors if the Plan is consummated? .............6

     F.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claims, Professional Fee Claim, or Priority Tax Claim? ........................12

         1.    Administrative Claims ................................................................12

         2.    DIP Administrative Claims .........................................................12

         3.    Professional Fee Claims..............................................................12

         4.    Priority Tax Claims.....................................................................13

     G.    What does it mean if I have a Convenience Claim?................................13

     H.    Are there any regulatory approvals required to consummate the Plan?..........13

     I.    If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ...............................................................................14

     J.    What are the sources of Cash and other consideration required to fund the Plan?........14

     K.    Is there potential litigation related to the Plan?.....................................14

     L.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...................15

     M.    Will the final amount of Allowed Tort Claims, Allowed Environmental Claims, Allowed Indirect Environmental Claims, and Allowed General Unsecured Claims affect the recovery of Holders of such Allowed Claims under the Plan?........................................15

     N.    What will happen to Executory Contracts and Unexpired Leases under the Plan?.................15

     O.    Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan?.......................................................................................16

         1.    Injunction Against Enforcement of Claims ................................16

         2.    Releases by the Debtors...............................................................17

         3.    Exculpation .................................................................................17

         4.    Injunction....................................................................................18

     P.    How will the preservation of the Causes of Action impact my recovery under the Plan? .............19

     Q.    How will undeliverable distributions and unclaimed property be treated under the Plan? ............19

     R.    Are there minimum distribution restrictions? .......................................20

     S.    What is the deadline to vote on the Plan? .............................................20

     T.    How do I vote for or against the Plan?..................................................20

| | U. | Why is the Bankruptcy Court holding the Confirmation Hearing?..................................20 |
|---|---|---|
| | V. | When is the Confirmation Hearing set to occur? ............................................................20 |
| | W. | What is the effect of Confirmation of the Plan?.............................................................20 |
| | X. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ..................................................................................................................20 |
| | Y. | Do the Debtors recommend voting in favor of the Plan?................................................21 |
| **IV.** | **THE PLAN** | **...............................................................................................................................21** |
| | A. | Wind-Down Transactions ................................................................................................21 |
| | B. | Funding of the GUC Trust, Environmental Remediation Trust, and Tort Claims Trust................21 |
| | C. | General Settlement of Claims and Interests ....................................................................22 |
| | D. | Estate Claims Settlement ................................................................................................22 |
| | E. | Plan Administrator ..........................................................................................................23 |
| | F. | Vesting of Assets ............................................................................................................23 |
| | G. | Insurance Neutrality .......................................................................................................23 |
| **V.** | **SOLICITATION AND VOTING PROCEDURES** | **.................................................................24** |
| | A. | Holders of Claims Entitled to Vote on the Plan .............................................................24 |
| | B. | Solicitation Agent ...........................................................................................................24 |
| | C. | Solicitation Package ........................................................................................................24 |
| | D. | Solicitation Directive ......................................................................................................25 |
| | E. | Voting Record Date .........................................................................................................26 |
| | F. | Voting on the Plan...........................................................................................................26 |
| | G. | Ballots Not Counted ........................................................................................................27 |
| | H. | Dates and Deadlines.........................................................................................................27 |
| **VI.** | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**......**28** |
| | A. | Overview of the Debtors' History and Governance .........................................................28 |
| | | 1. The 2004 and 2007 Transactions ........................................................................29 |
| | | 2. 2007 to the Petition Date .....................................................................................30 |
| **VII.** | **EVENTS LEADING TO THESE CHAPTER 11 CASES** | **.......................................................31** |
| | A. | Historical Asbestos Litigation.........................................................................................31 |
| | B. | Historical Environmental Litigation................................................................................31 |
| | C. | Decision to Commence These Chapter 11 Cases .............................................................31 |
| **VIII.** | **MATERIAL DEVELOPMENTS AND EVENTS IN THESE CHAPTER 11 CASES** .....................**32** |
| | A. | First Day Relief...............................................................................................................32 |
| | B. | Other Procedural and Administrative Motions ................................................................33 |
| | C. | Appointments...................................................................................................................33 |
| | D. | Request for Appointment of an Official Committee of Unsecured Commercial Creditors ...........34 |
| | E. | Retention of the Debtors' Professionals..........................................................................34 |
| | F. | Schedules of Assets and Liabilities and Statements of Financial Affairs .......................34 |
| | G. | The South Carolina Receiver's Motion to Dismiss .........................................................34 |
| | H. | Automatic Stay Developments.........................................................................................35 |

I.      The Adversary Proceeding ...................................................................................35
J.      Estate Claims Settlement ....................................................................................38
K.      DIP Financing ....................................................................................................38

**IX.  RISK FACTORS ...........................................................................................................39**

A.      Bankruptcy Law Considerations ........................................................................39
        1.      Parties in Interest May Object to the Plan's Classification of Claims and
                Interests ..................................................................................................39
        2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur ...................39
        3.      The Debtors May Fail to Satisfy Vote Requirements ..............................39
        4.      The Debtors May Not Be Able to Secure Confirmation of the Plan ...............39
        5.      Nonconsensual Confirmation ...................................................................40
        6.      Continued Risk upon Confirmation .........................................................40
        7.      The Committee and/or the Future Claimant's Representative May be Granted
                Derivative Standing to Pursue Certain Claims on Behalf of the Debtors' Estates ...........40
        8.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the
                Bankruptcy Code ....................................................................................41
        9.      The Chapter 11 Cases Could Result in a "Structured Dismissal" ...............41
        10.     The Debtors May Object to the Amount or Classification of a Claim ...............41
        11.     Risk of Non-Occurrence of the Effective Date ......................................41
        12.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the
                Plan .......................................................................................................41
        13.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved ...................42
        14.     The Total Amount of Allowed General Unsecured Claims, Allowed Tort
                Claims, Allowed Environmental Claims, Allowed Indirect Environmental
                Claims, and Allowed Convenience Claims May Be Higher Than Anticipated by
                the Debtors ............................................................................................42
        15.     The Total Amount of Allowed Administrative and Priority Claims May Be
                Higher than Anticipated by the Debtors. ...............................................42
B.      Disclosure Statement Disclaimer ........................................................................42
        1.      The Financial Information Contained in this Disclosure Statement Has Not Been
                Audited ...................................................................................................42
        2.      Information Contained in this Disclosure Statement Is for Soliciting Votes ...................42
        3.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement ...................42
        4.      No Admissions Made ..............................................................................43
        5.      Failure to Identify Litigation Claims or Projected Objections .................43
        6.      No Waiver of Right to Object to Claim or Interest .................................43
        7.      Information was Provided by the Debtors and Was Relied Upon by the Debtors'
                Advisors. ...............................................................................................43
        8.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update ...................43
        9.      No Representations Outside this Disclosure Statement Are Authorized .........43

**X.   CONFIRMATION OF THE PLAN ...............................................................................44**

A.      The Confirmation Hearing ..................................................................................44
B.      Purpose of the Confirmation Hearing .................................................................44
C.      Confirmation Requirements ................................................................................44
D.      Feasibility............................................................................................................45

E.   Conditions Precedent to the Effective Date ........................................................45
F.   Waiver of Conditions ........................................................................................45
G.   Effect of Failure of Conditions ........................................................................45
H.   Substantial Consummation ...............................................................................45
I.   Acceptance by Impaired Classes .......................................................................46
J.   Confirmation Without Acceptance by All Impaired Classes ...........................46
    1.   No Unfair Discrimination ......................................................................46
    2.   Fair and Equitable Test ..........................................................................46
K.   Best Interests of Creditors/Liquidation Analysis .............................................47
L.   Additional Information Regarding this Disclosure Statement and Plan............47

**XI.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN**...........................................................................................................................**48**
A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ....49
B.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
     Claims Entitled to Vote....................................................................................49
    1.   Consequences to Holders of Class B1, C1, D1, and E1 General Unsecured
         Claims ...................................................................................................49
        a.   GUC Trust ...................................................................................50
    2.   Consequences to Holders of Class B2, C2, D2, and E2 Tort Claims, and Holders
         of B3, C3, D3, and E3 Environmental Claims and Indirect Environmental
         Claims ...................................................................................................51
        a.   Environmental Remediation Trust and Tort Claims Trust ................51
        b.   Payments made by the Environmental Remediation Trust and Tort
             Claims Trust .................................................................................52
    3.   Consequences to Holders of Class B4, C4, D4, and E4 Convenience Claim ..................52
    4.   Accrued Interest.....................................................................................52
    5.   Market Discount.....................................................................................53
    6.   Limitation on Use of Capital Losses......................................................53
    7.   Medicare Tax..........................................................................................53
C.   Information Reporting and Backup Withholding................................................53

**XII.   RECOMMENDATION** .................................................................................**54**

**EXHIBITS**[3]

EXHIBIT A          Chapter 11 Plan

EXHIBIT B          Liquidation Analysis

---

[3]     Each Exhibit is incorporated herein by reference.

## I.      PRELIMINARY STATEMENT

Whittaker, Clark & Daniels, Inc. ("WCD"), Brilliant National Services, Inc. ("Brilliant"), L. A. Terminals, Inc. ("LAT"), and Soco West, Inc. ("Soco"), as debtors and debtors in possession (collectively, the "Debtors"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Plan, dated October 28, 2024.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

As part of these Chapter 11 Cases, the Official Committee of Talc Claimants (the "Committee"), the Future Claimants' Representative, National Indemnity Company and certain of its affiliates (collectively, "NICO"), Brenntag, and DB US Holdings f/k/a Stinnes Corporation ("DB US Holdings") participated in arm's-length formal mediation proceedings.  After the Committee and the Future Claimants' Representative requested that the Bankruptcy Court declare the mediation terminated [Docket Nos. 1114 and 1115], the Debtors negotiated with NICO, Brenntag, and DB US Holdings (collectively, the "Settlement Parties") to reach a good-faith compromise and settlement of numerous issues between and among the Debtors and the Settlement Parties (the "Estate Claims Settlement").  The Settlement Proceeds[4] will be used to fund distributions under the Plan.  The terms of the settlement are set forth in the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1297], Filed on September 3, 2024 (the "Estate Claims Settlement Motion").  The Debtors are soliciting votes for acceptance of the Plan from Holders of Claims in Class B1, Class B2, Class B3, Class B4, Class C1, Class C2, Class C3, Class C4, Class D1, Class D2, Class D3, Class D4, Class E1, Class E2, Class E3, and Class E4.

The Plan is centered around three trusts that shall serve as sources of recovery for three Classes of creditors.  First, the Plan establishes a trust for Tort Claims[5] (the "Tort Claims Trust") comprised of Assigned Tort Claim Insurance Rights and a percentage of the Settlement Proceeds.  Second, the Plan establishes an environmental remediation trust (the "Environmental Remediation Trust") comprised of Assigned Environmental Insurance Rights and a percentage of the Settlement Proceeds.  Third, the Plan establishes a trust for General Unsecured Claims[6] (the "GUC Trust") comprised of Assigned GUC Insurance Rights and a percentage of the Settlement Proceeds.

---

[4]    "Settlement Proceeds" means all Cash proceeds generated from the Estate Claims Settlement, *less* (a) the Professional Fee Amount required to be funded into the Professional Fee Escrow Account on or prior to the Effective Date and (b) the Reserve Funds.

[5]    "Tort Claim" means any Claim or Cause of Action against a Debtor whether known or unknown, manifested or unmanifested, for costs or damages, including with respect to any manner of alleged bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring, or other personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or in any way relating to the presence of or exposure to asbestos, talc, asbestiform minerals or any other chemical compound, or asbestos-, talc-, asbestiform- or any other chemical compound containing products caused or allegedly caused by, based on or allegedly based on, arising or allegedly arising from, attributable or allegedly attributable to, or in connection with, directly or indirectly, in whole or in part, the alleged acts, omissions, or conduct of the Debtors or any of the Debtors' Predecessors-in-Interest, including any such claims directly or indirectly, in whole or in part, arising out of or in any way relating to:  (a) any products previously mined, manufactured, engineered, assembled, distributed, sold, used, consumed, installed, maintained, owned, occupied, stored, possessed, processed, designed, marketed, fabricated, constructed, supplied, produced, serviced, specified, selected, repaired, removed, replaced, released, and/or in any other way made available by the Debtors or any of the Debtors' Predecessors-in-Interest; (b) any materials present at any premises owned, leased, occupied, or operated by the Debtors or the Debtors' Predecessors-in-Interest; or (c) any talc in any way connected to the Debtors.

[6]    "General Unsecured Claim" means any unsecured Claim against any of the Debtors that is not:  (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) a DIP Claim; (c) an Administrative Claim; (d) a Tort Claim; (e) an Environmental Claim; or (f) an Indirect Environmental Claim.

1

Through this framework, the Plan will result in a permanent resolution of the Tort Claims, the Environmental Claims,[7] the Indirect Environmental Claims,[8] and General Unsecured Claims.

Holders of Claims in Class B1, Class B2, Class B3, Class B4, Class C1, Class C2, Class C3, Class C4, Class D1, Class D2, Class D3, Class D4, Class E1, Class E2, Class E3, and Class E4 are the only claimants entitled to vote on the Plan. The rights of all other Holders of Claims against and Interests in the Debtor are either not Impaired by the Plan and conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or Impaired by the Plan and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, in each case, the Holders of such Claims and Interests are not entitled to vote on the Plan. The Holders of Claims and Interests that are not entitled to vote on the Plan are directed to other portions of this Disclosure Statement and the Plan for a more detailed discussion of the treatment of their respective Claims and Interests.

For the reasons detailed in this Disclosure Statement, the Debtors believe that there will be substantially more assets available to resolve Tort Claims, Environmental Claims, Indirect Environmental Claims, General Unsecured Claims, and Convenience Claims under the Plan than there would be if the Plan is not confirmed because, among other reasons, the proceeds of the Estate Claims Settlement fix recoveries for otherwise uncertain claims and avoid unfair and uneven recoveries to Holders of Claims. Further, costly litigation will be avoided through the Plan's orderly administrative process and the establishment of the Tort Claims Trust, Environmental Remediation Trust, and GUC Trust. Absent the Plan, distributions to Holders of Tort Claims, Environmental Claims, Indirect Environmental Claims, General Unsecured Claims, and Convenience Claims would most likely be delayed and, due to attendant costs, the funds actually available for distribution to Holders of such Claims may be substantially reduced.

**FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS IN CLASS B1, CLASS B2, CLASS B3, CLASS B4, CLASS C1, CLASS C2, CLASS C3, CLASS C4, CLASS D1, CLASS D2, CLASS D3, CLASS D4, CLASS E1, CLASS E2, CLASS E3, AND CLASS E4 VOTE TO ACCEPT THE PLAN.**

## II.    INTRODUCTION

### A.    Overview

The Debtors and their predecessors-in-interest historically operated primarily as distributors of chemicals, minerals, and pigments, including talc. Until November 1998, the entities that now constitute the Debtors were part of two separate revenue generating businesses that were not under the same corporate ownership: (a) the "SOCO Chemical" group and (b) WCD. Further, it was not until after 2000, when Brilliant acquired certain assets from the Holland Chemical group, that all of the Debtors were part of the same corporate group and became owned directly or indirectly by DB US Holdings.

In 2004, Deutsche Bahn AG became the ultimate parent of DB US Holdings. Through a series of transactions in 2004, substantially all of WCD's, Soco's, and Brilliant's operating assets were sold to certain affiliates of Bain Capital, and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "2004 Transaction"). LAT was not involved in the 2004 Transaction, as it had previously ceased all operations.

---

[7]    "Environmental Claim" means any Claim or Cause of Action against a Debtor asserted by any Government Environmental Unit, and other civil responsibilities, obligations or liabilities with respect to sites relating to or arising under the Comprehensive Environmental Response, Compensation, and Liability Act, Resource Conservation and Recovery Act, or any other Environmental Laws, including Claims for restoration, corrective action, or remediation of environmental or natural resource conditions.

[8]    "Indirect Environmental Claims" means a Claim held by a private party for breach of contract, indemnification, contribution, reimbursement, or cost recovery related to environmental monitoring or remediation, including Claims for contribution, personal injury, property damage, or direct costs under any Environmental Law.

