**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com

-and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2400
chad.husnick@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OBJECTION TO**
**THE JOINT MOTION OF THE OFFICIAL COMMITTEE OF TALC**
**CLAIMANTS AND THE FUTURE CLAIMANTS' REPRESENTATIVE FOR**
**ENTRY OF AN ORDER GRANTING STANDING AND AUTHORIZING THE**
**COMMITTEE AND THE FCR TO COMMENCE, PROSECUTE, AND SETTLE**
**CERTAIN CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are:  Whittaker, Clark & Daniels, Inc. (4760); Brilliant National Services, Inc. (2113); L. A. Terminals, Inc. (6800); and Soco West, Inc. (3400).  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 100 First Stamford Place, Stamford, Connecticut 06902.

## <u>TABLE OF CONTENTS</u>

**Table of Authorities**..................................................................................................................iii

**Preliminary Statement** ................................................................................................................1

**Background** ....................................................................................................................................5

      A.    <u>April–May 2023</u>:  The Disinterested Directors Join the Debtors' Boards, Commence These Bankruptcy Cases, and Begin Investigating the Debtors' Estate Causes of Action. ......................................................................................5

      B.    <u>May 2023</u>:  Immediately Following Its Appointment, the Committee Argues That WCD's Bankruptcy Petition Is Unauthorized. ...................................7

      C.    <u>September–November 2023</u>:  The Debtors Commence an Adversary Proceeding to Confirm Their Ownership of Potentially Valuable Estate Causes of Action and Begin the Process of Valuing Them. ...................................7

      D.    <u>November 2023–June 2024</u>:  The Parties Engage in Mediation and Agree to Delay the Summary Judgment Ruling in the Adversary Proceeding. .................8

      E.    <u>June 2024</u>:  The Mediation Breaks Down and the Debtors Request a Summary Judgment Ruling in the Adversary Proceeding......................................9

      F.    <u>June 19, 2024–August 30, 2024</u>:  The Debtors and Contributing Parties Engage in Negotiations Over a Potential Settlement of Estate Causes of Action and the Court Issues Its Summary Judgment Ruling. ................................10

      G.    <u>August 30, 2024–September 3, 2024</u>:  The Disinterested Directors Approve the Finalized Settlement Agreement; the Committee and FCR File the Standing Motion; the Debtors File the Settlement Motion....................................12

      H.    The Indemnification Disputes Among the Contributing Parties. ..........................13

**Argument**....................................................................................................................................14

**I.**      **Legal Standard**...............................................................................................................14

**II.**      **The Settlement Moots the Standing Motion**...................................................................15

**III.**      **Standing Must Be Denied Because the Debtors Have Pursued and Settled the Estate Causes of Action Raised in the Standing Motion, Not Refused to Pursue Them.** .................................................................................................................16

**IV.**      **The Committee and FCR Fail to Establish Any "Disabling" or "Irreconcilable" Conflicts That Justify Their Failure to Make a Demand on the Debtors or That Would Otherwise Warrant Granting Standing.** ........................19

A.    At All Times in These Bankruptcy Cases, the Debtors Have Had
      Disinterested Directors with Disinterested Legal and Financial Advisors. ...........20

B.    The Committee and FCR Have No Evidence That the Debtors Are
      "Beholden" to NICO ..............................................................................................23

C.    The Debtors' Disinterested Directors and Counsel Are Fully Capable of
      Pursuing the Estate Causes of Action. ..................................................................26

**V.     Any Request for Standing in the Event the Settlement Motion Is Denied Is
         Unripe. .................................................................................................................29**

**VI.    The Committee and FCR Should Not Be Granted Exclusive Settlement
         Authority. ............................................................................................................31**

**VII.   The Proposed Counts Concerning the Contributing Parties' Indemnification
         Obligations Are Either Moot or Unripe. ...............................................................32**

**Conclusion ........................................................................................................................33**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  371 B.R. 660 (S.D.N.Y. 2007) ...................................................................................31

*In re Caesar's Ent. Operating Co.*,
  561 B.R. 457 (Bankr. N.D. Ill. 2016) .......................................................................17

*In re Centaur*,
  2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ...................................................31

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003) ............................................................................5, 15, 21

*In re Cubic Energy, Inc.*,
  587 B.R. 849 (Bankr. D. Del. 2018) .........................................................................30

*In re Diocese of Camden*,
  2022 WL 884242 (Bankr. D.N.J. Mar. 24, 2022)..............................................*passim*

*In re G-I Holdings*,
  313 B.R. 612 (Bankr. D.N.J. 2004) ...............................................................15, 16, 19

*In re Louisiana World Exposition v. Fed. Ins. Co.*,
  858 F.2d 233 (5th Cir. 1988) .....................................................................................23

*In re Manley Toys Ltd.*,
  2020 WL 1580244 (Bankr. D.N.J. Mar. 31, 2020).............................................17, 30

*Scott v. Nat'l Century Fin. Enters. Inc. (In re Balt. Emergency Servs. II, Corp.)*,
  432 F.3d 557 (4th Cir. 2005) .......................................................................................4

*Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*,
  423 F.3d 166 (2d Cir. 2005).................................................................................14, 15

*In re STN Enters., Inc.*,
  779 F.2d 901 (2d Cir. 1985).......................................................................................30

*In re Weyandt*,
  544 F. App'x 107 (3d Cir. 2013) .................................................................................5

*In re Wilton Armetale, Inc.*,
  968 F.3d 273 (3d Cir. 2020).......................................................................................18

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") file this objection (the "Objection") to *The Joint Motion of the Official Committee of Talc Claimants and the Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates* [Dkt. No. 1293] (the "Standing Motion") filed by the official committee of talc claimants (the "Committee") and the future claims representative (the "FCR").[1]

## **PRELIMINARY STATEMENT**

1.      More than two-and-a-half months before the Committee and FCR filed the Standing Motion, the Debtors' Disinterested Directors (as defined herein)—lawyers by training and experienced restructuring professionals with no connections to Brenntag, DB US, or NICO—commenced hard-fought negotiations to explore the possibility of a settlement that would maximize value for the Debtors' estates, including by resolving the same estate causes of action against Brenntag that the Committee and FCR seek standing to pursue.  At every step along the way, the Debtors' Disinterested Directors were advised by experienced legal counsel and mass tort estimation professionals that this Court has held, without objection, are disinterested under section 327 of the Code.  The result (the pending Settlement Agreement) is a significant win for the Debtors' estates and all creditors: in exchange for resolving estate causes of action against the Contributing Parties, the Debtors will receive $535 million in cash from the Contributing Parties and a release of any potential recovery-diluting indemnification claims against the Debtors.

---

[1]     Capitalized terms not defined herein shall have the meaning ascribed to them in the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Dkt. No. 1297] (the "Settlement Motion") or the Standing Motion.  Unless otherwise specified, all references to sections refer to sections of the Bankruptcy Code.

2.      The Standing Motion is moot and should be denied because it does not account for the Debtors' pursuit and settlement of claims against the Contributing Parties.  The repeated assertion that the Debtors took no action to pursue estate causes of action against the Contributing Parties was not only inaccurate on the day the Standing Motion was filed, it was plainly out-of-date when the Settlement Motion was filed the very next business day.  The Settlement Motion necessarily supersedes the Standing Motion, and any continuing arguments for standing (given that the Committee and FCR have not withdrawn or amended the Standing Motion) are necessarily arguments against the Settlement Motion.  The Court need go no further and should deny the Standing Motion as moot.

3.      Even putting aside mootness, the Committee and FCR fail to meet their burden of demonstrating the requirements for obtaining derivative standing.  First, there has been no "refusal" by the Debtors to pursue claims against the Contributing Parties.  A debtor does not need to bring claims to trial, or even file them, to "pursue" them.  While the Settlement Motion makes that painfully obvious—obtaining $535 million in exchange for resolving claims is a substantial "pursuit" of such claims—the Debtors' pursuit was evident months before the Settlement Motion was filed.  Settlement negotiations commenced shortly after a breakdown in the months'-long global mediation among the Debtors, the Committee, the FCR, and the Contributing Parties.  That, in turn, followed the Debtors' efforts to confirm their ownership of any potentially valuable estate causes of action based on successor liability or alter ego theories through the adversary proceeding, which was commenced just a few months after these cases began.  In short, the Debtors worked to secure and pursue all estate causes of action for many months before the Standing Motion, and, through the significant efforts of their Disinterested Directors, finalized the Settlement Agreement

that will bring over half a billion dollars into the Debtors' estates only a few weeks after this Court's summary judgment ruling in the adversary proceeding.

