| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**COOLEY LLP**<br>Cullen D. Speckhart (admitted *pro hac vice*)<br>Michael Klein (admitted *pro hac vice*)<br>Evan M. Lazerowitz<br>Jeremiah P. Ledwidge (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Email: cspeckhart@cooley.com<br>　　　mklein@cooley.com<br>　　　elazerowitz@cooley.com<br>　　　jledwidge@cooley.com<br><br>*Lead Counsel to the*<br>*Official Committee of Talc Claimants* | **SHERMAN, SILVERSTEIN,**<br>**KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, NJ 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>　　　rswitkes@shermansilverstein.com<br><br>*Local Counsel to the*<br>*Official Committee of Talc Claimants* |
| **CAPLIN & DRYSDALE, CHARTERED**<br>Kevin C. Maclay (admitted *pro hac vice*)<br>Todd E. Phillips (admitted *pro hac vice*)<br>Kevin M. Davis (admitted *pro hac vice*)<br>Serafina A. Concannon (admitted *pro hac vice*)<br>One Thomas Circle, NW, Suite 1100<br>Washington, DC 20005<br>Tel: (202) 862-5000<br>Email: kmaclay@capdale.com<br>　　　tphillips@capdale.com<br>　　　kdavis@capdale.com<br>　　　sconcannon@capdale.com<br><br>*Special Asbestos Counsel to the*<br>*Official Committee of Talc Claimants* | |
| In re:<br><br>WHITTAKER, CLARK & DANIELS, INC., *et al.*,<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 23-13575 (MBK)<br><br>(Jointly Administered)<br><br>Honorable Michael B. Kaplan, U.S.B.J., Chief |

**THE OFFICIAL COMMITTEE OF TALC CLAIMANTS'**
**OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER (I) APPROVING THE SETTLEMENT AGREEMENT**
**BETWEEN THE DEBTORS AND THE CONTRIBUTING PARTIES,**

**(II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR
OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT BACKGROUND .................................................................................. 3

    I.    The Debtors and Their Successors ........................................................... 3

        A.    As Operating Businesses, the Debtors Sell Asbestos-Contaminated Talc for Use in Cosmetic and Personal Care Products. ........................... 3

        B.    DBUS and Bain Capital Execute a Strategy to Continue the Debtors' Business Without Its Liabilities. ................................................. 4

        C.    Brenntag Continues the Debtors' Talc Business. ..................................... 6

    II.    Berkshire Acquires the Debtors for Its Runoff Liability Business. ...................... 8

    III.    Talc Claim Verdicts Against WCD Threaten Berkshire's Investment. .............. 11

    IV.    Berkshire Looks to Exit Its Bad Investment. ...................................................... 13

    V.    The Appointment of a South Carolina Receiver Prompts Berkshire to Orchestrate a Hurried Bankruptcy Filing .............................................................. 16

    VI.    The Settlement Agreement is Negotiated at Less Than Arms-Length. .............. 19

LEGAL STANDARD ................................................................................................. 25

ARGUMENT .............................................................................................................. 27

    I.    The Proposed Settlement Is Subject to the Heightened Scrutiny that Applies to Insider Transactions. ........................................................................... 27

    II.    The Debtors Cannot Meet Their Burden to Show that the Settlement Is Fair Under the *Martin* Factors. ........................................................................... 30

        A.    Under the First *Martin* Factor, the Debtors Significantly Understate the Value and Merit of the Estates' Successor Liability Claims Against Brenntag. ....................................................................... 30

            1.    The Claims are Worth Billions of Dollars. ................................. 30

                a.    An Accurate Estimate of the Debtors' Talc Liabilities Would Be in the Range of ▮▮▮▮▮. ............. 30

                b.    Several Methodological Choices in Berkshire's Internal Modeling Accord with Austin. ........................... 33

                c.    The Brattle Estimate Is Fatally Flawed. ........................... 34

             The Settlement Motion Ignores the Merits of the Estates' Strongest Successor Liability Theories. ....................................................... 36

# TABLE OF CONTENTS

(continued)

Page

d.   The Estates' Product-Line Successor Liability
     Claims Against Brenntag Are Extremely Likely to
     Succeed. ........................................................................ 37

e.   The Estates' Fraud-Based Successor Liability
     Claims Against Brenntag Are Extremely Likely to
     Succeed. ........................................................................ 41

B.   The Debtors Introduce No Evidence Regarding Any Difficulties in
     Collection, Which Would Be Minimal. .................................... 43

C.   The Successor Liability Claims Can Be Easily and Quickly
     Resolved in Litigation. ............................................................ 47

D.   The Debtors' Settlement Is Not in the Paramount Interest of
     Creditors. ................................................................................. 48

III.   The Process that Led to the Settlement Did Not Embody the "Utmost
       Good Faith," and the Appointment of the Bankruptcy Directors Does Not
       Entitle the Debtors to Deference. ................................................... 50

A.   The Settlement was Procedurally Defective and There Was No
     Fair Process. ........................................................................... 51

     1.   The Bankruptcy Directors Released Claims Against
          Brenntag Without Attempting to Leverage Them. ..................... 51

     2.   The Bankruptcy Directors Were Selected by Mehta, the
          Debtors' Conflicted Leader. ........................................... 52

     3.   The Prospect of Future Directorships Clouds the
          Bankruptcy Directors' Purported Independence. ....................... 53

     4.   The Settlement Was Not the Result of True "Arms-Length"
          Bargaining. ............................................................... 55

          a.   The Debtors Effectively Negotiated a Settlement
               with Themselves. ................................................. 55

          b.   The Bankruptcy Directors Failed to Include the
               Committee or FCR in the Investigation or in Any
               Negotiations with Berkshire. .................................... 56

B.   It is Especially Important Scrutinize Independence in the Mass-
     Tort Context Where Debtors Solvent Parents are Seeking to Limit
     Recoveries for Claimants. ..................................................... 57

**TABLE OF CONTENTS**
(continued)

**Page**

IV.     The Settlement Should Be Rejected Even Under the Business Judgment
        Rule. .................................................................................................................... 59

V.      There Is Insufficient Evidence in the Record to Support Settlement
        Approval. ............................................................................................................ 59

CONCLUSION ..................................................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.M.E. Inc. v. T.R. Ricotta Elec., Inc.*,
   No. 22cv5211, 2023 WL 3841746 (D.N.J. June 6, 2023) ..................................................42, 43

*In re Accutane Litig.*,
   194 A.3d 503 (N.J. 2018)..........................................................................................................38

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*,
   323 B.R. 345 (Bankr. S.D.N.Y. 2005).....................................................................................29

*In re Alecto Healthcare Servs., LLC*,
   No. 23-10787, 2024 WL 1208355 (Bankr. D. Del. Mar. 20, 2024) .........................................44

*In re Amatex Corp.*,
   110 B.R. 168 (Bankr. E.D. Pa. 1990) ......................................................................................46

*In re Barretts Minerals Inc.*,
   Case No. 23-90794 (DRJ), Dkt. No. 13 .....................................................................................7

*Berg Chilling Sys., Inc. v. Hull Corp.*,
   435 F.3d 455 (3d Cir. 2006).....................................................................................................38

*Bogart v. Phase II Pasta Machs., Inc.*,
   817 F. Supp. 547 (E.D. Pa. 1993) ...........................................................................................40

*Busch v. McInnis Waste Systems, Inc.*,
   366 Or. 628 (July 9, 2020).......................................................................................................15

*Bussell v. DeWalt Prods. Corp.*,
   614 A.2d 622 (N.J. Super. Ct. App. Div. 1992).................................................................38, 39

*In re Caribbean Petrol. Corp.*,
   566 F. App'x 169 (3d Cir. 2014) .............................................................................................46

*In re Caribbean Petrol. Corp.*,
   No. 10-12553, 2012 WL 1899322 (Bankr. D. Del. May 24, 2012).........................................46

*Casey v. Brennan*,
   780 A.2d 553 (N.J. App. Div. 2001)........................................................................................29

*In re Caubble*,
   505 B.R. 857 (Bankr. E.D. Ark. 2014) ....................................................................................47

# TABLE OF AUTHORITIES
### continued

**Page(s)**

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ..................................................................27

*Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims (In
  re Papercraft Corp.)*,
  211 B.R. 813 (W.D. Pa. 1997) ...........................................................................27

*Class v. Am. Roller Die Corp.*,
  705 A.2d 390 (N.J. Super. Ct. App. Div. 1998) .................................................40

*Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*,
  No. 2022-0378, 2023 WL 5688392 (Del. Ch. Sept. 5, 2023) .............................41

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*,
  68 F.3d 914 (5th Cir. 1995) ............................................................27, 29, 50, 56

*In re Del Grosso*,
  106 B.R. 165 (Bankr. N.D. Ill. 1989) .................................................................29

*In re Dell Tech.s Inc. Class V S'holders Litig.*,
  No. CV 2018-0816-JTL, 2020 WL 3096748 (Del. Ch. June 11, 2020) ...............55

*In re Dewey*,
  478 B.R. 627 (Bankr. S.D.N.Y. 2012) ................................................................58

*In re Diocese of Camden*,
  653 B.R. 722 (Bankr. D.N.J. 2023) ....................................................................47

*In re Dow Corning Corp.*,
  192 B.R. 415 (Bankr. E.D. Mich. 1996) .......................................................28, 57

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 493 (S.D.N.Y. 1991) .....................................................................28, 56

*In re Drexel Burnham Lambert Grp. Inc.*,
  148 B.R. 982 (Bankr. S.D.N.Y. 1992) ................................................................46

*Eddy v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.
  (In re Med. Asset Mgmt., Inc.)*,
  249 B.R. 659 (Bankr. W.D. Pa. 2000) ..........................................................26, 49

# TABLE OF AUTHORITIES
**continued**

**Page(s)**

*In re Engman*,
    331 B.R. 277 (W.D. Mich. 2005) ........................................................................59

*Falor v. G&S Billboard*,
    No. 04-2373, 2008 WL 539225 (D.N.J. Feb. 27, 2008) ..............................39, 40, 41

*In re First Bos., Inc. S'holders Litig.*,
    No. CIV. A. 10338, 1990 WL 78836 (Del. Ch. June 7, 1990) ...............................55

*In re Fox*,
    No. 03–60547 JPK, 2011 WL 10468085 (Bankr. N.D. Ind. Mar. 16, 2011).........................29

*Gendregske v. Black Diamond Com. Fin., LLC (In re Ashing Corp.)*,
    552 B.R. 80 (D. Del. 2015) .................................................................................49

*Gray v. Johnson & Johnson*,
    No. MID-L-5932-19AS (N.J. Super. Ct. Law Div.) ................................................7

*Hanson Trust PLC v. ML SCM Acquisition, Inc.*,
    781 F.2d 264 (2d Cir. 1986).................................................................................59

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. ----, 144 S. Ct. 2071 (2024) ..................................................................1

*In re Imerys Talc Am., Inc.*,
    Case No. 19-10289-LSS, Docket. No. 10 (Feb. 13, 2019) ......................................8

*Johnson v. American Int'l Indus., Inc.*,
    No. MID-L-6651-16-AS (N.J. Super. Ct. Law Div.)...............................................8

*JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re
Charter Communications)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)...................................................................58

*Kahn v. M & F Worldwide Corp. (MFW)*,
    88 A.3d 635 (Del. 2014) ......................................................................................29

*Kaminski v. W. MacArthur Co.*,
    220 Cal. Rptr. 895 (Cal. Ct. App. 1985) ..............................................................40

*Koch Materials Co. v. Shore Slurry Seal, Inc.*,
    205 F. Supp. 2d 324 (D.N.J. 2002) ......................................................................39

# TABLE OF AUTHORITIES
## continued

**Page(s)**

*LAOSD Asbestos Cases,*
   JCCP Case No. 4674 (Cal. Super. Ct.) ...................................................................7

*Lee v. Schweiker,*
   739 F.2d 870 (3d Cir. 1984).........................................................................45

*Leren v. Kaiser Gypsum Co., Inc.,*
   442 P.3d 273 (Wash. Ct. App. 2019).............................................................40

*In re Los Angeles Dodgers LLC,*
   457 B.R. 308 (Bankr. D. Del. 2011) ...................................................58, 59, 60

*In re LTL Management, LLC,*
   58 F.4th 738 (3d Cir. 2023) ..........................................................................58

*In re LTL Management, LLC,*
   637 B.R. 396 (Bankr. D.N.J. 2022) ..............................................................58

*In re Marshall,*
   33 B.R. 42 (Bankr. D. Conn. 1983) ..............................................................50

*In re Marvel Ent. Grp., Inc.,*
   222 B.R. 243 (D. Del. 1998).........................................................................26

*In re Match Grp., Inc. Derivative Litig.,*
   315 A.3d 446 (Del. 2024) ...............................................................28, 29, 54

*In re Matco Elecs. Grp., Inc.,*
   287 B.R. 68 (Bankr. N.D.N.Y. 2002) ....................................................29, 49–50

*Mettinger v. Globe Slicing Mach. Co.,*
   709 A.2d 779 (N.J. 1998).............................................................................40

*Myers v. Martin (In re Martin),*
   91 F.3d 389 (3d Cir. 1996)...................................................................... *passim*

*In re Neshaminy Office Bldg. Assocs.,*
   62 B.R. 798 (E.D. Pa. 1986) .........................................................................26

*New York v. Nat'l Serv. Indus., Inc.,*
   460 F.3d 201 (2d Cir. 2006).........................................................................41

# TABLE OF AUTHORITIES
### continued

**Page(s)**

*Nieves v. Bruno Sherman Corp.*,
431 A.2d 826 ............................................................................................................... 39

*In re NJ Affordable Homes Corp.*,
No. 05-60442, 2007 WL 4300153 (Bankr. D. N.J. Dec. 5, 2007) ........................... 26

*In re Nutraquest, Inc.*,
434 F.3d 639 (3d Cir. 2006) ...................................................................................... 25

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) .......................................................................... 26

*In re Oracle Corp. Derivative Litig.*,
824 A.2d 917 (Del. Ch. 2003) .................................................................................... 54

*In re Ortiz*,
619 B.R. 273 (M.D. Fla. 2020) .................................................................................. 59

*Pepper v. Litton*,
308 U.S. 295 (1939) .................................................................................................... 27

*Protective Comm. for Indep. S'holder of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) .................................................................................................... 25

*In re Qmect, Inc.*,
359 B.R. 270 (Bankr. N.D. Cal. 2007) ...................................................................... 50

*Ramirez v. Amsted Indus., Inc.*,
431 A.2d 811 (N.J. 1981) .................................................................................. *passim*

*Ray v. Alad Corp.*,
560 P.2d 3 (Cal. 1977) ................................................................................................ 40

*Reading Co. v. City of Phila.*,
155 B.R. 890 (E.D. Pa. 1993) .................................................................................... 46

*Reiss v. Hagmann*,
881 F.2d 890 (10th Cir. 1989) .................................................................................... 50

*Revel AC, Inc. v. Revel Entm't Grp., LLC (In re Revel AC, Inc.)*,
909 F.3d 597 (3d Cir. 2018) ...................................................................................... 45

**TABLE OF AUTHORITIES**
**continued**

                                                                                          Page(s)

*Schubert v. Lucent (In re Winstar Commc'ns, Inc.)*,
    554 F.3d 382 (3d Cir. 2009)...................................................................................27

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) .......................................................................26

*Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*,
    973 F.2d 1065 (3d Cir. 1992)................................................................................45

*In re Wells*,
    26 B.R. 150 (Bankr. D.R.I. 1983) ..........................................................................50

**Statutes**

11 U.S.C. § 101(2)(A).............................................................................................28

11 U.S.C. § 502(e)(1)(B) .........................................................................................46

N.J.S.A. § 25:2-25(a)(1) ..........................................................................................42

**Other Authorities**

Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*
    U. CHI . L. REV. 973 (2023)....................................................................................57

Berkshire Hathaway, 2019 Annual Report,
    https://www.berkshirehathaway.com/2019ar/2019ar.pdf .......................................53

Berkshire Hathaway Inc., 2023 Annual Report,
    https://berkshirehathaway.com/2023ar/2023ar.pdf ..............................................8, 9

*Disputed Votes*, WALL ST. JOURNAL (Sep. 27, 2020 6:00 AM),
    https://www.wsj.com/articles/johnson-johnsons-8-billion-talc-plan-hinges-on-
    disputed-votes-90bb117a ......................................................................................32

Fed. R. Bankr. Proc. 9019(a) ..................................................................................25

*Financial Reports*, NAT'L INDEMNITY CO.,
    https://www.nationalindemnity.com/content/dam/pdfs/financial-
    reports/National_Indemnity_Company.pdf (last visited Dec. 7, 2024)....................9

### <u>TABLE OF AUTHORITIES</u>
**continued**

**Page(s)**

Jared A. Ellias, Ehud Kamar & Kobi Kastiel, *The Rise of Bankruptcy Directors,*
95 S. CAL. L. REV. 1083, 1095 (2023) ...............................................................................54

Jef Feeley, *J&J Lifts Baby Powder Settlement Bid to More than $8.2 Billion*,
BLOOMBERG (Sep. 20, 2024 6:51 AM),
https://www.bloomberg.com/news/articles/2024-09-19/j-j-lifts-baby-powder-
settlement-bid-to-morethan-8-2-billion ..............................................................................32

