**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Jeanne T. Cohn
Natalie G. Harrison
Conner R. Huggins
Alan S. Tenenbaum
Environment & Natural Resources Division
U.S. Department of Justice
150 M St NE
Washington, DC 20002
Tel: (202) 514-5409
Email: Jeanne.Cohn@usdoj.gov
Natalie.G.Harrison@usdoj.gov
Conner.Huggins@usdoj.gov
Alan.Tenenbaum@usdoj.gov
*Counsel for United States on behalf of EPA*

| | |
|---|---|
| In re: | Chapter 11 |
| WHITTAKER, CLARK & DANIELS, INC., *et al.*, | Case No. 23-13575 (MBK) |
| Debtors. | (Jointly Administered) |
| | Honorable Michael B. Kaplan, U.S.B.J., Chief |

**UNITED STATES' OBJECTION TO THE SETTLEMENT AGREEMENT**
**BETWEEN DEBTORS AND CONTRIBUTING PARTIES**

i

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ........................................................................................ 1

BACKGROUND .......................................................................................................... 2

STANDARD OF REVIEW ............................................................................................ 4

ARGUMENT ............................................................................................................... 5

I.    The Debtors Have Not Proven That The Settlement Agreement Is Fair Given That
It Is Based on a Materially Low Estimate of Environmental Liabilities of Debtors .......5

II.    The Debtors Have Not Proven That the Settlement Agreement Is Fair Given That
Debtors' Lead Negotiator Failed to Consider the Estates' Direct Claims for
Indemnification Against Purchaser in the 2007 Stock Purchase Transaction ...............12

III.    The Debtors Have Not Proven That the Settlement Agreement Is Fair Because
Debtors Have Underestimated the Strength of Successor Liability Claims Under
Environmental Law......................................................................................................13

IV.    The Settlement Agreement Is Unfair to The Extent That the Non-Debtors Seek to
Utilize Settlement Proceeds to Diminish Their Own Non-Derivative Liabilities .........15

V.    Any Approval of the Settlement Agreement Should Clearly State That Approval
Is Without Prejudice to Allocation of Settlement Proceeds...........................................17

VI.    Any Approval of the Settlement Agreement Should Clearly State That the
Governments' Causes of Action Under Environmental Law Against Non-Debtor
Owners or Operators of Property Are Not Enjoined or Subject to the Jurisdiction of the
Bankruptcy Court........................................................................................................17

VII.  Any Approval of the Settlement Agreement Should Strike The Indemnification
Provision of Paragraph 19 of the Settlement Agreement as Unfair...............................19

CONCLUSION........................................................................................................... 20

## TABLE OF AUTHORITIES

Cases

*Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288 (E.D. Pa. 2006)...................14
*Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) ............................................................19
*Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455 (3d Cir. 2006) ...........................................18
*Garza v. Citigroup Inc.*, 881 F.3d 277 (3d Cir. 2018) ...................................................................20
*Gould, Inc. v. A&M Battery & Tire Serv.*, 950 F. Supp. 653 (M.D. Pa. 1997)...........................14
*In re Adelphia Commc'ns Corp.*, 323 B.R. 345 (Bankr. S.D.N.Y. 2005) .....................................4
*In re Bell & Beckwith*, 87 B.R. 472, 474 (N.D. Ohio 1987).........................................................4
*In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015)..............................................4
*In re CMC Heartland Partners*, 966 F.2d 1143 (7th Cir. 1992)...................................................17
*In re Gen. Motors Corp.*, 407 B.R. 463 (S.D.N.Y. 2009)..............................................................17
*In re Martin*, 91 F.3d 389 (3d Cir. 1996)......................................................................................4
*In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455 (Bankr. E.D. Pa. 1998) ...........................4
*In re Steel Wheels Transp., LLC*, No. 06-15377, 2011 WL 59000958 (Bankr. D.N.J. Oct. 28, 2011) ......................................................................................................................................4
*In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013)..............................................................13
*In re Whittaker, Clark & Daniels*, 663 B.R. 1 (Bankr. D.N.J. 2024) ............................................3
*Landsford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993) ................13
*Ohio v. Kovacs*, 469 U.S. 274 (1985) ...........................................................................................17
*Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, 678 F. Supp. 3d 611 (D.N.J. 2023) ............14
*Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988)........................13
*United States v. American Standard Inc., et al.*, 07-cv-5334 (D.N.J. Nov. 6, 2007)...................16
*United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir. 1992)..................................14
*United States v. Cornell Dubilier Elecs., Inc.*, Civ. Act. No. 12-5407 (JLL), 2014 WL 4978635, (D.N.J. Oct. 3, 2014)...................................................................................................................6
*United States v. Fed. Res. Corp.*, 525 B.R. 759 (D. Idaho 2015) .................................................13
*United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294 (3d Cir. 2005)..............................13, 18
*United States v. Mex. Feed & Seed Co., Inc.*, 980 F.2d 478 (8th Cir. 1992).........................14, 15
*United States v. White-Sun Cleaners Corp.*, No. 09-CV-2484 (ARR)(JO), 2011 WL 1322266, at *12 (E.D.N.Y. Mar. 9, 2011) ......................................................................................................13

Statutes

42 U.S.C. § 9607(a)(1)–(3)......................................................................................................2, 18
Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.* ...........................................................................2
Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq.*......................................................................2
Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*.............................................................................................................2
Oil Pollution Act (OPA), 33 U.S.C. §§ 2701 *et seq.* ......................................................................2
Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 *et seq.*............................2
Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 *et seq.*...............................................2

