FOR PUBLICATION

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
|---|---|
| In Re:<br>Whittaker, Clark & Daniels, Inc. *et al.* | Case No. 23-13575 (MBK)<br>Hearing Date: March 3 – 6, 2025<br>Chapter 11<br>Judge: Michael B. Kaplan |

**MEMORANDUM OPINION**

This matter comes before the Court on Debtors' Motion for Entry of an Order (I) Approving the Settlement Agreement Between the Debtors and the Contributing Parties, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief (the "Settlement Motion", Dkt. No. 1297) and the Joint Motion of the Official Committee of Talc Claimants and Future Claimants' Representative Seeking Derivative Standing (the "Derivative Standing Motion", Dkt. No. 1293). The Court has considered all of the parties' submissions as well as the arguments, testimony, and evidence presented during the four-day evidentiary hearing. The Court also considers the evidence admitted as the result of motion practice after the 2025 evidentiary hearing (Dkt. No. 2830), and the record constructed during the Motion for Entry of an Order Approving the Consent Decree and Environmental Settlement Agreement Between the Debtors, the Government Environmental Creditors, the Berkshire Entities, Brenntag, and the DBUS Entities (Dkt. No. 2626). For the reasons that follow, the Settlement Motion is GRANTED and the Derivative Standing Motion is DENIED in light of the pending Settlement.

## I. Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984—as amended September 18, 2012, and June 6, 2025—referring all bankruptcy cases to the bankruptcy court. This matter is a statutory core proceeding, and this Court has constitutional authority to enter a final order. 28 U.S.C. § 157(b)(2)(A), (B), & (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The following constitutes the Court's findings of fact pursuant to FED. R. BANKR. P. 7052.[1]

## II. Background and Procedural History

### The Debtors and Their Successors

This case consists of four debtor estates, including Whittaker, Clark & Daniels, Inc. ("WCD"), Brilliant National Services, Inc. ("Brilliant"), Soco West, Inc. ("Soco West"), and L. A. Terminals, Inc. ("LAT") (collectively, the "Debtors"). "The Debtors' corporate history collectively goes back more than 100 years. Until November 1998, however, the entities that now constitute the Debtors were part of two separate revenue generating businesses that were *not* under the same corporate ownership: (a) the 'SOCO Chemical' group and (b) WCD." *Settlement Motion* ⁋ 17, Dkt. No. 1297.

Debtor, Brilliant, is the parent entity in these proceedings. Debtors WCD, Soco, and LAT[2] are direct or indirect subsidiaries of Brilliant. *First Day Decl. of Moshin Y. Meghji* ("First Day

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] LAT was established in 1981 and operated a chemical storage and distribution terminal—along with a bulk plant—within the Los Angeles Harbor. LAT discontinued these operations in 1994, after which it focused primarily on addressing its remaining liabilities through ordinary-course claims management. Through a series of stock acquisitions completed by 2001, LAT ultimately became a direct subsidiary of Stinnes Corporation. *First Day Decl*. at ¶ 16.

Decl."), ¶ 16, Dkt. No. 5. Brilliant has historically functioned as a holding company, and for most of its pre-2004 history was known first as "Stinnes Oil & Chemical Company" (abbreviated "SOCO") and later as SOCO Chemical. During that period, Brilliant (formerly SOCO) operated as the North American parent entity for the chemical businesses of the German industrial conglomerate Stinnes AG. "Brilliant was itself a direct, wholly owned subsidiary of Stinnes Corp. ("Stinnes"), a U.S. holding company." *Settlement Motion* at ⁋ 18.

Between 1977 and 2004, Brilliant expanded through the formation and acquisition of various operating companies. By 2004, it held equity interests in multiple regional chemical distribution businesses, many of which were created through the consolidation of several corporate entities. For instance, Soco West emerged over more than two decades by combining several California-based distributors—Western Chemical & Manufacturing, A.J. Lynch, and Crown Chemical—with Dyce Chemical and Holchem, two companies acquired from the Holland Chemical group when it was integrated into the Stinnes corporate family around 2000. *Id.* at ⁋ 19.

> During the multi-decade build-up of various chemical distribution businesses owned by Brilliant, Brilliant did *not* own WCD. Instead, WCD was privately held for over 100 years after it first began business (and over twenty-five years after it was reorganized from a New York corporation to a New Jersey corporation), operating as a distributor of minerals and pigments, including talc. It was only in November 1998 that Brilliant acquired WCD from its then-individual stockholders and WCD became part of the Stinnes corporate family.

*Id.* at ⁋ 20.

In the early 2000s, Brenntag, Inc., Brenntag West, Inc., and WCD were part of the "Brenntag" family of companies owned by Stinnes and its parent, Deutsche Bahn US Holding Company ("DBUS"). As part of "Brenntag," they distributed thousands of chemical products. *TCC Obj*. at ⁋ 5, Dkt. No. 1606. WCD, which held itself out as "A Brenntag Company," sold talc as a primary component of its chemical business. WCD supplied a large proportion of the talc sold in the United States. WCD received, stored, packaged, and distributed talc from a warehouse

in South Plainfield, New Jersey. In 2002, DBUS became the ultimate parent of the Stinnes group. *Settlement Motion* at ⁋ 21.

**DBUS Transfer to Bain Capital**

In 2003, DBUS sold the Brenntag family of companies to Bain Capital ("Bain") for €1.4 billion. *TCC Obj*. at ⁋ 8, Dkt. No. 1606. The transaction was structured in two parts to ensure that Bain acquired operating companies without acquiring substantial liabilities. *Id.* First, Brenntag entities that were not subject to substantial liabilities were simply transferred to Bain via stock purchase agreements ("2003 MSPA"). *Id.* Second, Bain created new shell entities with "Brenntag" in their name (with other affiliates, "Brenntag"). *Id.* at ⁋ 10. Brenntag did not purchase the Debtors' stock, which would have resulted in ownership of the Debtors. *Id.* Instead, Brenntag acquired the assets (but not the asbestos liabilities) of each Debtor, via asset purchases, during the close of the 2003 MSPA on February 27, 2004 ("2004 Transaction"). *Id.* The asset purchase agreements underlying the 2004 Transaction (the "APAs") resulted in "all or substantially all" of the Debtors' operating assets being transferred to the new Brenntag entities. *Id.* at ⁋ 11. Subsequent to the asset sales, the Debtors retained their respective liabilities and continued to be wholly-owned by Brilliant.




*Fig. 1 – Post-2004 Transaction Structure.*

DBUS and Bain arranged for the Debtors' remaining corporate entities to indemnify Brenntag against lawsuits tied to the Debtors' pre-transaction talc operations, with DBUS agreeing to cover those obligations if the Debtors could not. *Id.* at ⁋ 12. In connection with this arrangement, DBUS and Bain executed a contemporaneous letter agreement under which the Debtors' subsidiaries were directed to discourage asbestos claimants from pursuing Brenntag or its affiliates and to represent that all asbestos liabilities remained with the Debtors. *Id.* at ⁋ 13.

**NICO Acquires the Debtors**

In 2007, the Debtors attracted the interest of Berkshire Hathaway ("Berkshire"), which operates one of the world's largest insurance businesses. Berkshire, through its Stamford-based reinsurance division, specializes in retroactive reinsurance and acquiring runoff liabilities—particularly asbestos claims—because their long-tail nature generates substantial investment "float" that Berkshire can profitably deploy before claims come due. *Id.* at ⁋⁋ 20-23.

As a result, National Indemnity Company ("NICO"), which is one of Berkshire's premier insurance companies, purchased Debtors for $1.00 with a potential for a purchase price adjustment

for asbestos and environmental claims (the "2007 Transaction"). *Id.* at ⁋ 24-5; *Settlement Motion* at ⁋ 24.

In exchange for a nominal $1 payment, NICO assumed and guaranteed DBUS's indemnity obligations to Brenntag under the 2004 Agreements. *TCC Obj.* at ⁋ 26. Taken together, the 2004 and 2007 Agreements created a direct chain of indemnification that placed ultimate financial responsibility for Brenntag's successor liability, if any, on NICO, a highly solvent Berkshire affiliate. *Id.* Following the 2007 transaction, Berkshire installed Raj Mehta (an assistant vice president in its reinsurance division with extensive experience in managing tort claims) as president of the Debtors, which—as corporate shells—depended entirely on Berkshire's broader insurance and claims management infrastructure. *Id.* at ¶ 27. From 2007 through the Petition Date, Brilliant, WCD, and Soco West invested their assets and managed their liabilities under the direct ownership of Ringwalt (an indirect subsidiary of Berkshire), and the indirect ownership of NICO. *Settlement Motion* at ⁋ 25. Through a complicated series of transactions, NICO agreed to indemnify any Stinnes-related entity (such as Brenntag) to the extent that entity is liable "under any theory that such party is liable for the acts or financial obligations of" WCD or Soco West, including asbestos-related obligations. *Id.* at ⁋ 30.[3]

[3] *See also Berkshire's Reply* 7, Dkt. No. 1663 ("NICO agreed to indemnify DBUS for DBUS's own obligations to Brenntag. NICO thus must indemnify DBUS to the extent that DBUS is obligated to indemnify Brenntag for any asbestos or environmental liabilities arising from the Debtors' pre-2004 operations.").




*Fig. 2 – Post-2007-Agreement Structure.*

**Talc Litigation**

"Beginning in the late-2000s, the Debtors have been litigated claims stemming from talc, asbestos, and other chemical compound-related liabilities. In recent years, such claims have engulfed the Debtors in litigation." *First Day Decl.* ¶ 21, Dkt. No. 5.

In Berkshire's early years of ownership, Mr. Mehta largely managed WCD's claims himself. By 2018, recognizing the need for additional expertise, he enlisted the help of Berkshire's reinsurance division, which includes a subsidiary called Resolute, led by President Thomas Ryan —already indirectly involved through prior reinsurance arrangements—to assist in managing WCD's talc claims. *Id.* at ¶¶ 33, 34; *see also Direct Testimony of Thomas Ryan ("Ryan Direct")* ¶ 6, BTX-264; *see also Berkshire's Reply* 10, Dkt. No. 1663.

After 2018, the average resolution values for talc claims against WCD began to rise, culminating in a series of escalating jury verdicts between 2021 and 2023—including awards of $3.5 million, $76 million, $18.4 million, and $29.14 million—which significantly increased the Debtors' litigation exposure. *See, generally, TCC Obj.*, Dkt. No. 1606.

**The Appointment of the Disinterested Directors**

After the $29.14 million verdict in the *Plant* case in March 2023, WCD was placed into receivership in South Carolina by retired South Carolina Supreme Court Justice Jean H. Toal. *Id.* at ⁋ 43. Faced with significant unforeseen tort liabilities, the Debtors quickly engaged restructuring counsel and appointed Tim Pohl and Paul Aronzon as independent directors (the "Disinterested Directors"), effective as of March 30, 2023. *Id.* at ⁋⁋ 44, 46.

The Debtors' Disinterested Directors maintain authority to both investigate and approve any transaction, settlement, or other action with respect to any "Conflict Matter," which is defined to include any matter pertaining to a strategic transaction or any chapter 11 proceeding in which a conflict of interest exists or is reasonably likely to exist between the Debtors, on the one hand, and any of the Debtors' equity holders, affiliates, subsidiaries, directors, managers, and officers, or other stakeholders, including Mr. Mehta (collectively, the "Related Parties"), on the other hand. *Settlement Motion* at ⁋ 32.

At the direction of their Disinterested Directors, the Debtors investigated their potential causes of action against third parties. *Id.* at ⁋ 33. The Debtors focused on potential successor liability theories against Brenntag entities, as well as any estate causes of action against DBUS or NICO based on transactions and governance during their respective periods of ownership of the Debtors. *Id.*

**The Bankruptcy Case**

On April 26, 2023 (the "Petition Date"), the Debtors commenced these chapter 11 cases, asserting that they had more than $1 billion in assets and up to $10 billion in liabilities, including environmental remediation obligations and asbestos litigation exposure. *Petition*, Dkt. No. 1. Talc

personal injury victims hold the vast majority of current claims against the Debtors, in number and amount. *Settlement Motion* at ⁋ 51.

On May 3, 2023, Mr. Peter Protopapas—the receiver who had been appointed by the South Carolina state court to assist in recovering funds to satisfy the *Plant* verdict—moved to dismiss the bankruptcy case. *See Mot. to Dismiss*, Dkt. No. 62; *Amended Mot. to Dismiss*, Dkt. No. 117. The Court denied that motion on June 20, 2023 and Mr. Protopapas appealed. *See Order Denying Mot. to Dismiss*, Dkt. No. 211. The district court affirmed, *see Dist. Court Order*, Dkt. No. 1196; *Protopapas v. Whittaker, Clark & Daniels, Inc.*, No. 23-cv-04151, 2024 WL 2796449 (D.N.J. May 31, 2024), as did the Third Circuit, *see In re Whittaker Clark & Daniels Inc*, 152 F.4th 432 (3d Cir. 2025), *reh'g granted sub nom. In re Whittaker Clark & Daniels Inc.,* 173 F.4th 490 (3d Cir. 2026), *and amended and superseded on reh'g*, 176 F.4th 241 (3d Cir. 2026).

On May 24, 2023, the United States Trustee appointed the Official Committee of Talc Claimants (the "TCC" or "Committee") to represent the interests of talc claimants. *Notice of Appointment of Official Committee Of Talc Claimants*, Dkt. No. 121. On June 26, 2023, the Court approved the appointment of Hon. Shirley C. Chapman (ret.) as the Future Claimants' Representative (the "FCR"), effective as of the Petition Date. *Order Appointing Future Claimants' Representative*, Dkt. No. 231.

On September 7, 2023, the Debtors commenced an adversary proceeding (the "Adversary Proceeding") to establish the Debtors' ownership of all estate causes of action based on potential successor liability. *Whittaker, Clark & Daniels, Inc. et al. v. Brenntag AG, et al.*, Adv. Pro. No. 23-01245. The Debtors filed their Summary Judgment Motion seeking such relief on September 8, 2023—one day after the Adversary Complaint was filed. *See* Dkt. No. 268 in Adv. Pro. No. 23-01245. Shortly after commencing the Adversary Proceeding, the Debtors also retained Brattle

Group, Inc. ("Brattle") to assist with the critical task of valuing the size of pending and future litigation claims against the Debtors. *See Order Granting Application to Employ Brattle Group, Inc. as Claims Estimation Experts*, Dkt. No. 668. At the Court's direction, the Debtors and various creditors and stakeholders, including the Committee and FCR, engaged in mediation for more than six months from December 2023 through May 2024, before the Honorable Robert E. Gerber (Ret.). When negotiations with the Committee and FCR broke down in June 2024, the Debtors began to explore a settlement with Berkshire, DBUS, and Brenntag to resolve the successor liability claims and other estate causes of action. *Berkshire's Obj. to TCC's Standing Motion* 6, Dkt. No. 1596.

On August 13, 2024, the Court ruled that certain successor liability and alter ego claims of tort creditors against the Brenntag entities, NICO, and DBUS ("Settling Non-Debtors") were property of Debtors' bankruptcy estates. *In re Whittaker, Clark & Daniels*, 663 B.R. 1 (Bankr. D.N.J. 2024).[4] Debtors resumed negotiations—this time without the Committee—and reached settlement.

On August 30, 2024, the Committee and the FCR filed a Motion for Entry of an Order Granting Standing and Authorizing the Committee and the FCR to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of the Debtors' Estates (the "Standing Motion", Dkt. No. 1293). Through the Standing Motion, the Committee and FCR sought (a) exclusive authority to prosecute and settle successor liability claims against Brenntag; (b) an injunction of a then-pending arbitration between DBUS and NICO and a declaration as to NICO's indemnification obligations to DBUS; and (c) a declaration as to DBUS's indemnification obligations to Brenntag.

[4] At the Committee's request, the Court authorized a direct appeal to the Third Circuit with respect to the Court's ruling on summary judgment. *See* Dkt. No. 1265. The Third Circuit heard the direct appeal, along with the then-pending appeal of the Court's denial of the Committee's Motion to Dismiss, The Third Circuit affirmed the Court's summary judgment ruling. *See In re Whittaker Clark & Daniels Inc*, 176 F.4th 241 (3d Cir. 2026).

On September 3, 2024, Debtors filed the Settlement Motion seeking approval of a settlement that would resolve all estates causes of action against the settling non-debtors including all Successor Liability Claims (as defined in the Adversary Proceeding). *Settlement Motion*, Dkt. No. 1297. On December 20, 2024, the Debtors, DBUS, and Berkshire filed opposition to the Standing Motion. *See* Dkt. Nos. 1595, 1596, & 1597. Additionally, Brenntag filed a joinder to the Debtors' opposition. Dkt. No. 1599.[5]

**The Proposed Settlement**

The proposed settlement (the "Proposed Settlement", "Settlement", or "Settlement Agreement") provides for, among other things, a mutual release of claims, in exchange for the Settling Non-Debtors' agreement to make an aggregate payment to the Debtors in the amount of $535 million. *Settlement Motion* at ⁋ 36. Nearly every creditor body initially opposed the Settlement Motion. The TCC filed an objection on December 23, 2024, and the FCR joined that objection (collectively, the "Objecting Parties"). *See* Dkt. Nos. 1606 & 1607. Certain environmental parties (the "Environmental Parties") likewise opposed: the U.S. Environmental Protection Agency (the "EPA") filed an objection on January 7, 2025; the California State Water Resources Control Board joined the Committee's objection the same day; and on January 8, 2025, the California Department of Toxic Substances Control ("DTSC") and the Orange County Water District ("Orange County") filed objections of their own. *See* Dkt. Nos. 1625, 1627, 1635, & 1636.

[5] Notwithstanding the filing of the Standing Motion and the Settlement Motion, the Court directed all parties to engage in additional mediation efforts and appointed a new mediator, Lawrence W Pollack, by Order dated December 16, 2024. Dkt. No. 1586. Unfortunately, these mediation efforts—despite good faith efforts by all parties involved—likewise failed to produce a global resolution of the disputes.

On January 23, 2025, the Debtors, Brenntag, and Berkshire filed replies in support of the Settlement Motion. Dkt. Nos. 1662, 1663, & 1665. Also on January 23, 2025, the Committee and the FCR filed a joint response to the objection to the Standing Motion. *See* Dkt. No. 1664.

The proponents of the Settlement offer arguments centered on the reasonableness, efficiency, and fairness of the proposed resolution of estate claims—particularly against entities like Brenntag, DBUS, and Berkshire. The Debtors contend that the Settlement is the result of extensive, arm's-length negotiations conducted by the Disinterested Directors and is in the best interests of the estate and its creditors. According to the Debtors, the Settlement amount either exceeds or covers the vast majority of their projected tort and environmental liabilities—which Debtors value between $474 million and $571 million. Debtors also contend that settlement avoids the risks, costs, and delays associated with litigating successor liability, alter ego, or fraudulent transfer claims. Debtors further submit that litigation would be uncertain, factually complex, and could ultimately yield little due to legal defenses and collectability risks.

Brenntag, in its joinder, supports the Proposed Settlement and disputes any successor liability for the Debtors' conduct or products. It emphasizes that no court has found Brenntag liable in such capacity and asserts that the Settlement is reasonable because it resolves potentially costly estate claims to which Brenntag has valid indemnification rights and defenses. Brenntag notes that it is releasing valuable indemnification claims and that its contribution reflects a pragmatic and efficient resolution that reduces litigation risk for all parties.

In its Reply in Support of the Settlement Motion, Berkshire asserts that the Settlement exceeds the fair value of estate causes of action and represents an overpayment relative to WCD's historical talc liability exposure. Berkshire contends that the Settlement will provide a substantial fund for creditors while avoiding costly and uncertain litigation over successor liability,

particularly claims against Brenntag. Berkshire asserts that both its and the Debtors' experts independently estimated Whittaker's talc liabilities to be well under $535 million, with upper-bound values in the $500 million range. The objectors' figures, by contrast, are portrayed as inflated by reliance on outlier verdicts, flawed epidemiological modeling, and cherry-picked post-bankruptcy claim data that overemphasizes the period during which Johnson & Johnson ("J&J"), a primary defendant in the vast majority of talc suits, was temporarily in bankruptcy and out of the tort system. Berkshire's Reply highlights that internal estimates by Resolute prior to bankruptcy—used for business planning—also support the settlement's reasonableness.

Berkshire further contends that the objectors overstate the strength of the estate's successor liability claims, which Berkshire asserts would be governed by Delaware law, and fail under both traditional and nontraditional theories. Berkshire emphasizes that the 2004 sale of WCD's operating assets to Brenntag was an arm's-length transaction, for fair value, and no precedent supports imposing liability on Brenntag under the circumstances. Berkshire also rejects the notion that any parties were improperly excluded from negotiations, stating throughout the mediation all parties had an opportunity and did, in fact, engage in meaningful settlement discussions.

**The Opposition**

The Objecting Parties take the position that the Settlement is the product of a procedurally and substantively flawed process that fails to provide fair value for the Debtors' significant tort and environmental liabilities, and disproportionately benefits non-debtor insiders like Berkshire Hathaway, NICO, DBUS, and Brenntag. The Committee contends that the Settlement undervalues successor liability and alter ego claims that could be worth billions of dollars. It asserts that the settlement amount is based on flawed data and a manipulated valuation process led by conflicted parties. The Committee emphasizes that the Disinterested Directors who approved the Settlement

were selected by a conflicted Berkshire executive and officer of the Debtors (Raj Mehta) and had no asbestos or tort experience. The Committee further argues that the Disinterested Directors failed to include the Committee or FCR in negotiations, and that the process lacked transparency, independence, and good faith. According to the Committee, the resulting agreement serves to shield Berkshire from significant liabilities, at a fraction of their potential exposure.

The FCR joins the Committee's objection and adds that the settlement is not only deeply unfair in substance, but is also procedurally invalid given that neither current nor future claimants were meaningfully represented in the negotiation. The FCR points out that the Debtors were negotiating against entities with which they are closely affiliated—Brenntag (WCD's successor), DBUS (WCD's prior owner), and NICO (WCD's controlling affiliate) and Berkshire (parent of controlling affiliate)—rendering any claim of independence illusory.

The Environmental Parties initially argued that the settlement significantly underestimates the Debtors' environmental liabilities and the strength of certain state law claims against Debtors, as well as independent direct claims against certain Settling Non-Debtors. Nevertheless, moments before the final day of trial in this matter, the Debtors and the Environmental Parties announced that they had reached an agreement in principle to resolve Debtors' environmental liabilities. Following the trial, the parties continued negotiations and, on April 3, 2026, Debtors filed a motion seeking approval of the Consent Decree and Environmental Settlement Agreement ("CDESA"). *Environmental Settlement Motion*, Dkt. No. 2626. The Environmental Settlement Motion ran on a parallel path with the public comments period following publication of notice of the CDESA, which is required for settlements involving governmental parties. The TCC objected to the Environmental Settlement Motion and the Court conducted a hearing on September 2, 2026. The merits of that motion and the Court's ruling are detailed in an Opinion filed contemporaneously to

the filing of this document. Only the CDESA's impact—or lack thereof—on the fairness of the overall Proposed Settlement is addressed *infra*. The remainder of this Opinion is limited to the Settlement as it relates to the Successor Liability Claims.

**The Evidentiary Hearing**

The Court held an evidentiary hearing over the span of several days, March 3rd to March 6th, during which the Court heard testimony from the following witnesses, including declarations on direct testimony subject to cross-examination: Raj Mehta, Brian J. Griffith, Tim Pohl, Paul Aronzon, Thomas More Ryan, David L. McKnight, Marc Scarcella, Yvette R. Austin, Michael Atkinson, and Gayle Koch.

**Testimony of Raj Mehta**

Raj Mehta testified as the President of the Debtors and a key internal decision-maker with extensive involvement in the company's operations since the 2007 Transaction, in which the Debtors became part of the Berkshire family of companies. *See Tr. of March 3, 2025 Hrg. – AM Session* 31:14-23, Dkt. No. 1842. In addition to serving as President and board member of all four Debtor entities, Mr. Mehta also holds officer titles (primarily Vice President) at several Berkshire insurance affiliates, including NICO. *Id.* at 32:8-25.

Mr. Mehta testified that he personally managed the Debtors' asbestos and talc-related claims and litigation for years, particularly following the 2007 Transaction. *Id.* at 34:21–35:3. As the volume of litigation grew, he engaged Resolute Management, a Berkshire affiliate, to assist in administering claims and negotiating settlements. *Id.* at 37:12–38:17. Mr. Mehta further testified in support of the Settlement, emphasizing the avoidance of escalating litigation costs and severe financial risk from verdicts. *Id.* at 62:2-10.

On cross-examination—in addition to acknowledging that he held officer positions in both the Debtors and their indemnitor (NICO), creating a potential conflict in assessing the true value of claims against Berkshire, *id.* at 32:2-25—Mr. Mehta also acknowledged that he tried to limit disclosure of Berkshire's involvement with the Debtors in litigation settings, specifically to avoid inflated settlement demands based on the perception of deep-pocketed backing. *Id.* at 35:24–37:6. Mr. Mehta also conceded that he did not object when Thomas Ryan (who had represented the Debtors in litigation) negotiated the settlement on behalf of NICO, nor when Berkshire's counsel, Brian Snover, who had previously advised the Debtors, signed the Settlement for NICO. *Id.* at 41:12–42:21.

**Testimony of Brian J. Griffith**

Brian J. Griffith, Treasurer and Secretary for the Debtors and a Senior Managing Director at M3 Advisory Partners, submitted testimony in support of the Debtors' proposed settlement and in opposition to the Committee and FCR's Standing Motion. *See Direct Testimony of Brian Griffith* ("*Griffith Direct*") ¶¶ 1-2, DX-247. Mr. Griffith oversaw an extensive review of the Debtors' books and records dating from their 2007 Transaction through the bankruptcy filing. *Id.* at ⁋⁋ 10-12. He found no evidence of improper dividends or transfers. *Id.* at ⁋ 15. Under cross-examination, Mr. Griffith clarified that M3's engagement did not include conducting a valuation of the estate causes of action being resolved under the Settlement Agreement. *See Tr. of March 3, 2025 Hrg. AM Session* 79:5-18, Dkt. No. 1842.

**Testimony of Timothy Pohl**

Timothy Pohl, an independent director appointed to the Debtors' boards in April 2023, submitted testimony in support of the Debtors' Settlement Motion and in opposition to the Standing Motion. *See Direct Testimony of Timothy Pohl (*"*Pohl Direct*") ⁋⁋ 1-2, DX-248. Mr.

Pohl described the Disinterested Directors' exclusive authority to evaluate and resolve conflict matters involving potential claims against insiders and affiliates, and he detailed the process by which he and fellow independent director, Paul Aronzon, investigated such claims, received legal and financial analyses, and authorized the chapter 11 filings. *Id.* at ⁋⁋ 7-14. Mr. Pohl emphasized the Debtors' deteriorating financial position, lack of ongoing business operations, and mounting litigation costs as reasons for seeking bankruptcy protection and pursuing a global resolution. *Id.* at ⁋ 11.

Mr. Pohl recounted extensive arm's-length settlement negotiations with Berkshire, which began following the cessation of the initial mediation in mid-2024 and culminated in the $535 million Proposed Settlement. *Id.* at ⁋⁋ 16-28. Messrs. Pohl and Aronzon made the final demand and held firm until it was accepted, believing the offer maximized value for creditors and reflected a fair compromise, considering Brattle's estimated liabilities ($500–$600 million) and the litigation risks. *Id.* at ⁋⁋ 19-22. He affirmed that no coordination occurred with the Committee or FCR regarding the settlement and maintained that the agreement was reached independently before the Standing Motion was filed. *Id.* at ⁋ 29. Mr. Pohl concluded that the Settlement reflects a fair and reasonable compromise and appropriately monetizes valuable claims without unnecessary litigation risk. *Id.*

On cross-examination, Mr. Pohl conceded that the board did not instruct experts to include the *Plant* or *Graham* verdicts in full in their base-case modeling, though he acknowledged their relevance to the risk profile. *See Tr. of March 3, 2025 Hrg. PM Session* 6:9-24; 41:16–42:4, Dkt. No. 1843. Mr. Pohl also acknowledged that he did not independently verify or model the value of claims against Berkshire, and instead deferred to the legal and financial professionals' judgment

on the claims' strength. *Id.* at 40:23–41:1. Mr. Pohl agreed that the Settlement effectively released all potential claims against Berkshire. *Id.* at 16:14–17:23.

**Testimony of Paul Aronzon**

Paul Aronzon provided further direct testimony in support of the Debtors' Settlement Motion and in opposition to the Committee's and FCR's Standing Motion. *See Direct Testimony of Paul Aronzon* ("*Aronzon Direct*") ¶¶ 1-2, DX-249. Mr. Aronzon detailed the Disinterested Directors' exclusive authority to evaluate and resolve conflict matters, including potential claims against affiliates such as NICO, Brenntag, and DBUS. *Id.* at ⁋ 12. Upon appointment in March, 2023, Mr. Aronzon supported the Debtors' chapter 11 filing due to their non-operational status, mounting litigation costs, and lack of revenue. *Id.* at ⁋ 11. Both Messrs. Aronzon and Pohl oversaw a broad, unrestricted investigation into estate claims, including such claims bottomed on successor liability and alter ego theories, and authorized an adversary proceeding to confirm the Debtors' ownership of such claims. *Id.* at ¶¶ 14-17.

