NOT FOR PUBLICATION

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)** | Case No. 23-13575 (MBK) |
| --- | --- |
| In Re:<br><br>Whittaker, Clark & Daniels, Inc., *et al.* | Chapter 11<br><br>Judge: Michael B. Kaplan |

**MEMORANDUM OPINION**

## I. Introduction

This matter comes before the Court on the Debtors' Motion for Entry of an Order (I) Approving the Consent Decree and Environmental Settlement Agreement ("CDESA") Between the Debtors, the Government Environmental Creditors, the Berkshire Entities, Brenntag, and the DBUS Entities[1], (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief (the "Environmental Settlement Motion" or the "Motion," Dkt. No. 2626). The Official Committee of Talc Claimants (the "TCC" or "Committee") has objected to the Environmental Settlement Motion. Dkt. No. 2876 ("TCC Obj.").

The jointly administered chapter 11 cases concern Whittaker, Clark & Daniels, Inc. ("WCD"), Brilliant National Services, Inc. ("Brilliant"), Soco West, Inc. ("Soco West"), and L.A. Terminals, Inc. ("LAT") (collectively, the "Debtors"). *See Estate Claims Settlement Motion* ¶¶ 17–26, Dkt. No. 1297. The Debtors trace their corporate histories through businesses and ownership

[1] All parties to the CDESA are further identified and defined below.

structures extending back more than a century. *See id.* at ¶ 17. Soco West's pre-2004 operations began as early as 1933, with the formation and incorporation of A.J. Lynch Co., which sold and distributed chemicals and raw materials to the paint industry. Over multiple decades and through a series of strategic mergers and acquisitions and corporate name changes, Soco West's historical operations expanded to include those of:

- Western Chemical & Manufacturing Co., which manufactured and distributed industrial chemicals and was incorporated in California in 1944;
- Dyce Chemical Inc., which repackaged and distributed industrial chemicals and was incorporated as Dyce Sales & Engineering Service Co. in Montana in 1957;
- Crown Chemical Corp., which sold and distributed industrial chemicals and was incorporated as Petrosolve Corp. Ltd. in California in 1969; and
- Holchem Inc., which distributed chemicals and handled and recycled solvents and was incorporated in California in 1981.

*First Day Decl. of Moshin Y. Meghji* ¶¶ 18-21, Dkt. No. 5.

LAT was formed and began its operations importing and storing industrial chemicals in 1981. *Id.* at ¶ 19. Specifically, LAT operated a chemical storage and distribution terminal and bulk plant located within the Los Angeles Harbor. *Id*. LAT ceased its storage and distribution operations in 1994 and largely resolved its liabilities through ordinary course claims management. *Id*. By 2001, through a series of stock purchases, LAT became a direct subsidiary of Stinnes Corporation ("Stinnes"). *Id.*

Brilliant was formed and began its operations in 1977 as Stinnes Oil & Chemical Company, Inc. ("Stinnes Oil & Chemical"), a subsidiary of Stinnes. By 1982, Stinnes Oil & Chemical had withdrawn from the oil business and concentrated its business on the marketing, distributing, and trading of chemicals. *Id.* at ¶ 20. Stinnes Oil & Chemical changed its name twice: first to Soco Chemical Inc. in 1986, and then to Brenntag Inc. in 1998. *Id.*

As of 2004, the Debtors were owned by Stinnes, itself an affiliate of Deutsche Bahn AG. *Id.* at ¶ 21. In 2004, substantially all of WCD, Soco West, and Brilliant's operating assets were sold to entities under the umbrella of Brenntag N.A., and those entities assumed certain non-asbestos and non-environmental liabilities related to the transferred assets (collectively, the "2004 Transactions"). *Id.* LAT was not involved in the 2004 Transactions, as it had previously ceased all operations. *Id.* The environmental liabilities relevant to the present Motion are concentrated overwhelmingly at Soco West. *See Estate Claims Settlement Motion* ¶ 62 & n.74, Dkt. No. 1297. The environmental sites addressed by the CDESA include the Service Chemical, Lockwood Solvent, La Mirada, Vernon, Chase Chemical, Omega Chemical, Cooper Drum, and Chatham Brothers sites. *See id.* at ¶ 15.

The governmental parties to the CDESA are the United States on behalf of the Environmental Protection Agency ("EPA"); the State of Montana through the Montana Natural Resource Damage Program and Montana Department of Environmental Quality; the California Department of Toxic Substances Control ("DTSC"); the California State Water Resources Control Board and California Regional Water Quality Control Board, Los Angeles Region (collectively, the "California Water Boards"); and the Orange County Water District ("OCWD") (collectively, the "Government Environmental Creditors" or "GECs"). *See Environmental Settlement Motion* ¶ 1 n.4. The Berkshire Entities consist of National Indemnity Company ("NICO"), Berkshire Hathaway Inc., BH Columbia Inc., Columbia Insurance Company, Resolute Management, Inc., Ringwalt & Liesche Co., and National Liability & Fire Insurance Company (collectively, the "Berkshire Entities"). *See Consent Decree and Environmental Settlement Agreement* ("CDESA") ¶ 1(e), Dkt. No. 2626, Ex. 1. Brenntag consists of Brenntag Canada, Inc., Brenntag Great Lakes, LLC, Brenntag Mid-South, Inc., Brenntag North America, Inc., Brenntag Northeast, LLC, Brenntag Pacific, Inc., Brenntag Southwest, Inc., Brenntag Specialties, LLC, and Coastal Chemical Co., LLC (collectively, "Brenntag"). *See id.* at ¶ 1(g). The DBUS Entities are DBUS

and DB US Corporation (collectively, "DBUS" or "DBUS Entities"). *See id.* at ¶ 1(o). The CDESA defines the "Contributing Parties" to include the Berkshire Entities, Brenntag, and DBUS. *See id.* at ¶ 1(m).

The CDESA contains two related sets of compromises. *See Environmental Settlement Motion* ¶ 23. As between the GECs and the Debtors, the settlement provides for aggregate Stipulated Allowed Claims against Soco West totaling $57 million. *See id.* at ¶ 3, *CDESA* ¶ 8. The GECs also agree to waive any Administrative Claims and other claims entitled to priority under section 507(a) against the Debtors, subject to the conditions set forth in the CDESA. *See CDESA* ¶ 9. The CDESA further requires the Debtors to seek authority to establish the Lockwood Environmental Response Trust and convey the Lockwood Solvent Site to that trust. *See id.* at ¶ 15. It also establishes procedures governing consultation with the GECs and the parties' respective obligations concerning plan provisions addressed by the settlement. *See id.* at ¶¶ 51–52.

The second set of compromises addresses potential direct environmental liability of non-debtors. *See Environmental Settlement Motion* ¶¶ 5–7, 25. NICO agrees to fund an aggregate $16.5 million payment on the terms specified in the CDESA. *See CDESA* ¶ 6. In exchange, the CDESA provides reciprocal covenants concerning specified direct claims between the GECs and the participating non-debtors. *See id.* at ¶¶ 32–39. Those claims include alleged direct operator liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(2), pursuant to *United States v. Bestfoods*, 524 U.S. 51 (1998), as well as certain analogous claims under state environmental law. *See id.* at ¶ 1(f). The covenants are subject to the exclusions and reservations contained in the CDESA, including limitations applicable to Brenntag and certain additional entities defined as "Purchased Entities." S*ee Environmental Settlement Motion* ¶ 6. The $16.5 million payment is funded by NICO rather than by the Debtors or their assets. *See CDESA* ¶ 6; *Debtors' Reply in Support of the Environmental Settlement Motion* ("Debtors' Reply") ¶ 16, Dkt. No. 2893.

The CDESA also addresses the GECs' pending disputes concerning the Estate Claims Settlement.[2] Subject to the Effective Date, the GECs agree to provide affirmative support for the Estate Claims Settlement in the form prescribed by the CDESA. *See CDESA* ¶ 52(c). The GECs' objections to the Estate Claims Settlement Motion are also to be deemed withdrawn as of the Effective Date, subject to the reinstatement provision contained in the CDESA. *See id.* at ¶ 54. The settlement at issue in this Motion therefore addresses several categories of disputes at once: environmental claims against the Debtors, alleged direct claims against non-debtors, the disposition of the Lockwood Solvent Site, potential priority claims, and the GECs' objections to the Estate Claims Settlement. *See Environmental Settlement Motion* ¶¶ 23–25; *CDESA* ¶¶ 6, 8–15, 32–39, 51–54.