Following the 2004 Transaction, the Debtors continued their corporate existence to manage alleged asbestos and environmental liabilities related to their historical operations using the consideration the Debtors received through the 2004 Transaction and any of their remaining insurance assets.

In November 2007, National Indemnity Company ("National Indemnity") agreed to purchase—and later assigned to an affiliated entity, Ringwalt & Liesche Co. ("Ringwalt")—the equity in Brilliant and LAT. Ringwalt remains the direct parent of Brilliant (and the indirect parent of the other Debtors) today.

Since 2007, the Debtors' alleged asbestos liabilities have increased materially as a result of the evolution of the tort litigation landscape. In particular, cosmetic talc litigation rose to prominence and other companies involved in talc-related businesses availed themselves of chapter 11 protection, which left the Debtors as a litigation target. At the time of the filing of the chapter 11 petitions, the Debtors were embroiled in defending, litigating, and resolving claims stemming from alleged talc-, asbestos-, and environmental-related liabilities.

As of April 26, 2023, when the Debtors commenced these Chapter 11 Cases, WCD and Soco faced, in the aggregate, over 1,000 pending asbestos actions or asbestos-related talc actions arising from the Debtors' historical operations (the "Asbestos Lawsuits"). The Asbestos Lawsuits were in addition to costs related to outstanding Environmental Claims. The Debtors had been managing an active docket of cases across the United States—a task that became increasingly cumbersome absent a centralized forum to achieve global resolution for the benefit of all Holders of Claims.

B.      Mediation Efforts

On September 7, 2023, the Debtors Filed an adversary proceeding (the "Adversary Proceeding") seeking: (i) declaratory judgment that Successor Liability Claims against Brenntag and other protected parties are property of the Debtors' Estates which the Debtors have sole standing to pursue and compromise while these Chapter 11 Cases remain pending and which are subject to the automatic stay provisions set forth in section 362 of the Bankruptcy Code; and (ii) an extension of the automatic stay to, and preliminary injunction of, the commencement, continuation, and settlement of, such claims outside of these Chapter 11 Cases. On September 8, 2023, the Debtors Filed the *Debtors' Motion for Summary Judgment with Respect to Counts I, II, and IV of the Complaint* [Adv. Docket No. 3] (the "Summary Judgment Motion"), pursuant to which the Debtors sought summary judgment on Counts I (seeking a declaration that successor liability claims are subject to the automatic stay), II (seeking to extend the automatic stay to such claims to the extent the Bankruptcy Court determined the automatic stay is inapplicable), and IV (seeking a declaration that successor liability claims are property of the Debtors' estates) in the Adversary Proceeding.

On September 19, 2023, the Committee Filed a motion seeking to intervene in the Adversary Proceeding [Adv. Docket No. 24]. The Bankruptcy Court subsequently entered a case management order [Adv. Docket No. 52] (the "Case Management Order") on October 12, 2023, permitting the Committee to intervene in the Adversary Proceeding.

On November 15, 2023, the Bankruptcy Court appointed the Honorable Robert E. Gerber (Ret.) as mediator and ordered the Debtors, the Committee, the Future Claimants' Representative, NICO, Brenntag,[9] and DB US Holdings (collectively in such context, the "Mediation Parties") to engage in mediation (the "Mediation") to determine whether a consensual resolution of these Chapter 11 Cases could be reached, including regarding the Debtors' alleged Liabilities. *See Order (I) Appointing Hon. Robert E. Gerber (Ret.) as Mediator to Mediate Adversary Proceeding-, Plan-, and Confirmation-Related Matters; (II) Referring Such Matters to Mediation; (III) Directing the Mediation Parties to Participate in the Mediation; and (IV) Granting Related Relief* [Docket No. 654].

Following the appointment of the Honorable Robert E. Gerber (Ret.) as mediator, the Mediation Parties participated in arm's-length formal mediation proceedings. On June 2, 2024, the Debtors Filed a letter with the

---

[9]      "Brenntag" means, collectively, Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC (f/k/a Brenntag Specialties, Inc. and as Mineral and Pigment Solutions, Inc.), and Coastal Chemical Co., LLC. For the avoidance of doubt, Brenntag AG was named as a defendant in the Adversary Proceeding but has not been served with a copy of the complaint or entered an appearance therein.

Bankruptcy Court requesting that the Bankruptcy Court issue its decision on the Summary Judgment Motion as soon as practicable. [Adv. Docket No. 214]. On or around June 9, 2024, the Committee and the Future Claimants' Representative both requested the Bankruptcy Court decline to decide the Summary Judgment Motion and declare the Mediation terminated. [Docket Nos. 1114 and 1115]. On June 11, 2024, the Honorable Robert E. Gerber (Ret.) Filed his *Interim Report of Mediator (#2)* [Docket No. 1121] stating there was no reasonable likelihood of a deal between the Mediation Parties in the near term.

On August 28, 2024, the Bankruptcy Court entered an order (the "Summary Judgment Order") granting summary judgment in favor of the Debtors as to counts I and IV of the Adversary Proceeding, holding that Successor Liability Claims constitute property of the Estates and that the Debtors have exclusive standing to prosecute and seek to compromise such claims, and declined to terminate the Mediation. [Adv. Docket No. 292]. On September 11, 2024, the Committee Filed a notice of appeal with respect to the Summary Judgment Order [Adv. Docket No. 297]. On September 24, 2024, the relevant parties Filed a joint certification for a direct appeal [Adv. Docket No. 329] (the "Joint Certification") to the United States Court of Appeals for the Third Circuit (the "Third Circuit"). The Bankruptcy Court granted the Joint Certification by order dated September 25, 2024 [Adv. Docket No. 335]. The appeal is currently pending.

### C.    Continued Settlement Efforts

After the Committee and the Future Claimants' Representative requested that the Bankruptcy Court declare the Mediation terminated [Docket Nos. 1114 and 1115], the Debtors, at the direction of their disinterested directors, commenced discussions with the Settlement Parties and their advisors regarding the possibility of settling some or all of the estate causes of actions held by the Debtors against the Settlement Parties. Over the ensuing months, the Debtors and the Settlement Parties exchanged multiple settlement offers and drafts of settlement documentation.

On September 3, 2024, the Debtors Filed the Estate Claims Settlement Motion seeking approval of the Estate Claims Settlement. As part of the Estate Claims Settlement, NICO agreed to make a settlement payment to the Debtors, which is comprised of: (a) an initial contribution of a first priority secured debtor-in-possession delayed draw term loan facility (the "DIP Facility," and the loans thereunder, the "DIP Loans") of up to $50 million, which was made available upon the Bankruptcy Court's entry of an order approving the DIP Facility (the "Initial Settlement Contribution"); and (b) an amount equal to $535 million *less* the aggregate principal amount of DIP Loans funded in Cash by NICO or its designee, within five business days of the Debtors giving NICO notice of the occurrence of the Estate Claims Settlement Effective Date and provided the Estate Claims Settlement Effective Date has occurred (the "Settlement Contribution," and together with the Initial Settlement Contribution, the "Settlement Payment"). Absent this infusion of additional liquidity through the DIP Facility, which only NICO was willing to provide, the Debtors were at risk of needing to convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, to the serious detriment of the Estates' stakeholders. In exchange for NICO's agreement to make the Settlement Payment and the Settlement Parties' agreement to release all Causes of Action against the Debtor Releasees arising out of, in connection with, or relating to any matters occurring before the Estate Claims Settlement Agreement Effective Date, the Debtors agreed to release all of the Debtors' claims and causes of action against the Settlement Parties, including Successor Liability Claims.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. During the pendency of a chapter 11 case, the Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under such plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of such confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable Holders of voting Claims to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in <u>Article III</u> of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "<u>Class</u>." Each Class's respective voting status is set forth below.

| Class Identification for Other Claims or Interests | | | |
|---|---|---|---|
| **Class** | **Claims** | **Status** | **Voting Rights** |
| Class A1 | Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class A2 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class A3 | Non-Debtor Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class A4 | Debtor Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| **Class Identification for Whittaker, Clark & Daniels, Inc.** | | | |
| **Class** | **Claims** | **Status** | **Voting Rights** |
| Class B1 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class B2 | Tort Claims | Impaired | Entitled to Vote |
| Class B3 | Environmental Claims and Indirect Environmental Claims | Impaired | Entitled to Vote |
| Class B4 | Convenience Claims | Impaired | Entitled to vote |
| **Class Identification for Soco West, Inc.** | | | |
| **Class** | **Claims** | **Status** | **Voting Rights** |
| Class C1 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class C2 | Tort Claims | Impaired | Entitled to Vote |

| Class Identification for Other Claims or Interests | | | |
|---|---|---|---|
| **Class** | **Claims** | **Status** | **Voting Rights** |
| Class C3 | Environmental Claims and Indirect Environmental Claims | Impaired | Entitled to Vote |
| Class B4 | Convenience Claims | Impaired | Entitled to vote |
| **Class Identification for Brilliant National Services, Inc.** | | | |
| **Class** | **Claims** | **Status** | **Voting Rights** |
| Class D1 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class D2 | Tort Claims | Impaired | Entitled to Vote |
| Class D3 | Environmental Claims and Indirect Environmental Claims | Impaired | Entitled to Vote |
| Class B4 | Convenience Claims | Impaired | Entitled to vote |
| **Class Identification for L.A. Terminals, Inc.** | | | |
| **Class** | **Claims** | **Status** | **Voting Rights** |
| Class E1 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class E2 | Tort Claims | Impaired | Entitled to Vote |
| Class E3 | Environmental Claims and Indirect Environmental Claims | Impaired | Entitled to Vote |
| Class B4 | Convenience Claims | Impaired | Entitled to vote |

Holders of Claims in Claims in Class B1, Class B2, Class B3, Class B4, Class C1, Class C2, Class C3, Class C4, Class D1, Class D2, Class D3, Class D4, Class E1, Class E2, Class E3, and Class E4 are the only Holders of Claims entitled to vote on the Plan.

    **D.**        **What is the Wind-Down under the Plan?**

The Wind-Down is the orderly and value maximizing wind down and dissolution of each of the Wind-Down Debtors following the Effective Date, which will include, among other things, the wind down of the Debtors' and Wind-Down Debtors' affairs and the distribution of the Contributed Trust Consideration to the Environmental Remediation Trust, the Tort Claims Trust, and the GUC Trust, as applicable, in accordance with the Plan, the Environmental Remediation Trust Agreement, the Tort Claims Trust Agreement, and the GUC Trust Agreement. A Plan Administrator shall be appointed to facilitate the Wind-Down.

    **E.**        **What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter and subject in all respects to the GUC Trust Agreement, the Environmental Remediation Trust Agreement, or the Tort Claims Trust Agreement (including for the avoidance of doubt, the Tort

Claims Trust Distribution Procedures), as applicable.  The Debtors further reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.[10]**

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claims and Interests | Treatment of Claim | Projected Recovery Under the Plan |
| A1 | Priority Claims | Each Holder of an Allowed Priority Claim shall receive, in full and final satisfaction of such Allowed Priority Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, which renders such Allowed Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | 100% |
| A2 | Debtor Intercompany Claims | Each Debtor Intercompany Claim shall be, at the option of the Debtors, either Reinstated, otherwise set off, settled, distributed, contributed, canceled, or released. | 0% to 100% |
| A3 | Non-Debtor Intercompany Claims | On the Estate Claims Settlement Effective Date, each Holder of a Non-Debtor Intercompany Claim shall waive such Non-Debtor Intercompany Claim pursuant to the Estate Claims Settlement. | 0% |
| A4 | Debtor Interests | On the Effective Date, all Debtor Interests shall be canceled, released, and extinguished and will be of no further force or effect, without any Distribution to Holders of Debtor Interests. | 0% |

---

[10]  The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors and general economic conditions.  "Allowed" with respect to any Claim or Interest, except as otherwise provided herein, means: (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan or a Final Order of the Bankruptcy Court.  A Claim or Interest that has been Disallowed pursuant to a Final Order shall not be an "Allowed" Claim.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors.  A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or Interest.  "Allow" and "Allowing" shall have correlative meanings.

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claims and Interests | Treatment of Claim | Projected Recovery Under the Plan |
| B1 | General Unsecured Claims Against Whittaker, Clark & Daniels, Inc. | On the Effective Date, liability for all General Unsecured Claims against Whittaker, Clark & Daniels, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed General Unsecured Claim against Whittaker, Clark & Daniels, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the GUC Trust Agreement.  The GUC Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a General Unsecured Claim against Whittaker, Clark & Daniels, Inc. shall be to the GUC Trust. | [●] |
| B2 | Tort Claims Against Whittaker, Clark & Daniels, Inc. | On the Effective Date, liability for all Tort Claims against Whittaker, Clark & Daniels, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed Tort Claim against Whittaker, Clark & Daniels, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Tort Claims Trust Agreement and the Tort Claims Trust Distribution Procedures.  The Tort Claims Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a Tort Claim against Whittaker, Clark & Daniels, Inc. shall be to the Tort Claims Trust. | [●] |
| B3 | Environmental Claims Against Whittaker, Clark & Daniels, Inc. | On the Effective Date, liability for all Environmental Claims and Indirect Environmental Claims against Whittaker, Clark & Daniels, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.   Each Allowed Environmental Claim and Indirect Environmental Claim against Whittaker, Clark & Daniels, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the Environmental Remediation Trust Agreement.   The Environmental Remediation Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of an Environmental Claim or Indirect Environmental Claim against Whittaker, Clark & Daniels, Inc. shall be to the Environmental Remediation Trust. | [●] |
| B4 | Convenience Claims Against Whittaker, Clark & Daniels, Inc. | In full and final satisfaction, compromise, settlement, and release of its Convenience Claims, each Holder of a Convenience Claim against Whittaker, Clark & Daniels, Inc. shall receive a [●]% recovery on account of the Allowed amount of such Convenience Claim. | [●] |

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claims and Interests | Treatment of Claim | Projected Recovery Under the Plan |
| C1 | General Unsecured Claims Against Soco West, Inc. | On the Effective Date, liability for all General Unsecured Claims against Soco West, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed General Unsecured Claim against Soco West, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the GUC Trust Agreement.  The GUC Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a General Unsecured Claim against Soco West, Inc. shall be to the GUC Trust. | [●] |
| C2 | Tort Claims Against Soco West, Inc. | On the Effective Date, liability for all Tort Claims against Soco West, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed Tort Claim against Soco West, Inc. shall be resolved in accordance with the terms, provisions, and procedures of the Tort Claims Trust Agreement and the Tort Claims Trust Distribution Procedures.  The Tort Claims Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a Tort Claim against Soco West, Inc. shall be to the Tort Claims Trust. | [●] |
| C3 | Environmental Claims Against Soco West, Inc. | On the Effective Date, liability for all Environmental Claims and Indirect Environmental Claims against Soco West, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed Environmental Claim and Indirect Environmental Claim against Soco West, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the Environmental Remediation Trust Agreement.  The Environmental Remediation Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of an Environmental Claim or Indirect Environmental Claim against Soco West, Inc. shall be to the Environmental Remediation Trust. | [●] |
| C4 | Convenience Claims Against Soco West, Inc. | In full and final satisfaction, compromise, settlement, and release of its Convenience Claims, each Holder of a Convenience Claim against Soco West, Inc. shall receive a [●]% recovery on account of the Allowed amount of such Convenience Claim. | [●] |