4.      The Committee and FCR could have readily learned that the Debtors had pursued claims against the Contributing Parties if they had simply made a demand on the Debtors prior to filing the Standing Motion, as is required to obtain derivative standing.  Their failure to do so is another, independent reason to deny the Standing Motion out of hand.  The Committee and FCR argue that demand was excused because the Debtors are "hopelessly" and "inherently" conflicted and "beholden" to NICO.  Their arguments fail as a matter of fact and logic.  Even before these bankruptcy cases began, the Debtors had delegated exclusive authority to determine the path forward with respect to any matters involving a potential conflict between the Debtors and NICO (among others) to their Disinterested Directors, Tim Pohl and Paul Aronzon.  The Committee and FCR do not dispute that Mr. Pohl and Mr. Aronzon have no connection to the Debtors' current equity holder (NICO), former equity holder (DB US), or target of the successor liability causes of action (Brenntag).  Mr. Pohl and Mr. Aronzon have received advice in these proceedings from two sets of outside counsel (Cole Schotz and Kirkland) and a financial advisor (M3) that the Court has already found to be disinterested under section 327 of the Code.  Moreover, with respect to the key issue on the value of the estate claims being resolved, Mr. Pohl and Mr. Aronzon drew on the advice and experience of The Brattle Group, a firm with extensive mass torts valuation experience, and yet another disinterested advisor whose retention was approved by this Court.  These facts bear no resemblance to any cited situation where demand has been excused.  The Committee and FCR's "conflicts" arguments are factually mistaken and, at bottom, treat the Debtors' Disinterested Directors and professionals as credulous pawns in a nonexistent plot.  There is no conflict that

justifies the Committee and FCR's failure to make a pre-filing demand.  The Standing Motion should also be denied for failure to meet this threshold requirement.

5.      Given the pending Settlement Motion, a request for standing could only possibly be relevant if that motion is denied.  But any request for standing dependent on that future outcome is unripe for briefing now because it would be based on a hypothetical set of facts.  All parties would have to take the basis for and conclusions of any future ruling by the Court on these contested motions into account.  The Committee and FCR would have to present new arguments on changed facts, and still have far to go to show they have a feasible path forward to pursuing estate causes of action absent settlement.

6.      Additionally, the Committee and FCR's request to demand exclusive authority to settle estate causes of action is legally and factually baseless.  The Debtors lack any conflict that would justify such an extraordinary usurpation of a debtor-in-possession's rights and responsibilities under the Bankruptcy Code.  The Debtors' Disinterested Directors, counsel and advisors have facilitated the Committee and FCR's own investigations—not blocked them.

7.      Lastly, the claims the Standing Motion seeks to bring concerning the indemnification relationships among the Contributing Parties are again moot or unripe.  The previous indemnification dispute between NICO and DB US that led to an arbitration settled since the Standing Motion was filed, without any change in the indemnification obligations between them.  And the Committee and FCR do not point to any other indemnification dispute among the Contributing Parties that relates to the estate causes of action that is anything other than hypothetical.

8.      "[D]erivative standing is the exception rather than the rule." *Scott v. Nat'l Century Fin. Enters. Inc. (In re Balt. Emergency Servs. II, Corp.)*, 432 F.3d 557, 562 (4th Cir. 2005);

*see also In re Weyandt*, 544 F. App'x 107, 110 (3d Cir. 2013) (quoting *Baltimore Emergency Services*).  That is because derivative standing extends the rights of debtors-in-possession to stakeholders with a narrower set of interests—like the Committee and FCR here.  *Balt. Emergency Servs. II*, 432 F.3d at 562.  While derivative standing is an equitable remedy reserved for narrow circumstances "when the Code's envisioned scheme breaks down," these cases have proceeded as contemplated by the Bankruptcy Code.  *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003).  The Debtors marshalled the estates' limited non-litigation assets, investigated potential estate causes of action, sought confirmation of their ownership of those claims, attempted to reach a global mediated resolution of those claims, and ultimately negotiated a half-billion-dollar settlement of estate causes of action against the Contributing Parties for the benefit of all the Debtors' creditors—*all* under the direction of the Debtors' Disinterested Directors and with the advice of disinterested advisors.  There has been no "breakdown" here.  The Court should summarily deny the Standing Motion.

## BACKGROUND

A.    <u>April–May 2023</u>: **The Disinterested Directors Join the Debtors' Boards, Commence These Bankruptcy Cases, and Begin Investigating the Debtors' Estate Causes of Action.**

9.    Between December 2007 and April 2023, the Debtors had boards of directors consisting of three individuals affiliated with NICO.  For that entire period, Mr. Raj Mehta has been one of the Debtors' directors.  On April 8, 2023, the Debtors appointed Tim Pohl and Paul Aronzon to their boards as disinterested directors (the "<u>Disinterested Directors</u>"), replacing the other two NICO-affiliated directors.  Mr. Pohl and Mr. Aronzon are both lawyers by training, each with over three decades of restructuring experience.  As disclosed in their director questionnaires and reaffirmed in their engagement letters with the Debtors, neither Mr. Pohl nor Mr. Aronzon has

any connections to NICO, Brenntag, or DB US, and neither had any connections to the Debtors prior to their appointment as directors.

10.     Mr. Pohl began his career at Jones Day before moving to Skadden and becoming co-head of its global restructuring practice.  He was then a managing director at Lazard Freres until retiring in 2019, at which point he took on consulting and directorship roles for a variety of clients.  Mr. Aronzon was an attorney in Milbank's restructuring group for nearly thirty years.  He served as its global co-head until he retired in 2020, at which point he also took on consulting and directorship roles for a variety of clients.  Their extensive credentials are set forth in more detail in their declarations filed in support of the Settlement Motion and the DIP Motion, respectively. Dkt. Nos. 1298, 1303.

11.     The board consent appointing Mr. Pohl and Mr. Aronzon to the Debtors' boards provided them with exclusive authority to investigate and approve any transaction, settlement, or other action with respect to any "Conflict Matter," defined to include any matter pertaining to a strategic transaction or any chapter 11 proceeding in which a conflict of interest exists or is reasonably likely to exist between the Debtors, on the one hand, and any of the Debtors' equityholders, affiliates, subsidiaries, directors, managers, and officers, or other stakeholders on the other hand.  Campbell Decl. Ex. 28.

12.     Given the Debtors' strained liquidity due to ongoing litigation costs and a lack of revenue-generating operations, the Debtors' full boards approved bankruptcy filings on April 25, 2023.  The Debtors filed the bankruptcy petitions in these cases on April 26, 2023. Shortly after these cases commenced, Mr. Pohl and Mr. Aronzon directed the Debtors' bankruptcy counsel to investigate all potential estate causes of action the Debtors might possess.

13.     All of the professionals involved in the Debtors' investigation of potential estate causes of action have filed retention applications in these cases and have been confirmed by this Court to be disinterested under section 327 of the Code.  On June 4, 2023, the Debtors filed retention applications for Cole Schotz, Kirkland, and M3 Advisory Partners.  Dkt. Nos. 159, 160, 162.  Those applications were approved without objection later that month.  Dkt. Nos. 221, 227, 229.  In those applications and in supplemental declarations, Kirkland disclosed other matters where it represents or had represented companies where Mr. Pohl or Mr. Aronzon were directors.  Dkt. No. 160 at 53; Dkt. No. 223 at 3–4; Dkt. No. 552 at 6; Dkt. No. 838 at 7; Dkt. No. 1147 at 6; Dkt. No. 1401 at 7.