Lucian A. Bebchuk & Assaf Hamdani, Independent Directors and Controlling
Shareholders, 165 U. PA. L. REV. 1271, 1274 (2017)..............................................................53

NASDAQ, THE QUALIFICATION, LISTING AND DELISTING OF COMPANIES RULES
IM-5605-6, IM-5605-(e)(1), IM-5605(c)....................................................................................53

NYSE LISTED COMPANY MANUAL RULE 303A.04 (2004)...............................................53

The Official Committee of Talc Claimants (the "**Committee**") of Whittaker, Clark &

Daniels, Inc. ("**WCD**"), Brilliant National Services, Inc. ("**Brilliant**"), Soco West, Inc. ("**Soco**"),

and L. A. Terminals, Inc. (collectively, the "**Debtors**"), hereby submits this objection (the

"**Objection**") to the *Debtors' Motion for Entry of an Order (I) Approving the Settlement*

*Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to*

*Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* [Dkt. No. 1297]

(the "**Motion**" or "**Settlement Motion**").[1]  In support of this Objection, the Committee submits

the *Declaration of Michael Berkovits in Support of The Official Committee of Talc Claimants'*

*Objection to the Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement*

*Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of*

*Their Obligations Thereunder, and (III) Granting Related Relief* (the "**Berkovits Decl.**") filed

contemporaneously herewith and respectfully represents as follows:

<p align="center">**PRELIMINARY STATEMENT**</p>

1.     The Settlement Agreement should be rejected because it would extend "to

*nondebtors* the benefits of a Chapter 11 discharge usually reserved for *debtors*."  *Harrington v.*

*Purdue Pharma L.P.*, 603 U.S. ----, 144 S. Ct. 2071, 2081 (2024).  Tort claimants—primarily tort

victims suffering from mesothelioma as a result of the talc WCD and its affiliates sold for years—

have billions of dollars in successor liability claims against *nondebtor* Brenntag that they could

pursue at full value in state courts or in these proceedings.  However, in this case, Berkshire and

the Debtors are exploiting the bankruptcy system to achieve a result they could not outside of

chapter 11:  a release of those claims without the consent of the tort claimants who hold them.  The

substance and process of the Debtors' Settlement Motion is legally flawed at every level, but the

---

[1]    Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

<p align="center">1</p>

Court now faces a far bigger question: whether to allow Berkshire and the Debtors to decide how their victims should be compensated or to grant the victims standing to make that choice for themselves.[2]

2.      The Debtors have an extremely valuable asset: successor liability claims against Brenntag. Brenntag, in turn, has the right to seek indemnification ultimately from Berkshire.[3] The value of successor liability claims against Brenntag could be maximized by allowing disinterested fiduciaries to bring those claims in an adversary proceeding. Yet before obtaining control of those claims and without even threatening to litigate them, the Debtors negotiated exclusively with a principal of Berkshire to release those claims. Stripped to its fundamentals, the Settlement Agreement, if approved, would allow Berkshire and the Debtors to destroy billions of dollars in value.

3.      The Settlement Agreement fails to achieve a reasonable price because it is the result of a process that was defective from the start. The Committee and FCR stand ready to correct that process by pursuing the estates' successor liability claims against nondebtors for full value in these chapter 11 proceedings. But no matter how these claims are ultimately resolved, this Settlement Agreement falls well below the range of reasonableness.

4.      The Settlement Agreement does not survive the *Martin* factors under the heightened scrutiny this Court is obligated to apply. The Settlement Agreement proposes to settle extremely valuable claims that are highly likely to succeed; there will be no difficulties in collecting against highly solvent parties; much of the work required to ensure an expedited resolution of the claims

---

[2]    *See generally* Dkt. No. 1293 ("Standing Motion").

[3]    The Committee respectfully disagrees with the Court's determination (*see* AP Dkt. No. 268) that all successor liability claims are derivative and is presently obtaining review of the Court's decision through an appeal to the Third Circuit. *See* AP Dkt. No. 335.

is already done; and the Settlement Agreement is not in the paramount interest of creditors, the

vast majority of whom oppose it.  For all the reasons discussed herein, the Settlement Motion must

be denied.

## RELEVANT BACKGROUND

I.    **THE DEBTORS AND THEIR SUCCESSORS.**

A.    **As Operating Businesses, the Debtors Sell Asbestos-Contaminated Talc for Use in Cosmetic and Personal Care Products.**

5.    In the early 2000s, the Debtor corporations Brenntag, Inc., Brenntag West, Inc., and

WCD were part of the "Brenntag" family of companies owned by Stinnes Corporation ("**Stinnes**")

and its parent, Deutsche Bahn.[4]  As part of "Brenntag," they distributed thousands of chemical

products.  Dkt. No. 5, Decl. of Mohsin Meghji, ¶ 2 ("**First Day Declaration**").

6.    WCD, which held itself out as "████████████████," sold talc as a primary

component of its chemical business.[5]  WCD supplied a large proportion of the talc sold in the

United States.[6]  WCD received, stored, packaged, and distributed talc from ███████████

██████████████.[7]

---

[4]    *See* 2003 MSPA, **Exhibit 1**, BERKTCC0000058, at -61, -62, -83, -91.  Brenntag, Inc. is now known as Brilliant. Brenntag West, Inc. is now known as Soco.  Stinnes Corporation is now known as DB US Holding Corporation ("**DBUS**").  Deutsche Bahn is the German state railroad company.  Exhibit numbers cited herein refer to exhibits to the Berkovits Decl., concurrently filed herewith.

[5]    **Exhibit 2**, BNS-TCC-0068875 and **Exhibit 3**, BRENNTAG-TCC-00102401, at -462 to -488 (████████
████████████).

[6]    Dkt. No. 4 ("**First Day Declaration**") ¶ 2 ("At its zenith in the 1970s and 1980s, WCD operated one of the largest talc and industrial compound supply and distribution businesses in the United States.").

[7]    **Exhibit 4**, BRENNTAG-TCC-00030842, at -848 (████████████████████████████████
████████████████).

7.      WCD targeted its talc products to cosmetic and personal care applications.[8]  WCD's

marketing materials recommended ███████████████████████.[9]  WCD also sold a smaller amount

of talc for industrial applications.[10]

      **B.**      **DBUS and Bain Capital Execute a Strategy to Continue the Debtors' Business Without Its Liabilities.**

8.      In 2003, Deutsche Bahn sold the Brenntag family of companies to Bain Capital

("**Bain**") for €1.4 billion.  The transaction was structured in two parts to ensure that Bain acquired

operating companies without acquiring substantial liabilities.  Brenntag entities that were not

subject to substantial liabilities were simply transferred to Bain via stock purchase agreements

("**2003 MSPA**").[11]

9.      By the time of the 2004 Transaction, DBUS and Bain understood that the Debtors

faced significant asbestos liabilities.[12]  So they strategically transferred the Debtors free and clear

of those liabilities.

10.      Specifically, Bain created new shell entities[13] with "Brenntag" in their name (with

other affiliates, "**Brenntag**").  Brenntag did not purchase the Debtors' stock, which would have

resulted in ownership of the Debtors.  Instead, Brenntag acquired the *assets* (but not the asbestos

liabilities) of each Debtor, via asset purchases, during the close of the 2003 MSPA on February

---

[8]   **Exhibit 3**, BRENNTAG-TCC-00102401, at -462 to -487 ████████████████████████
████████████████████████ .

[9]   *See, e.g.*, **Exhibit 3**, BRENNTAG-TCC-00102401, at -474 (████████████████████████
████).

[10]  *See, e.g.*, **Exhibit 3**, BRENNTAG-TCC-00102401, at -408.

[11]  2003 MSPA §§ 2.1–2.8.

[12]  **Exhibit 5**, DBUS0030087 (████████████████████████████████
████████████████).

[13]  These new shell entities included Brenntag North America, Inc., Brenntag Pacific, Inc., and Mineral and Pigment Solutions, Inc.

27, 2004 ("**2004 Transaction**").[14]

11.    As shown below, the asset purchase agreements resulted in "all or substantially all" of the Debtors' operating assets being transferred to the new Brenntag entities.[15]

| Debtors<br>(Former Holder of Operational Assets) | Brenntag<br>(New Holder of Operational Assets) |
|---|---|
| Whittaker, Clark & Daniels, Inc. | Mineral and Pigment Solutions, Inc.<br>("**MPSI**") |
| Brenntag West, Inc.<br>(n/k/a Soco) | Brenntag Pacific, Inc. |
| Brenntag Inc.<br>(n/k/a Brilliant) | Brenntag North America Inc. |

12.    DBUS and Bain agreed that the Debtors' corporate shells would indemnify Brenntag against lawsuits predicated on the Debtors' pre-transaction talc operations—i.e., lawsuits rooted in successor liability theories.[16]  DBUS, in turn, agreed to backstop the Debtors' indemnity obligations if they became "unable to financially satisfy" them.[17]

13.    DBUS and Bain also executed a ████████████████████████ ███████████ contemporaneously with the 2003 MSPA to conceal Brenntag's liability from creditors.[18]  Under the ████████████████, DBUS promised to assist the Debtors' successor, Brenntag, in frustrating recoveries premised on successor liability:



---

[14]    *See* 2003 MSPA § 2.11; *see also* **Exhibit 6**, BERKTCC0000413, at -428, -561.

[15]    *See* **Exhibit 7**, Deposition of Brenntag 30(b)(6) Designee Jamie Skinner, dated November 13, 2024 ("**Skinner Dep. Tr.**") 53:8–14; *see also* Standing Motion ¶¶ 16–18.

[16]    *See* 2003 MSPA § 12.

[17]    *Id.*

[18]    **Exhibit 8**, BNS-TCC-1017385.



**C.     Brenntag Continues the Debtors' Talc Business.**

14.    Brenntag continued the Debtors' business with no pause and zero operational changes.[20]

15.    The Debtors represented to regulators in at least 60 permit transfer requests that the 2004 Transaction would "████████████████████████████████████████████ ████████"[21] WCD also informed a New Jersey regulator that its successor entity was purchasing "████████████████████████████████████████████████████████████████████"— *i.e.*, the Debtors' sole talc facility—to "██████████████████" ████.[22]

16.    WCD and Brenntag assured employees and customers that they would "██████████ ████████████" after the 2004 Transaction.[23] Brenntag emphasized the lack of any substantive or operational changes by referring to ████████████████████ (in scare quotes) and stated that ████ ██████████████████████ "████████████████████████████████████████████ ████████████████████████████████████"[24]

---

[19]   **Exhibit 8**, BNS-TCC-1017385, at -388 to -389.

[20]   *See, e.g.,* **Exhibit 9**, BRENNTAG-TCC-00029707, at -708 ██████████████████████████████████ ██████████████; **Exhibit 10**, BRENNTAG-TCC-00043386, at -387–390 ████████████████████ ██████████████████████████████████████████.

[21]   **Exhibit 11**, BRENNTAG-TCC-00026772; *see also* **Exhibit 12**, BRENNTAG-TCC-00096166 (████████████████ ██████████).

[22]   **Exhibit 13**, BNS-TCC-0014833, at -834.

[23]   **Exhibit 14**, BRENNTAG-TCC-00102276.

[24]   **Exhibit 14**, BRENNTAG-TCC-00102276, at -276 to -277. Indeed, every executive at MPSI—president, vice presidents of cosmetics and marketing, secretaries, and directors—all held the exact same positions with WCD

17.    MPSI also assumed WCD's distribution agreements and sold the same talc to the same customers,[25] including in the 12-month periods before and after the 2004 Transaction:[26]



| | WCD (Before the 2004 Transaction) | MPSI (After the 2004 Transaction) |
|---|---|---|
| **Talc Suppliers** | | |
| **Talc Customers** | | |

18.    WCD's successor used the same marketing materials for the same cosmetic talc as WCD and, pursuant to the 2003 MSPA, added the term "Whittaker" throughout those materials to advertise its talc product lines and exploit WCD's established tradename.[29]  As recently as 2009, WCD's successor[30] continued to sell the "                         "                , which had been

---

before the 2004 Transaction.  **Exhibit 15**, BRENNTAG-TCC-00032168 (

). Former WCD employees have testified that they "went to work one day" and "the next day . . . we were under a different name," **Exhibit 16**, Deposition of Thomas Grunstra, dated June 22, 2022, in *Gray v. Johnson & Johnson*, No. MID-L-5932-19AS (N.J. Super. Ct. Law Div.), 19:14–20:12, but with no interview or changes in colleagues, benefits, or operations.  **Exhibit 17**, Deposition of Bradley Owens, dated July 12, 2016, in *LAOSD Asbestos Cases*, JCCP No. 4674 (Cal. Super. Ct.), 45:8–51:17.  And to this day, at least one former WCD executive—Brad Owens—still works for Brenntag.  Skinner Dep. Tr. 40:11–24.

25    Skinner Dep. Tr. 105:23–106:18.

26    **Exhibit 3**, BRENNTAG-TCC-00102401, at -401 to -404; **Exhibit 18**, BNS-TCC-0542828; **Exhibit 19**, BRENNTAG-TCC-00104649.

27    

28

29    *See, e.g.*, **Exhibit 20**, BRENNTAG-TCC-00102284, at -287 (
; 2003 MSPA § 15.8 (specifically permitting Brenntag to use "the name 'Whittaker' as a trade name . . . for product lines of the relevant Sold US Business").

30    In September 2007, WCD's successor MPSI merged into its affiliate Brenntag Specialties, Inc.  *See* **Exhibit 21**, BRENNTAG-TCC-00102803 at -814, -818–19 (

emphasized in WCD's marketing materials since before the 2004 Transaction.[31]

19.    The Debtors remained subsidiaries of DBUS with no operating assets.[32]

## II.    BERKSHIRE ACQUIRES THE DEBTORS FOR ITS RUNOFF LIABILITY BUSINESS.

20.    In 2007, the Debtors drew the attention of the Berkshire Hathaway group of companies ("**Berkshire**").

21.    Berkshire controls one of the largest and most sophisticated insurance operations in the world.  These operations are highly profitable because, after policyholders pay premiums but before claims are paid out, Berkshire invests the interim "float" for its own benefit.[33]

22.    A significant component of Berkshire's business model is "retroactive" reinsurance.[34]  Berkshire also acquires "runoff" liabilities for mass torts, which similarly entails ████████████████████████████████████████.[35]  Berkshire

---

████████ ); *see also* **Exhibit 22**, BRENNTAG-TCC-00102599, Deposition of Bradley Owens, dated November 9, 2017, in *Johson v. American Int'l Indus., Inc.*, No. MID-L-6651-16-AS (N.J. Super. Ct. Law Div.), 27:15–28:2 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ).  In 2019, Brenntag Specialties, Inc. converted to Brenntag Specialties, LLC.  *See* **Exhibit 21**, BRENNTAG-TCC-00102803, at -2849–52.

[31]    *See* **Exhibit 10**, BRENNTAG-TCC-00043386, at -389 (████████████████████████████████████████ ); **Exhibit 23**, BNS-TCC-0601048, at -056 (████████████████████████ ████████████ ).

[32]    Skinner Dep. Tr. 52:11–53:14 (████████████████████████████████████████ ████████ ); *id.* 56:2–18 (████████████████████████ ); **Exhibit 8**, BNS-TCC-1017385, at -7385, -7388-89.

[33]    *See* Berkshire Hathaway Inc., 2023 Annual Report p. K-3, https://berkshirehathaway.com/2023ar/2023ar.pdf ("**Berkshire Hathaway 2023 Annual Report**") (noting that "retroactive reinsurance . . . generate[s] significant amounts of upfront premiums along with estimated claims expected to be paid over long time periods (creating "float")); *id.* at 18 (explaining that "insurers get to invest [] float for their own benefit").

[34]    *See* **Exhibit 24**, Deposition of Brian Snover, dated October 21, 2024 ("**Snover Dep. Tr.**") 327:10–328:25 (█████████████████████████████████████████████████████████ .

[35]    Snover Dep. Tr. 57:16–58:22; *see also* Snover Dep. Tr. 57:16–58:22 and **Exhibit 25**, Deposition of John Arendt, dated June 13, 2024 ("**Arendt Dep. Tr.**") 23:11–20 ██████████████████████████████████████████████████████████████████████████████████████████████ ).

runs its reinsurance and runoff operations through its reinsurance division in Stamford, Connecticut ("**Reinsurance Division**").[36]

23.    Berkshire has explained in its Annual Report that it specifically targets runoff asbestos liability due to the "extreme" long-tail nature of asbestos injuries:  "In extreme cases, such as claims arising from exposure to asbestos . . . payments can stretch over many decades. This collect-now, pay-later model leaves [insurers] holding large sums—money we call 'float'— that will eventually go to others.  Meanwhile, insurers get to invest this float for their own benefit."[37]

24.    In 2007, Berkshire's Reinsurance Division identified a potential acquisition of the Debtors' corporate shells as an opportunity to profit from asbestos runoff.[38]  It decided to acquire the Debtors through National Indemnity Company ("**NICO**"), which is one of Berkshire's premier insurance companies with reported assets in excess of $420 billion.[39]  NICO ultimately agreed to purchase the Debtors' shells from DBUS (the "**2007 Transaction**") pursuant to a Stock Purchase Agreement (the "**2007 Agreement**").[40]

25.    In the 2007 Transaction, NICO acquired the Debtors' assets from DBUS.[41]  DBUS also agreed to pay NICO a $30 million post-closing purchase price adjustment should lifetime

---

[36]   Snover Dep. Tr. 57:16–62:12, 70:8–74:22. ███████████████████████████████████████
████████████████████████████████████████████ Snover Dep. Tr. 36:18-41:7.