The United States of America ("United States"), on behalf of the U.S. Environmental Protection Agency ("EPA"), hereby objects to Debtors' Motion for Approval of the Settlement Agreement Between the Debtors and the Contributing Parties ("Settlement Agreement") and related relief (Dkt. No. 1297) ("Motion").  In support of its objection, the United States asserts as follows:

### SUMMARY OF ARGUMENT

1.      The Settlement Agreement should not be approved as filed because it is premised on a significant undervaluation of Debtors'[1] environmental liabilities.  As explained more fully in the United States' companion *Daubert* motion, Debtors selected an unqualified expert to opine on the magnitude of the environmental liabilities.  Moreover, this expert was merely a rubber stamp for Debtors' outdated and inaccurate books and records and old documents and he did not try to update his estimate for more recent information.  Debtors' expert significantly modified his original estimate as set forth in his Declaration in support of the Settlement Agreement, but Debtors did not increase the settlement amount as a result.  His revised estimate still has numerous defects.  As such the Settlement Agreement does not meet the requirements for approval of bankruptcy settlements, particularly under the heightened scrutiny standard for settlements with insiders.  The Settlement Agreement would leave significant shortfalls for the cleanup of numerous sites contaminated by the Debtors.  Nor should Debtors be permitted to manipulate corporate transactions or utilize other corporate gymnastics in combination with bankruptcy law to evade their responsibilities under environmental laws.  Finally, the Settlement Agreement and proposed Order have certain defects that could be contended by the settlors to be

---

[1] The Debtors in these chapter 11 cases are Whittaker, Clark & Daniels; Brilliant National Services, Inc.; L.A. Terminals, Inc.; and Soco West.  *See* Motion n.1.

1

contrary to the settlors' portrayal in Debtors' motion and agreements with counsel and therefore
should not be approved without clarification.

## BACKGROUND

2.      The United States, through EPA, is charged with regulatory responsibility to
oversee the protection of public health and the environment under several environmental statutes,
including the Comprehensive Environmental Response, Compensation, and Liability Act
(CERCLA), 42 U.S.C. §§ 9601 *et seq.*, Resource Conservation and Recovery Act (RCRA),
42 U.S.C. §§ 6901 *et seq.*, Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq.*, Oil Pollution Act
(OPA), 33 U.S.C. §§ 2701 *et seq.*, Clean Air Act (CAA), 42 U.S.C. §§ 7401 *et seq.*, and Toxic
Substances Control Act (TSCA), 15 U.S.C. §§ 2601 *et seq.*  State environmental agencies also
oversee the protection of public health and safety under these statutes and state statutes.

3.      Debtors originated from a conglomerate of companies owned by Stinnes
Corporation and its parent, Deutsche Bahn, which operated a chemical business for more than
100 years, resulting in significant environmental and tort liability.  Motion at 8–10.

4.      Under CERCLA, subject to certain defenses that are not relevant here, any entity
that owns, operates, and/or arranges for disposal of hazardous substances at a facility is liable for
the government's costs that are not inconsistent with the National Contingency Plan.  42 U.S.C.
§ 9607(a)(1)–(3).  Debtor Soco West owns and previously operated the Lockwood Solvent Site
in Billings, Montana.[2]  Soco West is also liable under CERCLA as an arranger for the Cooper
Drum and Omega Sites in South Gate and Whittier, California.[3]  The United States expects to
file a proof of claim for these sites prior to the March 26, 2025, government bar date that has
been set in this case, Dkt. No. 1588, as well as an administrative expense application for the

---

[2] TCC Ex. 99, Report of David McKnight, Oct. 25, 2024, Dkt. No 1601-1 (McKnight Report), p.47, Table 11.
[3] McKnight Report, p.47, Table 11.

Lockwood, Montana site.  In addition, Debtors have significant environmental liabilities in California and elsewhere where state agencies are the oversight lead.[4]

5.      In 2004, Bain Capital and Brenntag-named affiliates purchased the valuable operating subsidiaries and assets of the conglomerate and sought to separate out the legacy environmental and tort liabilities to minimize the purchasers' exposure.  Debtor Soco West took ownership of the Lockwood Solvent Site in Montana.  In 2007, the Berkshire Hathaway conglomerate of companies acquired the Debtors as an investment through a Stock Purchase Agreement ("2007 Agreement").[5]  The 2004 and 2007 transactions included complex indemnification provisions among the various parties including Debtors.  *See generally* Motion at 8–16; Official Committee of Talc Claimants' Objection to Settlement Agreement at 3–10. Dkt. No. 1606 ("TCC Objection").

6.      On April 26, 2023, Debtors filed their petitions for bankruptcy relief.  On August 23, 2024, the Court ruled that certain successor liability and alter ego claims of tort creditors against the Brenntag entities,[6] NICO, and DB US (Settling Non-Debtors) were property of Debtors' bankruptcy estates.  *In re Whittaker, Clark & Daniels*, 663 B.R. 1 (Bankr. D.N.J. 2024).[7]

7.      On September 3, 2024, Debtors filed the Motion seeking approval of the Settlement Agreement that would resolve all Estate Causes of Action against the Settling Non-Debtors including all Successor Liability Claims (as defined in the Adversary Proceeding). Settlement Agreement at 4.  Under the Settlement Agreement and proposed Order, the United

---

[4] *See* McKnight Report, p.47, Table 11.
[5] *See* Exhibit 14 to Declaration of Gavin C.P. Campbell, Dkt. No. 1301-1.
[6] *See* Motion n.4
[7] The Court's ruling was issued in Adv. Pro No. 23-01245.  EPA was not a party to that Adversary Proceeding, having been voluntarily dismissed as a defendant early in the case.  Adv. Pro. Dkt. No. 105.