Following the stalled mediation, Messrs. Aronzon and Pohl authorized direct negotiations with the Brenntag, NICO, and DBUS (collectively, the "Contributing Parties") in June 2024, rejecting joint settlement efforts with the Committee and FCR due to their adversarial stance. *Id.* at ¶¶ 21-22. After multiple rounds of negotiation, Messrs. Aronzon and Pohl secured the $535 million settlement—within Brattle's estimated range of liabilities and substantially above the Contributing Parties' initial offer of $150 million. *Id.* at ⁋ 23. Mr. Aronzon emphasized that the settlement was reached independently of the Standing Motion, which was filed after the agreement had been finalized, and that no requests from the Committee or FCR were received before then. *Id.* at ⁋ 24. Ultimately, Mr. Aronzon concluded that the settlement fairly and effectively monetized valuable estate claims. *Id.*

During cross-examination, Mr. Aronzon acknowledged that he did not have substantive experience in valuing mass tort asbestos claims. *Tr. of March 3, 2025 Hrg. PM Session* 94:25–95:7. Instead, Mr. Aronzon testified that the Disinterested Directors relied on retained experts and Debtors' professionals to guide them on liability exposure and settlement value. *Id.* at 94:25–95:9. Mr. Aronzon conceded that the board of directors did not independently quantify the value of potential claims against Berkshire—such as indemnification rights or fraudulent transfer actions—but determined that pursuing them would be uncertain, time-consuming, and expensive. *Id.* at 94:22–95:6.

**Testimony of Thomas Ryan**

Thomas Ryan, a longtime employee of Berkshire and President of Resolute Management, Inc. ("Resolute"), submitted direct testimony in support of the Debtors' proposed Settlement and in opposition to the Committee's Standing Motion. Mr. Ryan detailed Resolute's role in defending WCD in asbestos and talc litigation, highlighting its historically effective and economical litigation strategy when co-defendant, Johnson & Johnson. ("J&J"), was active in the tort system. *See Ryan Direct* at ⁋⁋ 1-11. However, after J&J's 2021 chapter 11 bankruptcy (via LTL Management LLC), WCD's litigation exposure surged, facing inflated demands as the "last defendant standing," resulting in over $70 million in payouts in 18 months—more than double its total prior payouts. *Id.* at ⁋⁋ 12-14. Mr. Ryan recounted three verdicts (*Vanklive*, *Graham*, and *Plant*) that illustrated the increased exposure and adverse trial dynamics WCD faced in J&J's absence from the tort system. *Id.* at ⁋⁋ 15-27.

Mr. Ryan oversaw liability modeling that projected a worst-case net present value of $497 million in future talc claims, though he later testified this figure was overstated due to the model's reliance on data from J&J's absence and a short two-year look-back period. *Id.* at ⁋⁋ 28-33. He

emphasized that Resolute's model values only actual payments, not verdicts, which often overstate liability due to post-trial reductions, appeals, and setoffs. *Id.* at ⁋⁋ 34-36. Ultimately, Mr. Ryan characterized the $535 million settlement as generous and based on the Debtors' own calculation of claims valuation rather than Resolute's lower estimates, however, he supports the settlement as necessary for finality. *Id.* at ⁋⁋ 51-53.

On cross-examination, Ryan admitted that prior to participating in the negotiation of the global settlement on behalf of NICO, he had directly supported the Debtors in managing asbestos litigation. *See Tr. of March 4, 2025 Hrg. AM Session* 75:9-11, Dkt. No. 1844. Specifically, he had worked as a claims administrator and attorney through Resolute, providing assistance in evaluating, settling, and strategizing defense against talc and asbestos claims brought against the Debtors. *Id.* at 85:17-21. He stated that he viewed his involvement with the Debtors as distinct and limited to the provision of claims-related services, rather than representation in a general counsel capacity. *Id.* at 84:24–86:20. He also emphasized that he acted at all times on behalf of Berkshire, both in assisting with historical claims and in negotiating the current settlement. *Id.* at 75:9-11.

**Testimony of David L. McKnight**

David L. McKnight, a principal at Brattle, submitted direct testimony supporting the Debtors' Settlement Motion and rebutting the higher valuation estimates offered by the Committee and FCR. *See Direct Testimony of David L. McKnight* ("*McKnight Direct*") ¶ 1, DX-250. Mr. McKnight estimated the net present value of the Debtors' prepetition tort and environmental liabilities to be between $498 million and $604 million, with an additional $151–$175 million in avoided defense costs attributable to settling claims through bankruptcy, rather than continuing litigation. *Id.* at ⁋⁋ 13 & 22. Mr. McKnight's analysis encompassed asbestos claims, cosmetic and industrial talc claims, and environmental liabilities, each modeled using established methodologies

like the Nicholson and Walker Methods and adjusted to reflect settlement data, claiming rates, and appropriate discounting. *Id.* at ⁋⁋ 15-20.

Mr. McKnight's testimony also addressed and critiqued the methodologies used by the Committee's and FCR's experts, Yvette Austin and Michael Atkinson. Mr. McKnight identified several perceived flaws in their valuations, including cherry-picked data, reliance on outlier verdicts, inflated payment rates, and failure to appropriately discount future claims. *Id.* at ⁋⁋ 23-32 & 49-65. By way of example, changing a single data point related to a reduced verdict would lower their estimates by nearly half a billion dollars. *Id.* at ⁋ 47. Mr. McKnight defended his reliance on pre-trial settlements as more representative of actual liability and concluded that, when correcting the methodological flaws, the claimants' valuations aligned more closely with his own estimates. *Id.* at ⁋⁋ 48 & 66.

**Testimony of Marc Scarcella**

Marc Scarcella, an economist with over two decades of experience in mass tort valuation, submitted direct expert testimony supporting the proposed settlement and rebutting the valuation methods of the Committee and FCR's experts. *See Direct Testimony of Marc Scarcella* ("*Scarcella Direct*") ¶ 1, BTX-265. Mr. Scarcella estimated Debtors' present-value talc liabilities to range from $226 and 245 million using a primary calibration period (2016–2023), based on established epidemiological models and WCD's historical claim data. *Id.* at ¶¶ 10-13 & 45. Mr. Scarcella employed both a Talc-Consumption Model and a Relative Contribution Model to project future mesothelioma cases allegedly caused by asbestos-contaminated talc distributed by WCD, and he calibrated these projections to WCD's real-world claims experience. *Id.* at ¶¶ 25-34.

Mr. Scarcella criticized the opposing experts' methodologies for inflating estimates by improperly incorporating outlier verdicts, using unsupported inflation and discount rates, and

misunderstanding settlement dynamics. *Id.* at ¶¶ 48-52 & 64-69. Mr. Scarcella emphasized that his approach more accurately reflects WCD's typical settlement values and anticipated filing trends, especially considering J&J's temporary absence from—and subsequent return to—the tort system. *Id.* at ¶¶ 21-24 & 70-76. Overall, Mr. Scarcella concluded that the Debtors' liability exposure aligns with the proposed settlement value and that opposing estimates significantly overstate future obligations.

On cross-examination, Mr. Scarcella was challenged on his choice of calibration periods and the exclusion of more recent verdict trends in some of his modeling. *See Tr. of March 4, 2025 Hrg. AM Session*, 134:20–147:11, Dkt. No. 1845. Counsel for the Committee suggested that his approach underestimated the value of future claims and failed to fully account for a changing evidentiary landscape that has led to higher jury awards. *Id.* Mr. Scarcella defended his methodology as conservative and consistent with accepted practices in mass tort bankruptcy proceedings. *Id.*

**Testimony of Yvette R. Austin**

Yvette R. Austin, a financial expert retained by the Committee, submitted two detailed expert reports estimating WCD's liability for talc-related personal injury claims. *See Expert Report of Yvette R. Austin* (*"Austin Expert Report"*), TCX-781; *Expert Rebuttal Report of Yvette R. Austin* (*"Austin Rebuttal Report"*), TCX-782. In her affirmative report, Ms. Austin estimated WCD's liability to a range between $3.3 billion and $5.3 billion, substantially exceeding the Debtors' expert estimate. *Austin Expert Report* at ⁋ 10. Ms. Austin based her analysis on WCD's historical claims data, emphasizing the recent surge in mesothelioma claims since 2015, and a sharp rise in cosmetic talc claims—particularly among female plaintiffs. *Id.* at ¶¶ 17-20. Ms. Austin's model

incorporated claim exposure periods, talc sales data, and recent settlement trends, and excluded inflation adjustments. *Id.* at ¶¶ 18-28.

In her rebuttal report, Ms. Austin critiqued the methodologies employed by Mr. McKnight and Mr. Scarcella. Ms. Austin argued that both experts understate WCD's liability by ignoring the effect of recent jury verdicts, applying unreasonably low inflation rates and high discount rates, and relying on outdated or inappropriate models like the Walker and Nicholson methods. *See Austin Rebuttal Report* at ¶¶ 10, 12-20, & 29-36. Ms. Austin emphasized that verdicts—some exceeding $35 million—have a material impact on settlement values and future claim trends, which both Mr. McKnight and Mr. Scarcella had omitted. *Id.* at ¶¶ 14-18. Overall, Austin testified that her estimate more accurately reflects WCD's actual and anticipated liability, aligning with current claim dynamics and valuation principles.

**Testimony of Michael Atkinson**

Michael Atkinson, a principal at Province, LLC and financial advisor to the FCR, submitted direct testimony in opposition to the proposed settlement and the Standing Motion. Mr. Atkinson critiqued the valuation prepared by the Debtors' expert, Mr. McKnight, asserting that Mr. McKnight's estimate significantly understated actual exposure by ignoring key elements of the Debtors' litigation history. *See Expert Report of Michael L. Atkinson* ("*Atkinson Expert Report*") ¶¶ 19-22, TCX 880. Specifically, Mr. Atkinson contended that Mr. McKnight had excluded 27 trial verdicts and settlements from his average claim valuation, thereby reducing average values by nearly a factor of three; including those verdicts would increase the average resolution value from $231,436 to $668,217, suggesting a revised liability range of $1.5 to $1.8 billion. *Id.* at ¶ 19.A.

Mr. Atkinson also criticized McKnight's reliance on a 2018–2022 calibration period, testifying that it distorts dismissal rates and claim values by incorporating outdated data. *Id.* at ¶¶ 28-31. Mr. Atkinson highlighted declining dismissal rates and increasing average resolution values in more recent years—trends that, if accounted for, would further increase projected liabilities. *Id.* at ¶ 19.B, *Id*. Adjusting for both verdicts and updated dismissal trends, Mr. Atkinson projected a corrected liability range of $2.1 to $4.4 billion. *Id.* at ¶ 19.C. Additionally, using his own independent methodology, Mr. Atkinson estimated the total value of pending and future talc and asbestos claims against the Debtors to be between $2.5 and $5.3 billion, with a likely figure toward the higher end given recent trends and the plaintiff firms involved. *Id.* at ¶ 19.D.

## III. Analysis

The ultimate issue for this Court is whether it should approve the Settlement, which would bring $535 million into the bankruptcy estates to resolve both the Environmental Claims and the Successor Liability Claims against the Settling Non-Debtors.[6] The TCC opposes the Settlement at every level. In addition to its challenges to other aspects of this case—including that the bankruptcy was improperly filed and that the Successor Liability Claims are not estate property[7]—

[6] As explained, following trial, the Debtors and the Environmental Parties reported that they reached an agreement in principle, resolving the Environmental Claims and, on April 3, 2026, the Debtors filed a motion seeking approval of that settlement (Dkt. No. 2626). An Opinion addressing the Environmental Settlement is being filed contemporaneously to this Opinion. The Court reiterates that its task in the context of this Motion is to determine whether a global settlement in the amount of $535 million—encompassing resolution of the Successor Liability Claims *in addition to* the terms of the Environmental Settlement—should be approved under the facts of this case and applicable law.

[7] The Third Circuit initially rejected these challenges in September, 2025. *See In re Whittaker Clark & Daniels Inc*, 152 F.4th 432 (3d Cir. 2025). At the Committee's request, the Third Circuit granted a panel rehearing—although denied a rehearing en banc—and, again, affirmed this Court's ruling regarding ownership of the Successor Liability Claims. *See In re Whittaker Clark & Daniels Inc*., No. 24-2210, 2026 WL 1130573 (3d Cir. Apr. 27, 2026) (granting rehearing); *In re Whittaker Clark & Daniels Inc*, No. 24-2210, 2026 WL 1131929 (3d Cir. Apr. 27, 2026) (affirming this Court's ruling that the successor liability claims the talc creditors seek to assert against the purchaser are property of the Debtors' bankruptcy estates).

the TCC disputes the appropriateness of the Debtors' settlement efforts as a means to address the potential third-party claims. Specifically, the TCC argues that the Settlement Agreement is subject to heightened scrutiny and—under such rigorous analysis—the Debtors cannot demonstrate that the Settlement is fair under controlling Third Circuit law. *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). In support of its opposition, the TCC contends that the Settlement Agreement is insufficiently funded given the value and merit of the Successor Liability Claims; that litigation of the Successor Liability in the tort system is in the best interests of the creditors; and that the Settlement was not negotiated in good faith and at arms-length. Finally, the TCC asserts that equitable reasons compel rejection of the Settlement Agreement.

For the reasons that follow, the Court finds that approval of the Settlement is in the best interests of the estates and by far the surest pathway to securing a timely, fair, and reasonable recovery for all creditors.

### A. Issues Before the Court

During the trial, the Court clarified the issues being litigated and the scope of the relief sought by way of the Motions. *See Court's Exhibit 5*. Further, as clarified by supplemental submissions regarding "straddle claims" from the TCC, FCR, and Debtors, *see* Dkt. Nos. 2335 & 2362, the Settlement being evaluated does not release any a direct claim premised on exposure to Brenntag's post-2004 Transaction products (a "Direct Brenntag Claim"). The Court now reiterates that, in addressing the Settlement Motion and Derivative Standing Motion, this Court is *not* fixing or determining the allowance of any claims against the Debtor-estates; nor is the Court estimating the amount of any individual claims for purposes of distribution or voting. Rather, this Court is tasked with evaluating the fairness of a settlement that resolves various alleged Successor Liability

Claims, and must consider the appropriateness of granting standing to the TCC to pursue the latter claims.

### B. Standard of Review

Having clarified precisely what is—and is not—at issue in these Motions, the Court must next determine the appropriate standard to be used when considering approval of the Settlement. The TCC and FCR assert that the Proposed Settlement is subject to heightened scrutiny because it is the result of "a conflicted transaction between a subsidiary and its ultimate corporate parent." *TCC Obj.* ¶ 72, Dkt. No. 1606 (citing *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009)); *FCR Joinder* ¶ 8, Dkt. No. 1607.[8] In support of this argument, the FCR focuses on NICO's involvement and its status as an "affiliate" of the Debtor. *See FCR Joinder* at ¶¶ 9-12. The TCC, on the other hand, explains that the Bankruptcy Directors were not truly independent because they were "engaged by the Debtors after Berkshire steered the Debtors to Kirkland, and Kirkland steered Mehta . . . to the Bankruptcy Directors." *TCC Obj.* at ¶ 73. The TCC next contends that the Debtors effectively negotiated the Settlement Agreement with themselves because it "was negotiated between the Bankruptcy Directors and Tom Ryan, who had previously worked on behalf of the Debtors to negotiate settlements[.]" *Id.* Finally, the TCC complains that the Settlement was negotiated without its or the FCR's involvement. In light of these circumstances, the TCC advocates for application of the "entire fairness" doctrine, which requires the party seeking approval of the transaction to demonstrate that both the procedural and substantive aspects of the agreement were intrinsically fair. *See In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 385 (Bankr.

[8] The FCR also presses for heightened scrutiny based on the fact that the proposed Settlement affords releases to the Contributing Parties (specifically, Brenntag, NICO, Berkshire, and DB US). *See FCR Joinder* ¶ 32, Dkt. No. 1607. Because this portion of the FCR's argument is presented in conjunction with her argument that the proposed Settlement is neither fair, nor in the best interest of the estates, the Court will address it in the context of its discussion, *infra*, on the best interests of the estates and creditors.

S.D.N.Y. 2005). The Debtors, in contrast, assert that there is no basis to apply heightened scrutiny. Debtors contend that "[t]he Disinterested Directors have no connection to the Contributing Parties, had a full delegation of authority to investigate and resolve all estate causes of action, and reached the Settlement with the aid of multiple disinterested law firms and financial and valuation advisors." *Debtors' Reply* ¶ 6, Dkt. No. 1665.

As an initial matter, the Court does not agree that the dots which the TCC connects—from the Debtor to Berkshire, Berkshire to Kirkland, and Kirkland to the Disinterested Directors—establishes insider status or undue influence. Indeed, it is not unusual for a struggling entity to rely on advice and recommendations from a parent or affiliate company when seeking counsel; and it is not unusual for counsel to suggest or recommend experienced and well-respected independent professionals, with whose work they are familiar, to fulfill roles for a client. Moreover, as elicited during testimony, the Disinterested Directors have no connection to Berkshire or the other Contributing Parties. *See, e.g. Aronzon Direct* ¶¶ 9-10, DX-249; *Pohl Direct* ¶ 6. Thus, while a settlement involving Berkshire, Brenntag, and Debtors—alone—could only be viewed as an insider transaction, the introduction of the Disinterested Directors places an independent wedge between the related entities and severs the insider ties. Nevertheless, this Court acknowledges the complicated corporate structures at play, and recognizes the commercial relationships between the interested parties, as well as the common interests they share. Accordingly, the Court will assume—without finding—that the Settlement is the product of dealings between the Debtors and insiders and, as such, is subject to heightened scrutiny.

The Court clarifies, however, that this heightened scrutiny does not alter the factors utilized and considered in the Court's analysis. At its core, the Settlement Motion is akin to any motion seeking use of estate property under § 363(b) or approval of a settlement under Bankruptcy Rule

9019. Accordingly, the Court must evaluate the Settlement based on the factors dictated by the Third Circuit in *Martin*; namely, "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). The "heightened scrutiny" component merely requires that this Court evaluate those factors with more rigorous scrutiny. *See, e.g*, *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009). The Court is confident that it has done so here.

Rather than simply deferring to the business judgment of the Disinterested Directors, this Court conducted a four-day, contested evidentiary hearing, during which it heard testimony from 10 expert and lay witnesses. The Court entertained lengthy argument, reviewed demonstrative exhibits, and admitted hundreds of documents into evidence. Following the hearing, this Court carefully examined the evidentiary record and thoroughly considered the applicable law. Therefore, by any calibration, the Settlement Agreement and the dealings between the parties were rigorously scrutinized by this Court.[9] *See, e.g*, *In re Winstar*, 554 F.3d 382.

Furthermore, while the TCC and FCR advocate for application of the "entire fairness" doctrine, this Court could not locate—and no party cites to—any binding authority suggesting that this doctrine must be utilized by a bankruptcy court in the context of approval of a bankruptcy settlement involving insiders. Rather, Third Circuit authority states only that dealings between a debtor and an insider should be "rigorously scrutinized by the courts." *In re Winstar*, 554 F.3d at

---

[9] Similarly, this Court has no doubt that it has scrutinized the proposed Settlement with sufficient rigor to satisfy the Third Circuit. In a footnote in its opinion affirming this Court's prior decisions, the Third Circuit reminded this Court the precepts to be considered with rigorous scrutiny in determining whether a proposed settlement is in the best interest of the estate. *See In re Whittaker Clark & Daniels Inc*, 176 F.4th 241, 277 n.16 (3d Cir. 2026) (Krause, J., concurring). This Court is mindful of the Third Circuit's direction and is confident that the intensive and detailed evaluation discussed herein comports with the Circuit's instruction and expectations.

412. In elaborating on the respective parties' burdens, the Third Circuit clarified that, once an objecting party presents material evidence of unfair conduct, the burden then shifts to the movant/insider to rebut that evidence and demonstrate the fairness of the transaction. *Id.* (citing *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986)).

Additionally, this Court observes that many of its sister courts—including those cited by the TCC—call for careful or close scrutiny when evaluating the actions of an insider under a heightened scrutiny standard, but do *not* apply the "entire fairness" doctrine. *See, e.g. Matter of Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995) ("When a debtor subsidiary settles a claim it has against a parent corporation without the participation of the creditors, a bankruptcy court should carefully scrutinize the agreement."); *In re AIG Fin. Prods. Corp*., 660 B.R. 603, 618 (Bankr. D. Del. 2024) (subjecting insider's actions to the heightened scrutiny standard with no mention of "entire fairness" doctrine); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (subjecting agreement to "closer scrutiny because it was negotiated with an insider"); *see also In re Charter Commc'ns*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) (holding that a bankruptcy settlement "should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and **not** under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders") (emphasis added). This approach makes sense to the Court. Afterall, the "entire fairness" doctrine is a test which has its roots in Delaware common law, when a stockholder challenges a board's business decision. *See, e.g.*, *In re Match Grp., Inc. Derivative Litig*., 315 A.3d 446, 459 (Del. 2024). Here, in contrast, the TCC challenges the Debtors' decision to enter into a settlement for the benefit of the estate in the context of a bankruptcy. Therefore, the Court sees no basis for imposition of non-bankruptcy

common law. Rather, common sense and case law suggest that this Court evaluate the Settlement under applicable bankruptcy law.

Notwithstanding this logic and persuasive authority, the Court acknowledges still other rulings—particularly by bankruptcy courts in New York and Delaware—that do utilize the "entire fairness" doctrine when a heightened scrutiny standard is invoked. *See, e.g. In re LATAM Airlines Grp. S.A.*, 2022 WL 272167, at *14 (Bankr. S.D.N.Y. Jan. 28, 2022) (quoting *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) ("In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration.")); *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 385 (Bankr. S.D.N.Y. 2005) (discussing "entire fairness jurisdictions" and stating that, where a transaction involves persons that are not disinterested, they must demonstrate the "entire fairness" of the transaction, or that it is "intrinsically fair"). The Court points out that most of these cases involve non-bankruptcy allegations of mismanagement,[10] challenges to controlling-stockholder actions,[11] or breach of loyalty or fiduciary duty claims.[12] However, at least one line of cases suggests that—where a settlement under Bankruptcy Rule 9019 involves insiders—heightened scrutiny applies and requires evaluation of "the integrity and entire fairness of the transaction at issue." *In re LATAM Airlines*, 2022 WL 272167, at *14.[13]

---

[10] *In re Adelphia Commc'ns Corp.*, 323 B.R. 345 (Bankr. S.D.N.Y. 2005).

[11] *In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446 (Del. 2024).

[12] *In re Opus E., LLC*, 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017).

[13] Interestingly, the *LATAM Airlines* bankruptcy court ultimately declined to apply heightened scrutiny because it rejected the objecting parties' assertion that those involved in the transaction were current insiders, or would become insiders as a result of the transaction. *In re LATAM Airlines*, 2022 WL 272167 at *16.

In any event, this Court recognizes—given the corporate structures and relationships at play—that more rigorous scrutiny of the proposed Settlement is warranted in this case. For the reasons that follow, this Court concludes that, when evaluated under a heightened scrutiny standard, the Settlement should be approved. Further, this Court determines that the Settlement is fair in both procedure and substance. In other words, it arises from a fair process involving significant investigation and deliberation by multiple parties; and it results in a fair value that is adequately explained through substantial, credible testimony and evidence.[14] Thus, although this Court finds the "entire fairness" doctrine inapplicable, the Settlement would pass muster under application of the doctrine.

**C. Procedural Analysis of Settlement**

Before addressing the merits and substance of the Settlement, the Court addresses the TCC and FCR's challenge to the fairness of the *process* that led to the Settlement. In sum, their position is that "[t]he Settlement is the product of a procedurally defective negotiation that left money on the table[.]" *TCC's Obj.* ¶ 128, Dkt. No. 1606. They argue that Debtors "are simply incapable of undertaking an objective assessment of their own liability and negotiating a fair deal with their controlling affiliate." *FCR Joinder* ¶ 5, Dkt. No. 1607. In contrast, Debtors and Brenntag maintain that the negotiations were "hard-fought, arm's-length, and good faith." *Settlement Motion* ¶ 82, Dkt. No. 1297; *see also Brenntag's Reply* ¶ 1, Dkt. No. 1662. They rely heavily on the fact that negotiations were carried out by the appointed Disinterested Directors, who lack any ties to the Contributing Parties. In response, the TCC challenges the impartiality of the Disinterested Directors and the process used to negotiate the Settlement. As explained below, the Court finds

[14] The Court's findings regarding substantive fairness are discussed in the context of the Court's evaluation of the *Martin* factors.

that the Disinterested Directors were appropriately appointed and, as such, were able to conduct negotiations free from outside influence. This produced a procedurally fair negotiation and process.

The TCC cites the fact that the Disinterested Directors were interviewed and selected by Mr. Mehta, who was—at the time—both President of the Debtors and a Vice President of NICO: entities that have conflicting interests. *TCC Obj.* ¶ 130, Dkt. No. 1606. However, this argument oversimplifies the process. The pool of potential directors was not chosen by Mr. Mehta. Rather, the process began when Debtors and NICO—given their association—recognized that Debtors might need independent counsel. *See Debtors' Reply* ¶ 97, Dkt. No. 1665. Mr. Mehta, on behalf of WCD, sought restructuring counsel, and he testified during his deposition that—because he was not familiar with counsel in the field of bankruptcy—he consulted with Munger Tolles (counsel for Berkshire) and "got recommendations from them as to possible law firms." *Tr. of Oct. 23, 2024 Deposition of Raj Mehta* ("*Oct. 23, 2024 Mehta Depo*.") 68:20-25.[15] Tom Ryan—who, via Resolute Management, previously assisted Mr. Mehta in managing claims against Debtors—suggested to counsel for Berkshire that Debtor might want to consider both Kirkland & Ellis and Jones Day as potential restructuring counsel. *Ryan Direct* ¶ 42, BTX-264.[16] Counsel for Berkshire relayed those recommendations to Mr. Mehta, who ultimately chose Kirkland to represent the Debtor entities. *See Oct. 23, 2024 Mehta Depo*. 69:10-12. Kirkland, in turn, provided six names to Mr. Mehta for consideration as potential disinterested directors. *Id.* at 91:6-8. Mr. Mehta then interviewed three candidates and selected Mr. Pohl and Mr. Aronzon based on criteria that Mr. Mehta alone developed and considered important. *Id.* at 92:18 – 94:14. No representatives from

[15] Deposition Designations were admitted into evidence via Agreed Order dated March 6, 2026, Dkt. No. 1857.

[16] Berkshire confirms that Mr. Mehta interviewed Paul Weiss and Kirkland & Ellis. *Berkshire's Reply* 11, Dkt. No. 1680.

Berkshire, NICO, or any other Contributing Party were consulted, provided advice, or otherwise weighed in on the selection of the Disinterested Directors. *Id.* at 94:15 – 95:7.

While the TCC suggests that Mr. Mehta's role in selecting the Disinterested Directors, itself, casts doubt on the Directors' ability to negotiate, they do not expand on this allegation and the Court finds that the assertion is wholly conclusory. As Debtors point out, a director's independence is not compromised merely because he is nominated by a stockholder, CEO, owner, or other interested party. *See, e.g. Patel v. Duncan*, 2021 WL 4482157, at *19 (Del. Ch. Sept. 30, 2021), *as corrected* (Oct. 4, 2021), *aff'd*, 277 A.3d 1257 (Del. 2022); *White v. Panic* 793 A.2d 356 (Del. Ch. 2000), *aff'd*, 783 A.2d 543 (Del. 2001); *see also In re Trade Desk, Inc. Derivative Litig.*, 2025 WL 503015, at *10 (Del. Ch. Feb. 14, 2025) (collecting cases); *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015) (collecting cases). Rather, ample case law confirms that the inquiry regarding a director's independence focuses on the manner in which the director performs his duty—and not on how the director secured his position. *See, e.g. Patel v. Duncan*, 2021 WL 4482157, at *19 (citing *Andreae v. Andreae*, 1992 WL 43924, at *5 (Del. Ch. Mar. 3, 1992); *see also Kanter v. Barella*, 489 F.3d 170, 179 (3d Cir. 2007)[17] (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)[18] ("It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.")).

[17] *Kanter v. Barella* was overruled on other grounds but remains current and valid authority with respect to assessment of directors' independence. *See In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 F.4th 250 (3d Cir. 2024) (overruling the abuse-of-discretion standard of review used in *Kanter* and other cases, and establishing that a decision to dismiss a derivative action for failure to plead demand futility under Rule 23.1 is reviewed *de novo*).

[18] *Aronson* was overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), which likewise changed the standard of review by an appellate court but did not alter the test for a director's independence utilized in the *Aronson* decision.

Here, the TCC offers no particularized facts that cast doubt upon the independence of the Disinterested Debtors. *See, e.g. Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1048 (Del. 2004) (explaining that a plaintiff must allege facts to create reasonable doubt about an outside director's independence). Instead, the TCC asserts that, generally, directors are compromised and incentivized by the possibility of future employment to produce an outcome that is favorable to the entity that appointed them. *TCC Obj.* ¶ 132, Dkt. No. 1606. This Court will not—and pursuant to case law should not—make that unfounded and generalized inference. *See In re CBS Corp. S'holder Class Action & Derivative Litig.*, 2021 WL 268779, at *29 (Del. Ch. Jan. 27, 2021), as corrected (Feb. 4, 2021) (citations omitted) ("Delaware's independence analysis is context-specific and fact-intensive.").

This Court acknowledges that "other factors, including personal and business relationships, can influence and, at times, compromise independence." *In re Trade Desk, Inc. Derivative Litig*., 2025 WL 503015, at *10 (Del. Ch. Feb. 14, 2025) (quoting *In re CBS*, 2021 WL 268779). Therefore, allegations regarding a particular director's professional or personal relationship with an appointing-entity can cast reasonable doubt on that director's independence. However, the Court has not been presented with any such evidence here. Rather, the TCC points to what they assert is "a growing trend in bankruptcy to appoint bankruptcy directors with nominal independence." *TCC Obj.* ¶ 132, Dkt. No. 1606 (citing Jared A. Ellias, Ehud Kamar & Kobi Kastiel, *The Rise of Bankruptcy Directors*, 95 S. CAL. L. REV. 1083, 1095 (2023)). Even assuming such a trend exists, the TCC does not present any evidence suggesting that these specific directors are beholden to Kirkland, Mr. Mehta, or the Contributing Parties; and the TCC does not set forth any facts that would lead to a reasonable inference that the Disinterested Directors' independence

is compromised. Reliance on academic speculation presented in law review articles does not suffice.