The proposed CDESA also was subjected to the governmental review and public-comment procedures applicable to the settling governmental entities. *See Environmental Settlement Motion* ¶ 22; *CDESA* ¶¶ 46–48. The United States received one public comment, submitted by the TCC, and after considering that comment continued to support the CDESA as fair and reasonable. *See The United States' Response to the Official Committee of Talc Claimants Objection to the Debtors' Motion* ("United States Resp.") 1–2, Dkt. No. 2900. Montana likewise determined that the CDESA is fair, reasonable, and in the public interest. *See The State of Montana's Joinder in the United States' Response to the Official Committee of Talc Claimants' Objection to the Debtors' Motion* (the "Montana Joinder") at 3, Dkt. No. 2901. DTSC stated that, after applying the criteria governing environmental settlements, it reached the same conclusion. *See Joinder of the California Department of Toxic Substances Control to the United States' Response to the Official Committee of Talc Claimants' Objection to the Debtors' Motion* (the "DTSC Joinder") at 8, Dkt. No. 2902. The California Water Boards similarly characterized the

[2] The Estate Claims Settlement is further described and discussed below in greater detail.

negotiated resolution as fair, reasonable, and in the public interest. *See Joinder of the California State Water Resources Control Board and Regional Water Quality Control Board, Los Angeles Region, to the United States' Response to the Official Committee of Talc Claimants' Objection to the Debtors' Motion* ("Water Boards Joinder") at 5, Dkt. No. 2903. OCWD joined the United States and DTSC and asked the Court to approve the CDESA. *See Orange County Water District Joinder* ("OCWD Joinder") at 1–2, Dkt. No. 2904.

The Court has considered the Environmental Settlement Motion; the declarations submitted in support thereof; the TCC's objection and supporting declaration; the Debtors' reply; the responses and joinders of the Berkshire Entities, the United States, the State of Montana, the California Department of Toxic Substances Control, the California State Water Resources Control Board and Regional Water Quality Control Board, Los Angeles Region, and the Orange County Water District; the Omega Chemical PRP Group's limited response; the record cited by the parties; and the arguments presented at the hearing. For the reasons that follow, the Environmental Settlement Motion is GRANTED.

## II. Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, and June 6, 2025, referring bankruptcy cases to the bankruptcy court. This matter is a statutory core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O), and the Court has constitutional authority to enter a final order. Venue is proper under 28 U.S.C. § 1408.[3]

[3] To the extent any finding of fact constitutes a conclusion of law, it is adopted as such; and to the extent any conclusion of law constitutes a finding of fact, it is adopted as such.

## III. Pertinent Additional Background and Procedural History

### The Debtors and their Alleged Tort/Successor and Environmental Liabilities

On September 3, 2024, the Debtors filed a separate motion (the "Estate Claims Settlement Motion," Dkt. No. 1297) seeking approval of a settlement with certain non-debtor parties concerning estate-owned claims, including successor-liability and related causes of action (the "Estate Claims Settlement"). Several parties objected. The United States, acting through the Environmental Protection Agency ("EPA"), and certain other environmental creditors filed objections or joinders directed principally to the treatment and valuation of environmental liabilities. Montana, however, did not object to the Estate Claims Settlement (a point Montana later emphasizes in response to TCC's characterization that all environmental creditors had opposed it). See Environmental Settlement Motion ¶¶ 17-19 & n.11; *Montana Joinder* at 2-3.

The Debtors' environmental liabilities were the subject of substantial contest in connection with the Estate Claims Settlement, including the submission of multiple expert reports addressing such liabilities. *See id.* at ¶¶ 17–20. In this regard, the Debtors' expert, David L. McKnight of The Brattle Group, estimated Soco West's environmental liabilities at those sites. *See id.*, *Declaration of David L. McKnight ("McKnight Decl.")* ¶ 6, Dkt. No. 2628. Mr. McKnight estimated the aggregate net present value of those liabilities at between approximately $38.86 million and $57.10 million. *See McKnight Decl.* ¶ 6 & tbl. 1. The Government Environmental Creditors disputed Mr. McKnight's environmental liability estimates during the litigation over the Estate Claims Settlement and presented competing expert testimony. *See Environmental Settlement Motion* ¶ 34. Their experts contended that Soco West's environmental liabilities could materially exceed the amounts estimated by Mr. McKnight. *See id.* at ¶ 30. EPA's expert, for example, testified that Mr.

McKnight had underestimated the costs associated with the Lockwood Solvent Site "by many multiples." *See March 5, 2025 (p.m.) 9019 Hr'g Tr.* at 146:23–24.

**The Estate Claims Settlement and the Preservation of Direct Environmental Claims**

Significantly, the Estate Claims Settlement did not release potential direct claims held by non-debtors against the Contributing Parties, including claims seeking to impose direct operator liability under CERCLA. *See* Environmental Settlement Motion ¶ 14. The existence and value of such potential direct claims are disputed. *See TCC Obj.* ¶¶ 34–45; *Debtors' Reply* ¶ 23. The record reflects that potential direct environmental claims against non-debtors were being discussed well before the parties reached the settlement embodied in the CDESA. *See Debtors' Reply* ¶ 12, ¶¶ 9–10; *Response of the Berkshire Entities to the Objection of the Tort Claimant Committee* ("Berkshire Resp.") at 4–6, Dkt. No. 2899. In September 2024, EPA sought changes to the proposed order approving the Estate Claims Settlement to address what it called the "owner/operator issue." *See Debtors' Reply* ¶ 9. The following month, EPA separately requested language clarifying that "direct liability is not impacted" by approval of that settlement. *See id.* In its January 2025 objection, EPA again requested language expressly preserving direct claims against the Berkshire Entities, Brenntag, and DBUS, whom the CDESA refers to as the "Contributing Parties" in reference to their participation in the separate Estate Claims Settlement. *See id.* at ¶ 10. The Debtors responded that the Estate Claims Settlement did not release direct claims against the Contributing Parties as owners or operators under CERCLA or analogous environmental laws and cited *United States v. Bestfoods*, 524 U.S. 51 (1998), in support of that distinction. *See id.*

That chronology bears directly on the TCC's contention that direct liability was later invoked as a *post hoc* justification for the NICO settlement payment. *See TCC Obj.* ¶ 25. The contemporaneous record shows that EPA was seeking to preserve potential direct claims against the Contributing Parties *before* the negotiations that ultimately produced the CDESA. *See Debtors'*

*Reply* ¶¶ 9–10; *Berkshire Resp.* at 4–6. The record further reflects that, when negotiations over a NICO contribution began in January 2025, the proposed settlement framework already contemplated the release of direct claims as part of the consideration for that contribution. *See Berkshire Resp.* at 7–8. Whether the asserted direct claims ultimately would succeed is a separate question; what matters here is that those claims had been identified and were part of the parties' negotiations before the CDESA was finalized. *See id.* at 8–10.

**The Negotiations and the CDESA**

The Court conducted a joint hearing on the Estate Claims Settlement from March 3 through March 6, 2025. During that hearing, the parties announced that they had reached a term-sheet-level agreement concerning certain environmental matters. *Mar. 6, 2025 Hr'g Tr*. at 5:13–19, Dkt. No. 1871. The agreement announced at the hearing was not the final CDESA, and negotiations continued thereafter. *See The Declaration of Tim Pohl in Support of the Debtors' Motion* ("Pohl Decl.") ¶ 12, Dkt. No. 2627. On March 6, 2025, Tim Pohl and Paul Aronzon—the Debtors' disinterested directors—met separately to consider an illustrative term sheet reflecting the proposed environmental settlement. *See Pohl Decl.* ¶ 8. They determined that the proposed settlement constituted a conflict matter, and the Berkshire-affiliated director, Raj Mehta, was neither involved in, nor informed of their discussions concerning the proposed settlement. *See id.* at ¶ 9. Messrs. Pohl and Aronzon then authorized the Debtors to continue pursuing a settlement on substantially similar terms. *See id.* at ¶ 10. Over the ensuing nearly nine months, the Debtors, through counsel, continued negotiating the Environmental Settlement and its long-form documentation. *See id.* at ¶ 12. On December 5, 2025, Pohl and Aronzon again met separately, reviewed the CDESA, and authorized the Debtors to enter into and perform their obligations under the agreement. *See id.* at ¶¶ 13–14.

**The Objection and Other Responses**

The TCC is the only party that asks the Court to deny the Environmental Settlement Motion. *See Debtors' Reply* ¶ 12. The TCC expressly "takes no position" on the validity of the environmental claims resolved through the $57 million Stipulated Allowed Claim. *See TCC Obj.* ¶ 33. The Debtors further note that the TCC does not object to the other provisions of the CDESA governing the treatment of the Debtors' environmental liabilities or remaining real property, including the administrative-claim waiver and the framework for the Lockwood property. *See Debtors' Reply* ¶¶ 12–13. Rather, the TCC's objection principally focuses on the $16.5 million NICO payment and the GECs' agreement to withdraw their objections to, and support, the Estate Claims Settlement. *See TCC Obj.* ¶¶ 32–33, 62–64.