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claims and Interests | Treatment of Claim | Projected Recovery Under the Plan |
| D1 | General Unsecured Claims Against Brilliant National Services, Inc. | On the Effective Date, liability for all General Unsecured Claims against Brilliant National Services, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed General Unsecured Claim against Brilliant National Services, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the GUC Trust Agreement.  The GUC Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a General Unsecured Claim against Brilliant National Services, Inc. shall be to the GUC Trust. | [●] |
| D2 | Tort Claims Against Brilliant National Services, Inc. | On the Effective Date, liability for all Tort Claims against Brilliant National Services, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed Tort Claim against Brilliant National Services, Inc. shall be resolved in accordance with the terms, provisions, and procedures of the Tort Claims Trust Agreement and the Tort Claims Trust Distribution Procedures.  The Tort Claims Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a Tort Claim against Brilliant National Services, Inc. shall be to the Tort Claims Trust. | [●] |
| D3 | Environmental Claims Against Brilliant National Services, Inc. | On the Effective Date, liability for all Environmental Claims and Indirect Environmental Claims against Brilliant National Services, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.    Each Allowed Environmental Claim and Indirect Environmental Claim against Brilliant National Services, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the Environmental Remediation Trust Agreement.    The Environmental Remediation Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of an Environmental Claim or Indirect Environmental Claim against Brilliant National Services, Inc. shall be to the Environmental Remediation Trust. | [●] |
| D4 | Convenience Claims Against Brilliant National Services, Inc. | In full and final satisfaction, compromise, settlement, and release of its Convenience Claims, each Holder of a Convenience Claim against Brilliant National Services, Inc. shall receive a [●]% recovery on account of the Allowed amount of such Convenience Claim. | [●] |

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claims and Interests | Treatment of Claim | Projected Recovery Under the Plan |
| E1 | General Unsecured Claims Against L. A. Terminals, Inc. | On the Effective Date, liability for all General Unsecured Claims against L. A. Terminals, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed General Unsecured Claim against L. A. Terminals, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the GUC Trust Agreement.  The GUC Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a General Unsecured Claim against L. A. Terminals, Inc. shall be to the GUC Trust. | [●] |
| E2 | Tort Claims Against L. A. Terminals, Inc. | On the Effective Date, liability for all Tort Claims against L. A. Terminals, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed Tort Claim against L. A. Terminals, Inc. shall be resolved in accordance with the terms, provisions, and procedures of the Tort Claims Trust Agreement and the Tort Claims Trust Distribution Procedures.  The Tort Claims Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of a Tort Claim against L. A. Terminals, Inc. shall be to the Tort Claims Trust. | [●] |
| E3 | Environmental Claims Against L. A. Terminals, Inc. | On the Effective Date, liability for all Environmental Claims and Indirect Environmental Claims against L. A. Terminals, Inc. shall automatically, and without further act, deed, or court order, be resolved solely in accordance with and to the extent set forth in the applicable Plan Documents and the Confirmation Order.  Each Allowed Environmental Claim and Indirect Environmental Claim against L. A. Terminals, Inc. shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the Environmental Remediation Trust Agreement.  The Environmental Remediation Trust shall be funded in accordance with the provisions of Article VII.C. of the Plan.  The sole recourse of a Holder of an Environmental Claim or Indirect Environmental Claim against L. A. Terminals, Inc. shall be to the Environmental Remediation Trust. | [●] |
| E4 | Convenience Claims Against L. A. Terminals, Inc. | In full and final satisfaction, compromise, settlement, and release of its Convenience Claims, each Holder of a Convenience Claim against L.A. Terminals, Inc. shall receive a [●]% recovery on account of the Allowed amount of such Convenience Claim. | [●] |

As described in the Solicitation and Voting Procedures (as defined herein), Holders of Tort Claims may vote by individual ballot (the "Claim Holder Ballot") or master ballot (the "Master Ballot," and together with the Claim Holder Ballot, the "Ballots," and each, a "Ballot") and Tort Claims will be temporarily allowed in the amount of

$1.00 per Tort Claim for voting purposes only.  The procedures and deadlines for voting on the Plan will be set forth in the Solicitation and Voting Procedures.

**F.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claims, Professional Fee Claim, or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.     Administrative Claims**

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.  Each Holder of an Allowed Administrative Claim will receive, in full satisfaction of its Allowed Administrative Claim:  an amount of Cash equal to the unpaid amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after April 26, 2023 (the "Petition Date"), in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Wind-Down Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.

**2.     DIP Administrative Claims**

The DIP Claims shall be deemed Allowed against each Debtor in the full amount outstanding under the DIP Agreement (including any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Agreement).  In full satisfaction, settlement, and release of, and in exchange for, the DIP Claims, each Holder of a DIP Claim shall receive:  (i) upon the occurrence of the Estate Claims Settlement Effective Date, pursuant to the Estate Claims Settlement, the dollar-for-dollar reduction (on account of the principal amount of the DIP Loans funded in cash) in the amount of the Settlement Contribution (as defined in the Settlement Agreement) described in the Settlement Agreement; or (ii) upon the occurrence of a DIP Termination Event prior to the Estate Claims Settlement Effective Date, payment in full in cash of such DIP Claims.

**3.     Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred during the period from the Petition Date through the Confirmation Date must be Filed no later than forty-five days after the Confirmation Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, including the Administrative Fee Order.  The Debtors or the Wind-Down Debtors, as applicable, shall pay Professional Fee Claims in Cash in the amount Allowed by the Bankruptcy Court from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have

12

an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

As soon as reasonably practicable after the Confirmation Date, and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Debtors or the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.    Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### G.    What does it mean if I have a Convenience Claim?

If you have a Convenience Claim, that means you have a General Unsecured Claim, Tort Claim, or Environmental Claim valued greater than the minimum Distribution threshold ($100) but less than the Convenience Claim Threshold (i.e., $[●]). If you have a General Unsecured Claim, Tort Claim, or Environmental Claim whose value exceeds the Convenience Claim Threshold, you may elect to reduce the value of your Claim to the Convenience Class Threshold and have your Claim treated as a Convenience Claim by making the appropriate selections on your General Unsecured Claim Ballot, Environmental Ballot, or Tort Claim Ballot, as applicable. Such election shall be irrevocable.

Creditors in the Convenience Class are expected to receive a one-time Cash payment on the Effective Date, or as soon as reasonably practicable thereafter. By contrast, the Debtors expect that distributions on account of GUC Claims, Tort Claims, Environmental Claims, and Indirect Environmental Claims will be paid later, in accordance with the applicable trust agreement, because the Contributed Trust Consideration includes certain Assigned Insurance Rights,[11] the monetization and/or liquidation of which is expected to take additional time after the Effective Date. Holders of Allowed Convenience Class Claims and Holders making the Convenience Claim Election will not be entitled to additional Distributions on account of GUC Trust Assets, the Tort Claims Trust Assets, or the Environmental Remediation Trust Assets.

### H.    Are there any regulatory approvals required to consummate the Plan?

No. There are no known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

---

[11]    "Assigned Insurance Rights" means, collectively, any and all rights, titles, privileges, interests, claims, demands or entitlements, as well as obligations of the Debtors and/or any Holder of Claims to any and all proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity arising under, or attributable to, any and all Insurance Contracts, now existing or hereafter arising, accrued, or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including those arising under or attributable to any and all commercial general liability policies, punitive damages policies, products liability policies, life sciences policies, D&O Liability Insurance Policies, and any of the Debtors' rights under any third parties' policies. For the avoidance of doubt, this definition is not intended to alter the Debtors' (including the Debtors' assignees') or any Insurers' rights under any Insurance Policy or applicable Law.

I.  **If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  The "Confirmation Date" is the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can become effective.  *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan," which begins on page 44, for a discussion of the conditions precedent to Consummation of the Plan.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter) and subject in all respects to the GUC Trust Agreement, the Environmental Remediation Trust Agreement, the Tort Claims Trust Agreement (including for the avoidance of doubt, the Tort Claims Trust Distribution Procedures), as applicable.  The Effective Date is the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and (c) the Plan is declared effective.

J.  **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund the distributions and obligations under the Plan with Cash of the Debtors or the Wind-Down Debtors, as applicable, on or after the Effective Date from all sources, including, without limitation, the revenues and proceeds of the Estate Claims Settlement and all Causes of Action not settled, released, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date available for use and distribution in accordance with the priorities set forth in the Plan.  In addition, distributions on account of Tort Claims, Environmental Claims, Indirect Environmental Claims, and General Unsecured Claims will be funded through any Cash from the pursuit of Assigned Insurance Right on account of the respective Claims (*e.g.*, distributions on account of Tort Claims will be funded through any Cash from the pursuit of the Assigned Tort Claim Insurance Rights).  The Debtors' historic insurance policies may provide up to $100 million in recoverable value based on available diligence.  Such claims are, however, contingent, unliquidated, and speculative.  For the avoidance of doubt, nothing contained in the Plan, including Article IX.C of the Plan, shall release, compromise, impair, or in any way affect any Assigned Insurance Rights.

K.  **Is there potential litigation related to the Plan?**

Parties in interest, regardless of whether they are entitled to vote on the Plan, may object to Confirmation of the Plan, and such objections potentially could give rise to litigation.  Because it is possible that one or more Class(es) will vote to reject the Plan and Class A4 is impaired and deemed to reject the Plan, the Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which require the Bankruptcy Court to determine that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article X.J of this Disclosure Statement entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 46.

The Committee's and the Future Claimants' Representative's joint appeal of the Summary Judgment Order, which held that Successor Liability Claims constitute property of the Estates and that the Debtors have exclusive standing to prosecute and seek to compromise such claims, is still pending.  Further, the Committee, the Future Claimants' Representative, or another party in interest may appeal any order granting the Estate Claims Settlement Motion (the "Settlement Motion Order") or any order denying the Committee's and Future Claimants' Representatives' joint motion seeking standing to pursue the Estate Causes of Action.  Any order (i) reversing, modifying, or vacating the Summary Judgment Order or the Settlement Motion Order or (ii) granting any person other than the Debtors standing to assert the Estate Causes of Action will give rise to a termination right under the Estate Claims Settlement, the Cash proceeds of which are used to fund distributions under the Plan.

**L.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Wind-Down Transactions.  It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of extended Chapter 11 Cases, or of a liquidation scenario, *see* Article X.K of this Disclosure Statement entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 47, and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.      Will the final amount of Allowed Tort Claims, Allowed Environmental Claims, Allowed Indirect Environmental Claims, and Allowed General Unsecured Claims affect the recovery of Holders of such Allowed Claims under the Plan?**

The ranges of potential recoveries set forth in the chart in Article III.E of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?", which begins on page 6, depend on a number of contingencies, including, among others, the Claims reconciliation process and the cost of administering these Chapter 11 Cases and Debtors' Estates through the Effective Date.

Although the estimated ranges of potential recoveries of Allowed Tort Claims, Allowed Environmental Claims, Allowed Indirect Environmental Claims, Allowed General Unsecured Claims, and Allowed Convenience Claims are the result of the Debtors' and their advisors' careful analysis of available information, the amount of such Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate, which difference could be material.  Further, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed Tort Claims, Allowed Environmental Claims, Allowed Indirect Environmental Claims, Allowed General Unsecured Claims, and Allowed Convenience Claims to change.  These changes could affect recoveries to Holders of such Claims, and such changes could be material.

While the Debtors do not believe their rejection of any Executory Contracts or Unexpired Leases will have a material impact on recoveries for Holders of Allowed General Unsecured Claims, the Debtors may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages Claims not accounted for in the Debtors' estimate of Allowed General Unsecured Claims.

**N.      What will happen to Executory Contracts and Unexpired Leases under the Plan?**

While the Debtors do not believe they hold material Executory Contracts or Unexpired Leases, as set forth more fully in Article V of the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed rejected by the Wind-Down Debtors in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (3) have been previously assumed or rejected by a Debtor pursuant to a Final Order; (4) are the subject of a motion to assume that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Wind-Down Debtors, the Estates, or their property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, notwithstanding anything in the Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

15

**O.** **Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the other parties in obtaining their support for the Plan.

To effectuate the settlements embodied in the Plan, the Plan includes certain Debtor releases, an exculpation provision, and an injunction provision. These provisions are the product of extensive good faith, arm's-length negotiations, were material inducements for the Settlement Parties to enter into the Estate Claims Settlement and are supported by the Debtor and the Settlement Parties. Moreover, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' Chapter 11 Cases through efforts to negotiate and implement the Plan, which will maximize value of the Debtors' Estates for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Based on the foregoing, the Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the Third Circuit. More specifically, while their review is ongoing, the Debtors are not aware of any potentially colorable Claims or Causes of Action, other than the Estate Causes of Action to be resolved pursuant to the Estate Claims Settlement, held by the Debtors or their Estates against the Released Parties that would provide a material benefit to creditor recoveries. In particular, the Debtors are not aware of any colorable Claims or Causes of Action against current or former directors or officers that would provide a material benefit to creditor recoveries. Accordingly, as of this time, the Debtors do not believe that they have material Causes of Action against any of the Released Parties, other than the Estate Causes of Action, let alone Causes of Action that would justify the risk, expense, and delay attendant to their pursuit and therefore, if the Plan is consummated, all Claims and Causes of Action against the Released Parties will be released pursuant to the Plan. For the avoidance of doubt, the Estate Claims Settlement and the Plan do not prohibit claimants from pursuing *direct* claims they may have against the Settlement Parties (excluding the Debtors), including any *direct* claims against Brenntag for liabilities arising from Brenntag's own post-February 2004 operations.

Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**1.** **Injunction Against Enforcement of Claims**

**Except as specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims against the Debtors (other than DIP Claims) are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, Wind-Down Debtors, or their respective property with respect to such Claim; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against the Debtors, Wind-Down Debtors, or their respective property with respect to such Claim; (c) creating, perfecting, or enforcing any Encumbrance of any kind against the Debtors, Wind-Down Debtors, or their respective property with respect to such Claim; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to any Debtors or against the property or interests in property of any Debtor, with respect to such Claim; (e) taking any action whatsoever to revive, reconstitute, reincorporate, or otherwise reform any Predecessor in Interest or any other previously dissolved or cancelled Affiliate of the Debtors; and/or (f) commencing or continuing any action, in any manner and in any place in the world, against the Debtors, Wind-Down Debtors, or their respective property that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the Debtors' successors (including, without limitation, the Wind-Down Debtors) and their respective properties and interests in property. The injunction provided in this provision shall void any Judgment obtained against any Debtor at any time, to the extent that such Judgment relates to an enjoined Claim.**

2.      **Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released by the Debtors, the Wind-Down Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative Claims, asserted by or on behalf of the Debtors, that the Debtors, the Wind-Down Debtors, or their Estates (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in the Debtors or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the Disclosure Statement, the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, or the Plan Supplement, Filing of the Chapter 11 Cases, pursuit of Confirmation, pursuit of Consummation, administration and implementation of the Plan, including the issuance or Distribution of Securities pursuant to the Plan, or the Distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) the rights of any Holder of Allowed Claims to receive Distributions under the Plan; (c) any matters retained by the Debtors pursuant to the Retained Causes of Action; or (d) any rights, claims, defenses (whether contractual or otherwise) of each Contributing Party (as defined in the Estate Claims Settlement Agreement) against another Contributing Party (as defined in the Estate Claims Settlement Agreement) against another Contributing Party, including all rights, claims, and defenses under the 2003 MPSA and 2007 SPA (the "Preserved Rights").  For the avoidance of doubt, nothing contained in the Plan, including Article IX.C of the Plan, shall release, compromise, impair, or in any way affect any Assigned Insurance Rights or (b) be raised as or constitute a defense to the assertion of Preserved Rights.

3.      **Exculpation**

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Claims or Causes of Action for any Claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date (and following the Effective Date solely with respect to any issuance or Distribution of Securities, the Distribution of any property, or the implementation of the Wind-Down Transactions and/or the establishment of the Environmental Remediation Trust, GUC Trust, or Tort Claims Trust, each pursuant to and in accordance with the Plan), of the Chapter 11 Cases, the Debtors, the formulation, preparation, dissemination, or negotiation of the Plan Documents, Filing of the Chapter 11 Cases, pursuit of Confirmation, Consummation, or administration and implementation of the Plan or Confirmation Order, including the issuance or Distribution of Securities pursuant to the Plan, or the Distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon Confirmation of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable Laws with regard to the solicitation and Distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the

17

solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in Article IX.D of the Plan (i) shall only be applicable to the maximum extent permitted by Law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any Wind-Down Transaction, or any of the Plan Documents.