**B.      May 2023:  Immediately Following Its Appointment, the Committee Argues That WCD's Bankruptcy Petition Is Unauthorized.**

14.     On May 24, 2023, the United States Trustee filed a notice of appointment of a talc claimants committee.  Dkt No. 121.  Only six days after its appointment, and without meaningful engagement with the Debtors' Disinterested Directors or advisors, the Committee joined a pending motion to dismiss WCD's bankruptcy petition.  Dkt. No. 132.  While unfortunate, this was not unexpected, because one of the TCC's members had been responsible for installing the receiver that had filed the motion to dismiss in the first place.  The Court denied the motion to dismiss on June 20, 2023.  Dkt. Nos. 210–11.  The Committee appealed this Court's ruling, and the District Court affirmed the denial of the motion to dismiss on May 31, 2024.  Dkt. No. 1101.  The Committee's further appeal of this second denial is currently being briefed before the Third Circuit.

**C.      September–November 2023:  The Debtors Commence an Adversary Proceeding to Confirm Their Ownership of Potentially Valuable Estate Causes of Action and Begin the Process of Valuing Them.**

15.     In August 2023, the Debtors' boards approved filing an adversary proceeding to confirm the Debtors' ownership of all estate causes of action based on potential successor liability

and alter ego theories.  That adversary proceeding was commenced on September 7, 2023, and the

Debtors filed a motion for summary judgment the next day.  Adv. Proc. Dkt. Nos. 1, 3.  By seeking

to confirm the Debtors' ownership of potentially valuable causes of action based on successor

liability or alter ego theories, the Debtors sought to expand and maximize the value of their estates.

The Committee and FCR, however, argued that the Debtors did *not* own these causes of action.

*E.g.*, Adv. Proc. Dkt. Nos. 90, 109.  The Committee and FCR argued vehemently for a ruling that

would diminish the Debtors' estates, including in the case of the Committee, by arguing for the

overruling of existing Third Circuit precedent holding successor liability and alter ego claims to

be property of the estate.  Adv. Proc. Dkt. No. 90 ¶¶ 47–48.

16.    Shortly after commencing the adversary proceeding, the Debtors also retained

Brattle to assist with the critical task of valuing the size of pending and future litigation claims

against the Debtors.  Brattle's valuation work has included not just asbestos-related talc claims at

WCD, but also claims against Soco West and environmental liabilities associated with LAT,

Soco West, and Brilliant.  The Debtors filed a retention application for Brattle on November 3,

2023, which the Court granted—again without objection—two weeks later.  Dkt. Nos. 606, 668.

**D.    November 2023–June 2024:  The Parties Engage in Mediation and Agree to
Delay the Summary Judgment Ruling in the Adversary Proceeding.**

17.    On November 15, 2023, the Court entered the Mediation Order, which provided for

the Debtors, the Committee, the FCR, as well as Brenntag, DB US, and NICO to mediate all

potential issues in this case.  Dkt. No. 654.  In connection with the mediation, the Debtors agreed

to request that the Court hold in abeyance any ruling on their pending summary judgment motion.

*See* Dkt. No. 813.  The Debtors extended this request to hold the summary judgment ruling

multiple times, including well into 2024.  *See* Dkt. Nos. 917, 1057.  The Debtors hoped that the

mediation could and would result in a global consensus on the path forward.  As described in the

mediator's reports, the parties engaged with each other and the mediator in multiple sessions over the course of the mediation.  *See* Dkt. No. 814 ¶¶ 2–4; Dkt. No. 1121 ¶¶ 7–10.

18.    Both prior to and during the mediation, the Debtors provided over 240,000 documents to the Committee and FCR (which has now grown to over 260,000 produced documents in total).  Since summer 2023, the Debtors' counsel also maintained a constant dialogue with the Committee and FCR's counsel over the scope of document collection, review, and production efforts, including recurring meet and confer calls and regular formal and informal correspondence about discovery issues.

**E.**    **June 2024:  The Mediation Breaks Down and the Debtors Request a Summary Judgment Ruling in the Adversary Proceeding.**

19.    By the end of May 2024, it became clear that the mediation was unlikely to result in a global consensus.  *See* Dkt. No. 1121 ¶ 11 ("Largely as the consequence of events that transpired during the last week in May . . . I came to the view that there is no reasonable likelihood of a deal between the Claimants Side (the Talc Creditors Committee and FCR), and the other Mediation Parties in the near term.").  On June 2, 2024, the Debtors requested that the Court render its decision on the pending summary judgment motion.  Adv. Proc. Dkt. No. 214.  In responsive letters on June 9 and 10, the Committee and FCR again opposed any attempt to confirm in the adversary proceeding that the Debtors actually owned potentially valuable estate causes of action based on successor liability and alter ego theories of liability.  Dkt. Nos. 1114–15.  On June 11, 2024, the mediator submitted his second mediation report, which concluded that "I see no reasonable basis for a view that a deal between the Claimants and the other Mediation Parties will be forthcoming any time soon."  Dkt. No. 1121 ¶ 11.

    **F.**    <u>June 19, 2024–August 30, 2024</u>:  **The Debtors and Contributing Parties Engage in Negotiations Over a Potential Settlement of Estate Causes of Action and the Court Issues Its Summary Judgment Ruling.**

20.     In the week after the mediator's second report, the Disinterested Directors held a board meeting (without Mr. Mehta) to discuss next steps.  A few days later, the Debtors convened representatives of Brenntag, DB US, and NICO to present on the potential estate causes of action that the Debtors had investigated and believed they owned (consistent with their arguments in the adversary proceeding).  That presentation commenced a multi-week process of exchanging views on the strengths and weaknesses of potential estate causes of action, offers and counteroffers, and exchanges of views between claims estimation experts as to the quantum of liability at issue.

21.     Mr. Pohl and Mr. Aronzon were intimately involved in this process, conducting iterative calls with representatives of the Contributing Parties, approving all offers made to the Contributing Parties, and ultimately engaging in a principal-to-principal discussion to reach a final number.  Mr. Mehta was not involved in these negotiations at all or informed of the Debtors' positions or offers during the negotiations.  In negotiating with the Contributing Parties, for purposes of estimating the Debtors' potential liabilities in the tort system that would be the subject of potential successor liability or alter ego theories, the Disinterested Directors relied on expert valuation work from the Debtors' mass tort advisors at Brattle.  The Disinterested Directors did not use or rely on numbers offered by the Contributing Parties.

22.     Mr. Pohl and Mr. Aronzon have explained that their goal in the negotiations was to see if they could obtain a resolution of estate causes of action sufficient to fully pay the estimated

amount of present and future litigation claims against the Debtors, as estimated by Brattle.[2]  As the Debtors explained in the Settlement Motion, the maximum value of any successor liability claims or alter ego claims is the amount of tort and environmental liabilities that would be assertable against the Debtors but for this bankruptcy.  *See* Settlement Mot. ¶¶ 47, 54, 60.  This range—as set forth in the declaration of Brattle expert David McKnight—was approximately $500 million to $600 million.  *Id.* ¶ 62; McKnight Decl. ¶ 7 & Fig. 1.

23.    As part of their attempt to steer negotiations to their targeted range, the Debtors' Disinterested Directors initially authorized a $1 billion demand from the Debtors to the Contributing Parties in the initial presentation of potential estate causes of action on June 19, 2024. On June 25, 2024, the Contributing Parties presented counterarguments in which they argued that the estate causes of action the Debtors had identified were meritless and offered only $150 million. The Debtors' Disinterested Directors and advisors (including both counsel and, on one occasion, the parties' various experts, including Brattle) then proceeded to negotiate over a series of calls during which arguments and counterarguments were exchanged, followed by written offers and counteroffers.  The Debtors' offers were always authorized exclusively by Mr. Pohl and Mr. Aronzon.  Mr. Mehta was not involved in any of these negotiations at all.

---

[2]    *E.g.*, Pohl Dep. Tr. 298:4–12 ("As a tactical matter, our approach was to -- our goal was to end up, if we could, with an agreement to pay an amount of cash that would cover the undiscounted, meaning for successor -- meaning success -- likelihood of success on the merits discounting, undiscounted value of the claims as estimated by Brattle in their -- in their range.  More would be better; less would be worse.  Our goal was to end up in that range."); Aronzon Dep. Tr. 220:14–221:8 ("Q.  In proposing a billion dollars, did the debtors have a range that they wanted to end in?  A.  We did.  Q.  And what was that range?  A.  We were looking at the Brattle range and without discounting, you know, the various litigation risks associated with our assets, our claims . . . .  So looking at -- at the value of the assets, which is what we ultimately are settling, we were trying to achieve obviously as much as we could, but to the extent we could get in the range or above -- you know, right at or above the high end of the range of what the claims estimate were, we'd be looking at something that would distribute to our creditors, you know, close to a hundred cents, which is a remarkable recovery in the bankruptcy world.").