[37]   Berkshire Hathaway 2023 Annual Report p. 18; *see also* Arendt Dep. Tr. 242:20–23, 244:8–13 (noting Berkshire has acquired "████████████████████████████████████████████").

[38]   **Exhibit 26**, BNS-TCC-1088637; Arendt Dep. Tr. 23:11–20 (███████████████████████████████); Snover Dep. Tr. 70:2–17 (same).

[39]   *Financial Reports*, NAT'L INDEMNITY CO., https://www.nationalindemnity.com/content/dam/pdfs/financial-reports/National_Indemnity_Company.pdf (last visited Dec. 7, 2024); *see also* Snover Dep. Tr. 51:8–10 (████████████████████████████████████████████████████████).

[40]   2007 Agreement, **Exhibit 27**, BERKTCC0000223.

[41]   *See* 2007 Agreement §§ 2.02, 3.09, 3.18.

9

asbestos liabilities exceed $165 million, with a similar provision for environmental liabilities.[42]
Apart from this "purchase price adjustment," Berkshire did not otherwise cap its potential
liabilities on account of the Debtors' future tort obligations.

26.     In exchange, NICO paid a nominal price of $1 and also guaranteed DBUS's
indemnity obligations to Brenntag under the 2004 Agreements.[43]   Collectively, the chain of
indemnification obligations pursuant to the 2004 Agreement and the 2007 Agreement shifts
ultimate financial responsibility for Brenntag's successor liability to NICO, the Debtors' highly
solvent corporate affiliate.

27.     Immediately after the 2007 Transaction, Berkshire installed Assistant Vice
President of Berkshire's Reinsurance Division, Raj Mehta, as President of the Debtors.[44]   Mehta
was an officer at NICO and other Berkshire entities and had substantial experience managing tort
claims.[45]   As corporate shells, the Debtors were reliant on Berkshire's broader insurance and
claims management apparatus.[46]

---

[42]   *See* 2007 Agreement § 2.06; Arendt Dep. Tr. 39:18–22.

[43]   *See* 2007 Agreement §§ 2.02, 8.03.

[44]   *See* **Exhibit 30**, Deposition of Raj Mehta, dated June 27, 2024 ("**Mehta June Dep. Tr.**") 20:7–21:17; **Exhibit 31**, BNS-TCC-1124884 ▮▮▮.

[45]   *See* **Exhibit 32**, BERKTCC0001352 (NICO D&O List 2008–2023); **Exhibit 33**, BERKTCC0001369 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[46]   *See* Mehta June Dep. Tr. 50:4–65:5; *see also* **Exhibit 34**, Deposition of Mohsin Meghji, dated November 2, 2023 49:2–9 ▮▮▮▮▮▮▮▮▮▮▮▮▮.  In fact, while Mehta was President of the Debtors and ostensibly in charge of the entirety of their business, his role was limited to managing the Debtors' tort liabilities.  Mehta June Dep. Tr. 128:9–16; *id.* 88:21–90:2 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  Immediately after the Debtors' board was formed in early 2008, Mehta and other directors granted Berkshire full control over the Debtors' assets and authorized Berkshire's investment team—including Warren Buffett—to invest those assets for Berkshire's own benefit and without oversight by Mehta.  **Exhibit 35**, BNS-TCC-0006656 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Mehta June Dep. Tr. 68:19–70:4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

28.    Mehta tried "████████████████████████" with the Debtors
for "██████████" namely that "██████████████████████████████████
████████████████████████████████████████"[47]

### III.  TALC CLAIM VERDICTS AGAINST WCD THREATEN BERKSHIRE'S INVESTMENT.

29.    Initially, Berkshire primarily faced steady but predictable traditional asbestos liabilities for which Soco was responsible, and environmental liabilities for which other Debtors were responsible.[48]  In the years leading up to the Debtors' bankruptcy filing, the claims arising from exposure to asbestos in cosmetic products as a result of WCD's talc increased significantly.

30.    The first jury award in a mesothelioma case related to asbestos-contaminated talc was in 2006.[49]  The first award related to *non*-industrial talc exposure, such as from talc in cosmetic products, occurred nearly a decade later.[50]

31.    WCD was initially named sparingly in mesothelioma talc cases.  The increase in talc claims against WCD is due mostly to a rise in claims alleging non-industrial exposure to talc in specific consumer cosmetic products (*e.g.*, WCD-supplied talc in Avon or Estée Lauder personal care products).[51]  In 2016, mesothelioma talc filings and associated settlements began to increase.[52]

32.    Plaintiff performance against WCD has improved over time:  the Committee's expert, Professor Alexandra Lahav, a leader in the study of mass tort litigation dynamics, explains

---

[47]    **Exhibit 108**, BNS-TCC-2386320; Mehta June Dep. Tr. 125:20–127:10.

[48]    Snover Dep. Tr. 126:17–22 ████████████████████████████████████████████████████
████████████████████████████████████████████████████).

[49]    *See* **Exhibit 36**, Expert Report of Yvette Austin, dated October 25, 2024 ("**Austin Affirmative Report**") ¶ 15.

[50]    *Id.*

[51]    *See* Austin Affirmative Report ¶ 18.

[52]    **Exhibit 37**, Corrected Affirmative Expert Report of Marc Scarcella, dated October 26, 2024 ("**Scarcella Affirmative Report**") ¶ 29; *see also* Austin Affirmative Report, Ex. 2; *id.* ¶ 22 (██████████████████████████████████████████), Austin Affirmative Report, Ex. 2.

that this is the usual pattern as attorneys representing personal injury victims improve their ability to establish causation and fault.[53]  For example, of five cosmetic talc cases that went to verdict before 2017, half resulted in defense verdicts; but from 2017 through the Petition Date, six straight trials resulted in plaintiff victories.[54]

33.    During Berkshire's early years owning the Debtors, Mehta managed WCD's claims largely on his own.[55]

34.    In 2018, Mehta realized that the changing landscape around WCD talc claims required additional expertise.  Berkshire's Reinsurance Division, which includes a subsidiary called Resolute Management, Inc. ("**Resolute**") led by president Tom Ryan,[56] manages Berkshire's runoff claims and conducts sophisticated modeling.[57]  As early as 2014, Ryan was indirectly involved in managing WCD's legacy asbestos liabilities because Berkshire had agreed to provide reinsurance for one of WCD's liability insurers.[58]  In 2018, Mehta asked Ryan, on an informal basis, to ███████████████████████████████████████████████████████████████

████████████.[59]

---

[53] **Exhibit 38**, Rebuttal Expert Report of Alexandra Lahav, dated November 12, 2024 ("**Lahav Rebuttal Report**") ¶¶ 25–27.

[54] *See* Lahav Rebuttal Report, Table 1 (████████████████████████████████████████████ ██████████████████████).

[55] Snover Dep. Tr. 120:4–16.

[56] Snover Dep. Tr. 65:18-21 (██████████████████████████████████████████████████████ ████████████████ **Exhibit 39**, Deposition of Tom Ryan, dated November 8, 2024 ("**Ryan Dep. Tr.**") 29:18–20 (████████████████████████████████████).

[57] Snover Dep. Tr. 58:2-62:12, 70:8–71:12, 327:10-328:25 (████████████████████████████████ ████████████).

[58] *See* **Exhibit 40**, DBUS0047597 (████████████████████████████████████████████████ ████████████████████); **Exhibit 41**, BERKTCC0216461 (████████████████████ ██████████████████████); *see* Ryan Dep. Tr. 44:17-46:8, 47:24-49:8; Scarcella Affirmative Report ¶ 15 n.23.

[59] Mehta June Dep. Tr. 64:23-65:5 (███████████████████████████████████████████████ ██████████████████████████)

35.    After 2018, "█████████████████████████████████████

█████████████████[60]  Then, on April 15, 2021, a jury returned a verdict in the *McNeal* case

for approximately $3.5 million.[61]  And on December 9, 2021 the jury returned a verdict in the

*Vanklive* case for ***approximately $76 million*** on the damages phase of the trial alone, not including

a subsequent punitive damages phase.[62]  Ryan promptly negotiated a ████████ settlement.[63]

## IV.  BERKSHIRE LOOKS TO EXIT ITS BAD INVESTMENT.

36.    On November 17, 2021, while focused on the impending verdict in *Vanklive*, Tom

Ryan directed Resolute "███████████████████████████████████

█████████████████████████████████████████████"[64]  Resolute

personnel worked directly with Ryan to model WCD's talc liabilities.[65]

---



[...] ██████████); **Exhibit 42**, Deposition of Melissa King, dated June 12, 2024 ("**King Dep. Tr.**") 33:11-15; Ryan Dep. Tr. 57:10-16.

[60]  Atkinson Affirmative Report ¶ 29.

[61]  *See* Lahav Rebuttal Report, Table 1.

[62]  **Exhibit 43**, BERKTCC0008262 (█████████████████████████████████████████);
Lahav Rebuttal Report, Table 1.

[63]  Ryan Dep. Tr. 58:13–22 (███████████████████████████████); *see also* **Exhibit 44**, BERKTCC0006972 (████████████████████).

[64]  **Exhibit 45**, BERKTCC0211420 (██████████████████████████).

[65]  *See, e.g.*, Ryan Dep. Tr. 187:10–12 (confirming that Ryan personally worked on the model and saved it with his "initials" in the filename); **Exhibit 46**, BERKTCC0240079 and accompanying metadata (███████████████████████████████████); **Exhibit 47**, BERKTCC0008552 (███████████████████) and its attachment **Exhibit 48**, BERKTCC0008553 (██████████████████████); **Exhibit 49**, BERKTCC0006086 (███████) and its attachment **Exhibit 50**, BERKTCC0006087 (2/6/23 iteration of model from Ryan); **Exhibit 51**, BERKTCC0008548 (████████████████████████) and its attachment, **Exhibit 52**, BERKTCC0008549 (█████████████); **Exhibit 53**, BERKTCC0007932 (███████████████) and its attachment, **Exhibit 54**, BERKTCC0007933 (███████████████); **Exhibit 55**, BERKTCC0259793 (██████████████████) and its attachment, **Exhibit 56**, BERKTCC0259809 (██████████████); **Exhibit 57**, BNS-TCC-1198266 (██████████) and its attachment, **Exhibit 58**, BNS-TCC-1198267 (████████████████); **Exhibit 59**, BERKTCC0262091 (████████████████ and its attachment, **Exhibit 59.A**, BERKTCC0262092 (██████████); **Exhibit 60**, BERKTCC0174230 (███████) and its attachment, **Exhibit 61**, BERKTCC0174231 (████████████); **Exhibit 62**, BERKTCC0246462 (██████████)

37. Ryan ███████████████████████████████████████████ for projecting future asbestos liabilities.[66]  Ryan spends an ████████████████████████ ████████████████████████████████████████.[67]

38. In modeling WCD's talc liabilities, Ryan and his team recognized that an accurate estimate of the Debtors' liabilities would need to account for large trial verdicts against them. Thus, in transmitting one iteration of the model, Ryan's team informed him that "██████████ ████████████████████████" and asked if he had "████████████"[68]

39. In late 2021, senior leaders in Berkshire's Reinsurance Division met "█████ ██████████████████" because "████████████████████████████████ ████████████████████████████████████████"[69]  Those strategic options included (1) ████████████████████, and (2) "█████████████████ ████████████████"[70]

████████████████████████████████████████████████████

---

████████████████████████████████████████) and its attachment, **Exhibit 63**, BERKTCC0246463 (████████████).

[66]  Ryan Dep. Tr. 82:13–83:20 (██████████████████████████████).

[67]  *See* Ryan Dep. Tr. 116:23–117:2 ████████████████████████████████████ ████████████████████ *see id.* 71:2–72:4 ████████████████████████████████████ ████████████████████); *cf. id.* 221:17–21 (████████████████████).

[68]  **Exhibit 53**, BERKTCC0007932 and **Exhibit 54**, BERKTCC0007933; *see also* Ryan Dep. Tr. 124:7–20, 184:10– 185:11 (████████████████████████████████████████ ████).

[69]  **Exhibit 64**, Deposition of Ateet Dhru, dated October 28, 2024 ("**Dhru Dep. Tr.**") 43:1-47:22; Snover Dep. Tr. 137:16–138:7, 179:4–180:16 ████████████████████████████████████████. ████████████████████████████████████████████████████████. Ryan Dep. Tr. 53:9–15 (████████████████████████████████).

[70]  Dhru Dep. Tr. 45:23–46:16.

████████████████████████████████████████████████ [71]

40.    Berkshire continued to adjust its analysis of the Debtors' liabilities through 2022. Days after Resolute ████████████████████████████████████, WCD suffered nearly $50 million in back-to-back trial verdicts.[72]

41.    On February 15, 2023, a jury in the *Graham* case awarded approximately $18.4 million in damages to the plaintiff, finding WCD 90% responsible for the harm.[73]    On March 3, 2023, a jury in the *Plant* case awarded approximately $29.14 million to the plaintiff on her claims against WCD.[74]

42.    Following these verdicts, Ryan believed that the Debtors would soon become "unable to financially satisfy" indemnification claims for Brenntag's successor liability (and trigger NICO's obligation to satisfy such claims): ████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[71]    **Exhibit 69**, BERKPL012494; *see* generally entries on Berkshire's privilege log ████████████████████████████████████████ including BERKPL013696; BERKPL013860 & BERKPL013861; BERKPL013865 & BERKPL013866; BERKPL006209; BERKPL006283 & BERKPL006284, BERKPL016453 & BERKPL016454; BERKPL001746 & BERKPL001747.

[72]    Two versions of the model sent only one day apart showed a ████████████████████████████. *Compare* **Exhibit 49**, BERKTCC0006086 (██████████████) and its attachment **Exhibit 50**, BERKTCC0006087 (████████████████████████████), D5, *with* **Exhibit 60**, BERKTCC0174230 (██████████████████████████████████████) and its attachment, **Exhibit 61**, BERKTCC0174231 (████████████), D5.

[73]    *See* **Exhibit 65**, BERKTCC0025628; *see also* Lahav Rebuttal Report, Table 1.  The *Graham* verdict was ultimately reduced because of a statutory cap on noneconomic damages in Oregon, but Berkshire recognized that this ruling was subject to appeal.  *See* **Exhibit 66**, BNS-TCC-1199013 (██████████████████████████████ Indeed, the constitutionality of the Oregon cap is not settled.  *See Busch v. McInnis Waste Systems, Inc.*, 366 Or. 628, 643 (July 9, 2020) (explaining:  "We recognize that *Horton* did not overrule *Greist* [which is the prior case upholding the constitutionality of a cap as applied to wrongful death actions], and we also need not overrule it to conclude that it is not controlling.").  Plaintiff's appeal of the Court's application of the damages cap was not filed before the case was stayed due to the bankruptcy filing.  In any event, the majority of states have no such statutory cap and thus the fact that a jury awarded $18.4 million is more relevant information—in projecting future liability *on a national basis*—than that the (unappealed) award was cut by a trial judge because of a feature specific to Oregon.

[74]    *See* **Exhibit 67**, BERKTCC0179914; *see also* Lahav Rebuttal Report, Table 1.

████████████████████████[75]

## V.    THE APPOINTMENT OF A SOUTH CAROLINA RECEIVER PROMPTS BERKSHIRE TO ORCHESTRATE A HURRIED BANKRUPTCY FILING.

43.    In March 2023, shortly after the $29.14 million *Plant* verdict, a South Carolina court placed WCD into receivership.[76]  The Judge that issued the receivership order—a former justice of the South Carolina Supreme Court—stated that "there clearly appear to be related company transactions involved in this matter" and "specifically authorize[d] the Receiver to investigate such transactions and actions of related companies and, where appropriate the officers and directors of those entities."[77]

44.    Facing potential scrutiny by a court with significant asbestos experience and a receiver that was pursuing WCD's financial entanglement with Berkshire, Ryan emailed Mehta concerning ████ "████████████" and Berkshire quickly engaged restructuring counsel.[78] Berkshire Reinsurance Division counsel Bruce Byrnes ██████████████ to the Chief Financial Officer of Berkshire Hathaway, Inc., itself and copied the head of the Reinsurance Division, Ajit Jain.[79]  Reinsurance Division executive Brian Snover likewise asked ████ ████████████████████████.[80]  Given Ryan's familiarity ████████ ██████████████████████.[81]

---

[75]  **Exhibit 68**, BNS-TCC-1199604.

[76]  Dkt. No. 157 ¶ 9; Dkt. No. 157, Ex. 3.

[77]  Dkt. No. 157, Ex. 3 at 5.

[78]  Dkt. No. 157 ¶ 14; **Exhibit 70**, BERKTCC0211694 (████████████ ████).

[79]  **Exhibit 71**, BERKTCC0257428 (████████████ ████); **Exhibit 72**, BERKTCC0257429 (████████████).