States would be enjoined from asserting such causes of action against Settling Non-Debtors.

Proposed Order ¶ 11.  Under the Settlement Agreement, Debtors' estates would receive $535

million less up to $50 million payable under the DIP Order (Dkt. No. 1410) as well as any

indemnification required to litigate with creditors over whether a claim was an Estate Cause of

Action.  Settlement Agreement ¶¶ 3, 19.

8.     The Motion does not seek to allocate the consideration to be received under the

Settlement Agreement among the different creditor constituencies.  The Plan and Disclosure

Statement filed by the Debtors on October 28, 2024, likewise do not provide for any allocation of

the consideration among creditor constituencies.  Dkt. Nos. 1468, 1469.  Counsel for Debtors

have stated to counsel for the United States that approval of the Settlement Agreement would be

without prejudice to allocation of the consideration under Plan proceedings.

## **STANDARD OF REVIEW**

9.     The Court should not approve the Settlement Agreement unless Debtors meet

their burden of proving the settlement as fair and reasonable to creditors.  *In re Martin*, 91 F.3d

389 (3d Cir. 1996); *In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 460 (Bankr. E.D. Pa.

1998); *In re Bell & Beckwith*, 87 B.R. 472, 474 (N.D. Ohio 1987).

10.    Moreover, the Settlement Agreement here is with insiders, which requires

heightened scrutiny in reviewing the fairness of a proposed settlement.  *In re Steel Wheels

Transp., LLC*, No. 06-15377, 2011 WL 59000958, at *7 (Bankr. D.N.J. Oct. 28, 2011) ("Courts

routinely subject transactions by and among insiders and fiduciaries to more exacting review.")

(citations omitted); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015); *see

also In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 385 (Bankr. S.D.N.Y. 2005).

11.     Debtors contend that the fact that their "independent" directors negotiated and approved the settlement means that the Settlement Agreement should be given greater deference. To the contrary, the independent directors testified that they did not interview the Brattle Group, the firm that employs Debtors' expert, David McKnight, and relied on other advisors to select the Brattle Group.[8] As to Debtors' environmental claims, the directors relied on Debtors' outdated and inaccurate books and records, as handled by one of the Settling Non-Debtors, NICO, and some old remediation documents.[9] Thus, the directors clearly failed to exercise any independence in this regard. Indeed, some of the Settling Non-Debtors themselves provided services to the debtors in connection with the debtors' cleanup activities. Debtors have not explained what Settling Non-Debtors' role was in connection with Debtors' inaccurate books and records that Debtors rely on in support of the Settlement Agreement. Heightened scrutiny of the fairness of the settlement is required.

## ARGUMENT

I.     <u>The Debtors Have Not Proven That the Settlement
Agreement Is Fair Given That It Is Based on a Materially
Low Estimate of Environmental Liabilities of Debtors</u>

12.     Debtors' Motion states that the settlement is based on a net present value of Debtors' environmental liabilities of $37 million by their expert, Mr. McKnight. Motion at 32–33. However, as discussed in the United States' accompanying *Daubert* motion, Mr. McKnight is not qualified to opine on the magnitude of environmental liabilities. His original estimate was merely a rubber stamp for debtors' inaccurate books and records and old documents that he did not try to update with more recent information. Approximately, eight weeks later, Mr. McKnight

---

[8] Ex. 8, Pohl Depo. 234:7–20; Ex. 9, Aronzon Depo. 164:3-9.
[9] Mr. Aronzon testified that NICO handled the books, records, accounts, and other services that were provided to the companies during the hiring process for the independent directors. Aronzon Depo. 112:6–12.

significantly modified his original opinion in support of the Settlement Agreement—adjusting
the range of Debtors' environmental liabilities to a net present value of $50 million to $71
million—and yet Debtors have not adjusted the settlement amount.[10]

13.     Even if the Court admits Mr. McKnight's testimony, his revised estimate of
environmental liabilities still has numerous defects resulting in a significant undervaluation of
environmental liabilities.[11]

14.     First, Mr. McKnight used a discount rate he derived from average returns on
investments from trusts established for individual claims for asbestos exposure.[12]  This average
rate was 6.69%.[13]  However, EPA usually can only invest money recovered under CERCLA in
U.S. market-based securities, which are considered risk-free, but generally have a much lower
return rate.[14]  The MK note rate for fiscal year 2024 is 3.46%.[15]  Because there is an inverse
relationship between the discount rate and the estimated cost of future environmental
remediation, Mr. McKnight's higher discount rate results in a lower estimation of Debtors'
environmental liabilities.[16]  Had he used a discount rate that was based on a risk-free rate—
which is what experienced environmental estimators typically use for environmental settlements
with the government—his estimation of Debtors' environmental liabilities would have been
higher.[17]