In contrast, the Debtors point out that Mr. Pohl has served in over 40 independent director positions, in only six of which had Kirkland offered his name for consideration. *Tr. of March 3, 2025 Hrg. AM Session* 87:24 – 88:1, Dkt. No. 1842; *see also Tr. of Deposition of Timothy Pohl* ("*Pohl Depo.*") at 38:18-25. Similarly, Mr. Aronzon has served as an independent director for over 40 companies, and Kirkland has offered his name a maximum of seven times. *Tr. of Deposition of Paul Aronzon* ("*Aronzon Depo*.") 25:19 – 26:17; *see also Debtors' Reply* ¶ 102, Dkt. No. 1665. Thus, the record does not suggest any unique business relationship between the Disinterested Directors and Kirkland or the Contributing Parties that would—without more—call their independence into question.

The record likewise does not support the TCC's allegation that Mr. Mehta's actions or communications affected the decisions made by the Disinterested Directors. Mr. Aronzon testified that the Disinterested Debtors had "full and complete authority" to determine where a potential conflict existed and, if so, how to resolve said conflict. *Tr. of March 3, 2025 Hrg. – PM Session* 115:9-13, Dkt. No. 1843; *see also Pohl Direct* ¶ 12, DX-248. Additionally, Mr. Pohl affirmed that the Disinterested Directors "would have excluded, and we did exclude, Mr. Mehta from any substantive discussions that we thought rose to the level of a conflict matter." *Tr. of March 3, 2025 Hrg. – AM Session* 95:14-16, Dkt. No. 1842. In support of its argument, the TCC provides several examples of minutes from board meetings during which the adversary proceeding and/or Settlement was listed as a topic of discussion. *See, e.g. TCC Closing Slidedeck* Slide 56 (admitted for demonstrative purposes only); *Tr. of March 3, 2025 Hrg. – AM Session* 97:13 – 109:10. However, the meeting minutes do not describe in detail the nature or content of those discussions.

And Mr. Pohl testified repeatedly that Mr. Mehta was excluded from substantive conversations. *See, e.g.*, *Tr. of March 3, 2025 Hrg. – PM Session* 36:17-25. Mr. Pohl further explained that Mr. Mehta would not have been excluded from certain meetings that touched on updates or reports on factual items involving the Settlement or the adversary proceeding because those topics—in his view—were not controversial and did not involve substantive issues; and, thus, did not require Mr. Mehta's exclusion. *Id.* at 52:17 – 54:1.

During cross-examination, counsel for the TCC also pointed to the Disinterested Directors' failure to exclude Mr. Mehta from the August 8, 2023 board meeting as evidence that Mr. Mehta was involved in substantive discussions. *Tr. of March 3, 2025 Hrg. – PM Session* 79:2 – 81:22, Dkt. No. 1843; *see also*, *e.g.*, *Omnibus Meeting Minutes for August 8,* JX-20; *TCC Closing Slidedeck* Slide 57 (admitted for demonstrative purposes only). Indeed, the record reflects that two votes were taken during that board meeting to approve the initiation of an adversary proceeding related to injunctive relief: one excluding Mr. Mehta, and one including him. During re-direct, however, Mr. Aronzon elaborated on the purpose behind the two votes; explaining that it was done out "an abundance of caution" because the Disinterested Directors anticipated that "some might argue [that the matter being considered] wasn't a conflict matter." *Tr. of March 3, 2025 Hrg. – PM Session* 117:16-21, Dkt. No. 1843. Although Mr. Aronzon conceded during re-cross that he could have recused Mr. Mehta from the voting process, he also pointed out that doing so "would have left open the alternative . . . [because] we weren't a hundred percent sure if it was conflict or not." *Id.* at 121:5-6. The Court finds this to be a reasonable explanation that is supported by the record. Significantly, the minutes from that meeting first report that "Messrs. Pohl and Aronzon, as disinterested directors, voted unanimously to approve the initiation of an adversary proceeding related to the injunctive relief discussed." *Omnibus Meeting Minutes for August 8* ¶ 6,

JX-20. This is followed by a qualifying statement indicating: "To the extent this was not a conflicts matter, the boards voted unanimously to approve the same." *Id.* Thus, the minutes buttress Mr. Aronzon's explanation that the second vote was conducted out of an abundance of caution. In any event, as Mr. Aronzon points out—regardless of whether or not the vote included Mr. Mehta—they "got to the same place" because the Disinterested Directors voted unanimously on their own. *Tr. of March 3, 2025 Hrg. – PM Session* 120:20, Dkt. No. 1843; *see also Pohl Depo.* 225:18-20 ("We controlled the board whether he voted or not. We were two out of three votes.").

In sum, the record does not support the TCC's contention that Mr. Mehta's "continued active presence in board meetings calls into doubt [the Disinterested Directors'] independence and ability to negotiate effectively against Berkshire." *TCC Obj.* ¶ 131, Dkt. No. 1606. Indeed, there has been no evidence offered—testimonial or documentary—which demonstrates engagement, interference, or participation by Mr. Mehta with respect to the Disinterested Directors' investigations or decision-making. Mere isolated presence at a board meeting is unpersuasive and insufficient to call into question the fairness of the process. Rather, the evidence and testimony elicited at trial indicates that Mr. Mehta was not involved with substantive discussions and that the Disinterested Directors excluded Mr. Mehta where appropriate. *See, e.g. Pohl Depo*. 211:18-21 ("We had a sense of things that we thought it was prudent to exclude him from consistent with those concepts, and we did that on an ad hoc basis, like the Supreme Court's definition of pornography. We knew it when we saw it.").

The TCC and FCR also assert that the "settlement negotiations were not conducted at arms'-length [sic]" because the Debtors were effectively negotiating against themselves. *TCC Obj.* ¶ 135, Dkt. No. 1606. In support of this argument, the TCC first cites the fact that Berkshire's lead negotiator, Tom Ryan, previously worked on behalf of Debtors to negotiate settlements for

individual claims. The TCC highlights that Mr. Ryan used the term "we" during cross-examination when describing actions taken by WCD. *Tr. of March 4, 2025 Hrg. – AM Session* 29:23, Dkt. No. 1844. This, argues the TCC, demonstrates that Mr. Ryan saw himself—and Berkshire—as aligned with Debtors. Indeed, Mr. Ryan conceded that his use of "we" was the result of "old habits" because he "worked on behalf of Whittaker for many years." *Id.* at 29:25, 30:3. However, the TCC does not expound upon this allegation or explain how Mr. Ryan's prior work for Debtors on a case-by-case basis impacted the Disinterested Directors' ability to negotiate against him.

The FCR similarly argues that Mr. Ryan "knew of the Debtors' secrets" and "had extensive insider knowledge about and involvement with the Debtors," which resulted in a "lopsided" process and power dynamic. *FCR Joinder* ¶¶ 18, 19, Dkt. No. 1607; *see also id.* at ¶ 20 (explaining that the Disinterested Directors "never stood a chance"). But the fact that Mr. Ryan may possess experience and insight that enhanced his ability to negotiate does not demonstrate that the Disinterested Directors' independence was compromised or that they otherwise failed to adequately perform their duties. In essence, the FCR asks this Court to conclude that the process was unfair strictly because Mr. Ryan was very experienced and knowledgeable. But that view ignores the other half of the equation; namely, the Disinterested Directors' roles in the negotiation. More to the point, the applicable inquiry does not focus on the adversary's experience or negotiating ability. Rather, as explained, courts place the focus on how the independent directors performed their duties. *See, e.g. Patel v. Duncan*, 2021 WL 4482157, at *19. Simply put, the record belies any allegations that the Disinterested Directors failed to use appropriate care and responsibility in undertaking their responsibilities.

As an initial matter, the Disinterested Directors (on behalf of Debtors) and Mr. Ryan (on behalf of the Contributing Entities) commenced negotiations from vastly different starting points.

*See, e.g.*, *Pohl Depo.* at 294:9-16 (explaining $1 billion proposal); *Ryan Direct* ¶ 52, BTX-264 (explaining his belief that Debtors' estimate was "too high"). Both Mr. Ryan and the Disinterested Directors detailed the progress of negotiations and explained their respective strategies. *See, e.g. See Tr. of March 3, 2025 Hrg. – PM Session.* 40:2 – 50:16, Dkt. No. 1843 (outlining Mr. Prol's strategy). Ultimately, it was the Disinterested Directors who ended negotiations with a take-it-or-leave-it offer of $535 million. *See, e.g.*, *Ryan Direct* at ¶ 53. Notably, this amount was significantly higher than amounts Mr. Ryan had projected for WCD's entire liability—which he had pegged anywhere from $121 million to, at most, $497 million. *Tr. of March 4, 2025 Hrg. – AM Session* 97:19 – 98:7, Dkt. No. 1844. In fact, Mr. Ryan testified that he believed WCD's liabilities would be "dramatically less" than his projected worst-case figure of $497 million. *Id.* at 98:12-14. Nevertheless, the parties settled at a significantly higher amount, which undercuts the assertion that Debtors negotiated against themselves or that Mr. Ryan's experience allowed him effectively to dominate negotiations.

Additionally, both Messrs. Pohl and Aronzon testified that their goal was to maximize value for the estate and that this alone drove their decision-making. *See, e.g.*, *Aronzon Direct* ¶ 15, DX-249; *Decl. of Tim Pohl in Support of Settlement Motion* ("*Pohl Decl.*") ¶ 13, Dkt. No. 1298; *Aronzon Depo.* at 123:13-17 ("[O]ur goal was to maximize the value of all assets . . . ."); *id.* at 205:16-17 ("[W]e wanted to maximize value of the assets of the estate."). In furtherance of this goal, the Disinterested Directors met regularly (via Zoom) and excluded Mr. Mehta from board meetings when they intended to have substantive discussions regarding how to handle the tort claims. In preparing for negotiations and formulating their strategy, they relied upon the advice of an independent expert and counsel. *See, e.g.*, *Pohl Depo.* at 245:16-21; *id.* at 288:2-18. And although the FCR contends that Mr. Ryan "recommended his adversaries' advisors," *FCR Joinder*

¶ 19, Dkt. No. 1607, this assertion is again an oversimplification of the process by which the Debtors' advisors were selected. Mr. Aronzon testified that the Disinterested Directors' estimation expert, Brattle Group, was chosen "[b]ased on their qualifications," and was selected out of a limited pool of available consultant firms. *Aronzon Depo.* at 161:15-22; *see also id.* at 162:18 – 163:8 (explaining that other potential firms were already taken by parties in interest); *Tr. of March 3, 2025 Hrg. – PM Session* 113:20-25, Dkt. No. 1843 (explaining his familiarity with Brattle and other similar firms). Therefore, nothing about the Disinterested Directors' reliance upon their expert negates their independence or demonstrates that they did not perform their duties with sufficient rigor. Rather, Messrs. Pohl and Aronzon engaged in extensive negotiations pursuing their underlying settlement strategy to maximize recoveries. *Tr. of March 3, 2025 Hrg. – PM Session* 40:2 – 50:16, Dkt. No. 1843.

The TCC also contends that the negotiation process was flawed because the Disinterested Directors did not have the ability to "say no". *TCC Obj.* ¶ 136, Dkt. No. 1606 (citing *In re First Bos., Inc. S'holders Litig*., 1990 WL 78836 (Del. Ch. June 7, 1990)). This assertion is contradicted by the fact that the Disinterested Directors placed a final offer on the table and testified that they were willing to "walk away" if it was not met. *See, e.g. Pohl Depo.* at 333:7-18. Thus, the record reflects that the Disinterested Directors were both authorized and prepared to forego settlement if they did not receive an offer that they believed fairly reflected the value of the claims at issue. Unlike the directors in the case cited by the TCC, the Disinterested Directors in this case not only possessed the "significant power" to say no, but were prepared to use it "unless they conclude[d] that they ha[d] achieved a fair transaction." *In re First Bos., Inc. S'holders Litig*., 1990 WL 78836,

at *8.[19] And although the TCC asserts that the Disinterested Directors did not know what alternatives they had aside from settlement, Mr. Pohl's testimony confirms that they understood that if the claims were not settled, they would return to litigation. *See, e.g. Pohl Depo.* at 334:9-23; *Tr. of March 3, 2025 Hrg. – PM Session* at 12:21 – 13:2. During negotiations, however, the Disinterested Directors' focus was on settlement. *Tr. of March 3, 2025 Hrg. – PM Session* at 50:18 – 51:22.

Finally, the TCC and FCR contend that the process was unfair because the Disinterested Directors did not consult with the TCC or claimants during the negotiation. *TCC Obj.* ¶¶ 138-140, Dkt. No. 1606; *FCR Joinder* ¶ 22, Dkt. No. 1607. In the first instance, the Court reiterates that the claims at issue are estate property; therefore, the decision of how to best address them rests with the Debtors. In any event, the Court notes—as do Debtors—that the TCC, FCR, Debtors and Contributing Parties engaged in mediation over the course of several months, with no success, prior to the decision of the Disinterested Directors' to negotiate with the Contributing Parties. Given the mediation history, the Disinterested Directors determined that reaching out to the TCC would not be productive for purposes of settlement. *See, e.g. Tr. of March 3, 2025 Hrg. – PM Session* 58:14-15, Dkt. No. 1843; *id.* at 32:22 – 33:22; *Aronzon Depo.* at 205:14-23. Further, Mr. Pohl testified that he had recognized that reaching a settlement would merely be the first step in the process and that interested parties—such as the TCC and FCR—would be able to voice concerns and objections in the approval process. *Id.* at 33:23 – 34:20. Thus, the circumstances of this case did not require TCC participation in settlement negotiations, and the cases cited by the FCR suggesting that "courts routinely reject settlements where . . . creditors had no say in the

[19] The Court finds that the other case cited by the TCC to be significantly factually distinguishable. *See In re Dell Techs. Inc. Class V S'holders Litig.,* 2020 WL 3096748 (Del. Ch. June 11, 2020). In that case, the company had offered the special committee only "three paths to a [desired] outcome." *Id.* at *16.

negotiation" are distinguishable. *FCR Joinder* ¶ 25, Dkt. No. 1607 (citing *In re Med. Asset Mgmt., Inc*., 249 B.R. 659, 665–66 (Bankr. W.D. Pa. 2000) (finding that the unsecured creditors would receive an unfair distribution from the settlement proceeds); *In re HyLoft, Inc*., 451 B.R. 104, 115 (Bankr. D. Nev. 2011) (suspecting nefarious conduct on the part of the debtor's principals and finding that significant information was missing from the record)).

Ultimately, the Court finds no impropriety in the appointment of the Disinterested Directors, nor any evidence of undue influence over the execution of their duties. As explained previously, the fact that independent directors are appointed by interested individuals does not, in itself, compromise the directors' independence. Here, Mr. Mehta's selection of the Disinterested Directors was reasonable in light of their prior experience. While Mr. Pohl admitted that he was not familiar with tort claims—and specifically, asbestos tort claims—he testified that he was familiar with successor liability claims. *See Tr. of March 3, 2025 Hrg. – PM Session* 28:12 – 29:9, Dkt. No. 1843. Mr. Aronzon testified that he had "lots of mass tort experience, some of it asbestos," and he had experience dealing with claims estimators. *Id.* at 113:11; *see also id.* at 113:2-21; 114:1-23. Their prior dealings with Kirkland were minimal in the context of their total portfolio of appointments as independent directors, and they lack any ties to the Contributing Parties. The fact that they were "new to the companies" has no bearing on their independence or performance. *See FCR Joinder* ¶ 18, Dkt. No. 1607; *id* at ¶ 20. Indeed, *any* appointed independent director would have been "new" to the companies.

The record reflects that the Disinterested Directors took their responsibilities seriously and performed their duties with objectivity and zeal. They consulted with their expert and counsel, who engaged in discovery, prepared presentations, and offered recommendations. Using this information, the Disinterested Directors formulated a settlement strategy and implemented

negotiations tactics that they believed would achieve the best result. Through hard-fought negotiations that involved multiple offers and counteroffers, they achieved a settlement value that exceeds the upper limits of their adversaries' estimates. For the foregoing reasons, the Court finds no flaw in the negotiation process, even if evaluated under the "entire fairness" doctrine.

### D. Substantive Analysis of Settlement: *Martin* Analysis

The Third Circuit has observed that compromises are favored in bankruptcy because they "minimize litigation and expedite the administration of the bankruptcy estate." *In re Martin*, 91 F.3d at 393; *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006). In evaluating a settlement, "[a] bankruptcy court must determine whether a settlement is 'fair and equitable' and in the 'best interests of the estate.' " *In re Petersburg Regency LLC,* 540 B.R. 508, 535 (Bankr. D.N.J. 2015) (quoting *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010)). In conducting this analysis, case law requires courts to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal" through examination of four factors. *In re Martin*, 91 F.3d at 393; *see also In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002). As previously stated, "[t]hese factors are: (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re RFE Indus., Inc.*, 283 F.3d at 165 (citing *In re Martin*, 91 F.3d at 393).

Notably, in evaluating whether to approve a settlement under Rule 9019(a), a bankruptcy court "need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement[.]" *In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020). Indeed, avoiding litigation "is one of the main advantages of settlement." *Id.* (citing *In re Key3Media Grp.,*

*Inc.*, 336 B.R. 87, 92-93 (Bankr. D. Del. 2005)) (other citations omitted). Rather, courts are instructed to "canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *In re Alecto Healthcare Servs. LLC*, 184 F.4th 163, 170 (3d Cir. 2026) (quoting *In re Capmark Fin. Grp. Inc*., 438 B.R. 471, 515 (Bankr. D. Del. 2010); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (explaining that "the court must determine whether the settlement falls within the lowest range of reasonableness"); *In re Petersburg Regency LLC*, 540 B.R. 508, 536 (Bankr. D.N.J. 2015) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

"The burden is on the proponent to establish that the settlement may be approved." *In re TCI 2 Holdings, LLC*, 428 B.R. at 136 (citing *In re Grand Prix Associates Inc.,* 2009 WL 1850966, *5 (Bankr. D.N.J. June 26, 2009). And, ultimately, "[t]he decision to approve [a] settlement 'lies within the sound discretion of the Bankruptcy Court.' " *In re Roper & Twardowsky, LLC*, 559 B.R. 375, 393 (Bankr. D.N.J. 2016) (quoting *In re Petersburg Regency LLC*, 540 B.R. at 535); *see also In re NovaPro Holdings, LLC*, 815 F. App'x at 657 n.6 (reviewing approval of settlement for an abuse of discretion).

Having established the framework for review, the Court now applies each *Martin* factor to the proposed Settlement.

### 1. Probability of Success In Litigation

The first *Martin* factor plays heavily into this Court's evaluation of the Settlement. Indeed, if this Court were to find that there is *no* likelihood of success on the Successor Liability Claims against Brenntag, then the precise value of Debtors' talc liability becomes irrelevant: *any* amount—let alone $535 million—is better than no recovery at all. In contrast, if this Court were to determine that *every* Successor Liability Claim is likely to succeed, then the amount of the Settlement falls

above the lowest point in the range of reasonableness only if it approximates the value of the Debtors' forecasted talc liability. *See e.g., In re Alecto Healthcare Servs. LLC,* 184 F.4th 170; *In re NovaPro Holdings, LLC*, 815 F. App'x 655. Accordingly, the probability of success must be considered in concert with the value of the Debtors' talc liability when evaluating the fairness of the Settlement. Unsurprisingly, the parties have vastly different views on both the merits of the Successor Liability Claims and the appropriate valuation of Debtors' talc liability. In this section, the Court will address the likelihood of success. The estimated value of the Debtors' future liability is discussed in the Court's analysis of the "paramount interest of the creditors" factor.

In their Motion, Debtors address the types of claims that the Settlement proposes to resolve. First, Debtors evaluate the claims that could be asserted against Brenntag for transfers or under theories of alter ego or corporate veil-piercing.[20] *Settlement Motion* ¶¶ 45-52, Dkt. No. 1297. Next, Debtors address the claims against Brenntag under theories of successor liability—claims which the Debtors describe as "the key estate causes of action." *Id.* at ¶¶ 53-58. Debtors conclude that "the likelihood of success on the merits on their successor liability claims against Brenntag are [sic] no greater than 50%, and possibly materially lower." *Id.* at ¶ 50. The TCC, on the other hand, asserts that "Debtors have textbook successor liability claims against Brenntag based on New Jersey's product-line doctrine for asset purchase agreements and traditional fraud-based successor liability analysis." *TCC Obj.* ¶ 92, Dkt. No. 1606; *see also Standing Motion* ¶ 69, Dkt. No. 1293. Prior to evaluating the parties' arguments and the potential success of the claims, the Court must determine—as a threshold matter—which state's law governs the successor liability claims against

[20] The Court notes that the veil-piercing and alter ego claims are not addressed in the TCC's Objection and FCR's Joinder; nor were these types of claims extensively discussed during trial. *See, generally, TCC Obj.*, Dkt. No. 1606; *FCR Joinder*,Dkt. No. 1607. Rather, the parties' disagreement throughout these proceedings remains focused on the Successor Liability Claims. As a result, this Court's analysis focuses on the fairness of the Settlement as it relates to the Successor Liability Claims.

Brenntag. *See In re Innovation Fuels, Inc*., 2013 WL 3835827, at *5 (Bankr. D.N.J. July 22, 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 61 S. Ct. 1020, 1021, 85 L. Ed. 1477 (1941)).

**a. Choice-of-Law**

A federal court sitting in diversity uses the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487. The Third Circuit recently observed, however, that it "has not previously determined whether the same rule applies in bankruptcy proceedings." *In re Whittaker Clark & Daniels Inc*, 176 F.4th 241, 277 (3d Cir. 2026) (Krause, J. concurring). In *Whittaker*, Judges Krause and Ambro each wrote lengthy concurrences addressing—in dicta—the differing views regarding choice of law doctrines in the bankruptcy context. Judge Krause concludes that *Klaxon* should apply and, indeed, substantial authority exists for application of the choice-of-law rules of the state in which the bankruptcy court sits. *See id.* at 278; *In re First Interregional Advisors Corp*., 271 B.R. 463, 469 (Bankr. D.N.J. 2001) (citing *In re Alcon Demolition, Inc*., 204 B.R. 440, 446 (Bankr. D.N.J. 1997) ("A federal court applies the choice-of-law doctrine in the forum state in which it sits."). Judge Ambro, on the other hand, qualifies *Klaxon's* application and advocates for the approach taken by the Second and Fourth Circuits—concluding that bankruptcy courts should apply *Klaxon* "unless a strong federal interest justifies creating federal choice-of-law rules as a matter of federal common law." *Id.* at 272 (Ambro, J., concurring) (citing *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988); *In re Gaston & Snow*, 243 F.3d 599, 605–06 (2d Cir. 2001)). Here, New Jersey is the forum state; therefore, under *Klaxon*, its choice-of-law rules controls. *See, e.g. Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C.*, 450 N.J. Super. 1, 34, 160 A.3d 44, 64 (App. Div. 2017) (citing *McCarrell v. Hoffmann-La Roche, Inc*., 227 N.J. 569, 588, 153 A.3d 207, 218 (2017)). And—mindful of Judge Ambro's

concurrence—this Court determines that there is no overriding federal interest which precludes *Klaxon's* application.[21]

Importantly, a court need only engage in a choice-of- law analysis where an actual conflict exists between the potentially applicable bodies of law. *See Pharmacia Corp. v. Arch Specialty Ins. Co.*, 2024 WL 208146, at *2 (3d Cir. Jan. 19, 2024) (collecting cases including *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453 (2008)); *see also On Air Ent. Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000); *Davis v. BMW of N. Am., LLC*, 810 F. Supp. 3d 528, 539 (D.N.J. 2025). Absent a relevant conflict that may alter the outcome of the dispute (depending on which state's law applies), courts should not undertake the choice-of-law analysis. *See, e.g.*, *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997) ("Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question."). Thus, the first step in the choice-of- law analysis is to determine which states' laws might apply and whether there is an actual conflict among those laws with respect to the successor liability issues. *See P.V. ex rel. T.V. v. Camp Jaycee,* 197 N.J. 132, 962 A.2d 453 (2008).

In the matter under consideration, the Court considers, primarily, Delaware law, New York law, and New Jersey law because: (1) the APAs for the relevant prepetition transactions are governed by Delaware law; (2) the transaction closings occurred in New York; and (3) the Debtors are incorporated in New Jersey. The TCC bottoms its argument on nontraditional successor liability theories, which the TCC contends are available in states like California and New Jersey.

---

[21] Regardless, this Court applies various choice-of-law theories and examines the claims under the laws of multiple states to ensure a thorough evaluation of the likelihood of success and requisite scrutiny of the Settlement overall. As explained, the uncertainty regarding the appropriate choice-of-law doctrine factors into this Court's overall assessment of the likelihood of success of the underlying claims.

And in their Joint Motion seeking Derivative Standing, the TCC and FCR cite to a California state court case for the proposition that "[s]everal states recognize a product-line theory of successor liability that focuses on whether an acquiring entity continued the seller's product-line." *Standing Motion* ¶ 70, Dkt. No. 1293 (citing *Ray v. Alad Corp*., 19 Cal. 3d 22, 560 P.2d 3 (1977)). Indeed, the TCC focuses on the Debtors' successor liability claims based on a product-line theory as their "strongest successor liabili[y] theor[y]." *TCC Obj.* ¶ 92, Dkt. No. 1606. The Berkshire Entities point out that "the TCC and FCR fail to do any choice-of-law analysis to show the law of those jurisdictions apply." *Berkshire Entities' Reply* 35, Dkt. No. 1680. In Berkshire's view, Delaware law governs these claims and, because "Delaware law only recognizes the narrow 'traditional' exceptions to the default rule of successor nonliability[,]" Berkshire concludes that "the TCC and FCR vastly overstate the strength of those nontraditional theories." *Id.* Given the emphasis on the product-line-based successor liability claims, the Court begins its analysis with these claims.

**b. Product-Line Claims**

In reviewing the successor liability laws of the relevant states, this Court observes—and Berkshire points out—that Delaware and New York, like the majority of states, "follow the traditional approach and recognize only four limited exceptions to the default rule of successor nonliability." *Berkshire's Reply* 36, Dkt. No. 1680. These exceptions include: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or defacto merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently to escape liability for such debts. *See, e.g.*, *Avamer 57 Fee LLC v. Hunter Boot USA LLC*, 2025 WL 2247582 (N.Y. App. Div. Aug. 7, 2025) (discussing exceptions under New York law); *Ross v. Desa Holdings Corp*., 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008)

(explaining exceptions under Delaware law) (citations omitted). In contrast, New Jersey joins the minority of states, which recognize the "nontraditional" product-line theory of successor liability, under which "a successor to the manufacturer of a product can be held liable for injuries caused by that product even when the successor took no action that caused the actual injury." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.,* 2025 WL 2228835, at *6 (D.N.J. Aug. 5, 2025) (discussing and explaining the product-line exception and citing *Ramirez v. Amsted Indus., Inc.,*86 N.J. 332, 431 A.2d 811 (1981)). Thus, a conflict exists between the potentially applicable successor liability laws, and a choice-of-law analysis is warranted.

As Berkshire notes, "[t]he TCC and FCR assume that New Jersey law or its equivalent will apply across the board to all successor liability claims." *Berkshire's Reply* 36, Dkt. No. 1680. Indeed, the TCC's argument regarding the strength of the successor liability claims is premised entirely on New Jersey law, without providing a legal basis for its application. The TCC contends in a footnote that it "reserves all rights with respect to the choice-of-law," and asserts that the "*Debtors* previously asserted that the 'choice of law analysis clearly results in the application of New Jersey law.' " *TCC Obj.* ¶ 96 n.170, Dkt. No. 1606 (emphasis in original) (citing *Debtor's Reply in Support of Summary Judgment Motion* ¶¶ 37, 42, Dkt. No. 99 in Adv. Pro. No. 23-01245). However, the Debtors and Berkshire argue that this assertion "mischaracterizes the Debtors' position" and is "misleading". *Berkshire's Reply* 36 n.56, Dkt. No. 1680; *Debtors' Reply* ¶ 58 n.51, Dkt. No. 1665. The Court agrees. The language to which the TCC cites was employed in the context of a dispute over whether the claims at issue are estate property and, more specifically, which state's laws apply to *ownership* of the successor liability claims—not to which state's laws address the *merits* of the claims themselves. The brief to which the TCC cites (Debtors' Reply In Support of Summary Judgment) consistently maintains that "there is no conflict of law regarding

whether Successor Liability Claims are property of the Debtors' estates" but that, if there were, "either New Jersey, New York, or Delaware law" applies. *Debtors' Reply in Support of Summary Judgment Motion* ¶ 25, Dkt. No. 99 in Adv. Pro. No. 23-01245. The Debtors' comment—offered in another context—does not inform the issues at hand.

The TCC further states that "[t]he only basis for Delaware or New York law to apply is the internal affairs doctrine or a contractual choice-of-law provision." *TCC Obj.* 96 n.170, Dkt. No. 1606. Despite acknowledging this, the TCC concludes that New Jersey law applies because WCD "is a New Jersey corporation" and the TCC cites a Third Circuit decision—*Berg Chilling Sys., Inc. v. Hull Corp*., 435 F.3d 455, 465 (3d Cir. 2006)—for the proposition that "contractual provisions are irrelevant because choice of law for product-line claims rests in tort, not contract." *Id.* However, in *Berg Chilling*, the Third Circuit explicitly declines to make any rulings as to the characterization of the choice-of- law framework for product-line successor liability claims. Instead, the Third Circuit describes the "confusing effect" of such claims. *Id.* at 465. Thus, *Berg Chilling* does not support the TCC's summary conclusion that New Jersey law applies. Rather, it guides the present analysis and compels this Court to recognize that "[t]he problem of characterization lies in the mottled nature of the exceptions to the ordinary rule in successor liability law because they are not uniformly characterized as wholly based in tort, contract, or corporate law." *Id.* at 464. Thus, the Court will examine the product-line claims under each choice-of-law provision.