The TCC's objections can be grouped into three principal categories. First, the TCC contends that the $16.5 million NICO Payment does not reflect a genuine compromise of potential *Bestfoods* claims. It argues that the record lacks sufficient site-specific evidence that any Contributing Party managed, directed, or conducted pollution-related operations at the relevant sites. *See TCC Obj.* ¶¶ 34–41. The TCC further contends that the GECs did not adequately investigate the factual basis for potential direct operator liability before agreeing to the settlement. *See id.* at ¶¶ 42–45. It also argues that the amount of the NICO Payment was negotiated as a "top-up" to the GECs' anticipated bankruptcy recoveries rather than by assigning value to the asserted *Bestfoods* claims. *See id.* at ¶¶ 46–47. The TCC points to the timing and urgency of the negotiations surrounding the March 2025 hearing as evidence that the purpose of the payment was to secure the GECs' support for the Estate Claims Settlement. *See id.* at ¶¶ 48–50. Finally, the TCC relies on the CDESA's original two-tranche payment structure, arguing that the payment obligations were tied to events involving the Estate Claims Settlement rather than to the resolution of the asserted direct claims. *See id.* at ¶¶ 51–52.

Second, the TCC argues that the CDESA does not serve the paramount interest of creditors because, in its view, the NICO Payment gives the GECs consideration unavailable to other unsecured creditors. *See TCC Obj.* ¶¶ 61–66. It further contends that the $57 million Stipulated Allowed Claim and the $16.5 million NICO Payment compensate for the same underlying environmental harm under different theories of liability, resulting in what the TCC characterizes as a double recovery. *See id.* at ¶¶ 57–60. According to the TCC, that structure permits the GECs to receive additional consideration beyond their allowed claims, while similarly situated creditors receive no comparable payment. *See id.* at ¶¶ 65–66.

Third, the TCC asks the Court, even if it approves the CDESA, to afford no weight to the GECs' changed position on the Estate Claims Settlement. *See id.* at ¶ 67. The TCC analogizes to section 1126(e) of the Bankruptcy Code and cases addressing designation of plan votes, including *In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010), arguing that creditor support procured through special consideration should not be credited in evaluating a contested transaction. *See id.* at ¶¶ 68–73. The TCC acknowledges that section 1126(e) does not directly govern the CDESA, but invokes the equitable principles underlying that provision and the Court's authority under section 105(a). *See* at *id.* ¶ 73. It therefore asks the Court to evaluate the Estate Claims Settlement as though the GECs' objections remained pending. *See id.* at ¶ 74.

The Debtors, the Berkshire Entities, and the governmental parties reject those contentions on several grounds. They emphasize that potential direct claims against the Contributing Parties were asserted and preserved months before the March 2025, hearing and the negotiations that produced the CDESA. *See Debtors' Reply* ¶¶ 9–10. They further argue that the GECs were not required to establish the Contributing Parties' liability before compromising disputed direct claims. *See Debtors' Reply* ¶ 23. The Berkshire Entities likewise emphasize the uncertainty, expense, and fact-intensive nature of litigating potential CERCLA operator liability. *See Berkshire Resp.* at 11–12. The Debtors and Berkshire Entities also distinguish the GECs from talc claimants

on the ground that the $16.5 million payment is made by NICO, rather than from the Debtors or their assets, in exchange for potential direct environmental claims that talc claimants do not hold. *See Debtors' Reply* ¶ 16; *Berkshire Resp.* at 9–10. The Debtors further submit that the CDESA provides independent benefits to the estates and the public at large, including resolution of environmental claims, waiver of potential administrative claims, disposition of the Lockwood Solvent Site, and reduction of future litigation and administrative expense. *See Debtors' Reply* ¶ 13.

The governmental parties also identify remediation funding as an important component of the settlement. The United States contends that its principal concern in structuring the NICO Payment was obtaining funds that could be deployed quickly to restart remediation at the Lockwood Solvent Site, and that it requested the two-part payment structure for that purpose. *See United States Resp.* at 8–9. DTSC similarly explains that settlement offered the fastest means of obtaining funding for the Service Chemical Site and resuming necessary response actions. *See DTSC Joinder* at 8. The California Water Boards state that their allocation of the NICO Payment is designated for environmental cleanup costs associated with the La Mirada Site. *See Water Boards Joinder* at 5.

One additional development bears directly on the TCC's payment-structure argument. The TCC interprets the CDESA to permit payment of the first $8.25 million tranche even if the Estate Claims Settlement is not approved, while the covenants concerning the asserted direct claims would not become effective unless the second tranche is also paid. *See TCC Obj.* ¶¶ 51–52. The Berkshire Entities dispute that interpretation, but NICO has nevertheless waived the condition to its second $8.25 million payment to the extent it is deemed dependent on approval of the Estate Claims Settlement. *See Berkshire Resp.* at 16. As a result of that waiver, the Berkshire Entities represent that, even if the Estate Claims Settlement is not approved, approval of the CDESA and satisfaction of its remaining conditions will result in payment of the full $16.5 million NICO

Payment and effectiveness of the covenants not to sue concerning the asserted direct claims. *See id.*

The Omega Chemical PRP Group (the "Omega Group") filed a limited response stating that it does not object to the relief requested in the Environmental Settlement Motion. *See Limited Response and Reservation of Rights of the Omega Chemical PRP Group* (the "Omega Group Resp.") ¶ 1, Dkt. No. 2651. The Omega Group nevertheless reserves all rights, arguments, and defenses concerning its proof of claim against Soco West, including its allowance, treatment, priority, amount, enforceability, and any distribution on account of that claim. *See id.* at ¶ 2. It also reserves its rights concerning the effect, if any, of the Environmental Settlement Motion, the CDESA, or any order approving the settlement on its proof of claim. *See id.* The Court addresses that reservation below.

## IV. Legal Standard

### Bankruptcy Rule 9019

Federal Rule of Bankruptcy Procedure 9019(a) provides that, on motion by the trustee or debtor in possession and after notice and a hearing, the Court may approve a compromise or settlement. FED. R. BANKR. P. 9019(a). In considering a proposed settlement, the Court must determine whether the compromise is "fair and equitable." *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006). The Court must exercise its own "informed, independent judgment" in making that determination. *In re Mulkerin*, 2025 WL 2402287, at *4 (Bankr. M.D. Pa. May 28, 2025) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). The fair-and-equitable inquiry also requires consideration of the settlement's fairness to parties who did not settle. *See Nutraquest*, 434 F.3d at 645.

The Third Circuit directs bankruptcy courts to assess a proposed compromise by considering four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay

necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Alecto Healthcare Services LLC*, 184 F.4th 163, 170 (3d Cir. 2026). In applying these factors, the Court assesses and balances the value of the claims being compromised against the value to the estate of accepting the compromise. *Alecto*, 184 F.4th at 170.

Compromises are favored in bankruptcy because they minimize litigation and expedite administration of the estate. *Martin*, 91 F.3d at 393. Accordingly, the Court need not resolve the numerous questions of law and fact that the settlement is intended to avoid. Rather, it must "canvas the issues" and determine whether the proposed settlement falls above the "lowest point in the range of reasonableness." *Alecto*, 184 F.4th at 170; *see also In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020). Thus, Rule 9019 does not require the Court to conduct a mini-trial or conclusively determine the merits of the claims being compromised. *See NovaPro*, 815 F. App'x at 658.

The TCC argues that the CDESA fails this standard because, in its view, the NICO Payment was used to purchase the GECs' support for the separate Estate Claims Settlement. *See TCC Obj.* ¶¶ 5–6, 64, 75. The Court considers those arguments as part of its Rule 9019 analysis, applying the Martin factors to determine whether the settlement is fair and equitable, with particular attention to the fourth factor—the paramount interest of creditors.

**Scope of This Decision**

A recurring theme in the TCC's objection is that the Government Environmental Creditors' withdrawal of their objections to, and support for, the Estate Claims Settlement should be afforded no weight in the Court's consideration of that separate motion. That issue need not be resolved to decide the Environmental Settlement Motion. The Court can determine whether the CDESA satisfies Rule 9019 and the *Martin* factors without deciding what significance, if any, the GECs' changed position should have in evaluating the Estate Claims Settlement. Accordingly, this Opinion expresses no view as to the weight that should be afforded to that support and does not

resolve the merits of any objections to the Estate Claims Settlement. The Court need not address in this Opinion what significance, if any, should be afforded to the GECs' changed position in evaluating the Estate Claims Settlement. That issue, along with the merits of the Estate Claims Settlement, is addressed in a separate opinion being filed contemporaneously with this Opinion.

## V. Discussion

### A. The CDESA Satisfies the *Martin* Factors

#### 1. Probability of Success in the Litigation

The first *Martin* factor requires the Court to consider the probability of success in the litigation being compromised. *Martin*, 91 F.3d at 393. Here, the CDESA compromises two distinct categories of disputed environmental claims: (1) claims against the Debtors arising from their environmental liabilities, and (2) potential direct claims against the non-debtor Contributing Parties. Both present meaningful litigation risk.