### 4.    Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or Distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, Exculpated Parties, or Released Parties:  (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (3) creating, perfecting, or enforcing any Lien or Encumbrance of any kind against such Entities or the Estates of such Entities on account of or in connection with or with respect to any Released Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan, including, for the avoidance of doubt, any action to revive, reconstitute, reincorporate, or otherwise reform any Predecessor in Interest or any other previously dissolved or cancelled Affiliate of the Debtors for any purpose whatsoever; *provided*, *however*, that nothing in the Plan or the provisions of Article IX.E thereof shall enjoin any of the Preserved Rights or applicable defenses in connection therewith.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, Distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article IX.E of the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article IX of the Plan without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim or Cause of Action of any kind, (ii) specifically finding that such Claim or Cause of Action was not released pursuant to Article IX of the Plan or the Estate Claims Settlement, as applicable, and (iii) specifically authorizing such Person or Entity to bring such a Claim or Cause of Action, as applicable, against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party, as applicable; *provided*, *however*, that nothing in the Plan or the provisions of Article IX.E thereof shall enjoin any of the Preserved Rights or applicable defenses in connection therewith.

**P.    How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the preservation of certain Causes of Action, which, for the avoidance of doubt, shall not include any of the Causes of Action that are settled, released, or exculpated under the Plan, whether pursuant to the Plan, Estate Claims Settlement, or otherwise.

With the exception of those claims released or settled by the Debtors pursuant to the Plan or the Estate Claims Settlement, as applicable, in accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing), all claims, rights, Retained Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, accruing to, or that are property of, the Debtors and their Estates pursuant to the Bankruptcy Code or any statute or legal theory, including any rights, claims, and Retained Causes of Action against third parties based upon, attributable to, or arising out of Allowed Claims, in their sole and absolute discretion, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019, and the Wind-Down Debtors shall retain and may enforce all defenses and counterclaims to all Claims asserted against the Debtors or their Estates, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

**The Wind-Down Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Retained Causes of Action of the Debtors against them. The Debtors and the Wind-Down Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Person or Entity that is not a Settlement Party or Released Party.**

The Wind-Down Debtors reserve and shall retain such Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors. The Wind-Down Debtors, through their authorized agents or Representatives, shall retain and may exclusively enforce any and all such Causes of Action.

**Q.    How will undeliverable distributions and unclaimed property be treated under the Plan?**

Pursuant to Article VI.D of the Plan, if any Distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no Distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed Distributions shall be made to such Holder on the next Distribution date without interest. Undeliverable Distributions shall remain in the possession of the Wind-Down Debtors until such time as a Distribution becomes deliverable, or such Distribution reverts to the Wind-Down Debtors or is cancelled pursuant to Article VI.D.4 of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any Distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 180 calendar days after the attempted Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable Distribution shall revest in the Wind-Down Debtors automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary). Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the Distribution that is an Unclaimed Distribution, to the contrary.

For the avoidance of doubt, any and all Distributions to be made to (a) Holders of Tort Claims shall be governed and made in accordance with the Tort Claims Trust Agreement and Tort Claims Trust Distribution Procedures, (b) Holders of Environmental Claims shall be governed and made in accordance with the Environmental Remediation Trust Agreement, and (c) Holders of General Unsecured Claims shall be governed and made in accordance with the GUC Trust Agreement, as applicable, and shall not be subject to Article VI of the Plan.

19

**R.      Are there minimum distribution restrictions?**

No Cash payment of less than $100 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

**S.      What is the deadline to vote on the Plan?**

The Voting Deadline is February 24, 2025, at 4:00 p.m., prevailing Eastern Time.

**T.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that your Ballot or Master Ballot including your vote is **actually received** by the Debtors' solicitation agent, Stretto, Inc. ("Stretto" or the "Solicitation Agent") **on or before the Voting Deadline, _i.e._, February 24, 2025, at 4:00 p.m., prevailing Eastern Time**.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for more information, which begins on page 44.

**U.      Why is the Bankruptcy Court holding the Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**V.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for March 3, 2025, at [●]:00 [●].m., prevailing Eastern Time.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be Filed and served on the Debtor, and certain other parties, by no later than February 24, 2025, at 4:00 p.m., prevailing Eastern Time, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* (the "Disclosure Statement Order").

**W.      What is the effect of Confirmation of the Plan?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Whittaker, Clark & Daniels, Inc., et al.,
c/o Stretto, Inc.
410 Exchange, Suite 100
Irvine, CA 92602

*By electronic mail at:*
WhittakerInquiries@stretto.com

*By telephone at:*
833-653-6464 (toll free) *or*
+1 303-802-1420 (for parties outside the U.S.)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in these Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/whittaker/ (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov/ (for a fee).

**Y.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to all Holders of Claims than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value provided for under the Plan.

## IV.      THE PLAN

The Plan contemplates, among other key terms described herein and therein, a wind down of the Debtors' Estates.  The Debtors and the Settlement Parties negotiated a value-maximizing transaction to effectuate an orderly Wind-Down as set forth in the Plan.  As discussed in Article IV of the Plan, the Plan contemplates, among other things, distributions to Holders of Allowed Claims in accordance with its terms.

### A.      Wind-Down Transactions

On the Effective Date, or as soon as reasonably practicable thereafter, the Wind-Down Debtors shall take all actions as may be necessary or appropriate to effectuate the Wind Down Transactions, which shall be reasonably acceptable to NICO, including, without limitation:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) such other transactions that are required to effectuate the Wind Down Transactions; (5) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (6) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### B.      Funding of the GUC Trust, Environmental Remediation Trust, and Tort Claims Trust

Pursuant to Article IV.C of the Plan, The GUC Trust, Environmental Remediation Trust, and Tort Claims Trust shall be funded solely by the GUC Trust Assets, Environmental Remediation Trust Assets, and Tort Claims Trust Assets (collectively, the "Contributed Trust Consideration"), respectively.  On the Effective Date, the obligations to provide the GUC Trust Assets, Environmental Remediation Trust Assets, and Tort Claims Trust Assets shall constitute legal, valid, binding, and authorized obligations of the Wind-Down Debtors, enforceable in accordance with the terms hereof.  The financial accommodations to be extended in connection with the Contributed Trust Consideration are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

On the Effective Date, pursuant to the Plan and in accordance with the GUC Trust Agreement, Environmental Remediation Trust Agreement, and the Tort Claims Trust Agreement, the Contributed Trust Consideration shall be transferred or issued to and vest in the GUC Trust, Environmental Remediation Trust, and Tort Claims Trust, as applicable, free and clear of all Claims, Interests, Liens, other encumbrances and liabilities of any kind (other than the General Unsecured Claims, Environmental Claims, Tort Claims, GUC Trust Operating Expenses, Environmental Remediation Trust Operating Expenses, and Tort Claims Trust Operating Expenses). The GUC Trust, Environmental Remediation Trust, and Tort Claims Trust shall have no liability for, and the Contributed Trust Consideration shall vest in the applicable trust free and clear of, any prepetition and postpetition Claims, Causes of Action or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including Claims based on successor liability), or any other Released Party based on any acts or omissions prior to the Effective Date, except for the General Unsecured Claims, Environmental Claims, and Tort Claims, as applicable.

From and after the Effective Date, all proceeds of the Contributed Trust Consideration, shall be applied in accordance with the GUC Trust Agreement, Environmental Remediation Trust Agreement, Tort Claims Trust Agreement (and Tort Claims Trust Distribution Procedures), and the terms of the Plan.

### C.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, satisfied, or otherwise resolved pursuant to the Plan, including any disputes concerning in any way the validity, effectiveness, or priority of the Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all Distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### D.    Estate Claims Settlement

Each of (a) the Debtors and (b) the Settlement Parties agreed to the terms of the Estate Claims Settlement. The Estate Claims Settlement reflects a good-faith compromise and settlement of numerous issues and disputes between and among the Debtors and the Settlement Parties. The Estate Claims Settlement is designed to achieve a reasonable and effective resolution of the Chapter 11 Cases and increase distributable value available for the benefit of Holders of Allowed Claims. Except as otherwise expressly set forth in the Estate Claims Settlement Agreement, the Estate Claims Settlement Order, and the DIP Order, the Estate Claims Settlement constitutes a settlement of all potential issues and claims between and among the Debtors, on the one hand, and the Settlement Parties, on the other. For the avoidance of doubt, the Estate Claims Settlement does not prohibit claimants from pursuing any *direct* claims they may have against the Settlement Parties, including any claims against Brenntag for liabilities arising from Brenntag's own post-February 2004 operations.

Pursuant to Bankruptcy Rule 9019, the Debtors and the Settlement Parties have agreed to the terms of the Estate Claims Settlement, which provides for, among other things:  (a) Cash payments to the Debtors totaling $535 million in the aggregate; (b) the Debtors' waiver of any and all Estate Causes of Action against the Non-Debtor Released Parties (as defined in the Estate Claims Settlement Agreement) arising out of, in connection with, or relating to any matters occurring before the Estate Claims Settlement Effective Date; (c) the Settlement Parties' release of all Causes of Action against the Debtor Releasees arising out of, in connection with, or relating to any matters occurring before the Estate Claims Settlement Agreement Effective Date, in each case all as more fully set forth in the Estate Claims Settlement, in exchange for the releases and other consideration set forth therein. For the avoidance of doubt, while the Estate Claims Settlement aims to maximize distributable value available for the benefit of Holders of Allowed Claims, the Estate Claims Settlement is not contingent upon Confirmation.

For the avoidance of doubt, the only releases contained in the Estate Claims Settlement are mutual releases between the Debtors and the Settlement Parties. Through the Estate Claims Settlement, the Debtors release any and all Estate Causes of Action against the Settlement Parties. The Estate Causes of Action include all actions, Claims, rights, remedies, defenses, counterclaims, suits, and Causes of Action (a) owned or held, or assertable by or on behalf of, any Debtor or its Estate (including, without limitation, claims assertable by the Committee or the Future Claimants' Representative, or by any other creditors, on behalf of any Debtor or its Estate), (b) that constitute property of the Estates under section 541 of the Bankruptcy Code, (c) that are or may be commenced or pursued by a representative of the Debtors or the Estates, including pursuant to sections 323 or 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code, (d) to avoid, invalidate or recover any transfer of any kind made by any Debtor, or any obligation of any Debtor, including under chapter 5 of the Bankruptcy Code or other applicable law, (e) against certain non-Debtor entities seeking to establish such entities' liability for Tort Claims on any grounds, including, without limitation, that such entities are successors to, or alter egos of, the Debtors, or (f) otherwise assertable by any Debtor or its Estate under any federal, state, or other applicable law seeking to establish a non-Debtor's liability for existing or future Tort Claims, Environmental Claims, Indirect Environmental Claims, or other Claims against the Debtors.

### E. Plan Administrator

As set forth in Article VII of the Plan, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a president and chief executive officer (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order. On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole officer of the Wind-Down Debtors, and shall succeed to the rights, powers, duties, and privileges of the Wind-Down Debtors' officers. Subject to the terms of the Plan, among other duties normal and customary of a director and officer responsible for winding down the affairs of a business, the Plan Administrator shall have the right and duty to investigate, prosecute, and compromise any and all of the Debtors' and Wind-Down Debtors' Claims and Causes of Action (other than Claims and Causes of Action released in the Estate Claims Settlement or the Plan).

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII of the Plan. The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court.

### F. Vesting of Assets

Except as otherwise provided in the Estate Claims Settlement Agreement, Estate Claims Settlement Order, Confirmation Order, the Plan, or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by the Debtors pursuant to the Plan shall vest in the Wind-Down Debtors, as applicable, free and clear of all Liens, Claims, charges, or other Encumbrances; *provided* that the Owned Site shall be deemed abandoned on the Effective Date. For the avoidance of doubt, any Entity, including any Predecessor-in-Interest or prior Affiliate of any Debtor, that was dissolved or otherwise cancelled prior to the Effective Date shall be precluded from ever pursuing any property of the Estate or any property of the Wind-Down Debtors, including proceeds of the Insurance Contracts. On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Debtors may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### G. Insurance Neutrality

Nothing in the Plan, the Plan Supplement, the Confirmation Order shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Insurance Contracts; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the Insurance Contracts, and this the rights or obligations

of any insurer, the Debtors, the GUC Trust, the Environmental Remediation Trust, and the Tort Claims Trust, arising out of or under any Insurance Contract, whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable Law (including any actions or obligations of the Debtors thereunder), the terms of the Plan, the Plan Supplement, and the Confirmation Order (including the findings contained therein or issued in conjunction therewith), and, to the extent the insurers have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date.  Furthermore, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall relieve any insurer of the Debtors from their obligations under the Insurance Contracts.

Nothing in the Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any insurer to provide a defense for, settle, or pay any judgment with respect to any Claim.  All such obligations with respect to the insurers shall be determined by and in accordance with the terms of the applicable Insurance Contracts and with applicable Law.

## V.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement is being distributed, along with the applicable Ballot to be used for voting on the Plan, to the Holders of General Unsecured Claims (Classes B1, C1, D1, and E1), Tort Claims (Classes B2, C2, D2, and E2), Environmental Claims and Indirect Environmental Claims (Classes B3, C3, D3, and E3), and Convenience Claims (Classes B4, C4, D4, and E4) entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, incorporated herein by reference.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

**THE DISCUSSION OF THE SOLICITATION PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.  PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" which begins on page 5, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class B1, Class B2, Class B3, Class B4, Class C1, Class C2, Class C3, Class C4, Class D1, Class D2, Class D3, Class D4, Class E1, Class E2, Class E3, and Class E4 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Class A1, Class A2, Class A3, and Class A4.

### B.    Solicitation Agent

The Debtors have retained the Solicitation Agent, Stretto, to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

### C.    Solicitation Package

Contemporaneously herewith, the Debtors Filed the proposed Disclosure Statement Order.  For purposes of this Article IV, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  Pursuant to the Disclosure Statement Order, Holders of Claims in the Voting Class will

receive appropriate solicitation materials (in paper or electronic form) including (the following materials, collectively, the "Solicitation Package"):

- the Disclosure Statement (including all exhibits, including the Plan with its exhibits);

- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);

- the Solicitation and Voting Procedures;

- the Cover Letter;

- the Confirmation Hearing Notice;

- the applicable Ballot;

- a pre-addressed, postage pre-paid reply envelope; and

- any supplemental documents the Debtors may File with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

For the avoidance of doubt, Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits, except for the Solicitation and Voting Procedures) in electronic format (flash drive or CD-ROM), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format.

### D. Solicitation Directive

If a law firm (a "Firm") represents four (4) or more clients in their capacity as Holders of Tort Claims (each, a "Client"), such attorney will also receive a Solicitation Directive. Through the Solicitation Directive, Firms representing four (4) or more Clients shall elect one of three solicitation methods for such Clients: (i) the Master Ballot Solicitation Method; (ii) the Direct Solicitation Method; or (iii) the Mixed Solicitation Method. All Firms must submit a Solicitation Directive through the Solicitation Agent's attorney portal, which can be accessed by clicking the "E-Ballot" link at https://cases.stretto.com/whittaker/ and navigating to the "Submit Master Ballot" section within five (5) Business Days of receipt of the Solicitation Package.

If a Firm elects the Master Ballot Solicitation Method, such Firm must provide this Disclosure Statement to its Clients, provide instructions on how to access electronic or hard copy versions of this Disclosure Statement to its Clients, or request the Solicitation Agent serve Solicitation Packages (without Ballots) upon its Clients. The Firm will solicit votes from each of its Clients directly and record such votes on a single Master Ballot.

If a Firm, elects the Direct Solicitation Method, the Solicitation Agent will serve such Firm's Clients with the Solicitation Packages (including Ballots) at the address identified by such Firm on the Client List (or, if no address is provided, to the address listed on the applicable Proof of Claim, or if neither is available, to the address indicated in the Schedules). By electing this method, the Firm certifies that it does not have the authority to vote to accept or reject the Plan on behalf of its Clients, it has such authority but does not intend to exercise it, and/or it has less than four (4) Clients.