24.     These negotiations took place over a month-and-a-half and culminated in the Debtors and the Contributing Parties agreeing on a $535 million number for a settlement in principle in the first week of August 2024. Despite being fully willing and able to walk away from the negotiations, Mr. Pohl and Mr. Aronzon ultimately agreed to a settlement because the $535 million figure was well within the range of potential liabilities estimated by Brattle *prior to* any likelihood of success discount on the estate causes of action.

25.     On August 13, 2024, the Court issued its summary judgment ruling and held that the Debtors did in fact own estate causes of action based on successor liability and alter ego theories. Adv. Proc. Dkt. No. 268. With confirmation of their ownership of potential estate causes of action in hand, the Debtors proceeded to finalize draft settlement documentation with the Contributing Parties.

**G.    <u>August 30, 2024–September 3, 2024</u>: The Disinterested Directors Approve the Finalized Settlement Agreement; the Committee and FCR File the Standing Motion; the Debtors File the Settlement Motion.**

26.     By August 30, 2024, the terms of the Settlement Agreement were finalized. The Debtors and all Contributing Parties began the process of obtaining formal authority to enter into the Settlement Agreement. On August 30, 2024—the Friday before Labor Day—the Disinterested Directors approved the Debtors' entry into the Settlement Agreement and the filing of the Settlement Motion. However, because the Debtors had not received signature pages from all of the Contributing Parties, they were not able to file the Settlement Motion.

27.     Later that same evening, August 30, 2024, the Committee and FCR filed the Standing Motion. In the Standing Motion, the Committee and FCR sought (a) exclusive authority to prosecute and settle successor liability claims against Brenntag; (b) an injunction of a then-pending arbitration between DB US and NICO and a declaration as to NICO's

indemnification obligations to DB US; and (c) a declaration as to DB US's indemnification obligations to Brenntag.

28.     The next business day (the Tuesday after Labor Day), the Debtors received the final signature pages from the Contributing Parties and filed the Settlement Motion, which extensively discussed the successor liability claims against Brenntag.  Settlement Mot. ¶¶ 53–59.  The Debtors described these claims as "their most valuable asset for monetization and distribution" and their "strongest claims."  *Id.* ¶¶ 6, 79.  Additionally, the Debtors discussed various potential theories of liability against NICO and DB US, including alter ego theories of liability and other potential estate causes of action based on discrete historical transactions between the Debtors on the one hand, and DB US or NICO on the other, and the likely factual and legal hurdles to succeeding on the merits of those claims.  *Id.* ¶¶ 44–52 & nn. 47, 49.  Despite repeatedly touting the rigor of their investigation in the Standing Motion, the Committee and FCR did not propose bringing *any* estate causes of action based on these theories or transactions against NICO or DB US in their proposed standing complaint.  In the Settlement Motion, the Debtors also extensively discussed the indemnification relationships among the Debtors and the Contributing Parties.  *Id.* ¶¶ 27–30.

**H.      The Indemnification Disputes Among the Contributing Parties.**

29.     While the focus of the Standing Motion is on the Debtors' successor liability claims against Brenntag, some additional context may help the Court to fully understand the indemnification-related counts raised in the proposed derivative complaint.

30.     As explained in greater detail in the Settlement Motion, a chain of indemnification obligations owed by and among the Debtors and the Contributing Parties existed prior to these bankruptcy proceedings.  Following the 2004 Transaction, the Debtors were required to indemnify Brenntag (which purchased the Debtors' operating assets) if Brenntag was found liable for any alleged distribution of asbestos or asbestos-containing products by WCD.  If the Debtors were

unable to pay, DB US backstopped the Debtors' indemnification obligations to Brenntag.  And as part of the 2007 Transaction in which DB US sold the Debtors to NICO, NICO agreed that if DB US ultimately had to indemnify Brenntag for certain liabilities (including WCD asbestos-related liabilities), NICO would indemnify DB US.  *See* Settlement Mot. ¶¶ 27–30.

31.     After these bankruptcy proceedings commenced, various disputes arose between Brenntag, DB US, and NICO over their respective indemnification rights and obligations.  In particular, NICO requested, among other relief, that an international arbitration panel declare its indemnification obligations to DB US null and void.  The Committee and FCR did not raise the possibility of enjoining that arbitration with the Debtors or their advisors at any time between being informed of the arbitration in November 2023 and filing the Standing Motion nine months later.

32.     Shortly after the Settlement Motion was filed, DB US and NICO negotiated a resolution of the arbitration and signed a settlement agreement on October 7, 2024.  In that agreement, NICO reaffirmed its indemnification obligations to DB US under the 2007 SPA. DB US, for its part, has never sought to declare its own underlying indemnification obligations to Brenntag null and void.  The Court is well aware of the disputes between the Contributing Parties over how the indemnities apply to liability for Brenntag's *post*-2004 operations, but the Settlement Agreement does not hinge on the resolution of those disputes, and releases the Debtors from any liability related to any indemnification disputes among the Contributing Parties.

## ARGUMENT

### I.     Legal Standard

33.     "It is the debtor-in-possession who controls the estate's property, including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate." *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 175 (2d Cir. 2005).  In contrast, parties

14

representing only certain constituencies—like the Committee and FCR here—are generally not well-situated to manage an estate's legal claims. *See id.* at 180 ("As a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative."). Derivative standing, therefore, is "an implicit exception," applicable only "under certain narrow conditions," to a debtor-in-possession's exclusive right to prosecute actions on behalf of the estate. *Balt. Emergency Servs. II*, 432 F.3d at 560; *see also Cybergenics*, 330 F.3d at 553 (describing derivative standing as a "a remedy when the Code's envisioned scheme breaks down").

34.     Courts grant derivative standing only where the movant establishes that colorable claims exist, and that the debtor has unjustifiably refused to bring those claims after "a demand has been made upon the statutorily authorized party to take action." *In re G-I Holdings, Inc.*, 313 B.R. 612, 628–29 (Bankr. D.N.J. 2004); *In re Diocese of Camden, N.J.*, 2022 WL 884242, at *4 (Bankr. D.N.J. Mar. 24, 2022). In determining whether a refusal to pursue a claim is unjustifiable, "the court must perform a cost-benefit analysis." *Diocese of Camden*, 2022 WL 884242, at *5. It is the Committee and FCR's burden to demonstrate that they have satisfied the test for derivative standing. *See G-I Holdings*, 313 B.R. at 629; *Diocese of Camden*, 2022 WL 884242, at *4.

## II.    The Settlement Moots the Standing Motion.

35.     Both factually and legally, the Settlement Motion rendered the Standing Motion moot. As a factual matter, the Standing Motion contained multiple assertions that the Debtors had taken no steps to investigate or maximize the value of the estate causes of action against Brenntag or the other Contributing Parties. As just some examples:

- "The Debtors nonetheless have never advanced Successor Liability Claims against Brenntag in any meaningful way, either before or after the Petition Date." Standing Mot. ¶ 2.

- "Although the Debtors spent months attempting to wrest control of the Successor Liability Claims from the Talc Claimants, they never initiated a reasonable investigation into the merits of such claims." *Id.* ¶ 37.

- "[T]he Movants are aware of no evidence that the Debtors have taken any steps at all to establish the merits and value of the Successor Liability Claims that the Debtor AP Complaint sought to have declared property of the estates." *Id.* ¶ 41

- "[T]he Debtors' failure to adequately investigate potential estate claims against the Proposed Defendants or advance the Successor Liability Claims in any meaningful way is proof enough that they will not go further to zealously prosecute any such claims." *Id.* ¶ 67.

36.    These statements were inaccurate when they were made, and they were directly disproven the next business day, when the Settlement Motion was filed.  The Committee and FCR must at least concede that the Standing Motion was based on a picture that was incomplete and is now entirely stale.  Given the disconnect between the narrative spun in the Standing Motion and the reality of this case, the Standing Motion should be denied as factually moot.