[80]  Ryan Dep. Tr. 220:6–8.

[81]  Ryan Dep. Tr. 221:9–222:3.

45.     Snover and Brynes personally interviewed ███████████████████████

███████████.[82] Mehta then spoke to █████ firms, including Kirkland, and formally engaged

Kirkland to represent Debtors in connection with a potential restructuring.[83]

46.     Aware of the potential for a related party transaction involving the Debtors'

affiliates, Berkshire and NICO, Kirkland ██████████████████████████████████

█████████████.[84]   Mehta then met with Tim Pohl and Paul Aronzon (the "**Bankruptcy**

**Directors**") for █████████████ before selecting them to serve as directors, upon which

Berkshire counsel ████████████████████████████████████.[85]  When asked

about his interview for the role, Pohl explained ██████████████████████████████

████████████████████████████████████[86]

47.     Pohl and Aronzon were sent independence questionnaires to complete.   Mehta

executed their engagement letters ████████████████████████████████████████

█████████.[87] Without negotiating, Mehta agreed that the Debtors would compensate them

---

[82]  **Exhibit 73**, BERKTCC0281595 (███████████████████████████████████████████
███████████████████); *see also* Snover Dep. Tr. 186:3–6 ("████████████████████
████████████"); **Exhibit 74**, Deposition of Bruce
Byrnes, dated October 25, 2024 ("**Byrnes Dep. Tr.**") 58:19-63:14 (███████████████████
████).

[83]  **Exhibit 75**, Deposition of Raj Mehta, dated October 23, 2024 ("**Mehta Oct. Dep. Tr.**") 69:2–12.  **Exhibit 76**,
BNS-TCC-3401842; **Exhibit 77**, BNS-TCC-3401843 (attachment).  Mehta routinely forwarded the Debtors'
privileged communications with Kirkland to counsel for NICO.  *See* **Exhibit 78**, BERKTCC02700544 (████████
████████████████████); **Exhibit 79**, BERKTCC0272829 (█████████████████████████
██████████); **Exhibit 80**, BERKTCC0274970 (████████████████████████████████).

[84]  *See* **Exhibit 81**, BNS-TCC-3401834 and **Exhibit 82**, BNS-TCC-3401838 (████████████████████
████████████████).

[85]  **Exhibit 83**, Deposition of Paul Aronzon, dated November 9, 2024 ("**Aronzon Dep. Tr.**") 58:18-59:17 (██████
████████████████████); **Exhibit 84**, Deposition of Tim Pohl, October 30, 2024 ("**Pohl Dep. Tr.**") 62:12-
64:7 (████████████████████████████████████████████); *see also* **Exhibit
85**, Deposition of Carmel O'Sullivan, dated February 7, 2024 219:24–220:6; Mehta June Dep. Tr. 251:5–252:12.

[86]  Pohl Dep. Tr. 62:12–20.

[87]  **Exhibit 86**, BNS-TCC-3401993 (████████████████████████████████████████
████████████); *see* **Exhibit 87**, BNS-TCC-

at $███ per month or $████ each annually.[88]

48.   Mehta testified that in evaluating director candidates, he ████████████
█████████ "████████████" instead concluding that ████████████████████
███.[89]   Neither Pohl nor Aronzon have previously done significant work related to ██
████████████████████.[90]

49.   Instead, Pohl and Aronzon's experience as directors centers on ████████████
████████████████████████" ████████████████████████
████████████.[91] ████ "████████████" ████████████████████
████████████████████████████████████
████████████.[92]

50.   Aronzon testified that he works as a "████████████████" with "████████████
████████" of his past ██ directorships resulting from ████████ recommendation.[93]  And Pohl



3400428 (████████████████████████████████); **Exhibit 88**, BNS-TCC-3320722 (████
█████).

[88]   **Exhibit 86**, BNS-TCC-3401993, at -2006, -2011 (████████████████████████); *see also* **Exhibit
89**, BNS-TCC-3320668 (████████████████████████████████).

[89]   Mehta Oct. Dep. Tr. 93:13–17; *id.* 95:10–96:14.

[90]   Pohl Dep. Tr. 47:14–48:13
████████████████████████████████████; *see also* Pohl Decl., Dkt. No. 1298
¶¶ 3–4; Pohl Dep. Tr. 56:17–58:11, 235:3–7, 47:14–48:13; Aronzon Dep. Tr. 23:3-6, 59:23–60:22
████████████████████████).

[91]   Aronzon Dep. Tr. 24:17–25:6
████████████████████████████████████████
████████); *see also id.* 25:11–14
████████████████████████████████████████████)
Pohl Dep. Tr. 37:20–38:4 (████████
████████████████████████
████████.

[92]   Aronzon Dep. Tr. 24:24–25:2 (████████████████████
████████████████████████); *id.* 25:19–26:9.

[93]   Aronzon Dep. Tr. 21:7–9 (████████████████████████).

testified that ███████████████████████████████ is from his directors' fees, with ███ of

his directorships resulting from ██████████████████.[94]

51.       Shortly after their appointment, on April 25, 2023, Mehta voted along with Pohl

and Aronzon to formally authorize the Debtors' bankruptcy, and the filing occurred the next day.[95]

On April 26, 2023 (the "Petition Date"), the Debtors commenced these chapter 11 cases, asserting

that they had more than $1 billion and up to $10 billion in liabilities.[96]  Talc personal injury victims

hold the vast majority of current claims against the Debtors, in number and amount.[97]  On May 24,

2023, the United States Trustee appointed the Committee to represent the interests of talc

claimants.[98]

52.       On May 3, 2023, the Debtors moved to appoint the Honorable Shelley C. Chapman

(Ret.) as the Future Claimants' Representative ("**FCR**") in these Chapter 11 Cases, in order "to

ensure that the rights of Future Claimants are adequately represented by a disinterested and

qualified representative[,]" citing to section 524(g)(4)(B)(i) of the Bankruptcy Code.[99]  On June

26, 2023, the Court approved the appointment of Ret. Judge Chapman as the FCR, effective as of

the Petition Date.[100]

## VI.    THE SETTLEMENT AGREEMENT IS NEGOTIATED AT LESS THAN ARMS-LENGTH.

53.       Following the Petition Date, Mehta remained on the Debtors' board.  At the same

---

[94]    Pohl Dep. Tr. 35:23–36:4, 38:18–25.

[95]    **Exhibit 90**, BNS-TCC-2220121 (██████████████████████).

[96]    *See* Dkt. No. 1 at 4 (voluntary chapter 11 petition of WCD estimating liabilities at $1-10 billion).

[97]    *See generally* Global Notes and Statement of Limitations, Methodology, and Disclaimers Regarding the Debtors'
        Schedules of Assets and Liabilities and Statements of Financial Affairs, Dkt. No. 134; McKnight Declaration,
        Dkt. No. 1300, Fig. 1.

[98]    Dkt. No. 121.

[99]    Dkt. No. 54 ¶¶ 11–12.

[100]   Dkt. No. 231 ¶ 1.

time he was working in Berkshire's Reinsurance Division, Mehta attended many of the Debtors'

post-petition board meetings.[101]  Mehta recused himself arbitrarily and only "████████████

████████████████████████████████████████████████████████████"[102]

      54.     Mehta participated in the Debtors' decision-making related to Berkshire.  For

example, the Debtors filed the Adversary Proceeding naming Berkshire as a "Protected Party" and

seeking control of successor liability claims indemnified by NICO on September 7, 2023.[103]  On

November 20, 2023, Mehta attended a board meeting and participated in a presentation by counsel

on "████████████████████████████████████████████████████████████

████████████████████████████████████████████████"[104]  When

confronted with board minutes reflecting his participation in this meeting, Mehta claimed that the

minutes "███████████████"[105]

      55.     Mehta likewise voted to engage the Debtors' talc claims valuation expert, the

---

[101]  *Compare* Snover Dep. Tr. 119:17–120:3 (████████████████████████████), *and* Byrnes
Dep Tr. 187:10–188:9 (████████████████████████████████), *with* Pohl Dep.
Tr. 150:17–151:4 (████████████████████████████), *and id.* 214:7:–
215:12 (███████████████████████████████████████████████████████),
*and id.* 232:21–237:20 (██████████████████████████████████████████
████████████), *and id.* 247:16–248:21
██████████████████████), *and id.* 250:18–256:13 (██████████████
██████████████████), *and id.* 257:1–258:2 (█████████████
██████████████████████████████, *and id.* 271:4–272:11 (███████
████████).

[102]  Pohl Dep. Tr. 211:18–23.

[103]  AP Dkt. No. 1-2, App'x B (listing Non-Debtor Affiliates, including various Berkshire entities, as "Protected
Parties").

[104]  **Exhibit 91**, BNS-TCC-3189660; **Exhibit 92**, BNS-TCC-3329476 (███████████
████████████); **Exhibit 93**, BNS-TCC-2220061 (██████████████
███████████████████); Pohl Dep. Tr. 272:6–23 (████████████████
██████████).

[105]  Mehta Oct. Dep. Tr. 199:7–200:18.

Brattle Group ("**Brattle**").[106] The Bankruptcy Directors ███████████████████████████████

███.[107] According to Aronzon, "███████████████████████████████████

███████████████████████"[108]

56.     The Bankruptcy Directors had broad authority to manage the Debtors and the Debtors' assets, including any estate causes of action.  They delegated the investigation and valuation of such causes of action to the Debtors' counsel and Brattle.[109]

57.     The Bankruptcy Directors received a ████████████████████████

█████████████████████████████████████████.[110] When asked about those steps, Aronzon testified "████████████████████████" and "████████████

█████████████████"[111]  In fact, the Debtors did not propound any discovery requests, noticed no fact depositions, and do not appear to have conducted informal interviews or information gathering.[112]

58.     The "summary" of conclusions was presented in two written presentations to the

---

[106]  October 12, 2023 Omnibus Meeting Minutes (**Exhibit 94**, BNS-TCC-3189664) ███████████████
███████████████████████); Mehta Oct. Dep. Tr. 182:23–183:11 (███████████████████
████████████).

[107]  *See* Aronzon Dep. Tr.164:3–9 (██████████████████████████████████████████
███████).

[108]  Aronzon Dep. Tr. 161:15-162:23; *see also* Pohl Dep. Tr. 238:1–5 (█████████████████████
████████████████████).

[109]  *See, e.g.*, Pohl Dep. Tr. 187:4–10 (██████████████████████████████████████
████████████████████████); Aronzon Dep. Tr. 218:22–24 (██████████████████
████████████████████).

[110]  Pohl Dep. Tr. 186:13–22.

[111]  Aronzon Dep. Tr. 126:7–17; Pohl Dep. Tr. 182:4–183:13, 184:14–24 (████████████████████
████████████████), *see also* Aronzon Dep. Tr. 126:12–17 (█████████████████████████
█████████████████████████████████████████████████████████████████████████).

[112]  Berkovits Decl. ¶¶ 121–130 (explaining that, unlike the TCC, the Debtors played a passive role in the discovery process); *see generally* Standing Motion ¶¶ 43–50 (summarizing in detail the rigorous investigation conducted by the Committee and contrasting it with the conduct of the Debtors).

Bankruptcy Directors:  one on August 8, 2023 titled " █████████████ ," and one on May 2, 2024, also titled " ███████████ ."  Both are fully redacted.[113]  The sole testimony from the Bankruptcy Directors on the substance of counsel's conclusions is the claim that " █████████████

████████████████████ ."[114]

59.    With respect to valuation, the Bankruptcy Directors " ████████████ " ███

█████████████████████████████████████

████████████████████ .[115]  Instead, on May 2, 2024, Brattle presented to

the Bankruptcy Directors on ██████████████████████ [116]

60.    The entire presentation has been withheld as privileged, but the Bankruptcy

Directors testified that their ████████████████████████████

██████████████████ .[117]  It appears that the Bankruptcy Directors

had no understanding of claim values outside of the Brattle presentation; as Aronzon put it:

" █████████████████████████████████████

████████████████ "[118]

61.    These withheld presentations regarding (1) counsel's investigation of the Debtors'

---

[113]  *See* **Exhibit 95**, BNS-TCC-3189648 ( ███████████████████████████
██████ ); **Exhibit 96**, BNS-TCC-3323284 ( ████████████████████████
██ ).

[114]  Pohl Dep. Tr. 292:22-25.

[115]  Pohl Dep. Tr. 268:20-24.

[116]  **Exhibit 97**, BNS-TCC-3323721 ( ███████████████ ); *see* Pohl Dep. Tr. 263:23–264:14 ( █████████
████████████████████████████████████ ); Aronzon Dep. Tr. 195:11–196:3
(same).

[117]  **Exhibit 98**, BNS-TCC-3323290 ( ████████████████████████████████████
██████ ); Pohl Dep. Tr. 301:12–18, 320:8–22; Aronzon Dep. Tr. 222:14–223:4.

[118]  Aronzon Dep. Tr. 226:3–12; *see also id.* 224:9–16 ( ████████████████████████████
████████████████████████████ ); Pohl Dep. Tr. 269:11–12 ( ███████
████ ).

claims, and (2) Brattle's estimated valuation of those claims (excluding prior cases that went to trial), are the only information the Bankruptcy Directors obtained before deciding to settle all claims against Brenntag, DBUS, and Berkshire: they were "████████████████████████

████████████████████████████████████████████████████████████████████

████████████████"[119]

62.     In June 2024, the Debtors had a full written plan to release claims against Brenntag.[120] They made their first offer weeks later, still in June 2024.[121] While the claims to be settled were principally claims against Brenntag, the Bankruptcy Directors did not attempt to negotiate with Brenntag's principals directly[122] or seek monetary contribution by Brenntag.[123] Instead, the Debtors negotiated solely with a principal from their parent, Berkshire, for a release that eliminated tort claims against Brenntag.[124] On August 14, 2024, the Court granted control of successor liability claims against Brenntag to the estates.[125]

---

[119] Pohl Dep. Tr. 287:23-288:14 ██████████████████████████████████████
████████████████████████████); *see also id.* 294:17–295:1 (████████████████);
Aronzon Dep. Tr. 218:20–219:9 (same).

[120] **Exhibit 102**, BNS-TCC-3320591 (██████████████████████████████
████████████████████████.

[121] **Exhibit 102**, BNS-TCC-3320591; Pohl Dep. Tr. 18–21 (██████████████
████████████████).

[122] *See* Standing Motion, Ex. B ¶¶ 68–87; Skinner Dep. Tr. 142:15–20 ("█████████
████████████████████████████████████████████████
████████████████████").

[123] Skinner Dep. Tr. 139:5–17 ████████████████████████████████████████
████████████████████████████████████████████████
████████████████).

[124] **Exhibit 103**, BNS-TCC-3316782 (████████████████████████████████
████); **Exhibit 104**, BNS-TCC-3323570 ████████████████
████████).

[125] AP Dkt. No. 268.

63.     Berkshire's "███" ███████████, who had previously managed the Debtors' liabilities and represented them as recently as April 2023 in trying to settle the ███ case.[126]

64.     Tim Pohl and Tom Ryan—Aronzon was unavailable "███████"—ultimately reached a settlement agreement in principle on August 5, 2024.[127] Had settlement failed, the Bankruptcy Directors had no plan to "███████" or "████████████████"[128] Pohl testified that he and Aronzon "███████████" ████████████████ and claimed that "████████████████████" *i.e.*, "████████████████" would have been "███████"[129]

65.     The $535 million Settlement Agreement includes a $50 million debtor-in-possession loan from Berkshire.[130] That loan from Berkshire is not value to creditors for talc claims; rather, those funds are for the bankruptcy professionals in this case, and the value Berkshire is receiving from that loan is the (enormous) value of keeping this bankruptcy proceeding afloat, which is the sole procedural vehicle through which Berkshire can attempt to settle its aggregate liability under Rule 9019. This bankruptcy proceeding likewise stays claims against Brenntag and Berkshire while mesothelioma victims die from their conditions before they get to trial.

66.     Of the remaining $485 million, it appears that *only 70%*, or *only approximately*

---

[126]  Ryan Dep. Tr. 222:13–22; Mehta Oct. Dep. Tr. 48:24–50:5 (████████████████ ████████████████); *See* **Exhibit 105**, Berkshire Response to ROG 7 ████████████████ ████████████████); Ryan Dep. Tr. 264:4–15.

[127]  **Exhibit 106**, BNS-TCC-3323864.

[128]  Pohl Dep. Tr. 333:14–334:5.

[129]  *Id.* 334:7–337:3.

[130]  Settlement Agreement, Dkt. No. 1297-3 Ex. B, § 3 (payment is "$535 million *less* the aggregate principal amount of DIP Loans funded in Cash by NICO or its designee"); *id.* § 4 ("NICO may terminate this Settlement Agreement . . . if any of the following occur . . . (7) an uncured default or Event of Default under the DIP Order and DIP Term Loan Facility pursuant to the terms of the DIP Order and the DIP Credit Agreement.").

*$340 million*, relates to the settlement of talc claims.[131] This is despite the fact that the estates' successor liability claims against Brenntag are worth around ███████.[132]

67.    Of that $340 million, $████████████████████████████████████████████████

███████████████████████████████████████████████████████.[133]    That leaves

approximately $300 million in real value being paid by Berkshire for settlement of this liability.