---

[10] McKnight Report at pp. 10–11, Tables 3 and 4.
[11] The United States expects to provide a more precise estimate in advance of either claims adjudication and/or
confirmation of the Debtors' Plan.  The United States also notes that the bar date for government entities has not yet
passed.  Because the Court is not deciding allocation in this Motion, a more precise estimation is not necessary at
this time, but in any case, Debtors' estimate of their environmental liabilities is unsupported and plainly too low.
[12] McKnight Report ¶¶ 107–11.
[13]  McKnight Report ¶ 111.
[14] Declaration of Gayle Schlea Koch, Ex. 3, ¶ 7;  *see also United States v. Cornell Dubilier Elecs., Inc.*, Civ. Act.
No. 12-5407 (JLL), 2014 WL 4978635, at *12 (D.N.J. Oct. 3, 2014).
[15] Koch Decl. ¶ 7.
[16] Koch Decl. ¶¶ 5–7.
[17] *See* Koch Decl. ¶ 7.

15.      Second, Mr. McKnight failed to include EPA's indirect rates as part of his analysis of Debtors' environmental liabilities.[18]  He appears to misunderstand how EPA incurs indirect costs and applies indirect rates.  He testified that he understood that when a potentially responsible party (PRP) performs remediation at a site, that PRP incurs indirect costs itself; therefore, he believed it was not necessary for him to account for EPA's indirect rates in his analysis.[19]  However, EPA incurs costs, including indirect costs, throughout the remediation process, regardless of what entity performs the cleanup.[20]

16.      Mr. McKnight's "unique" methodology is primarily based on outdated costs in remedial plans and is inconsistent with standard practice and guidance documents.  Mr. McKnight used a methodology to evaluate Debtors' environmental liabilities that he described as "unique to this case."[21]  Mr. McKnight and his team searched for publicly available remedial plans (EPA's Records of Decision, or RODs, and state Remedial Action Plans, or RAPs), along with publicly available ROD amendments or Explanations of Significant Differences (ESDs).[22] He apparently assumed that if significant cost estimate increases were identified, they would be made public via an ESD or ROD amendment.[23]  However, there are multiple assumptions with this methodology that lead to underestimation:

     a.  First, cost estimates of environmental remediation frequently increase without EPA issuing a ROD amendment or an ESD.[24]  Therefore, searching for ROD

---

[18] Ex. 1, Deposition of David McKnight, Vol. II, In re Whittaker, Clark & Daniels, Ch. 11, Case No. 23-13575 (MBK), United States Bankruptcy Court, 358:12–16.
[19] McKnight Depo. 358:12–360:10.
[20] Koch Decl. ¶ 15.
[21] McKnight Depo. 313:21–22.
[22] McKnight Report, ¶¶ 96–99; McKnight Depo. 325:5–326:3, 289:20–290:16.
[23] McKnight Depo. 331:23–25.
[24] Koch Decl. ¶ 9.

Amendments or ESDs alone is unlikely to identify all relevant, up-to-date cost information for a given site.[25]

b. Second, the cost estimates in remedial plans are not intended to be used to project the budget for future costs of environmental cleanup. Instead, EPA prepares these estimates primarily to compare alternatives during the remedy selection process. EPA-issued guidance, which Mr. McKnight cited to, states that the cost estimates in remedial plans are not intended "for establishing project budgets or negotiating Superfund enforcement settlements."[26] Similarly, an industry standard text warns against using cost estimates in remedial plans as a basis to estimate future costs of remediation.[27] These remedial plans often make certain simplifying assumptions, such as excluding costs for elements that are the same across all alternatives and truncating operation & maintenance at 30 years, despite the fact that in reality, many sites may require operation and maintenance for a much longer time period.[28] Mr. McKnight's failure to recognize these assumptions and account for these missing data causes him to underestimate Debtors' environmental liabilities.[29]

c. Third, the cost estimates in the remedial plans themselves contain inaccurate cost information because the cost estimates are often a few years old, thus already

---

[25] *See* Koch Decl. ¶ 9.
[26] McKnight Report nn. 89–91; Ex. 4, A Guide to Developing and Documenting Cost Estimates During the Feasibility Study, US Army Corps of Engineers & EPA, July 2000 (EPA Guide) at 1-2.
[27] Ex. 5, ASTM International Standard Guide for Estimating Monetary Costs and Liabilities for Environmental Matters, 2024, at 5.3.10 and p.12 X1.7. The United States files U.S. Exhibit 5 under seal because it is a proprietary document that the United States treats as Confidential Material under Paragraph 7(a) of the Second Amended Confidentiality Stipulation and Protective Order, entered by the Court on September 26, 2024, Dkt. No. 1361.
[28] Koch Decl. ¶ 12.
[29] Koch Decl. ¶ 28.

affected by inflation, and biased low.[30] The cost estimates provided in the

remedial plans can range significantly, from -50%/+100% to -30%+50%.[31]  This

range narrows as EPA and/or potentially responsible parties (PRPs) gather more

information during later stages of the remedial process, including the remedial

design[32] process, which generates more accurate cost estimates.  Mr. McKnight's

failure to confirm when these remedial plan cost estimates were prepared, or

recognize these other assumptions leads to underestimation.