**i) Analysis Under <u>Contract</u> Choice of Law Principles**

Berkshire contends that "[b]ecause the successor liability claims at issue concern the legal effect of a contractual transaction between two corporations, this conflict must be resolved by reference to the corporate or contract choice-of-law principles—both of which result in the

application of Delaware law." *Berkshire Reply* 37, Dkt. No. 1680. This Court agrees that, under a contract-based approach, the choice-of-law provision in the asset purchase agreement memorializing the 2004 Transaction (the "APA") between Debtors and Brenntag controls, and Delaware law applies. "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *Chen v. UBS Bus. Sols. US LLC*, No. A-1263-24, 2025 WL 3469008, at *4 (N.J. Super. Ct. App. Div. Dec. 3, 2025) (quoting *Instructional Sys., Inc. v. Computer Curriculum Corp*., 130 N.J. 324, 341, 614 A.2d 124 (1992) and citing *Restatement (Second) of Conflicts of Laws* § 187 (1971)).[22] Here, it is undisputed that the APA provides for the parties' selection of Delaware law as applicable governing law. *See Brenntag Asset Purchase Agreement ("APA")* § 2.5, DX-008. And nothing in the record suggests that enforcement of the parties' contractual choice would violate public policy. *See, e.g. Little v. Am. Income Life Ins. Co.*, 2025 WL 1550016, at *3 (N.J. Super. Ct. App. Div. May 30, 2025) (describing findings required to override parties' contractual choice-of-law). Accordingly, Delaware law would control under a contract-based approach.

---

[22] The same holds true under Delaware and New York contract-based choice-of-law rules. *See, e.g.*, *GI DI Rushmore Parent L.P. v. Stoops*, No. 2026-0505-JTL, 2026 WL 1679305, at *9 (Del. Ch. June 10, 2026) (explaining that Delaware courts follow the Restatement (Second) of Conflict of Laws and, as such, are bound to respect the chosen law of contracting parties, unless doing so violates fundamental Delaware policy, or unless no substantial relationship between the chosen state and the parties or the transaction); *see also Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017); *GC Broadway, LLC v. AN SM 1925 Broadway Holdings, LLC*, No. 2024-1070-LWW, 2026 WL 539233, at *13 (Del. Ch. Feb. 26, 2026) (citing J.*S. Alberici Const. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 519 (Del. 2000)); *Hugh O'Kane Elec. Co., LLC v. MasTec N. Am., Inc.*, 19 A.D.3d 126, 127, 797 N.Y.S.2d 45, 46 (2005) (citing *Finucane v. Interior Const. Corp.*, 264 A.D.2d 618, 695 N.Y.S.2d 322 (1999)). Therefore, to the extent this is the type of case contemplated by Judge Ambro's concurrence in *Whittaker* that warrants application of federal common law choice of law, the same analysis would apply—and same outcome would result—if this Court were to consider the claims under Delaware's or New York's choice-of-law rules. *See In re Whittaker Clark & Daniels Inc*, 176 F.4th 241 (Ambro, J., concurrence).

As stated, "[i]n Delaware, when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's liabilities, including claims arising out of the seller's tortious conduct." *Ross v. Desa Holdings Corp*., 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008). Delaware recognizes only the traditional exceptions to this general rule. *See, e.g. Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC,* No. 2022-0378, 2023 WL 5688392, at *15 (Del. Ch. Sept. 5, 2023) (explaining that "[e]xceptions include: (1) the buyer's assumption of liability; (2) defacto merger or consolidation; (3) mere continuation of the predecessor under a different name; or (4) fraud") (citations omitted); *Am. Int'l Indus. v. Neslemur Co.*, 2020 WL 7255550, at *2 (Del. Super. Ct. Dec. 10, 2020) (observing that defendant did not face potential liability under the product-line exception to successor liability in Delaware). As one court conducting a choice-of-law analysis for product-line successor liability claims recently concluded, "Delaware has not adopted the product-line exception." *Dickens v. A-1 Auto Parts & Repair Inc.*, 2020 WL 6265078, at *3 (S.D. Miss. Oct. 23, 2020) (citing *The O'Brien Corp. v. Hunt-Wesson, Inc.*, 1999 WL 126996, at *7 n. 3 (Del. Ch. Feb. 25, 1999) (other citations omitted); *see also Lopez v. Delta Int'l Mach. Corp*., 2017 WL 3142028, at *31 (D.N.M. July 24, 2017) (stating that Delaware "has not adopted the product-line exception" and citing Daniel R. Campbell, *Product Liability Just Doesn't Fly*, 84 DEF. COUNSEL J. 1, 11 (2017) (conducting a fifty-state review of the product-line exception)). Accordingly, Debtors' claims based on product-line theories would likely not survive under Delaware law, after employing contract choice of law principles.

**ii) Analysis Under <u>Corporate</u> Choice of Law Principles**

Under a corporate-based approach, the applicable law is determined by the internal affairs doctrine. The Supreme Court has explained:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.

*Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (citing *Restatement (Second) of Conflict of Laws* § 302 cmt. b (Am. L. Inst. 1971)); *see also*, *e.g.*, *In re Innovation Fuels, Inc.*, 2013 WL 3835827, at *5 (Bankr. D.N.J. July 22, 2013) (applying internal affairs doctrine). Because the internal affairs doctrine applies only to matters "peculiar to" corporations, it is unlikely that a corporate-based approach would guide the choice-of-law inquiry involving these Successor Liability Claims. *Id.; see also In re Whittaker Clark & Daniels Inc,* 176 F.4th 258-9 (explaining proper application of internal affairs doctrine). Nevertheless, in the interest of completeness, the Court provides the following analysis of the doctrine, which relies on the Restatement.

Section 302 of the Restatement provides that "[t]he local law of the state of incorporation will be applied to determine [issues involving the rights and liabilities of a corporation], except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties." Accordingly, under New Jersey's choice-of-law rules, "where no other state has a more significant countervailing interest, "the law of the state of incorporation governs internal corporate affairs." *Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005).[23]

[23] Delaware and New York also utilize the same corporate-based choice-of-law rule. *See, e.g.*, *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005); *Eccles v. Shamrock Cap. Advisors, LLC*, 42 N.Y.3d 321, 340 n.12, 245 N.E.3d 1110, 1123 (2024). Therefore, once again, to the extent this is the type of case that warrants application of federal common law choice of law, the same analysis would apply—and same outcome would result—if this Court were to consider the claims under Delaware's or New York's choice-of-law rules. *See In re Whittaker Clark & Daniels Inc*, 176 F.4th 241 (Ambro, J., concurrence).

Here, the successor liability claims are directed at Brenntag, which is incorporated in Delaware. Given the facts of this case, it is unlikely that another state has a more significant countervailing interest: although the Debtor was incorporated in New Jersey, it maintained its principal place of business in Connecticut, and the alleged injuries occurred across multiple states. Therefore, under the internal affairs doctrine, Delaware law governs and—as explained—claims based on the product-line exception to successor liability fail under Delaware law, having applied corporate choice-of-law principles.[24]

**iii) Analysis Under <u>Tort</u> Choice of Law Principles**

The TCC submits that "choice of law for product-line claims rests in tort, not contract." *TCC Obj.* ¶ 96 n.170, Dkt. No. 1606. Indeed, case law exists which supports the TCC's contention. *See, e.g. Berg Chilling Sys., Inc. v. Hull Corp*., 435 F.3d 455, 466 (3d Cir. 2006) (suggesting that the product-line exception to successor liability "is generally analyzed using torts choice of law principles)*; Dickens v. A-1 Auto Parts & Repair Inc.,* 2020 WL 6265078, at *4 (S.D. Miss. Oct. 23, 2020) ("Although a corporate purchase of assets may be necessary for liability under the exception, the imposition of product-line liability is grounded in reasons familiar to tort law.").

---

[24] Although not raised by the parties, the Court acknowledges that plaintiff in the relevant successor liability actions is the Debtor estate, and the Debtor corporation (Whittaker, Clark & Daniels) is incorporated in New Jersey. However, it is evident from the comments to § 302 of the Restatement—as well as from supporting case law—that the focus of the "state of incorporation" inquiry is on the corporation against whom demands are being made and claims are being asserted. *See, e.g.*, Restatement (Second) of Conflict of Laws § 302 cmts (a), (g) (1971) (explaining that the provision addresses primarily matters that are "peculiar to corporations" and often brought by shareholders, and citing "justified expectations of the parties" and "predictability and uniformity of result"); *see also Edgar v. MITE Corp*., 457 U.S. 624, 645, 102 S. Ct. 2629, 2642, 73 L. Ed. 2d 269 (1982) (explaining that the internal affairs doctrine serves to reduce conflicting demands on a corporation); *In re PA Co-Man, Inc*., 644 B.R. 553, 584 (Bankr. W.D. Pa. 2022) (collecting cases and stating that "the law of an entity's state of incorporation applies to claims relating to the internal affairs of that corporation"); *Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, 2015 WL 4092392, at *3 (S.D.N.Y. July 6, 2015) (explaining that under choice-of-law analysis, courts look to the successor's state of incorporation).

When presented with conflicting laws in a tort case, New Jersey applies the Second Restatement's most significant relationship test. *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008).[25] Specifically, § 145 of the Restatement provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 145(1) (1971). To assist in the analysis, subsection (2) of § 145 lists the "[c]ontacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue" and advises that the contacts should "be evaluated according to their relative importance with respect to the particular issue." *Id.* § 145(2). Those contacts are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.*

[25] Delaware likewise applies the Restatement when conducting a tort-based choice-of-law analysis. *See, e.g. Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045 (Del. 2015); *see also* Kiss v. Lathrop, No. N24C-05-080, 2026 WL 244475, at *2 (Del. Super. Ct. Jan. 29, 2026) (explaining that "the Delaware Supreme Court has concluded that the most significant relationship test under the Restatement (Second) of Conflicts is applied to resolve choice-of-law issues in tort"). New York's approach mirrors the Restatement's "significant relationship" test, and the New York inquiry focuses on "which forum has the greatest policy interest in the outcome of the dispute in light of the parties' contacts with each forum." *Eccles v. Shamrock Cap. Advisors*, LLC, 42 N.Y.3d 321, 336, 245 N.E.3d 1110, 1120 (2024) (citing *Edwards v. Erie Coach Lines Co.*, 17 N.Y.3d 306, 318, 929 N.Y.S.2d 41, 952 N.E.2d 1033 (2011)). Under New York law, consideration is given to—among other factors—the significant contacts (*i.e.* the state of domicile of the parties and location of the tort), and the underlying purpose of the law at issue. *See Elmaliach v. Bank of China Ltd.*, 110 A.D.3d 192, 202, 971 N.Y.S.2d 504, 514 (2013) (citing *Schultz v. Boy Scouts of Am.,* 65 N.Y.2d 189, 197–198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)); *see also Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) (explaining New York courts' transition to a more "flexible approach" based on a jurisdiction's relationship or contact with the occurrence or the parties). Notably, the factors considered by New York courts are also factors evaluated under the Restatement, and evaluation of New York's factors approximates the flexible approach delineated in the Restatement. *See* Restatement (Second) of Conflict of Laws §§ 6, 145 (1971). Therefore, to the extent this is the type of case which warrants application of federal common law choice of law, the same analysis would apply—and same outcome would result—if this Court were to consider the claims under Delaware's or New York's choice-of-law rules. *See In re Whittaker Clark & Daniels Inc*, 176 F.4th 241 (Ambro, J., concurrence).

Notably, the factors to be considered "vary somewhat in importance from field to field" and the weight afforded to a given contact changes depending on the circumstances and the tort at issue. *Id.* at cmt. b. For example, the place where the injury occurred (the "place-of-injury contact") is central to the selection of the applicable state law in the personal injury context. *See id.* at §§ 146-147. The place-of-injury contact can "likewise play[] an important role in the selection of the state of the applicable law in the case of other kinds of torts, *provided that the injury occurred in a single, clearly ascertainable, state*." *Id.* at § 145 cmt b (emphasis added). However, this contact will carry little weight "when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue." *Id.* (citing § 146, Comments d-e). The comments to § 145 of the Restatement provide guidance and suggest a multitude of factors to be considered and balanced in a given case, including—but not limited to—the justified expectations of the parties, predictability of results, foreseeability of injury, and the purpose of (and underlying policy behind) the tort at issue. Given these considerations and the mandate for an issue-and-fact-specific analysis, the choice-of-law inquiry for torts can be highly complicated. The Court determines that the facts of this case and the unique nature of the product-line successor liability claims at issue compel a complex choice-of-law analysis.

The Court first considers the "place of injury" contact and notes that the Debtors' product-line liability claims are not traditional direct personal injury claims and, instead, are equitable exceptions to a general product liability rule. Given the confusing nature of the tort, *see Berg Chilling*, it is unclear to this Court the weight to be afforded the place of injury in conducting the significant relationship test. Nevertheless, assuming this contact bears some significance, the place of injury in the context of these cases would likely be the place where plaintiffs were injured by

the allegedly defective product. Those injuries arose across multiple jurisdictions throughout the United States and not "in a single, clearly ascertainable, state." *Id.* at § 145 cmt b. Where the place-of-injury contact does not weigh strongly in favor of any one state, the contact is considered neutral. *See, e.g., Paucek v. Shaulis*, 349 F.R.D. 498 (D.N.J. 2025) (finding place of injury unpersuasive for choice-of-law analysis because defamatory statements were "distributed nationwide", creating injury in multiple states).

With respect to the place where the conduct causing the injury occurred, this contact, too, produces mixed results. Case law indicates that this contact will be determined by the location at which the product was manufactured or the location at which the product was purchased. *See, e.g. Van Doren v. Coe Press Equip. Corp*., 592 F. Supp. 2d 776, 785 (E.D. Pa. 2008) (describing the place of conduct for a product-line successor liability claim as the location of the manufacture and sale of the defective product). In this case, however, the location at which the product may have been manufactured is uncertain. Although WCD is incorporated in New Jersey, over the years it has had plants and operations in other states, including California and Montana. *See First Day Decl.* ¶¶ 17-19, Dkt. No. 5. Moreover, WCD operated as a large-scale industrial compound supply and distribution business, selling to other companies, who then used WCD's base product in the creation of their own brand products. For example, in the *Plant* case, WCD was a co-defendant with Avon Products, Inc. Thus, the place-of-conduct contact could be considered the location at which a co-defendant—such as Avon—manufactured the allegedly defective product. Finally, to the extent the place of conduct is considered to be the location in the country where the product was sold, nearly every state would be implicated. Ultimately, a consistent outcome under a place-of-conduct analysis results only if, as Berkshire advocates, the "conduct" at issue is defined as the

asset transfer, which results in application of Delaware law. *See Berkshire's Reply* 37, Dkt. No. 1680.[26]

The third contact in the Restatement is the domicile, place of incorporation, and place of business of the parties. The New Jersey Supreme Court observes in *Camp Jaycee* that "the use of the term 'domiciliary' when referring to corporations is imprecise." *Camp Jaycee*, 197 N.J. at 146 (citing Restatement, § 145 comment e). The *Camp Jaycee* court further instructs that "[c]ourts should focus not only on an entity's place of incorporation but also on its principal place of business." *Id.* And courts applying New Jersey choice-of-law principles have repeatedly emphasized that a corporation's operational and economic center—not its legal domicile—should guide the analysis. *See, e.g.*, *Paucek v. Shaulis*, 349 F.R.D. 498, 522 (D.N.J. 2025) (stating that "a corporation's principal place of business is its 'nerve-center,' 'the place where [its] officers direct, control, and coordinate the corporation's activities' " and quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92, 130 S. Ct. 1181, 1192, 175 L. Ed. 2d 1029 (2010)). Here, the Debtor was incorporated in New Jersey but maintained its principal place of business in Connecticut. *See Decl. of Moshin Meghji* n.1, Dkt. No. 5. The alleged successor-in-interest, Brenntag, is incorporated in Delaware and maintains substantial operations outside the United States. *See, e.g. Exs. 10 & 11 to Campbell Decl.* ("*US APA*"), Dkt. No. 1301-1. Thus, although WCD's incorporation in New Jersey provides a formal link to the state, it is not dispositive under the most significant relationship test. Given the circumstances, the third Restatement contact does not provide a definitive answer to the choice-of-law question.

---

[26] To the extent the place-of-conduct contact could be considered the location at which the APA was executed, this contact would suggest application of New York law. Given that this is the *only* contact relative to New York, it is unlikely that a court would conclude New York has the most significant relationship to, or greatest interest in, the tort claims at issue. In any event, New York—like Delaware—recognizes only the four traditional exceptions to the general successor liability rule; therefore, the product-line claims would likewise fail under New York law.

The final contact to be considered is the place where the relationship between the parties is centered. Here, the transaction between Brenntag and Debtors was structured under Delaware law and is governed by a Delaware choice-of-law provision. There is no evidence in the record that the relationship between the parties was centered in New Jersey in any respect. *See, e.g., Berkshire's Reply*, 36-38, Dkt. No. 1680.

Ultimately, the contacts do not provide a clear answer to the Restatement's question of which state possesses the most significant relationship to the product-line successor liability claims under a tort analysis. "[T]he mottled nature of the exceptions to the ordinary rule in successor liability law[,]" *Berg Chilling*, 435 F.3d at 464, complicates the inquiry and renders difficult the Restatement's instruction to conduct a "qualitative balance" of all the § 145 factors and the guiding principles set forth in § 6. These principles include: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971); *see also Erny v. Est. of Merola*, 171 N.J. 86, 101 (2002); *Fu v. Fu*, 160 N.J. 108, 122 (1999). As the comments to § 145 elucidate, many of the § 6 principles, such as the justified expectations of the parties and the values of certainty, predictability, and uniformity of result are of lesser importance in torts. Restatement (Second) of Conflict of Laws § 145 cmt b. Further, the Restatement acknowledges that—in the tort context—policies that ordinarily aid the choice-of-law inquiry, such as "the deterrence of tortious conduct and the provision of compensation for the injured victim, . . . are likely to point in different directions in situations where the important elements of

an occurrence are divided among two or more states." Thus, the Restatement advises that the "remaining factors listed in § 6 assume greater importance." Restatement (Second) of Conflict of Laws § 145 cmt b.

In assessing the first remaining factor—which emphasizes the importance of interstate comity—the assessing state should have "regard for the needs and policies of other states and of the community of states." *Id.* at § 6 cmt. d. This must be balanced against other remaining factors, which compel consideration of the relevant policies of the forum, the relevant policies of other interested states (particularly of the state with the dominant interest in the determination of the particular issue), and ease in the determination and application of the law to be applied. The facts of the present case and the claims at issue do not fit neatly into the analysis and are not easily balanced. The Court acknowledges that the forum state, New Jersey, has a policy in favor of the product-line exception to successor liability. However, New Jersey is—undoubtedly—in the minority in this respect. *See, e.g.*, Restatement (Third) of Torts: Prod. Liab. § 12 cmt. a (1998) (observing that a minority of jurisdictions impose product-line successor liability); *Lopez v. Delta Int'l Mach. Corp.*, 2017 WL 3142028, at *34 (D.N.M. July 24, 2017) (recognizing that a minority of states have adopted the product-line exception); *Lefever v. K.P. Hovnanian Enters., Inc.*, 160 N.J. at 315 (same). While one could argue that New Jersey has a strong interest in employing the product-line exception, the principles underlying § 6 of the Restatement compel this Court to respect other states' policies in rejecting the exception. *See, e.g.*, *Camp Jaycee*, 197 N.J. at 148-54 (explaining that New Jersey's policy of charitable immunity substantially impaired Pennsylvania's ability to regulate within its borders).

In sum, the choice of law applicable to the product-line successor liability claims remains unclear under a tort-based approach. There are no dominant interests or policies at play. There is

no singular place of allegedly tortious injury or conduct. *Cf. Camp Jaycee*, 197 N.J. at 146 (explaining Pennsylvania as "the *only* location" of the injury and conduct at issue). This Court is not presented with competing state statutes. *Cf. Rowe v. Hoffman-La Roche, Inc.*, 189 N.J. 615, 626, 917 A.2d 767, 774 (2007) (addressing competing statutes). Given the facts, there is no single state that has strong tort-based ties and interests to the claims at issue. The injured parties are scattered throughout the country, and the claims are held by Debtors: a company incorporated in New Jersey with its principal place of business in Connecticut. The purported successor-in-interest is a company incorporated in Delaware, and the basis for its successorship was established by means of a transaction that closed in New York and explicitly selected Delaware law. These factors suggest that no single state plays a determinative role or clearly has the most significant relationship from a tort-based perspective. Given that only a minority of states recognize the product-line exception, it is wholly unlikely that plaintiffs would secure a favorable choice-of-law ruling in pursuing these claims. *See, e.g. Green v. United States Steel Corp.,* No. (X06) UWY-CV-22-6079639S, 2025 WL 2793050, at *2 n.1 (Conn. Super. Ct. Sept. 23, 2025) ("The overwhelming majority of state courts have expressly declined to endorse this [product-line] theory of liability.").

Furthermore, this Court finds the analysis in *Dickens v. A-1 Auto Parts & Repair Inc*., 2020 WL 6265078 (S.D. Miss. Oct. 23, 2020) to be instructive. In *Dickens*, a Mississippi plaintiff alleged he developed mesothelioma due to asbestos exposure from products manufactured, distributed, and supplied by defendant, Trinity, a Delaware corporation. Trinity had purchased the subject product from a manufacturer called New Nabrico, and the parties' asset purchase agreement called for application of Tennessee law. The district court conducted a tort-based choice of law analysis for product-line claims under Mississippi law, which—like New Jersey—looks to the Restatement. In doing so, the *Dickens* court ruled that "the contacts relevant to the *successor*

*liability* issue in the present case occurred in Delaware and Tennessee—Trinity is a Delawarean corporation, and its purchase agreement with New Nabrico invoked Tennessee law." *Id.* at *4 (emphasis in original). Thus, the court in *Dickens* determined that Delaware and Tennessee had the most significant relationship to the issues before it. Notably, the *Dickens* court did not give any consideration to the state in which the seller, New Nabrico, was incorporated.

In the instant case, Brenntag is a Delaware corporation and the purchase agreement calls for application of Delaware law. Thus, this Court concludes that it is highly likely that—even under a tort-based approach—Delaware has the most significant relationship to the product-line claims, and Delaware law will apply. As the *Dickens* court explained, "the 'place of incorporation and place of business of the parties' may still be relevant to tort issues under Section 145, and the 'relative importance' of these contacts is to be determined 'with respect to the particular issue.' " *Dickens,* 2020 WL 6265078 at *5 (citing Restatement (Second) of Conflict of the Conflict of Laws § 145(2)(c) (1971)). Simply put, the "corporate and contractual contacts are of greater importance to issues of successor liability." *Id.*

With this in mind, this Court considers that key aspects of the parties' agreement—including the decision to structure the transaction as an asset purchase and the manner of assuming or excluding certain liabilities—were carefully crafted under Delaware law. The absence of any material role played by New Jersey law—whether in terms of the transaction's execution, negotiation, or corporate governance—significantly diminishes New Jersey's interest in determining the legal principles applicable to this asset transfer and the consequences thereof. This Court, therefore, rejects the TCC's application of New Jersey law as a foregone conclusion. Rather, it seems more likely that Delaware is the state with the most significant contacts under a tort-based approach. Application of Delaware law will also uphold the values of certainty,

predictability and uniformity of result set forth in § 6 of the Restatement. Given that Delaware does not recognize product-line exception to successor liability, these claims are not likely to succeed.

Finally, this Court notes that precedent exists for conducting a jurisdiction-by-jurisdiction choice-of-law analysis. In the Multistate District Litigation context, a district court in the Southern District of New York "look[ed] to the law of each individual jurisdiction at issue to determine what substantive law to apply in assessing Plaintiffs' successor liability claims." *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3382071, at *9 (S.D.N.Y. Aug. 3, 2017). The *General Motors* court rejected the argument advanced by "New GM" (the purported successor-in-interest to the debtor, "Old GM", via a sale of Old GM's assets) calling for application of the law of New GM's state of incorporation, or for application of the law of the state where the sale of Old GM's assets was negotiated and executed. Instead, the *General Motors* court conducted a choice-of-law analysis for 15 different jurisdictions and reached varied results; for example, finding that Pennsylvania law applied to Pennsylvania plaintiffs' claims, that New York law applied to Virginia plaintiffs' claims, and that Delaware law applied to Wisconsin plaintiffs' claims. *Id.* at *16. Several New Jersey courts have also looked favorably on a party-by-party choice of law analysis. *See Ginsberg v. Quest Diagnostics, Inc.*, 227 N.J. 7, 18, 147 A.3d 434, 441 (2016) (finding that "a defendant-by-defendant analysis furthers the *Restatement* principles and provides the most equitable method of resolving choice-of-law questions"); *Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C.*, 450 N.J. Super. 1, 35, n.24, 160 A.3d 44, 64 (App. Div. 2017) (discussing *Ginsberg* and stating that "the same principles may at times warrant plaintiff-by-plaintiff analyses as well").

This Court will not undertake such an analysis here. As the New Jersey Supreme Court has acknowledged, "a defendant-by-defendant choice-of-law analysis is not feasible in every

matter." *Ginsberg*, 227 N.J. at 20. For the same reasons, a party-by party choice-of-law-analysis is equally impractical especially in cases, like this one, which involve complex issues and injured parties in multiple states. Indeed, Debtors have been sued in over 30 jurisdictions. Furthermore, the cases cited are not binding on this Court and do not address the specific issue of product-line claims.

In any event, this Court need not delve further into the analysis. A mini-trial is not necessary or warranted for purposes of this Motion. Rather, in assessing the "likelihood of success" factor to aid in overall evaluation of the proposed Settlement, it is enough for this Court to identify the hurdles that plaintiffs would face in bringing these claims. For the reasons expressed, it is unclear—and in this Court's opinion, unlikely—that a choice-of-law analysis would result in application of the law of New Jersey or of another state that is also in the minority of states that embraces the product-line exception to successor liability. This uncertainty weighs heavily in favor of the Settlement.

**iv) Analysis of product-line claims under New Jersey law**

As discussed, this Court finds it unlikely that New Jersey law would apply to the claims at issue. *See, e.g. Dickens*, 2020 WL 6265078; *see also Berg Chilling*, 435 F.3d at 472 (Ambro, J., dissenting) ("I am of the view that the successor liability claim involved here relates to the "interpretation, construction, [and] effect" of the asset purchase transaction, and is, therefore, within the scope of the broad choice of law provision contained in the APA."); *In re Asbestos Litig.*, 517 A.2d 697, 699 (Del. Super. Ct. 1986) (conducting choice of law analysis under Delaware law in product-line context and concluding that "while questions of negligence and what constitutes tortious conduct" were appropriately decided under the law of the place of injury, "the focus of the successor liability issue is more properly on the legal effect of the . . . contractual transaction").

Nevertheless, even assuming that New Jersey law applies, this Court determines that the product-line claims are unlikely to succeed.

Generally, "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct." *Ramirez v. Amsted Indus., Inc*., 86 N.J. 332, 340 (1981) (quoting *Menacho v. Adamson United Co*., 420 F. Supp. 128, 131 (D.N.J. 1976)). As the TCC points out, however, in *Ramirez*, the Supreme Court of New Jersey approved of the product-line exception to that traditional rule of successor liability. The *Ramirez* court held that

> where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product-line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Id.* at 358 (relying on the California Supreme Court's ruling in *Ray v. Alad Corp.,* 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977)). In so ruling, the *Ramirez* court

> identified three fundamental policy concerns that justified imposing liability on successors under the product-line exception. First, the successor's acquisition of the original manufacturer's business caused a "virtual destruction of the plaintiff's remedies against the original manufacturer." Second, the successor had the "ability to assume the original manufacturer's risk-spreading role." And third, it was fair to require "the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business."

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2025 WL 2228835, at *6 (D.N.J. Aug. 5, 2025) (quoting *Ramirez*, 431 A.2d at 820).

As an initial matter, Brenntag contends that the TCC's "analysis suffers from a fundamental flaw fatal to [its] argument." *Brenntag's Reply* ¶ 4, Dkt. No. 1662. Namely, Brenntag asserts that the product-line exception applies to *manufacturers* and not *distributors* like WCD or Brenntag.

*Id.* (citing *Falor v. G&S Billboard*, 2008 WL 539225, at *6 (D.N.J. Feb. 27, 2008); *see also Debtors' Motion* ¶ 55, Dkt. No. 1297. The TCC, in turn, cites *Ramirez* and argues that "the product-line exception is expansive by design and focused primarily on injured plaintiffs' ability to recover." *TCC Obj.* ¶ 99, Dkt. No. 1606. The TCC also points out that the decision in *Ramirez* explicitly uses the phrase "manufactured and distributed." *Ramirez*, 86 N.J. at 358. The Debtors assert that *Ramirez*'s focus remains on the *manufacturer* and that the use of the conjoining word "and" creates uncertainty as to whether the product-line theory would be extended to distributors in New Jersey. The Court, however, agrees with the TCC. Indeed, the product-line exception set forth in *Ramirez* is policy-based and designed to promote fairness to injured parties. Thus, whether the injury is caused by a manufacturer or distributor seems irrelevant to the analysis. To point of fact, in *Falor*—the case relied upon by Brenntag and Debtors—the court specifically took issue with application of the product-line exception to a distributor where the predecessor manufacturer was still a viable defendant. *See Falor* 2008 WL 539225, at *6. The emphasis in *Falor* was not on the distinction between manufacturer and distributor, but rather on the available remedies to the plaintiff. Like the court in *Falor*, this Court places its focus and emphasis on the available remedies for plaintiffs over the decades following the 2004 Transaction.