With respect to the claims against the Debtors, the $57 million Stipulated Allowed Claim is near the upper end of Mr. McKnight's estimated range of Soco West's environmental liabilities, which he calculated at approximately $38.86 million to $57.10 million. *See McKnight Decl.* ¶ 6 & tbl. 1. The Government Environmental Creditors dispute these estimates and contended that the Debtors' environmental liabilities could be materially greater. *See Environmental Settlement Motion* ¶ 30. EPA's expert, for example, testified that Mr. McKnight had underestimated the costs associated with the Lockwood Solvent Site "by many multiples." *See id.*, *See March 5, 2025 (p.m.) 9019 Hr'g Tr.* at 146:23–24. The parties also risk potential litigation over whether certain environmental obligations were entitled to administrative-expense priority. *See id.* at ¶ 40. Thus, absent settlement, the Debtors face uncertainty not only as to the amount of the environmental claims, but also as to the priority that might attach to some portion of those claims.

Against that record, compromise of the claims against Soco West for $57 million falls well within a reasonable range. The stipulated amount is near the high end of the Debtors' own expert

estimate, but it eliminates the risk that continued litigation could result in greater liability and resolves disputes concerning the amount of the GECs' claims without further site-by-site litigation. *See McKnight Decl.* ¶ 6 & tbl. 1, *Environmental Settlement Motion* ¶¶ 29–31. The CDESA also provides for the waiver of potential administrative claims asserted by the GECs. *See CDESA* ¶ 9. As the Debtors point out, the TCC does not ask the Court to reject the $57 million Stipulated Allowed Claim and instead directs its objection principally to the separate NICO Payment. *See Debtors' Reply* ¶ 12, *TCC Obj.* ¶ 33. The Court independently concludes that the litigation risk associated with the claims against the Debtors supports their compromise.

The potential direct claims against the Contributing Parties present different liability questions. Under *United States v. Bestfoods*, a parent corporation may be directly liable as an operator under CERCLA if it "manage[s], direct[s], or conduct[s] operations specifically related to pollution," including operations concerning the disposal of hazardous waste or decisions about compliance with environmental regulations. *Bestfoods*, 524 U.S. 51, 66–67 (1998). The inquiry focuses on the relationship between the alleged operator and the facility's pollution-related operations. *See PPG Indus., Inc. v. United States*, 957 F.3d 395, 402 (3d Cir. 2020). Conduct involving environmental compliance, including the hiring of consultants to conduct testing and remediation and the oversight of that work, may be relevant to that inquiry. *See Litgo N.J., Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369, 381–82 (3d Cir. 2013) (finding liability where the current operator had "actual authority to make decisions about compliance with environmental regulations . . . [and] hired environmental consultants to conduct tests and remediation operations" and explaining that "the Supreme Court's decision in *Bestfoods* does not create an exception for 'innocent' operators"); *see also Bestfoods*, 524 U.S. at 66-67 (defining an "operator" under CERCLA to include an entity that makes "decisions about compliance with environmental regulations"). At the same time, *Bestfoods* makes clear that ordinary parental oversight and the activities of officers acting in their capacities for a subsidiary do not, without more, establish direct

liability. *See Bestfoods*, 524 U.S. at 69–72. Where an individual serves both the parent and subsidiary, courts ordinarily presume that conduct consistent with ordinary corporate practice was undertaken on behalf of the subsidiary. *See id.* at 69–70 & n.13. The TCC is therefore correct that potential operator liability would require a fact-intensive, site-specific inquiry. That uncertainty, however, does not require the Court to treat the potential direct claims as valueless. Rule 9019 does not require a party to establish liability before compromising a disputed claim. *See Alecto*, 184 F.4th at 170, *NovaPro*, 815 F. App'x at 658. The relevant question is whether the claims present genuine litigation risk warranting compromise.

The record demonstrates that potential direct claims against the Contributing Parties had been identified before the March 2025 negotiations that produced the environmental settlement. *See Debtors' Reply* ¶¶ 9–10, *Berkshire Resp*. at 4–6. In September 2024, EPA sought modifications to the proposed order concerning what it described as the "owner/operator issue." *See Debtors' Reply* ¶ 9. The following month, EPA requested clarification that "direct liability is not impacted" by the Estate Claims Settlement. *See id.* In its January 2025 objection, EPA again sought language expressly preserving direct claims against the Contributing Parties. *See id.* at ¶ 10. This chronology demonstrates that potential direct-liability theories were being asserted and preserved well before the parties reached the agreement in principle that ultimately became the CDESA. EPA reiterated that point at the September 2, 2026 hearing, emphasizing that the parties' discussions concerning potential *Bestfoods* liability dated back to 2024. *See Tr. of Sept. 2, 2026 Hrg.* at 50:16–19. The record also reflects a genuine disagreement concerning the strength of those claims. NICO maintains that the claims are weak and that NICO would expect to prevail if required to defend them. *See Berkshire Resp.* at 11. The governmental parties, by contrast, identify specific evidence they contend supports direct operator liability. *See United States Resp.* at 7–8, *DTSC Joinder* at 3–7. Such evidence is not merely abstract. With respect to Lockwood, the United States identifies communications concerning remediation, cost estimates, and the scope and progress of

environmental work that were sent to or from Mr. Mehta, using NICO or Berkshire email addresses. *See United States Resp.* at 7–8; *Email from J. Sullivan to J. Black and C. Sterrett*, Oct. 6, 2023, USX-9; *Emails from R. Hoogerheide to R. Mehta,* April & May 2021, USX-19 (addressing groundwater issues at the Lockwood site); *Email from R. Mehta to T. Terp*, Aug. 16, 2011, USX-8; *Email from R. Mehta to C. O'Sullivan*, Mar. 1, 2010, USX-3; *Email from R. Mehta to C. O'Sullivan*, Dec. 10, 2009, USX-2; *Emails from J. Sullivan to R. Mehta*, Oct. 10, 2011, Nov. 10, 2011, Dec. 8, 2011, USX-5; *Emails from J. Sullivan to R. Mehta*, March 7, 2012, USX-17. With respect to the Service Chemical Site, DTSC points to evidence that Mr. Mehta made environmental-management decisions, hired and directed environmental consultants, and directed contractors to cease remediation activities required by a DTSC order. *See DTSC Joinder* at 4–6; *Tr. of March 3, 2025 Hrg. (Mehta Re-Cross)* 114:12-17, DTSC Ex. B ("Q. In your role as president of Soco -- of the Soco West, you supervised environmental actions at certain properties in California; is that correct? A. Yes."). The California Water Boards likewise identify a regulatory history at the La Mirada Site involving numerous communications with Mr. Mehta in his various corporate roles. *See Water Boards Joinder* ¶¶ 7–8. DTSC contends that these facts support potential operator liability attributable to NICO; the TCC disputes that conclusion. *See DTSC Joinder* at 5–7; *TCC Obj.* ¶¶ 34–45.

The TCC also relies on testimony from EPA's Rule 30(b)(6) witness, Carolina Balliew, who was unable to answer various questions concerning the investigation or assessment of potential *Bestfoods* liability. *See TCC Obj.* ¶¶ 42–45. That testimony bears on the strength of EPA's asserted claims, but it does not resolve whether potential direct claims asserted by the several governmental parties lack a factual basis. The separate submissions described above identify evidence and legal theories that would require further factual development if such claims were litigated.

The Court does not determine that NICO, Berkshire, Brenntag, DBUS, or any other non-debtor is liable under *Bestfoods*. Nor is such a determination necessary to approve a compromise under Rule 9019. The narrower conclusion is that the asserted direct claims are sufficiently grounded in identified legal theories and factual circumstances to present litigation risk. Resolving these claims would require further factual development and site-specific litigation, and the possibility that the Contributing Parties ultimately could prevail, affects the value of the claims. It does not require the Court to assign them zero settlement value.

The TCC also emphasizes that the record contains no formal valuation model translating the asserted *Bestfoods* claims into the $16.5 million NICO Payment. *See TCC Obj.* ¶¶ 46–47. But the absence of such a model does not establish that the claims lack settlement value. The negotiation history reflects substantial disagreement over that value. NICO initially countered at $2.5 million and, by the beginning of the Estate Claims Settlement hearing, had offered $4 million (*see* TX-888) in exchange for a release of the direct claims, while the GECs demanded $29 million (*see* TX-889). The parties ultimately agreed to the $16.5 million NICO Payment, the midpoint between the latter two figures, as part of a broader settlement that includes covenants concerning the asserted direct claims. *See Berkshire Resp.* at 13.

The first *Martin* factor therefore supports approval. The claims against the Debtors present material uncertainty concerning both amount and potential priority, while the asserted direct claims against the Contributing Parties present substantial factual and legal disputes concerning operator liability. The CDESA resolves those uncertainties without requiring the parties to litigate them to judgment. On this record, the compromises fall comfortably within the range of reasonableness required by Rule 9019. *See Alecto*, 184 F.4th at 170.