If a Firm elects the Mixed Solicitation Method, such Firm will notify the Solicitation Agent of which Clients shall vote by Claim Holder Ballots and which Clients shall vote by Master Ballot. For those Clients who will vote by Claim Holder Ballots, the Solicitation Agent will serve such Firm's Clients with the Solicitation Packages (including Ballots) at the address identified by such Firm on the Client List (or, if no address is provided, to the address listed on the applicable Proof of Claim, or if neither is available, to the address indicated in the Schedules). For those Clients who will vote by Master Ballot, such Firm is required to provide this Disclosure Statement to such Clients, provide instructions on how to access electronic or hard copy versions of this Disclosure Statement to such Clients, or request the Solicitation Agent serve Solicitation Packages (without Ballots) upon such Clients.

If a Firm elects either the Master Ballot Solicitation Method or the Mixed Solicitation Method, the Firm shall be responsible for submitting a Master Ballot to the Solicitation Agent so as to be received by the Voting Deadline on behalf of those Clients voting by Master Ballot.  Clients voting by Claims Holder Ballot shall be responsible for submitting their individual Claims Holder Ballots to the Solicitation Agent so as to be received by the Voting Deadline.

E.        **Voting Record Date**

**The Voting Record Date is December 9, 2024**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

F.        **Voting on the Plan**

**The Voting Deadline is February 24, 2025, at 4:00 p.m., prevailing Eastern Time**.  In order to be counted as votes to accept or reject the Plan, all Ballots or Master Ballots must be:  (i) electronically submitted utilizing the online balloting portal maintained by the Solicitation Agent on or before the Voting Deadline; or (ii) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, personal delivery, the online portal, or, for Master Ballots only, by e-mail) so that the Ballots or Master Ballots are **actually received** by the Solicitation Agent on or before the Voting Deadline at one of the below addresses.

---

**DELIVERY OF BALLOTS**
**FOR GENERAL UNSECURED CLAIMS (CLASSES B1, C1, D1, AND E1),**
**TORT CLAIMS (CLASSES B2, C2, D2, AND E2), ENVIRONMENTAL**
**CLAIMS AND INDIRECT ENVIRONMENTAL CLAIMS (CLASSES B3,**
**C3, D3, AND E3), AND CONVENIENCE CLAIMS (CLASSES B4, C4, D4, AND E4)**

**Whittaker, Clark & Daniels, Inc., et al.,**
**c/o Stretto, Inc.**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

OR

**ONLINE PORTAL AT https://cases.stretto.com/whittaker/**

OR

**FOR MASTER BALLOTS ONLY**

**Via E-mail:  WhittakerInquiries@stretto.com**
**(Please reference "Whittaker Master Ballot" or "Whittaker" in the subject line, as applicable)**

---

**E-BALLOT SHALL BE THE EXCLUSIVE MEANS OF VOTING BALLOTS ELECTRONICALLY. STRETTO SHALL NOT ACCEPT VOTES SUBMITTED VIA E-MAIL, FACSIMILE, OR ANY ELECTRONIC METHODS OTHER THAN E-BALLOT; *PROVIDED* THAT STRETTO SHALL ACCEPT MASTER BALLOTS SUBMITTED VIA E-MAIL TO STRETTO.  HOLDERS OF CLAIMS WHO CAST A BALLOT OR MASTER BALLOT VIA E-BALLOT SHOULD NOT ALSO SUBMIT A PAPER BALLOT.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT BY E-MAIL AT WHITTAKERINQUIRIES@STRETTO.COM OR BY TELEPHONE AT 833-653-6464 (TOLL FREE) OR +1 303-802-1420 (INTERNATIONAL).  ANY BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE**

**SOLICITATION AND VOTING PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTOR**.

### G.    Ballots Not Counted

**No Ballot or Master Ballot will be counted toward Confirmation if, among other things**: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the Disclosure Statement Order; (iii) it was cast by a person or entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no Proof of Claim was timely Filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), any indenture trustee, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (vii) it lacks an original signature, with the understanding that the voting party's electronic signature through E-Ballot will be deemed an original signature; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan or it is marked to partially accept and partially reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

For the avoidance of doubt, Tort Claims shall be deemed to be temporarily Allowed for voting purposes in accordance with the terms and provisions of the Disclosure Statement Order.

### H.    Dates and Deadlines

The following table sets forth important dates and deadlines relating to voting and confirmation of the Plan.[12]

| EVENT | DATE |
|---|---|
| **Disclosure Statement Objection Deadline** | December 9, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Voting Record Date** | December 9, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| **Disclosure Statement Hearing** | December 16, 2024, at 10:00 a.m. (prevailing Eastern Time) |
| **Solicitation Deadline** | Within 5 Business Days after entry of the Order |
| **Publication Deadline** | Within 5 Business Days following entry of the Order |
| **Plan Supplement Filing Deadline** | February 17, 2025 |
| **Voting Deadline** | February 24, 2025, at 4:00 p.m. (prevailing Eastern Time) |
| **Confirmation Objection Deadline** | February 24, 2025, at 4:00 p.m. (prevailing Eastern Time) |
| **Deadline to File Voting Report** | February 26, 2025 |
| **Confirmation Hearing Date** | March 3, 2025 at [●] [a.m./p.m.] (prevailing Eastern Time), or such other time as may be scheduled by the Bankruptcy Court |

---

[12]    These dates and deadlines are subject to the Bankruptcy Court's entry of the Debtors' proposed Disclosure Statement Order.

**VI.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

**A.     Overview of the Debtors' History and Governance**

The Debtors' historical businesses have included the distribution of chemicals, minerals, and pigments, including talc. Until November 1998, the entities that now constitute the Debtors were part of two separate revenue-generating businesses that were *not* under the same corporate ownership: (a) the "SOCO Chemical" group and (b) WCD.

WCD was originally formed as a privately held New York company and operated as a distributor of minerals and pigments, including talc. In 1972, WCD reincorporated in New Jersey. In November 1998, Brilliant acquired WCD from its then-individual stockholders and WCD became, indirectly, part of the DB US Holdings corporate family.

Soco's pre-2004 operations began as early as 1933, with the formation and incorporation of A.J. Lynch Co. ("A.J. Lynch"), which sold and distributed chemicals and raw materials to the paint industry. What is now Soco was built by combining—over more than twenty years—multiple distributors with connections to California (Western Chemical & Manufacturing Co., A.J. Lynch, and Crown Chemical Corp.) with two entities (Dyce Chemical Inc. and Holchem Inc.) acquired from the Holland Chemical group—which was brought into the DB US Holdings corporate family around 2000.

Brilliant, which has historically been a holding company, was formed in 1977, and was known for the majority of its pre-2004 history as first "Stinnes Oil & Chemical Company" (hence the abbreviation "SOCO") and then as SOCO Chemical. Prior to 2004, Brilliant (f/k/a SOCO Chemical) was a subsidiary of DB US Holdings and served as a North American parent entity for DB US Holdings' chemical operations. Between 1977 and 2004, Brilliant formed or acquired other operating companies. Brilliant changed its name three times: first to Soco Chemical Inc. in 1986; second to Brenntag, Inc. in 1998; and then to Brilliant in 2004. On November 7, 2007, Brilliant (including its subsidiaries WCD and Soco) and LAT were sold by DB US Holdings to National Indemnity in a transaction described further in Article VI.A.1 herein.

LAT was formed and began its operations importing and storing industrial chemicals in 1981. Specifically, LAT operated a chemical storage and distribution terminal and bulk plant located within the Los Angeles Harbor. LAT ceased its storage and distribution operations by the mid-1990s before it was brought into the DB US Holdings corporate family as part of the Holland Chemical transactions around 2000. Accordingly, LAT has not been a revenue-generating entity since its acquisition by DB US Holdings. By 2001, through a series of stock purchases, LAT became a direct subsidiary of DB US Holdings. LAT was sold to Ringwalt as part of the 2007 Transaction between DB US Holdings and National Indemnity and was moved underneath debtor Brilliant in 2008.

Today, WCD, Soco, and LAT are direct or indirect subsidiaries of Brilliant.



**Figure 1:  Simplified 2008 to Present Structure Diagram**

### 1.        The 2004 and 2007 Transactions

In 2002, Deutsche Bank AG became the ultimate parent of the DB US Holdings group and sought to divest DB US Holdings' chemical business, including the U.S. operations conducted by Brilliant's subsidiaries.  In a series of transactions between 2003 and 2004, the Debtors' assets were transferred to affiliates of Bain Capital.  These transactions were effectuated with respect to Brilliant and its subsidiaries by two sets of agreements: (a) a December 2003 master sale and purchase agreement to which both Brilliant and its immediate parent, DB US Holdings, were parties, and (b) a series of February 2004 agreements between Brilliant or its subsidiaries on the one hand, and newly created Bain-affiliated "Brenntag" entities on the other.  LAT was not involved in the 2004 Transaction, as it had previously ceased all operations.

More specifically, in 2004, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 Soco APA"), Soco (then named Brenntag West, Inc.) divested substantially all of its assets in exchange for approximately $44 million and the assumption of certain ongoing liabilities by the purchaser, Brenntag Pacific, Inc.  Pursuant to the 2004 Soco APA, Soco retained all liability for the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real estate.  Following these transactions, on March 8, 2005, Soco changed its name from Brenntag West, Inc. to Soco West, Inc.

Simultaneously, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 WCD APA"), WCD divested substantially all of its assets in exchange for approximately $16 million and the assumption of certain ongoing liabilities by the purchaser, Mineral & Pigment Solutions Inc. (n/k/a Brenntag Specialties).  Pursuant to the 2004 WCD APA, WCD retained all liabilities as to the Tort Claims and retained certain assets, including asbestos- and environmental-related insurance receivables and certain real property.

Simultaneously with the execution of the 2004 Soco APA and the 2004 WCD APA, pursuant to that certain asset purchase agreement dated February 27, 2004 (the "2004 Brilliant APA"), Brilliant (then named Brenntag Inc.) sold substantially all of its assets to Brenntag North America in exchange for approximately $140 million for selling the equity in its other subsidiaries, as well the assumption of certain non-asbestos-related and non-environmental ongoing liabilities by Brenntag North America.

29



**Figure 2: Simplified 2004 Transaction Diagram.**

Between February 2004 and December 2007, Brilliant, WCD, and Soco West managed their liabilities under the direct ownership of DB US Holdings and the indirect ownership of Deutsche Bahn.

In December 2007, National Indemnity paid $1.00 to acquire the Debtors, with the possibility of an up to $45 million purchase price adjustment payable by DB US Holdings (and guaranteed by Deutsche Bahn) to National Indemnity if the Debtors actually paid (or incurred before paying) more than specified thresholds for asbestos and environmental claim. At closing in December 2007, National Indemnity assigned the right to acquire the Debtors' stock to Ringwalt—a NICO affiliate under a different corporate chain—such that Ringwalt is Brilliant's sole direct equity holder (together with National Indemnity's 2007 acquisition of the Debtors, the "2007 Transaction"). Ringwalt remains the direct parent of Brilliant (and the indirect parent of the other Debtors) today.



**Figure 3: Simplified 2007 Transaction Diagram.**

**2.    2007 to the Petition Date**

From 2007 through the Petition Date, Brilliant, WCD, and Soco West invested their assets and managed their liabilities. During this time, certain administrative and shared services were performed by NICO, pursuant to certain intercompany service agreements (collectively, the "Shared Services Agreements"). Pursuant to the Shared Services Agreements, National Indemnity and NLF make available or otherwise provide, among other facilities and services

reasonably necessary to the conduct of the Debtors' claims management operations, certain data processing equipment, business property, and claims services to the Debtors.

For nearly 20 years, the Debtors have had no business operations outside of the management of their alleged Liabilities and investment of their assets, no employees, no funded third-party debt, and minimal assets aside from cash and certain insurance assets. The Debtors have not issued dividends or distributions to Ringwalt or any of its other indirect parent entities. The Debtors have managed and invested their assets and have achieved investment gains on their asset portfolio since 2007 that have allowed WCD and Soco to pay out significantly more in settlements and judgments on the Liabilities than the assets on their balance sheets at the time of the 2007 Transaction.

The only changes to the Debtors' corporate structure since the 2007 Transaction occurred in 2008, when: (a) LAT, which was originally a direct subsidiary of Ringwalt and a corporate sibling to Brilliant, became a direct subsidiary of Brilliant, and (b) WCD, which was originally a direct subsidiary of Brilliant and a corporate sibling to Soco, became a direct subsidiary of Soco.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Historical Asbestos Litigation

As of the Petition Date, WCD and Soco faced, in the aggregate, over 1,000 pending asbestos actions or asbestos-related talc actions arising from the Debtors' historical operations. Since 2013, the Debtors' litigation expenditures materially increased as a result of the evolution of the tort landscape concerning asbestos-related talc claims. In the years leading up to the Petition Date, the Debtors have seen increasingly large verdicts rendered in such cases.

Each of these lawsuits has presented unique facts, circumstances, and allegations. While these lawsuits have contained common allegations of asbestos or talc exposure and related injuries, they have involved plaintiffs who assert claims in different venues across the United States based on exposure to different products, sold by different companies, at different times. Between 2008 to the Petition Date, the Debtors remitted approximately $213 million in payments related to Tort Claims.

### B.    Historical Environmental Litigation

Federal and state governmental entities and plaintiffs have pursued actions or brought claims against the Debtors, or entities that the Debtors are obligated to indemnify, alleging that the Debtors or such entities produced and/or handled hazardous materials that contributed to environmental contamination at approximately twenty-seven properties across at least fourteen states.

The Debtors actively engaged with both federal and state governmental entities with respect to responding to, investigating, monitoring, and remediating the alleged contamination on these properties. As of December 31, 2022, the Debtors' accounting records reflect approximately $54.5 million of remediation, monitoring, investigation, and other environmental liabilities, on a GAAP basis, related to these properties. Since 2008, in the aggregate, the Debtors have remitted approximately $123 million in payments related to Environmental Claims.

### C.    Decision to Commence These Chapter 11 Cases

As described above, prior to the Petition Date, the Debtors faced new and ongoing asbestos and environmental litigation without any alternative mechanism to efficiently and equitably address liabilities stemming from such litigation. Further, certain developments arising from the growing number of claimants pursuing talc manufacturers in the United States, including the significant increase in settlement demands with respect to cosmetic talc claims and certain large judgments against the Debtors, threatened to swiftly exhaust the Debtors' remaining assets, leaving the universe of potential future claimants without any assets from which to collect. As such, on April 26, 2023, the Debtors initiated these Chapter 11 Cases in an effort to fairly and equitably address their liabilities to all of their creditors through a chapter 11 plan.

## VIII.    MATERIAL DEVELOPMENTS AND EVENTS IN THESE CHAPTER 11 CASES

### A.      First Day Relief

The Debtors Filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions") on April 26, 2023.  Shortly thereafter, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of these Chapter 11 Cases.  On May 8, 2023, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis.

The First Day Motions, and all orders for relief granted in these Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/whittaker/.  A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of Whittaker, Clark & Daniels, Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "First Day Declaration").

On the Petition Date, the Debtors Filed several motions seeking relief to facilitate the administration of these Chapter 11 Cases, including:

- Joint Administration Motion:  The *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 4] (the "Joint Administration Motion"), seeking authorization to procedurally consolidate and jointly administer the Chapter 11 Cases of Whittaker, Brilliant, LAT, and Soco.  On May 8, 2023, the Bankruptcy Court entered an order approving the Joint Administration Motion on a final basis [Docket No. 72].

- Case Management Motion:  The *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 7] (the "Case Management Motion"), seeking authorization to designate these Chapter 11 Cases as complex cases and approving certain notice, case management, and administrative procedures set forth therein.  On May 8, 2023, the Bankruptcy Court entered an order approving the Case Management Motion on a final basis [Docket No. 67].