37.    Additionally, it is clear that any request for derivative standing is legally moot and cannot be considered unless the Settlement Motion is denied.  If the Settlement Motion is granted, there will be no estate causes of action against the Contributing Parties to litigate because they will be settled and resolved.  Regardless of how they frame it, any continued request by the Committee or FCR to be granted standing to litigate the claims resolved by the Settlement Agreement is inherently an attack on the Settlement Motion.

**III.    Standing Must Be Denied Because the Debtors Have Pursued and Settled the Estate Causes of Action Raised in the Standing Motion, Not Refused to Pursue Them.**

38.    At a minimum, derivative standing is not permitted unless a debtor unjustifiably *refuses* to pursue estate causes of action.  *G-I Holdings*, 313 B.R. at 628 (derivative standing

16

requires that a "demand is declined"); *Diocese of Camden*, 2022 WL 884242, at *4 (same); *see also* Standing Mot. ¶ 115.[3]

39.     Here, the Debtors have not *refused* to pursue estate causes of action against the Contributing Parties at all.  Instead, the Debtors (a) commenced an adversary proceeding to actually confirm they owned estate causes of action based on successor liability and alter ego theories (which the Committee and FCR vigorously disputed to the potential detriment of the estates), (b) engaged in a mediation with the Committee, FCR, and Contributing Parties for over six months, (c) commenced settlement negotiations with the Contributing Parties in mid-June 2024 after it became clear the mediation would not bear fruit, and negotiated a $535 million settlement amount by the first week of August 2024, and (d) papered and filed the Settlement Motion within a month of reaching an agreement in principle with the Contributing Parties and three weeks after the Court's ruling in the Adversary Proceeding.  Moreover, the Debtors will engage in multiple *further* mediation sessions with the Committee, FCR, and Contributing Parties, which are to commence just after the holidays.  *See* Dkt. No. 1579.

40.     The Debtors' actions in these cases are simply not a "refusal" of any kind—let alone an unjustified one.  Courts considering derivative standing motions have recognized that pursuing claims does not require litigating them, and that a debtor's negotiation and settlement of claims constitutes "pursuing" the claims, not "refusing" to do so.  *See, e.g.*, *In re Manley Toys Ltd.*, 2020 WL 1580244, at *8 (Bankr. D.N.J. Mar. 31, 2020) ("Engaging in settlement discussions with opposing parties is evidence that the Liquidators are in fact pursuing the Claims."); *In re Caesars*

---

[3]     The Debtors do not dispute that certain successor liability claims against Brenntag are at least colorable, despite material potential challenges to their ultimate likelihood of success (and despite many factual and legal assertions in the Standing Motion and the proposed standing complaint that the Debtors disagree with).  *See* Settlement Mot. ¶¶ 53–59.  As noted above, the Committee and FCR do not propose bringing any counts against NICO or DB US based on historical transactions.  *Supra* ¶ 28.

*Ent. Operating Co.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016) ("[I]t should be noted that the debtors have supplied an adequate justification for their decision not to pursue the claims. The debtors made that decision, they say, because they favor resolving the claims through a comprehensive plan of reorganization that will provide distributions to creditors . . . . The debtors' decision to forego pursuing the claims in favor of settling them through a plan is a reasonable exercise of the debtors' judgment."); *see also Diocese of Camden*, 2022 WL 884242, at *11 ("The Committee cannot obtain derivative standing simply because it does not believe the terms of those settlements are not favorable."). More generally, the law is clear that settling claims is an expected and appropriate way of a debtor-in-possession pursuing estate causes of action. *E.g.*, *In re Wilton Armetale, Inc.*, 968 F.3d 273, 283–84 (3d Cir. 2020) ("As discussed, the Bankruptcy Code makes a creditor's derivative causes of action property of the estate. From there, the trustee decides how best to manage them for the benefit of all creditors. One option is to prosecute those claims to judgment. Another is to settle and extinguish them.") (internal citations omitted).

41.     The Debtors' pursuit of the Settlement Motion (and their prior prosecution of the Adversary Proceeding and participation in mediation) means they have not engaged in *any* "refusal" to pursue the claims raised by the Standing Motion. And to the extent any party would characterize the lack of a complaint filed by the Debtors regarding estate causes of action as some kind of technical "refusal" to pursue them, that refusal is plainly justifiable given the Debtors' current pursuit of the Settlement Motion and their previous actions to obtain control of and resolve estate causes of action against the Contributing Parties prior to filing the Settlement Motion. The Standing Motion thus stumbles at the first hurdle and should be denied out of hand.

IV.     **The Committee and FCR Fail to Establish Any "Disabling" or "Irreconcilable"
Conflicts That Justify Their Failure to Make a Demand on the Debtors or That Would
Otherwise Warrant Granting Standing.**

42.     The Committee and FCR failed to make *any* demand on the Debtors to take action

on the claims in their proposed complaint.  Before derivative standing can be granted based on an

unjustifiable refusal to pursue claims, an actual demand must be made on the Debtors.

*G-I Holdings*, 313 B.R. at 628 (derivative standing requires that "a demand has been made upon

the statutorily authorized party to take action"); *Diocese of Camden*, 2022 WL 884242, at *4

(same); *see also* Standing Mot. ¶ 115.  This case demonstrates precisely why such a demand

requirement exists.  If the Committee or FCR had bothered to pick up the phone following the

termination of the mediation, or sent a draft complaint to the Debtors' advisors, they could have

determined that the Debtors had kept pursuing negotiations and were on the cusp of obtaining

$535 million for the benefit of the estates.  Despite the Committee and FCR's counsel spending

over $1.2 million on the Standing Motion *before* filing it, they did not take a single minute out of

drafting accusations that the Debtors were unfaithful stewards of the estate to verify the accuracy

of those accusations.

43.     The Committee and FCR do not dispute that they made no demand on the Debtors

concerning the claims in the Standing Motion, let alone that they previewed the proposed

complaint.  They instead argue the Court should excuse their failure to comply with the demand

requirement because of the Debtors' purported "disabling" or "irreconcilable" conflicts.  Standing

Mot. ¶¶ 115–18.  Going further, they argue that the Debtors have "inherent and inescapable

conflicts" that prevent the Debtors from *ever* maximizing the value of estate causes of action

against the Contributing Parties under *any* circumstances.  *Id.* ¶¶ 90–91, 111; *see also id.* ¶ 114

("At bottom, the Debtors' conflicts of interest with respect to the Successor Liability Claims

disqualifies them from prosecuting and/or settling those claims."); *id.* ¶ 7 ("[T]he Movants are

clearly the only appropriate parties—rather than the conflicted Debtors—to prosecute, and if appropriate, negotiate a settlement of the valuable Successor Liability Claims.").

44.     The Committee and FCR's purported "conflicts"-based arguments are specious, provide no excuse for the Committee and FCR's failure to make a demand on the Debtors prior to filing the Standing Motion, and do not justify granting derivative standing now or in the future. They assert two overarching purported sources of "conflict":  (1) that the Debtors are "beholden" to NICO in these bankruptcy proceedings; and (2) that the Disinterested Directors' actions and their prior service on boards of companies represented by the Debtors' counsel somehow suggest they could not be faithful stewards of the estate causes of action.  Neither argument passes muster, and both ignore the actual process in this case.

**A.      At All Times in These Bankruptcy Cases, the Debtors Have Had Disinterested Directors with Disinterested Legal and Financial Advisors.**

45.     It is the *post*-petition governance of these Debtors that determines whether the Committee and FCR's failure to make a demand should be excused.  The Committee and FCR's argument that the Debtors are "beholden" to NICO thus stumbles out of the gate by focusing on the Debtors' *pre*-petition relationships with NICO entities and employees.  Standing Mot. ¶¶ 92–95.  Prior to these bankruptcy cases, the Debtors had three directors, all of whom were affiliated with NICO entities.  But before these cases began, the Debtors added two directors with no connection to NICO (or any other Contributing Party)—a point that the Committee and FCR do not dispute.  The Debtors and their Disinterested Directors have been advised by independent outside counsel at Cole Schotz and Kirkland—both of whom the Court has ruled, without objection, are disinterested persons under section 327 of the Code.  The Debtors' financial advisor at M3 has also been found to be disinterested, and M3 personnel took over the management and control of the Debtors' financial accounts and books and records after its appointment.  On the key

issue of claims valuation—which will likely be the most contested matter on the Settlement Motion because it necessarily caps the amount that can be recovered on the estate causes of action—the Debtors received expert analysis and advice from Brattle, which this Court has also found to be a disinterested person under section 327.