## LEGAL STANDARD

68.    Pursuant to Federal Rule of Bankruptcy Procedure 9019, under certain circumstances "the Court may approve a compromise or settlement" of estate-held claims.  Fed. R. Bankr. Proc. 9019(a).  The Court may only approve a settlement that is "fair and equitable," *Protective Comm. for Indep. S'holder of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine

---

[131]  The $485 million settlement was designed to resolve what Brattle, (under-)estimated at **$460 million to $557 million in talc claims**, $14 million in asbestos claims, $37 million in environmental claims, and $158-185 million in "avoided defense costs."  *See* McKnight Decl., Dkt. No. 1300, Fig. 1; *see also* **Exhibit 99**, Expert Report of David McKnight, dated October 25, 2024 ("**McKnight Affirmative Report**") Table 1.  In other words, the talc claims only constitute 70% of all value calculated by Brattle ($460 million divided by ($460 million + $14 million + $37 million + $158 million = $669 million total), or $557 million divided by ($557 million + $14 million + $37 million + $185 million = $793 million total)), and thus the settlement can be presumed to be allocated 70% toward talc claims and 30% toward other claims and defense costs.

[132]  *See infra* Section II.A.1.

[133]  As noted, the 2007 agreement required DBUS (then Stinnes) to pay a purchase price adjustment totaling $45 million if talc and environmental liabilities exceeded a specific threshold, of which $30 million was for talc liabilities. 2007 Agreement § 2.06(c); Snover Dep. Tr. 98:5–99:3 (███████████
███). ███████████████████. Arendt Dep. Tr. 164:12–17 ("██████████████
█████ ██). ████████████████████████████.  *See* **Exhibit 107**, BNS-TCC-0462992 at -995 ████████████████████████████████████████); King Dep. Tr. 176:12–24 (████████████████████████
██████████). Eventually, DBUS agreed to pay the purchase price adjustment to NICO and the parties agreed that █████████████
██████████████████████████  *See also* **Exhibit 109**, BERKTCC0283010, at -011 (██████████████).

settlements before approving them.").[134]  Moreover, the party seeking approval bears the burden

to show that the settlement is also "in the best interests of the estate and the debtor."  *In re NJ*

*Affordable Homes Corp.*, No. 05-60442, 2007 WL 4300153, at *2 (Bankr. D. N.J. Dec. 5, 2007);

*see also In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 804 (E.D. Pa. 1986).

69.     When considering a proposed settlement, courts generally "assess and balance the

value of the claim that is being compromised against the value to the estate of the acceptance of

the compromise proposal."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  The

Third Circuit recognizes four criteria that a bankruptcy court should consider in this assessment:

"(1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the

complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attending it; and (4) the paramount interest of the creditors."  *Id.* (listing the so-called "*Martin*

factors").

70.     In considering these factors, courts must consider all that is "relevant to a full and

fair assessment of the wisdom of the proposed compromise."  *In re Marvel Ent. Grp., Inc.*, 222

B.R. 243, 249 (D. Del. 1998).  A court must "afford paramount consideration to the interests of

creditors, ***but that consideration should focus particularly on the fairness of a settlement to those***

***parties who did not partake in the settlement***."  *In re Nutritional Sourcing Corp.*, 398 B.R. 816,

837 (Bankr. D. Del. 2008); *Eddy v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. (In re Med. Asset*

*Mgmt., Inc.)*, 249 B.R. 659, 663 (Bankr. W.D. Pa. 2000); *see also In re TCI 2 Holdings, LLC*, 428

B.R. 117, 136 (Bankr. D.N.J. 2010) (court should appraise "the fairness of the settlement to other

persons, i.e., the parties who did not settle").

71.     As importantly, in applying the *Martin* factors to determine whether a settlement is

---

[134]   Emphasis is added and internal quotation marks and citing references are omitted unless otherwise noted.

fair and equitable, a court must also apply the appropriate standard of review. The U.S. Supreme Court has instructed that an insider's "dealings with the [Debtor] corporation are subjected to rigorous scrutiny." *See Pepper v. Litton*, 308 U.S. 295, 306 (1939); *accord Schubert v. Lucent (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."). The proponent of a conflicted transaction bears the burden of establishing the entire fairness of the transaction. *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider . . . to show the inherent fairness from the viewpoint of the corporation and those with interests therein."). Heightened scrutiny requires the Court to refuse to defer to the proponents' business judgment in assessing the proposed settlement. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015) (courts "apply heightened scrutiny and some skepticism" to settlement with debtor parent).[135]

## ARGUMENT

### I. THE PROPOSED SETTLEMENT IS SUBJECT TO THE HEIGHTENED SCRUTINY THAT APPLIES TO INSIDER TRANSACTIONS.

72. The Court must subject the Debtors' proposed settlement with Berkshire and the other Contributing Parties to rigorous scrutiny because it is a conflicted transaction between a subsidiary and its ultimate corporate parent. *See In re Winstar*, 554 F.3d at 412 ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."); *see also Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995) ("When a debtor subsidiary settles a claim it has against a parent

---

[135] Of course, even if the Court applied the business judgment rule, the Settlement Agreement would still easily fail the *Martin* factors, for all the reasons discussed herein.

corporation without the participation of the creditors, a bankruptcy court should carefully scrutinize the agreement.") (citing *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (S.D.N.Y. 1991) ("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the . . . factors [used] to determine whether a settlement is fair and reasonable.")); *In re Dow Corning Corp.*, 192 B.R. 415, 428 (Bankr. E.D. Mich. 1996) ("The case law clearly holds that when a debtor in possession seeks to settle a dispute with its parent company or with another related party, the court should give greater scrutiny than in the usual case."); *c.f. In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446, 451 (Del. 2024) (explaining "entire fairness is the presumptive standard of review" in a conflicted transaction). No party seriously disputes that the Settlement Agreement is a conflicted transaction.[136] NICO, as the ultimate parent of the Debtors, is an insider under the Bankruptcy Code. 11 U.S.C. § 101(2)(A) (defining "affiliate" to include an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"); *id.* § 101(31) (defining "insider" to include an "affiliate").

73.     As Professor Jackson explains, the appointment of the Bankruptcy Directors did not cleanse the transaction. First, the Bankruptcy Directors are professional directors who were engaged by the Debtors after Berkshire steered the Debtors to Kirkland, and Kirkland steered Mehta (himself a Berkshire employee serving as a co-director with Pohl and Aronzon) to the Bankruptcy Directors. Second, the Settlement was negotiated between the Bankruptcy Directors and Tom Ryan, who had previously worked on behalf of the Debtors to negotiate settlements, market their assets, and model their liabilities. That is, the Debtors effectively negotiated against

---

[136]   *See, e.g.*, Settlement Motion ¶ 85 (acknowledging the Settlement "settles causes of action against the Debtors' current direct and indirect equityholders (NICO) and related parties"). As explained by Pohl, the Settlement Agreement extinguishes the Debtors' most valuable remaining asset: claims indemnified by its "sole current direct and indirect equity holders" NICO and Berkshire. Pohl Declaration, Dkt. No. 1298 ¶¶ 4, 6, 11, 12.

themselves.[137]   Third, the Settlement was negotiated without the knowledge or involvement of

creditors, including the Committee and FCR.  *See In re Match Grp.*, 315 A.3d at 473 ("A special

committee created to secure the protections of *MFW* should function 'in a manner which indicates

that the controlling stockholder did not dictate the terms of the transaction and that the committee

exercised real bargaining power at an arm's length.'") (quoting *Kahn v. M & F Worldwide Corp.*

*(MFW)*, 88 A.3d 635, 646 (Del. 2014)).  These circumstances, which are discussed in detail below,

confirm that applying heightened scrutiny is appropriate, and themselves elucidate why the

Settlement represents a faulty proposed resolution to the key issue in these bankruptcy cases.

74.     Accordingly, it is the Debtors' burden to establish not only that the terms of the

Settlement are fair and reasonable, but also that the process that led to the Settlement was fair and

reasonable.  *See Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 323 B.R.

345, 385–86 (Bankr. S.D.N.Y. 2005) (under heightened scrutiny, court must examine "dual

components—one procedural and one substantive").  Proponents of a self-dealing transaction are

"required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the

bargain."  *Casey v. Brennan*, 780 A.2d 553, 569 (N.J. App. Div. 2001)*.*  The "burden of proving

entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but

not invariably" results in a court invalidating the proposed transaction.  *In re Adelphia Commc'ns*,

323 B.R. at 385.

75.     As explained below, first, the *Martin* factors conclusively demonstrate that the

---

[137] "When a debtor subsidiary settles a claim it has against a parent corporation without the participation of the creditors," questions of collusion are inherently raised and, thus, the Court must examine "the extent to which the settlement is truly the product of arms-length bargaining, and not fraud or collusion." *Foster Mortg.*, 68 F.3d at 918 (citation omitted) ("Another factor bearing on the wisdom of the compromise at hand is the extent to which the settlement is truly the product of arms-length bargaining, and not fraud or collusion."). And it is the Debtors' burden to show that the proposed settlement is in fact the product of arms-length bargaining. *See, e.g.*, *In re Fox*, No. 03–60547 JPK, 2011 WL 10468085, at *11 (Bankr. N.D. Ind. Mar. 16, 2011); *In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989); *In re Matco Elecs. Grp., Inc.*, 287 B.R. 68, 78-79 (Bankr. N.D.N.Y. 2002).

substantive terms of the settlement do not meet the substantive "inherent fairness" standard. Second, Berkshire created a playing field that was unequal by design and inconsistent with the exercise of the procedural "utmost good faith," resulting in the flawed bargain now before the Court.[138]

## II. THE DEBTORS CANNOT MEET THEIR BURDEN TO SHOW THAT THE SETTLEMENT IS FAIR UNDER THE *MARTIN* FACTORS.

### A. Under the First *Martin* Factor, the Debtors Significantly Understate the Value and Merit of the Estates' Successor Liability Claims Against Brenntag.

#### 1. The Claims are Worth Billions of Dollars.

76.    The Settlement Agreement is unreasonable because the Debtors' successor liability claims against Brenntag are worth billions of dollars. Yet the Settlement Agreement allocates approximately $310 million (from Berkshire, not Brenntag) to resolving those claims.[139]  No defensible estimation method supports the Debtors' decision to accept billions less than their claims are worth.

##### a. An Accurate Estimate of the Debtors' Talc Liabilities Would Be in the Range of $███████.

77.    Despite settling talc claims against Brenntag for a few hundred million dollars, a reasonable estimate for the Debtors' talc liabilities is in the range of $████████████.[140] The Bankruptcy Directors did not even question Brattle's method or try to understand its

---

[138] For the reasons discussed herein, the Settlement Agreement would also be rejected under the business judgment standard. *See infra* Argument IV.

[139] The calculation is as follows:  Brattle's valuation matrix accounted for $460 million to $557 million in talc liability, $14 million in asbestos liability, $37 million in environmental liability, and $158 million to $185 million in avoided defense costs, for a total of $669 million at the low end.  The allocation for talc liability is $460 million / $669 million, times the $485 million non-loan portion of the settlement, less ████████. The allocation for asbestos liabilities is $14 million / $669 million, times the $485 million non-loan portion of the settlement.  The allocation for environmental liabilities is $37 million / $669 million, the $485 million non-loan portion of the settlement.  The allocation for avoided defense costs is $158 million / $669 million, times the $485 million non-loan portion of the settlement.  The calculations if one used the high-end of the Brattle range are similar.

[140] Austin Affirmative Report ¶ 28.

unreasonable inputs and assumptions.    By contrast, valuation expert Yvette Austin made reasonable assumptions and reached an estimate that the Debtors should be using to pursue their claims against Brenntag and the other Contributing Parties.

78.    Austin used the right inputs to estimate the value of the Debtors' claims against Brenntag.    Claims based on talc in *cosmetic products*—which constitute the lion's share of projected liability in this case—largely began in or shortly before 2015.    For example, Brattle expert McKnight, states: "███████████████████████████

███████████████████████"[141] ██ "████████████████████"██

██████████████ "████"[142] Until a mass tort is mature, older data is less useful.    All of the valuation experts agree that ███████████████████████████

████████████████████████████████████.[143]    Accordingly,

"████████████████████████████."[144]    Thus, Austin projected WCD's future

talc liability as follows:



- ████████████████████████████████████
- ████████████████████████████████████
- ████████████████████████████████████

---

[141] McKnight Affirmative Report ¶ 48.

[142] *See also* Lahav Rebuttal Report ¶ 20 (citing article).

[143] McKnight Affirmative Report, Fig. 6 (████████████████); *id.* Ex. 4 (████
████); Scarcella Affirmative Report ¶¶ 29–32 & Figs. 5 & 7 (████
████); **Exhibit 110**, Expert Report of Michael Atkinson, dated October 25, 2024 ("**Atkinson Affirmative Report**") ¶ 29 & Figs. 3b & 4 (same); Austin Affirmative Report Ex. 2 (████
████); *id.* ¶ 36 (████████████████████).

[144] Lahav Rebuttal Report ¶ 26.

[145] Austin Affirmative Report ¶ 27.

[146] *Id.*



79.    Using these assumptions, Austin calculated WCD's total talc liabilities between approximately ███████████████████████████.[148]

80.    Austin's estimate is reasonable considering the wider context of talc litigation.  For example, Johnson & Johnson is currently seeking to settle its own talc claims for $8.2 billion—a number completely in line with liability settlements in similar cases.[149]  Other mass tort cases have settled for billions of dollars each *even without settling future liability*.[150] ███████████████████████████████████████████,[151] ██████████████████████████████████████████.

81.    Taking into account this wider context, Austin's projections are conservative in another respect.  All of the valuation experts in these cases agree that leading up to the time of the bankruptcy filing WCD's talc liabilities were *increasing rapidly*.  However, none of them, including Austin, made the assumption—although such an assumption would have been justified, *see generally* Lahav § IV—that claims values would continue to increase into the future after the bankruptcy filing on the same trajectory (*e.g.*, assuming that average claim value from 2023

---

[147] *Id.*

[148] *Id.* ¶ 28.

[149] *See* Jef Feeley, *J&J Lifts Baby Powder Settlement Bid to More than $8.2 Billion*, BLOOMBERG (Sep. 20, 2024 6:51 AM), https://www.bloomberg.com/news/articles/2024-09-19/j-j-lifts-baby-powder-settlement-bid-to-more-than-8-2-billion; Alexander Gladstone & Akiko Matsuda, *Johnson & Johnson's $8 Billion Talc Plan Hinges on Disputed Votes*, WALL ST. JOURNAL (Sep. 27, 2020 6:00 AM), https://www.wsj.com/articles/johnson-johnsons-8-billion-talc-plan-hinges-on-disputed-votes-90bb117a.

[150] Lahav Rebuttal Report ¶¶ 14–16 ████████████████████████████████████████
████████████████████████████████████████████.

[151] McKnight Affirmative Report ¶ 56, n.44 and Fig. 7.

through 2026 would increase as dramatically as average claim value did between 2020 through 2023).[152]

               **b.**      **Several Methodological Choices in Berkshire's Internal Modeling Accord with Austin.**

      82.    Berkshire's own valuation modelers at Resolute made at least three methodological choices that align with Austin's and which are salient here.



      83.    ***First***, Berkshire's talc valuation models often used ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.[153] This is consistent with, albeit even more aggressive than, Austin's valuation model, which ▮▮▮▮▮▮▮▮▮▮. (It is inconsistent with the valuation model of Berkshire's own valuation expert in this litigation, which ▮▮▮▮▮▮▮▮, most of which predates recent cosmetic talc trends.[154])

      84.    ***Second***, the valuation model incorporated a discount rate based on ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[155] In the most recent version of the model, this discount rate was capped at ▮%.[156] This is consistent with the discount rate Austin asserted would have been more appropriate for the Debtors' and Berkshire's valuation experts to use in their modeling, and is inconsistent with the discount rates actually used by those experts.[157]

---

[152] That Austin's approach was conservative is further demonstrated by Berkshire executive Brian Snover's testimony, in which he explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Snover Dep. Tr. 125:23–126:9, 126:17–25.

[153] *See, e.g.*, **Exhibit 48**, BERKTCC0008553, Policyholder Projection Model tab, Cells B41 and C41.

[154] **Exhibit 37**, Corrected Expert Report of Marc Scarcella, dated October 26, 2024 ("**Scarcella Affirmative Report**") ¶ 19.

[155] Ryan Dep. Tr. 105:3–14.

[156] **Exhibit 63**, BERKTCC0246463, PV tab.

[157] *Compare* **Exhibit 101**, Rebuttal Expert Report of Yvette Austin, dated November 12, 2024 ("**Austin Rebuttal Report**") ¶¶ 24–26 and accompanying notes (▮▮▮▮▮▮▮▮▮▮ *with* McKnight Affirmative Report ¶ 111 and Scarcella Affirmative Report ¶ 74 (▮▮▮▮▮▮▮▮▮▮).