17.    Mr. McKnight limited his estimation of Debtors' environmental liabilities to the

date that Debtors filed their petition for Chapter 11 bankruptcy in April 2023 assuming that the

Debtors had not filed for bankruptcy.[33]  Regardless of whether this assumption was appropriate

in assessing Debtors' tort liabilities, it is not a common assumption made when assessing

environmental liabilities, where parties regularly provide updated cost information.[34]  Applying

this assumption to Debtors' environmental liabilities further devalues them for at least three

reasons.  First, by limiting the valuation of Debtors' environmental liabilities to the petition

date—now nearly two years ago—Mr. McKnight ignores the passage of time and discounts

Debtors' environmental liabilities further back in time, resulting in an artificially low estimate.[35]

Second, he overlooks costs that are likely to continue accruing, such as temporary shut down or

transition costs or EPA's oversight costs, for which Debtors are still potentially liable.[36]  Third,

---

[30] Koch Decl. ¶ 13.
[31] Ex. 4, EPA Guide at 2-4-2-5 ("The screening-level accuracy range of -50% to +100% means that, for an estimate of $100,000, the actual cost of an alternative is expected to be between $50,000 and $200,000."); Koch Decl. ¶ 13.
[32] Mr. McKnight testified that he did not know whether he or his team searched for documents related to remedial designs for Debtors' sites and that he thought the remedial design occurred before the ROD.  McKnight Depo. 290:17–291:4.
[33] McKnight Depo. 358:18–22, 375:21–376:2, 382:8–12, 393:19–394:7, 400:15–18.
[34] *Compare* McKnight Report ¶ 23 *with* Koch Decl. ¶ 20.
[35] Koch Decl. ¶ 20.
[36] Koch Decl. ¶ 21.

he overlooks the likelihood that in the bankruptcy context, EPA will take over the remediation of sites which are solely owned and/or operated by Debtors resulting in significantly increased costs associated with the remediation.

18.    Mr. McKnight assumed that Debtors' books and records were accurate, reliable, and complete.[37]  However, experienced evaluators understand that companies often underestimate the book values of their environmental liabilities and such evaluators therefore approach those books and records more skeptically.[38]  Mr. McKnight's assumption is even more troubling where Debtors' independent directors did not interview Mr. McKnight's firm, were not familiar with claims evaluations themselves, and were not involved in selecting the books and records that Mr. McKnight later relied upon.[39]  One of the directors, Paul Aronzon, testified that "[Brattle] provided us with information, you know, decks and things that showed us how they did it, but if something was missing, I wouldn't know."[40]

19.    Mr. McKnight also failed to investigate for natural resource damage estimations, other than at the Lockwood Solvent Site, claiming that it would have been speculative for him to do so.[41]  However, natural resource damage claims often lag behind site remediation investigations and plans because the natural resource trustees need additional time to collect data necessary to evaluate their claims.[42]  Additionally, the bar date for government entities to file such claims is in March 2025, so it was incumbent of Mr. McKnight and Debtors to seek out information related to such claims, rather than reject such claims as "speculative."

---

[37] McKnight Depo. 373:7–12, 412:18–413:6.
[38] Koch Decl. ¶ 17.
[39] Aronzon Depo. 112:6–12, 164:3–9; Pohl Depo. 234:1–235:8.
[40] Aronzon Depo. 226:7–12.
[41] McKnight Depo. 415:13–416:4.
[42] Koch Decl. ¶ 19.

20.    The flaws in Mr. McKnight's methodology are apparent in the example of the
Lockwood Solvent site in Montana owned by Debtor Soco West.  Prior to the bankruptcy,
Debtors, through their technical consultant(s), had been performing the remediation at that Site;
after the bankruptcy, it is likely that EPA, in coordination with the Montana Department of
Environmental Quality, will complete remediation that is expected to last in perpetuity due to the
nature of the required relief.[43]

     a.    EPA's ROD for the Lockwood Solvent Site was published in 2005.[44]  There is no
       ESD or ROD amendment for this Site; however, in preparing his report, Mr.
       McKnight was not aware that Debtors' technical consultant had prepared a
       remedial design pilot test work plan in 2015 which contained updated information
       about the remediation and that was available on EPA's public website.[45]

     b.    Mr. McKnight also excluded EPA's indirect costs. Should EPA complete
       remediation at the Lockwood Solvent Site, the current indirect rate that is
       applicable to all costs is approximately 56.34%.[46]

21.    Nor did Debtors seek input from the Governments as to the scope of Debtors'
environmental liabilities in shaping their proposed Settlement.  Indeed, the United States did not
even know that Debtors were negotiating a settlement with the Settling Non-Debtors.  Had the
Governments' input been sought, some of the concerns highlighted above in Mr. McKnight's
methodology might have been avoided and his estimate for environmental liabilities would have

---

[43] Koch Decl. ¶ 12.
[44] Ex. 10, Record of Decision, Lockwood Solvent Groundwater Plume Site, Billings Montana, Montana Dep't of
Envt'l Quality & EPA, Aug. 2005.
[45] McKnight Depo. 349:11–354:4.
[46] Koch Decl. ¶ 15.

11

been more accurate and higher, resulting in a settlement amount that would have been

significantly higher.

        II.       <u>The Debtors Have Not Proven That the Settlement
                Agreement Is Fair Given That Debtors' Lead Negotiator
                Failed to Consider the Estates' Direct Claims for
                Indemnification Against Purchaser in the 2007 Stock
                Purchase Transaction</u>

       22.     The unfairness of the settlement is further demonstrated by the fact that Debtors'

lead negotiator, Director Tim Pohl, was not familiar with a key indemnification provision of the

2007 Stock Purchase Agreement ("2007 SPA") nor had he read the 2007 SPA itself.[47]  Nor does

Debtors' Motion discuss or analyze this key indemnification provision in the 2007 SPA.