Relying on *Ramirez*, the Debtors, Brenntag, and Berkshire maintain that a prerequisite for application of the product-line exception is that the plaintiffs' potential remedy against the original manufacturer was destroyed by the successor's acquisition. *See Ramirez,* 86 N.J. at 349 (quoting *Ray*, 19 Cal.3d at 31 and explaining that the imposition of liability against a successor corporation is justified where "[t]he virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business"); *see also id.* at 350 (finding that the plaintiff's potential remedy against . . . the original manufacturer of the allegedly defective

press, was destroyed by the purchase of the . . . assets, trade name and good will, and [the original manufacture's] resulting dissolution). Here, it is undisputed that the transaction in question—the 2004 Transaction—did *not* destroy potential plaintiffs' remedies against WCD. The TCC does not directly address this point but—in the context of its argument rejecting Debtors' *Falor* argument—states that "the Debtors are no longer valuable defendants." *TCC's Obj.* ¶ 100, Dkt. No. 1606. As with everything in this case, the inquiry is not so simple.

"[I]n determining whether a current successor should be held liable under the product-line exception to successor non-liability, a court's focus is solely on whether the original manufacturer is viable." *Perlman v. Virtua Health, Inc.,* 2005 WL 8174806, at *4 (D.N.J. Apr. 12, 2005). Here, WCD remained a viable defendant for nearly two decades after the sale at issue. *See, e.g. Debtors' Reply* ¶ 66, Dkt. No. 1665. Following the 2004 Transaction, WCD continued defending and resolving over 1,600 talc and environmental claims, using consideration from that transaction—including cash, insurance policies, insurance receivables, tax receivables and other assets—to satisfy liabilities between 2004 and 2023. During this time, plaintiffs had access to a fully solvent defendant. *See, e.g., Debtors' Reply* ¶ 66, Dkt. No. 1665; *Brenntag's Reply* ¶ 6, Dkt. No. 1662; *Berkshire Entities' Reply* 44, Dkt. No. 1680. Because the 2004 Transaction did not destroy WCD's viability as a defendant, Brenntag and Berkshire conclude that the "causation element" is absent and the product-line remedy is unavailable. *Berkshire's Reply* 44-46. In opposition, the TCC posits that Brenntag is liable regardless because the facts of this case implicate the other two policy concerns outlined in *Ramirez*; namely, continued use of goodwill and equipment, and risk-spreading. Thus, in determining the likelihood of success of product-line claims under New Jersey law, this Court must first consider whether the causation element is a prerequisite to the application of the product-line exception.

At least one New Jersey state case holds that this first *Ramirez* criterion—that the transaction destroyed the original manufacturer's availability as a defendant—is *not* an essential element for imposition of product-line liability. In *Pacius*, the state court ruled that "[i]t was the fact of nonviability of the predecessor company which governed the imposition of liability, not the reason for it." *Pacius v. Thermtroll Corp.*, 259 N.J. Super. 51, 56, 611 A.2d 153, 156 (Law. Div. 1992). However, several New Jersey courts have since rejected the holding in *Pacius* as overly broad. *See, e.g.*, *Ryan v. Smith*, 2010 WL 743946, at *3 (D.N.J. Mar. 4, 2010); *Saez v. S & S Corrugated Paper Mach. Co.*, 302 N.J. Super. 545, 557, 695 A.2d 740, 746 (App. Div. 1997). Having found no binding authority, the Court considers decisions in other jurisdictions that similarly permit use of the product-line exception, as well as the rationale underpinning New Jersey's product-line exception.

First, the Court looks to Pennsylvania law. In doing so, this Court acknowledges that the Pennsylvania Supreme Court has not yet adopted the product-line exception. *See Burnley v. Loews Hotel*, 2026 PA Super 43, 355 A.3d 328, 347 (2026), *appeal denied*, No. 106 EAL 2026, 2026 WL 2717926 (Pa. Sept. 15, 2026) (citing *Schmidt v. Boardman Co*., 608 Pa. 327, 360, 11 A.3d 924, 944 (2011) and noting that "the Pennsylvania Supreme Court did not expressly adopt the product line exception")). Nevertheless, several Pennsylvania trial and intermediate appellate courts have recognized a product-line theory of successor liability. *See, e.g., Dawejko v. Jorgensen Steel Co.*, 290 Pa. Super. 15, 434 A.2d 106 (1981). Unfortunately, these courts have reached varying conclusions regarding whether the causation element is mandatory. *See Lacy v. Carrier Corp.*, 939 F. Supp. 375, 383–84 (E.D. Pa. 1996) (noting "there is a split in authority as to whether Pennsylvania law requires that the defendant's acquisition of the manufacturer 'caused' the destruction of the plaintiff's remedy, as opposed to a later event such as the manufacturer's

bankruptcy, for use of the product line exception"); *Compare id.* (collecting cases and concluding that "a plaintiff does **not** have to demonstrate that it was the purchaser corporation's acquisition that destroyed the plaintiff's remedy against the manufacturer in order to apply the product-line exception") (emphasis added); *with Fisher v. Am. Int'l Indus.*, 2024 PA Super 69, 313 A.3d 1140, 1150 (2024) (stating that, implicit in a finding for product-line exception, is a finding that a successor's acquisition of the original manufacturer destroyed a plaintiff's remedies against the original manufacturer) *and Dale v. Webb Corp*., 252 F. Supp. 2d 186, 193 (E.D. Pa. 2003) (finding that "the causation requirement is an essential element of Pennsylvania's product-line exception").

In interpreting Pennsylvania law, federal courts have been compelled to predict whether the Pennsylvania Supreme Court would adopt the theory and, if so, whether it would rule that the causation element was essential to its application. The Third Circuit answered that question in the affirmative, predicting that the Pennsylvania Supreme Court would require that the "virtual destruction of the plaintiff's remedies against the original manufacturer [be] caused by the successor's acquisition." *Conway v. White Trucks, A Div. of White Motor Corp*., 885 F.2d 90, 97 (3d Cir. 1989). In so ruling, the Third Circuit observed that "many of the cases analyzing the applicability of successor liability have emphasized the *Ray* requirement that the asset transfer must have caused the destruction of plaintiff's remedy." *Id.* at 95 (collecting cases and citing the requirement set by the California Supreme Court in *Ray v. Alad Corp.,* 19 Cal.3d 22). Because the successor's acquisition in *Conway* had not caused the original manufacturer's nonviability, the Third Circuit upheld the lower court's dismissal of plaintiff's product-line successor liability claims.

Shortly after the ruling in *Conway*, a district court in the Eastern District of Pennsylvania was compelled to make this same prediction—i.e. if the Pennsylvania Supreme Court were to

adopt the product-line exception, would it rule that the causation element was essential to its application? *See Tracey by Tracey v. Winchester Repeating Arms Co*., 745 F. Supp. 1099 (E.D. Pa. 1990), aff'd, 928 F.2d 397 (3d Cir. 1991). In *Tracey*, the record clearly established that plaintiff's remedies against the original manufacturer were destroyed by the manufacturer's decision to place itself into a receivership, not by any sale to the successor. In rendering its ruling, the *Tracey* court looked to a Ninth Circuit case, *Nelson v. Tiffany Indus., Inc*., 778 F.2d 533, 537 (9th Cir. 1985), in which it was the original manufacturer's bankruptcy—and not the sale of assets to a successor—that destroyed plaintiff's remedies against the original manufacturer. The Ninth Circuit in *Nelson*, in turn, relied on *Ray*—the case on which New Jersey's product-line exception is largely premised. *See Ramirez*, 86 N.J. 349-53 (discussing *Ray v. Alad Corp.*, 19 Cal. 3d 22). After analyzing the rationale and policies underlying the product-line exception (and the decisions in *Ray* and its progeny), the *Tracey* court concluded that "if the Pennsylvania Supreme Court were to adopt the product-line exception, it would . . . require as a prerequisite to applying the exception some showing of causation." *Tracey by Tracey v. Winchester Repeating Arms Co*., 745 F. Supp. 1099, 1108 (E.D. Pa. 1990), aff'd, 928 F.2d 397 (3d Cir. 1991). Several other federal courts in this circuit have followed the reasoning in *Tracey* and *Conway*. *See e.g., Buck v. Endo Pharms*., *Inc*., No. CV 19-837, 2019 WL 1900475, at *5 (E.D. Pa. Apr. 29, 2019); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 510 (D.N.J. 2011).

This Court's analysis would be incomplete if it did not recognize that a superior court in Pennsylvania recently stated that "the Pennsylvania Supreme Court [in *Schmidt*] . . . confirmed that *none* of the *Ray* factors is mandatory[.]" *Burnley*, 355 A.3d at 347 (citing *Schmidt v. Boardman Co*., 608 Pa. 327, 360, 11 A.3d 924, 944 (2011)). However, this Court reviewed the decision in *Schmidt* and determines that the Pennsylvania Supreme Court made no such affirmative

confirmation regarding the *Ray* factors.[27] Instead, the *Schmidt* court clarified that it had "not yet decided on developed reasoning whether to adopt [the product-line exception] in the first instance" and simply pointed out "inconsistencies in the Superior Court's application of the exception it has adopted[.]" *Schmidt*, 608 Pa. at 359. Specifically, the *Schmidt* court observed that, in the case under review, the lower court had found the *Ray* factors mandatory. This was inaccurate, said the Pennsylvania Supreme Court, because the lower court had relied on the rationale in *Dawejko*, which derived its product-line exception from the New Jersey case, *Ramirez*—not the California case, *Ray*. And because *Dawejko* adopted a flexible test under *Ramirez*, the Pennsylvania Superior Court relying on *Dawejko* should not have held that any of the *Ray* factors were mandatory.

Ultimately, this Court's research produces no conclusive result. While Pennsylvania lower courts presently recognize the product-line exception, it is applied inconsistently. *Compare Hodges v. Baja Marine Corp*., No. 1866 MDA 2012, 2013 WL 11257084, at *5 n.2 (Pa. Super. Ct. July 9, 2013) (agreeing that, under Pennsylvania law, a claim under the product-line exception to successor immunity does not exist where a plaintiff is "unable to show destruction of their remedies against the original manufacturer"); *with Burnley*, 355 A.3d at 347 (stating that the *Ray* factors are not mandatory; but nevertheless acknowledging that the jury "was provided with sufficient evidence to determine whether the successor corporation's acquisition of the product line in question resulted in the virtual destruction of the [plaintiffs'] remedies against . . . the original manufacturer"). The Pennsylvania Supreme Court has not ruled that the exception should exist in the state—let alone set forth a test for its application. *See Fizzano Bros. Concrete Prods. v. XLN,*

[27] Moreover, the decision in *Burnley* was delivered by a heavily divided panel, and featured a vigorous and thorough dissent, which this Court finds persuasive. *See Burnley v. Loews Hotel*, 2026 PA Super 43, 355 A.3d 328, 379 (2026), appeal denied, No. 106 EAL 2026, 2026 WL 2717926 (Pa. Sept. 15, 2026) (Bowes, J. dissenting) ("I would rule in the case *sub judice* that the first *Ray* factor is mandatory.").

*Inc.*, 615 Pa. 242, 269, 42 A.3d 951, 967 (2012) ("[P]rocedural matters in *Schmidt* obviated the necessity for this Court to then rule upon whether the product-line exception should continue as the law of the Commonwealth."); *Schmidt*, 608 Pa. at 359. Given the uncertainty, it is unclear how—and if—Pennsylvania courts will apply the exception going forward.[28] What *is* clear, however, is that even the Pennsylvania courts that do not find the causation element *mandatory* hold that it is a highly *important* factor when considering liability. *See McLaud v. Indus. Res., Inc.*, 715 F. App'x 115, 119 (3d Cir. 2017) (citing *Dawejko* and collecting cases stating that the first factor is "logically the most important" because imposing liability where an acquisition virtually destroyed remedies against the original manufacturer reflects the policy considerations underlying the product-line exception).

Having found no clear guidance under Pennsylvania law, this Court looks to the law in other jurisdictions. Only three other states have adopted the product-line exception: California, Washington, and New Mexico. *See Ray,* 560 P.2d 3; *Garcia v. Coe Mfg. Co.*, 1997-NMSC-013, 123 N.M. 34, 933 P.2d 243 (1997); *Martin v. Abbott Lab'ys*, 102 Wash. 2d 581, 615, 689 P.2d 368, 388 (1984). Two of those—California and Washington—have ruled that the exception does not apply *unless the successor's acquisition caused the destruction of a plaintiff's remedy* against the initial manufacturer—in other words, the causation requirement is mandatory. *See, e.g. Little v. Hardie-Tynes Co.*, 35 Wash. App. 2d 638, 646, 574 P.3d 1066, 1072 (2025), review denied, 6 Wash. 3d 1007, 589 P.3d 785 (2026) ("A key premise of the product line exception is that successor liability is only appropriate when the successor corporation by its acquisition actually played some

---

[28] This Court notes that application of Pennsylvania law is not out of the question because Brenntag's US headquarters is located there. *See* Brenntag (US) Home Page, https://www.brenntag.com/en-us/ (last visited Oct. 13, 2026) (listing the address for Brenntag North America LLC as 5083 Pottsville Pike, Reading, PA 19605). To the extent Pennsylvania's product-line case law were applied to the claims at issue in this case, causation would be an essential element, and the claims would fail for the reasons discussed *infra*.

role in curtailing or destroying the claimants' remedies.") (quoting *Hall v. Armstrong Cork, Inc*., 103 Wash. 2d 258, 263, 692 P.2d 787, 790 (1984)); *Gentle v. Portland Orthopaedics Ltd*., 2018 WL 771333, at *7 (E.D. Wash. Feb. 7, 2018) (finding no product-line liability under Washington law because the successor company did not cause the destruction of plaintiff's remedy against the original manufacturer); *Hernandez v. Enter. Rent-A-Car Co. of San Francisco*, 37 Cal. App. 5th 187, 202, 249 Cal. Rptr. 3d 467, 479 (2019) (finding no viable product-line claim under California law because the original manufacturer entered bankruptcy through no fault of the acquiring entities); *Fuit v. Extreme Prods. Grp., L.L.C.*, 2018 WL 1801914, at *4 (D. Utah Apr. 13, 2018) (applying California law and finding no product-line claim because the successor entity played no role in destroying plaintiff's remedies against original defendant). These decisions are, of course, merely persuasive, and not determinative of how the New Jersey Supreme Court would rule.

To gain further insight, this Court returns to the rationale in *Ramirez*, in which the New Jersey Supreme Court expanded traditional notions of corporate successor liability to protect the interests of parties to products liabilities actions. In setting the stage for expansion of liability, the *Ramirez* court criticized the "narrow[,]" traditional approach as "plac[ing] unwarranted emphasis on the form" of a given corporate transaction. *Ramirez*, 86 N.J. at 341. The court in *Ramirez* believed the focus should, instead, be on "the practical effect of a particular corporate transaction." *Id.* at 342. An exception to the traditional rule of nonliability was developed in *Ramirez* to balance parties' rights and interests "following corporate acquisitions." *Id.* And in justifying the nonliability exception, the *Ramirez* court explained that "[t]he form of *the corporate transaction by which* [the successor] acquired the manufacturing assets of [the original manufacturer] should not be controlling as to [the successor's] liability for the serious injury suffered by plaintiff . . . ." *Ramirez*, 86 N.J. at 343 (emphasis added).

Given *Ramirez*'s repeated emphasis on the need for the product-line exception to protect parties from the impact of a corporate transaction, it is difficult to imagine how the corporate transaction, itself, can be divorced from the exception's application. Under the rationale in *Ramirez*, if "the practical effect of a particular corporate transaction" did not negatively impact the ability of persons injured by defective products to recover, then there would be no need for an exception. Accordingly, this Court finds it likely that causation—the corporate transaction's effective destruction of a plaintiff's remedy against the original manufacturer—is an essential element for application of the product-line exception under New Jersey law. *See Ramirez*, 86 N.J. at 358, (Schreiber, J., concurring) ("The central thesis of this methodology is premised on the elimination by the successor of an effective remedy. *That is an essential condition precedent to recovery*.") (emphasis added). Indeed, this was the situation the New Jersey Supreme Court was presented with in *Ramirez*. *See Ramirez*, 86 N.J. at 350 ("[T]he plaintiff's potential remedy against Johnson, the original manufacturer of the allegedly defective press, was destroyed by the purchase of the Johnson assets, trade name and good will, and Johnson's resulting dissolution.").

This conclusion is supported by case law. *See, e.g.*, *Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 99 (3d Cir. 1994) (explaining that the first *Ramirez* factor contemplates that "the sale of the enterprise virtually destroyed the injured party's remedy against the original manufacturer" and stating that "[t]he first factor, the destruction of the injured party's remedy is a *necessary* but not a *sufficient* basis on which to place liability on the successor") (emphasis in original); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2025 WL 2228835, at *6 (D.N.J. Aug. 5, 2025) (identifying as a fundamental policy concern that "*the successor's acquisition of the original manufacturer's business caused* a 'virtual destruction of the plaintiff's remedies against the original manufacturer'") (quoting *Ramirez*, 431 A.2d at 820) (emphasis

added); *Perlman v. Virtua Health, Inc.*, 2005 WL 8174806, at *4 (D.N.J. Apr. 12, 2005) (explaining that when the original manufacturer is no longer viable, "each viable [successor] company that succeeded the manufacturer--and thus 'caused' the destruction of plaintiff's remedy against the original manufacturer --can be held liable"); *Holloway v. State*, 237 N.J. Super. 71, 75, 566 A.2d 1177, 1180 (Law. Div. 1989) (affirmatively holding that "[t]he successor corporation must cause the destruction by its acquisition of the predecessor corporation" for the product-line exception under *Ramirez* to apply).

With this in mind, the Court finds it highly unlikely that the product-line successor liability claims in this case will succeed under New Jersey law. It is undisputed that the 2004 Transaction did *not* destroy WCD's viability as a defendant. WCD continued addressing, resolving, and paying out claims for 19 years after the corporate transaction that potentially gives rise to Brenntag's liability. WCD lost viability as a defendant as a result of judgments against it and, ultimately, its voluntary bankruptcy—not as a result of any corporate transaction. Because Brenntag's acquisition did not cause the destruction of plaintiffs' remedies against WCD, the fairness contemplated in *Ramirez* is not served by such a broad extension of the exception.

Further, courts seemingly unanimously hold that the lack of an available remedy against the original manufacturer is a prerequisite for application of the product-line exception. *See, e.g. Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 99 (3d Cir. 1994) ("The first factor, the destruction of the injured party's remedy is a *necessary* but not a *sufficient* basis on which to place liability on the successor [under *Ramirez*].") (emphasis in original); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. CV 16-2738, 2025 WL 2228835, at *6 (D.N.J. Aug. 5, 2025) (collecting cases stating that "the Court's focus is whether the original manufacturer is viable") (citations and quotations omitted). The social policies underlying

extension of liability in cases like *Ramirez* and *Ray* (and their progeny) simply do not exist where the original manufacturer remains a viable defendant. The Third Circuit has stated that "if the selling corporation remains a viable entity able to respond in damages to the injured party, a successor acquiring a product line will not be liable for injuries caused by the predecessor's product after the product's sale as in that circumstance there would be no reason to impose successor liability." *Leo*, 37 F.3d at 99–100. Therefore, setting aside the question of whether the product-line exception requires that the corporate transaction—itself—destroyed the original manufacturer's viability, a court evaluating the Successor Liability Claims must determine whether the exception applies where elimination of recovery against the original manufacturer not occur for nearly two decades *after* the corporate transaction. Notably, this was not the situation in *Ramirez.* There, the injuries occurred long after the corporate transactions at issue—the plaintiffs *never* had a remedy against the original manufacturer and could only look to its successors to recover damages. The New Jersey Supreme Court's extension of liability was grounded in fairness and a determination that—when choosing between an innocent injured party or a successor corporation—the successor corporation should bear the costs of injury from an allegedly defective product. Here, in contrast, the original manufacture bore the costs for 19 years, rendering such a difficult choice unnecessary.[29]

To be clear, this Court makes no affirmative determination as to how the New Jersey Supreme Court would resolve these issues. For purposes of this Motion, it is enough to observe

[29] The Court acknowledges that, in *Ramirez*, the New Jersey Supreme Court discussed time-limitations in the context of defendants' argument that it was unfair to impose liability so long after the corporate transaction giving rise to successor liability. The *Ramirez* court commented that "only the legislature is authorized to establish a limitation," *Ramirez*, 86 N.J. at 355, and—in dicta—the Court essentially called for a legislative response, *id.* at 356. To date, no such legislation has been introduced. However, the Court reiterates that the situation in *Ramirez* is factually distinguishable from the case at hand. Here, plaintiffs maintained a remedy against original manufacturer for 19 years.

that—even if New Jersey law were to apply—claims brought under the New Jersey product-line theory would face substantial challenges. Simply put, the Court agrees with Debtors that WCD's continued viability for 19 years after the 2004 Transaction "poses a material risk to the likelihood of success on a product-line theory." *Debtors' Reply* ¶ 66, Dkt. No. 1665. This uncertainty weighs strongly in favor of the Settlement.

Berkshire asserts that "[c]laimants will also struggle to prove the second element [of the *Ramirez* test]—that it is fair to require Brenntag to take on a risk-spreading role and assume responsibility for WCD's allegedly defective talc products." *Berkshire's Reply* 46, Dkt. No. 1680. The TCC summarily pronounces that "there is no realistic doubt that Brenntag is liable" based on the "public policy of spreading the risk to society at large for the cost of injuries from defective products[.]" *TCC Obj.* ¶ 97, Dkt. No. 1606 (citing *Ramirez*, 431 A.2d at 820; *Nieves*, 431 A.2d at 830-31). No further analysis is provided. In reviewing the cases cited by the TCC—and in conducting its own research—the Court determines that, as with everything in this case, the claimants' success in proving this second, risk-spreading element, is possible, but certainly not guaranteed.

In *Nieves*—one of the cases cited by the TCC—the court emphasized that liability on the successor corporation was appropriate because the successor "had virtually the same capacity as [the original manufacturer] to estimate the risks of claims for injuries from defects . . . and to bear the costs of minimizing or avoiding those" injuries. *Nieves*, 431 A.2d at 830-31. And the rationale for the risk-spreading factor set forth in seminal cases like *Ramirez* and *Ray* focuses on the *knowledge* needed to gauge the risk of injury and the *ability* to satisfy liability. *See Ramirez,* 86 N.J. at 352; *Ray,* 19 Cal. 3d at 25. Here, it is arguable that Brenntag, which utilized WCD's facility, equipment, and inventory after the 2004 Transaction, was in a position to understand the risks of

injury to end-users of the products. Furthermore, it is undisputed that Brenntag—through its indemnification agreements—would have the ability to satisfy claims against it.

In evaluating this *Ramirez* factor, this Court acknowledges that the focus for purposes of the risk-spreading element rests on the successor's knowledge and ability to assess and assume the risk of injury. As a New Mexico state court succinctly explained

> Whether liability should be imposed depends on whether the successor has the same ability as its predecessor to assess, control, and distribute the risks and costs of injuries caused by a product defect. If it does, we must still determine whether under the facts of a particular case this ability is nevertheless outweighed by the policies underlying the contract-law-based rule of successor corporation nonliability[.]

*Garcia v. Coe Mfg. Co.*, 123 N.M. 34, 39, 933 P.2d 243, 248 (1997).

Thus, this factor involves balancing competing public policies; namely, which entity—the successor or the user of the product—is in a better position to bear the cost of injury. One could argue that, while the New Jersey's public policy in favor of risk-spreading to a successor may be outweighed by other policies (i.e. fairness and policies underlying contract law), when presented with the choice between burdening an innocent product-user or a corporation who had the same knowledge and resources as the original manufacturer, it is more likely that the successor will be deemed liable.

Admittedly, the 2004 Transaction was brokered with the specific intention that Brenntag would *not* assume liability. Thus, as Berkshire points out, it is arguably unfair to impose liability on a successor under these circumstances. *Berkshire's Reply* 46-47, Dkt. No. 1680 (citing *Chaknova v. Wilbur-Ellis Co.*, 69 Cal. App. 4th 962, 81 Cal. Rptr. 2d 871 (1999)). This argument—standing alone—is unavailing. The circumstances in *Chaknova*, the case relied upon by Berkshire, are distinguishable. *See Chaknova v. Wilbur-Ellis Co.*, 69 Cal. App. 4th 962, 81 Cal. Rptr. 2d 871

(1999). There, the court determined it would be unfair to impose liability on a successor because the successor had not been in the asbestos business for 35 years, had only been in the business for a short time, and it was "impossibil[e] at the time [of the transaction for the successor to] envision[] the need to spread such an enormous but then unknown risk." *Chaknova*, 69 Cal. App. 4th at 973. The facts of this case differ greatly. These talc claims were not unforeseeable and, in fact, were accounted for in the transaction. The fact that the TCC and FCR value the claims significantly higher than do Debtors or Brenntag does not change the risk-spreading analysis. Brenntag stands in a comparable position to WCD in terms of its ability to assess the risk of injury posed by the product. Therefore, at first blush it appears that this second element could be satisfied under New Jersey law.

However, the Court cannot ignore the significant factual differences between the instant case and those cases that form the foundation of the product-line exception to successor liability. Specifically, the courts in *Ramirez*, *Ray*, and *Nieves* each premised their risk-spreading basis for imposition of the product-line exception on the fact that "the successor corporation acquired the resources that had previously been available to the original manufacturer for meeting its responsibilities to persons injured by defects in its line of products." *Nieves*, 86 N.J. at 369; *Ramirez,* 86 N.J. at 352; *Ray,* 19 Cal. 3d at 25. The same is not true in the instant case. Instead, WCD retained assets and resources needed to satisfy its liability and did so for 19 years following Brenntag's acquisition. Thus, the risk-spreading analysis that led to extension of liability in *Ramirez* and its progeny applied to factual circumstances significantly distinct from those present in this case; and it is unclear the impact that WCD's continued viability would have on this second *Ramirez* factor.

As to the final factor in *Ramirez*—the fairness of imposing liability based on the successor's enjoyment of the original manufacturer's good will through continued operation of the business—the Court determines that it could likely be established here.[30] Nevertheless, it remains doubtful that such factor, by itself, can bear the weight necessary to impose liability under the product-line exception.

Ultimately, a court applying the product-line exception under New Jersey law must evaluate all the *Ramirez* considerations and balance fairness among the parties given the facts of the case. In order to succeed on these Successor Liability Claims under a product-line theory, a court would have to conclude that that it is fair to impose liability on a successor where the first *Ramirez* factor is absent and the second is uncertain. In this Court's view, such a conclusion seems unlikely given the significant factual differences; namely, the 19-year continued viability of the original manufacturer. In any event, the foregoing analysis demonstrates that the Successor Liability Claims face numerous merited challenges, which weighs in favor of settlement under *Martin*.

#### c. Fraud Claims

Next, the TCC argues that the Debtors' fraud-based successor liability claims are likely to succeed against Brenntag. *See TCC Obj.* ¶¶ 103-106, Dkt. No. 1606. The TCC analyzes this theory under New Jersey law but observes that the law is the same in Delaware. *Id.* at ¶ 103 n.175 (citing

[30] The Debtors, Brenntag, and Berkshire Entities do not dispute this element; therefore, the Court declines further analysis on this point.

*Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392)).[31] Accordingly, a choice-of-law analysis is unnecessary for fraud-based claims.

The TCC concludes that fraud-based claims are "extremely likely to succeed" because "[t]he 2004 Transaction is rife with badges of fraud that establish Brenntag's liability[.]" *TCC Obj.* at ¶ 103. However, the Court finds that the TCC's position manifestly overestimates the likelihood of success of these claims—whether they are based on actual or constructive fraud. Rather, it is improbable that the Successor Liability Claims would succeed under either fraud-based theory.

"The fraudulent transfer theory of successor liability is governed by the New Jersey Uniform Fraudulent Transfer Act, N.J.S.A. § 25:2-20, et seq. ('UFTA')." *A.M.E. Inc. v. T.R. Ricotta Elec., Inc.*, 2023 WL 3841746, at *2 (D.N.J. June 6, 2023); *see also Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392, at *3 (Del. Ch. Sept. 5, 2023) (explaining that fraudulent transfer claims in Delaware are governed by the Delaware Uniform Fraudulent Transfer Act (DUFTA)). Under the UFTA, a transfer is fraudulent if it is made with "actual intent to hinder, delay or defraud any creditor of the debtor." *See Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392, at *10 (citing Del. Code Ann. tit. 6, § 1304); *A.M.E. Inc. v. T.R. Ricotta Elec., Inc.*, 2023 WL 3841746, at *3 (D.N.J. June 6, 2023) (citing N.J. STAT. ANN. § 25:2-25).[32] And in the successor liability context, the fraud exception does not apply unless the transaction at issue was undertaken with the purpose of escaping liability. *See, e.g.*, *Cleveland-*

---

[31] The TCC also asserts that the law is the same in New York. *See TCC Obj.* ¶ 103 n.175 (citing *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201 (2d Cir. 2006)). This Court agrees. *See, e.g. Nieves v. Highland Operating, Ltd.*, 252 A.D.3d 651 (N.Y. App. Div. 2026) (collecting cases).

[32] To the extent an action in New York is filed under the New York Uniform Voidable Transactions Act, the analysis remains unchanged because the Act likewise looks to an "actual intent to hinder, delay or defraud any creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a); *see also Precious Care Mgmt., LLC v. Monsey Care, LLC*, 221 A.D.3d 922, 201 N.Y.S.3d 104 (2023) (explaining that causes of action alleging, among other things, conveyances made with intent to defraud are governed by the Uniform Voidable Transactions Act).