**2. Likely Difficulties in Collection**

The second *Martin* factor is neutral. With respect to the environmental claims against the Debtors, the Debtors are defending against asserted claims rather than seeking an affirmative

recovery, so the usual concern regarding the ability to collect on a judgment is not implicated. *See In re Mallinckrodt PLC*, 639 B.R. 837, 864 (Bankr. D. Del. 2022) (treating the second Martin factor as neutral where the debtors were defending claims rather than asserting them); *see also Environmental Settlement Motion* ¶ 32. As to the potential direct claims against the Contributing Parties, the record identifies no material collection risk. NICO has agreed to fund the $16.5 million payment required by the CDESA, and no party contends that an inability to collect from NICO or the other Contributing Parties materially affected the settlement. *See CDESA* ¶ 6. Accordingly, the likelihood of collection neither favors nor weighs against approval of the CDESA.

**3. Complexity, Expense, Inconvenience, and Delay**

The third *Martin* factor strongly favors approval. Absent the CDESA, the parties would face continued litigation concerning environmental liabilities across multiple sites and involving multiple governmental entities. *See Environmental Settlement Motion* ¶¶ 34–36. The disputes concerning the Debtors alone involve competing estimates of remediation costs, potential administrative-expense claims, and site-specific issues that would require further claims-reconciliation proceedings. *See id.* at ¶¶ 34–36, 40–41. The asserted direct claims against the Contributing Parties add another layer of complexity because potential CERCLA operator liability requires a fact-intensive inquiry into the conduct associated with particular facilities. *See Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1222 (3d Cir. 1993).

The history of the parties' environmental disputes demonstrates the attendant expense and delay. The Government Environmental Creditors have already challenged the Debtors' environmental estimates, presented competing expert testimony, and participated in depositions and extensive briefing concerning these liabilities. *See Environmental Settlement Motion* ¶¶ 17–20, 30, 34. The Debtors contend that continued claims litigation would require another battle of experts and adjudication of the parties' competing positions on a site-by-site basis. *See id.* at ¶ 35. The TCC's own position underscores the factual development that would be required to litigate

the asserted direct claims: it argues that the present record is insufficient to establish *Bestfoods* liability and that liability must be evaluated through site-specific evidence of pollution-related operations. *See TCC Obj*. ¶¶ 34–45.

The CDESA substantially reduces litigation burdens. It fixes the aggregate Stipulated Allowed Claims against Soco West at $57 million and establishes the allocation among the Government Environmental Creditors. *See CDESA* ¶ 8. It eliminates potential litigation over administrative-expense claims through the GECs' waiver of those claims. *See id.* at ¶ 9. It provides for the establishment of the Lockwood Environmental Response Trust and transfer of the Lockwood property to that trust. *See id.* at ¶ 15. And it resolves specified potential direct claims between the GECs and the Contributing Parties through reciprocal covenants, subject to the CDESA's stated reservations and exclusions. *See id.* at ¶¶ 32–39.

The benefits of avoiding continued litigation are not limited to reduced legal expense. The settlement permits environmental funding to be deployed substantially sooner than would likely occur if the parties were required to litigate the underlying claims to judgment. At the September 2, 2026, hearing, counsel for the United States emphasized that the settlement would provide "much needed funds for environmental remediation" so that cleanup could be addressed "as soon as possible," would avert the potential abandonment of the contaminated Lockwood property, and would avoid the additional time and expense of litigating the environmental claims. *Tr. of Sept. 2, 2026 Hrg.* at 22:21–23:5. The United States similarly explains that $7.92 million, or 48% of the NICO Payment, will be used to fund cleanup at the Lockwood Site and that the CDESA establishes the Lockwood Environmental Response Trust to avoid potential abandonment of the property and ensure performance of required remediation. *See United States Resp.* at 4–5.

DTSC identifies the same practical benefit at the Service Chemical Site in Santa Ana. It concludes that settlement offered the "fastest way to acquire funding for the Site and resume needed response actions," whereas continued litigation would be "drawn-out and uncertain." *See*

*DTSC Joinder* at 8. Thus, continued litigation would impose not only additional costs, but also delay remediation at sites where the governmental parties contend prompt action is necessary.

The California Water Boards identify similar ongoing remediation needs at the La Mirada Site. The Los Angeles Water Board oversees the investigation and remediation of contamination, including chlorinated solvents detected in soil, soil gas, and groundwater. *See Water Boards Joinder* ¶¶ 7–8. The Water Boards submit that their allocation of the NICO Payment is intended for environmental cleanup costs and that the combined settlement consideration attributable to La Mirada remains below their estimated environmental liability at that site. *See id.* at ¶¶ 9–11.

Taken together, the terms of the CDESA avoids or materially narrows litigation that otherwise would involve multiple parties, sites, experts, and distinct factual records, while allowing remediation funding to be deployed without awaiting the conclusion of potentially years of additional litigation. Accordingly, the complexity, expense, inconvenience, and delay associated with continued litigation strongly favor approval of the CDESA.

**4. The Paramount Interest of Creditors**

The fourth *Martin* factor—the paramount interest of creditors—is the principal focus of the TCC's objection. In applying this factor, the Court must consider the fairness of the settlement to creditors who did not participate in it. *See In re Nutritional Sourcing Corp.*, 398 B.R. 816, 837 (Bankr. D. Del. 2008). Creditor opposition is relevant, but it is not dispositive; the Court must determine whether the settlement serves the paramount interest of creditors. *In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020); *see* also *In re Summit Metals, Inc.*, 477 F. App'x 18, 22 (3d Cir. 2012).

The CDESA provides several benefits to the Debtors' estates and their creditors. The Government Environmental Creditors waive potential administrative claims against the Debtors, thereby eliminating both the risk that such claims could receive priority over general unsecured claims and the cost of litigating their validity and amount. *See CDESA* ¶ 9; *Environmental*

*Settlement Motion* ¶¶ 40–41. The settlement fixes the aggregate Stipulated Allowed Claims against Soco West at $57 million and avoids further litigation concerning the amount of such environmental claims. *See CDESA* ¶ 8; *Environmental Settlement Motion* ¶¶ 29–31. It also provides a mechanism for transferring the Debtors' Lockwood property to an environmental response trust, thereby addressing the Debtors' only owned real property. *See CDESA* ¶ 15, *Debtors' Reply* ¶ 13. That mechanism not only addresses the contaminated property but also provides funding for remediation and reduces the risk that the property will be abandoned without a means to continue necessary cleanup. *See Tr. of Sept. 2, 2026 Hrg.* at 22:21–23:5. These provisions reduce potential administrative expense and litigation exposure that otherwise would be borne by the estates.

The TCC principally contends that the $16.5 million NICO Payment unfairly benefits the GECs while other unsecured creditors receive no comparable payment. *See TCC Obj.* ¶¶ 62–66. But the NICO Payment is funded by NICO, not by the Debtors or their assets. *See CDESA* ¶ 6; *Debtors' Reply* ¶ 16. The payment is consideration for the compromise of potential direct environmental claims asserted against the Contributing Parties—claims distinct from the GECs' claims against the Debtors. The TCC does not identify comparable direct environmental claims held by talc claimants against the Contributing Parties. *See TCC Obj.* ¶¶ 57–66. Thus, the payment itself does not represent estate property being diverted from one group of unsecured creditors to another.

The TCC also argues that the CDESA prejudices talc claimants because the GECs will withdraw their objections to, and support, the separate Estate Claims Settlement. *See TCC Obj.* ¶ 63. That agreement does not, however, extinguish or limit the TCC's own objections to the Estate Claims Settlement. The TCC remains free to press those objections, and the Court remains obligated to decide that separate motion under the applicable legal standard. As explained above,

this Opinion expresses no view concerning what weight, if any, should be afforded to the GECs' changed position in connection with that motion.

The Court has also considered the TCC's contention that it represents the vast majority of the creditor body and did not participate in negotiating the CDESA. *See TCC Obj.* ¶ 62. The size of the objecting constituency is relevant to the fourth *Martin* factor, but it does not itself determine whether a settlement serves the paramount interest of creditors. *See In re NovaPro Holdings, LLC*, 2018 WL 2102323, at *9 (Bankr. D. Del. May 4, 2018), aff'd, 815 F. App'x 655 (3d Cir. 2020) (approving settlement over objections by 99% of the creditors). *See also, e.g. In re Capmark Fin. Grp. Inc.*, 438 B.R. 471 (Bankr. D. Del. 2010) (explaining there is no *per se* rule that views of committee or other creditors are dispositive on reasonableness of proposed settlement, and debtor may seek approval of settlement over major creditor objections as long as it carries its burden of establishing that balance of pertinent factors, including paramount interests of creditors, weighs in favor of settlement); *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 494 (Bankr. S.D.N.Y. 2024) (collecting cases establishing that a settlement may be approved over the opposition of large claimholders where the settlement is in the best interests of the estate as a whole). Here, the CDESA does not require the estates to fund the $16.5 million NICO Payment, while the estates receive the benefit of the GECs' waiver of potential administrative claims, resolution of disputed environmental claims, and reduced litigation and administrative expense. On this record, these benefits support the conclusion that the settlement is fair to non-participating creditors.