- Cash Management Motion:  The Debtors Filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to (A) Operate Their Cash Management System, (B) Use Their Bank Accounts, and (C) Perform Intercompany Transactions; (II) Authorizing the Debtors' Banks to Charge Certain Fees; and (III) Granting Related Relief* [Docket No. 9] (the "Cash Management Motion"), seeking authorization to continue to operate their cash management system, use their bank accounts, and perform intercompany transactions, and authorization for the cash management banks to charge certain bank fees.  On May 8, 2023, the Bankruptcy Court entered an order approving the Cash Management Motion on an interim basis [Docket No. 68]. On June 6, 2023, the Bankruptcy Court entered a second order approving the Cash Management Motion on an interim basis [Docket No. 178].  On June 26, 2023, the Bankruptcy Court entered an order approving the Cash Management Motion on a final basis [Docket No. 232].

- Creditor Matrix Motion:  The *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a List of the Top Law Firms and Use the Addresses of Counsel in Lieu of Claimants' Addresses and (II) Redact Personally Identifiable Information, (B) Approving Certain Notice Procedures, and (C) Granting Related Relief* [Docket No. 8] (the "Creditor Matrix Motion"), seeking authorization to File a single consolidated list consisting of the top fifteen law firms representing the largest numbers of Holders of Tort Claims asserting claims against the Debtors as determined by the volume of claims or other related factors, authorizing the listing of addresses of counsel for the claimants asserting Tort Claims against the Debtors in lieu of the claimants' addresses, authorizing the Debtors to redact certain personally identifiable information, and approving certain notice procedures for the Tort Claimants.  On May 8, 2023, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on an interim basis [Docket No. 69].  On June 6, 2023, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 177].

- SOFA Motion:  The *Debtors' Motion for Entry of an Order (I) Extending Time to File Certain Schedules and Statements of Financial Affairs, and (II) Granting Related Relief* [Docket No. 6] (the "SOFA Motion"), seeking

authorization to extend the deadline by which the Debtors will File their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statement") until June 5, 2023. On May 8, 2023, the Bankruptcy Court entered an order approving the SOFA Motion on a final basis [Docket No. 70]. On May 30, 2023, the Debtors Filed their Schedules and Statements [Docket Nos. 134–37].

### B.    Other Procedural and Administrative Motions

- Administrative Fee Motion:  On May 9, 2023, the Debtors Filed the *Debtors' Motion for Entry of an Administrative Fee Order Establishing Procedures for the Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of this Court* [Docket No. 76] (the "Administrative Fee Motion").  The Interim Compensation Motion sought to establish procedures for compensating and reimbursing the professionals retained under section 327 of the Bankruptcy Code and, to the extent applicable, sections 328(a) and 1103 of the Bankruptcy Code.  On June 6, 2023, the Bankruptcy Court entered an order granting the Administrative Fee Motion [Docket No. 176].

- Ordinary Course Professionals Motion:  On June 13, 2023, the Debtors Filed the *Debtors' Motion for Entry of an Order Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 198] (the "OCP Motion").  The OCP Motion sought to authorize the Debtors to retain and pay ordinary course professionals without the necessity of a separate, formal retention application for each ordinary course professional.  On July 18, 2023, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 294].

- Application for Protective Order:  On September 28, 2023, the Debtors Filed the *Application in Lieu of Motion in Support of Entry of Confidentiality Stipulation and Protective Order* [Docket No. 523] (the "Application for Protective Order").  The Application for Protective Order sought to facilitate the production of discovery materials to parties in interest while protecting confidential and highly confidential materials that may be contained therein.  On September 28, 2023, the Bankruptcy Court entered the *Confidentiality Stipulation and Protective Order* [Docket No. 524] (the "Protective Order").  On November 17, 2023, the Bankruptcy Court entered the *Amended Confidentiality Stipulation and Protective Order* [Docket No. 665].

### C.    Appointments

On May 24, 2023, the United States Trustee for the District of New Jersey Filed the *Notice of Appointment of Official Committee of Talc Claimants* [Docket No. 121].  Subsequently, on July 7, 2023, the Committee Filed applications to retain Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. as local counsel to the Committee [Docket No. 254], Cooley LLP as counsel [Docket No. 255], Caplin & Drysdale, Chartered as special asbestos counsel [Docket No. 256], Gilbert LLP as special insurance counsel [Docket No. 257], and FTI Consulting, Inc. as financial advisor [Docket No. 258].  On August 4, 2023, the Bankruptcy Court approved the application for FTI Consulting, Inc. [Docket No. 362].  On August 7, 2023, the Bankruptcy Court approved the applications for Cooley LLP [Docket No. 368] and Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. [Docket No. 369].  On August 9, 2023, the Bankruptcy Court approved the application for Gilbert LLP [Docket No. 383].  On August 11, 2023, the Bankruptcy Court approved the application for Caplin & Drysdale, Chartered [Docket No. 390].

On May 3, 2023, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Appointing the Honorable Shelley C. Chapman (Ret.) as Future Claimants' Representative, Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 54].  On May 30, 2023, the U.S. Trustee and the Committee Filed objections to the Debtors' motion [Docket Nos. 131 and 133].  The Debtors Filed a reply to the objections [Docket No. 216].  The Bankruptcy Court approved the appointment on June 26, 2023 [Docket No. 231].  On July 10, 2023, the Future Claimants' Representative Filed an application to retain Willkie Farr & Gallagher LLP as counsel [Docket No. 272], which was approved by the Bankruptcy Court on July 27, 2023 [Docket No. 326].  On July 18, 2023, the Future Claimants' Representative Filed an application to retain Province, LLC as a consultant [Docket No. 290], which was approved by the Bankruptcy Court on August 1, 2023 [Docket No. 336].  On July 18, 2023, the Future Claimants' Representative Filed an application to retain Rabinowitz, Lubetkin & Tully, LLC as counsel [Docket No. 292], which was approved by the Bankruptcy Court on August 1, 2023 [Docket No. 339].

### D.      Request for Appointment of an Official Committee of Unsecured Commercial Creditors

On February 16, 2024, an ad hoc committee of the Debtors' general unsecured commercial creditors (the "Ad Hoc GUC Committee") Filed the *Ad Hoc Committee's Motion for an Order Directing the Appointment of an Official Committee of Unsecured Commercial Creditors* [Docket No. 854] (the "GUC Committee Appointment Motion"), seeking the appointment of an official committee to assure the adequate representation of unsecured commercial creditors.  On March 26, 2024, the U.S. Trustee and the Committee Filed objections to the GUC Committee Appointment Motion [Docket Nos. 956 and 958].  The Debtors Filed a response to and reservation of rights regarding the GUC Committee Appointment Motion [Docket No. 958].  The Future Claimants' Representative Filed a joinder to the Committee's objection [Docket No. 959].  On April 2, 2024, the Ad Hoc GUC Committee filed a reply in further support of the GUC Committee Appointment Motion [Docket No. 972].  On April 8, 2024, the Bankruptcy Court entered an order denying the GUC Committee Appointment Motion [Docket No. 990].

### E.      Retention of the Debtors' Professionals

On June 4, 2023, to assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in these Chapter 11 Cases, the Debtors Filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, or 363 of the Bankruptcy Code, as applicable:  (i) Kirkland & Ellis LLP ("Kirkland") as counsel to the Debtors [Docket No. 160]; (ii) Cole Schotz P.C. ("Cole Schotz") as co-counsel to the Debtors [Docket No. 159]; (iii) Stretto as Notice and Claims Agent [Docket No. 161]; (iv) M3 Advisory Partners, LP ("M3") as financial advisor to the Debtors [Docket No. 162]; and (v) Mohsin Y. Meghji as Chief Restructuring Officer ("CRO") [Docket No. 162].  On June 23, 2023, the Bankruptcy Court entered an order approving the retention of Cole Schotz [Docket No. 221].  On June 26, 2023, the Bankruptcy Court entered orders approving the retention of Kirkland [Docket No. 227], Stretto [Docket No. 228], M3 [Docket No. 229], and Mr. Meghji [Docket No. 229].  On November 3, 2023, the Debtors Filed an application to retain The Brattle Group, Inc. ("Brattle") as Claims Estimation Experts [Docket No. 606].  On November 17, 2023, the Bankruptcy Court entered an order approving the retention of Brattle [Docket No. 668].

### F.      Schedules of Assets and Liabilities and Statements of Financial Affairs

On April 23, 2023, the Debtors Filed the SOFA Motion [Docket No. 6] seeking an extension of the time within which the Debtors must file its schedules of assets and liabilities and statements of financial affairs until June 5, 2023, for a total of forty days from the Petition Date.  The Bankruptcy Court granted this motion on May 8, 2022 [Docket No. 70].  On May 30, 2023, the Debtors Filed their Schedules and Statements [Docket Nos. 134-37].  Interested parties may review the Schedules and Statements free of charge at https://cases.stretto.com/whittaker/.

### G.      The South Carolina Receiver's Motion to Dismiss

On May 3, 2023, a receiver appointed by the South Carolina Court of Common Pleas for WCD (the "Receiver") Filed a motion to dismiss [Docket No. 62].  The Receiver argued that the chapter 11 case for WCD should be dismissed for cause because it was not duly authorized by the Receiver.  Moreover, the Receiver argued the voluntary petition for WCD was filed in bad faith because WCD lacked ongoing operations and the filing was motivated to avoid the state court receivership order.  On May 19, 2023, the Receiver Filed an amended motion to dismiss, removing the bad faith allegations [Docket No. 117].  On May 26, 2023, the Debtors Filed the *Debtors' Objection to Motion to Dismiss the Chapter 11 Case of Whittaker, Clark & Daniels, Inc.* [Docket No. 124] (the "Debtors' Objection").  The Debtors' Objection stated, among other things, that the Receiver lacks standing to seek dismissal, the WCD board had full authority to file the voluntary petition, and the receivership order did not divest the WCD board of its authority to file the voluntary petition.  The Receiver subsequently Filed the *Reply of Peter Protopapas as Court-Appointed Receiver in Support of Amended and Revised Motion to Dismiss the Chapter 11 Case of Whittaker, Clark & Daniels, Inc.* [Docket No. 156].  On June 20, 2023, the Bankruptcy Court issued an order denying the motion to dismiss [Docket No. 211] (the "Order Denying Motion to Dismiss") as well as a letter opinion [Docket No. 210].

On July 3, 2023, the Receiver and Committee Filed a joint motion for certification of direct appeal of the Bankruptcy Court's order denying the motion to dismiss [Docket No. 248].  On July 17, 2023, the Debtors Filed the *Debtors' Objection to Joint Motion of Official Committee of Talc Claimants and Peter Protopapas, as Court*

*Appointed Receiver, for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit* [Docket No. 289]. On July 24, 2023, the Receiver and Committee Filed a reply to the objection [Docket No. 314]. On August 1, 2023, the Bankruptcy Court entered an order denying the motion for certification [Docket No. 338], as well as a letter opinion [Docket No. 331].

On August 3, 2023, the District Court for the District of New Jersey (the "District Court") Filed a notice stating the record of appeal was available [Docket No. 360]. On September 12, 2023, the Committee Filed its *Joint Opening Brief of Appellants in Support of Appeal from the Bankruptcy Court Order Denying Motion to Dismiss Chapter 11 Case* [App. Docket No. 18]. On October 27, 2023, the Debtors Filed their *Appellee's Brief* [App. Docket No. 22]. On November 16, 2023, the Committee Filed its *Joint Reply Brief of Appellants in Support of Appeal from the Bankruptcy Court Order Denying Motion to Dismiss Chapter 11 Case* [App. Docket No. 23].

On May 31, 2024, the District Court dismissed the appeal [App. Docket Nos. 36 and 37]. On July 8, 2024, the Receiver and the Committee Filed separate notices appealing the District Court's decision upholding the Order Denying Motion to Dismiss to the Third Circuit. The Receiver's and the Committee's appeals are currently pending before the Third Circuit.

**H.    Automatic Stay Developments**

On July 28, 2023, creditor Orange County Water District ("OCWD") Filed the *Notice of Creditor Orange County Water District's Motion for a "Comfort Order" and Lifting the Automatic Stay* [Docket No. 329], arguing that the automatic stay does not apply to non-debtor defendants in its proceeding against Soco and that the Bankruptcy Court should lift the automatic stay to enable OCWD to liquidate its claim against Soco. On August 17, 2023, the Debtors Filed the *Debtors' Objection to Orange County Water District's Motion for a "Comfort Order" and to Vacate the Automatic Stay* [Docket No. 404], arguing that the automatic stay applies to the continuation of OCWD's lawsuit against the non-debtor defendants because the lawsuit is effectively an action to recover a claim against Estate property. On August 21, 2023, OCWD Filed a reply [Docket No. 416]. On August 29, 2023, the Bankruptcy Court entered an order declaring that the automatic stay does not prevent OCWD from proceeding against the non-debtor defendants in subsequent lawsuits and continuing the motion for a "comfort order" to December 12, 2023 [Docket No. 452]. On March 19, 2024, the Bankruptcy Court held a status conference regarding OCWD's motion for relief from the automatic stay, ultimately deciding to adjourn the matter until May 15, 2024. On May 16, 2024, the Bankruptcy Court granted OCWD's motion effective July 30, 2024 [Docket No. 1065].

**I.    The Adversary Proceeding**

On September 7, 2023, the Debtors Filed the *Debtors' Verified Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Successor Liability Claims Against Non-Debtors, (II) Extending the Automatic Stay to Such Claims, (III) Preliminarily Enjoining Such Claims, and (IV) Declaring that Successor Liability Claims Are Property of the Debtors' Estates* [Docket No. 464, Adv. Docket No. 1] (the "Adversary Complaint") against Brenntag, all known plaintiffs with talc claims pending against the Debtors and/or Brenntag, and certain John and Jane Doe defendants, seeking:  (i) declaratory judgment that Successor Liability Claims against Brenntag and other protected parties are property of the Debtors' Estates which the Debtors have sole standing to pursue and compromise while these Chapter 11 Cases remain pending and which are subject to the automatic stay provisions set forth in section 362 of the Bankruptcy Code; and (ii) an extension of the automatic stay to, and preliminary injunction of, the commencement, continuation, and settlement of, such claims outside of these Chapter 11 Cases.

On September 8, 2023, the Debtors Filed the Summary Judgment Motion, pursuant to which the Debtors sought summary judgment on Counts I (seeking a declaration that successor liability claims are subject to the automatic stay), II (seeking to extend the automatic stay to such claims to the extent the Bankruptcy Court determined the automatic stay is inapplicable), and IV (seeking a declaration that successor liability claims are property of the Debtors' estates) of the Adversary Complaint. That same day, the Debtors also Filed the *Debtors' Motion for an Order Preliminarily Enjoining Certain Actions Against Non-Debtors* [Adv. Docket No. 2] (the "Preliminary Injunction Motion"), pursuant to which the Debtors sought to preliminarily enjoin the commencement, continuation, and settlement of Successor Liability Claims while these Chapter 11 Cases are pending, and the *Debtors' Motion for Approval of Service Procedures for Summons, Complaint, and Other Initial Pleadings* [Adv. Docket No. 5]

(the "Service Procedures Motion"), pursuant to which the Debtors sought authority to serve the Adversary Complaint, summons, Summary Judgment Motion, and Preliminary Injunction Motion on the individual talc claimant defendants through their counsel.

On September 18, 2023, the Committee filed an objection to the Service Procedures Motion [Adv. Docket No. 21]. On September 19, 2023, the Debtors filed a reply to the Committee's objection to the Service Procedures Motion [Adv. Docket No. 22]. The Bankruptcy Court granted the Service Procedures Motion by order dated September 21, 2023 [Adv. Docket No. 27] (the "Service Procedures Order").

On September 19, 2023, the Committee Filed the *Motion of the Official Committee of Talc Claimants for Entry of Case Management Order* [Adv. Docket No. 24], pursuant to which the Committee sought approval of, among other things, a lengthy discovery schedule in connection with the Bankruptcy Court's adjudication of the Summary Judgment Motion and Preliminary Injunction Motion. On September 28, 2023, the Debtors Filed the *Debtors' Objection to Motion of the Official Committee of Talc Claimants for Entry of Case Management Order* [Adv. Docket No. 35], arguing that extensive discovery was not necessary for the Bankruptcy Court to resolve the predominantly legal question of ownership of Successor Liability Claims posed by the Adversary Proceeding. On October 2, 2023, the Committee Filed a reply [Adv. Docket No. 37], arguing that the discovery sought is necessary to investigate the facts surrounding the Debtors' requests for declaratory and injunctive relief. On October 12, 2023, following multiple hearings and iterations of a case management order, the Bankruptcy Court entered the Case Management Order for the Adversary Proceeding [Adv. Docket No. 52], which continued the hearing on the Preliminary Injunction Motion and the Summary Judgment Motion with respect to Count II and scheduled a hearing to consider the Summary Judgment Motion solely with respect to Counts I and IV for December 5, 2023.