46.    The Disinterested Directors have considered the investigation of potential estate causes of action against the Contributing Parties apart from Mr. Mehta, did not conduct the negotiations with the Contributing Parties with or through Mr. Mehta, and did not apprise him of the status of those negotiations or the Debtors' positions in those negotiations.[4]  Both before and after the negotiation of the Settlement Agreement, the Disinterested Directors had multiple board meetings that excluded Mr. Mehta.   The Disinterested Directors always received independent advice from their legal and financial advisors on the two biggest drivers of potential settlement value with respect to the estate causes of action:  (a) the amount of the potential liabilities that could be attributed to the Contributing Parties using successor liability or alter ego theories; and (b) the likelihood of success on the merits of those claims.  The Disinterested Directors did not, for example, use or rely on the opinions of advisors to the Contributing Parties, or use the same counsel as the Contributing Parties.

---

[4]    *E.g.*, Pohl Decl. ¶ 12; Pohl Dep. Tr. 110:17–22 ("I know we conducted ourselves consistent with the view that I just described when we were investigating, discussing investigating settling, discussing settlement, discussing tactics, discussing litigation.  We would not have those discussions with Mr. Mehta."); Aronzon Dep. Tr. 205:25–206:9 ("Q.  Did you and Mr. Pohl talk to Mr. Mehta about the decision to engage with the contributing parties directly?  A.  I certainly did not. ...  Q. Did you view Mr. Mehta as a valuable source of information for any upcoming negotiation with the contributing parties? . . .  A.  Did I view it?  No. I didn't -- I didn't require any assistance from Mr. Mehta on this point."); *see also* Mehta 10/23/24 Dep. Tr. at 202:25–203:14 ("Q.  And did you -- what was your role in those negotiations, if any?  A.  None.  Q.  Did you receive any updates on those negotiations?  A.  No.  Q.  And did you receive -- or were you notified by Mr. Aronzon and Mr. Pohl before any offer was made to settle with nondebtors?  A.  No.  Q.  Were you asked to provide any information that would assist in the course of those negotiations?  A.  No.").

47.     None of the cases cited by the Committee and FCR excusing demand bear any resemblance to these facts.  The idea of excusing making a demand on debtors originated from situations where the decision about whether to prosecute estate causes of action would be made by the very same targets of those actions.  *Cf. Cybergenics*, 330 F.3d at 573 (discussing policy concern of pre-petition management "avoid[ing] bringing a claim that would amount to reputational self-immolation").  It has no application here, where the Disinterested Directors, and not any Contributing Party-affiliated individual or entity, have exclusive authority over any decision concerning the pursuit of claims against those individuals and entities.  The Committee and FCR cannot and do not contend that the Disinterested Directors had any involvement in any of the transactions that are the subject of the estate causes of action against the Contributing Parties, have any financial stake in the Settlement Agreement, have any connection to or financial interest in the Debtors other than their current directorships, or have any financial or other relationships with the Contributing Parties.

48.     The caselaw the Committee and FCR cites is far afield.  For example, they return repeatedly to *G-I Holdings*, describing the case as involving "analogous circumstances."  Standing Mot. ¶ 112; *see also id.* ¶ 117 (describing *G-I Holdings* in context of demand requirement).  But *G-I Holdings* bears no resemblance to this case.  There, an official committee sought standing to challenge a historical asset divestment as a fraudulent transfer—but the transaction had been "implemented by executives who still remain in charge of both [the debtor] and [a potential fraudulent transfer defendant]."  313 B.R. at 630.  In fact, the potential fraudulent transfer defendant was actually a subsidiary of the debtor, which was the debtor's "most significant asset."  *Id.*  And prior to the request for standing, the debtor had sought to dismiss a preference action

arising from the historical asset divestment and opposed a request for substantive consolidation arising out of the transaction. *Id.* None of those facts are present here.

49.     Unlike in *G-I Holdings*, it is the Debtors' Disinterested Directors that determined the path forward with respect to claims against the Contributing Parties and that negotiated the Settlement Agreement. Those decision-makers had no role in the historical transactions that give rise to estate causes of action against the Contributing Parties and no connection to the potential targets of those claims. In particular, the 2004 asset sales that the Committee and FCR focus on predate the Disinterested Directors' involvement with the Debtors by 19 years (and also predated NICO's involvement with the Debtors). Also, unlike in *G-I Holdings*, the Debtors have never attempted to dismiss any other challenge to the 2004 transaction. To the contrary, they have fought to confirm that such challenges belong to the Debtors' estates for the benefit of all creditors, and have identified those claims as "their most valuable asset for monetization and distribution" and their "strongest claims." Settlement Mot. ¶¶ 6, 79. The other cases cited by the Committee and FCR are similarly inapposite. *See, e.g.*, *In re La. World Exposition, Inc.*, 832 F.2d 1391, 1393–94, 1397–98 (5th Cir. 1987) (demand on directors was excused as to committee's complaint to enjoin the payment of those same directors' legal fees in defending the committee's prior complaint for breach of fiduciary duties against those same directors). None involved disinterested fiduciaries, like the Disinterested Directors here, with no involvement in the historical transactions at issue and no connections to potential defendants.

**B.      The Committee and FCR Have No Evidence That the Debtors Are "Beholden" to NICO.**

50.     The Committee's argument that the Debtors are "beholden" to NICO rests on a series of unsupported and disingenuous arguments about the post-petition presence of Mr. Mehta on the Debtors' boards. Standing Mot. ¶¶ 96–101. For example, the Committee and FCR make

much of Mr. Mehta's participation in *full* board meetings, but are entirely silent on the fact that Mr. Aronzon and Mr. Pohl conducted numerous meetings separate from Mr. Mehta where they received updates on the investigation of potential estate causes of action and the valuation of those causes of action.  *Compare* Standing Mot. ¶¶ 96–98, *with, e.g.*, Berkovits Decl. Ex. R at 135-36, 141-63 (minutes of multiple Disinterested Director-only meetings attached to the Standing Motion).  And as both the Disinterested Directors and Mr. Mehta have made clear, all negotiations over the estate causes of action were conducted without Mr. Mehta participating or even being aware of the status of the negotiation or the potential settlement terms.  *Supra* ¶ 46 n.4.

51.    The Committee and FCR also argue that "Mr. Mehta has testified that in many instances, he makes decisions without the involvement of other directors," claiming that Mr. Mehta "testif[ied] that, ***post-petition***, he communicates with Kirkland directly regarding requests for funding of any Debtor settlements or expenditures."  Standing Mot. ¶ 100 (emphasis added).  That simply misstates the factual record:  Mr. Mehta testified that "I believe I have ***not*** had any involvement in settlement of any cases after the bankruptcy filing."  Mehta 6/27/24 Dep. Tr. at 264:24–265:2 (emphasis added).   With respect to general activities after the appointment of the Disinterested Directors, Mr. Mehta testified that "[a]ny requests for any funding, bills, settlements, I would forward to Kirkland and then be circulated to whoever it needed to be circulated to.  In this -- in one or two situations, we may have circulated it directly to the directors as well as to him and Paul.  But otherwise, all of my communications have been to Kirkland, and at that point, they make the determination as to whether it needs to go to the board or for -- for approval or can it be approved directly for payment through M3."  *Id.* at 266:23–267:11.  Mr. Mehta's testimony makes clear the exact opposite of what the Committee and FCR assert: not only did Mr. Mehta not have *any* involvement in post-petition settlements, to the extent

he became aware of any issue requiring the use of Debtor assets, he forwarded all of them to the Debtors' counsel to determine the path forward.  Mr. Mehta made *no* decisions "without the involvement of other directors," and the Committee and FCR do not cite a single example of any such purported "decision" that they have any complaint about.