85.    ***Third***, Berkshire's model included a "████████" ████████████████████████

█████████████████████████████████████████████.[158] This is consistent with

Berkshire's understanding that it was important to update its modeling to account for large verdicts,

and is also consistent with the insights from Professor Lahav related to verdicts and the recent

upward trajectory of claims and claims values.[159]

### c.    The Brattle Estimate Is Fatally Flawed.

86.    The Bankruptcy Directors failed to question the inputs and assumptions made by

Brattle. If they had, they would have understood that the Brattle analysis is unacceptably flawed

and should not have served as the basis for the Settlement Agreement.

87.    The Debtors' expert, David McKnight, artificially suppressed his estimate by

excluding ***all verdicts and all settlements that resulted after a trial began***, such as the combined

$50 million verdicts in *Graham* and *Plant* that drove the Debtors into bankruptcy. This

nevertheless yielded an estimate of ████████████████████ in nominal dollars.[160]

McKnight's decision to cherry-pick the Debtors' lowest payouts resulted in an average claim

resolution value of only ███████ for each mesothelioma claim in his estimate.[161] In other words,

McKnight excluded the very data points that led WCD to consider bankruptcy.

88.    In contrast, Austin used *all* resolved claims—by settlement or by jury—filed since

---

[158]  Ryan Dep. Tr. 124:7–20.

[159]  **Exhibit 53**, BERKTCC0007932 (████████████████████████████████████████
████████). *See generally* Lahav Rebuttal Report. *See also* Snover Dep. Tr. 124:7-127:24
████████████████████████████████).

[160]  McKnight Affirmative Report ¶ 93 & Table 10.

[161]  *Id.* ¶¶ 89, 92; **Exhibit 100**, Deposition of David McKnight Vol. 1, dated November 25, 2024 ("**McKnight Vol. 1 Dep. Tr.**") 189:20–190:5 (███████████████████████████████████
████████████████████████); *see* **Exhibit 101**, Rebuttal Expert Report of Yvette Austin, dated November 12, 2024 ("**Austin Rebuttal Report**") ¶¶ 17–18.

2020.[162]  Consequently, she calculated an average claims resolution value of ▮▮▮▮ for each mesothelioma claim, or *more than* ▮▮▮▮ McKnight's figure.  If McKnight had used an average claim value of ▮▮▮▮, his estimate would have been significantly higher.  Indeed, maintaining McKnight's other flawed assumptions and correcting *only* McKnight's average claim resolution values and his assumed rate of claims that will not receive payment (*i.e.*, dismissal rate) results in an estimated talc liability of ▮▮▮▮.[163]

89.    McKnight's figure also suffers from the assumption that claim values against WCD would ▮▮▮▮.  But this is directly contradicted by testimony from Berkshire's reinsurance division executive Brian Snover, who testified that ▮▮▮▮ ▮▮▮▮.[164]

90.    Moreover, as noted, McKnight does not take into account that the value of claims against WCD would have likely *increased* with momentum from WCD's recent tort history—including, for example, the *Graham* and *Plant* verdicts.  Even the Debtors' valuation expert and Berkshire's valuation expert agree that ▮▮▮▮

---

[162]  . *See* Austin Affirmative Report ¶ 27.

[163] *See* Austin Affirmative Report Section VI.D.

[164] *Supra* Section II.A.1.a. ▮▮▮▮



McKnight Affirmative Report ¶ 107. ▮▮▮▮ . Austin Rebuttal Report ¶¶ 23-26. ▮▮▮▮ Austin Affirmative Report ¶ 28 ( ▮▮▮▮ .

██████████████████████,[165] and multiple Berkshire witnesses testified that the *Graham* and *Plant* verdicts changed the landscape.[166]  Professor Lahav, a leading expert on the trajectory of mass tort cases, confirms that the data from WCD's own tort history, viewed in the larger context of recent dynamics in mass tort litigation against other companies, suggested that things would only get worse for WCD.[167]

91.      The facts are clear:  the proposed settlement defies incontrovertible evidence of billions of dollars in talc liability alone.

### The Settlement Motion Ignores the Merits of the Estates' Strongest Successor Liability Theories.

92.      The Debtors claim that "the likelihood of success on the merits on their successor liability claims against Brenntag are (sic) no greater than 50%, and possibly materially lower."[168]  That is not true.  The Debtors have textbook successor liability claims against Brenntag based on New Jersey's product-line doctrine for asset purchase agreements and traditional fraud-based successor liability analysis.

93.      The doctrine of successor liability ensures that people injured by defective products do not lose their remedy merely because the tortfeasor sold its assets to another owner.  *Ramirez*

---

[165]  Scarcella Affirmative Report ¶ 65 ██████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
McKnight Vol. 1 Dep. Tr. 179:14–25 ██████████████████████████████████████████████████
████████████████████████████████████).  Neither expert explains why they do not adjust their projections upward
to account for the missing data—*i.e.*, ███████████████████████████████████████████████
█████████████████████████████████████████.

[166]  Mehta Oct. Dep. Tr. 25:15–20 █████████████████████████████████████████████████████
██████████████████████████████████); Snover Dep. Tr. 179:10–23 ████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████).

[167]  Lahav Rebuttal Report ¶ 20.

[168]  Settlement Motion ¶ 59.

*v. Amsted Indus., Inc.*, 431 A.2d 811, 816 (N.J. 1981).  Traditionally, the purchaser of a corporate tortfeasor's assets "will be held responsible for the debts and liabilities of the selling corporation, including those arising out of defects in the latter's products, where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities [contractual successor liability]; (2) the transaction amounts to a consolidation or merger of the seller and purchaser [de facto merger]; (3) the purchasing corporation is merely a continuation of the selling corporation [mere continuation], or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities [fraud-based]."  *Id.* at 815.[169]

94.    These categories have been "sharply criticized" for their "unwarranted emphasis on the form rather than the practical effect of a particular corporate transaction."  *Ramirez*, 431 A.2d at 815–16.  Accordingly, New Jersey has adopted an additional successor liability path—the "product line" exception—predicated on continuity of business operations between an asset seller and purchaser.  *Id.* at 819–20.

95.    Despite the clarity of New Jersey law and abundance of information produced in this case establishing Brenntag's successor liability, the Debtors (and Contributing Parties) focus exclusively on "de facto merger" analysis under inapplicable law, while unpersuasively disputing the applicability of product-line and fraud-based successor liability.  These arguments are meritless and intentionally miss the point:  Brenntag is the Debtors' successor under New Jersey law and would be held liable for WCD's pre-2004 Transaction torts in litigation.

### d.    The Estates' Product-Line Successor Liability Claims Against Brenntag Are Extremely Likely to Succeed.

96.    New Jersey's[170] product-line exception centers on whether the purchaser continued

---

[169]    *See also* Standing Motion ¶ 54.

[170]    While the Committee reserves all rights with respect to choice-of-law, the *Debtors* previously asserted that the "choice of law analysis clearly results in application of New Jersey law," AP Dkt. No. 99 ¶¶ 37, 42, and since

"essentially" the same business as the seller by using its physical facilities, equipment, inventory, customer lists, personnel, marketing material, trade names, and goodwill, and incorporates three factors to guide analysis:

> (1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,
>
> (2) the successor's ability to assume the original manufacturer's risk-spreading role, and
>
> (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Ramirez*, 431 A.2d at 820 (quoting *Ray v. Alad Corp.*, 560 P.2d 3, 9 (Cal. 1977)).

97.    Here, Bain's new "Brenntag" entities were created solely to split WCD's entire operating business from its asbestos liabilities and would easily be found liable as its successor under New Jersey law.  No party disputes that Brenntag acquired substantially all of the Debtors' assets and exploited them to continue "essentially the same" business. *Ramirez*, 431 A.2d at 825; *see also supra* Background I.B & I.C.  The Brenntag entity MPSI acquired and immediately used WCD's New Jersey talc distribution facility, equipment, inventory, suppliers, customers, directors, officers, employees, "Whittaker"-branded talc product lines, marketing materials, and accumulated goodwill.[171]  Under New Jersey's product-line exception and "public policy of

---

then the Court has granted summary judgment, consolidating those claims with the Debtors.  *See In re Accutane Litig.*, 194 A.3d 503, 521 (N.J. 2018); *Bussell v. DeWalt Prods. Corp.*, 614 A.2d 622, 628–29 (N.J. Super. Ct. App. Div. 1992) (requiring application of New Jersey law to product-line claims).

The only basis for Delaware or New York law to apply is the internal affairs doctrine or a contractual choice-of-law provision.  Yet WCD is a New Jersey corporation and contractual provisions are irrelevant because choice of law for product-line claims rests in tort, not contract.  *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 465 (3d Cir. 2006) ("[A]t one extreme lies the explicit and implicit assumption of liability exception, interpreted solely based on contract. At the other lies the product line exception, which is generally analyzed using torts choice of law principles.").  It likewise makes no difference that the 2004 Transaction closed in New York.  *Bussell*, 614 A.2d at 628 (requiring application of New Jersey law to product-line successor claims for defendant whose "domicile was in Maryland" and despite that the relevant contract "was finalized in Maryland").

[171]    *See generally supra* Background I.C.

spreading the risk to society at large for the cost of injuries from defective products," there is no realistic doubt that Brenntag is liable for defective products sold by WCD. *Ramirez*, 431 A.2d at 820; *Nieves v. Bruno Sherman Corp.*, 431 A.2d 826, 830–31 (finding purchase of substantially all of a business's assets and use of seller's trade name on product line sufficient to establish successor liability); *Bussell*, 614 A.2d at 631 (finding purchaser liable as successor where it acquired and used "good will, trademarks, inventory, equipment, and the same manufacturing plant" from seller).[172]

98.      Despite filing an adversary proceeding to gain control of their creditors' product-line successor liability claims—presumably because they are worth a significant amount of money and worth expending estate resources to control—the Debtors now misleadingly assert that "courts applying New Jersey law have been reluctant to apply the 'product-line' theory of successor liability to distributors like the Debtors and Brenntag."[173]  They cite one unreported federal district court opinion, *Falor v. G&S Billboard*, No. 04-2373, 2008 WL 539225, at *6 (D.N.J. Feb. 27, 2008), which is an outlier and not on point.  The Debtors' argument premised on *Falor* is flawed for three reasons.

99.      ***First***, the New Jersey product-line exception is expansive by design and focused primarily on injured plaintiffs' ability to recover.  *See Ramirez*, 431 A.2d at 820 (emphasizing importance of social risk-spreading and "progressive character of New Jersey decisional law in the area of strict products liability").  It is black-letter law that distributors are strictly liable for distributing—not manufacturing—products with defects.  *Mettinger v. Globe Slicing Mach. Co.*,

---

[172]  For similar reasons, the Committee likely also has a viable claim for successor liability on a theory of mere continuation.  *See Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 337 (D.N.J. 2002) (recognizing potential claim for mere continuation because "the intent of the contracting parties is especially important" in determining whether a subsequent corporation is the legal successor, where there exists a "risk of intentional evasion of pre-existing contractual and tort obligations").

[173]  Settlement Motion ¶ 55.

709 A.2d 779, 783 (N.J. 1998) (noting that distributors are engaged in the marketing of defective

products and therefore strictly liable). And the New Jersey Supreme Court's seminal ruling in

*Ramirez* explicitly contemplates that a successor to an entity that "manufactured **or distributed**"

defective products is strictly liable for defective products its predecessor "placed into the stream

of commerce." *Ramirez*, 431 A.2d at 821 (emphasis added); *see also id.* at 816 (narrow conception

of successor liability is "unresponsive to the interests of persons injured by defective products in

the stream of commerce").[174] There is no basis in New Jersey law to conclude that the product-

line exception does not reach distributors of defective products.

100.    ***Second***, by its terms, *Falor* stands for the unremarkable proposition that where a

product's original manufacturer can still pay and is a named, active defendant in the lawsuit, a

products-liability plaintiff cannot argue that his remedies against that manufacturer have been

destroyed. *Falor*, 2008 WL 539225, at *6 (expressly resting decision not to apply product line

doctrine on the fact that "***the manufacturer is a viable defendant in the case at bar***"). The core

holding of *Falor* does not fit the present facts because (1) the Debtors are no longer valuable

defendants, and (2) **the Debtors have exclusive control of the very successor liability claims at**

**issue**.

101.    ***Third***, the facts in *Falor* are distinguishable in other significant respects. *Falor*

---

[174] *Ramirez* adopted the product line exception from the California Supreme Court's decision in *Ray v. Alad Corp.*, and New Jersey courts routinely cite California products liability law when dealing with successor liability. *Ramirez*, 431 A.2d at 819; *see, e.g., Class v. Am. Roller Die Corp.*, 705 A.2d 390, 396 (N.J. Super. Ct. App. Div. 1998) (affirming successorship finding and citing *Sindell v. Abbott Lab'ys*, 607 P.2d 924 (Cal. 1980)). Courts in California and other jurisdictions that followed *Ray* and *Ramirez* have found that the product-line exception applies to successor distributors, and it is thus highly likely that New Jersey courts would find the same as to the Debtors and Brenntag. *See Kaminski v. W. MacArthur Co.*, 220 Cal. Rptr. 895, 901 (Cal. Ct. App. 1985) ("To hold *Ray* inapplicable to successor distributors and retailers would be contrary to the policy of compensating injured plaintiffs from the resources of those better capable of estimating and spreading the risk of the marketing of defective products."); *Leren v. Kaiser Gypsum Co., Inc.*, 442 P.3d 273, 281 (Wash. Ct. App. 2019) (applying product-line doctrine to asbestos distributor that "maintained largely the same suppliers and customers, and continued operating in the same region" as predecessor entity); *Bogart v. Phase II Pasta Machs., Inc.*, 817 F. Supp. 547, 549, 550 n.6 (E.D. Pa. 1993) (finding an importer and seller of pasta machines liable as a successor).

declined to apply the product line doctrine in part because there was no evidence that the distributor acquired "goodwill" from the relevant predecessor as required by the doctrine, *see* 2008 WL 539225, at *6; here, Brenntag was created solely to exploit WCD's goodwill and actually did so by selling the same talc products to the same customers using the WCD trade name.  *See supra* Background I.C.  And while *Falor*'s distributor defendants only *leased* the defective product and did not "design, manufacture, *or sell*" it, *id.* at *4, the Debtors and Brenntag both marketed and sold the exact talc products that gave rise to the Debtors' talc liabilities.

102.    In sum, the Settlement Motion's one-sentence claim that "courts applying New Jersey law have been reluctant to apply the 'product-line' theory of successor liability to distributors like the Debtors and Brenntag" is as shallow as it reads and not at all consistent with New Jersey law.  If it were, Berkshire would never have fought for a year to gain control of the successor liability claims against Brenntag nor offered **hundreds of millions of dollars** to cram down an undervalued settlement and thereby avoid such claims in the tort system.

### e.    The Estates' Fraud-Based Successor Liability Claims Against Brenntag Are Extremely Likely to Succeed.

103.    New Jersey law[175] provides for successor liability where "the transaction is entered into fraudulently in order to escape responsibility for [tort] debts and liabilities."  *See Ramirez*, 431 A.2d at 815; *A.M.E. Inc. v. T.R. Ricotta Elec., Inc.*, No. 22cv5211, 2023 WL 3841746, at *3 (D.N.J. June 6, 2023).  "The fraudulent-transfer theory of successor liability is governed by the New Jersey Uniform Fraudulent Transfer Act [UFTA]."[176]  *A.M.E.*, 2023 WL 3841746, at *2-3.

---

[175]    The law is the same in Delaware and New York.  *See Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, No. 2022-0378, 2023 WL 5688392, at *15 (Del. Ch. Sept. 5, 2023); *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (citing *Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983)).

[176]    While the standards for establishing successor liability under a theory of fraud import certain UFTA factors, it is ultimately a common law successor liability framework, not a direct fraudulent transfer claim under the UFTA statute.  *See A.M.E.*, 2023 WL 3841746, at *3.

104.    Under the UFTA, a transfer is fraudulent if it is made "[w]ith the actual intent to

hinder, delay, or defraud any creditor." N.J.S.A. § 25:2-25(a)(1). Because "[f]raudulent intent,

by its very nature, is rarely susceptible to direct proof," New Jersey courts provide that "[a]ctual

intent often must be established through inferential reasoning, deduced from the circumstances

surrounding the allegedly fraudulent act." *A.M.E.*, 2023 WL 3841746, at *3. The New Jersey

UFTA sets out "badges of fraud" as non-exhaustive indicators of fraudulent intent, including

whether "the transfer or obligation was disclosed or concealed"; "[b]efore the transfer was made

or obligation was incurred, the debtor had been sued or threatened with suit"; and "[t]he transfer

was of substantially all of the debtor's assets." *Id.* at *3. "Even 'a single . . . badge of fraud may

cast suspicion on the transferor's intent,' but 'the confluence of several in one transaction generally

provides conclusive evidence of an actual intent to defraud.'" *Id.* at *3.

105.    The 2004 Transaction is rife with badges of fraud that establish Brenntag's liability

under the traditional successor analysis. The parties to the 2004 Transaction understood that the

Debtors had been sued for asbestos many times and faced significant future asbestos liability.[177]

That is why they structured the transaction as a stock purchase for nearly every Brenntag entity

*other* than the Debtors, transferred the Debtors' businesses via asset purchase, and required the

Debtors to indemnify Brenntag with their remaining assets.[178] And, most tellingly, DBUS and

Bain executed the ▮▮▮▮▮▮▮▮▮▮▮ to deliberately conceal from asbestos victims Brenntag's

liability to pay for tort claims as a successor.[179] Under applicable law, that is more than enough to

establish DBUS, Bain, and Brenntag's intent to defraud creditors and therefore Brenntag's

---

[177] *See, e.g.*, **Exhibit 5**, DBUS0030087 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[178] *See* **Exhibit 14**, BRENNTAG-TCC-00102276 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); 2003 MSPA § 12.