       23.     Under Section 8.03(f) of the 2007 SPA, in return for consideration provided, the

Purchaser agreed to indemnify the Seller and its Affiliates (now Debtors) for numerous

environmental liabilities.[48]  Although the indemnities are undoubtedly complex and have

numerous exceptions and complicated defined terms, it is evident that Debtors' lead negotiator

was not familiar with the indemnity provisions and failed to consider them in negotiating the

consideration to be paid under the Settlement Agreement.

       24.     Nor does Debtors' Motion provide any explanation or basis demonstrating that

the value of the estate's indemnification claim under the 2007 SPA was included in the proposed

settlement amount under the Settlement Agreement.

       25.     If the cause of action for indemnification under Section 8.03(f) had been properly

considered, the settlement amount would have been significantly higher.

---

[47] *See* Pohl Deposition Transcript at 362:25–371:20.  The Stock Purchase Agreement may be found at Exhibit 14 to
Declaration of Gavin C.P. Campbell, Dkt. No. 1301-1, at 465–524.
[48] 2007 SPA at 43, Exhibit 14, Docket No. 1301-1, at 513.

III.    The Debtors Have Not Proven That the Settlement
Agreement Is Fair Because Debtors Have Underestimated
the Strength of Successor Liability Claims Under
Environmental Law

26.    The claims for environmental liability against successors here have significant

value because the Third Circuit has long recognized that CERCLA successor liability requires

the application of uniform federal law.  *United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294,

298 (3d Cir. 2005) (citing *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 92

(3d Cir. 1988) and *Landsford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1225

(3d Cir. 1993)).  Similarly, there are four well-recognized exceptions under which a successor

entity may be liable for the acts of its predecessor: (1) where the successor expressly assumes the

predecessor's liability; (2) where the transaction is a de facto merger; (3) where the purchaser is

a mere continuation of the predecessor; and (4) where the transaction is fraudulent and intended

to provide an escape from liability.  *Gen. Battery*, 423 F.3d at 305 (citations omitted).

27.    The fraudulent transaction exemption is well-recognized under federal

environmental law.  *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013) (finding

actual and constructive fraudulent conveyance to avoid environmental liabilities); *United States

v. White-Sun Cleaners Corp.*, No. 09-CV-2484 (ARR)(JO), 2011 WL 1322266, at *12 (E.D.N.Y.

Mar. 9, 2011) (finding entity liable as successor because it was created via fraudulent transaction

to avoid prior obligations under environmental settlement with EPA); *see also United States v.

Fed. Res. Corp.*, 525 B.R. 759 (D. Idaho 2015) (noting that claims under CERCLA and the

Federal Debt Collection Procedures Act fell within § 362(b)(4)'s police or regulatory powers

exception to the automatic stay of the bankruptcy court).

28.    The mere continuation theory is stronger under environmental law than Debtors

may recognize.  Because Congress enacted CERCLA to ensure that responsible parties account

13

for their environmental liabilities, courts will flexibly analyze the mere continuation doctrine of successor liability by looking at several different factors: (1) retention of employees; (2) retention of supervisory personnel; (3) retention of same production facilities in the same location(s); (4) retention of name; (5) product retention; (6) asset retention; (7) continuation of general business operations; and (8) generally holding itself out as the continuation of the previous enterprise.  *See, e.g.*, *Gould, Inc. v. A&M Battery & Tire Serv.*, 950 F. Supp. 653, 657 (M.D. Pa. 1997) (citing *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992)).  "In the CERCLA context, the imposition of successor liability under the continuity of enterprise theory is justified by a showing that in substance, if not in form, the successor is a responsible party."  *Id.* at 660 (quoting *United States v. Mex. Feed & Seed Co., Inc.*, 980 F.2d 478, 488 (8th Cir. 1992) (brackets omitted)).

29.     Thus, although the 2004 transactions to acquire Debtors' assets excluded Debtors' stock, see TCC Objection ¶ 10, successor liability claims against Brenntag under a mere continuation theory in the CERCLA context likely would hinge less on a continued link of stock ownership, but instead on the other factors indicating that various Brenntag entities conducted their predecessors' operations in essentially the same fashion.  *Gould*, 950 F. Supp. at 657; *see Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, 678 F. Supp. 3d 611, 622–26 (D.N.J. 2023) (finding successor liability despite the lack of continuity of shareholders) (citations omitted); *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288, 335 (E.D. Pa. 2006) (finding *de facto* merger had occurred where (1) successor acquired most of the predecessor's physical assets and common stock; (2) successor retained same employees, management, and ownership; and (3) parties made representations to the IRS regarding the reorganization).

30.     Debtors and Settling Non-Debtors should not be permitted to utilize corporate

manipulations and bankruptcy to evade their environmental liabilities. *See Mex. Feed & Seed

Co.*, 980 F.2d at 487 ("When including corporations within that set of entities which must bear

the cost of cleaning up the hazardous conditions they have created, Congress could not have

intended that those corporations be enabled to evade their responsibility by dying paper deaths,

only to rise phoenix-like from the ashes, transformed, but free of their former liabilities.").