*Cliffs Burns Harbor LLC v. Boomerang Tube, LLC, et al.*, No. 2022-0378-LWW, 2026 WL 2925766, at *14 (Del. Ch. Sept. 28, 2026).

Evaluation of these types of claims is fact-intensive and plaintiffs asserting actual fraud must plead their claims with a heightened level of specificity and prove the elements of their claim by a preponderance of the evidence. *Cleveland-Cliffs*, 2023 WL 5688392, at *10 (citing *Ki-Poong Lee v. So*, 2016 WL 6806247, at *4 (Del. Super. Ct. Nov. 17, 2016) and explaining that fraudulent transfer claims must satisfy the heightened pleading standards of Superior Court Civil Rule 9(b)); *J.P. v. J.N.,* 2024 WL 178217, at *8 (N.J. Super. Ct. App. Div. Jan. 17, 2024) (citing *Motorworld, Inc. v. Benkendorf*, 228 N.J. 311, 326 (2017) and explaining burden of proof); *see also Avamer 57 Fee LLC v. Hunter Boot USA LLC*, 241 A.D.3d 401, 402, 241 N.Y.S.3d 181, 185 (2025) (explaining that, under New York law, plaintiff must make particularized allegations of fraud); *A.M.E. Inc.* 2023 WL 3841746, at *4 (discussing particularity requirements for a fraud claim). The TCC is not obligated to plead or prove these claims in the context of this Motion, or ever—these claims belong to the Debtor estates. Nevertheless, the fact-specificness, heightened pleading standard, and burden of proof regarding actual fraud claims is relevant to this Court's analysis because these stringent particularity requirements are likely to reduce the chances of success.

Moreover, the Court recognizes other challenges to the fraud-based theories of successor liability. As the TCC acknowledges, "[f]raudulent intent, by its very nature, is rarely susceptible to direct proof, [therefore] . . . actual intent often must be established through inferential reasoning, deduced from the circumstances surrounding the allegedly fraudulent act." *A.M.E. Inc.*, 2023 WL 3841746 (quoting *Gilchinsky*, 159 N.J. at 477) (cleaned up)). The UFTA lists several "badges of fraud" that may be considered in determining actual intent. *See, e.g.*, *Def. Acquisition Program Admin., Republic of Korea v. Kang*, No. A-3728-23, 2026 WL 1549485, at *12 (N.J. Super. Ct.

App. Div. June 2, 2026); *In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at *31 (Del. Ch. Jan. 25, 2013) (explaining badges of fraud under the DUFTA). The TCC contends that the 2004 Transaction is "rife with badges of fraud." *TCC Obj.* ¶ 105, Dkt. No. 1606. Specifically, the TCC cites the fact that the Debtors' asbestos liability was known to the parties at the time of the transaction and that the parties structured the deal so as to convey nearly every entity other than the debtor-entities liable for the asbestos claims. Second, the TCC points to a side agreement executed as part of the transaction, intended "to deliberately conceal from asbestos victims Brenntag's liability to pay for tort claims as a successor." *Id.* Taken together, the TCC asserts that these aspects of the sale transaction are, "more than enough to establish DBUS, Bain, and Brenntag's intent to defraud creditors and therefore Brenntag's successor liability for the Debtors' torts." *Id.* This Court does not agree.

The Court considers the TCC's first alleged badge of fraud: that the APAs excluded the entities responsible for the liability in question. While this could arguably suggest an intent to hinder or defraud creditors, it tells only half of the story. Absent from the TCC's argument is the fact that, in addition to keeping these liabilities, Debtors explicitly retained and received assets by way of the 2004 Transaction so that they could continue to satisfy both environmental and tort liabilities. When viewed in the context of the transaction as a whole, it is unlikely that courts would view the structure of the transaction as a badge of fraud. Rather, the record demonstrates that all parties to the 2004 Transaction anticipated that WCD had sufficient resources to satisfy asbestos and environmental claims following the transfer and, in fact, did so for nearly two decades—paying out over $330 million in settlement and remediation obligations. *Griffith Decl.* ¶ 15, Dkt. No. 1299.

As the Debtors suggest, accepting the TCC's argument (that excluding liability in a purchase agreement, in itself, signifies fraud) does not comport with existing law. The general rule is that an acquiring company is *not* liable for the debts and liability of the selling company merely because it is a successor in ownership—unless, of course, some exception applies. *See, e.g.*, *Lefever*, 160 N.J. at 310 (explaining the general rule and the four traditional exceptions under New Jersey law); *Cleveland-Cliffs Burns Harbor LLC,* 2026 WL 2925766, at *14 (same under Delaware law). Thus, the fact that a purchase agreement does not pass liabilities from a buyer to a seller is consistent with the general rule. *See, e.g.*, *Cleveland-Cliffs Burns Harbor LLC*, 2026 WL 2925766, at *14 ("It would be unjust to rewrite that bargained-for allocation of risk to hold [the buyer] liable for [the seller's] unsecured debts."). Were courts to accept the mere fact that an asset purchase agreement excludes certain liabilities as indicia of a fraudulent transfer—even though the seller continued satisfying those liabilities—then any agreement wherein the purchaser does not assume *all* liabilities would indicate fraudulent intent. This is patently illogical and cannot be an acceptable conclusion. Likewise, the TCC's concerns regarding a side agreement in which the parties agreed to deflect responsibility away from Brenntag and back towards WCD (which retained significant assets) is unpersuasive for the same reason.

The Court reiterates that "the purpose of the UFTA is to prevent a debtor from placing his or her property beyond a creditor's reach." *J.P. v. J.N.*, 2024 WL 178217, at *8 (quoting *Gilchinsky*, 159 N.J. at 475 (cleaned up); *see also Ross v. Desa Holdings Corp.*, 2008 WL 4899226, at *4 (explaining that imposing successor liability on a purchaser under Delaware law is appropriate in limited situations, where avoidance of liability would be unjust). Indeed, "[t]he The New Jersey Supreme Court has held 'the UFTA's fundamental objective: [is] to protect creditors from transactions that are either intended to defraud them or otherwise deprive them of assets to which

they are entitled.' " *Geyer v. Geyer*, No. A-1259-24, 2026 WL 1028129, at *5 (N.J. Super. Ct. App. Div. Apr. 16, 2026) (quoting *Motorworld, Inc. v. Benkendorf*, 228 N.J. 311, 327, 156 A.3d 1061, 1070 (2017)). Here, the 2004 Transaction neither transferred property beyond a creditor's reach, nor deprived them of assets—the debtor continued satisfying creditor-claims for 19 years after said transaction. Therefore, it is difficult to reconcile the facts of this case with the underlying purpose of the UFTA and the limited exceptions to the general rule for successor liability.

Similarly, the Court finds that plaintiffs are also unlikely to succeed under a constructive fraudulent transfer theory of liability. To plead a claim for constructive fraudulent transfer under the UFTA, a plaintiff must allege "(i) that the transferor failed to receive reasonably equivalent value for the asset transferred; and (ii) that the transferor was insolvent at the time of the transfer, or was rendered insolvent by the transfer." *Cleveland-Cliffs*, 2023 WL 5688392, at *9 (quoting *In re Samson Res. Corp.*, 2023 WL 4003815, at *24 (Bankr. D. Del. June 14, 2023)); *see also* DEL. CODE ANN. tit. 6, § 1304(a)(2); N.J. STAT. ANN. § 25:2-25(a)(2); *Sun Nat. Bank v. Visci*, No. A-0317-10T4, 2011 WL 2410238, at *7 (N.J. Super. Ct. App. Div. June 8, 2011) (discussing constructive fraud or "fraud-in-law" under New Jersey law). Again, these claims are fact-intensive and subject to the same heightened pleading standards. *See, e.g.*, *Cleveland-Cliffs*, 2023 WL 5688392, at *10. Here, it is undisputed that WCD was neither insolvent, nor rendered insolvent by the APA. Additionally, nothing in the record suggests that WCD did not receive reasonably equivalent value for the assets transferred. Accordingly, it is difficult to imagine how Debtors—or, if permitted, plaintiffs—could succeed under this approach.

In sum, the likelihood of success under a fraud-based theory is undercut by the undisputed facts of the case. Nothing in the record suggests that the 2004 Transaction was designed to enable the transferor, WCD, to avoid its liability or place its assets beyond its creditors' reach. The

evidence suggests quite the opposite. The Court is cognizant that the APA was designed, in part, to insulate the purchaser, Brenntag, from liability; however, the protections afforded to a buyer are not the focus of the inquiry for a fraud claim. Instead, courts evaluate the seller's financial capacity and intent in completing the transaction. *See, e.g.*, *Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392 (focusing on the transferor's financial status and intent in completing the transaction). To be clear, the Court does not find that a fraud-based claim would definitively *not* succeed. However, the facts of this case as applied to the law indicate that such a claim is *unlikely to* succeed. Again, this weighs heavily in favor of the Settlement.

**d. Probability of Success Summary**

Ultimately, the Court agrees with the Debtors that the choice of law analysis "is a complex, disputed analysis on which there is no obvious answer and no clearly on-point caselaw." *Debtors' Reply* ¶ 60, Dkt. No. 1665. The choice of law determination is significant because the probability of success on the product-line claims—the theory which the TCC characterizes as Debtors' "strongest", *TCC Obj*. ¶ 92, Dkt. No. 1606—varies greatly depending on which state's law applies. Because the majority of states do not adopt a product-line exception to successor liability, the uncertainty in applicable law means that the claims are unlikely to succeed and favors approval of the Settlement. And, as discussed, even assuming that New Jersey law applies to the product-line claims, this Court is extremely skeptical that such claims would succeed, given the facts of this case. Finally, for reasons previously expressed, the Court finds it highly unlikely that the fraud-based claims would succeed under the circumstances. For the foregoing reasons, this Court concludes that success on *any* Successor Liability Claim is improbable. Nevertheless, for purposes of this Motion, and to ensure a conservative analysis, the Court will generously peg the probability

of success at 50%. In reality—for reasons expressed—the Court believes this success rate to be substantially lower.

**2. The Likely Difficulties in Collection**

The TCC asserts that there are "no plausible issues with collectability." *TCC's Obj.* at 43, Dkt. No. 1606. In contrast, Counsel for Brenntag asserts that its indemnification rights "severely complicate collection" on the Successor Liability Claims. *Brenntag's Reply* at ¶ 9, Dkt. No. 1662. Brenntag points out that it is "fully indemnified for the ***entire amount*** of any claims that allege exposure to WCD talc, regardless of whether such claims also allege exposure to talc distributed by Brenntag in and after 2004." *Id.* (emphasis in original). Thus, Brenntag contends that Debtors would not be able to collect on any claims until such time as this Court determines the scope of Brenntag's indemnity rights and conducts a fact-intensive inquiry into Brenntag's defenses. *Id.* Brenntag also asserts that the doctrine of equitable recoupment casts further doubt on Debtors' ability to recover from Brenntag on the Successor Liability Claims. *Id.* at ¶ 10. Debtors likewise argue that the TCC "downplays the risk surrounding an equitable recoupment defense," and that the TCC's failure to discount their valuation based on this potential defense is "reckless and unrealistic." *Debtors' Reply* ¶ 80, Dkt. No. 1665.

Equitable recoupment—which is not codified but is recognized under Third Circuit precedent—is a doctrine that permits a claim to "avoid[] the usual bankruptcy channels" but still receive full value by "netting . . . obligations between a creditor and the debtor[.]" *In re Revel AC Inc*., 909 F.3d 597, 603 (3d Cir. 2018) (quoting *In re Flagstaff Realty Assocs*., 60 F.3d 1031, 1035 (3d Cir. 1995)). In brief, where a debtor and creditor owe debts to each other arising from the same transaction, equitable recoupment serves to reduce each party's obligation. Thus, a creditor is essentially paid on its claim (by having its own indebtedness to the debtor reduced) "without

regard to the bankruptcy priority of the claim," and possibly ahead of other creditors who would otherwise be entitled to priority under the Bankruptcy Code. *Id.* Importantly, for equitable recoupment to apply, the debts in question must *arise from the same transaction*. *Id*; *see also In re Hollister Constr. Servs., LLC*, No. 19-27439, 2023 WL 2466427, at *8 (Bankr. D.N.J. Mar. 10, 2023) (collecting cases).

The Court has no doubt—as Debtors allege, and as Brenntag has indicated—that Brenntag will fiercely defend itself against the Successor Liability Claims, and against collection efforts for any successful claims, for example, by invoking the doctrine of equitable recoupment. The TCC argues that equitable recoupment is inapplicable under these circumstances because the debts in question did not arise from the same transaction. *See TCC's Obj.* ¶¶ 110- 111, Dkt. No. 1606. However, this Court cannot ignore the argument that, but for the 2004 Transaction, neither party's liability would exist. Indeed, counsel for Brenntag emphasizes that "[u]nlike the talc claims ***against the Debtors***, the Debtors' successor liability claims ***against Brenntag*** exist only by virtue of the 2004 Transaction and the 2003 MSPA. Critically, the 2004 Transaction and the 2003 MSPA also unquestionably give rise to Brenntag's indemnification obligations." *Brenntag's Reply* ¶ 10, Dkt. No. 1662 (emphasis in original).

In contrast, the TCC attempts to frame Brenntag's liability for Successor Liability Claims and Debtors' indemnification liabilities as arising from "wholly separate 'transaction[s]'" *TCC's Obj.* ¶ 111, Dkt. No. 1606; *see also id.* at ¶ 110. However, the case law cited by the TCC does not support this argument and is distinguishable. *See Reading Co. v. City of Philadelphia*, 155 B.R. 890, 903 (E.D. Pa. 1993) (ruling that a debtor's claims against the city under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") did not arise from the same transaction as the city's indemnity provisions under railcar lease agreements with

debtor). No doubt, the relationship between the parties' obligations in this case remains debatable and requires a fact-specific application to determine whether the "same transaction" test for recoupment is satisfied. *See, e.g. In re Revel AC Inc.*, 909 F.3d at 603 (quoting *In re Univ. Med. Ctr*., 973 F.2d 1065, 1081 (3d Cir. 1992)) (explaining that "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations"). The Court need not—and, as instructed by case law—should not undertake such an inquiry in the context of evaluating the appropriateness of this Settlement. *See In re NovaPro Holdings, LLC*, 815 F. App'x at 658 (advising against conducting a "mini-trial" when evaluating a settlement). Rather, it is enough for this Court to note, as Debtors do, that "there are . . . plausible arguments that equitable recoupment *could* apply" in this case and act as a barrier to recovery. *Debtors' Reply* ¶ 80, Dkt. No. 1665. Thus, again, this factor weighs in favor of Settlement.[33]

The TCC further argues that there is no issue with respect to collectability because "any equitable recoupment claims asserted by Brenntag would be disallowed as contingent indemnification claims under 11 U.S.C. § 502(e)(1)(B)." *TCC's Obj.* ¶ 111, Dkt. No. 1606. Brenntag counters that this argument "misses the mark" and explains that Brenntag's recoupment rights are not subject to disallowance under this Code provision because they serve as an affirmative defense and are not a claim for reimbursement or contribution. *Brenntag's Reply* ¶ 12, Dkt. No. 1662. Under § 502, "three criteria that must be satisfied for a claim to be disallowed: '(i) the claim must be contingent, (ii) the claim must be for reimbursement or contribution, and (iii)

[33] Brenntag also argues that collection would be difficult because—prior to collection—this Court must make further fact-finding regarding the scope of Brenntag's indemnity rights and defenses, which litigation—Brenntag asserts—would be "protracted and complicated." *Brenntag's Reply* ¶ 9, Dkt. No. 1662. The Court determines that this argument is misplaced as it relates to the complexity of the litigation, whereas this second *Martin* factor focuses on the difficulties of collection.

the debtor and the claimant must be co-liable on the claim.' " *In re Caribbean Petroleum Corp.*, 566 F. App'x 169, 173 (3d Cir. 2014) (quoting *In re Touch America Holdings*, 409 B.R. 712, 715–16 (Bankr. D. Del. 2009)); 11 U.S.C. § 502(e)(1)(B). The TCC asserts that "Brenntag's contingent indemnification claims would easily satisfy the standard for disallowance under section 502(e)(1)(B)." *TCC's Obj.* ¶ 111, Dkt. No. 1606. Thus, the TCC summarily posits that any equitable recoupment claim would satisfy the first and second prongs of the § 502(e)(B)(1) analysis. The Court agrees in part.

Indeed, at this time, the first prong of the § 502(e)(B)(1) analysis would likely be satisfied because unsecured indemnification claims are contingent. *See, e.g. In re Touch Am. Holdings, Inc.*, 409 B.R. at 719. The Court must acknowledge, however, Debtors' argument that "the claims potentially assertable by Brenntag against the Debtors could become fixed (and not contingent) if successor liability claims against Brenntag succeed." *Debtors' Reply* ¶81, Dkt. No. 1665. Therefore, such claims could be deemed either allowable, or—if already disallowed—could be subject to reconsideration under § 502(j). *See, e.g., In re Caribbean Petroleum Corp.*, 566 F. App'x at 175 (3d Cir. 2014) (citing *In re Caribbean Petroleum Corp.*, 2012 WL 1899322, at *4).

With respect to the second prong, however—that the claim be for reimbursement or contribution—a fundamental quagmire arises. Namely, the TCC's argument conflates Brenntag's *indemnification claims* with Brenntag's *right to equitable recoupment*. They are not the same. "[T]he doctrine of equitable recoupment is an affirmative defense[.]" *In re Revel AC Inc.*, 909 F.3d at 604; *see also In re Hollister Constr. Servs., LLC*, 2023 WL 2466427, at *8 (collecting case describing equitable recoupment as a "shield" and a "defensive and narrow remedy") (citations omitted). Historically, its use "in bankruptcy derives from the rule that the trustee takes the bankrupt's property subject to the equities therein." *In re Monongahela Rye Liquors*, 141 F.2d 864,

869 (3d Cir. 1944) (citing *Bull v. United States*, 295 U.S. 247, 262, 55 S. Ct. 695, 700, 79 L. Ed. 1421 (1935) (stating that "recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded").[34] The inquiry for its application turns on whether a creditor's claim against a debtor "qualifies for equitable recoupment," *In re Revel AC Inc.*, 909 F.3d at 603, and—if so—the creditor can effectively bypass usual bankruptcy procedure and recover "to the exclusion of other creditors," *In re Anes*, 195 F.3d 177, 182 (3d Cir. 1999). The Third Circuit has characterized equitable recoupment as "a non-statutory, equitable exception to the automatic stay[.]' " *In re Revel AC Inc.*, 909 F.3d 597, 603 (3d Cir. 2018) (quoting *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir. 1992)). Thus, equitable recoupment is not derived from statute and is not concerned with the traditional procedures and policies underlying the Bankruptcy Code.

In contrast, the purpose of § 502(e)(1)(B) is—at its core—to "foster[] equitable distribution among all creditors of the same class." *In re Touch Am. Holdings, Inc.*, 381 B.R. 95, 109 (Bankr. D. Del. 2008) (quoting *In re Hemingway Transport, Inc.*, 993 F.2d 915, 923 (1st Cir. 1993). Specifically, where the filing of a contingent claim for contribution or reimbursement entails risk that the assets of the estate will be exposed to "double-dipping" by holders of the same underlying claim against the estate, § 502(e)(1)(B) mandates disallowance of the contingent claim and precludes redundant recoveries on identical claims. So, for example, where shareholders bring a

---

[34] Courts have noted that "[t]he justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations in setoff in bankruptcy would be inequitable." *In re HQ Glob. Holdings, Inc.*, 290 B.R. 78, 81 (Bankr. D. Del. 2003) (citing *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984)). As a corollary, one could argue that it would similarly be inequitable to apply the restrictions of disallowance under § 502(e)(1)(B).

lawsuit against a debtor-company and its officers and directors, the officers' and directors' claims against the debtor-company for indemnification for defense costs may be disallowed because the debtor-company is exposed to double-dipping: once from the shareholders by way of the claims in their lawsuit, and second by way of the officers' and directors' indemnification claims. Here, however, the Court is presented with the unique situation where the Debtors possess the Successor Liability Claims. Thus, it is difficult to conceive of how Debtors would be exposed to the same "double-dipping" concern that underscores disallowance under § 502(e)(1)(B). Nevertheless, for purposes of this analysis, the Court will assume that Brenntag's right to equitable recoupment is an indemnification claim that could be subject to disallowance under § 502(e)(1)(B) and, thus, satisfies the second prong of the test.

The third and final requirement for application of § 502(e)(1)(B) is that "the debtor and the claimant must be co-liable on the claim.' " *In re Caribbean Petroleum Corp.*, 566 F. App'x at 173. This co-liability element requires "a finding that the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay." *In re Touch Am. Holdings, Inc.*, 409 B.R. 712, 718 (Bankr. D. Del. 2009) (quoting *In re Wedtech Corp.,* 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988)). And, as the TCC observes, "the Debtors and Brenntag are both potentially liable for the same underlying talc claims." *TCC Obj.* ¶ 113, Dkt. No. 1606. Therefore, they are co-liable within the meaning of § 502(e)(1)(B), *see, e.g.*, *In re Caribbean Petroleum Corp.*, 2012 WL 1899322, at *3 (Bankr. D. Del. May 24, 2012), aff'd, 566 F. App'x 169 (3d Cir. 2014), and the third prong of the test is satisfied.

In sum, the Court determines that the pathway to collection is not as straightforward as the TCC suggests. While the Court finds it possible that the standard for disallowance under §502(e)(1)(B) could be met, it remains palpably suspect as to whether an affirmative defense for

equitable recoupment constitutes an indemnification claim that is even subject to the provision. The Court need not engage in an intellectual exercise to answer this question. Again, it is enough for purposes of this Rule 9019 analysis to find that the issue remains subject to significant contest. The Court also considers Brenntag's promise to fiercely defend itself against claims and collection efforts. On balance, the Court determines that this factor is neutral, at best.

#### 3. The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It

In their Motion, Debtors characterize the Successor Liability Claims as "complex and expensive litigation." *Debtors' Mot.* ¶ 76, Dkt. No. 1297. In their view, the issues are both factual and legal, and "likely concern[] events that took place over twenty years ago and for which memories have dramatically faded or for which witnesses may be unavailable." *Id.* The TCC, on the other hand, asserts that the factual issues have already been resolved, and "will not need to be litigated at length." *TCC Obj.* ¶ 117, Dkt. No. 1606. Thus, the TCC posits that "[t]he litigation that the Settlement seeks to resolve is not overly complex;" and that the third *Martin* factor weighs against approval of the Settlement. *Id.* at ¶¶ 115, 118. The Court is unpersuaded by the TCC's argument.

As an initial matter, Debtors and Brenntag dispute the TCC's assertion that factual issues are resolved. *See, e.g., Debtors' Reply* ¶ 86, Dkt. No. 1665 (pointing out that no post-2004 Brenntag employees have been deposed); *Brenntag's Reply* ¶ 15, 16, Dkt. No. 1662 (asserting that Brenntag will "aggressively litigate" and suggesting that "Brenntag's indemnification claims against the Debtors would need to be litigated alongside any successor liability claims"). Nevertheless, even if this Court assumes that discovery is complete and that the factual issues underlying the Successor Liability Claims have been established, what remains is the complex task of *application of the law* to the facts of each case. It is evident from the pleadings in this bankruptcy proceeding

that significant legal disputes remain. First and foremost, the parties vehemently disagree over one of the most fundamental aspects of the litigation; namely, *which law applies*. Thus, this Court determines that significant time and resources would be expended before any actual legal analysis begins. In addition, the parties dispute—among other things—the merits of the underlying claims, valuation of the claims, and applicability of the equitable recoupment doctrine. These issues present complex legal questions, litigation of which will result in substantial expense and delay.

Given these circumstances, the fact that some—or even all—discovery has been completed does not swing this *Martin* factor in the TCC's direction. Moreover, the case law cited by the TCC does not support its position. The TCC first cites *In re Diocese of Camden*, 653 B.R. 722, 744 (Bankr. D.N.J. 2023), pointing out that, in that case, the court denied the settlement motion "as failing to establish undue cost or complexity where experts believed claims may be worth around $100 million despite $15 million settlement." *TCC's Obj.* ¶ 116, Dkt. No. 1606. Omitted from the TCC's argument is the fact that the movant in the *In re Diocese of Camden* case presented no credible evidence as to the value of the policies involved in the settlement—a fact that was incorporated into the court's analysis of nearly every *Martin* factor in the opinion. The portion of the opinion cited by the TCC arose in the specific context of the third *Martin* factor because—although the movant had established that litigation would be costly and cause delay, which would reduce the claims' present value—the court could not properly assess the impact of the costs and delays or the appropriateness of settlement "without knowing what present value is." *In re Diocese of Camden*, 653 B.R. at 745. Here, the parties have presented ample evidence regarding valuation; therefore, the circumstances of this case are distinguishable from those of the *Diocese of Camden* case.

Further, the TCC relies on an out-of-circuit case, *In re Caubble*, 505 B.R. 857, 877 (Bankr. E.D. Ark. 2014), in support of its contention that the litigation is not complex because "most of the work necessary to litigate" the Successor Liability Claims has already been done. *TCC Obj.* ¶ 116, Dkt. No. 1606. Indeed, the bankruptcy court in *Caubble* noted that "[m]ost of the discovery has already been done" and stated that "[s]ome parts of the litigation are factually and legally complex while other parts are simple." *In re Caubble*, 505 B.R. at 877. However, the court also recognized that "the litigation is likely to be time consuming and expensive and there will certainly be a delay in closing the case." *Id.* And because none of the *Martin* factors are examined in isolation, the court in *Caubble* ruled that the "complexity, expense, inconvenience and delay attending the necessary litigation, [was] not enough to outweigh" the other *Martin* factors that weighed against settlement. *Id.* at 878. Thus, the decision in *Caubble* likewise does not support the TCC's position.

Ultimately, and notwithstanding any resolved factual issues, the Court agrees with the Debtors and Brenntag that litigation of the Successor Liability Claims would be time-consuming, expensive, and complicated. Further, "[i]t is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation." *In re Nutraquest, Inc.*, 434 F.3d 639, 646 (3d Cir. 2006) (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968)). Accordingly, the Court finds that the third *Martin* factor weighs in favor of the Settlement.

**4. The Paramount Interest of the Creditors**

The fourth factor in the *Martin* test for determining whether to approve a settlement requires a court to consider the interests of the creditors. The Third Circuit has stated that this "exercise is all about maximizing value for creditors." *In re Summit Metals, Inc.*, 477 F. App'x 18,

22 (3d Cir. 2012); *see also In re Legarde*, 654 B.R. 74, 92 (Bankr. E.D. Pa. 2023) (quoting *In re Summit Metals, Inc.* and noting that "the exercise [of evaluating the paramount interest of the creditors] is all about maximizing value for creditors"). And because this analysis requires a court "to balance the value of the claim being compromised against the value to the estate of accepting the proposed settlement," an inquiry into the value of the Successor Liability Claims is appropriate at this time. *See In re Diocese of Camden*, 653 B.R. at 742 (citations omitted).

**a. Value of the Successor Liability Claims**

As previewed earlier, the parties have vastly differing concepts as to the value of the Successor Liability Claims. Debtors place this figure in the range of $434 million to $519 million. *McKnight Expert Report*, DX-191. The TCC and FCR, however, put this figure in the *billions*, with an outside limit of $5.3 billion. *Austin Expert Report*, TCX-781. This huge gap is troublesome.

In reaching their respective estimated values of Debtors' talc liability, each party relies on the opinion of its expert(s) and witnesses.[35] *See, e.g.*, *McKnight Expert Report*, DX-190; *Austin Expert Report*, TCX-781; *Scarcella Direct Testimony*, BTX-265; *Lahav Expert Report*, TCX-484; *Atkinson Expert Report*, TCX-880. Through cross-examination, the presentation of evidence at trial, and rebuttal expert reports, each party then challenges the reliability of their adversary's claims valuation process—criticizing the methodology utilized by their adversary's experts and identifying potential bias and flaws in the expert's conclusions. For example, the TCC's experts (Lahav, Atkinson, and Austin) criticize the Debtors' expert and witnesses (McKnight and

[35] These reports were submitted under seal and are subject to a Protective Order; therefore, many relevant parts will not be directly quoted. For the most part the Court will, instead, refer to the reports generally, and will limit specific references and citations to those portions of the reports that were discussed openly on the record and/or displayed in demonstratives used at trial. Portions that convey sensitive information will be redacted.

Scarcella) because their analyses exclude both the amount of trial verdicts and post-verdict settlements. According to Lahav, these are important data points that help estimate future exposure; therefore, it is inappropriate to omit them. *See, e.g.*, *Lahav Rebuttal Report*, TCX-123. Likewise, Debtors' expert, McKnight, challenges the discount rate[36] used by the TCC's experts, Atkinson and Austin, explaining that it is far too low. *McKnight Rebuttal Report* ¶¶ 61-68, DX-191. McKnight also contends that the TCC's experts failed to exclude from their analyses so-called "Straddle Claims"—claims that allege exposure to talc sold by Brenntag beginning in 2004, for which Debtors do not have liability. *Id.* at ¶¶ 73-75. Thus, "the parties fundamentally disagree as to which experts' opinion and interpretation is best and, further, which experts reached the correct conclusions." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig*., 509 F. Supp. 3d 116, 192 (D.N.J. 2020).