The fourth *Martin* factor therefore favors approval. The TCC has identified reasons why it would prefer the GECs to maintain their opposition to the Estate Claims Settlement, but that preference does not negate the estate benefits provided by the CDESA or establish that approval of the Environmental Settlement is contrary to the paramount interest of creditors. The question under Rule 9019 is whether the CDESA itself falls within the range of reasonableness and serves the interests of the creditor body. For the reasons discussed above, the Court concludes that it does.

### B. The TCC's "Purchased Support" Theory Does Not Require Denial of the CDESA

#### 1. The *Bestfoods* Claims Need Not Be Proven Before They Are Settled

The Court has already addressed the viability of the *Bestfoods* claims and the risks of litigation, *see* Section V(A)(1), *supra*, and will not repeat them here. The Court reiterates and emphasizes, however, that it is not necessary for the GECs to prove *Bestfoods* liability prior to settling these claims. Rather, it is enough to demonstrate that such claims against the Contributing Parties could be asserted and, thus, have value that is appropriately resolved in the Environmental Settlement. As previously explained, the GECs have sufficiently demonstrated that such claims are plausible and carry genuine litigation risk—going so far as to identify specific evidence and legal theories supporting the *Bestfoods* claims. The TCC's disagreement with the merits or value of the claims does not, standing alone, establish that the NICO payment constitutes sham consideration or warrant denial of the CDESA.

#### 2. The Negotiation Record Does Not Establish That the NICO Payment Was Solely for Support of the Estate Claims Settlement

The TCC next argues that the manner in which the $16.5 million NICO Payment was negotiated demonstrates that the payment was consideration for the GECs' support of the Estate Claims Settlement, rather than for the compromise of asserted direct claims. *See TCC Obj*. ¶¶ 46–47. It relies principally on references during the negotiations to anticipated plan recoveries and a "top-up" or incremental payment, the movement from NICO's lower initial proposals to the ultimate $16.5 million amount, and the absence of a valuation assigning a specific dollar amount to the asserted *Bestfoods* claims. *See id.* at ¶¶ 46–47.

The negotiation history does establish that NICO sought more than a release of direct claims. NICO no doubt also wanted the GECs to support the Estate Claims Settlement and a future plan. But the record does not support the further conclusion that the direct-claim component was merely a later-created justification for the payment. [redacted]

[redacted] In response, the Berkshire Entities rejected the GECs' requested guarantee of full payment and proposed that NICO make a $2.5 million incremental cash payment in exchange for a release of the GECs' direct claims against the Contributing Parties. *See Ex. B to Oliver Decl. (email chain re: FRE 408 Settlement Communication)*, ECF No. 2899-3; USX-1. Thus, a monetary payment by NICO in exchange for a release of direct claims was part of the negotiations before the parties agreed on the $16.5 million amount.

The January 20, 2025, settlement framework likewise contemplated a broader exchange. The framework identified an additional Berkshire contribution in exchange for three components: a governmental release of direct claims, GEC support for the Estate Claims Settlement, and GEC support for the Debtors' plan. *See Berkshire Resp.* at 7–8. [redacted] The Court therefore does not accept the premise that the negotiation record reflects consideration for support alone. It reflects negotiations toward a global resolution containing several elements of consideration.

The manner in which the parties negotiated the amount does not compel a different conclusion. The record shows that, by the beginning of the Estate Claims Settlement hearing, NICO had offered $4 million in exchange for a release of the direct claims, while the GECs sought $29 million. *See Berkshire Resp.* at 12–13. The parties ultimately agreed to the $16.5 million NICO Payment, the midpoint between these figures, as part of the broader settlement. *See id.* at 13. The TCC emphasizes that the negotiations used anticipated bankruptcy recoveries and environmental-claim amounts as reference points, rather than a site-by-site valuation of potential *Bestfoods*

liability. *See TCC Obj.* ¶¶ 46–47. Again, that circumstance is relevant to the Court's assessment of the settlement, but it does not establish that the asserted direct claims played no role in the bargain. The February 27 proposal, for example, expressly contemplated a $4 million payment "in return for the release of direct claims," while also requiring support for the Estate Claims Settlement and plan confirmation. *See Berkshire Resp.* at 12.

Rule 9019 does not require the parties to demonstrate that each component of a global settlement was assigned a separately calculated dollar value. The Court must determine whether the compromise as a whole falls within the range of reasonableness. *See Alecto*, 184 F.4th at 170. Here, the parties disagree both over the strength of the asserted direct claims and over the consideration necessary to resolve them. *See Berkshire Resp.* at 12. NICO regarded the claims as weak, while the GECs regarded them as substantial. *See id.* That disagreement is consistent with compromise.

The Court therefore agrees with the TCC to this extent: obtaining the GECs' support for the Estate Claims Settlement certainly was an important objective of NICO's negotiations. The record does not, however, establish that it is the only consideration for the NICO Payment or that the compromise of the asserted direct claims is a sham. The relevant documents and testimony show that the parties negotiated a global resolution that included both support obligations and covenants resolving potential direct claims. The presence of the former does not, on this record, negate the latter.

**3. The Timing of the Agreement Does Not Render It Improper**

The TCC further relies on the urgency of the negotiations surrounding the March 2025 hearing. It points to communications reflecting NICO's desire to reach an agreement before closing arguments and to statements that the value of the proposed resolution included the ability to advise the Court that the Government Environmental Creditors supported the Estate Claims Settlement. *See TCC Obj.* ¶¶ 48–50. The record leaves little doubt that timing mattered and that

obtaining the GECs' support before the hearing concluded was important to NICO. *See id.*; *Berkshire Resp.* at 16–17.

That circumstance, however, does not establish that the compromise of the asserted direct claims was pretextual. As discussed, the contemplated settlement is broader than the GECs' support for the Estate Claims Settlement. The parties had been discussing preservation and resolution of potential direct claims before the March 2025 hearing, and an incremental NICO payment in exchange for a release of these claims appeared in the negotiations before the parties reached the ultimate $16.5 million figure. *See, e.g., Jan. 20, 2025 Email re: FRE 408 Settlement*, DX-282; *Feb. 27, 2025 Email re: FRE 408 Settlement, TX*-888; *Feb. 28, 2025 Email re: FRE 408 Settlement,* TX-889; *Debtors' Reply* ¶¶ 9–10; *Berkshire Resp.* at 6–8. Because resolution of the GECs' pending objections to the Estate Claims Settlement was also one component of the contemplated global resolution, the parties had an obvious reason to seek agreement before that hearing concluded. The resulting urgency demonstrates the importance of the support component. It does not, without more, demonstrate that the direct-claim component lacks independent substance.

The circumstances surrounding the Debtors' March 6, 2025, board meeting do not alter the Court's conclusion. The action taken at that meeting was limited. Mr. Pohl states that, before the meeting, he reviewed and evaluated an illustrative term sheet reflecting the proposed settlement. *See Pohl Decl.* ¶ 8. At the meeting, Messrs. Pohl and Aronzon determined that the proposed settlement constituted a conflict matter and excluded Mr. Mehta from the process. *See id.* at ¶ 9. They then authorized the Debtors to pursue a settlement on terms substantially similar to those reflected in the illustrative term sheet. *See id.* at ¶ 10.

The settlement process continued for nearly nine months after the March 6 meeting. *See id.* at ¶ 12. During that period, the Debtors—through counsel—continued negotiating the terms of the Environmental Settlement and its long-form documentation. *See id.* On December 5, 2025,

Messrs. Pohl and Aronzon participated in a second disinterested-directors-only meeting at which they considered the Environmental Settlement and the completed CDESA. *See id.* at ¶ 13. Mr. Pohl states that he reviewed and evaluated the CDESA before that meeting, after which the disinterested directors authorized the Debtors to enter into the agreement and perform their obligations under it. *See id.* at ¶¶ 13–14.

The Court therefore does not view either the urgency surrounding the March hearing or the circumstances of the March 6 board meeting as evidence that the final CDESA was adopted without meaningful consideration. The March meeting authorized continued pursuit of a settlement framework; the final agreement followed months of additional negotiation and a separate review and authorization by the disinterested directors. The timing confirms that resolution of the GECs' opposition to the Estate Claims Settlement was an important objective of the negotiations, but it does not establish that the asserted direct claims or the consideration exchanged for their compromise were fictitious.