On October 31, 2023, the Debtors Filed the *Debtors' Motion for Entry of an Order: (I) Temporarily Enjoining Certain Actions Against Non-Debtors; and (II) Approving Procedures for Seeking Extensions of Temporary Restraining Order* [Adv. Docket No. 61]. On November 22, 2023, the Bankruptcy Court granted the *Temporary Restraining Order* [Adv. Docket No. 89] (the "Temporary Restraining Order") and issued a letter opinion [Adv. Docket No. 88].[13]

On November 15, 2023, the Bankruptcy Court entered the *Order (I) Appointing Hon. Robert E. Gerber (Ret.) as Mediator to Mediate Adversary Proceeding-, Plan-, and Confirmation-Related Matters; (II) Referring Such Matters to Mediation; (III) Directing the Mediation Parties to Participate in the Mediation; and (IV) Granting Related Relief* [Docket No. 654, Adv. Docket No. 72] (the "Mediation Order"). By its terms, the Mediation Order appointed the Honorable Robert E. Gerber (Ret.) as mediator in an attempt to resolve the Adversary Proceeding and Plan-related issues.

On November 22, 2023, OCWD Filed a brief in opposition to the Summary Judgment Motion, arguing that (i) the Debtors are not entitled to the requested relief, (ii) any order granting the Summary Judgment Motion should expressly preserve certain non-Debtors' indemnification obligations arising out of the 2004 Transaction and 2007 Transaction, (iii) certain Successor Liability Claims arising under California law are not property of the Debtors' Estates, and (iv) in the event the Bankruptcy Court determines that Successor Liability Claims are property of the Debtors' Estates, the Bankruptcy Court should authorize creditors to bring a derivative suit.

Also on November 22, 2023, the Committee Filed a brief in opposition to the Summary Judgment Motion [Adv. Docket No. 90] arguing, among other things, that (i) Successor Liability Claims premised on the product-line theory are not property of the Debtors' Estates, (ii) the Debtors failed to satisfy their evidentiary burden with respect to their requests for declaratory relief, (iii) genuine issues of material fact preclude summary judgment in favor of the Debtors, and (iv) the Bankruptcy Court should refuse to issue the requested declaratory judgment in its discretion. The Committee also Filed *The Official Committee of Talc Claimants' Motion to Strike Hearsay and Other Inadmissible Testimony in the First Day Declaration and the Declaration of Mohsin Y. Meghji* [Adv. Docket No. 91] seeking to strike certain testimony made in support of the Summary Judgment Motion.

---

[13]    During the course of the Adversary Proceeding, the Debtors sought and obtained nine extensions of the Temporary Restraining Order through and including September 18, 2024. *See* [Adv. Proc. Docket Nos. 112, 118, 121, 129, 133, 139, 147, 153, 157, 172, 190, 206, 210, 218, 226, 237, 250, 254, 288].

On November 29, 2023, the Debtors Filed the *Debtors' Reply in Support of Motion for Summary Judgment as to Counts I and IV of the Complaint and in Opposition to Tort Claimants' Committee's Motion to Strike* [Adv. Docket No. 99] and the *Debtors' Reply to Creditor Orange County Water District's Memorandum of Law in Opposition to Debtors' Motion for Summary Judgment with Respect to Counts I, II, and IV of the Complaint* [Adv. Docket No. 100], pursuant to which the Debtors responded to the arguments made in the Committee's and OCWD's opposition briefs.  On December 1, 2023, the Committee Filed *The Official Committee of Talc Claimants' Reply in Support of its Motion to Strike Hearsay and Other Inadmissible Testimony in the First Day Declaration and the Declaration of Mohsin Y. Meghji* [Adv. Docket No. 102].  On December 6, 2023, the Future Claimants' Representative Filed a statement opposing the Debtors' request for declaratory relief [Adv. Docket No. 109].

The Bankruptcy Court held oral argument on the Summary Judgment Motion solely with respect to Counts I and IV of the Adversary Complaint on December 5, 2023, following which the Bankruptcy Court indicated its intent to reserve decision pending the outcome of the Mediation.

On February 5, 2024, the Honorable Robert E. Gerber (Ret.) Filed his *Interim Report of Mediator* [Docket No. 814] regarding the outcome of the initial mediation session.

On June 2, 2024, the Debtors Filed a letter with the Bankruptcy Court requesting that the Bankruptcy Court issues its decision on the Summary Judgment Motion as soon as practicable.  [Adv. Docket No. 214] (the "Summary Judgment Request").  On June 7, 2024, the Committee filed a notice of additional facts regarding the pending summary judgment decision [Adv. Docket No. 215] (the "Notice of Additional Facts").  On or around June 9, 2024, the Committee and the Future Claimants' Representative both requested the Bankruptcy Court decline to decide the Summary Judgment Motion and declare the mediation terminated.  [Docket Nos. 1114 and 1115] (collectively, the "Mediation Letters").  On June 11, 2024, the Honorable Robert E. Gerber (Ret.) Filed his *Interim Report of Mediator (#2)* [Docket No. 1121] stating there was no reasonable likelihood of a deal between the Mediation Parties in the near term.  On June 16, 2024, the Debtors responded to the Notice of Additional Facts and Mediation Letters and reiterated their request for the Bankruptcy Court to decide the Summary Judgment Motion.  [Adv. Docket No. 221].

On June 17, 2024, the Bankruptcy Court held a status conference regarding the Summary Judgment Request and the Mediation Letters, during which the Bankruptcy Court requested additional briefing regarding the Summary Judgment Motion.  On July 1, 2024, the Debtors, the Committee, and the Future Claimants' Representative Filed their supplemental briefs regarding the Summary Judgment Motion [Docket No. 1195; Adv. Docket Nos. 232 and 233].  On July 15, 2024, the Committee and the Future Claimants' Representative Filed responses to the Debtors' supplemental brief regarding the Summary Judgment Motion [Docket No. 1222; Adv. Docket No. 242], and the Debtors Filed a response to the Committee's and the Future Claimants' Representatives supplemental briefs [Adv. Docket No. 241].

On August 13, 2024, the Bankruptcy Court issued the *Memorandum Decision* granting the Summary Judgment Motion as to Counts I and IV of the Adversary Proceeding [Adv. Docket No. 268] and declaring that Successor Liability Claims constitute property of the Debtors' Estates.  On August 28, 2024, the Bankruptcy Court entered the *Order Granting Summary Judgment in Favor of the Debtors on Counts I and IV of the Complaint* [Adv. Docket No. 292].  On September 11, 2024, the Committee Filed a notice of appeal with respect to the Summary Judgment Order [Adv. Docket No. 297].  On September 24, 2024, the relevant parties Filed the Joint Certification [Adv. Docket No. 329] for a direct appeal to the Third Circuit.  The Bankruptcy Court granted the Joint Certification by order dated September 25, 2024 [Adv. Docket No. 335].  The appeal is currently pending.

On September 11, 2024, the Debtors Filed the *Debtors' Motion for Leave to File an Amended Complaint* [Adv. Docket No. 298] (the "Motion to Amend"), requesting permission to amend Counts II and III of the Adversary Complaint to seek to extend the automatic stay to and/or preliminarily enjoin direct claims against Brenntag that contain allegations of pre-2004 talc/asbestos exposure and therefore implicate the Debtors' conduct, operations, and potential indemnification obligations to Brenntag, or which do not provide sufficient information in the underlying complaint for the Debtors to identify the year in which plaintiff was first allegedly exposed to talc/asbestos and therefore make a reasonable determination as to the impact on the Debtors' Estates pending the entry of (a) a final, non-appealable Order granting the Estate Claims Settlement Motion or (b) an Order denying the Estate Claims Settlement Motion.  On September 12, 2024, the Debtors Filed the *Debtors' Motion for (I) an Order Extending the*

*Automatic Stay to And/or Preliminarily Enjoining Certain Actions Against Non-Debtors Pending Entry of a Final, Non Appealable Order Regarding the Debtors' Proposed Settlement and (II) a Temporary Restraining Order Enjoining Such Claims Pending the Court's Decision on the Debtors' Request for Such Injunctive Relief* [Adv. Docket No. 299] (the "PI Motion") seeking the extension of the automatic stay and preliminary injunction described above, as well as the *Debtors' Motion to Extend Existing Service Procedures to Additional Talc Claimants* [Adv. Docket No, 300] (the "Service Procedures Extension Motion") seeking to extend the relief granted in the Service Procedures Order to all additional talc-claimant defendants identified since the Adversary Complaint was Filed.

The Bankruptcy Court granted the Motion to Amend and Service Procedures Extension Motion by Orders dated September 19, 2024 [Adv. Docket Nos. 319, 320]. Also on that date, the Debtors filed an amended complaint [Adv. Docket No. 321]. On October 24, 2024, the Court issued the *Memorandum Opinion* [Adv. Docket No. 360] granting the PI Motion except as to the plaintiff's claims against Brenntag in the action styled *Sneider v. Avon Products Inc., et al.*, Case No. 23STCV25951 (Cal. Super. Ct.).

**J.     Estate Claims Settlement**

After the Committee and the Future Claimants' Representative requested that the Bankruptcy Court declare the Mediation terminated [Docket Nos. 1114 and 1115], the Debtors' disinterested directors and their advisors commenced discussions with the Settlement Parties and their advisors regarding the possibility of settling some or all of the estate causes of actions held by the Debtors against the Settlement Parties. Over the ensuing months, the Debtors and the Settlement Parties exchanged multiple settlement offers and drafts of settlement documentation.

On September 3, 2024, the Debtors Filed the Estate Claims Settlement Motion seeking approval of the Estate Claims Settlement. As part of the Estate Claims Settlement, NICO agreed to make the Settlement Payment, which will be used to fund recoveries in these Chapter 11 Cases and the Settlement Parties agreed to release all Causes of Action against the Debtors or the Wind-Down Debtors arising out of, in connection with, or relating to any matters occurring before the Estate Claims Settlement Agreement Effective Date. In exchange, the Debtors agreed to release all claims and causes of action against the Settlement Parties, including Successor Liability Claims.

On August 30, 2024, the Committee and the Future Claimants' Representative Filed the *Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1293].

**K.     DIP Financing**

After nearly a year and a half in bankruptcy, the Debtors were faced with the stark reality of diminishing assets and strained liquidity. Given the Debtors' fixed assets and lack of business operations, the Debtors' liquidity had been rapidly depleted throughout these Chapter 11 Cases, making it apparent that the Debtors would require additional financing to seek approval of and effectuate the Estate Claims Settlement and pursue confirmation and consummation of a plan that would maximize value for all of their stakeholders and bring these long-pending Chapter 11 Cases to a conclusion.

On September 3, 2024, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Claims Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 1302] (the "DIP Motion").

As set forth in greater detail in the DIP Motion and related declarations, the Debtors contacted twenty potential third-party financing sources, including well-known commercial banks and specialty lenders, in addition to leveraging ongoing settlement negotiations with the Settlement Parties in an effort to obtain critical liquidity by monetizing otherwise illiquid Estate Causes of Action. As part of the Estate Claims Settlement, the Debtors negotiated for an up to $50 million senior secured multiple draw term loan credit facility which included none of the fees typically associated with third-party lender debtor-in-possession financing transactions and carries a below-market interest rate that is payable in-kind in arrears (and forgiven upon the Debtors' receipt of the Settlement Contribution). No party,

other than NICO, provided an alternative financing proposal.  On October 15, 2024, the Bankruptcy Court entered an order granting the DIP Motion and authorizing the Debtors to enter into the DIP Facility.  [Docket No. 1410].

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.**

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or require a re-solicitation of the votes of Holders of Claims in such Impaired Class.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other Claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or are not met, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Claims as those proposed in the Plan, and the Debtors do not believe that any such alternative path exists or is likely to exist that would be more beneficial to the Estate or Holders of Claims and Interests than the Plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.

A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the Solicitation and Voting Procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Solicitation and Voting Procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  Further, because Claims in Class A4 shall be canceled, no payment or distribution shall be made on account of such Claims, and Holders of Class A4 Claims shall be deemed to reject the Plan, a Holder of a Class A4 Claim may challenge confirmation of the Plan.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear what, if anything, Holders of Allowed Interests and Allowed Claims would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the limitations imposed by applicable law, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class of Allowed Claims or Allowed Interests, including Holders of Tort Claims and Environmental Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan; *provided* that such less favorable treatment could require the Plan as modified to be submitted to a separate vote by any Class so impacted.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.  Further, as of the date hereof, the Committee and the Future Claimants' Representative do not support the Plan and, therefore, there can be no assurances as to how the Bankruptcy Court may rule on any objections to Confirmation that may be Filed by the Committee or the Future Claimants' Representative or any modifications that may be required to resolve the Committee's or the Future Claimants' Representatives concerns.

### 5.  Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan would satisfy these requirements if necessary, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

Further, if discussions with the Committee and the Future Claimants' Representative are unsuccessful and the Committee or the Future Claimants' Representative does not support the Plan, there can be no assurances as to how the Bankruptcy Court may rule on a request for Confirmation of the Plan on a nonconsensual basis with respect to the Committee or Future Claimants' Representative.

### 6.  Continued Risk upon Confirmation

In addition, at the outset of chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a competing plan.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.  The Debtors' statutory exclusivity period to file a chapter 11 plan and solicit acceptances thereof expires on October 28, 2024 and December 26, 2024, respectively.  *See Order (I) Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and (II) Granting Related Relief* [Docket No. 1193].

### 7.  The Committee and/or the Future Claimant's Representative May be Granted Derivative Standing to Pursue Certain Claims on Behalf of the Debtors' Estates

On August 30, 2024, the Committee and the Future Claimants' Representative Filed the *Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action*

*on Behalf of the Debtors' Estates* [Docket No. 1293], which seeks standing to pursue claims that would otherwise be resolved by the Estate Claims Settlement. If the Committee and/or the Future Claimants' Representative are granted standing to pursue such claims, the Estate Claim Settlement would be terminated and NICO will have no obligation to pay the Settlement Payment.

8.      **These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors, including Holders with General Unsecured Claims, Tort Claims, Environmental Claims, Indirect Environmental Claims, and Convenience Claims than those provided for in a chapter 11 plan because (i) NICO may not make any Settlement Payment to a chapter 7 estate, (ii) there would be additional administrative expenses involved in the appointment of a chapter 7 trustee, and (iii) additional expenses and Claims, some of which would be entitled to priority, would be generated during the liquidation.

9.      **The Chapter 11 Cases Could Result in a "Structured Dismissal"**

If the Confirmation or Consummation of the Plan does not occur, (a) the Plan shall be null and void in all respects other than as set forth in the Plan, (b) the Debtors could file a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (c) nothing contained in the Plan or this Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

10.     **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

11.     **Risk of Non-Occurrence of the Effective Date**

There can be no assurance as to the timing of, or whether, the Effective Date will, in fact, occur.

12.     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

13.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens that may otherwise be asserted against the Debtor, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties, including the Settlement Parties, may withdraw their support for the Plan, and/or NICO may withdraw its commitment to fund Distributions under the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the successful implementation and effectuation of the Plan because the Released Parties and Exculpated Parties have made or will make significant contributions to the Distributions provided under the Plan, but only if they receive the full benefit of the Plan's release, exculpation, and injunction provisions.  The Plan's release, exculpation, and injunction provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

14.     **The Total Amount of Allowed General Unsecured Claims, Allowed Tort Claims, Allowed Environmental Claims, Allowed Indirect Environmental Claims, and Allowed Convenience Claims May Be Higher Than Anticipated by the Debtors**

With respect to a Holder of Allowed General Unsecured Claims, Allowed Tort Claims, Allowed Environmental Claims, Allowed Indirect Environmental Claims, and Allowed Convenience Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated, which would result in a lower recovery to Holders of Allowed General Unsecured Claims, Allowed Tort Claims, Allowed Environmental Claims, and Allowed Indirect Environmental Claims.