52.    The Committee and FCR also argue that NICO influenced the Debtors post-petition because Mr. Mehta provided information to the Disinterested Directors and the Debtors' counsel about the Debtors' pre-petition background and operations.  Standing Mot. ¶¶ 99, 101.  This makes no sense as a basis for a "conflict":  it is entirely logical and appropriate to request and receive extensive information from Mr. Mehta, who has been the president and a director of the Debtors since 2007.  The implication that the Debtors' Disinterested Directors and legal and financial advisors are so credulous as to not test the information provided by Mr. Mehta, or that they did not independently review reams of documents themselves to corroborate, test, or refute any information they received from any NICO-affiliated source, is absurd and unsupported.  Of course, the Committee and FCR have deposed Mr. Mehta twice, and have not pointed to any indication that Mr. Mehta has ever been anything other than entirely transparent and cooperative with the Disinterested Directors and the Debtors' outside advisors.

53.    Finally, the Committee and FCR claim that Mr. Mehta had more email communications with the Debtors' counsel than the Disinterested Directors, arguing this further demonstrates some purported nefarious influence.  Standing Mot. ¶ 100.  In the first instance, the argument is factually misguided.  Subsequent productions in response to discovery targeted at the Disinterested Directors' communications have made clear they communicated many dozens of times by email with the Debtors' advisors—in addition to the numerous substantive board meetings and phone calls that took place without an accompanying email.  Of course, the Debtors'

counsel did not need to copy the Disinterested Directors every time that they requested information

from Mr. Mehta.[5]  Most importantly, Mr. Mehta was not copied on communications concerning

the negotiations over a potential resolution of the estate causes of action against the Contributing

Parties.  As Mr. Mehta, Mr. Pohl, and Mr. Aronzon all made clear—Mr. Mehta was never involved

in those negotiations.  *See supra* ¶ 46 n. 4.

54.      In addition to being meritless, the Committee and FCR's attacks are illogical.  The

Committee and FCR insinuate that Mr. Mehta was part of a conspiracy by NICO to undermine the

successor liability claims against Brenntag to minimize NICO's potential indemnity obligations.

But in deposition testimony the Committee and FCR cited in the Standing Motion, Mr. Mehta

made clear he had never focused on the indemnity chain beyond the Debtors' obligations to

Brenntag because the Debtors had previously been able to fulfill those obligations.  Standing Mot.

¶ 103 & n.76.  Of course, after deposing Mr. Mehta (twice), both of the Disinterested Directors,

every other living NICO-affiliated director of the Debtors, and multiple NICO in-house counsel

and other employees, the Committee and FCR have not elicited any evidence of any plot—let

alone one that could have extended to the Debtors' Disinterested Directors or their disinterested

counsel and advisors.

### C.      The Debtors' Disinterested Directors and Counsel Are Fully Capable of Pursuing the Estate Causes of Action.

55.      Perhaps because the facts of this case are nothing like those where failure to make

a demand has been excused, the Committee and FCR instead attack the Disinterested Directors

and outside bankruptcy counsel.  Again, the Committee and FCR's arguments fail.

---

[5]    At the best of times, the comparison of email counts between custodians is fraught, given the effects of de-threading and de-duplication (let alone whether an email chain is produced once in full versus having every single iteration of the chain produced).  The Debtors will not waste estate resources (as the Committee and FCR apparently did) to engage in a more updated and accurate (but equally meaningless) comparison of the number of emails sent by Mr. Mehta versus the Disinterested Directors.

56.    The Committee and FCR first charge that "the Debtors have done nothing to prosecute [estate] claims, increase litigation pressure on the Proposed Defendants, or otherwise act in the best interests of creditors."  Standing Mot. ¶ 102; *see also id.* ¶ 106.  That accusation was inaccurate when it was levied, surprisingly has not been withdrawn since, and is plainly stale now. For two months before the Standing Motion was filed, the Disinterested Directors had been negotiating with the Contributing Parties, and hours before the Standing Motion was even filed, had approved the final form of the Settlement Agreement.  While those negotiations alone disprove the Committee and FCR's accusations, so do the months of prior mediation efforts the Debtors engaged in and the Debtors' (opposed) efforts to confirm their ownership of the potentially valuable estate causes of action at issue.  As the lengthy discussions in the Settlement Motion make clear, the Debtors have extensively and deliberately considered the strengths and weaknesses of a wide range of estate causes of action going far beyond those raised in the Standing Motion. Settlement Mot. ¶¶ 43–59.

57.    The Committee and FCR further nakedly assert that "the Debtors have actively blocked the Committee and FCR from obtaining discovery relevant to these claims."  Standing Mot. ¶ 102.  There is a reason why there is no citation or example supporting this accusation.  As the Court is well aware, the Committee and FCR did not raise a single discovery issue before this Court in the main proceedings up until the Committee and FCR's recent (unsuccessful) attempt to pierce the Debtors' privileges.  The Debtors' counsel has engaged in a recurring meet and confer with the Committee and FCR's counsel for well over a year.  Despite the TCC and FCR's claims to the contrary, the Debtors did nothing to discourage or dissuade the Committee or FCR from pursuing documents from third parties—let alone object to such discovery.  It is unfortunate to see the distortion of the Debtors' extensive cooperation with the Committee and FCR on discovery.

58.    Grasping at straws, the Committee and FCR lastly suggest that the Disinterested Directors cannot do their job because they have previously served as directors on the boards of companies represented by Kirkland.  Standing Mot. ¶¶ 109–11.  But this argument simultaneously overstates the purported relationships and fails to explain why they matter.  First, the Committee and FCR ignore (or simply misunderstand) that Mr. Pohl and Mr. Aronzon—who both have led major law firm restructuring practices in the past—serve or have served on the boards of companies represented by many other law firms.   Mr. Pohl and Mr. Aronzon's prior board appointments have not even been *mostly* for firms represented by Kirkland, let alone *only* by Kirkland.[6]  The accusations that they "depend" on Kirkland for "future board appointments" and have "divided loyalties" as a result are simply inaccurate.  Second, while the Committee and FCR's argument that Kirkland has an "extraneous influence[] in their decision-making" is factually unsupported, it also does not explain how *Kirkland* has any agenda other than to maximize the value of these Debtors' estates.  It also ignores that (a) the Court approved the retention of Kirkland as disinterested without objection, (b) the Disinterested Directors also received advice from additional disinterested counsel at Cole Schotz, and (c) on the critical issue of claims valuation,

---

[6]    *See, e.g.*, Pohl Dep. Tr. 37:20–38:4 ("Q:   What are the ways independent director work gets to you?  A: Sometimes I get a phone call from a law firm, sometimes I get a phone call from an investment bank, sometimes I get a phone call from a financial advisory firm, sometimes I get a phone call from a lender or a group of lenders to a company, and sometimes I get a phone call from another – another person who served as an independent director in various situations."); *id.* 38:18–25 ("Q:   How many other clients did you serve as an independent director for as a result of a call from Kirkland? . . . THE WITNESS:  Including this one? . . . Q.  Including this one.  A.  Five."); Aronzon Dep. Tr. 25:11–26:9 ("The -- the firms that I see most frequently would be firms like Paul Weiss, Weil Gotshal, Kirkland, my former colleagues at Milbank, and then there's just a handful of others.  Q.  Can you remember any of the others?  A.  I've had some from Cleary, from Simpson Thacher, from Latham.  I'd have to do some digging, but it -- it's all over the place when it comes to the lawyers.  Q.  Okay.  I think one of the first firms you named was Kirkland.  Can you ballpark for me how many independent director opportunities Kirkland has brought to you?  A.  Over what period of time?  Q.  Since 2020.  A.  I'm guessing, but it's probably five or six or seven.  Q.  So five to seven of the 20 boards or so that you've sat on in the past four years?  A.  Yeah. Like I said, I'd have to actually look and count which I haven't done.  For instance, the 20 might be low.  It could be a little more.  It -- you know, I -- without knowing and looking, I don't know that off the top of my head.  And the same is true for Kirkland.  And, look, Weil Gotshal similar, you know.  Paul Weiss, similar.").

received advice from another disinterested advisor:  Brattle.  In addition to simultaneously

insulting the professionalism and competence of both the Disinterested Directors and the Debtors'

advisors, the Committee and FCR's accusations appear to be collateral attacks on multiple

retention orders in these cases.