[179] **Exhibit 8**, BNS-TCC-1017385, at -388.

successor liability for the Debtors' torts. *See A.M.E.*, 2023 WL 3841746, at *4 (finding successor liability based on fraud actionable where debtor sold substantially all its assets shortly after notice of threatened legal proceedings and sought to conceal sale from creditors).

106.    The Debtors claim otherwise by emphasizing that the 2004 Transaction "was between unrelated parties . . . and occurred years before the present wave of talc litigation had appeared."[180]  New Jersey law does not require a transaction between related parties to assert a fraud-based successor liability claim. *See A.M.E.*, 2023 WL 3841746, at *1 (finding asset purchase between unrelated parties actionable as fraud-based successor liability).  Nor does it matter whether "the present wave of talc litigation had appeared" in 2004.  Even at that time, the parties required the Debtors to indemnify Brenntag for successor liability claims they knew were coming and executed the ████████████ to attempt to prevent that from happening.  This is fraud against creditors, and it renders Brenntag liable as the Debtors' successor.

**B.    The Debtors Introduce No Evidence Regarding Any Difficulties in Collection, Which Would Be Minimal.**

107.    Not only is there a high probability of litigation success with respect to enormously valuable claims here, but there are also no plausible issues with collectability.  The Debtors introduced no evidence regarding the difficulty of collecting a judgment against the Contributing Parties and should not be credited for unsupported allegations regarding collectability.[181]  The Debtors' contention that collection issues exist is also facially implausible given that the Contributing Parties are highly solvent multinational companies with billions of dollars of assets

---

[180]    Settlement Motion ¶ 55.

[181]    *See* Motion ¶¶ 69–74.

available to satisfy any judgment.[182] This factor therefore weighs against approval of the proposed settlement. *See, e.g.*, *In re Alecto Healthcare Servs., LLC*, No. 23-10787, 2024 WL 1208355, at *12 (Bankr. D. Del. Mar. 20, 2024) (holding that the difficulties in collection factor was neutral where there was no evidence presented regarding the possibility of collection on any judgment). The Debtors' collectability should be rejected for three simple reasons.

108.    ***First***, the Debtors contend that there are alleged "uncertainties" with the Contributing Parties' legal obligations to satisfy successor liability claims asserted against Brenntag. But as the Debtors concede, NICO is contractually obligated under the 2007 Agreement to indemnify DBUS for its contractual indemnity obligations to the Debtors under the 2003 MSPA. NICO recently reaffirmed those obligations;

.[183] In any event, any purported uncertainties would be problematic for *Brenntag* (against whom judgments will issue), not for the Debtors.

109.    ***Second***, the Debtors claim that "Brenntag could argue that the transactional overlap and factual nexus between the Debtors' successor liability claims and the Debtors' potential indemnification obligations meets the standard for equitable recoupment."[184] But "[r]ecoupment is the setting up of a demand *arising from the same transaction as the plaintiff's claim or cause of*

---

[182]    *See, e.g.*, *Future Claimants' Representative's Reply in Response to Debtors' Supplemental Brief in Support of Motion for Summary Judgment with Respect to Counts I and IV of the Complaint*, Dkt. No. 1222 ¶ 4 (summarizing key financial metrics for Berkshire Hathaway, Inc., Brenntag, and Deutsche Bahn AG as of Q1 2024).

[183]    *See* **Exhibit 109**, BERKTCC0283010 (                                                                                                    ; *id.* § 1.d.i (                                                                        ); **Exhibit 111**, BERKTCC0283286 (                                                                                    ).

[184]    Settlement Motion ¶ 70.

action, strictly for the purpose of abatement or reduction of such claim." *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992); *id.* at 1081-82 (holding that the "same transaction" requirement for recoupment must be narrowly construed). "The fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, however, does not mean that the two arose from the 'same transaction.'" *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984). Instead, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Revel AC, Inc. v. Revel Entm't Grp., LLC (In re Revel AC, Inc.)*, 909 F.3d 597, 603 (3d Cir. 2018). As the Third Circuit explained in *University Medical*, "the typical situation in which equitable recoupment can be invoked involves a credit and debt arising out of a transaction for the same goods and services." *In re Univ. Med. Ctr.*, 973 F.2d at 1081.

110. Here, the Debtors' state law successor liability claims, on one hand, and Brenntag's contractual indemnification claims, on the other, do not arise from the "same transaction" for purposes of recoupment. As discussed above, *see supra* Argument II.A, the successor liability claims against Brenntag relate to the Debtors' operations *before* the 2004 Transaction and what Brenntag did with their assets *after* the 2004 Transaction closed. By contrast, any "equitable recoupment" claim against the Debtors must arise from the 2003 MSPA itself and does not even touch the primary factual bases for successor liability.

111. The successor liability claims asserted derivatively on behalf of talc claimants arise from a wholly separate "transaction" from the contractual indemnities that the Debtors were forced to agree to. *See Reading Co. v. City of Phila.*, 155 B.R. 890, 911 (E.D. Pa. 1993) ("A set of common facts differs substantially from a single transaction or a single series of transactions that gives rise to both a debtor's and a creditor's claims against each other."). On these facts, the

45

doctrine of recoupment does not apply.

112.    ***Third***, as the Debtors recognize, it is likely that any equitable recoupment claims asserted by Brenntag would be disallowed as contingent indemnification claims under 11 U.S.C. § 502(e)(1)(B).  Section 502(e)(1)(B) mandates disallowance of claims which (i) are "contingent," (ii) are for "reimbursement or contribution," and (iii) are claims for which the debtor and claimant are "co-liable."  *In re Caribbean Petrol. Corp.*, 566 F. App'x 169, 173 (3d Cir. 2014).

113.    Brenntag's contingent indemnification claims would easily satisfy the standard for disallowance under section 502(e)(1)(B).  *See, e.g.*, *In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982, 986 (Bankr. S.D.N.Y. 1992) ("The contingency contemplated by § 502(e)(1)(B) relates to both payment and liability.").   Indemnity is a "paradigmatic" example of a claim for reimbursement or contribution.  *In re Caribbean Petrol.*, 566 F. App'x at 174.  And, because the Debtors and Brenntag are both potentially liable for the same underlying talc claims, they are co-liable within the meaning of 11 U.S.C. § 502(e)(1)(B), which covers "all possibilities for shared liability, whether judicially, contractually or statutorily created."  *In re Caribbean Petrol. Corp.*, No. 10-12553, 2012 WL 1899322, at *3 (Bankr. D. Del. May 24, 2012), *aff'd*, 566 F. App'x 169 (3d Cir. 2014).  *See also In re Amatex Corp.*, 110 B.R. 168, 168 (Bankr. E.D. Pa. 1990) (claims for indemnification on asbestos liability disallowed when underlying tort claims had not been adjudicated, and no judgment of joint liability made).

114.    Accordingly, the "uncertainties" that the Debtors identify—"pressure" on the DBUS-NICO indemnification chain[185] and the potential for Brenntag to assert an equitable recoupment defense—have no legal merit.  There are no difficulties in collection, which weighs

---

[185]   Settlement Motion ¶ 72 (arguing that "[a]ny pressure on either of the steps on this indemnification chain further reduces the potential collectability of any successor liability claims").

against approving the Settlement.

### C. The Successor Liability Claims Can Be Easily and Quickly Resolved in Litigation.

115.    The litigation that the Settlement seeks to resolve is not overly complex.

116.    The Committee and FCR have already done most of the work necessary to litigate the estates' successor liability claims and would obtain far more value than whatever might be lost through litigation "complexity," "expense," or "delay." *In re Martin*, 91 F.3d at 393; *see In re Diocese of Camden*, 653 B.R. 722, 745 (Bankr. D.N.J. 2023) (denying settlement motion as failing to establish undue cost or complexity where experts believed claims may be worth around $100 million despite $15 million settlement); *In re Caubble*, 505 B.R. 857, 877-78 (Bankr. E.D. Ark. 2014) (denying settlement motion because "[m]ost of the discovery has already been done" and assessing that "[s]ome parts of the litigation are factually and legally complex while other parts are simple").

117.    The Settlement Motion focuses on downside risks that the Committee has already resolved.[186]  First, the Rule 2004 and contested-matter discovery in this case, as well as discovery in prior tort cases, has yielded an admissible and highly sound factual basis for Brenntag's liability.[187]  And although Brenntag might disagree with how the law applies to these facts, the facts are not truly in dispute and will not need to be litigated at length.  Second, while the Debtors argue that NICO, DBUS, and Brenntag would challenge the value of the successor liability claims, they ignore that valuation is being litigated right now and that this work can easily be leveraged to ensure efficient resolution of the successor liability claims themselves.

---

[186]    *See* Settlement Motion ¶ 76 (arguing that "complex and expensive litigation over both factual and legal issues . . . concerning events that took place over twenty years ago" would be required and that Brenntag would challenge the factual basis for successor liability).

[187]    While it is true that *the Debtors* have not made the same efforts, the Committee and FCR have assembled extremely strong successor liability facts and are prepared to leverage them immediately and efficiently.

118.    In short, the Debtors' arguments ignore the factual and legal reality and elide the

work that the Committee and FCR have already done to maximize the value of claims that stem

from the injuries of their constituents.  The manageable complexity and cost of litigating those

claims to conclusion is a low-risk path that is strongly preferred by the creditors who are best

positioned to swiftly win them.  Accordingly, the third *Martin* factor weighs against the Settlement

Motion.

**D.    The Debtors' Settlement Is Not in the Paramount Interest of Creditors.**

119.    The Settlement Agreement is Berkshire's best effort to leverage the Debtors and

this bankruptcy process to limit the downside risk it bargained for in the 2007 Transaction.  There

should be no scenario in or outside the bankruptcy system where a highly solvent entity like

Berkshire can pay pennies on the dollar to its subsidiaries and thereby release claims against a

different **non-debtor**—Brenntag—**without the consent of involuntary creditors whose claims it**

**would otherwise indemnify**.  Talc claimants hold the vast majority of claims against the Debtors,

in number and amount,[188] and, through the Committee, have pushed back against Berkshire's

efforts during these cases, first by contesting WCD's corporate authority to authorize a bankruptcy

filing while subject to a court-ordered receivership and then by contesting the Debtors' ability to

wrest control of valuable successor liability claims held by individual plaintiffs against Brenntag.

Now through the Settlement Motion, the Debtors seek to non-consensually release Berkshire and

the other Contributing Parties from any and all estate causes of action and for an amount that vastly

undervalues the Debtors' current and future liabilities—effectively taking away the rights of

creditors to vote on broad releases that will become binding if the Debtors' proposed plan is

---

[188]    *See generally* Global Notes and Statement of Limitations, Methodology, and Disclaimers Regarding the Debtors'
Schedules of Assets and Liabilities and Statements of Financial Affairs, Dkt. No. 134; McKnight Declaration,
Dkt. No. 1300, Fig. 1. (estimating talc vs. environmental claim values).

approved.

120.    "The analytical framework established in *In re Martin*—particularly the fourth prong, the 'paramount interest of the creditors'—**cannot possibly be satisfied when all the creditors object**." *Gendregske v. Black Diamond Com. Fin., LLC (In re Ashing Corp.)*, 552 B.R. 80, 83-84 (D. Del. 2015).  There are three primary creditor groups in these cases: current talc claimants, future talc claimants, and environmental claimants—none of which were involved in the Debtors' settlement negotiations and all of which opposed the proposed settlement.

121.    Indeed, courts have found settlements were not in the best interest of creditors where, as here, they cut off valuable claims by creditors, especially where those creditors had no say in the negotiation of the proposed settlement.  *See In re Med. Asset Mgmt.*, 249 B.R. at 663-64 (rejecting proposed three-party settlement between disbursing agent for Chapter 11 debtor, an allegedly secured creditor, and an insurance company, because "fairness to the settling parties of a proposed settlement agreement may not warrant its approval if the rights of others who are not parties to the settlement agreement are unduly prejudiced" and "the proposed settlement would enjoin certain objecting junior creditors who are not parties to the settlement from pursuing causes of action they may have against a party to the settlement other than debtor"); *In re Matco Elecs. Grp.*, 287 B.R. 68, 78 (Bankr. N.D.N.Y. 2002) (denying settlement motion as not in best interest of creditors and estate given that "the Settlement Agreement is not being proposed by a disinterested trustee in the cases . . . [and] provides for the release of the very individuals who signed it . . . without any apparent explanation for their release or consideration being tendered on their part" and where the creditors' committee had no part in the negotiation).

122.    Further, as evidenced by the Standing Motion, the fiduciaries appointed to represent the interests of current and future talc claimants strongly believe that the interests of creditors are

best served by authorizing the Committee and FCR to pursue and, if appropriate, resolve valuable

successor liability claims against Brenntag directly.  Indeed, Courts routinely deny approval of

settlements when, as would happen here, an overwhelming majority of creditors object and are

themselves willing to take on the costs and risks of the litigation that the settlement might otherwise

forego.  *See, e.g.*, *Reiss v. Hagmann*, 881 F.2d 890, 892-93 (10th Cir. 1989) (reversing bankruptcy

court's approval of a settlement where sole creditor objected to amount of settlement and offered

to pay the legal expenses to pursue the claim); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.

(In re Foster Mortg. Corp.)*, 68 F.3d 914, 918-19 (5th Cir. 1995) (reversing approval of settlement

for abuse of discretion where bankruptcy court did not adequately consider that creditors opposed

settlement and were prepared to assume risks and costs of further litigating relevant cause of

action).[189]

123.    Accordingly, the proposed Settlement is not in the paramount interest of creditors.

In a case like this one where the Debtors have no operations and no employees, the court should

not substitute its judgment for the judgment of creditors.

## III.    THE PROCESS THAT LED TO THE SETTLEMENT DID NOT EMBODY THE "UTMOST GOOD FAITH," AND THE APPOINTMENT OF THE BANKRUPTCY DIRECTORS DOES NOT ENTITLE THE DEBTORS TO DEFERENCE.

124.    The process that led to the Settlement, does not reflect the "utmost good faith" of

the participants.  For the reasons discussed below, (1) the Settlement is procedurally defective and

there was no "fair process" in the Settlement negotiations, and (2) the Debtors' argument that the

---

[189]    *See also In re Qmect, Inc.*, 359 B.R. 270, 273 (Bankr. N.D. Cal. 2007) (denying motion to approve settlement where all but one creditor (which was a party to the settlement) objected and estate would not bear costs of prosecuting litigation); *In re Marshall*, 33 B.R. 42, 45 (Bankr. D. Conn. 1983) (denying settlement where creditor with ninety percent interest in the result of the litigation raised objections and was willing to assume the costs of litigation); *In re Wells*, 26 B.R. 150, 152 (Bankr. D.R.I. 1983) (denying settlement where objecting creditor with eighty percent interest was willing to advance the costs of litigation).

appointment of the Bankruptcy Directors[190] means that the Court should apply a deferential business judgment standard is fundamentally flawed.

### A.    The Settlement was Procedurally Defective and There Was No Fair Process.

### 1.    The Bankruptcy Directors Released Claims Against Brenntag Without Attempting to Leverage Them.

125.    The estates' most valuable assets are successor liability claims against WCD's successor, *Brenntag*. *Supra* Background VI. If the Debtors were truly motivated to maximize those assets, they would have taken an aggressive position from the outset of these cases that successor liability claims against Brenntag are property of the estate, filed an adversary proceeding against Brenntag, and used that litigation as leverage to force Brenntag into an advantageous settlement: *Brenntag* is liable as successor for billions of dollars in talc claims, *Brenntag* can be sued on those claims, any judgment on those claims would be entered against *Brenntag*, and *Brenntag* would then be on the hook for billions of dollars in liability. But that was not the Debtors' strategy. Instead, the Debtors spent nearly a year litigating over property rights.

126.    That Brenntag may have a claim against WCD for indemnification does not solve Brenntag's immediate problem, which is that tort claimants would be suing *Brenntag* and judgments would be issued against *Brenntag*.[191]

127.    Undoubtedly, Brenntag would place value on achieving peace *without* jumping through the obstacles above. The Bankruptcy Directors, on behalf of the Debtors, possessed leverage: they could have explained this to Brenntag, demanded fair value *from Brenntag*, and in

---

[190]    Settlement Motion ¶ 85.

[191]    To avoid paying out on these judgments, Brenntag would have to convince a court to grant a *stay* and freeze out mesothelioma victims despite Brenntag having adequate assets to satisfy such judgments. Brenntag would likely face difficulties in any such argument, including that its indemnification claims are against the Debtors, which are insolvent. Brenntag would likely have to sue DBUS, and DBUS would *separately* have to bring in NICO, for Brenntag to recover on any indemnification rights.

turn forced it (if so chosen) to bring parties like DBUS and Berkshire to the table. There is no justification whatsoever for the Bankruptcy Directors having made this process easy and free for Brenntag and DBUS while seeking recovery solely from Berkshire.