31.     The environmental creditors in this case are also victims of Debtors' fraudulent

actions directed against tort creditors.  The Debtors' and Settling Non-Debtors' corporate

manipulations relating to tort creditors resulted in the Debtors being unable to pay for their

environmental liabilities.[49]

IV.     The Settlement Agreement Is Unfair to the Extent That the
        Non-Debtors Seek to Utilize Settlement Proceeds to
        Diminish Their Own Non-Derivative Liabilities

32.     The Settlement Agreement and Debtors' expert report appear to contemplate that

some of the consideration being provided will be used to fund cleanup liabilities of certain

Settling Non-Debtors for certain so-called Brilliant sites.  Motion at 33; McKnight Report at

p.47, Table 11.  The liable parties at various of the Brilliant sites are certain Brenntag entities

that are wholly owned operating subsidiaries of Brenntag North America, Inc. ("Brenntag North

America"), which purchased these operating entities from Debtors or their predecessors.  These

wholly owned subsidiaries are the original liable parties under environmental laws.  Their

liability under environmental law is not based on successor liability or any other theory of

liability that is derivative of Debtor-liability.  Any liability of Debtors and various Settling Non-

Debtors for these sites arise solely by voluntary agreements to provide indemnification.  These

---

[49] It should be noted that successor liability claims for environmental liability were generally not yet asserted by the
Government because Debtors were paying their bills and thus such pursuit of such claims was not yet necessary.

non-debtor wholly owned subsidiaries are the liable entities in their own right independent of any

actions by Debtors.

33.     For example, Brenntag Northeast, Inc. (formerly known as Textile Chemical Co.),

a wholly owned subsidiary of Brenntag North America, is a PRP by virtue of its own disposal of

hazardous waste at the Martin Aaron Superfund Site located in Camden County, New Jersey.

Pursuant to the Consent Decree for Performance of Phase 1 of the Remedial Action for the

Martin Aaron Superfund Site, dated August 7, 2008, by and among the United States, the State

of New Jersey and a number of PRPs, Brenntag Northeast, Inc. is a settling defendant, a liable

entity in its own right.  *United States v. American Standard Inc., et al.*, Civ. No. 07-cv-5334

(D.N.J. Nov. 6. 2007), Dkt. No. 1 (LEXIS CourtLink).

34.     There is no possible legal basis to enjoin the Government from pursuing such

liable parties (or a pending order to them by a District Court).  Nor is this any basis to provide

any of the $535 million settlement proceeds back to the contributing parties or their affiliates in

support of their independent indemnification agreements, rather than to Debtors' creditors as

represented in Debtors' Motion.  It should be made clear that the Court will not permit this to

happen if this settlement or any version thereof is ever approved.  Otherwise, the settlement is

not a $535 million settlement as has been represented to the Court and parties.  Some of the

Settling Non-Debtor would be diverting consideration that was supposed to be paid to the

Debtors' creditors.  This is also contrary to language in the Settlement Agreement under which

they are supposedly waiving any such claims against Debtors' estates.[50]  Any approval of the

settlement should provide that the proceeds go to creditors, not to benefit the non-debtor

signatories to the Settlement Agreement or their affiliates.

---

[50] *See, e.g.,* Settlement Agreement ¶ 6.

16

V.      Any Approval of the Settlement Agreement Should Clearly
        State That Approval Is Without Prejudice to Allocation of
        Settlement Proceeds

35.     Any approval of the settlement should expressly provide that approval is entirely

without prejudice to allocation of proceeds among creditors; the inclusion of the Plan Term Sheet

as an exhibit to the settlement agreement should be without prejudice to any plan objections.

VI.     Any Approval of the Settlement Agreement Should Clearly
        State That the Governments' Causes of Action Under
        Environmental Law Against Non-Debtor Owners or
        Operators of Property Are Not Enjoined or Subject to the
        Jurisdiction of the Bankruptcy Court

36.     The definitions of Estate Causes of Action and Successor Liability Claims under

the Settlement Agreement may be contended to be ambiguous or overbroad relating to

governmental causes of action under environmental law against Settling Non-Debtors under the

Settlement Agreement who now own or operate properties that used to be owned or operated by

Debtors.  It is well-established that anyone who owns or operates property acquired from a

debtor must comply with environmental law.  No one is entitled to ignore hazards or disregard

laws that protect the public and the environment.[51]  This liability under environmental law is the

current owner or operator's own liability as a present owner or operator regardless of how the

contamination originated and is separately provided for by most environmental laws.[52]  It is very

---

[51] *See, e.g.*, *Ohio v. Kovacs*, 469 U.S. 274, 285 (1985) ("[A]nyone in possession of [a] site . . . must comply with . . .
environmental laws . . . .  Plainly that person . . . may not maintain a nuisance, pollute the waters . . . [,] or refuse to
remove the source of such conditions."); *In re CMC Heartland Partners*, 966 F.2d 1143 (7th Cir. 1992) (a
reorganized debtor that owns property that was contaminated prior to confirmation is liable to EPA as the present
owner of the property); *In re Gen. Motors Corp.*, 407 B.R. 463, 508 (S.D.N.Y. 2009) (a free and clear purchaser
"would have to comply with its environmental responsibilities starting with the day it got the property, and if the
property required remediation as of that time, any such remediation would be the buyer's responsibility").
[52] *See, e.g.*, CERCLA §107(a)(1), 42 U.S.C. § 9607(a)(1) (providing separately for the liability of the current
"owner and operator" of a facility).