The Court has conducted an exhaustive review of the testimony, the expert reports, the rebuttal expert reports, and the reliance materials upon which all are founded. The Court has also thoroughly evaluated the parties' arguments and given considerable thought to each expert's defense of her/his own report, as well as her/his critique of the other expert reports. The points raised by each expert have merit. Each valuation is bottomed on reasoned logic and supported by

[36] By way of explanation, all parties agree that a dollar spent in the future is worth less than a dollar spent today. Accordingly, the experts apply a "discount rate" to the estimated value of the claims against the Debtors as of the Petition Date to produce a "net present value" (or "NPV") as of the Petition Date. This discounted value—the NPV—is the final value against which this Court will compare the benefits of the proposed Settlement for purposes of the Rule 9019 evaluation. *See In re Diocese of Camden,* 653 B.R. at 742 ("[D]etermining whether a compromise is fair and equitable under Rule 9019 requires courts to balance the value of the claim being compromised against the value to the estate of accepting the proposed settlement.") (citing *In re Nortel Networks, Inc*., 522 B.R. at 509; *In re Martin*, 91 F.3d at 393).

accredited reliance materials; yet each methodology simultaneously suffers from meaningful flaws.

For example, the Debtors' experts, Scarcella and McKnight, use historical data going back to 2016 and 2018, respectively. Both also decline to incorporate jury verdicts in their calculations, maintaining that settlement amounts more accurately reflect the true value of the claims and avoid "selection bias." *McKnight Expert Report* ¶ 17, DX-190. However, it is evident that science and social trends have changed since claims were first filed more than a decade ago. *See, e.g.*, *Austin Expert Report* ¶¶ 13-17, TCX-781; *Litigation costs drive claims inflation: indexing liability loss trends,* Swiss Re Institute (2024) (not admitted into evidence). All parties agree that tort claims, as a whole, "mature" the longer they have been litigated—meaning that as more claims are filed and work their way through the legal system, the later-filed claims become more refined through—among other things—advances in science, development of legal argument, experience of counsel, and public awareness. *See, e.g. Lahav Expert Report* ¶ 25, TCX-123. Therefore, outcomes of mature claims are more indicative of current and future trends than are outcomes reflected in older data.

Moreover, verdicts—as unpredictable and varied as they may be—are affirmative data points as to the value of the claim litigated. *See, e.g. Tr. of Deposition of John Arendt* ("*Arendt Depo.*") 265:4-14 ("Some percentage of the claims are going to be outliers. You're going to get hit every now and then . . . It's unusual, but it's not unusual. It's inevitable."); *Tr. of March 4, 2025 Hrg. – AM Session* (*Ryan Cross*) 25:13-15, Dkt. No. 1844. For these reasons, McKnight and Scarcella's claim average—which omit what they believe to be outlier verdicts and settlements—may be improperly skewed downward. Additionally, the Court has reservations regarding McKnight's and Scarcella's discount rate, which appears to be unduly high. Certainly, a discount

rate should apply to achieve the net present value ("NPV"). *See* footnote 36, *supra*. And while the Court agrees that the lower, risk-free inflation rate used by the TCC and FCR may not reflect reality, a discount rate based on the higher rate of return of the trust's investment portfolios likewise seems unrealistic on a consistent, going-forward basis. *See, e.g.*, *Austin Rebuttal Report* ¶¶ 23, 24, TCX-782.

The Court harbors even greater reservations about the TCC and FCR's valuations. Their experts estimate claim value based on a more recent set of historical data. For example, Austin incorporates only "settlement and verdict amounts for 86 resolved claims *filed* between 2020 and 2022." *Austin Expert Report* ¶ 27 (emphasis added). Atkinson uses two different calibration periods in his report: the "low end" estimate, which incorporates "claims resolution data for claims filed from 2019 through 2022[;]" and a "high end" estimate that uses data from 2022 only. *Atkinson Expert Report* ¶ 53, TCX-880. While the Court understands that more accurate data is collected as a tort matures, the Court likewise agrees that Austin's and Atkinson's limited datasets improperly rely on outlier verdicts and settlements, disregard dispositive appellate reversals and adjustments, disproportionately shift dismissal rates, and ignore other external factors—thus, skewing the calculations upward.[37] In this vein, the Court notes that TCC and FCR's experts do not factor at all Johnson & Johnson's ("J&J") departure from—and subsequent return to—the tort system into their analyses. Indeed, the bankruptcy filing of J&J's affiliate, LTL Management, LLC, in 2021 meant that claimants could no longer pursue litigation against J&J, a primary defendant with ample resources. The TCC and FCR's experts do not account for the impact J&J's absence as a defendant may have had on litigation outcomes against remaining defendants, including Debtors, during this time period. This, too, likely contributes to an inflated claim

[37] For instance, the TCC and FCR's experts fail to address the reduced verdict in *Graham*, which they concede is error. *See, e.g. Tr. of March 5, 2025 Hrg. – AM Session* (*Austin Cross*) 104:3-16, Dkt. No. 1856.

valuation. *See, e.g.*, *Ryan Direct* ¶ 44-46; *Tr. of March 4, 2025 Hrg. – AM Session* (*Scarcella Redirect*) 149:17 – 151:5, Dkt. No. 1845.

Ordinarily, "[w]here the Court has determined that the experts on both sides have applied a reliable methodology in reaching their conclusions, 'it is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.' " *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 192 (quoting *In re Asbestos Prods. Liab. Litig.* (No. VI), 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010)). In the bankruptcy context, however, this duty falls to the Court as factfinder.

Ultimately, the Court is unpersuaded by any one expert. *See, e.g. In re Com. Fin. Servs., Inc.*, 350 B.R. 520, 540 (Bankr. N.D. Okla. 2005) (stating that criticisms did not affect reliability of expert's methodology, but rather impacted the weight the court might eventually give to the expert's conclusions). In predictable fashion, each expert's opinion supports the position of the entity that retained it, suggesting bias.[38] The potential for bias does not necessarily serve as a basis to exclude an opinion as unreliable, but generally presents a credibility issue for the Court as factfinder. *See, e.g.*, *In re Anthony*, No. 23-52661, 2024 WL 5711062, at *3 (Bankr. S.D. Ohio Dec. 3, 2024). Moreover, here—where questions exist regarding, among other things, the appropriate datasets and discount rate, and where parties are applying nuanced methodologies—it is evident that the outcome of this claims estimation process is very susceptible to manipulation. The experts recognize this possibility in their rebuttal reports—substituting factors in each other's reports to achieve results more like their own. *See, e.g., TCC's Obj.* at ¶ 88 ("If McKnight had used an average claim value of $970,865, his estimate would have been significantly higher."); *Austin*

[38] By "bias," the Court refers to opinions bottomed on data and assumptions intended to produce conclusions consistent with certain pre-set outcomes.

*Expert Report* ¶ 10, TCX-781 (stating that correcting two erroneous inputs in McKnight's report would result in "a nearly six-fold increase" in the high end of his estimate); *Atkinson Expert Report* ¶ 21, TCX-880 ("Correcting just two of those issues [with McKnight's analysis] . . . would increase the projection by roughly $1.5 to $4 billion."); *McKnight Rebuttal* ¶ 37, DX-191 (stating that if Austin and Atkinson removed their date-filed restriction in their calculations, "her valuation would decrease by 35%" and Atkinson's low and high valuations "would have decreased by 24% to 49%"); *id*. at ¶ 89 ("[A]fter making the corrections to Claimants' Reports, their liability estimates are in line with the estimates presented in my opening report."). Given the plethora of variables and potential for manipulation, this Court determines that a more unbiased view of claims valuation offers the more accurate and objective estimate. Fortunately, one exists in this record.

Tom Ryan has been involved with asbestos litigation since 1992. *Tr. of March 3, 2025 Hrg. – PM Session* 124:21-25 – 125:4, Dkt. No. 1843. He has been President of Resolute Management, Inc. ("Resolute") since 2011. *Ryan Direct* ¶ 2, BTX-264. Resolute is one of the non-debtor Berkshire entities in this matter and an indirect affiliate of National Indemnity Company ("NICO"). *Id.* Mr. Ryan first became involved with WCD because Resolute provided claim-handling services to an insurance company that controlled the defense of asbestos lawsuits against WCD. *Id.* at ¶ 5. When those insurance policies were exhausted in 2017, Resolute continued to do work for WCD —initially through a shared services agreement with Berkshire, but then directly through an agreement with WCD —and eventually took over defense of WCD's asbestos litigation for WCD. Thus, since 2011, Mr. Ryan has been intimately involved with the talc-related lawsuits against Debtors, and has observed since trends in filings, settlements, and verdicts.

Throughout the course of his work Mr. Ryan constructed models to predict WCD's future exposure to talc-based claims, and to project future liability. As indicated in direct testimony, Mr.

Ryan spent many hours designing models and consistently tweaked them for accuracy by changing inputs, altering curves, and adjusting for new data. *See Tr. of March 3, 2025 Hrg. – PM Session* (*Ryan Direct*) 141:6 – 142:12. Significantly, Mr. Ryan prepared one such model reflecting WCD's "retained exposure for indemnity and defense [from January 1, 2023] going forward." *Tr. of Deposition of Tom Ryan* ("*Ryan Depo.*") at 213:23 – 214:3. The nominal value assigned to that projection was $728,781,417 with a present value of $542,577,234. *Id.* at 214:5, 214:8.

The model was then updated in February 2023 to include new claim trend information (the "Resolute Model" or "Model"). *See id.* at 214:17-23. Mr. Ryan testified that the Resolute Model projected approximately $648 million of future nominal exposure. *See Tr. of March 3, 2025 Hrg. – PM Session* 142:8-10; *see also Ex. B to Ryan Direct* ("Policy Holder Projection Model") p.1, Cell B-4, BTX-260.[39] To convert that $648 million in future liability to present value, the Resolute Model applied various discount rates that, in several iterations of the model, "ranged from 1.75 percent to seven and a half percent[.]" *Tr. of March 3, 2025 Hrg. – PM Session* at 149:12-13. This was done on a year-by-year basis, meaning that the projected future liability produced by the Model for a given year was reduced by the projected discount rate for that same year.[40] After applying the discount rates, Mr. Ryan testified that the Model produced a present value estimate

[39] In reaching this figure, Mr. Ryan used a variable he called the "past/future ratio," which he described as a "sanity check." *Tr. of March 3, 2025 Hrg. – PM Session* at 144:17-23. The purpose of this variable—as explained by Mr. Ryan—is to ensure the accuracy of the future liability by accounting for how far along is the entity in the exposure and claims-paying process. Here, Ryan assumed that "of the total exposure, Whittaker has already incurred 18% of it." *Id.* at 145:1-2. Thus, the past/future ratio was 18%.

[40] For example, the Resolute Model projected that WCD would incur $27,822,841 in liability in the year 2033 and anticipated a discount rate for that year in the amount of 3.57%. *Ex. B to Ryan Direct* ("Policy Holder Projection Model") p.3, Cell W-2, BTX-260; *id.* at p.5, Cell C-12. In contrast, the Model projected liability in the amount of $6,079,726 in the year 2045 and a discount rate of 4.5% for that year. *Id.* at p.1, Cell AI-2; *id.* at p.5, Cell C-24.

of future liability in an amount "right under 500 [million]" or approximately $497 million.[41] *Id.* at 150:9; *Ryan Direct* ¶ 30, BTX-264.

Importantly, this valuation occurred prior to the bankruptcy and for no purpose other than to accurately predict for his client the amount of WCD's future liabilities. Indeed, Mr. Ryan's deposition testimony confirms that he was not consulted about the bankruptcy filing and that, although he had suspicions, he did not know that Debtors were going to file for bankruptcy. *See Ryan Depo.* at 219:3 – 220:6. Thus, the estimated future liability produced by the Resolute Model was not, and is not, subject to the same potential bias or manipulation as valuations produced and the models used by the parties' experts in preparation for this litigation. Mr. Ryan would have no reason or motivation to "lowball" valuation or estimates and deceive Berkshire's management (his own client). Indeed, Mr. Ryan's projections were critical to formulating his client's exposure for public reporting and planning purposes.

Moreover, the TCC agrees with certain methodological choices used by Mr. Ryan. In relevant part, the TCC approves of the discount rates in the Model, which were based on current interest rates and were capped at 4.5%. *TCC Obj.* ¶ 84, Dkt. No. 1606. The TCC also believes that the Resolute Model properly "included a 'multiplier' that would increase liability projections from what the model had otherwise calculated from inputs." *Id.* at ¶ 85.[42]

For all of the aforementioned reasons, Mr. Ryan's February 2023 Resolute Model is the model upon which this Court will rely when determining the total value of the Successor Liability

---

[41] The Court could not locate in the record a figure more precise than the $497 million approximation. However, using the raw data from the Resolute Model, the Court calculated this figure to be $496,614,797.49. For purposes of evaluating this Settlement, the Court's figures are sufficient.

[42] Although Ryan distinguishes Resolute's February 2023 Model from the analyses utilized by the TCC's expert in other ways, *see Ryan Direct* ¶ 54, BTX-264, he nevertheless does not dispute that the models are similar in the three respects noted by the TCC—only two of which are referenced above.

Claims. To be clear, the Court intends to use the figure produced by the Resolute Model as a *starting point*, not as the finish line. Like the other expert reports, the Court finds that the Resolute Model suffers from certain methodological flaws. Accordingly, the Court will change certain inputs and variables—which result in an upward adjustment—to arrive at its final dollar estimation.[43] As will be discussed in detail, the Court will expand the calibration period and will use the "multiplier" feature of the Model to balance improperly excluded data that increase average claim value against other factors that bring claim values down.

Prior to engaging in an in-depth value analysis, the Court notes that it treated Mr. Ryan as a lay witness during trial and accepted his testimony under Rule 701. *See Tr. of March 3, 2025 Hrg. – PM Session,* 155:14-19 (explaining that the Court "does not view, nor will accord any weight to Mr. Ryan as an expert").

> Generally, FRE 701 allows a lay witness to testify only as to opinions rationally based on the witness' perception, and not based on scientific or other specialized knowledge. Fed. R. Evid. 701. However, courts have held lay opinion as to technical matters may sometimes be appropriate, but only when the "witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses."

*In re Diocese of Camden*, 653 B.R. 722, 736–37 (Bankr. D.N.J. 2023) (quoting *Eichorn v. AT&T Corp.*, 484 F.3d 644, 649 (3d Cir. 2007)). "In determining whether a lay witness has sufficient special knowledge or experience to ensure that the lay opinion is rationally derived from the witness's observation and helpful to the jury, the trial court should focus on the substance of the witness's background and its germaneness to the issue at hand." *Asplundh Mfg. Div., a Div. of*

[43] The Court acknowledges that it does not possess the same software or exact same Excel formulas utilized by the parties in calculating their estimates. Nevertheless, the Court was able to replicate the NPV formula and the Court's calculations produce results that are substantially similar to the parties' calculations. And although the adjustments made in this Opinion will be generalized, the Court reiterates that for purposes of a motion under Rule 9019, the Court need not conduct a mini-trial. It is enough for this Court to have approximate figures—supported by data and the record—that correct what it believes to be missteps in the parties' respective estimates, and against which this Court can compare the benefits of the Settlement.

*Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1202 (3d Cir. 1995). Here, it is undisputed that Mr. Ryan has specialized knowledge and experience. His opinions are undeniably rationally derived from observations he made through more than a decade working in the field.

In affording weight to Ryan's opinion, the Court is also cognizant of the differences between Federal Rules of Evidence 701 and 702. Rule 701 permits the introduction of lay opinion testimony that is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue," FED. R. EVID. 701(a), (b), while Rule 702—in contrast—provides for the admission of testimony by a qualified expert, which must be based on, inter alia, "the expert's scientific, technical, or other specialized knowledge," FED. R. EVID. 702(a). Likewise, the Court acknowledges that Rule 701 was amended in 2000 to add subsection (c), which bars lay testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(c). However, the basis for that amendment and—in large part—for the distinctions between Rule 701 and Rule 702 is to prevent undue influence on a *jury* and to "protect against testimony that usurps the jury's role as fact finder." *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016); *see also United States v. Savage*, 970 F.3d 217, 284 (3d Cir. 2020); *United States v. Stadtmauer*, 620 F.3d 238, 262 (3d Cir. 2010) (stating that Rule 701 "is nonetheless designed to exclude lay opinion testimony that 'amount[s] to little more than choosing up sides' . . . or that merely tells the jury what result to reach") (cleaned up and quoting FED. R. EVID. 701 advisory committee's note).

In this case, however, there is no jury. Therefore, the concerns forming the basis for the distinction between the Rules are inapplicable here. The Court chooses Mr. Ryan's model precisely because—given Mr. Ryan's role, the reason behind his data collection, and the timing of the February 2023 Resolute Model—his testimony does *not* amount to "choosing up sides." *See,*

*e.g.*, *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1193 (3d Cir. 1995) (observing that the Third Circuit "like other courts, has commonly interpreted the rule to permit individuals not qualified as experts, but possessing experience or specialized knowledge about particular things, to testify about technical matters that might have been thought to lie within the exclusive province of experts"); *id.* at 1202–03 (citing *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399 (3d Cir. 1980) and stating that, in *Teen-Ed* "the accountant who testified as a lay witness had very particular and quite extensive prior experience with Teen–Ed's books, which allowed him to properly calculate for the court how lost profits should be determined and to draw inferences from his examination of the accounts"); *see also In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig*., No. CV 16-2738, 2025 WL 2962904, at *9 (D.N.J. Oct. 20, 2025) (citing *Asplundh*); *Urb. v. Allstate Fire & Cas. Ins. Co*., No. CV 20-3490, 2021 WL 4774866, at *10 (E.D. Pa. Oct. 13, 2021) (noting "that lay witnesses may sometimes offer opinions on technical matters without qualifying as experts under Rule 702"); *Walker v. Mankey*, No. 2:14-CV-01504-LPL, 2018 WL 10230906, at *1 (W.D. Pa. Oct. 30, 2018) (accepting opinion testimony under Federal Rules of Evidence 701 and 702 even though witnesses were not designates as experts).

Having established a legal and factual basis for accepting the Resolute Model as a foundation, the Court makes adjustments which account for concerns raised by all experts, and produce a more reliable estimation of claims liability. The Court starts with the appropriate calibration period. The parties' disagreement regarding the calibration period is two-fold. First, they disagree as to the proper time period from which data should be pulled. Debtors' experts use a calibration period with older data—settlements going back as far as 2016—while the TCC's and FCR's experts use more recent data—including settlements and verdicts going back to 2019 at the

earliest. Second, the parties disagree as to whether the date of the filing of the claim should dictate whether the claim's resolution is included in the dataset. The TCC's and FCR's experts limit their calibration period to only those claims *both filed and resolved* in their respective calibration periods. Debtors assert that this limitation further distorts claim values. In their view, all claims resolved during the time period should be incorporated in the calculations.

The Court finds that a calibration period from 2019 to 2022, which makes no distinction for the date such claims were filed, provides the most accurate estimate. For reasons previously stated, the Court recognizes that mature claims better reflect the true value of existing and future claims. Therefore, McKnight's and Scarcella's data, which extends back to 2016 and 2018, respectively, prove too old. A window of time this large may include claims filed many years prior and may not account for increased social awareness, changes in filing trends, or refinements in legal and scientific arguments. On the flip side, the time period used by Ms. Austin—2020 to 2022—proves too recent and does not capture a large enough window to produce a balanced claim analysis. Historically, the number of filings against WCD each year has risen and fallen. *See e.g. Resolute Model* ("*ClaimTrendAnalysis" Tab*), TCX-142 (showing a 45% increase in filings between 2017 to 2018 and 48% drop in 2019); *Scarcella Direct* ¶ 74, BTX-265 (pointing out that "the annualized claim filings against WCD in 2023 *declined* by approximately 25% relative to 2022) (emphasis in original). Thus, the Court determines that Austin's two-year data set is incomplete. While the Court appreciates the importance of mature claims, there is nothing in the record to suggest that these claims did not mature until 2020. To the contrary, the FCR's expert, Mr. Atkinson, describes the year 2019 as an "inflection point." *Atkinson Expert Report* ¶ 28, TCX-880. Thus, there exists some consensus that the dataset should extend back to at least 2019. The Court also considers that this window includes data collected before the COVID-19 outbreak and

prior to LTL's bankruptcy and accounts for the impact that the pandemic and J&J's exit from the tort system may have had on claims asserted against WCD.

The Court further determines that the date the claims were filed should have no bearing on whether those claims' data are included in the evaluation. Both Austin and Atkinson limit their calculations to only those claims that were both filed and resolved in their calibration periods. Debtors argue that "[t]his approach arbitrarily—and without explanation—excludes claims that take longer to resolve than the calibration period in question." *Debtors' Reply* 25, Dkt. No. 1665. The Court agrees. When pressed during cross examination, Ms. Austin conceded that her report did not consider that, historically, the longer a claim remains pending, the lower the claim's value. *See Tr. of March 5, 2025 Hrg. – AM Session* 90:16 – 93:7. The purpose of this valuation exercise is to examine past data to predict future obligations. In the past, claims that lingered in the tort system were resolved for lesser amounts. *See Scarcella Direct* ¶ 79, BTX-265 ("Whittaker's claim history shows that the lag between the date of a claim's filing and its resolution is inversely proportional to average resolution value."). Nothing in the record suggests that this pattern will not continue into the future and, thus, no basis exists for excluding data based merely on the filing date. For these reasons, the Court finds that limiting the dataset to only those claims filed *and* resolved in the calibration period improperly skews the claims value upward. Accordingly, the Court will include in its calculations all claims resolved during the time period from 2019 to 2022 regardless of when the claims were filed.

Having established the calibration period, the Court next turns to the appropriate discount rate. Indeed, the nominal future value represented in Cell B-4 of Exhibit B to Ryan's Direct Testimony is $648,334,738. TCX-142. This figure represents the sum of the year-by-year nominal projections of future indemnity produced by the Model. *See Ryan Direct* ¶ 30, n.2; *id. Exhibit B* at

2-4 ("Policy Holder Projection Model," "Products" worksheet, Row 2), TCX-142. In reaching the NPV estimate (approximately $497,000,000), the Model reduced each yearly nominal projection by applying the discount rate for that year.[44] Each year's discount rate is reflected in the "PV" tab of the workbook. The present value of each yearly projection is then aggregated to calculate the total NPV of all claims going forward. Like the TCC, the Court agrees with the discount rates applied. Indeed, one of the concerns this Court harbors regarding the McKnight expert report is the high discount rate. The Court finds that a varied discount rate—that reflects fluctuations in returns and has a reasonable cap—is more appropriate. Therefore, no changes will be made to the Resolute Model in that respect.

The Court next turns to the scope of the input data for the calculations. As the TCC and FCR point out—and as the Resolute Model, itself, notes—the Model excludes jury verdicts and post-trial settlements. In support of this methodology—also used by McKnight—the Debtors and Berkshire contend that settlement amounts are more consistent and accurately reflect verdict outcomes. *See, e.g. Atkinson Expert Report* ¶ 27, TCX-880; *Austin Rebuttal Report* ¶ 12, TCX-782. While the Court concedes that settlement amounts are driven by *past* verdicts and, thus, reflect common verdict outcomes, so too do verdict outcomes drive *future* settlement amounts. *See, e.g. Scarcella Direct* ¶ 49, BTX-265 (explaining that "settlement values reflect the impact of prior verdicts and post-verdict settlements"); *Austin Expert Report* ¶ 16, TCX-782.

---

[44] Taking the year 2034 as an example, the Model projects future liability in 2034 to be $25,863,097 (the "nominal value") with a discount rate of 3.77%. *See Ex. B to Ryan Direct ("Policy Holder Projection Model")* p.3, Cell X-2, BTX-260; *id*. at p.5, Cell C-13. The "time" factor in the equation represents the "number of time periods,"—here, the number of payment years—between "now" (the date of the estimate) until the date of the future projected amount. Including the payment year 2023, the year 2034 is the 12th "time period" (or 12th yearly payment) since the Model's creation; therefore, the value used for "time" in the year 2034 is 12. Applying this formula, illustrated below, produces a present value ("PV") for the year 2034 in the amount of approximately $16,594,088.11.

$$PV = \frac{\text{nominal value}}{(1 + \text{discount rate})^{\text{time}}} \qquad PV = \frac{\$25{,}863{,}097}{(1 + 3.77\%)^{12}} = \$16{,}594{,}088.11$$

Moreover, as this Court and others have noted in the past, the tort system can be characterized as a lottery-like system of recovery for plaintiffs—many of whom recover nothing. However, occasionally a plaintiff "hits big."[45] These verdicts, as unusual as they are, cannot be overlooked. They shape the landscape going forward and set new baselines for settlements in the future. Thus, the Court finds that the Resolute Model must be tweaked to account for outlier verdicts. For these same reasons, the Court determines that any projected future value must also account for post-trial settlements, including—for example—the VanKlive settlement. Mr. Ryan defended the exclusion by asserting that VanKlive was, essentially, "anomalous," *Ryan Direct* ¶36, or a "unicorn," whose factual circumstances would not and could not be repeated, *Ryan Depo.* at 216:14-16. *See also, e.g.*, *Tr. of March 4, 2025 Hrg. – PM Session* (*Scarcella Redirect*) 150:12-15 (explaining that the VanKlive verdict represents a "microcosm"); *id.* (*McKnight Redirect*) at 116:12-25 (describing Plant verdict as an "outlier"). As unlikely as repetition is, the VanKlive settlement nevertheless remains an affirmative data point and cannot be ignored.

Ultimately, the Court agrees with the TCC that Debtors cannot "exclude[] the very data points that led WCD to consider bankruptcy." *TCC Obj.* ¶ 87, Dkt. No. 1606. Doing so results in an average settlement amount that is unacceptably low, and the Court will adjust the Resolute Model accordingly. Notwithstanding, the Court also agrees with the Debtors that it should not exclude data points that that permitted WCD to function outside of bankruptcy for nearly two decades. Thus, the Resolute Model will also be adjusted to account for settlement amounts and verdicts dating back to 2019.

---

[45] The Court emphasizes that it uses this analogy merely to explain the probability and financial impact of these verdicts, not to make light of the circumstances. To be clear, there are no "winners" in these types of situations. Large verdicts are often the result of unusual and devastating circumstances, many of which involve young claimants and heartbreaking personal tragedies.

Having set an appropriate framework, the Court now returns to valuation. The Resolute Model yielded an average settlement amount of $232,932 for mesothelioma claims. *Ex. B to Ryan Direct* 1 ("Policyholder Projection Model"), Cell C-41. This, in turn, was used to create future projections. *See* ("*ClaimTrendInfo" Tab*) formulas for cells in Row 62, TCX-142. The Model calculated the average settlement amount of $232,932 by averaging historical settlements from the previous two years. Specifically, the Resolute Model uses an average claim value of $132,692 for year 2021, and $306,793 for year 2022, resulting in an average of $232,932 for the two-year period. However, as discussed, those calculations exclude verdicts and post-trial settlements. The Court accounts for the excluded data by revisiting the amounts used in the Resolute Model.[46] As explained in detail below, the Court will adjust those amounts (for years 2021 and 2022) to include post-trial settlements and verdicts, and will do the same for years 2019, 2020, and 2023.[47] After computing the average settlement amount for each of those 5 years, the Court will calculate a new average settlement amount.

---

[46] The Court recognizes that its figures may be imprecise. The data and exhibits submitted in this case were voluminous and, at times, confusing. Certain verdicts contained in the controlling claims spreadsheet (TCX-236) were later reduced on appeal; and certain verdicts rendered in one calendar year were attributed to the subsequent fiscal year. This Court acknowledges that the parties may dispute the figures used, or the year in which a verdict was applied, and the Court concedes that mistakes may have been made. Nevertheless, the Court reiterates that, for purposes of determining the reasonableness of this proposed Settlement, the Court need not conduct a mini-trial; therefore, its estimates do not have to be mathematically precise. Rather, it is enough for this Court to use the available data to reach what it considers to be a more accurate estimate of liability against which it can compare the proposed Settlement. The Court remains confident that its estimates are sufficiently accurate as the averages and totals calculated in this Opinion (prepared using the overall claims data, *see* TCX-236) comport substantially with the totals and data available in other exhibits. By way of example, the WCD Complete Database Report, which includes all types of claims, including industrial, reports total settlements for the year 2019 in the amount of $1,538,480. *WCD Complete Database Report* ("*Complete Database" Tab*) and ("*2019 Stats" Tab*) Cell E36, BTX-245. The Court's calculations peg that figure at $1,533,480.

[47] It is at this point where a candid explanation of the Court's calculations becomes difficult. The Court is mindful that, in order to protect the interests of claimants, the precise dollar amount of certain settlements must remain confidential. Were the Court to publicly explain certain portions of its rationale in detail, confidential settlement amounts could be extracted by simple reverse math. Accordingly, out of an abundance of caution and to respect the privacy of claimants, the Court has redacted any identifiable information and specific dollar amounts. Counsel will be provided with—or may request—an unredacted version of the Opinion consistent with Court procedure.

The Court begins with data from the year 2019. The Resolute Model reports that 20 claims were settled for an average of $76,674 per claim. *See* TCX-142 ("*$$ Projections" Tab*) Cell Q46 (number of settled mesothelioma claims); Cell Q62 (average settlement amount). Thus, WCD's liability for mesothelioma claims as reported in the Model for year 2019 totals $1,533,480.[48] However, that figure excludes two post-trial settlements reached that year totaling $325,000. *See* TCX-236 (*"Cleaned Claims Data"*) Cell AN2124 ([redacted]); Cell AN57 ([redacted]). Adding that value ($325,000) to the total paid on mesothelioma claims according to the Model ($1,533,480) yields a new total of $1,858,480 in mesothelioma liability for 22 claims, which results in a new average of $84,476.36 for the year 2019.[49] The Court performs this same analysis for subsequent years.