**4. The Payment Architecture, as Modified by NICO's Waiver, Does Not Support Denial**

The TCC also relies on the CDESA's two-tranche payment structure. Under the TCC's interpretation, if the CDESA became effective, but the Estate Claims Settlement was not approved, the GECs could receive the first $8.25 million payment while the covenants concerning the asserted direct claims would not take effect because the second $8.25 million payment had not been made. *See TCC Obj.* ¶¶ 51–52. The Berkshire Entities dispute that interpretation of the CDESA. *See Berkshire Resp.* at 15–16. The Court need not resolve that interpretive dispute, however, because NICO has waived the condition to its second $8.25 million payment requiring approval of the Estate Claims Settlement. *See id*. The consequence of that waiver is significant. The Berkshire Entities represent that, even if the Estate Claims Settlement is not approved, following approval of the CDESA and satisfaction of its remaining conditions, the GECs will

receive the full $16.5 million NICO Payment and the covenants not to sue concerning the asserted direct claims will take effect. *See id.*

The United States also offers an explanation for the two-part payment structure independent of the TCC's purchased-support theory. It states that its principal concern in the negotiations is obtaining funds that could be deployed promptly to restart remediation at the Lockwood Site, where work ceased during the bankruptcy. *See United States Resp.* at 8–9. According to the United States, it—not NICO—requested the two-part payment provisions so that funding could become available for the Lockwood Environmental Response Trust and remediation work before all components of the broader settlement had been completed. *See id.* That explanation does not eliminate the relationship between the payment structure and the Estate Claims Settlement, but it demonstrates that the timing of the payments also serves an environmental-remediation purpose.

The Court does not conclude that the CDESA is unrelated to the Estate Claims Settlement. It plainly is not. The parties negotiated a broader resolution that included both the compromise of asserted environmental claims and obligations concerning the separate settlement. But the existence of that relationship does not establish that the direct-claim component lacks substance. Most importantly for the TCC's structural argument, NICO's waiver ensures that the full $16.5 million payment will not depend on approval of the Estate Claims Settlement and that, upon satisfaction of the remaining CDESA conditions, the corresponding direct-claim covenants will become effective. The original two-tranche structure therefore does not provide a basis to deny approval of the CDESA.

**5. The Government Environmental Creditors Could Settle Their Objections Without a Change to the Estate Claims Settlement Itself**

The TCC further emphasizes that the terms of the Estate Claims Settlement did not change when the Government Environmental Creditors agreed to withdraw their objections and provide

support. *See TCC Obj.* ¶ 67. That observation is accurate, but it does not establish that the CDESA is inequitable. The CDESA does not purport to amend the Estate Claims Settlement. Rather, it creates a separate set of rights and obligations among the Debtors, the Government Environmental Creditors, and the Contributing Parties.

These additional rights and obligations are substantial. The CDESA provides for $57 million in aggregate Stipulated Allowed Claims against Soco West. *See CDESA* ¶ 8. The Government Environmental Creditors waive potential administrative and priority claims against the Debtors. *See id.* at ¶ 9. The agreement establishes a framework for transferring the Lockwood property to an environmental response trust. *See id.* at ¶ 15. It also provides for the $16.5 million NICO Payment and reciprocal covenants concerning specified potential direct claims. *See id.* at ¶¶ 6, 32–39. It also establishes consultation and support obligations concerning a future plan and the Estate Claims Settlement. *See id.* at ¶¶ 51–54. Thus, although the terms of the Estate Claims Settlement itself remained unchanged, the broader legal and economic arrangement applicable to the Government Environmental Creditors did not. That distinction matters here. The fact that the GECs agreed to alter their litigation position as part of a broader compromise does not establish that the other consideration provided under the CDESA is pretextual or that the CDESA itself fails Rule 9019. Whether the GECs' resulting support should be afforded persuasive weight in deciding the Estate Claims Settlement is a separate question that, as explained, the Court does not decide in this Opinion.

Montana's participation further demonstrates why the CDESA cannot be characterized simply as consideration paid to induce every Government Environmental Creditor to reverse its position on the Estate Claims Settlement. Montana emphasizes that it did not object to the Estate Claims Settlement. *See Montana Joinder* at 2–3. Nevertheless, Montana is a party to the CDESA, which resolves its natural-resource-damage and response-cost claim. *See id.* Montana therefore had no objection to withdraw and no preexisting opposition to reverse. *See id.* Its participation

does not resolve the TCC's broader argument concerning the other GECs, but it does undermine any characterization of the CDESA as serving only to convert environmental creditors from opponents of the Estate Claims Settlement into supporters.

### C. The CDESA Does Not Produce an Impermissible Double Recovery or Discriminate Among Estate Creditors

The TCC also posits that the CDESA permits the Government Environmental Creditors to recover twice for the same environmental liabilities. It reasons that the $57 million Stipulated Allowed Claims and the $16.5 million NICO Payment relate to the same underlying contamination and therefore permit an aggregate $73.5 million recovery on claims fixed at $57 million. *See TCC Obj*. ¶¶ 57–60. The argument, however, treats the face amount of the Stipulated Allowed Claims as though it were a guaranteed cash recovery and does not account for the distinct liabilities being compromised.

The $57 million represents the aggregate amount of the Government Environmental Creditors' Stipulated Allowed Claims against Soco West. *See CDESA* ¶ 8. It does not establish that the GECs will receive $57 million in distributions. Any recovery on those claims will depend on the terms of a confirmed plan and the distributions available thereunder. As the United States observes, the amount the GECs ultimately will collect on the Stipulated Allowed Claims is presently unknown. *See United States Resp.* at 12 & n.5. The $16.5 million NICO Payment, by contrast, is funded by NICO rather than by the Debtors or their assets and forms part of the consideration for covenants concerning potential direct claims against the Contributing Parties. *See CDESA* ¶¶ 6, 32–39. Thus, the NICO Payment does not provide a duplicative recovery, but rather, separate consideration for resolving potential direct claims against the Contributing Parties.

Nor does the fact that the asserted claims arise from the same underlying contamination establish impermissible duplication. CERCLA may impose joint and several liability on multiple potentially responsible parties where the harm is indivisible, while section 113(f) provides a

mechanism for allocating response costs among liable parties through contribution. *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614–15 (2009); *United States v. Atl. Research Corp.*, 551 U.S. 128, 138–39 (2007); 42 U.S.C. § 9613(f). And *Bestfoods* distinguishes direct operator liability based on a parent's own conduct from derivative liability based on the conduct of a subsidiary. *See Bestfoods*, 524 U.S. at 64–65. Thus, the possibility that more than one party may bear liability for the same response costs does not, standing alone, render the compromise of one party's potential direct liability duplicative.

The present record also does not demonstrate that the CDESA produces a windfall. The Government Environmental Creditors estimate remediation costs at the covered sites exceeding $110 million. *See United States Resp.* at 9–10. That estimate materially exceeds both the face amount of the Stipulated Allowed Claims and the NICO Payment, even before accounting for the uncertainty surrounding the actual recovery on the Stipulated Allowed Claims. DTSC further explains that its remediation responsibilities at the Service Chemical Site concern onsite contamination, while OCWD focuses on contamination that has reached the regional aquifer, and that the agencies' cost estimates contain only incidental overlap. *See DTSC Joinder* at 2. The California Water Boards similarly state that their $918,225 allocation of the NICO Payment and approximately $3.17 million Stipulated Allowed Claim relating to La Mirada remain below the approximately $8.3 million estimate of environmental liability at that site. *See Water Boards Joinder* at 5. These circumstances do not establish the absence of every possible duplication issue, but they do undermine the contention that the CDESA on its face provides the GECs with a recovery exceeding the environmental liabilities being addressed.

The TCC separately relies on Article VI.L of the filed plan, which addresses circumstances in which a creditor receives payment from a third party on account of the same claim. *See TCC Obj.* ¶¶ 59–60. It argues that Paragraph 8 of the CDESA improperly avoids that provision by treating the NICO Payment as separate from distributions on the Stipulated Allowed Claims. *See*

*id.* at ¶ 60. The Court need not resolve in this Rule 9019 decision how Article VI.L, or any comparable provision included in a confirmed plan, would apply to a particular future distribution. The CDESA itself provides that the NICO Payment is separate from distributions on the Stipulated Allowed Claims and shall not count as payment on account of such claims for purposes of Article VI.L or an equivalent provision of a confirmed plan. *See CDESA* ¶¶ 8, 10. Whether that treatment gives rise to an issue under a subsequently confirmed plan may be addressed in the appropriate context. It does not require denial of the CDESA at this stage.

The TCC's related discrimination argument fares no better. The record does not show that the Debtors are making the $16.5 million payment or diverting assets otherwise available for distribution to creditors. Rather, the payment is funded by NICO as part of the consideration for covenants concerning potential direct environmental claims against the Contributing Parties. *See Debtors' Reply* ¶ 16. The talc claimants are not alleged to hold comparable direct environmental claims against those parties. The fact that the GECs and talc claimants may both hold claims against a Debtor therefore does not require them to receive identical consideration for separate claims asserted directly against non-debtors.