15.     **The Total Amount of Allowed Administrative and Priority Claims May Be Higher than Anticipated by the Debtors.**

Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

B.     **Disclosure Statement Disclaimer**

1.     **The Financial Information Contained in this Disclosure Statement Has Not Been Audited**

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.     **Information Contained in this Disclosure Statement Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.     **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

*This Disclosure Statement does not constitute legal or tax advice to you*.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other

matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**4.      No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

**5.      Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular Cause of Action or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

**6.      No Waiver of Right to Object to Claim or Interest**

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

**7.      Information was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

**8.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**9.      No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## X.        CONFIRMATION OF THE PLAN

### A.        The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.  The Confirmation Hearing is currently scheduled for March 3, 2025 at [●]:00 [●].m., prevailing Eastern Time.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.  Further, a condition precedent to the Effective Date that must be satisfied, unless waived in accordance with Article X.B of the Plan, is that the Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered by the Bankruptcy Court and affirmed by the District Court or issued by the District Court.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to confirmation.  The deadline to object to confirmation of the Plan is currently February 24, 2025, at 4:00 p.m. (prevailing Eastern Time).  An objection to confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Bankruptcy Court's order so that the objection is actually received on or before the deadline to File such objections as set forth therein.

### B.        Purpose of the Confirmation Hearing

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

### C.        Confirmation Requirements

Among the requirements for confirmation of a plan pursuant to section 1129 of the Bankruptcy Code are: (i) the plan is accepted by all impaired classes of claims or interests,[14] or if rejected by an impaired class, the plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired class; (ii) the plan is feasible; and (iii) the plan is in the "best interests" of holders of claims or interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

---

[14]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

D.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such chapter 11 plan).

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

E.      **Conditions Precedent to the Effective Date**

The following are conditions precedent to occurrence of the Effective Date of the Plan that must be satisfied, unless waived in accordance with Article X.B of the Plan:

(a)      The Confirmation Order shall have been duly entered and in full force and effect;

(b)      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Wind-Down;

(c)      The final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Plan, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan;

(d)      The Estate Claims Settlement Order and Successor Liability Claims Order each shall have become final and non-appealable;

(e)      The Debtors shall have received the final contribution of the Estate Claims Settlement; and

(f)      The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.C of the Plan.

F.      **Waiver of Conditions**

Except as otherwise specified in the Plan, any one or more of the conditions to Consummation set forth in Article X of the Plan may be waived only if waived in writing by the Plan Proponents, with the written consent of NICO (email being sufficient) and written consent of Brenntag with respect to the condition precedent set forth in Article X.A.1.(d) of the Plan (email being sufficient), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

G.      **Effect of Failure of Conditions**

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims or Interests by the Debtors,; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

H.      **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

I.        **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each Impaired Class of Claims or Interests accept the plan.  A Class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a Class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that actually vote on the Plan cast their ballots in favor of acceptance.

Pursuant to <u>Article III</u> of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

J.        **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one Impaired Class of Claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an Impaired Class of Claims' rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.        **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of similarly situated creditors differently without unfairly discriminating against either class.

2.        **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receives more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Allowed Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### K.    Best Interests of Creditors/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Seventeen Classes of Claim or Interests (other than Intercompany Claims) are Impaired under the Plan: General Unsecured Claims (Classes B1, C1, D1, and E1), Tort Claims (Classes B2, C2, D2, and E2), Environmental Claims and Indirect Environmental Claims (Classes B3, C3, D3, and E3), Convenience Claims (Classes B4, C4, D4, and E4), and Debtors' Interests (Class A4). Holders of such Claims would likely receive no distribution if the Debtors were liquidated under chapter 7 of the Bankruptcy Code for the reasons explained below.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. To calculate the probable distribution to holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the Debtors' assets, if any, by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of any secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both chapter 7 cases and these Chapter 11 Cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in these Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in chapter 7 cases, and litigation costs. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). To the extent a bar date has been set prior to the Chapter 11 Cases being converted to cases under chapter 7, the conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

Further, as reflected in the Liquidation Analysis, the Debtors expect that there will be substantially more assets available to pay Holders of Claims under the Plan than if there were no Plan because, among reasons, the Settlement Proceeds would not be available outside of the Plan. The Plan is the result of an extensively negotiated settlement which avoids costly and time-consuming litigation that would deplete funds available for creditors. Further, as a non-operating entity, the Debtors do not own any material assets that could be sold to provide distribution to Holders of any Claim against or Interests in the Debtors, including any General Unsecured Claim, Tort Claim, Environmental Claim, Indirect Environmental Claim, or Convenience Claim. Accordingly, the Debtors believe there would likely be no distributable value to any Claim against or Interest in the Debtors in the event of a chapter 7 liquidation. For these reasons, the Plan provides greater or equal recoveries to the Debtors' stakeholders, including all Holders of General Unsecured Claims, Tort Claims, Environmental Claims, Indirect Environmental Claims, and Convenience Claims than would be realized in a chapter 7 liquidation.

### L.    Additional Information Regarding this Disclosure Statement and Plan

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, by emailing WhittakerInquiries@stretto.com, or by calling 833-653-6464 (toll free) or +1 303-802-1420 (international).

Copies of the Plan and the Disclosure Statement: (i) are available on the Debtors' restructuring website, free of charge, at https://cases.stretto.com/whittaker/; (ii) may be obtained upon request of the Debtors' counsel at the address specified above; (iii) are on file with the Clerk of the Bankruptcy Court, Clarkson S. Fisher United States Courthouse, 402 East State Street, Trenton, New Jersey 08608, where they are available for review between the hours

of 9:00 a.m. to 4:00 p.m., prevailing Eastern Time; and (iv) are available for inspection for a fee on PACER at https://ecf.njb.uscourts.gov/.

## XI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to certain Holders. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Changes in these rules or new interpretations of the rules with retroactive effect could significantly affect the U.S. federal income tax consequences described herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors have not requested, and do not intend to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, Persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons using a mark-to-market method of accounting, Persons who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims or Interests in a single Class and holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year, and that various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims against and Interests in the Debtors described below also may vary depending on the nature of any Wind-Down Transactions that the Debtors and/or Wind-Down Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (a) an individual who is a citizen or resident of the United States; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning

of section 7701(a)(30) of the IRC.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

This discussion does not address any tax issues relevant to a Non-U.S. Holder's receiving consideration under the Plan.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.       **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

Pursuant to the Plan and in accordance with the GUC Trust Agreement, Environmental Remediation Trust Agreement, and the Tort Claims Trust Agreement, on the Effective Date the Debtors or Wind-Down Debtors, as applicable, will form the GUC Trust, the Environmental Remediation Trust, and the Tort Claims Trust, and the Debtors or Wind-Down Debtors, as applicable, will transfer the GUC Trust Assets to the GUC Trust, the Environmental Remediation Trust Assets to the Environmental Remediation Trust, and the Tort Claims Trust Assets to the Tort Claims Trust.  In general, and subject to certain exceptions (including if any such property so-transferred is the transferor's own debt obligation) the transfer by the Debtors or Wind-Down Debtors, as applicable, of such property to each such trust will be treated as a sale or exchange for the fair market value of such property under section 1001 of the IRC.  It is not yet possible to determine whether such transactions are in the aggregate expected to result in a cash tax liability.

B.       **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the Wind-Down Transactions.

1.       **Consequences to Holders of Class B1, C1, D1, and E1 General Unsecured Claims**

Pursuant to the Plan, each Class B1, Class C1, Class D1, and Class E1 General Unsecured Claim shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the GUC Trust Agreement.  The sole recourse of a Holder of any such General Unsecured Claim shall be to the GUC Trust.

Such Holder should recognize gain or loss equal to the difference between (a) the fair market value of its beneficial interests in the GUC Trust received (subject to "Accrued Interest" discussed below) and (b) such Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

### a.      GUC Trust

Although not free from doubt, and unless otherwise required by applicable law, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, the GUC Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the IRC. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, it is intended that the GUC Trust will be structured with the intention of generally complying with such general criteria.  The Debtors intend to take the position that this treatment applies to the extent reasonably practicable.  In such case, any beneficiaries of the GUC Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the GUC Trust and then contributed such undivided interest to the GUC Trust.  If this treatment applies, the person or persons responsible for administering the GUC Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the GUC Trust pursuant to the Plan and not unduly prolong its duration.  The GUC Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the governing documents for the GUC Trust.

Other than with respect to any assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to beneficiaries of the GUC Trust prior to the contribution of such assets to the GUC Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

Other than with respect to any assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the GUC Trust with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the GUC Trust, even if no distributions are made.  Allocations of taxable income with respect to the GUC Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the GUC Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the GUC Trust.  Similarly, taxable losses of the GUC Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining GUC Trust Assets.  The tax book value of the GUC Trust Assets shall equal their fair market value on the date of the transfer of the GUC Trust Assets to the GUC Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in the GUC Trust, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder.  Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the GUC Trust and not as income or loss with respect to such beneficiary's applicable Claim.  In the event any tax is imposed on the GUC Trust, the person or persons responsible for administering the GUC Trust shall be responsible for payment, solely out of the assets of the GUC Trust, of any such taxes imposed on the GUC Trust.

The person or persons responsible for administering the GUC Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income.  The person or persons responsible for administering the GUC Trust will, unless otherwise required by applicable law, file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the GUC Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations.  As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the GUC Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of

income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account, and such account will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets in such account (including any gain recognized upon the disposition of such assets).  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

Notwithstanding the foregoing, if the GUC Trust were characterized as a "qualified settlement fund," which treatment is mandatory (rather than elective) for any fund that meets the requirements of a "qualified settlement fund," the tax treatment of the GUC Trust would instead be as set forth below for the Environmental Remediation Trust and the Tort Claims Trust.

**2.      Consequences to Holders of Class B2, C2, D2, and E2 Tort Claims, and Holders of B3, C3, D3, and E3 Environmental Claims and Indirect Environmental Claims**

Pursuant to the Plan, each Class B2, C2, D2, and E2 Claim shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Tort Claims Trust Agreement and the Tort Claims Trust Distribution Procedures.  The sole recourse of a Holder of any such Tort Claim shall be to the Tort Claims Trust.

Pursuant to the Plan, each Class B3, C3, D3, and E3 Claim shall be resolved and receive Distributions, if any, in accordance with the terms, provisions, and procedures of the Plan and the Environmental Remediation Trust Agreement.  The sole recourse of a Holder of any such Environmental Claim or Indirect Environmental Claim shall be to the Environmental Remediation Trust.

If, as the Debtors anticipate and as is further described below, each of the Environmental Remediation Trust and the Torts Claims Trust qualifies as a qualified settlement fund, the formation and funding of the Tort Claims Trust is generally not expected to have a direct tax effect on the beneficiaries of the Tort Claims Trust and the formation and funding of the Environmental Remediation Trust is generally not expected to have a direct tax effect on the beneficiaries of the Environmental Remediation Trust.

**a.      Environmental Remediation Trust and Tort Claims Trust**

Treasury Regulations promulgated under Section 468B of the IRC provide that a fund, account, or trust will be a "qualified settlement fund" if three conditions are met.  First, the fund, account, or trust must be established pursuant to an order of or be approved by a governmental authority, including a court, and must be subject to the continuing jurisdiction of that governmental authority.  A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review or revision.  Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort, breach of contract, violation of law, or under the Comprehensive  Environmental  Response,  Compensation  and  Liability  Act  of  1980  (hereinafter  referred  to as CERCLA), as amended, 42 U.S.C. 9601 *et seq.*  Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor and related persons.  Qualified settlement fund treatment for funds that meet its requirements is mandatory,

not elective.  Based upon the foregoing, the Debtors anticipate that each of the Environmental Remediation Trust and the Torts Claims Trust will be a qualified settlement fund (*i.e.*, two separate qualified settlement funds).

A qualified settlement fund is treated as a separate taxable entity and is taxable at the highest tax rate applicable to trusts and estates on its taxable income.  The fund takes a fair market value basis in property contributed to it, and such contributions are not taxable as income to it.  Very generally, a qualified settlement fund gets no deduction for distributions to its beneficiaries and any distributions of property by it to its beneficiaries are treated as a taxable sale of such property by the fund.  The deductions that a qualified settlement fund may take in computing its income are subject to limitation.

> **b.**     **Payments made by the Environmental Remediation Trust and Tort Claims Trust**

The tax consequences of the Plan and payments received by Holders of Tort Claims, Environmental Claims or Indirect Environmental Claims will depend on the individual nature of each such Claim and the circumstances and facts applicable to such Holder at the time each such payment is made.

Generally, to the extent that payments from the Environmental Remediation Trust to a beneficiary thereof or from the Tort Claims Trust to a beneficiary thereof constitute damages received by such Holder on account of physical injuries or physical sickness, such payments should not constitute gross income to such recipients under Section 104 of the IRC, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the IRC for a prior taxable year (in which case, such payments are taxable as ordinary income to such Holder).  To the extent that any payments from the Environmental Remediation Trust to a beneficiary thereof or from the Tort Claims Trust to a beneficiary thereof constitute damages received by such Holder because of claims other than physical injuries (such as lost wages) or received interest (or any other amounts not excludable from income under Section 104 of the IRC), such payments will generally be includible in the gross income of such Holders.

Each such Holder is urged to consult with its own tax advisors regarding the tax consequences of receiving a payment from the Environmental Remediation Trust or the Tort Claims Trust.

> **3.**     **Consequences to Holders of Class B4, C4, D4, and E4 Convenience Claim**

Pursuant to the Plan, in full and final satisfaction, compromise, settlement, and release of its Convenience Claim, each Holder of a Class B4, C4, D4, or E4 Convenience Claim shall receive an amount of cash in respect of such Convenience Claim.  The tax consequences of the Plan and payments received by such Holders will depend on the individual nature of each such Claim and the circumstances and facts applicable to such Holder at the time each such payment is made, including considerations similar to those described above for whether payments received Holders of Tort Claims, Environmental Claims or Indirect Environmental Claims constitute gross income.

To the extent that a Holder of such a Convenience Claim held such Claim as a capital asset and the amount is includible in gross income, the Holder should recognize capital gain or loss equal to the difference between (a) the amount of Cash received that is not allocable to accrued interest and (b) the Holder's tax basis in the Convenience Claim surrendered therefor by the Holder.  Such gain or loss should be (subject to the "market discount rules" described below) long-term capital gain or loss if the Holder had a holding period in the Convenience Claim of more than one year.  To the extent that a portion of the Cash received in exchange for such Claim is allocable to accrued but untaxed interest, the Holder may recognize ordinary income (as discussed in greater detail below).

> **4.**     **Accrued Interest**

As applicable, to the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such

Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 5.    Market Discount

As applicable, in the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim. Any such market discount is generally the excess of (a) (i) the "revised issue price" of such Claim if the Claim is issued with OID or (ii) the stated redemption price at maturity of such Claim if the Claim is not issued with OID over (b) such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory de minimis amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Wind-Down Transactions.

### 6.    Limitation on Use of Capital Losses

A U.S. Holder who recognizes capital losses will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 7.    Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their own tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### C.    Information Reporting and Backup Withholding

The Debtors, Wind-Down Debtors, GUC Trust, Environmental Remediation Trust, and Tort Claims Trust, and any other applicable withholding agents, will withhold all amounts required by law to be withheld from payments

of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.  In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommends that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: October 28, 2024                           WHITTAKER, CLARK & DANIELS, INC.


                                                  /s/ Mohsin Y. Meghji
                                                  _____
                                                  Mohsin Y. Meghji

                                                  Chief Restructuring Officer
                                                  Whittaker, Clark & Daniels, Inc.

## EXHIBIT A

**Chapter 11 Plan**

[Filed Separately]

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

[TO COME]