59.    In any event, the Committee and FCR cite no example of a court granting derivative

standing based on purported connections between a disinterested director and a debtor's counsel—

let alone ones as tenuous as those here.  To the contrary, this Court has recognized the valuable

contributions of disinterested directors and professional debtor advisors in situations with

interested board members or management.  *See In re Invitae Corp.*, No. 24-bk-11362 (Bankr.

D.N.J. July 12, 2024) [Dkt. No. 793] at 7:10–25 (preliminary ruling on standing motion noting

"the use of professional advisors, Special Committees, and independent directors in assisting and

advising the board," and "the guidance given by law firms . . . as well as other financial advisors"

and "emphasiz[ing] the respect it has for the role of an independent director" and their "positive

value and contributions in situations of conflicted management").

60.    At bottom, the Committee and FCR have not established any "disabling" or

"inherent" conflicts in the Debtors' governance that have precluded the Debtors from maximizing

their estate causes of action or that would preclude them from doing so even in the event the

Settlement Motion is denied.  There is certainly no excuse for the Committee and FCR's failure to

make a demand on the Disinterested Directors prior to filing the Standing Motion.  That alone is

another reason to deny the motion.

## V.    Any Request for Standing in the Event the Settlement Motion Is Denied Is Unripe.

61.    Although the Settlement Motion rendered the Standing Motion out of date and

moot, the Committee and FCR have not withdrawn (or even updated) the Standing Motion.  But

to the extent the Committee or FCR argues their request for standing remains pending in the hope

that the Court denies the Settlement Motion, that request is unripe.  *See In re Cubic Energy, Inc.*,
587 B.R. 849, 855 (Bankr. D. Del. 2018) ("Federal courts, including bankruptcy courts, are also
barred from giving opinions advising what the law would be upon a hypothetical state of facts.  To
allow decisions on these types of matters would be to open the door to advisory opinions, over
which the court has no jurisdiction.") (cleaned up).  The possibility that the Court could deny the
Settlement Motion creates, at best, a hypothetical scenario that would present a further changed
factual situation that would require the Debtors, the Committee, the FCR, and the Contributing
Parties to consider the next steps in this case.  All parties would have to digest and engage with
updated facts and whatever guidance is provided by the Court.  That is precisely why any request
for derivative standing in changed circumstances should (and would) require the Committee and
FCR to make a new, updated demand to the Debtors and file a new, updated request for standing.

62.    Among other items, the Committee and FCR would need to provide a concrete plan
for funding any alternative path for pursuing the estate causes of action against the Contributing
Parties.  *See, e.g.*, *Manley Toys*, 2020 WL 1580244, at *8 ("Lack of sufficient funding is a rational
basis to decline to pursue claims or to pursue settlement of claims in lieu of litigation."); *In re STN
Enters., Inc.*, 779 F.2d 901, 905 (2d Cir. 1985) ("The creditors who compose the committee may
agree themselves to be responsible for all attorneys' fees, but if they would seek to impose such
fees on other creditors or the chapter 11 estate, whether by contingent fee arrangement or
otherwise, that would obviously affect the cost-benefit analysis the court must make in determining
whether to grant leave to sue.  Hence fee arrangements should not only be made a matter of record
but should be carefully examined by the court as it makes that determination.").

63.    To date, the Committee and FCR have simply asserted that the benefits from
pursuing estate causes of action "dwarf any associated costs" or "far outweigh[] the costs."

Standing Mot. ¶¶ 7, 86.  But nowhere does the Committee attempt to articulate the amount of those costs or how or by whom they would be borne.  *Cf. Diocese of Camden*, 2022 WL 884242, at *12 (denying standing where "the Committee provides little indication of how it intends to fund litigation of these claims" and "makes little reference to the costs or a proposed fee arrangement in bringing the Complaints or how the litigation would be funded").  In discovery, the Committee and FCR have produced no evidence that they have a plan to fund litigation in the absence of settlement.  In any (currently unripe) future standing motion, the Committee and FCR will have to come to the Court with an explanation of how they intend to fund the litigation they wish to usurp from the Debtors.

## VI.    The Committee and FCR Should Not Be Granted Exclusive Settlement Authority.

64.    Even if the Committee and FCR were granted standing, there is no basis to grant them exclusive authority to settle estate causes of action.  "A grant of derivative standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have the right, subject to Court approval, to settle the Claims."  *In re Centaur*, 2010 WL 4624910, at *7 (Bankr. D. Del. Nov. 5, 2010).  While requests for exclusive settlement authority may frequently be made, they are seldom granted.  *Cf. In re Adelphia Commc'ns Corp.*, 371 B.R. 660, 670–71 (S.D.N.Y. 2007) ("[A] debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct."), *aff'd*, 544 F.3d 420, 424 (2d Cir. 2008) (Sotomayor, J.) ("[I]t does not follow—and our Court in *Smart World* did not hold—that an *STN* plaintiff's control over the estate's claims rivals that of the debtor-in-possession.").  For the same reasons there is no conflict that justifies the Committee and FCR's refusal to make a demand on the Debtors, there is no conflict or misconduct here that prevents the Debtors from fully prosecuting or settling the estate

causes of action in any circumstance. There is certainly no basis to find unusual "misconduct" that warrants stripping settlement authority away from the Debtors.[7]

## VII.   The Proposed Counts Concerning the Contributing Parties' Indemnification Obligations Are Either Moot or Unripe.

65.    Counts III and IV of the proposed standing complaint seek to declare that NICO owes indemnification obligations to DB US, and to enjoin the ICC arbitration where NICO had sought, among other relief, to declare those obligations null and void. Proposed Compl. ¶¶ 98–119. These counts are plainly factually moot. Because the ICC arbitration has been resolved, there is nothing to enjoin. And in the Settlement Agreement, NICO and DB US agreed that their indemnification obligations under the 2007 SPA remain in full force and effect, so there is no live dispute that justifies declaratory relief. Indeed, in their proposed complaint, the Committee and FCR do not identify any dispute over indemnification between DB US and NICO beyond the ICC arbitration. *See id.* ¶¶ 63–67. Because that dispute has been resolved, any request for relief based on potential indemnification disputes between DB US and NICO is moot.

66.    Count II of the proposed standing complaint is even more tenuous, as it seeks to declare DB US owes indemnity obligations to Brenntag but does not identify any instance where DB US has disavowed its indemnification obligations to Brenntag. Proposed Compl. ¶¶ 88–97. Such a claim is thus either moot, unripe, or both. There is also no dispute between DB US and

---

[7]    Additionally, it is disingenuous for the Committee and FCR to argue they should be given the *exclusive* power to steward causes of action they do not even believe the estates actually own, and, with respect to WCD, in a case they believe is unauthorized and must be dismissed. *See supra* ¶¶ 14–16 (describing the Committee and FCR's prior arguments).

Brenntag over indemnification related to estate causes of action that ever rose to the level of the arbitration between NICO and DB US.[8]

67.    Neither past nor hypothetical indemnification disputes among the Contributing Parties affect the Settlement Agreement and the benefits it provides to the Debtors' estates.  The Settlement Agreement provides $535 million regardless of any disputes among the Contributing Parties on any matter.  And the potential impact of any indemnification claims asserted by the Contributing Parties *against* the Debtors are also resolved and mooted by the Settlement Agreement, under which all Contributing Parties release all causes of action against the Debtors, including those for indemnification.

## **CONCLUSION**

68.    For the reasons set forth above, the Standing Motion should be denied.

*[Remainder of page intentionally left blank.]*

---

[8]    The Court is well aware of the opposing positions between Brenntag (on the one hand) and DB US and NICO (on the other hand) as to the precise scope of indemnification obligations for claims involving allegations of post-2004 conduct by Brenntag.  *E.g.*, Adv. Proc. Dkt. No. 360 at 13–15 (opinion noting disputes over indemnification obligations with respect to straddle claims).

Dated: December 20, 2024

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:    msirota@coleschotz.com
             wusatine@coleschotz.com
             fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:       joshua.sussberg@kirkland.com

               -and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:       chad.husnick@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*