128. Instead, the Bankruptcy Directors entered "negotiations" against Berkshire with no backup plan and an artificially low valuation estimate. On August 5, 2024, they reached the Settlement Agreement with Tom Ryan and ███████ "██████████████████████."[192] If the Bankruptcy Directors were truly interested in extracting maximum value they would have at least seriously threatened, and potentially filed, litigation against Brenntag to gain maximum leverage. But the Bankruptcy Directors **did not even consider** threatening litigation to maximize value, let alone actually bring it. Instead, they negotiated with NICO and sold their litigation leverage against Brenntag for pennies on the dollar. The Settlement is the product of a procedurally defective negotiation that left money on the table inconsistent with a process conducted by negotiating parties in the "utmost good faith."

## 2. The Bankruptcy Directors Were Selected by Mehta, the Debtors' Conflicted Leader.

129. The process by which the Bankruptcy Directors were installed is inconsistent with a process conducted by negotiating parties in the "utmost good faith."

130. The Bankruptcy Directors were interviewed and selected by the Debtors' conflicted leader, Mehta. *Supra* Background V. At the time he selected them, Mehta was both President of the Debtors and a Vice President of NICO, the very conflicted party against whom the Bankruptcy Directors ultimately negotiated the Settlement Agreement. *Supra* Background V.

131. Mehta's role in the Bankruptcy Directors' selection and his continued active

---

[192]    **Exhibit 106**, BNS-TCC-3323864.

presence in board meetings calls into doubt their independence and ability to negotiate effectively against Berkshire.  As explained by Professor Jackson, this selection process would not be allowed under stock exchange rules and would require detailed disclosure under SEC rules.[193]  That reflects the common-sense understanding that, where directors were chosen by a controller, there is a risk that the controller could influence the directors' decisions.[194]

> ### 3. The Prospect of Future Directorships Clouds the Bankruptcy Directors' Purported Independence.

132.    Empirical studies have confirmed the obvious:  professional bankruptcy directors like Pohl and Aronzon have a personal financial incentive to ensure that outcomes in the bankruptcy process are favorable for the controllers who select them, and, when goals compete, to forgo value for creditors who have no say.  As Berkshire chairman Warren Buffet puts it, "When seeking directors, C.E.O.s don't look for pit bulls.  It's the cocker spaniel that gets taken home."[195]  According to an empirical study conducted by Harvard Professor Jared Ellias and his colleagues, there is a growing trend in bankruptcy to appoint bankruptcy directors with nominal independence.[196]  Ellias and his colleagues found that two firms, Kirkland and Weil, Gotshal &

---

[193]    *See* **Exhibit 112**, Amended Expert Report of Robert Jackson, dated November 15, 2024 ("**Jackson Affirmative Report**") ¶¶ 14–17 (citing NASDAQ, THE QUALIFICATION, LISTING AND DELISTING OF COMPANIES RULES IM-5605-6, IM-5605-(e)(1), IM-5605(c); NYSE LISTED COMPANY MANUAL RULE 303A.04 (2004); U.S. Sec. & Exch. Comm'n, *Disclosure Regarding Nominating Committee Functions*, Rel. No. 33-8340, 68 Fed. Reg. 69204, 69207 (2004) (requiring disclosure where nominees are recommended by the CEO of a company)).

[194]    Jackson Affirmative Report ¶¶ 95–96 ("The Delaware courts would be unlikely to defer to the decisions of directors selected in this way when examining conflicted agreements those directors struck with a controller."); *see also* Lucian A. Bebchuk & Assaf Hamdani, Independent Directors and Controlling Shareholders, 165 U. PA. L. REV. 1271, 1274 (2017) ("controllers [have] decisive power to appoint independent directors and decide whether to retain them [while] independent directors have significant incentives to side with the controller and insufficient countervailing incentives to protect public investors in conflicted decisions").

[195]    Berkshire Hathaway, 2019 Annual Report, at 13, https://www.berkshirehathaway.com/2019ar/2019ar.pdf.  It is worth noting that, when read this quote, Mehta, who selected Pohl and Aronzon, testified that he "agrees with what [Buffett] says there."  Mehta Oct. Dep. Tr. 130:11–13.

[196] *See* Jared A. Ellias, Ehud Kamar & Kobi Kastiel, The Rise of Bankruptcy Directors, 95 S. CAL. L. REV. 1083, 1095 (2023).

Manges, "exert significant influence over the selection of bankruptcy directors."[197]  According to

Ellias' analysis, the recovery rate for unsecured creditors—those whose claims are typically most

at risk in bankruptcy—is on average 20% lower when bankruptcy directors are on a debtor's

board.[198]

133.    NYU Professor Robert Jackson extended Ellias' analysis and found that Pohl and

Aronzon are both among the top 15 repeat players in a recent sample of independent directors.[199]

This analysis is consistent with the Bankruptcy Directors' own testimony:  Pohl's advisory

business gets ▇ of its revenue exclusively from directors' fees, while Aronzon has served as a

bankruptcy director for over ▇ firms in the last five years, with ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇.  *Supra*

Background V.  Aronzon also acknowledged the ▇▇▇▇▇▇▇,

explaining "▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇"  *Supra* Background V.

134.    In assessing director independence, courts holistically assess directors' personal

and professional relationships, including the likelihood they will seek similar work in the future.

*See In re Match Grp.*, 315 A.3d at 472 ("Longstanding business affiliations, particularly those

based on mutual respect, are of the sort that can undermine a director's independence."); *In re

Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940–42 (Del. Ch. 2003) (special litigation

committee members not independent for purpose of investigating claims against benefactor of

institution with which they were affiliated).  Given the Bankruptcy Directors' own description of

▇▇▇▇▇▇▇, there is even more reason to

---

[197]  *Id.* at 1125.

[198]  *Id.* at 1087–88.

[199]  Jackson Affirmative Report ¶¶ 100–102.

question whether they were "independent, empowered negotiating agents" for all aspects of the estate causes of action released in the settlement before the court. *See In re Dell Techs. Inc. Class V S'holders Litig.*, No. CV 2018-0816-JTL, 2020 WL 3096748, at *17 (Del. Ch. June 11, 2020).

> #### 4. The Settlement Was Not the Result of True "Arms-Length" Bargaining.
>
> ##### a. The Debtors Effectively Negotiated a Settlement with Themselves.

135.    The settlement negotiations were not conducted at arms'-length. The Bankruptcy Directors, rather than negotiating with Brenntag, negotiated without the direct involvement of advisors and against Tom Ryan, who previously worked on behalf of the Debtors to negotiate settlements, market their assets, and model their liabilities.[200] In effect, the Debtors negotiated the Settlement with themselves.

136.    In evaluating whether an agreement was truly a result of "arms-length" negotiations, courts also look to whether the negotiators are actually empowered and prepared to "say no to any transaction that is not the best transaction available." *See, e.g.*, *In re First Bos., Inc. S'holders Litig.*, No. CIV. A. 10338, 1990 WL 78836, at *7 (Del. Ch. June 7, 1990); *see also In re Dell*, 2020 WL 3096748, at *17 (declining to apply business judgment rule because "the Company did not empower the [independent directors] with the ability to say no.").

137.    Here, the Bankruptcy Directors did not even know what alternatives they had to accepting Berkshire's settlement proposal. According to Pohl, he told Ryan ██████████ ██████████ "██████████" ██████████.[201] But when asked what

---

[200]    Pohl Dep. Tr. 318: 10-23; 284:9-23 (██████████████████████); Pohl Declaration, Dkt. No. 1298 ¶ 11 ("Mr. Aronzon and I also negotiated directly with a principal of the NICO entities."); *see, e.g.*, **Exhibit 103**, BNS-TCC-3316782 (██████████████████████████████████); **Exhibit 104**, BNS-TCC-3323570 (██████████████████████).

[201]    *See* Pohl Dep. Tr. 333:14-18.

the Debtors would have done next, Pohl testified "███████████████████████████████"

and acknowledged that he and Aronzon never even discussed ████████████████████

████.[202]  The Bankruptcy Directors never prepared themselves to "say no" to Berkshire's

settlement—they have both centered their careers on appeasing law firms and companies by

quickly settling claims against those very companies.  This fact further weighs against finding that

the negotiations were of the "utmost good faith."

> **b.  The Bankruptcy Directors Failed to Include the Committee or FCR in the Investigation or in Any Negotiations with Berkshire.**

138.    As noted, the Bankruptcy Directors did not include the Committee and FCR in the

negotiations.

139.    The need for rigorous judicial scrutiny is at an apex under the facts of this case

where the Settlement Agreement was negotiated and executed without the knowledge or

involvement of creditors, including the Committee and FCR, the fiduciaries charged with

representing the interests of the vast majority of claimants in these cases.  *Conn. Gen. Life Ins. Co.

v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995) ("When a

debtor subsidiary settles a claim it has against a parent corporation without the participation of the

creditors, a bankruptcy court should carefully scrutinize the agreement.") (citing *In re Drexel

Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (S.D.N.Y. 1991)); *In re Drexel*, 134 B.R. at 498

("We subjected the agreement to closer scrutiny because it was negotiated with an insider, and

hold that closer scrutiny of insider agreements should be added to the . . . factors [used] to

determine whether a settlement is fair and reasonable."); *accord In re Dow Corning Corp.*, 192

B.R. 415, 428 (Bankr. E.D. Mich. 1996) ("The case law clearly holds that when a debtor in

---

[202]  *See* Pohl Dep. Tr. 333:19-334:8; *see also id.* 335:9-337:12.

possession seeks to settle a dispute with its parent company or with another related party, the court should give greater scrutiny than in the usual case.").

140.    Here, the Bankruptcy Directors never sought to involve the estates' creditors in their investigation of the merits of the successor liability claims that the Committee and FCR are best-positioned, and most motivated, to maximize in value. *Supra* Background VI. Nor did they even consider involving the Committee or FCR in negotiations with Berkshire—the Committee was not even aware they were happening. *Supra* Background VI. The decision further highlights the Bankruptcy Directors' unwillingness to actually exercise their power to "say no" to the bargain basement offers by Berkshire and to negotiate a fair and reasonable settlement for claimants.

**B.      It is Especially Important Scrutinize Independence in the Mass-Tort Context Where Debtors Solvent Parents are Seeking to Limit Recoveries for Claimants.**

141.    Moreover, the need for the Court to apply heightened scrutiny is especially acute, where, as here, a settlement of tort claims is negotiated with a corporate insider who is in a better position to know the value of those claims. As Professor Jackson explained, "for every dollar by which the claims are undervalued, the Debtor's controller stands to gain a dollar and the Debtor and its constituents—here, tort victims—stand to lose one. ***In such a situation, deferring to the decision of directors chosen by an officer of the controller would signal to practitioners that, even where conflicts are clear and acute, courts will defer to bargains struck in a setting where opportunism is possible***."[203]

142.    As this Third Circuit has observed, "[b]ankruptcy has proven an attractive

---

[203] Jackson Affirmative Report ¶ 126; *See* Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*, 90 U. CHI . L. REV. 973, 1015, 1016 (2023) (explaining that when settlements involve valuation of mass tort claims "[i]nformation asymmetries exacerbate [both] issue[s]," because the debtor is likely in a better position than victims to know the value of claims. "The[se] valuation challenges . . . are significant, and they may allow debtors to gain leverage in bankruptcy proceedings.").

alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of present and future liability."[204] As Professor Jackson points out, with a it "may be especially important to police the independence of directors in the mass-tort context" where "a debtor's solvent 'affiliate' is 'to be released from liability,' raising more pointed concerns about 'efforts to 'cap' the liabilities owing the injured parties' than other cases and warranting particular care with respect to review of independent directors' bargains." *See* Jackson Affirmative Report ¶ 48.  As this Court has noted, it has not yet decided a case which raised the prospect of limiting amounts owed to claimants.[205] As discussed in Background V, *infra*, this is precisely such a case, as Debtors' solvent parents are seeking to limit the amounts available to the claimants including the Committee and FCR.  Accordingly, this court should exercise particular care in deciding which standard of review to apply, especially under the facts of this case, as practitioners will use judicial decisions to inform their conduct in the future. *See* Jackson Affirmative Report ¶¶ 20-28.

143.    For all of these reasons, the process by which the Settlement was reached was not conducted in good faith, and the Settlement cannot survive heightened scrutiny.[206]

---

[204]    *In re LTL Management, LLC*, 58 F.4th 738, 767 (3d Cir. 2023).

[205]    *In re LTL Management, LLC*, 637 B.R. 396, 409-10 (Bankr. D.N.J. 2022).

[206]    The Debtors' cases do not salvage their fundamentally flawed theory of deference.  The Debtors cite *JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter Communications)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) for the proposition that "Bankruptcy courts have approved transactions with insiders without applying . . . 'entire fairness' . . . ."  Settlement Motion ¶ 85.  But that opinion actually states that the court subjected the settlement in that case to "considerable attention" with "heightened scrutiny and some skepticism."  *In re Charter*, 419 B.R. at 240.  *Charter* does not support the argument that the Court should not subject the settlement in this case to heightened scrutiny simply because bankruptcy directors negotiated the settlement. *In re Dewey & LeBoeuf LLP* likewise illustrates the Debtors' failure to grapple with the facts of this case because the settlement there had "substantial input from counsel for the Unsecured Creditors Committee and the Secured Lenders."  *In re Dewey*, 478 B.R. 627, 641–42 (Bankr. S.D.N.Y. 2012).  Debtors also cite *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) for the proposition that the "business judgments can only be set aside upon a showing that directors did not actually make a decision or were uninformed, grossly negligent, or lacking independence."  This citation also fails to support Debtors theory.  In *In re Los Angeles Dodgers LLC*, the court expressly found "Debtors' decision [was] not entitled to deference as a matter of business

## IV.    THE SETTLEMENT SHOULD BE REJECTED EVEN UNDER THE BUSINESS JUDGMENT RULE.

144.    The Court should not defer to the business judgment of the Debtors because, among other things, the Bankruptcy Directors failed to evaluate basic information about the strength and value of their claims and negotiated exclusively with their affiliate's principal. *Supra* Background VI; *see, e.g.*, *In re Engman*, 331 B.R. 277, 300 (Bankr. W.D. Mich. 2005) (denying Rule 9019 motion despite assertion of business judgment rule because "it does not appear that the trustee critically evaluated this issue when he settled" and "clearly took a 'their word/his word' approach"); *In re Ortiz*, 619 B.R. 273, 277–78 (M.D. Fla. 2020) (finding trustee "failed to exercise [] reasonable business judgment" by failing to "look[] at the claims"); *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 276 (2d Cir. 1986) (finding business judgment rule inapplicable where directors failed to obtain "material information and in overseeing" advisor by "not seek[ing] any documents" underlying advisor's "conclusory opinion"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (noting that business judgment does not apply if "the directors' decision was uninformed," "the directors were not disinterested or independent," or "the directors were grossly negligent").

## V.    THERE IS INSUFFICIENT EVIDENCE IN THE RECORD TO SUPPORT SETTLEMENT APPROVAL.

145.    As noted, the Bankruptcy Directors negotiated the settlement on the basis of (1) a presentation from counsel concerning potential claims, and (2) a presentation from Brattle concerning the value of asbestos, talc, and environmental claims.[207]  Both of these presentations have been withheld as privileged, leaving the record devoid of the basis for the Bankruptcy

---

judgment" because conflicts of interest "clearly compromised Debtors'[] independent judgment" and ultimately found Debtors failed to prove the entire fairness of the transaction. *Id*. at *313–314.

[207]    *Supra* Background VI.

Directors' decision to enter into the settlement.[208]   This leaves the Court without a proper

foundation with which to assess, let alone approve, the settlement, under any standard of review;

for example, the Court does not have information available to establish that the directors' decision

was not "uninformed" because that information has been withheld.  *See, e.g.*, *In re L.A. Dodgers

LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).   The settlement should be rejected on this basis

alone.

<div align="center">

## <u>RESERVATION OF RIGHTS</u>

</div>

146.    The Committee reserves the right to supplement or amend this Objection.

<div align="center">

## <u>CONCLUSION</u>

</div>

For the foregoing reasons, the Committee respectfully requests that sustain the Objection

and deny the Settlement Motion.

Dated:   December 20, 2024

<div style="margin-left: 40%;">

*/s/* Arthur J. Abramowitz
**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email:  aabramowitz@shermansilverstein.com
          rswitkes@shermansilverstein.com

**COOLEY LLP**
Cullen D. Speckhart (admitted *pro hac vice*)
Michael Klein (admitted *pro hac vice*)
Evan M. Lazerowitz
Jeremiah P. Ledwidge (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000

</div>

---

[208]  *Id.*; *see* **Exhibit 96**, BNS-TCC-3323284; **Exhibit 98**, BNS-TCC-3323290.

Email:   cspeckhart@cooley.com
mklein@cooley.com
elazerowitz@cooley.com
jledwidge@cooley.com

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Serafina A. Concannon (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
Tel: (202) 862-5000
Email:   kmaclay@capdale.com
tphillips@capdale.com
sconcannon@capdale.com

*Co-Counsel to the*
*Official Committee of Talc Claimants*