17

different from what is commonly thought of as "successor liability" under the case law.[53]

37.    At the commencement of discovery on this matter, counsel for the United States raised the issue with counsel for the other parties as to whether they were improperly seeking to sweep the liability of the Settling Non-Debtors for their contaminated property into the Settlement Agreement and injunction against the Government.  Counsel for the United States indicated that if they were, discovery would be necessary to understand and bring to the Court's attention the threats to public health and safety that would be posed by trying to limit the Settling Non-Debtors' liability even though they had not submitted their assets to the bankruptcy process.

Counsel agreed that this was not their intent and language was finalized on October 8, 2024 to reflect this agreement of the parties and avoid the need for discovery on this issue.  Any order approving the Settlement Agreement should include the agreed upon language.  The agreed upon language was:[54]

> Nothing in this Order or the Settlement Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the date of the transfer of property from any Debtor.  For the avoidance of doubt, this Paragraph 14 does not preserve or expand any liability that a party would not otherwise have as an owner or operator of property after the date of the transfer of property from any Debtor.  For the further avoidance of doubt, nothing in this Paragraph 14 shall be construed to mean that the Settlement Agreement does not resolve any and all alleged liability (environmental or otherwise) of Non-Debtor Released Parties (a) as alter egos of the Debtors, and (b) in connection with allegations that the Non-Debtor Released Parties (1) expressly or impliedly agreed to assume the Debtors' liabilities; (2) engaged in a de facto merger; (3) were a mere continuation of the Debtors' businesses; (4) continued one or more Debtors' enterprise; (5) fraudulently avoided liability of any of the Debtors; or (6) continued one or more product lines of the Debtors.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

---

[53] *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455 (3d Cir. 2006); *United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294 (3d Cir. 2005).

[54] This agreement was without prejudice to other objections of the Governments to the Settlement Agreement.

38.     Finally, Debtors' Motion says that direct claims of the creditors are not affected or enjoined as a result of the Settlement Agreement.  Motion at 4.  But Debtors' proposed Order and Settlement agreement do not clearly so state and the definitions of Estate Causes of Action and Successor Liability may be ambiguous in this regard.  Any order approving the Settlement Agreement should therefore have language providing that: "The Settlement Agreement does not prohibit claimants from pursuing direct claims that they may have against the Contributing Parties," as represented in the Motion at 4.

VII.    Any Approval of the Settlement Agreement Should Strike the Indemnification Provision of Paragraph 19 of the Settlement Agreement as Unfair

39.     Paragraph 19 of the Settlement Agreement provides that the Debtors and any Plan Administrator "shall indemnify and defend, and seek, at its sole cost and expense, the dismissal of any litigation asserting a Debtor Released Estate Cause of Action against Non-Debtor Released Parties."

40.     This indemnification and defense requirement should be stricken as unfair and unreasonable.  Creditors should not bear the expense of other creditors' violations of the Agreement or of any settling contributing parties' unreasonable positions as to whether direct or other causes of actions are Estate Causes of Action.  This indemnification and defense requirement may significantly reduce the amount of consideration available to innocent creditors. All parties should bear their own attorney's fees and costs as is the general rule in the United States,[55] rather than seek to burden such costs on innocent creditors.

---

[55] *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) ("Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."); *Garza v. Citigroup Inc.*, 881 F.3d 277, 281 (3d Cir. 2018) (noting "bedrock principle known as the American Rule . . . [that] [e]ach litigant pays its own attorneys' fees.").

**CONCLUSION**

41.     Debtors have given consistently short shrift to their environmental liabilities.

Their independent directors did not participate in hiring an expert, who is not qualified to

evaluate their environmental liabilities.  His estimate that Debtors' environmental liabilities have

a net present value of between $50 to $71 million is a significant underestimation.  Debtors have

failed to recognize how the unique aspects of environmental law may increase their liability and

affect claims for successor liability.  This failure alone merits denial of Debtors' Motion.

42.     The settlement is additionally unfair for separate reasons.  Debtors' independent

directors failed to understand a potentially valuable indemnification provision against Settling

Non-Debtors.  As structured, it may permit the Settling Non-Debtors to benefit from the

settlement proceeds that should be allocated to creditors.  The Debtors have failed to show that

the settlement is fair and reasonable, and the Court should reject it.

**FOR THE UNITED STATES OF AMERICA**

**TODD KIM**
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*/s/ Natalie G. Harrison*
Natalie G. Harrison
Jeanne T. Cohn
Conner R. Huggins
Alan S. Tenenbaum
Environment & Natural Resources Division
U.S. Department of Justice
150 M St NE
Washington, DC 20002
(202)
Email: Jeanne.Cohn@usdoj.gov
Natalie.G.Harrison@usdoj.gov
Conner.Huggins@usdoj.gov
Alan.Tenenbaum@usdoj.gov

In accordance with D.N.J. LBR 9013-1(a)(1), I hereby certify that the Declarations of Meghan Jones and Gayle Koch, filed with this Objection, along with the documents referred to herein, contain the facts supporting this Objection in compliance with Local Bankruptcy Rule 7007-1.

*/s/ Natalie G. Harrison*
NATALIE G. HARRISON

*Counsel for the United States on behalf of EPA*

21