In 2020, the Resolute Model reported an average value of $58,333 based on 24 settled claims. *See* TCX-142 ("*$$ Projections" Tab*) Cell R46 (number of settled mesothelioma claims in 2020); *id.* at Cell R62 (average settlement amount in 2020). Thus, WCD's liability for mesothelioma claims as reported in the Resolute Model for year 2020 totals $1,399,992.[50] To that figure, the Court adds 4 trial settlements not included in the Resolute Model, which total $250,000. *See* TCX-236 (*"Cleaned Claims Data"*) Cell AN2411 ([redacted]); Cell AN2331 ([redacted]); Cell AN74 ([redacted]); Cell AN1917 ([redacted]). The new aggregate value of mesothelioma claims

[48] Claim average of $76,674 x 20 claims = $1,533,480.

[49] $1,858,480 ÷ 22 = $84,476.36.

[50] Claim average of $58,333 x 24 claims = $1,399,992.

paid that year becomes $1,649,992[51] for 28 claims[52]—resulting in a new average of $58,928.29 for the year 2020.[53]

For the year 2021, the Resolute Model reports an average mesothelioma value of $132,692 based on 42 reported settlements. *See* TCX-142 ("*$$ Projections" Tab*) Cell S46 (number of settled mesothelioma claims in 2021); *id.* at Cell S62 (average settlement amount in 2021). Thus, according to the Resolute Model, the value of WCD's liability for settled mesothelioma claims for year 2021 totals $5,573,064.[54] However, that figure excludes 3 plaintiff verdicts and 3 trial settlements totaling $37,920,342.98. *See* TCX-236 (*"Cleaned Claims Data"*) Cell AN2331 ([redacted]); Cell AN2634 ([redacted]); Cell AN2404 ([redacted]); Cell AN1945 ([redacted]); JX-48 ([redacted]); DX-173 ([redacted]); The Court adds that amount ($37,920,342.98) to the aggregate amount in the Resolute Model ($5,573,064), resulting in a new total of $43,493,406.98 for 48 paid mesothelioma claims[55] in 2021. This yields a new average of $906,112.65 for the year 2021.[56]

For the year 2022, the Resolute Model computes an average mesothelioma value of $306,793 based on 57 reported settlements. *See* TCX-142 ("*$$ Projections" Tab*) Cell T46 (number of settled mesothelioma claims in 2022); *id.* at Cell T62 (average settlement amount in

---

[51] $1,399,992 (total Resolute Model value) + $250,000 (sum of trial settlements reported in TCX-236) = $1,649,992.

[52] 24 (settled claims reported in Resolute Model) + 4 (trial settlements found in TCX-236 for year 2020) = 28.

[53] $1,649,992 ÷ 28 = $58,928.29.

[54] Claim average of $132,692 x 42 claims = $5,573,064.

[55] 42 (settled claims reported in Resolute Model) + 3 (excluded trial settlements) + 3 (excluded plaintiff verdicts) = 48.

[56] $43,493,406.98 ÷ 48 = $906.112.65.

2022). This means that a total of $17,487,201 was paid toward settlement of mesothelioma claims in 2022 according to the Resolute Model.[57] However, the Resolute Model excludes 9 trial settlements totaling $4,630,000 from its calculation. *See* TCX-236 (*"Cleaned Claims Data"*) Cell AN2116 ([redacted]); Cell AN2118 ([redacted]); Cell AN364 ([redacted]); Cell AN1228 ([redacted]); Cell AN2189 ([redacted]); Cell AN633 ([redacted]); Cell AN402 ([redacted]); Cell AN1526 ([redacted]); Cell AN146 ([redacted]). The Court adds that amount ($4,630,000) to the figure in the Resolute Model representing the total paid toward mesothelioma claims that year ($17,487,201), and calculates a new total of $22,117,201.00. This amount, which is a sum of 66 paid mesothelioma claims[58] yields a new average of $335,109.11 for the year 2022.[59]

Finally, the Resolute Model reports an average mesothelioma claim value of $239,920.00 for the year 2023, calculated using the values of 244 settlements. *See* TCX-142 ("*$$ Projections" Tab*) Cell U46 (number of settled mesothelioma claims in 2022); *id.* at Cell U62 (average settlement amount in 2022). Thus, the Resolute Model shows that an aggregate of $58,540,480.00 was paid toward settlement of mesothelioma claims in 2023.[60] Again, that figure excludes 4 verdicts and trial settlements, which total $15,944,846.00. *See* TCX-236 (*"Cleaned Claims Data"*) Cell AN1755 ([redacted]); Cell AN1136 ([redacted]); JX-36 ([redacted]

---

[57] Claim average of $306,793 x 57 claims = $17,487,201.

[58] 57 (settled claims reported in Resolute Model) + 9 (excluded trial settlements) = 66.

[59] $22,117,201.00 ÷ 66 = $335,109.11.

[60] Claim average of $239,920.00 x 244 claims = $58,540,480.00.

[redacted])[61]; ([redacted])[62]. Adding these omitted trial settlements and verdicts ($15,944,846) to the Resolute Model's reported aggregate ($58,540,480.00) produces a new amount of $74,485,326.00 for a total of 248 claims.[63] This, in turn, yields a new average value of $300,344.06 for mesothelioma claims in the year 2023.[64]

The Court notes that Debtors filed for bankruptcy in 2023 and, therefore, the data set for that year is incomplete. Nevertheless, the figures used in the Resolute Model—and, indeed, in all the experts' models—are premised on averages. Thus, although WCD ostensibly would have settled more cases and/or more trial settlements would have been reached or plaintiff verdicts rendered, the snapshot of data from the first third of 2023 provides a sufficient basis upon which this Court can discern the average value for purpose of this Motion. Again, when determining the reasonableness of a settlement under Rule 9019, a court need not conduct a mini-trial. Moreover, as will be discussed, the Court will account for any potential downward skew caused by the incomplete 2023 dataset by applying a multiplier.

As the foregoing calculations demonstrate, including plaintiff verdicts and trial settlements into the Resolute Model results in the following adjusted average values of mesothelioma claims for the 5 years preceding the bankruptcy filing:

2019: $84,476.36
2020: $58,928.29
2021: $906,112.65

---

[61] *Hrg. Tr. March 5, 2025 – AM Session* (*Austin Cross*) 112:12-14, Dkt. No 1856 (explaining Austin applied a 50% reduction to *Plant* verdict); *Hrg. Tr. March 6, 2025 – AM Session* (*Debtors' Closing*) 28:10-11, Dkt. No. 1871.

[62] *Hrg. Tr. March 6, 2025 – AM Session* (*Debtors' Closing*) 28:10-11, Dkt. No. 1871 ("The *Graham* verdict was already reduced to $900,000 prior to the petition date.").

[63] 244 (settled claims reported in Resolute Model) + 4 (excluded verdicts and trial settlements) = 248.

[64] $74,485,326.00 ÷ 248 = $300,344.06.

2022: $335,109.11
2023: $300,344.06

Thus, the 5-year average based on the Court's adjusted model is $336,994.09.[65] This by no means ends the inquiry. The Resolute Model involves complicated formulas, inputs intricate data to produce its projections, and incorporates other variables such as the number of future-filed claims and dismissal rates. The Court will *not* undertake a similar in-depth projection analysis to account for the deficient average claim valuation, and will *not* produce new projected claim values on a year-by-year basis. Instead, the Court will utilize a feature in the Resolute Model, which Mr. Ryan declined to apply in his calculations, and was looked upon favorably by the TCC: the "multiplier." *TCC Obj.* ¶ 85, Dkt. No. 1606.

As indicated in Mr. Ryan's deposition, the cell in the Resolute Model reflecting the nominal future value, $648,334,738, imports its data from another tab (the "$$ Projections" tab) and provides the option to apply multipliers. *Ryan Depo.* at 124:7-11. Mr. Ryan explains that the multipliers provide "an ability . . . to increase the baseline indemnity policyholder future, based on a whim, knowledge, whatever . . . ." *Id.* at 124:16-18. While Resolute did not apply a multiplier in its Model, the Court intends to do so for two purposes. First, the Court will use the multiplier to adjust the Resolute Model figures in light of the 5-year average calculated by the Court and to produce—what the Court believes is—a more accurate projected claims total. Second, the Court will use the multiplier to account for other variables including, but not limited to: the incomplete 2023 dataset, the use of estimated amounts for verdicts still on appeal at the time of the bankruptcy filing, and any errors or omissions on the Court's part.[66]

[65] ($84,476.36 + $58,928.29 + $906,112.65 + $335,109.11 + $300,344.06) ÷ 5 = $336,994.09.

[66] The Court reiterates that the figures used in its calculations are not presented as infallible amounts or meant to be viewed as unquestionably accurate. They are the Court's best estimates based on testimony, available data admitted into evidence, and the Court's admittedly limited understanding of the complicated formulas utilized by the parties' experts. The Court is not an expert. It does not purport to know more than the talented and experienced professionals

In determining the appropriate amount for the multiplier, the Court first compares its adjusted 5-year average ($336,994.09) to the 2-year average calculated in the Resolute Model ($232,932). As previously explained, that 2-year average was used in the Resolute Model to project future claim liability. *See* ("*ClaimTrendInfo" Tab*) formulas for cells in Row 62, TCX-142. The Court's adjusted 5-year average is 1.45 times greater than the Resolute Model's 2-year average.[67] This differential—a factor of 1.45—forms the basis for what the Court will use as the multiplier. Given that the Court's adjusted 5-year mesothelioma claim average is 1.45 times greater than the 2-year average that serves as the foundation for the Resolute Model's calculations, the Court finds that—at a minimum—a multiplier of 1.45 is appropriate to bring the Resolute Model in line with a projection that includes verdicts and trial settlements. The Court next considers how much *further* upward adjustment is warranted to account for the other variables, oversimplifications, and potential inaccuracies previously discussed.

The TCC's expert, Austin, advocates for a multiplier of 2.75 to account for what she describes as "Latency/Awareness Factor." *See Austin Expert Report, Appendix C*, TCX-781; *Tr. of March 5, 2025 Hrg. – AM Session* (*Austin Direct*) 32:10 – 34:22 (explaining arrival at

who devoted hours of their time conducting extensive research, formulating opinions, and preparing reports. And the Court acknowledges that its methods—specifically, applying multipliers to achieve a more accurate future claims estimate—are simplistic. Nevertheless, the Court need not conduct a mini-trial or make specific findings. Instead, this Court's goal remains focused on the fairness of the Settlement. As explained, to properly evaluate the Settlement, the Court needs a claims value against which to compare the proposed settlement amount. However, the expansive gap in the parties' respective positions regarding the value of these claims was troublesome. Without the knowledge and ability to conduct its own, independent analysis—and short of simply "splitting the difference" between the parties suggested values—the Court needed assistance and a neutral starting point. As discussed, the Court found that in the Resolute Model prepared by Tom Ryan: an experienced professional with intimate knowledge of the specific types of claims at issue. This Model—like the various iterations that preceded it—was prepared before the bankruptcy filing for no purpose other than to provide his client, Berkshire, with a realistic estimate of WCD's (and potentially its) exposure to liability. Mr. Ryan simply had no reason or incentive to manipulate the data. Skewing the value upwards or downwards would not benefit him, his company, or his client. For these reasons—and for those previously discussed—the Court emphasizes that the Resolute Model provides the most unbiased estimated value of these claims and the much-needed neutral starting point. And the Court's adjustments made to the Resolute Model's figures—as simplistic as they are—carry this Court across the finish line.

[67] $336,994.09 (Court's 5-year adjusted average) ÷ $232,932 (Resolute Model's 2-year average) = 1.4467.

Latency/Awareness Factor). The Court concludes that a multiplier of this magnitude overcompensates and swings too far in the other direction. Indeed, the TCC and FCR's expert reports predict an exponential growth in claim value. While the Court accepts that outliers exist and believes they are viable data points, there is nothing in the record to suggest that they will become the norm. As elicited through testimony, the large verdicts and settlements often result from tragic cases involving young plaintiffs. *See, e.g.*, *Tr. of March 5, 2025 Hrg. – PM Session* (*Atkinson Cross*) 62:25 – 63:2, Dkt. No. 1870 (conceding Vanklive and Plant plaintiffs were "much younger than the average meso claimant"). Those types of cases are undeniably few and far between. *See, e.g.*, *Tr. of March 4, 2025 Hrg. – PM Session* (*McKnight Redirect*) 116:19-25, Dkt. No. 1845 ("It is very rare for mesothelioma to occur in individuals under the age of 40."). And, given the fact that WCD stopped production more than twenty years ago in 2004, the pool of potential plaintiffs is aging. *See, e.g. Scarcella Direct* ¶50, BTX-265. Likewise, the products distributed by WCD were incorporated into cosmetics, which may have a shelf life far shorter than other familiar products, such as bottles of baby powder. Therefore, no matter the epidemiological model of mesothelioma incidence used to project future claim filings, the plaintiffs will become fewer and less likely to possess the age factor that often contributes to higher jury verdicts and settlements. As a result, the Court finds that the multiplier should be less than the 2.75 figure suggested by the TCC's expert.

In finding a multiplier—based on evidence—that fits between the minimum 1.45 and proposed 2.75, the Court looks the supplemental evidence submitted since the conclusion of trial; namely to the KCIC Industry Report ("KCIC Report") submitted into evidence as the result of motion practice in July of this year. *Order Granting in Part and Denying in Part the Future Claimants' Representative's Motion to Supplement the Record*, Dkt. No. 2380. The KCIC Report

data shows that 694 talc-related mesothelioma claims were filed in the United States in 2024, and 814 talc-related mesothelioma claims were filed in the United States in 2025. To determine the number of claims that would have been filed against Debtors during that time period, the Court considers that FCR's counsel argued that "debtors were named as defendants in approximately 86 percent of all talc-related mesothelioma cases filed against any defendant nationwide." *Tr. of July 21, 2026 Hrg.* 13:8-10, Dkt. No. 2859. This means that, presumably, 597[68] claims would have been filed against Debtors in 2024 and 700[69] against Debtors in 2025. The Court compares these numbers to those in the Resolute Model, which projected that 291 claims would be filed in the years 2024 and 2025. *See* TCX-142 ("*Claim Projections" Tab*) Cell T13 (projected future mesothelioma claims in 2024); *id.* at Cell U13 (projected future mesothelioma claims in 2025).[70] Thus, the KCIC Report's figures were greater than the Resolute Model's projections by a factor of 2.05[71] in year 2024, and by a factor of 2.41[72] in year 2025. The average of those two factors is 2.23.[73] This is the figure the Court will use as a multiplier.[74]

---

[68] 694 claims x .86(86%) = 597.

[69] 814 claims x .86(86%) = 700.

[70] The Court is confident these figures represent Mr. Ryan's projected number of future claim *filings* (as opposed to projected number of future claim settlements or dismissals) because the row in this table—representing the total of all claims types in a given year—is titled "# New Claims", *see* TCX-142 ("*Claims Projections*" *Tab*) Cell A17, and because the figures in this table correspond with those reported in the "# Claims Filed" Tab.

[71] 597 (claims that would have been filed against Debtors in 2024 according to KCIC Report data) ÷ 291(claims projected in Resolute Model for year 2024) = 2.05.

[72] 700 (claims that would have been filed against Debtors in 2025 according to KCIC Report data) ÷ 291 (claims projected in Resolute Model for year 2025) = 2.41.

[73] (2.05 + 2.41) ÷ 2 = 2.23.

[74] The Court recognizes that the parties opposing the Settlement may argue that this factor (2.23) should be used *in addition to* the minimum 1.45 multiplier applied to the Resolute Model. In other words, parties may argue that the Resolute Model's figures should first be adjusted by a factor of 1.45 to reach a more accurate claims resolution figure, and then again by a factor of 2.23 to account for an increased number of claims. This results in a multiplier of 3.23 (1.45 x 2.23 = 3.23). The Court rejects this methodology. Although the KCIC Report indicates an increase in total mesothelioma filings against all potential defendants, it is not indicative of the *value* of claims *against these Debtors*.

The Resolute Model reports a nominal future value of $648,334,738, and an NPV of approximately $497,000,000. *Resolute Model* ("*Policyholder Projection Model*") Cell B4, TCX-142. Multiplying those figures by 2.23, in order to reflect adjustments discussed above, produces an adjusted nominal future value of $1,445,786,465.74,[75] and an adjusted NPV of $1,108,310,000.00[76]. Notably, this NPV is several hundred million dollars more than the settlement on the table ($535,000,000). However, as explained, the reasonableness of the settlement must be determined by comparing it to the value of the claims *in conjunction with* the likelihood of success on those claims.

**b. Value Considering the Likelihood of Success**

Having determined the NPV of the Successor Liability Claims, the Court now returns to the likelihood of success on those claims. It is only through consideration of these elements together that the Court can determine whether the Settlement reflects a fair resolution for the claims at issue. For example (and using the TCC's figures for illustration purposes only), were this Court to accept the TCC's $3.3 billion valuation for Debtors' talc liability—and find a 90% likelihood of success in the state courts against Brenntag on the Successor Liability Claims—then the value proposed Settlement appears far too low.[77] On the other hand, were this Court to accept the TCC's $5.3 billion valuation for Debtors' talc liability—but find only a 1% likelihood of success in the

For reasons previously discussed, a factor of this magnitude (3.23) improperly assumes exponential growth in both claim filings and claim value *against these Debtors*, and improperly inflates estimated value of future claims against these Debtors. The Court uses the KCIC Report not to acquire a hard data point, but as a guidepost for determining an appropriate multiplier for purposes of this Motion.

[75] $648,334,738 (nominal value of future claims in Resolute Model) x 2.23 = $1,445,786,465.74.

[76] $497,000,000 (NPV from Resolute Model) x 2.23 = $1,108,310,000.00.

[77] $3,300,000,000 x 90% = $2,970,000,000.

state courts against Brenntag on the Successor Liability Claims—then the proposed Settlement appears generous.[78] Here, the Court adjusts the NPV to $1,108,310,000. The Court must next consider an appropriate success rate.

The Court previously discussed the substantial hurdles and significant obstacles facing the Successor Liability Claims at issue. In this Court's view, these claims have minimal probability of success on the merits. Notwithstanding, this Court recognizes that it did not conduct a trial on the merits of the claims. For this reason, the Court believes it is prudent for purposes of evaluation of this Settlement to afford the claims the benefit of the doubt. Accordingly, the Court will assume that one-half of the claims will succeed, and will apply a generous 50% success rate.[79]

Applying the generous 50% success rate to the adjusted NPV reduces the value of the Successor Liability Claims to $554,155,000.[80] That is the figure against which the Proposed Settlement must be compared to determine its reasonableness. Clearly, the Proposed Settlement of $535,000,000 approximates the Court's high-end estimated value of the Successor Liability Claims at $554,155,000. Indeed, the Proposed Settlement is roughly only 3.5% lower than the Court's estimate. Given the considerations discussed—and in light of the *Martin* factors—the Proposed Settlement amount certainly "falls above the lowest point in the range of reasonableness." *In re Alecto Healthcare Servs*. LLC, 184 F.4th 163, 170 (3d Cir. 2026) (citations and quotations omitted); *see also, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004) (recognizing that lawsuit could produce damages exceeding the proposed settlement amount but nevertheless concluding that the settlement of lawsuit was above the lowest point in

---

78 $5,300,000,000 x 1% = $53,000,000.

79 To be clear, the Court makes no finding regarding the precise percentage of success for these claims. As indicated, the Court uses the 50% rate out of an abundance of caution. The Court's unfiltered views about the merits of these claims are discussed in detail in the section of this Opinion devoted to the first *Martin* factor.

80 $1,108,310,000 (adjusted NPV) x .50 (50%) = $554,155,000.

the range of reasonableness); *In re Trib. Co*., 464 B.R. 126, 157 (Bankr. D. Del.), on reconsideration in part, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Trib. Media Co*., 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Trib. Co.*, 972 F.3d 228 (3d Cir. 2020), and *aff'd in part sub nom. In re Trib. Media Co*., 587 B.R. 606 (D. Del. 2018), and *aff'd sub nom. In re Trib. Co*., 972 F.3d 228 (3d Cir. 2020) (approving settlement where the court's valuation was higher than the proposed settlement amount); *In re NII Holdings, Inc.*, 536 B.R. 61 (Bankr. S.D.N.Y. 2015) (approving a settlement reflecting in 79% reduction in claim amount as reasonable where such reduction was commensurate with the likelihood of success on the merits).

Finally, the Court reiterates that it expects the Successor Liability Claims to face significant challenges in the tort system; and it is the Court's view that the probability of success is much less than 50%. As explained, a lower chance for success corresponds to a lower value for these claims. Even a small downward adjustment in the assumed rate of success results in a Court-calculated NPV value that falls far below the offer on the table.[81] Given the Court's serious doubts regarding the viability of the Successor Liability Claims, it concludes that the Settlement is reasonable and in the best interest of the creditor body.

**c. Summary of Paramount Interest of Creditors**

As stated, evaluation of the fourth *Martin* factor requires courts to consider whether the proposed compromise truly maximizes value for creditors. *See In re Summit Metals, Inc.*, 477 F. App'x at 22 (3d Cir. 2012). Here, the value of the proposed Settlement to the debtor estates likely exceeds the value of the claims being compromised, and, thus, benefits all parties to this

[81] For example, assuming a likelihood of success of 40% reduces the Court-calculated NPV to $443,324,000 (adjusted NPV of $1,108,310,000 x .4(40%) = $443,324,000), which is well below the $535,000,000 proposed in the Settlement.

bankruptcy proceeding. *See In re Diocese of Camden*, 653 B.R. at 742. Simply put, this Court disagrees with the TCC's and FCR's position as to the value and merits of the Successor Liability Claims. The Court determines that the proposed Settlement is sufficiently funded; and finds it unlikely that these claims would fare better in the tort system. The Settlement results in an immediate influx of cash into the debtor estates and eliminates the need for costly and time-consuming future litigation on issues of indemnification. Thus, the fourth *Martin* factor—the paramount interest of creditors—weighs in favor of approving the Settlement.

At this point the Court addresses the FCR's concern, *see* footnote 8, *supra*, that the Settlement is unfair because it affords releases to the Settling Non-Debtors. The Court acknowledges that the Settling Non-Debtors receive this benefit. However, this benefit does nothing to diminish the overall benefit the Settlement brings to the debtor-estates and the creditor body. As expressed, the Court does not share the TCC's and FCR's belief that the Successor Liability Claims have significant value; therefore, for reasons discussed, the best interests of the estates and the creditors are served by approval of the Settlement.

**E. Impact of Environmental Settlement**

Contemporaneously with this Opinion, the Court issues an Opinion approving Debtors' proposed settlement with the Environmental Creditors (the "Environmental Settlement"). The basis for approval of the Environmental Settlement can be found in that Opinion, and no further discussion is warranted here. However, the Court raises the Environmental Settlement to address two issues as they relate to the instant Motion.

First, in the contemporaneous Opinion on the Environmental Settlement, this Court declines to address the TCC's argument that no weight should be afforded the newly found government support for the Settlement at issue in this Motion. Indeed, most of the governmental

entities (the "Government Environmental Creditors" or "GECs") who are parties to the Environmental Settlement previously opposed the Settlement being addressed in the instant Opinion. Since resolving their claims by way of the Environmental Settlement, however, the GECs now support the Settlement, which globally resolves both the Environmental Claims against—and Successor Liability Claims held by—the debtor-estates. In the Opinion approving the Environmental Settlement, the Court indicates that it would address the TCC's argument regarding the GECs' changed position in the context of its ruling on the present Motion. The Court does so now.

The TCC states that "the question remains what weight—if any—the Court should afford the GECs' withdrawal of their objections to the Estate Claims Settlement. The TCC respectfully submits that the answer is none." *TCC Obj. to Estate Claims Settlement Motion* ¶ 67, ECF No. 2876. To the extent the TCC asks this Court to disregard the withdrawal of the GECs' objections and analyze this Motion as if the objections remain, the Court simply cannot accommodate this request—doing so would disregard reality. However, ultimately, the Court finds that the issue is of minimal import. Even if this Court were to, as the TCC requests, afford no weight to the GECs' support for the Settlement, the Court's decision remains the same: the Settlement is approved for the detailed reasons previously discussed. The Court's rationale is unchanged irrespective of explicit support from the GECs.

Second, the Court recognizes that the agreement reached between the Environmental Creditors and Debtors contemplates, in part, use of funds from the aggregate settlement amount of $535 million discussed in this Motion, which further reduces recoveries for the tort claimants on the Successor Liability Claims. This fact has no bearing on the Court's present ruling. Indeed, the sharing of funds among creditors has always been contemplated in the Settlement, and in the larger

context of the bankruptcy itself. Moreover—although a precise figure is not available in the record—the Court notes that the Environmental Claimants' share of recovery is dwarfed by the amount from the Settlement that will go to the tort claimants. Therefore, the settlement with the Environmental Claimants has little effect on the *Martin* analysis as it relates to these Successor Liability Claims. Indeed, the TCC's objections to the Environmental Settlement focus on factors relating to fairness rather than on the Environmental Settlement's financial impact on potential tort claimant recoveries. Finally, the Court again expresses its view that the Successor Liability Claims are not likely to succeed on the merits; therefore, while the impact of the Environmental Settlement—if any—is unknown, it is likely to be minimal.

## IV. Conclusion

For the foregoing reasons, the Court finds that the Settlement falls above the lowest point of reasonableness and GRANTS the Motion to Approve the Settlement. The Court further denies the TCC's Derivative Standing Motion.[82]

---

[82] The district court in *In re Invitae Corp* provided a concise explanation of derivative standing:

> Generally, the trustee of the debtor has a fiduciary duty to "maximize the value of the bankruptcy estate," which potentially includes bringing avoidance actions against third parties under certain circumstances. *See* [*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003)]. By the terms of the Bankruptcy Code itself, this duty—and by extension, the ability to bring an avoidance action on behalf of the debtor—does not extend to other creditors. *See id.*; *see also In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 423 (2d Cir. 2008) ("The Bankruptcy Code does not expressly authorize committees or individual creditors—in contrast to trustees and debtors-in-possession—to sue on behalf of an estate,"). But "[t]his situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor—really, the debtor's management—bears a fiduciary duty to avoid fraudulent transfers that it itself made." *Cybergenics Corp.*, 330 F.3d at 573. Indeed, "[d]ebtors sometimes lack the inclination, or the means, to bring actions that should be prosecuted," *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005.)
>
> This is where derivative standing comes in, providing a "critical safeguard against lax pursuit of avoidance actions." *Cybergenics*, 330 F.3d at 573. As a result, "bankruptcy courts can confer derivative standing upon creditors' committees to bring actions to recover property for the benefit of the estate." *Centaur, LLC*, 2010 WL 4624910, at *4 (citing *Cybergenics*, 330 F.3d at 548). However, the decision to grant derivative standing is "uncommon" and " 'the exception rather than

Counsel for Debtors are directed to settle an appropriate Order consistent with this ruling and referencing this Opinion.

Dated: October 22, 2026

Honorable Michael B. Kaplan
United States Bankruptcy Judge

the rule.' " *In re DeCurtis Holdings, LLC*, No. 23-10548, 2023 WL 5274925, at *4 & n.43 (Bankr. D. Del. Aug. 14, 2023) (quoting *In re Merritt*, 711 F. App'x 83, 86 (3d Cir. 2017) and citing *In re Airocare, Inc.*, No. 10-14519, 2011 WL 2133526, at *1 (Bankr. E.D. Va. May 24, 2011) ("The Bankruptcy Code does not expressly permit such parties to initiate adversary proceedings. Derivative standing is thus an implicit exception to the 'general rule' whereby the Bankruptcy Code assigns to the trustee or debtor-in-possession 'the privilege of prosecuting' various actions on behalf of the estate." (cleaned up))). The party seeking derivative standing bears the burden of proof. *In re Diocese of Camden, N.J.*, No. 20-21257, 2022 WL 884242, at *4 (Bankr. D.N.J. Mar. 24, 2022); *In re MRPC Christiana, LLC*, No. 18-26567, 2019 WL 6652237, at *10 (Bankr. D.N.J. Dec. 5, 2019) ("It is the creditor's burden in the first instance to demonstrate it satisfies the[ ] prerequisites for derivative standing.").

*In re Invitae Corp.*, No. BR 24-11362, 2025 WL 2538952, at *8 (D.N.J. Aug. 11, 2025).

Courts utilize a two-part test for determining whether derivative standing is appropriate: "(1) the court must determine whether a claimant has presented a colorable claim; (2) the court must then undertake a cost-benefit analysis." *In re G-I Holdings, Inc.*, No. CIV. 04-3423, 2006 WL 1751793, at *11 (D.N.J. June 21, 2006), opinion amended on reconsideration, No. BR 01-30136(RG), 2006 WL 8458733 (D.N.J. Aug. 7, 2006) (citing *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985)); *see also In re Invitae Corp.*, 2025 WL 2538952 at *9. The second part of this test necessitates a cost-benefit analysis that implicates many of the same factors considered under the *Martin* standard; namely: (1) "whether the action asserting such claims is likely to benefit the reorganization estate; (2) the probabilities of legal success in the event the action is pursued; (3) financial recovery in event of success; (4) whether appointment of a trustee or another party to bring the action would be preferable; and (5) the cost to the estate in proceeding with the action and the terms relative to any attorneys' fees[.]" *In re Invitae Corp.*, 2025 WL 2538952, at *9 (cleaned up and citing *In re STN Enters.*, 779 F.2d at 906 and *In re G-I Holdings, Inc.*, 2006 WL 1751793 at *11).

In addressing the Settlement Motion under *Martin*, this Court has provided a detailed analysis regarding the likelihood of success, the potential financial recoveries involved, and the cost to the estate of continued litigation—and has determined that the Settlement is in the estates' best interests. In light of these findings and the Court's approval of the Settlement Motion, there can be no finding that the Debtors have unjustifiably failed to pursue the Successor Liability Claims. Accordingly, the second part of the test cannot be satisfied and granting derivative standing is unwarranted.