The analysis might be different if the record were to establish that value belonging to the Debtors or their estates was redirected through NICO to provide the GECs with a preferential recovery. That is not the case. Instead, the CDESA fixes the GECs' claims against Soco West, provides independent benefits to the estates, and separately provides for a payment by NICO in exchange for covenants concerning asserted direct claims. The TCC's double-recovery and discrimination theories therefore do not establish that the CDESA falls below the range of reasonableness required by Rule 9019.

### D. Section 1126(e) and *Quigley* Do Not Require Denial of the CDESA

The TCC also invokes section 1126(e) of the Bankruptcy Code and cases addressing the designation of plan votes procured in bad faith. Section 1126(e) permits a court, on request of a

party in interest, to designate an entity whose acceptance or rejection of a plan was not in good faith or was not solicited or procured in good faith. 11 U.S.C. § 1126(e). The TCC relies principally on *In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010), where the court designated votes resulting from prepetition settlements between a non-debtor and asbestos claimants after concluding that the votes had been procured to obtain the benefit of a channeling injunction. *See TCC Obj*. ¶¶ 68–71.

Section 1126(e) does not directly govern the Motion presently before the Court. The Court is not determining whether to designate an acceptance or rejection of a chapter 11 plan, and the GECs' support for the Estate Claims Settlement is not a plan vote. The TCC acknowledges as much, stating that it "does not contend that section 1126(e) applies directly to the CDESA," which is presented for approval under Rule 9019. *See id.* at ¶ 73. Section 1126(e) therefore does not, itself, provide a basis to deny approval of the Environmental Settlement Motion.

*Quigley* arose in a materially different procedural setting. There, the issue was whether votes cast in favor of a chapter 11 plan should be designated under section 1126(e). *See Quigley*, 437 B.R. at 129–32. The challenged settlements were prepetition agreements between Pfizer and asbestos claimants, and the debtor was not a party to those settlements. *See id.* at 117–19, 127; *Debtors' Reply* at 14–15. Here, by contrast, the CDESA is itself before the Court for approval, the Debtors are parties to it, and the agreement resolves environmental claims involving the Debtors as well as asserted direct claims against the Contributing Parties. The Debtors' participation was authorized through their disinterested directors. *See Pohl Decl.* ¶¶ 8–14. These distinctions do not render the TCC's concerns irrelevant, but they prevent *Quigley* from supplying a categorical rule that requires denial of the CDESA.

The same is true of the TCC's reliance on section 105(a). The TCC invokes that provision and the Court's equitable authority as a basis to disregard what it characterizes as purchased support. *See TCC Obj.* ¶¶ 73–74. Whatever relevance those equitable principles may have to the

Court's consideration of the surrounding circumstances, they do not displace the standard governing approval of the settlement presently before the Court. The CDESA must be evaluated under Rule 9019 and the *Martin* factors. The Court concludes under that standard that the settlement falls within the range of reasonableness. Section 105(a) therefore does not provide an independent basis to deny approval.

The TCC's narrower request presents a different question. It asks the Court, even if the CDESA is approved, to evaluate the Estate Claims Settlement as though the GECs' objections remained pending and to afford no weight to their subsequent support. *See TCC Obj.* ¶ 75. As explained, that issue is not necessary to the disposition of the Environmental Settlement Motion and is not resolved here. The United States and the California Water Boards likewise take no position concerning what weight, if any, should be afforded to their support for the Estate Claims Settlement. *See United States Resp.* at 12; *Water Boards Joinder* ¶ 12. Accordingly, approval of the CDESA should not be understood as a determination that the GECs' support for the Estate Claims Settlement is entitled to persuasive weight. Nor should it be understood as a determination that such support must be disregarded. The Court reserves that question for its consideration of the Estate Claims Settlement and will evaluate that separate motion on the record and arguments applicable to it.

**E. Limited Modification of the Automatic Stay**

The Debtors also request a limited modification of the automatic stay to the extent necessary to implement and effectuate the CDESA. *See Environmental Settlement Motion* ¶ 44. The request is directed principally to the settlement's treatment under section 113(f) of CERCLA, which affords contribution protection to a person that resolves its liability to the United States or

a state in an administrative or judicially approved settlement. *See* 42 U.S.C. § 9613(f)(2); CDESA ¶ 40.

The Debtors contend that approval of the CDESA under Rule 9019 itself constitutes the requisite judicial approval for purposes of section 113(f). *See Environmental Settlement Motion* ¶ 45. They nevertheless seek limited stay relief in the event that approval from another judicial or administrative body is later determined to be necessary to effectuate the CDESA. *See id.* No party has identified any prejudice resulting from that limited relief. Because the Court approves the CDESA and the requested modification is limited to actions reasonably necessary to implement, effectuate, or enforce the approved settlement and the rights arising thereunder, cause exists to modify the automatic stay for that limited purpose. The accompanying order shall so provide.

**F. Omega Chemical PRP Group's Reservation of Rights**

The Omega Chemical PRP Group does not object to the relief requested in the Environmental Settlement Motion, but reserves its rights concerning Proof of Claim No. 125 against Soco West. *See Omega Group Resp.* ¶¶ 1–2. Specifically, the Omega Group reserves all rights, arguments, and defenses concerning the Proof of Claim and its underlying basis, including its allowance, treatment, priority, amount, enforceability, and any distribution on account of the claim. *See id.* at ¶ 2. It also reserves its rights concerning the effect, if any, of the Environmental Settlement Motion, the CDESA, or any order approving the settlement on that Proof of Claim. *See id.*

Nothing in the Court’s approval of the CDESA adjudicates the Omega Group’s Proof of Claim beyond the matters expressly resolved by the CDESA and the accompanying order. To the extent any issue concerning Proof of Claim No. 125 remains unresolved by the approved settlement, the Omega Group’s rights with respect to that issue are preserved for determination in the appropriate claims process.

## VI. Conclusion

Rule 9019 does not require the Court to determine that the CDESA is the best possible compromise. *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004). The Court's task is to exercise its independent judgment and determine whether the compromise is fair and equitable and falls within the range of reasonableness after consideration of the *Martin* factors. On the record before the Court, the CDESA satisfies that standard.

The $57 million in Stipulated Allowed Claims resolves disputed environmental liabilities at an amount near the upper end of the range estimated by the Debtors' expert. The Government Environmental Creditors waive potential administrative and priority claims, thereby eliminating related litigation risk and expense. The CDESA also provides immediate funding to permit remediation efforts to proceed, establishes a trust to administer and fund environmental obligations, and reduces the risk that contaminated properties will be abandoned or left without a mechanism for continued remediation. It further establishes a mechanism for addressing the Lockwood property and substantially reduces the need for further litigation concerning environmental liabilities. Separately, the $16.5 million NICO Payment is funded by NICO rather than by the Debtors or their assets and forms part of the consideration for covenants concerning asserted direct environmental claims against the Contributing Parties.

The TCC's objections do not require a different result. Its arguments concerning *Bestfoods* identify substantial factual and legal issues that would bear on the ultimate merits of the asserted direct claims, but Rule 9019 does not require those claims to be proven before they may be compromised. Instead, for purposes of this Motion, the record sufficiently demonstrates that the asserted claims present meaningful litigation risk and therefore may appropriately be compromised for value. The negotiation history and timing demonstrate that obtaining the GECs' support for the Estate Claims Settlement was an important component of the broader bargain, but they do not establish that the direct-claim component was pretextual or that the CDESA was negotiated in bad

faith. The concern raised by the original two-tranche payment structure is addressed by NICO's waiver of the condition to its second $8.25 million payment that depended on approval of the Estate Claims Settlement. The TCC's double-recovery and discrimination arguments likewise do not establish that the CDESA improperly diverts estate value or provides an impermissible duplicate recovery. Finally, neither section 1126(e) nor *Quigley* supplies a basis to deny approval of the CDESA under Rule 9019, and—for reasons discussed—the Court declines to invoke its equitable powers under section 105(a).

Accordingly, the Environmental Settlement Motion (Dkt. No. 2626) is GRANTED, and the TCC's objection (Dkt. No. 2876) is OVERRULED to the extent it seeks denial of the Environmental Settlement Motion. The order should reflect NICO's waiver of the condition to its second $8.25 million payment, as set forth in the Berkshire Entities' response. The Court expressly reserves the TCC's request concerning what weight, if any, should be afforded to the Government Environmental Creditors' support for the separate Estate Claims Settlement. Nothing in this Opinion resolves, previews, or otherwise expresses a view concerning the merits of that separate motion. Debtors are to settle a separate order consistent with this Opinion.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

DATED: October 22, 2026